ALDEN F. ABBOTT
General Counsel

EVAN M. MENDELSON, DC Bar No. 996765
JONATHAN W. WARE, DC Bar No. 989414
Federal Trade Commission
600 Pennsylvania Avenue NW, CC-9528
Washington, DC  20580
(202) 326-3320; emendelson@ftc.gov (Mendelson)
(202) 326-2726; jware1@ftc.gov (Ware)

Attorneys for Plaintiff Federal Trade Commission

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Federal Trade Commission,<br><br>        Plaintiff,<br><br>        v.<br><br>James D. Noland, Jr., a/k/a Jay Noland and J.D. Noland, individually and as an officer of Success By Media Holdings Inc. and Success By Media LLC;<br><br>Lina Noland, individually and as an officer of Success by Media Holdings Inc. and Success By Media LLC;<br><br>Scott A. Harris, individually and as an officer of Success By Media LLC;<br><br>Thomas G. Sacca, Jr., individually and as an officer of Success By Media LLC;<br><br>Success By Media Holdings Inc., a corporation, also d/b/a Success By Health and Success By Media; and<br><br>Success By Media LLC, a limited liability company, also d/b/a Success By Health and Success By Media,<br><br>        Defendants. | SEALED<br><br>CV-20-00047-PHX-DWL<br>**Case No.** _____<br><br><br>**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF**<br><br>**<u>DOCUMENT SUBMITTED UNDER SEAL</u>** |

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its Complaint alleges:

1.      The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b), 57b; the Mail, Internet, or Telephone Order Merchandise Rule ("Merchandise Rule"), 16 C.F.R. Part 435; and the Rule Concerning Cooling-Off Period for Sales Made at Homes or at Certain Other Locations ("Cooling-Off Rule"), 16 C.F.R. Part 429, to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and in violation of the Merchandise Rule and the Cooling-Off Rule.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 57b.

3.      Venue is proper in this district under 28 U.S.C. § 1391(b)(2-3) and 15 U.S.C. § 53(b).

## PLAINTIFF

4.      The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces the Merchandise Rule, 16 C.F.R. Part 435, which requires mail-, Internet-, or phone-based sellers to have a reasonable basis for advertised

shipping times, and, when sellers cannot meet promised shipping times or ship within 30 days, to obtain the buyer's consent for a delay or provide a refund.  The FTC also enforces the Cooling-Off Rule, 16 C.F.R. Part 429, which requires sellers of certain goods or services at places other than the seller's place of business to notify purchasers of their right to cancel the transaction within three business days.

5.      The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act, the Merchandise Rule, and the Cooling-Off Rule, and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. §§ 53(b), 57b; 16 C.F.R. Part 435; 16 C.F.R. Part 429.

## **DEFENDANTS**

6.      Defendant Success By Media Holdings Inc. ("SBM Holdings"), also doing business as Success By Health ("SBH") and Success By Media, is a Nevada corporation with its principal place of business at 2875 Saint Rose Parkway, Suite 100, Henderson, NV 89052.  SBM Holdings transacts or has transacted business in this District and throughout the United States.  SBH is or was an unincorporated division of SBM Holdings.

7.      Defendant Success By Media LLC ("Success By Media"), also doing business as SBH and Success By Media, is a Nevada limited liability company with its principal place of business at 2875 Saint Rose Parkway, Suite 100, Henderson, NV 89052.  Success By Media transacts or has transacted business in this District and

throughout the United States.  Success By Media is a wholly owned subsidiary of SBM Holdings.   SBH is or was an unincorporated division of Success By Media.

8.       Defendant James D. Noland, Jr. ("Jay Noland"), also known as Jay Noland and J.D. Noland, is an owner, director, chief executive officer, president, and treasurer of SBM Holdings.  He also is a manager and chief executive officer, and previously was an owner, of Success By Media and the founder and chief executive officer of SBH.  At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Success By Media, SBM Holdings, and SBH, including the acts and practices set forth in this Complaint.  Defendant Jay Noland, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

9.       Defendant Lina Noland (together with Jay Noland, the "Nolands") is an owner, officer, director, and corporate secretary of SBM Holdings.  She also is a manager, and previously was an owner, of Success By Media.  At all times material to this Complaint, acting alone or in concert with others, she has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Success By Media, SBH Holdings, and SBH, including the acts and practices set forth in this Complaint.  Defendant Lina Noland, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

10.     Defendant Scott A. Harris ("Harris") is the president and an officer, and previously was a senior field advisor, of Success By Media and SBH.  At all times

material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Success By Media and SBH, including the acts and practices set forth in this Complaint. Defendant Harris, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

11.     Defendant Thomas G. Sacca, Jr. ("Sacca") is the chief visionary officer, and was previously the chief sales officer and a senior field advisor, of Success By Media and SBH. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Success By Media and SBH, including the acts and practices set forth in this Complaint. Defendant Sacca, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

## **COMMON ENTERPRISE**

12.     Defendants SBM Holdings and Success By Media (collectively, "SBM Defendants") have operated as a common enterprise while engaging in the unlawful acts and practices described below. SBM Defendants have conducted the business described below through both SBM Holdings and Success By Media, which have or had common ownership, officers, managers, business functions, and office locations. Because the SBM Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below.

13.     Defendants Jay Noland, Lina Noland, Harris, and Sacca had knowledge of, and have formulated, directed, controlled, had the authority to control, or participated in,

the acts and practices of the SBM Defendants that constitute the common enterprise. According to Harris, the Nolands were involved in product development, website development, sales, overseeing management, and "pretty much everything you see. . . . Mr. Noland and his wife Lina Noland, they've got, they're all, they're all involved in all of it."

## COMMERCE

14.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

### Overview

15.     SBM Defendants' unincorporated SBH division distributes coffee, tea, and dietary supplements through a network of independent distributors called "Affiliates."

16.     To convince consumers to enroll as Affiliates, Defendants claim that Affiliates likely can replace their job income in six months and become financially free (and never have to work again) in 18 months by working hard and following Defendants' instructions.

17.     These claims are false, and, in reality, Defendants have been operating a pyramid scheme since SBH's inception in or about July 2017.  Most SBH Affiliates have lost money in the program.  SBH's commission plan emphasizes and incentivizes recruiting new Affiliates over selling products to ultimate users or consumers outside of

the organization.  SBH's business practices also make it unlikely that Affiliates can meaningfully earn money by selling products to outside customers.

18.     In many instances, Defendants fail to timely ship products to Affiliates and other consumers who place product orders.  When those consumers complain to the company, seek a refund from the company, or seek a chargeback through their credit card company, Defendants respond with threats and lawsuits.

19.     Defendants also host SBH and Success by Media events at hotels and additional locations other than their place of business.  At those sometimes-mandatory events, Defendants use high-pressure sales tactics to force Affiliates to buy expensive consumer goods and services, including SBH products and tickets to future training events, without informing Affiliates of their legal right to cancel those transactions.

### The SBH Marketing Scheme

20.     Consumers pay an annual membership fee of $49 to become SBH Affiliates, making them eligible to sell SBH products and receive rewards for doing so.

21.     Each SBH Affiliate receives a distinct URL that directs consumers to the Affiliate's SBH website, a duplicate of the main SBH website.  Product purchases made on either the Affiliate's copy of the SBH website (the "Affiliate Website") or on the main SBH website are handled identically—SBH receives the proceeds of the transaction and is responsible for fulfilling and shipping the order.  Purchases made by Affiliates or non-Affiliates on an Affiliate Website, including purchases made by the Affiliate himself or herself, result in the Affiliate receiving credit for the sale toward commissions.

22.     Any member of the public can buy SBH products from the company's website, or an Affiliate Website, at the same "wholesale" price that SBH offers to Affiliates.  SBH sets the pricing both on its website and on the Affiliate Websites. Affiliates do not have the ability to offer different prices on the internet.

23.     Only SBH Affiliates are eligible to recruit a "downline" of additional SBH Affiliates and to earn commissions and other rewards based on purchases made through their own or their downline's Affiliate Websites.

24.     In practice, because SBH requires Affiliates to accrue $20 in commission before they can receive a payout and because SBH commissions generally do not exceed 10% of the purchase amount, an Affiliate or his or her downline must purchase, or generate purchases of, at least $200 from SBH before the Affiliate can receive any commission.

25.     Affiliates only become eligible for certain rewards by increasing their SBH "rank."  The current 11 ranks range from "Business Affiliate" ("BA"), which requires $5,000 in monthly purchase volume from the Affiliate and the Affiliate's downline, to "5 Star Diamond," which requires $1.25 million in monthly purchase volume from the Affiliate and the Affiliate's downline.  To qualify for each rank, no more than 50% of the Affiliate's qualifying purchase volume can come from a single downline Affiliate or that Affiliate's own downline.

26.     If Affiliates lack the downline volume to meet the monthly purchase volume requirements, they can personally purchase products to make up the difference and qualify for new rewards.

27.     Each Affiliate's rank resets every month.  Therefore, to maintain his or her rank, an Affiliate must consistently meet the relevant purchase thresholds.

28.     In addition to other forms of compensation, Affiliates earn percentage-based commissions on total sales volume at various "tiers" within their downlines.  "Tier 0" is the Affiliate himself or herself.  "Tier 1" is recruits of the Tier 0 Affiliate.  "Tier 2" is the Tier 1 Affiliates' recruits, "Tier 3" is the Tier 2 Affiliates' recruits, and so on.

29.     The percentage-based commissions that an Affiliate earns depend on two variables:  the Affiliate's rank and the tier at which purchases occurred.  As an Affiliate's rank increases, the Affiliate can access commissions at additional tiers and increase the applicable commission percentage at each tier.  The table below, from SBH's marketing materials, provides the percentage commissions by rank and tier:

| Titles | RETAIL CUSTOMER | AFFILIATE | BUSINESS AFFILIATE | SUPER BUSINESS AFFILIATE 1 | SUPER BUSINESS AFFILIATE 2 | SUPER BUSINESS AFFILIATE 3 | SUPER BUSINESS AFFILIATE 4 | 1 STAR DIAMOND | 2 STAR DIAMOND | 3 STAR DIAMOND | 4 STAR DIAMOND | 5 STAR DIAMOND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Abbreviation | C | A | BA | SBA1 | SBA2 | SBA3 | SBA4 | 1SD | 2SD | 3SD | 4SD | 5SD |
| 6-TIER RESIDUAL TEAM COMMISSION | | | | | | | | | | | | |
| TIER 0 [T0] | | | | | 10% | | | | | | | |
| TIER 1 | | 8% | 10% | 10% | 10% | 10% | 10% | 10% | 10% | 10% | 10% | 10% |
| TIER 2 | | 2% | 5% | 6% | 6% | 6% | 6% | 6% | 6% | 6% | 6% | 6% |
| TIER 3 | | 1% | 2% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% |
| TIER 4 | | | 1% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% |
| TIER 5 | | | | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% |

30.     Under this plan, a hypothetical Affiliate, "Joe," with a rank of Super Business Affiliate 1 ("SBA1") earns 10% commission on purchases made by Joe and by Joe's "Tier 1" members—those Affiliates that Joe recruited personally.  Joe also earns 10% commission on orders placed through his or his Tier 1 members' Affiliate Websites. Joe earns 6% on Tier 2 purchases, 4% on Tier 3 purchases, 3% on Tier 4 purchases, and 2% on Tier 5 purchases.  An Affiliate without any elevated rank, by contrast, earns 8%

commission on Tier 1 sales, 2% on Tier 2, 1% on Tier 3, and no commission on Tiers 4 and 5.

31.    Defendants also pay various bonuses based on recruiting new Affiliates who purchase $500 or $1,995 "product packs" upon enrollment.  For example, Defendants' "5x5 bonus" paid cash bonuses of up to $10,000 for recruiting five new Affiliates, each of whom purchased a product pack and recruited five new Affiliates who also purchased product packs.

32.    Achieving SBA1 status—and gaining access to all five tiers of commission, in addition to other bonuses and rewards—requires an Affiliate and that Affiliate's downline to purchase, or have others purchase through one of their Affiliate Websites, $15,000 in products in one month.

33.    Jay Noland, Lina Noland, Harris, and Sacca all participated in developing or revising SBH's commission plan for Affiliate compensation.

34.    SBH's flagship product is its "MycoCafé" brand of instant coffee, which Defendants attempt to differentiate from other coffees by touting the inclusion of "ganoderma," a mushroom that Defendants call the "king of herbs" for its myriad purported health benefits.

35.    SBH is in a self-proclaimed "build-out" stage.  The company's recruiting and marketing materials explain, using the visual below or other materials, that SBH plans to capture 1% of the world coffee market in 5-7 years, which will result in $24 billion in annual revenues.



36.     Over two years into SBH's 5-7 year plan, its annual revenues have yet to exceed $5 million.

37.     From July 2017 through June 2019, more than 500 consumers in this District made more than 1,900 purchases from Defendants, totaling more than $460,000.

**Defendants' False Income and Lifestyle Claims**

38.     Defendants promote their scheme through videos and presentations on the SBH website; in materials provided to Affiliates for recruiting purposes; on videos and statements posted to an Affiliates-only Facebook group that is administered exclusively by the Nolands; on daily "SBH Heat" conference calls for SBH Affiliates; and during in-person training and recruiting sessions.

39.     In these settings, Defendants lure consumers into SBH, and encourage aggressive purchasing by already-enrolled consumers, with claims that SBH provides a life-changing financial solution.

40.    Defendants Jay Noland, Lina Noland, Harris, and Sacca have all promoted recruitment and continued participation in SBH.

41.    Defendants frequently tell consumers that they likely will replace their job income within six months and obtain "financial freedom" within 18 months if they work hard and follow Defendants' instructions.

a.    Jay Noland told SBH Affiliates that, by following his instructions for six months, you "can have a reasonable expectation that you would have replaced your income if you were results-oriented and focused."

b.    On one SBH Affiliate conference call, Jay Noland explained that "replacing your income at your job in six months or less . . . really starts with just thinking right," as depicted in the following SBH advertisement:



c.    Jay Noland also told SBH Affiliates that if they "just applied [his system], without fail, you should be able to be financially free in 18 months."

     d.     In a video posted to Facebook in March 2018, Jay Noland told SBH Affiliates that some of them "by the end of this year [would] never, ever have to work again."

     e.     Sacca told SBH Affiliates that if "we're out there busting this thing for 12 to 18 months, it's going to give us a lifetime of freedom."

42.     In multiple scripts provided to Affiliates for recruiting purposes, Defendants claim that "several people" are "achieving Financial Freedom already with our company."

43.     Defendants also frequently tell SBH Affiliates and recruits that Jay Noland is the "Millionaire Maker" and has trained many millionaires in past multilevel marketing programs.  Defendants explain that Noland is applying the same lessons in SBH, thereby offering Affiliates an opportunity to become "coffee millionaires."

     a.     Success By Media's website refers to Jay Noland as the "millionaire maker."

     b.     Jay Noland calls many of his Facebook videos for SBH Affiliates "Millionaire Mentorship" trainings.

     c.     On one Millionaire Mentorship training, Jay Noland declared that he would create "1,000 millionaires" through SBH.

     d.     In another Millionaire Mentorship training, Jay Noland said that he was training people to make "$1 million per year" "forever."  He then asked, "Who in the hell would have the audacity to talk about that type of money?,"

before proceeding to claim that he could train Affiliates to make $1 million "year after year whether you work or not."

e.      Harris told SBH Affiliates that he had "watched [Jay Noland], through the years, build way too many millionaires and multi-millionaires, go out and do billions in volume."

f.      Harris also told Affiliates, "All that matters is are you out there building it the way that Mr. Noland teaches us to build it?  And if you are, the rewards are gonna come no matter what, that's the way I feel about it."

g.      SBH's director of sales told Affiliates on a company conference call that they could be "financially free and be making a five-figure income possibly on a monthly basis residually."  He continued, "This is not a theoretical example. It's fact.  I'm just talking about what's happened in the past and the people that Mr. Noland has worked with, trained, and taught and the companies that he's developed.  And what's happening with Success By Health is like no other."

44.      Defendants encourage Affiliates to sign a "Million Dollar Contract."  In that "contract," Affiliates agree that they are "100% committed to my goals and dreams" and that "[f]or the next 18 months I'm willing to do whatever it takes to make my dreams a reality."  Affiliates then commit to maintain a $500 monthly auto-order from the company for at least 18 months, to attend "all SBH Corporate trainings and events no matter what," and to "ask at least 4 people a day to join my business at least 5 days a week for at least 18 months," among other things.

45.     Referencing SBH's goal of $24 billion in annual revenues in 5-7 years, described in paragraph 35 above, Defendants claim that Affiliates' fortune will come from a pool of $12 billion in anticipated annual payouts to Affiliates.  Defendants base that $12 billion projection on, among other things, their claim that SBH shares approximately 50% of its revenues with Affiliates.  Defendants highlight the $12 billion figure in recruiting materials and promotional videos featuring Jay Noland with the following images:



46.     Defendants also tout Affiliates' potential to earn unlimited income.

        a.      One SBH training document tells Affiliates that the company's commission plan "provides for UNLIMITED Income.  You can earn as much money as you want.  There is NO LIMIT on the width of the affiliates you can refer to the program."

        b.      An "SBH Prospecting System" document tells Affiliates how to pitch the program to recruits.  The document provides a closing script that allows Affiliates to fill in the blanks for consumers' potential earnings if they join the company:

**STEP 4:  4 CLOSING QUESTIONS**

1. "Now, how much money would you need to make on a monthly basis, for this business to be worth your time?"

2. "How many hours per week could you put towards working your SBH business in order to get to $_____ / month?"

3. "How long (months or years) would you be willing to work _____ hours per week to reach $_____ / month?"

4. "If I could show you how to get to $_____ / month working _____ hours per week within _____ months/years, you'd be ready to get started, wouldn't you?"

     c.     In one video posted to Facebook, Jay Noland called SBH a "literal golden goose . . . a perpetual money and health machine."

47.     Notwithstanding the claims described above, Defendants also tell SBH Affiliates to avoid making "income claims" by instead referring to "lifestyle enhancements."

     a.     SBH's "Getting Started Training" presentation deck tells Affiliates, "No Income Claims (Share Lifestyle Enhancements Instead)."

     b.     Similarly, SBH's "1-10 Overview," which Affiliates use to recruit consumers, includes a "Lifestyle" section picturing a luxury car and highlighting "exotic reward trips and vacations" and "luxury and living incentives."

     c.     On one company conference call, Harris told Affiliates:  "Don't make income claims.  Say things like, 'I've been able to make my car payment or my house payment with the income we're making on the side.' . . . Say things like, 'My wife was able to walk away from her job . . . or both of us were able to walk away from our jobs based on the residual income from the company.'"

d.      In a video posted to Facebook, Jay Noland claimed that his past trainees, by listening to his advice, had acquired "Lamborghinis; Rolls Royces; Bentleys; multimillion-dollar homes in single-, double-, and triple-gated communities; [and] Bahamas trips."

e.      On another Facebook video, Jay Noland described the success obtained by adherents to his system:  "You see their million-dollar homes they're buying.  You see the Lamborghinis, you see the Ferraris.  You see all these great things that people are able to obtain, the travel, how they're able to help their family out, help their favorite nonprofit cause.  All of a sudden, you see them going in, donating $100,000, $200,000, man."

48.     Jay Noland has described this "lifestyle enhancement" marketing strategy as an effort to avoid government scrutiny.  He explained that "instead of telling people how much [money] we make, we just go, okay, last week, I made enough to buy that Maserati cash."

49.     Defendants' publicly available marketing materials feature images of luxury yachts and cars, piles of cash, and exotic vacations.  For example, one SBH promotional video states that SBH is a "recession-proof" business that could "change everything – the car you drive, the home you live in, the vacations you take, the control of your life."

50.     Defendants sometimes tell consumers that income is not "guaranteed," that "results may vary," and that any explanations of the SBH commission plan that show lucrative results are "simple theoretical examples."

51.     These income-related disclaimers frequently are inconspicuously disclosed in fine print on SBH's promotional materials.

52.     Defendants also regularly undermine these disclaimers, including by making the claims described in paragraphs 38-49 above.

　　a.     On one SBH conference call, Jay Noland explained that Defendants' "theoretical examples" of lucrative income are only "theoretical" because "you haven't done it yet."

　　b.     Similarly, in a publicly available presentation, Jay Noland referenced potential income of $23,500 per month as a "simple theoretical example." He then asked, "Why is it theoretical?" and answered himself, "Because you just ain't done it yet. But are there people that do it? . . . Yes. I got people in my network globally that make that look silly."

53.     On many occasions, Defendants explain that the only things separating SBH Affiliates from substantial income and millionaire status is work ethic, attitude, and a willingness to follow Defendants' instructions.

　　a.     In an SBH conference call announcing changes to the company's commission plan, Jay Noland told Affiliates, "The money opportunities to make and change your life [are] ridiculous. All you've got to do is go to work."

　　b.     Jay Noland told Affiliates this his plan was "literally dummy-proof. . . . [They] came out with 'This for Dummies' and 'That for Dummies,' this is literally 'Direct Sales for Dummies.' A dummy can just go follow these instructions and create wealth."

  c. Sacca promised Affiliates that "there's no way you can fail if you utilize the training that Mr. Noland is going to give us at [an upcoming training event]."

  d. In one SBH recruiting presentation, just after describing a $5 million recruitment incentive, Defendants suggest that anyone can succeed:



54. Defendants direct SBH Affiliates to tell recruits that the company's rewards are "achievable for the masses."

55. Defendants' claims described in paragraphs 39-54 are false.

56. SBH does not offer consumers a viable path to "financial freedom" or to replacing their job income in six months.

57. Typically, SBH Affiliates pay more money to the company than they receive from it.

58. SBH does not even abide by its own commission plan when compensating Affiliates.  An FTC investigator used an undercover identity to enroll in SBH and then made sales and purchases that should have entitled him to commissions.  He never

received those commissions, and the company did not respond to his email inquiry regarding the missing commissions.

59. Even if Defendants honored SBH's commission plan, the structure of that plan, and Defendants' instructions for how to take advantage of it, ensure that the vast majority of participants lose money in the program.

<u>**SBH Operates as an Unlawful Pyramid Scheme**</u>

60. Each version of the SBH commission plan, and the manner in which Defendants have promoted the plan, has prioritized and incentivized recruiting new Affiliates over selling SBH products to ultimate users of those products.

61. For example, SBH promises commissions to Affiliates based only on Affiliate or non-Affiliate product *purchases* from SBH, rather than *sales to users of SBH products*. Specifically, Affiliates receive commissions and other rewards based on the Affiliate's "personal order and any orders generated from [their SBH] website" as well as personal orders and orders generated from downline Affiliate Websites. SBH does not separately track sales made by Affiliates to ultimate users of SBH products.

62. The vast majority of purchases from the SBH website or from Affiliate Websites are made by Affiliates.

63. Affiliates' purchases from the SBH website or Affiliate Websites are not motivated by actual consumer demand for the SBH products, but rather by the opportunity to pursue higher ranks within SBH.

64. Defendants promote "Four Steps to Success" for new SBH Affiliates, as depicted in the visual below. The Four Steps to Success—which have remained

consistent throughout all versions of the commission plan—do not mention retail sales, instead encouraging Affiliates to buy products, "build a team," and then "duplicate" their own efforts by "[t]each[ing] your team to do the same."



65.    In other training materials, Defendants elaborate on the Four Steps to Success.

        a.    In Step 1 ("Get Started"), Defendants urge consumers to make large up-front investments in "business packs," which cost $125, $500, or $1,995 and contain miscellaneous SBH products.  Defendants tell Affiliates that starting with a more expensive pack will create "more initial commission benefits."

        b.    In Step 2 ("Be a Product of the Product"), Defendants tell consumers to set up a monthly product "auto-order."  To be eligible for many bonuses and rewards, Affiliates must set up a minimum $60 monthly auto-order.  Defendants

also tell Affiliates and recruits that setting up an auto-order will give them an

"85% chance of earning regular commission checks within 2 years."

       c.      In Step 3 ("Build A Team"), Defendants focus Affiliates on

recruiting.  They instruct Affiliates to "be sure to personally refer at least two new

Affiliates within your first 7 Days if you are aiming to Replace Your Income (No

More Job)."  After the first seven days, Affiliates are encouraged to "keep building

every month," "duplicate the system," and "focus on rank advancing."

       d.      In Step 4 ("Pay Attention to the Training and Duplicate"),

Defendants tell Affiliates to use SBH-provided materials to "[t]each your team to

do the same" steps identified above.  A separate SBH training document describes

"duplication" as the "key to long term success" as an SBH Affiliate.

      66.     All versions of the SBH commission plan have encouraged Affiliates to

harness the "Power of 10."  An Affiliate can achieve the "Power of 10" by recruiting ten

new Affiliates as the Affiliate's "Tier 1," each of whom themselves recruit ten new

Affiliates as the original Affiliate's "Tier 2," and so on through Tiers 3-5.  Therefore, in

the Power of 10, Tier 1 contains 10 Affiliates, Tier 2 contains 100 Affiliates, Tier 3

contains 1,000 Affiliates, Tier 4 contains 10,000 Affiliates, and Tier 5 contains 100,000

Affiliates, for a cumulative total of 111,110 Affiliates.

      67.     Defendants promote an example of the Power of 10 wherein each of the top

Affiliate's 111,110 downline Affiliates generate purchases from SBH of $500 per month,

for a cumulative monthly purchase volume of over $55 million.  Defendants use the

following visual to highlight that the top Affiliate receives a $1,173,500 monthly commission in this example:



68.     Defendants also promote an otherwise-identical example wherein each of the 111,110 downline Affiliates generate $100 rather than $500 in product purchases per month, which results in a $234,700 monthly commission for the top Affiliate.

69.     Defendants further push the Power of 10 by promoting a "BAM Bonus" that pays out $1 million to an Affiliate who completes the Power of 10 with all 111,110 downline Affiliates generating $100 in monthly purchases, and $5 million to an Affiliate who completes the Power of 10 with all 111,110 downline Affiliates generating $500 in monthly purchases.

70.     In fact, as of April 2019, not a single SBH Affiliate had even completed Tier 2 of the Power of 10 at the $100-per-month level, much less all five tiers at the $500-per-month level.

71.     For a single Affiliate to achieve the five-tier "Power of 10," at least 100,000 of that Affiliate's downline team members must lose money.

72.     Defendants frequently emphasize that the path to millionaire status and financial freedom depends on recruiting ten Affiliates and then starting the "duplication" process.

a.     A public SBH presentation that includes the following visual directs Affiliates to "get 'my 10' Affiliate Team Members" and to "teach[] each new Team Member to the same thing, get 'their 10.'"



b.     On one SBH Affiliate conference call, Harris told SBH Affiliates "your ten-by-ten is the most important thing you can ever build in this company.

The most important thing you can do is think about it every day.  I've got to get my ten, my ten on my first tier."

c.     In another Facebook video, Sacca told Affiliates that the SBH commission plan is "driven 100%" by the Power of 10 BAM Bonus.  Jay Noland called this training session the best training he ever saw Sacca do.

73.     Defendants also encourage Affiliates to buy large amounts of products when they sign up, and to continue stockpiling inventory thereafter.  They encourage these purchases not as a response to consumer demand, but instead as a strategy of growing one's business and advancing to higher SBH ranks.

a.     The SBH Fast Start system, for example, states, "The more inventory you have to start your business, the faster your business typically will grow."

b.     Harris coached Affiliates to "make sure we keep our shelves full."

c.     With just hours remaining in one monthly sales period, Jay Noland pushed any Affiliate with $500 in monthly sales over the prior 30 days to make an additional $14,500 in purchases in the final four hours, which would qualify the Affiliate for SBA1 status for the following month.  Noland added:  "You can do it. It's just in your mind . . . . Listen to me.  You can go in, order you a case."

d.     Similarly, Harris told Affiliates at the end of another monthly sales period to buy products to achieve Business Affiliate status.  He acknowledged receiving complaints from Affiliates who already had $1,000 in unsold merchandise in their house, but dismissed those concerns by explaining that this

unsold inventory was actually a benefit:  "If you got $1,000 [in products] in your house, congratulations.  If you got 4 or $5,000 worth, congratulations.  If you got more than that, congratulations.  Mr. Noland and I used to carry around 10, 15, 20, $25,000 or more in products."

74.     Defendants press Affiliates to take financial risks to attend trainings and buy SBH products.  In particular, Defendants encourage recruits to max out credit cards, borrow from family, take loans from banks, and sell or mortgage their homes to fund their SBH businesses.

75.     In one Facebook video, Harris recounted telling an Affiliate that he should obtain a loan to travel to Orlando for an SBH training event:  "So it's not worth getting a loan to come here and build something that's going to take care of your family for generations?  Right, I mean, yeah, I would get a loan if I needed one.  Guess what I did back in the 1990s [in a prior multilevel marketing program]?  I got loans. . . . I got [my credit cards] increased to the point where I couldn't even use them no more . . . . I borrowed money from people in my family and from some of my friends."

76.     While urging Affiliates to build large inventories of products in order to improve their SBH ranks—and therefore increase their commissions and other rewards—Defendants simultaneously undercut Affiliates' ability to sell that inventory at any meaningful profit.

77.     Specifically, Defendants sell products to Affiliates at what they call "wholesale" price.

78.     Defendants then state that Affiliates should apply at least a 50% "markup" to products in the Affiliate's personal inventory before selling the products in hand-to-hand sales at a "retail" price.  Affiliates earn no commission on those in-person sales, but can make money by selling at a higher price than their wholesale purchase price.

79.     Defendants, however, compete with their own Affiliates by making the Affiliate "wholesale" price available to the general public.  Thus, both Affiliates and non-Affiliates can purchase products at the exact same "wholesale" price from the SBH website or Affiliate Websites.

80.     As a result, non-Affiliate consumers have little reason to pay the 50% retail "markup" at which SBH suggests Affiliates sell their products, and Affiliates struggle to sell products from their rapidly growing inventory for any meaningful profit.

81.     Defendants actually encourage Affiliates to tell their own customers that they can buy products cheaper directly from SBH.  SBH's retail script directs Affiliates to tell customers, "I need you to help me out by buying at least a bag or two of coffee from me one time at Retail Pricing.  If you like it, I will show you how to get it at Wholesale Pricing from then on."

82.     Defendants also expressly tell Affiliates that their top priority is recruiting rather than retail sales.

a.      In describing one "cash promotion," Jay Noland declared that the goal was "to get you focused on what you should be focusing on right now, which is new people getting into the company."  Noland then reminded Affiliates to "get[] ten to get ten to get ten."

b.      SBH's director of sales told Affiliates that retail sales were a "great way to make some extra, part-time money, to make some quick quick money," but emphasized that "recruiting is key" and that Affiliates should spend their time building a "10x10x10x10x10."

c.      Similarly, one top SBH Affiliate said she would "gloss over retail" at a recruiting event in order to spend more time on the purported lucrative benefits of recruiting.

83.     Defendants' "One Year Commitment Form" for new Affiliates requires Affiliates to make ten commitments, none of which involve selling products to non-Affiliate consumers.

---

**I hereby commit that I will:**

- Give 110% to my SBH Business.
- Be a Product of the SBH Products.
- Launch my Business by hosting at least 4 SBH Business Mixers within my first 30 days.
- Expose my SBH business to at least 2 people per day (5 days per week).
- Make sure my team goes through the SBH "Fast Start System" Training.
- Host or Attend at least 1 SBH Business Mixer (CTM) per week for the next year.
- Attend all Major Corporate Events (typically 2 or 3 per year).
- Attend all local weekly "Getting Started Trainings" and "Regional Events" in my area.
- Practice at least 30 minutes of Self Development Daily. Commit to "Conquer Myself" and  control my destiny.
- Be an Honorable Person that KEEPS MY WORD.

**I WILL CONDUCT MY BUSINESS BY THESE CORE PRINCIPLES AND I FURTHER COMMIT THAT I WILL BE HERE 1 YEAR FROM NOW!**

---

84.     Jay Noland has urged Affiliates to continue recruiting even when products are unavailable due to shipping delays, explaining that Affiliates should "sell the vision" instead of the products, and adding that "the bigger vision you sell, the bigger paycheck you get."

85. Jay Noland also has admitted that the products, and consumer demand for the products, are unimportant to his ability to sell consumers on the promise of financial freedom. Noland stated that "you can plug any company or product into this process, and you can be free financially if you want to be."

**Defendants' Shipping Delays and Punitive Chargeback and Refund Policies**

86. Defendants sell products to consumers, including Affiliates, through the SBH website and Affiliate Websites.

87. Defendants also sell products to Affiliates through the Affiliate's "back office"—a password-protected website managed by SBH and unique to each Affiliate.

88. Defendants do not clearly and conspicuously disclose a shipping date to consumers who purchase products on the SBH website, Affiliate Websites, or Affiliate back offices.

89. During the product-ordering process on the SBH website or Affiliate Websites, Defendants do not display the SBH "terms and conditions." Instead, consumers can only find the terms and conditions by clicking on a small-print "Terms of Use" hyperlink on the bottom of the SBH website or Affiliate Websites.

90. When Affiliates order products from their back offices, they can only view the terms and conditions by clicking a hyperlink.

91. Buried within Defendants' undisclosed or hyperlinked terms and conditions, and spread across multiple, sometimes-unnumbered sections in small font, are the specifics of SBH's shipping, no-refund, and chargeback policies.

a.      In the second paragraph of section 14, Defendants state that "SBH [p]roducts typically ship within 48 business hours" and that "from time to time," products may not ship for "up to 60 days or more in some cases."

b.      Section 14 also states that all product purchases are nonrefundable "for any reason whatsoever" and prohibits consumers from seeking credit card "chargebacks" (i.e., a refund through a credit card company).

c.      The unnumbered "Liquidated Damages" section of the terms and conditions impose liquidated damages upon consumers who "violate[] the No Refund Policy and file[] a chargeback or dispute[] a purchase they made from [SBH]." Those damages equal three times the amount of each chargeback or $1,000—whichever is greater.

d.      The unnumbered "Confession of Judgment" section of the terms and conditions also allows SBH to confess a judgment in any court against a consumer who "dispute[s]" a credit card payment or obtains a reversal of a credit card transaction "for any reason." The same section defines the confessed judgment amount as three times the amount of each reversed or disputed charge or $1,000—whichever is greater—plus the amount of the original charge, along with collection costs, court costs, and attorneys' fees.

92.     In a separate part of the SBH Affiliates' back offices, a "frequently asked questions" section responds to a "What is the SBH Shipping policy?" question by stating that products "typically ship within 48 – 72 business hours from when the order is

placed." Only under a separate "How do refunds work?" question do Defendants state that orders may not ship for "up to 60 days or more in some cases."

93.     On many occasions, consumers have waited months to receive products or have not received products at all.

94.     Defendants do not obtain consumers' consent to shipping delays.

95.     Defendants do not offer any consumers, including consumers who wait for months to receive products or who never receive their products, the option to cancel their order and obtain a refund.

96.     Defendants do not provide refunds to consumers who request them, including consumers who wait months to receive their products or who never receive their products.

97.     Jay Noland has urged Affiliates to "keep ordering, keep moving, keep pushing," even when SBH runs out of products.

98.     Defendants threaten consumers who ask questions or complain about shipping delays with legal action or removal from the company.

99.     In one Facebook video, Jay Noland said, "We're having just a crazy amount of people calling our 800 number asking where their orders are at." He blamed this on "terrible leadership" not by himself, but instead by the Affiliates who had recruited the complaining Affiliates. He then threatened to remove from SBH the complaining Affiliates and those Affiliates' upline referrers.

100.    In one video posted to Facebook, Jay Noland threatened to report to the police any Affiliate who requested a chargeback on a product for which he or she had received a commission—even if the Affiliate had not received the product.

101.    SBM Holdings sued nine SBH Affiliates in Nevada state court, alleging, among other things, that the Affiliates violated the SBH terms and conditions by seeking at least 12 chargebacks.

## Defendants' Sale of Consumers Goods and Services at SBH and Success by Media Events

102.    Defendants and their representatives frequently host events at which they sell SBH products and tickets to future training events.  These events occur at locations other than the Defendants' place of business.

103.    As seen in the image accompanying paragraph 83, Defendants require new Affiliates to attend all "major corporate events."  Similarly, as described in paragraph 44, Defendants encourage Affiliates seeking financial freedom to attend "all SBH Corporate trainings and events no matter what."

104.    The "major corporate events" referenced in paragraph 103 occur 3-4 times annually at a cost $200-3500 per ticket, excluding travel and hotel costs.  These events usually occur in hotel conference rooms or convention centers.

105.    Defendants and their representatives also host smaller events, such as "coffee tea mixers" ("CTMs") or "Success Saturdays," throughout the year.  These events usually occur in Defendants' or their representatives' homes or in hotel conference rooms.

106.    At these events, Defendants use high-pressure tactics—including threats of diminished status within SBH; emotional pleas from friends, family, and SBH leaders; and screaming—to sell consumer goods or services, including SBH products and tickets to training events, that cost more than $130.

107.    Defendants do not inform, either orally or in writing, purchasers of goods or services at the above-described events of their right to cancel the transaction within three business days.  Defendants also do not provide these purchasers with a form "notice of cancellation" that they may use to cancel the transactions.

108.    Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission.

## VIOLATIONS OF THE FTC ACT

109.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

110.    Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

### Count I – Illegal Pyramid

111.    As alleged above, Defendants operate or promote participation in an unlawful scheme in which participants pay money to the company in return for which they receive (1) the right to sell products, and (2) in return for recruiting other participants into the program, the right to receive rewards that are unrelated to the sale of products to ultimate users.

112.    Defendants' operation or promotion of this type of scheme, often referred to as a pyramid scheme, constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count II – Income Misrepresentations

113.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of the right to participate, or further participate, in the SBH program, Defendants have represented, directly or indirectly, expressly or by implication, that SBH Affiliates are likely to earn substantial income.

114.    In truth and in fact, in numerous instances in which Defendants have made the representations set forth in paragraph 113, SBH Affiliates are not likely to earn substantial income.

115.    Therefore, Defendants' practices, as set forth in paragraph 113, constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count III – Means and Instrumentalities

116.    By furnishing SBH Affiliates with promotional materials and instructions to be used in recruiting new participants that contain false or misleading representations, Defendants have provided the means and instrumentalities for the commission of deceptive acts and practices.

117.    Therefore, Defendants' practices, as set forth in paragraph 116, constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE MAIL, INTERNET, OR TELEPHONE ORDER MERCHANDISE RULE

118.    The Merchandise Rule, 16 C.F.R. Part 435, prohibits sellers from soliciting any order for the sale of merchandise ordered through the mail, via Internet or by telephone "unless at the time of the solicitation, the seller has a reasonable basis to expect that it will be able to ship any ordered merchandise to the buyer" either "[w]ithin that time clearly and conspicuously stated in any such solicitation; or [i]f no time is clearly and conspicuously stated, within 30 days after receipt of a properly completed order from the buyer."  16 C.F.R. § 435.2(a)(1).

119.    "Receipt of a properly completed order" means "where the buyer tenders full or partial payment . . . the time at which the seller receives both said payment and an order from the buyer containing all of the information needed by the seller to process and ship the order."  16 C.F.R. § 435.1(c).

120.    Where a seller is unable to ship merchandise within the seller's advertised time or within 30 days, if no time is given, the seller must offer to the buyer "clearly and conspicuously and without prior demand, an option either to consent to a delay in shipping or to cancel the buyer's order and receive a prompt refund."  16 C.F.R. § 435.2(b)(1).

      a.    Any such offer "shall be made within a reasonable time after the seller first becomes aware of its inability to ship."  16 C.F.R. § 435.2(b)(1).

      b.    The offer must fully inform the buyer of the buyer's right to cancel and provide a definite revised shipping date or inform the buyer that the seller

cannot make any representation regarding the length of the delay.  16 C.F.R. §

435.2(b)(1)(i).

121.    A seller must "deem an order canceled and . . . make a prompt refund to the

buyer whenever the seller receives, prior to the time of shipment, notification from the

buyer cancelling the order pursuant to any option [under the Merchandise Rule] . . . [or]

[t]he seller fails to offer the option [to consent to a delay or cancel required by

§ 435.2(b)(1)] and has not shipped the merchandise" within the time required by the

Merchandise Rule.  16 C.F.R. § 435.2(c), (c)(1), (c)(5).

122.    Pursuant to Section 18 of the FTC Act, 15 U.S.C. § 57a(d)(3), and 16

C.F.R. § 435.2, a violation of the Merchandise Rule constitutes an unfair or deceptive act

or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15

U.S.C. § 45(a).

## Count IV – Failure to Seek Consent or Offer Cancellation

123.    In numerous instances, when Defendants failed to ship orders within the

timeframe required by the Merchandise Rule, they failed to offer customers the

opportunity to consent to a delay in shipping or to cancel their order.

124.    Defendants' practices as alleged in paragraph 123 violate the Merchandise

Rule, 16 C.F.R. § 435.2(b), and therefore are unfair or deceptive acts or practices in

violation of Section 5 of the FTC Act, 15 U.S.C. § 5(a).

## Count V – Failure to Provide Cancellation or Refund

125.    In numerous instances, when Defendants failed to ship orders within the

timeframe required by the Merchandise Rule and failed to offer consumers the

opportunity to consent to a delay in shipping or to cancel their order, they did not cancel those orders or provide consumers a refund.  In addition, if buyers notified Defendants of an order cancellation pursuant to any option under the Merchandise Rule, Defendants did not deem those orders cancelled or provide a prompt refund.

126.    Defendants' practices as alleged in paragraph 125 violate the Merchandise Rule, 16 C.F.R. § 435.2(c), and therefore are unfair or deceptive acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 5(a).

## VIOLATIONS OF THE RULE CONCERNING COOLING-OFF PERIODS FOR SALES MADE AT HOME OR CERTAIN OTHER LOCATIONS

127.    The Cooling-Off Rule, 16 C.F.R. Part 429, gives purchasers of certain goods and services three days to cancel purchases of $25 or more when the sale takes place at the purchaser's home, or $130 or more when the sale takes place at any location other than the seller's place of business (e.g., hotel rooms or convention centers).  16 C.F.R. §§ 429.0(a), 429.1.

128.    The Cooling-Off Rule requires the seller to furnish the purchaser with a fully completed receipt or copy of any contract pertaining to such sale at the time of its execution, which must contain a statement summarizing the purchaser's right to cancel within three business days.  16 C.F.R. § 429.1(a).

129.    The Cooling-Off Rule also requires the seller to inform purchasers about cancellation rights at the time of the sale by giving the purchaser two copies of a cancellation form (one to keep and one to send).  The Cooling-Off Rule also requires the cancellation form to be captioned either "NOTICE OF RIGHT TO CANCEL" or

"NOTICE OF CANCELLATION" and sets forth the language that must be contained in the cancellation notice.  16 C.F.R. § 429.1(b), (c).

130.    The Cooling-Off Rule also requires that, at the time the purchaser signs the contract or purchases the goods or services, the seller orally inform the purchaser of the purchaser's right to cancel.  16 C.F.R. § 429.1(e).

131.    Pursuant to Section 18 of the FTC Act, 15 U.S.C. § 57a(d)(3), and 16 C.F.R. § 429.1, a violation of the Cooling-Off Rule constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### Count VI – Failure to Notify Consumers of Cancellation Rights

132.    Defendants are "sellers" as that term is defined in Section 429.0(c) of the Cooling-Off Rule, and have been engaged in "door-to-door sales" of "consumer goods and services," as those terms are defined in Section 429.0(a), (b) of the Cooling-Off Rule.

133.    In numerous instances, in connection with the door-to-door sales of SBH products and training events, Defendants have:

a.    Failed to furnish purchasers with a receipt or contract informing them of their right to cancel the transaction within three business days;

b.    Failed to furnish purchasers with a "Notice of Cancellation" or "Notice of Right to Cancel" that purchasers can use to cancel the transaction; and

c.    Failed to orally inform purchasers of their right to cancel the transaction.

134.    Defendants' practices as alleged in paragraph 133 violate the Cooling-Off Rule, 16 C.F.R. § 435.1, and therefore are unfair or deceptive acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 5(a).

## CONSUMER INJURY

135.    Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the Merchandise Rule, and the Cooling-Off Rule.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

136.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

137.    Section 19 of the FTC Act, 15 U.S.C. § 57b, the Merchandise Rule, and the Cooling-Off Rule authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the Merchandise

Rule and the Cooling-Off Rule, including the rescission or reformation of contracts, and the refund of money.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff FTC, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b), 57b, the Merchandise Rule, the Cooling-Off Rule, and the Court's own equitable powers, requests that the Court:

A.     Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to temporary and preliminary injunctions, and an order providing for immediate access, the turnover of business records, an asset freeze, and the appointment of a receiver;

B.     Enter a permanent injunction to prevent future violations of the FTC Act by Defendants;

C.     Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, the Merchandise Rule, and the Cooling-Off Rule, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

D.     Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Respectfully submitted,

ALDEN F. ABBOTT
General Counsel

Dated:  January 8, 2020

_____
EVAN M. MENDELSON, DC Bar No. 996765
JONATHAN W. WARE, DC Bar No. 989414
Federal Trade Commission
600 Pennsylvania Ave. NW
Mailstop CC-9528
Washington, DC 20580
(202) 326-3320; emendelson@ftc.gov
(202) 326-2726; jware1@ftc.gov
(202) 326-3197 (Fax)
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION