**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Federal Trade Commission,

      Plaintiff,

v.

James D. Noland, Jr., et al.,

      Defendants.

No. CV-20-00047-PHX-DWL

**ORDER**

On January 8, 2020, the Federal Trade Commission (the "FTC") filed a complaint against Defendants James Noland, Lina Noland, Thomas Sacca,[1] Scott Harris, Success By Media Holdings Inc. ("SBM"), d/b/a Success By Health ("SBH"), and Success By Media LLC, d/b/a SBH (collectively, "Defendants"). (Doc. 3.) The Court previously granted the FTC's *ex parte* request for a temporary restraining order ("TRO") (Doc. 38) and held a hearing on February 12, 2020 to determine whether a preliminary injunction should issue. (Doc. 86.) After considering the evidence and argument presented before and during the hearing, as well as the evidence submitted by Defendants following the hearing, the Court will grant the FTC's request for a preliminary injunction.

…

…

---

[1] This action originally listed Thomas Sacca, Jr. as a defendant. (Doc. 1.) That was in error. (Doc. 36.) The FTC filed an amended complaint to reflect that the proper defendant is Thomas Sacca, Sr. (Doc. 35.) Thomas Sacca, Jr. has no involvement in this case, and all references to Sacca in this order refer to the correct individual named in the FTC's amended complaint.

# BACKGROUND

## I.  Factual Background

This case focuses on the activities of SBH.  SBH is one of three businesses, along with "Success by Coaching" and "Success by Networking," that form SBM.  (Doc. 72 at 3.)  SBH is an "affiliate-marketing program that sells coffee products and other nutraceuticals through its online platform and network of affiliates." (*Id.* at 4.)

Defendants claim that SBH currently has 6,754 Affiliates.  (*Id.*)  To become an Affiliate, an individual must pay a $49 annual fee to SBH.  (*Id.*)  That individual "is immediately qualified to begin earning commissions and bonuses." (*Id.*)

Under the "SBH Affiliate Commission Plan" (Ex. 40), Affiliates are promised the opportunity to earn money in the following six ways,[2] known as phases:

▪ Phase one is "Retail Sales."  (*Id.* at 2.)  Specifically, an Affiliate can purchase coffee and other products directly from SBH through the SBH website at a "wholesale" price, then resell the products at a marked-up price to the public.  (*Id.*)  When engaging in this type of transaction, the Affiliate keeps 100% of the profits.  (Doc. 72 at 5.)  Notably, SBH does not track the profits that Affiliates earn through retail sales.[3]  Additionally, a member of the public can go to the SBH website and purchase products at "wholesale" prices, too.  (Ex. 40 at 2.  *See also* Doc. 35 ¶¶ 77-79 [amended complaint]; Doc. 92 ¶ 1 [admitting these allegations].)  As discussed in more detail below, this pricing structure raises questions about whether retail sales can and do serve as a legitimate pathway to profits for Affiliates.

▪ Phase two is SBH's auto-order program.  (Ex. 40 at 3.)  "Every person (affiliate or non-affiliate on-line customer) that joins our Monthly Auto-Order Program will get 5% of their order credited in SBH Product Points.  Each point is worth one dollar" and "can be used for future SBH Orders." (*Id.*)  Additional auto-order rewards accrue if an Affiliate

---

[2]  A later version of the plan outlined six additional ways for an Affiliate to earn money. (Ex. 42.)

[3]  *Compare* Doc. 35 ¶ 61 ("SBH does not separately track sales made by Affiliates to ultimate users of SBH products.") *with* Doc. 92 ¶ 1 (admitting same).

has multiple "Direct-Referred Affiliates" also signed up for the auto-order program. (*Id.*)

▪ Phase three is the "Accelerator Bonus." (*Id.*) This allows Affiliates to "[e]arn quick bonuses when you sell the SBH $500 Accelerator Pack or the SBH $1,995 Super Accelerator Pack to people that you personally refer to your SBH Affiliate Team." (*Id.*) An Affiliate can earn further bonuses in this phase by selling a certain number of Accelerator or Super Accelerator Packs within the first week as an Affiliate. (*Id.*)

▪ Phase four is SBH's "6-Tier Bonus program." (*Id.* at 4.) This allows an Affiliate to earn commissions on orders placed by "downline" recruits. (*Id.*) An Affiliate earns a 10% commission on anything ordered by the Affiliate or others directly recruited by the Affiliate (Tier 0 and Tier 1). (*Id.*) Purchases by those recruits' recruits, Tier 2, garner 6% commissions. (*Id.*) Tier 3 pays 4% commissions, Tier 4 pays 3%, and Tier 5 pays 2%. (*Id.*) An Affiliate is only eligible for Tier 4 and Tier 5 commissions if certain other requirements are met. (*Id.*)

▪ Phase five is the "Generation Super Business Affiliate Infinity Bonus." (*Id.*) To earn money in this phase, an Affiliate must become a "Super Business Affiliate." (*Id.*) There are multiple tiers to this status, but the lowest, Super Business Affiliate 1, requires $15,000 in purchases by certain downline Affiliates in one calendar month, with no more than $7,500 in purchases coming from any one team. (*Id.*) Once eligible, Affiliates earn 1% commissions "down to the next Super Business Affiliate." (*Id.*) In other words, a Super Business Affiliate 1 would earn a 1% commission on all purchases made by those in the Affiliate's downline until that downline hit another Super Business Affiliate. Higher ranking Super Business Affiliates could earn commissions on successive generations (earning down to the next two, three, or four Super Business Affiliates in the downline). (*Id.*)

▪ Phase six is the "BAM Bonus Program." (*Id.*) This is a bonus paid "when certain milestones are achieved by an Affiliate." (*Id.*) Affiliates are told they can earn more than $5 million in such bonuses. (Doc. 8-11 at 14.) This bonus relies on the "Power of 10." In a nutshell, the Power of 10 and the BAM bonus are premised on an Affiliate recruiting 10

downline affiliates, each of whom purchases at least $100 of product per month from SBH. Then, when the Affiliate's 10 recruits each recruit 10 more Affiliates, the Affiliate has completed a "10x10" and is entitled to a $1,000 BAM bonus. (*Id.*) When the recruits' recruits each recruit 10 more recruits of their own, the initial Affiliate has completed a "10x10x10" and can now receive a $10,000 bonus. (*Id.*) Continuing on, an Affiliate can earn a $100,000 bonus for completing a 10x10x10x10 and a $1 million bonus for completing a 10x10x10x10x10. (*Id.*) Additionally, SBH's marketing materials state that if each downline recruit purchases at least $500 of product per month, an Affiliate with a 10x10x10x10x10 will earn a one-time bonus of $5 million. (*Id.*) In other words, an Affiliate earns the full BAM bonus only by having 111,110 individuals in a downline network. SBH officials repeatedly stress the importance of the "Power of 10" concept during their marketing efforts.[4]

SBH's marketing materials state there are three different types of Affiliates. (Ex. 28 at 33.) The first are those who want to "use products, supplement [their] income, and gain great tax benefits." (*Id.*) Second are those who want to "replace [their] income (no more job)." (*Id.*) The third category are those who want "financial freedom." (*Id.*) This final category is reserved for those who want to "live the life of their dreams. They don't want to settle for average." (Ex. 37 at 8.) As discussed in more detail below, Defendants have described "financial freedom" as a life "where your son before he was born was already retired, and his kids are retired, and his kids' kids are retired."

SBH employs the same "fundamental training system" for all three types of Affiliates—"get started," "be a product of the product," "build a team," and "duplicate."

---

[4] *See, e.g.*, Ex. 69-11 at 46:20 (Noland speaking: "Your job is to score. Scoring here is 10x10s. Not creating a 10x10, you're not doing your job . . . that's the job we need done."); Ex. 69-7 at 1:02:11 (Noland speaking: "We don't need everyone. We need 10. We need 10 that are real winners."); Ex. 69-11 at 1:03:51 (Noland speaking: "If they don't go get somebody that did what they did, which is order and refer, then they're not the one . . . you gotta find 10 people that, at a minimum, will [buy] a bag a week . . . you got a million coming in 6 months if you got a 10x10 . . . ."); *id.* at 1:00:12 (Noland speaking: "I can't get free unless I find these ten to get ten. That's how I want you to think . . . anybody that tells me they want financial freedom and will not go do to get these 10 are an enemy. They're an imposter. They're a spy that came into the camp. They want to steal from you."). *See also* Doc. 8-13 at 291 ["All other five plans are driven by the [BAM] bonus."].)

- 4 -

(Ex. 32 at 17-23.)  Within these four steps, "the key to long term success" is identified as "DUPLICATION.  Duplication comes from putting together simple steps that can be followed and repeated by a large group of people."  (*Id* at 2.)  In particular, Affiliates are encouraged to "duplicate Mr. Noland."  (Ex. 70-7 at 13:09.)

Affiliates are also pressured to attend every training put on by SBH and Noland, even if they must max out their credit cards and take out loans to afford the attendance fees. (Ex. 70-6 at 5:20; Doc. 8-13 at 238 [transcript of Harris's remarks on January 21, 2019: "I had someone tell me yesterday . . . , look, if I do this, I'm going to have to get a loan to be able to go there.  And I said, oh, so it's not worth getting a loan to come here and build something that's going to take care of your family for generations, right?  I mean, yeah, I would get a loan if I needed one."].)  For example, SBH asks Affiliates to sign a "Million Dollar Contract."  (Doc. 8-13 at 189; Ex. 54.)  Among other things, this contract purports to require the Affiliate to "attend all SBH corporate trainings and events *no matter what*." (*Id.*, emphasis added.)   Similarly, SBH's "One Year Commitment Form" requires an Affiliate to "commit that I will . . . [a]ttend all Major Corporate Events (typically 2 or 3 per year)."  (Doc. 8-5 at 2; Ex. 33.)[5]

The problem with all of this, as the FTC sees it, is that the entire SBH enterprise is built on false premises.  (Doc. 35.)  The FTC asserts that "Defendants frequently tell consumers that they likely will replace their job income within six months and obtain 'financial freedom' within 18 months if they work hard and follow instructions."  (*Id.* ¶ 41.)  The FTC asserts, however, "that the vast majority of participants lose money in the program."  (*Id.* ¶ 59.)

According to the FTC, this is true because of a more fundamental problem: SBH operates as an illegal pyramid scheme.  (*Id.* at 20).  "Each version of the SBH commission plan, and the manner in which Defendants have promoted the plan, has prioritized and

---

[5]     Following the hearing, Defendants submitted a pair of recordings during which Noland stated that trainings are not "required."  (Doc. 95-5 at 5.)  This evidence does not change the Court's overall conclusion that Defendants place heavy emphasis on the need to attend costly training sessions.  Indeed, in the first clip submitted by Defendants, Noland stated "it is preferable that you go to trainings."  (*Id.*)

incentivized recruiting new Affiliates over selling SBH products." (*Id.* ¶ 60.) The FTC contends that neither the "Four Steps to Success" nor the "Power of 10" model favor retail sales—instead, they rely almost entirely on Affiliate recruiting. (*Id.* ¶¶ 64-72.) The FTC contends that Affiliates are also encouraged to "buy large amounts of products when they sign up, and to continue stockpiling inventory thereafter. [Defendants] encourage these purchases not as a response to consumer demand, but instead as a strategy of growing one's business and advancing to higher SBH ranks." (*Id.* ¶ 73.)[6]

II.    Procedural Background

On January 8, 2020, the FTC filed this action. (Doc. 35 ¶ 1; originally filed at Doc. 3.) The Defendants are SBM, of which SBH is an unincorporated division (*id.* ¶6), Success by Media LLC, which also did business as SBH (*id.* ¶ 7), Jay Noland, the owner, director, chief executive officer, president, and treasurer of SBM (*id.* ¶ 8), Lina Noland, Jay Noland's wife who is also an owner, director, officer, and corporate secretary of SBM (*id.* ¶ 9), Scott Harris, the president of SBM and SBH (*id.* ¶ 10), and Thomas Sacca, the chief visionary officer of SBM and SBH (*id.* ¶ 11).

On the same day, the FTC moved for an *ex parte* TRO. (Docs. 7, 8.) The FTC argued that a TRO was necessary to "stop . . . ongoing fraud, freeze the Defendants' assets for consumer redress, and preserve evidence." (Doc. 8 at 7.)

The FTC submitted various materials in support of its request for a TRO. One supporting document was an affidavit from Adam Rottner, an FTC investigator. (Doc. 8-1.) Among other things, Mr. Rottner summarized various SBH marketing videos and materials that he had reviewed as part of the investigation. (*Id.*) The FTC also submitted an expert report prepared by Dr. Stacie Bosley, an associate professor of economics at Hamline University. (Doc. 8-21.) In a nutshell, Dr. Bosley stated in her report that "SBH and its promoters are marketing a pyramid scheme and are misrepresenting to consumers

---

[6]    This practice is known as "inventory loading." *Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776, 783 n.3 (9th Cir. 1996) ("'Inventory loading' occurs when distributors make the minimum required purchases to receive recruitment-based bonuses without reselling the products to consumers.").

the amount of money consumers are likely to make by joining SBH."  (*Id.* at 80 ¶ 140.)

Another supporting document was a declaration from Amanda Lorusso Wilson, an FTC

data analyst.  (Doc. 8-23.)  Ms. Wilson's role was to review and analyze SBH's financial

records, and her declaration included a chart showing that, between 2017-2019, a total of

4,913 Affiliates paid over $4.5 million to SBH for products, and paid an additional $1.2

million to SBH for training, yet received a payout from SBH in commissions of around

only $1 million—resulting in an aggregate loss of over $4.7 million.  (*Id.* at 23 ¶ 36.)  Ms.

Wilson further calculated that, of the 4,913 Affiliates, "only 81 Affiliates received more

from [SBH] than they paid to it" and those 81 individuals earned an average profit of less

than $2,300.  (*Id.* ¶ 37.)

On January 9, 2020, the Court held an *ex parte* hearing on the FTC's request for a

TRO.  (Doc. 17.)

On January 13, 2020, the Court substantially granted the FTC's motion.  (Docs. 15,

19, 38.)  The Court also appointed Kimberly Friday to serve as the temporary receiver of

SBM Holdings and SBM (the "Receivership Entities").  (Doc. 19 at 16.)  A preliminary

injunction hearing was initially scheduled for January 27, 2020.  (*Id.*)

On January 14, 2020, Defendants moved to modify the TRO.  (Doc. 22.)  They

argued modification was necessary to ensure the Receivership Entities could meet their

payroll obligations.  (*Id.*)  Because the TRO already allowed the receiver to meet those

obligations, the Court denied the motion.  (Doc. 33.)

On January 24, 2020, the parties stipulated to delay the preliminary injunction

hearing and keep the TRO in place until the Court ruled on the preliminary injunction

request.  (Doc. 43.)  The hearing was rescheduled for February 12, 2020.  (Doc. 52.)

Before the hearing, Defendants sought leave to present live testimony.  (Doc. 56.)

They requested that the FTC make its TRO declarants available for cross-examination and

also sought leave to present direct testimony from their own witnesses.  (*Id.*)  Defendants

later supplemented their request, informing the Court that they no longer planned to present

direct testimony but still sought an order compelling the FTC to produce its witnesses for

cross-examination. (Doc. 73.) The FTC had already informed the Court that it would produce its witnesses for cross-examination, so the Court denied Defendants' request as moot. (Docs. 74, 83.)

At the same time, Defendants requested leave to pursue expedited discovery. (Doc. 53.) They sought authorization to obtain discovery of a "limited" (but undefined) scope, compulsion of the FTC's responses to Defendants' written discovery requests, compulsion of the FTC to make its witnesses available for depositions, and an order that if the FTC failed to comply, it would be precluded from introducing evidence at the preliminary injunction hearing. (Doc. 53 at 4-5.) The FTC largely opposed this request but did offer to make available to Defendants all of the documents upon which it relied when preparing its complaint and TRO motion. (Doc. 58 at 8-9.) The Court found the FTC's offer reasonable and accordingly granted Defendants' motion in part. (Doc. 59.)

In the days before the hearing, both parties submitted further briefing on the merits of the FTC's request for a preliminary injunction. (Docs. 76, 81.) As attachments to their brief, Defendants included, among other things, (1) a declaration from Jay Noland (Doc. 76-1 at 2-9), and (2) an expert report from Michael Fahlman, a managing director at a global strategic advisory and expert services firm, who offered various criticisms of the FTC's expert, Dr. Bosley (Doc. 76-1 at 20-31).

On February 10, 2020, the receiver issued a report summarizing her activities and observations since assuming control of SBH on January 13, 2020. (Doc. 82.) Among other things, the receiver stated that "in 2018, SBH made payments to approximately 3,398 Affiliates. Only 296 of those Affiliates made $500 or more in commissions . . . . In other words, more than 90% of Affiliates – persons who purchased memberships with SBH as a business opportunity to 'replace their job,' or become 'financially free,' made $500 or less in commissions for the entire year, and may have spent much more." (Doc. 82-1 at 17.) The receiver concluded that she "does not believe that the business can be operated without violating the TRO. The inaccurate marketing statements, the organization of the commission system, and the movement of large amounts of cash to the insiders strongly

suggests that the business is structured in such a fashion that prevents Affiliates from realizing the promoted business opportunities. In light of that reality . . . the Temporary Receiver believes it would be inadvisable to continue operations pending the outcome of the case." (*Id.* at 19.)

On the evening of February 11, 2019, Defendants filed a motion to supplement the record. (Doc. 85.) Specifically, Defendants sought to introduce four categories of documents: (1) declarations from SBH Affiliates concerning their satisfaction with SBH (Doc. 85-1); (2) declarations from SBH Affiliates concerning the earnings they had derived from SBH (Doc. 85-2); (3) a photograph of an online poll posted on the SBH Facebook page (Doc. 85-3); and (4) an index that supplied additional "context" surrounding some of the statements the FTC had proffered (in the Rottner affidavit) as evidence of false statements (Doc. 85-4). This motion was granted. (Doc. 86.)

On February 12, 2020, the preliminary injunction hearing took place. (Doc. 86.). During the hearing, Defendants cross-examined Mr. Rottner, Ms. Wilson, and Dr. Bosley. Additionally, the FTC elicited testimony from Ms. Wilson concerning the Affiliate declarations that Defendants had submitted the night before the hearing. Ms. Wilson testified that, based on her review of SBH's financial records, the Affiliates who submitted declarations on Defendants' behalf paid a total of around $572,000 to SBH but received a total of around only $207,000 in commissions. After the hearing, the Court took the matter under advisement. (*Id.*)[7]

On February 19, 2020, Defendants filed a response to the receiver's report. (Doc. 94.) Additionally, Defendants filed another motion to supplement the record. (Doc. 95.) Enclosed with this motion were: (1) a declaration from Jay Noland and associated exhibits, including a "Personal Net Worth Statement" (Doc. 95-2); (2) various audio and video clips during which Noland mentioned the importance of retail sales, stated there was "no

---

[7]     The FTC also filed a motion to transfer a related case, No. 00-cv-2260-PHX-DWL, to the undersigned judge. (Doc. 40.) That case closed in 2002 with a permanent injunction against an earlier business run by Noland. (No. 00-cv-2260-PHX-DWL, Doc. 66.) The motion to transfer was granted (Doc. 69), and the FTC has since initiated contempt proceedings against Noland (No. 00-cv-2260-PHX-DWL, Doc. 78).

pressure" on Affiliates, stated that training sessions were not required, and stated that SBH wasn't making income claims (Doc. 95-5 at 2-8 [chart summarizing same]; (3) a declaration from Crystal Roney, SBM's external accountant (Doc. 95-19); and (4) further social media posts from SBH Affiliates (Docs. 95-20, 95-21, 95-22, 95-23, 95-24).

On February 20, 2020, the FTC filed a notice stating that it "does not oppose the Court considering the [post-hearing] material" submitted by Defendants but urging the Court to "giv[e] it the de minimis weight it deserves" because it is "replete with factual inaccuracies" and is "contradicted by Defendants' sworn testimony." (Doc. 97.) Accordingly, Defendants' second motion to supplement was granted. (Doc. 98.)

## ANALYSIS

When the FTC "has reason to believe" that "any person, partnership, or corporation is violating . . . any provision of law enforced by the [FTC]" and "the enjoining thereof . . . would be in the interest of the public," it may seek a preliminary injunction from a district court. 15 U.S.C. § 53(b). Section 53(b) "places a lighter burden on the Commission than that imposed on private litigants by the traditional equity standard; the Commission need not show irreparable harm to obtain a preliminary injunction." *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1159 (9th Cir. 1984). Thus, "[u]nder this more lenient standard, 'a court must 1) determine the likelihood that the Commission will ultimately succeed on the merits and 2) balance the equities.'" *FTC v. Affordable Media*, 179 F.3d 1228, 1233 (9th Cir. 1999) (quoting *Warner Commc'ns*, 742 F.2d at 1160).

I. <u>Likelihood Of Success</u>

The FTC alleges that (1) Defendants are operating an illegal pyramid scheme, (2) Defendants have made false and misleading representations, and (3) Defendants have violated two FTC rules governing refunds and shipping time. During oral argument, however, the FTC clarified that the rules violations, standing alone, likely would not warrant injunctive relief. Accordingly, the Court focuses on the first two allegations.

A. **Pyramid Scheme**

The FTC Act prohibits the use of "[u]nfair methods of competition in or affecting

commerce, and unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a). The operation of an illegal pyramid scheme constitutes such a prohibited practice. *FTC v. BurnLounge, Inc.*, 753 F.3d 878, 880 (9th Cir. 2014) ("The operation of a pyramid scheme constitutes an unfair or deceptive act or practice in or affecting commerce for the purposes of [the FTC Act].").

It is important to emphasize that not all multi-level marketing businesses ("MLMs") are pyramid schemes. To determine whether an MLM is a pyramid scheme, "a court must look at how the MLM business operates in practice." *Id.* at 883. "A pyramid scheme is 'characterized by the payment by participants of money to the company in return for which they receive (1) the right to sell product *and* (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users.'" *Id.* (quoting *Omnitrition,* 79 F.3d at 781). Here, Defendants don't dispute that the first element is satisfied. (Doc. 72 at 14.) Thus, the Court will focus on the second element.

The satisfaction of the second element "is the *sine qua non* of a pyramid scheme." *BurnLounge*, 753 F.3d at 883-84 (quotation omitted). It "is characterized by recruitment with rewards unrelated to product sales." *Id.* at 884 (quotation omitted). Put another way, the second element is present when "participants purchase the right to earn profits by recruiting other participants, who themselves are interested in recruitment fees rather than the sale of products." *Id.* (quoting *In re Amway Corp.*, 93 F.T.C. 618, 716 (1979)). Notably, the second element "does not require that rewards be *completely* unrelated to product sales." *Id.* at 885 (emphasis in original). If that were the rule, "any illegal MLM business could save itself from liability by engaging in *some* retail sales." *Id.* at 886 (emphasis in original). Thus, in the Ninth Circuit, an MLM business may be considered an illegal pyramid scheme if "the rewards the participants received in return were largely for recruitment, not for product sales." *Id.*

There is ample evidence that SBH meets the second requirement of offering rewards that are "largely" based on recruitment, not sales to ultimate users. First, SBH's sales

videos and transcripts, which the Court has carefully reviewed, show that SBH and Noland focus overwhelmingly on recruitment as the path to commissions and profits. Although the FTC exaggerated during the hearing by suggesting that SBH never focuses on retail sales—two of the clips played during closing (Exs. 69-7, 129-1) depict Noland talking about the importance of retail sales, and the materials submitted by Defendants following the hearing contain additional instances of such discussion (Doc. 95-5 at 2-4)—these are drowned out by the drumbeat of constant emphasis on recruiting other Affiliates and profiting from a cut of the commissions earned by downline Affiliates.[8] To take one example, during a seminar in April 2019, Sacca told the audience that:

> *Our commission plan is driven 100 percent, not—not 95, not 85, not 75—it's driven 100 percent by our [BAM] bonus.* I want y'all to think about that for a second. . . . If we can teach people and instruct people how to get that [BAM] bonus and how to make sure that people are duplicating that [BAM] bonus down through our sales organization and our sales team, all other five parts of our commission plan are going to take care of themselves.

(Doc. 8-13 at 291, emphasis added.) This is a damning statement—it essentially serves as an admission that the profits an SBH Affiliate might earn through retail sales (which is "phase one" of SBH's six-phase plan) are trivial and that the commission plan is actually "driven" by the potential profits to be earned by qualifying for the BAM bonus (which is "phase six" and requires, in its highest form, the recruitment of over 100,000 people).

Other videos contain similar statements. For example:

▪ Noland video: "Your job is to score. Scoring here is 10x10s. Not creating a 10x10, you're not doing your job . . . that's the job we need done." (Ex. 69-11 at 46:20.)

▪ Noland video: "We don't need everyone. We need 10. We need 10 that are real winners." (Ex. 69-7 at 1:02:11.)

▪ Harris video: "Be professional, be polite, and smile, but have a plan to kill everybody you meet. [Laughter] Be polite, be professional, and smile, and have a

---

[8] Thus, the Court agrees with Dr. Bosley's conclusion that, although "there is some discussion of retail sales in the SBH materials," the "primary emphasis" is on "Affiliate purchases, recruitment, and duplication." (Doc. 8-21 at 53.)

plan to *recruit* everybody you meet." (Ex. 70-7 at 4:04.)

▪ Noland video: "If they don't go get somebody that did what they did, which is order and refer, then they're not the one . . . you gotta find 10 people that, at a minimum, will [buy] a bag a week . . . you got a million coming in 6 months if you got a 10x10 . . . ." (Ex. 69-11 at 1:03:51.)

▪ Noland video: "I can't get free unless I find these 10 to get 10. That's how I want you to think . . . anybody that tells me they want financial freedom and will not go do to get these 10 are an enemy. They're an imposter. They're a spy that came into the camp. They want to steal from you." (*Id.* at 1:00:12.)

▪ Noland video: "EVERY DAY somebody's gotta get into your business . . . you not doing that is giving into being a loser." (Ex. 69-7 at 1:02:40.)

Second, and in a similar vein, SBM's written marketing and sales materials focus on recruitment, rather than sales to ultimate users, as the primary pathway to profits. For example, SBH's "Retail Sales Script" encourages Affiliates to make the following statement when attempting to make retail sales to third parties: "I need you to help me out by buying at least a bag or two of coffee from me *one time* at retail pricing. If you like it, *I will show you how to get it at wholesale pricing* from then on." (Ex. 35, emphasis added). As the italicized language shows, Affiliates aren't encouraged to continue making repeat retail sales to third parties who enjoy SBH products—instead, they are encouraged to make a retail sale only once, then persuade the purchaser to start buying wholesale quantities directly through the SBH website (conduct that would result in recruitment commissions for the Affiliate, not profits from retail sales). Similarly, SBH's "Four Steps to Success" (Ex. 44 at 68) focuses solely on recruitment and doesn't say a thing about retail sales.[9]

---

[9] The consumer complaints submitted by the FTC corroborate the Court's conclusion that SBH's videos and written materials emphasize recruiting over retail sales. (*See, e.g.,* Doc. 8-16 at 42 [consumer complaint: "I . . . was pressured to spend money I didnt [sic] have, attemd [sic] events I couldnt [sic] afford, . . . and was pressured to get others to 'join' . . . ."]; Doc. 8-17 at 3 [consumer complaint: "They pressured us into getting other people involved very hard. As well as Pressured to attend events regularly and constantly pressured to spend money we dont [sic] have and promised to get so much back if we do as told."]; Doc. 8-17 at 11 [consumer complaint: "[T]he plan is all about recruiting more people, not so much selling the product."].)

Third, when evaluating whether an MLM company's rewards are based primarily on recruitment or sales to ultimate users, courts also consider whether the company has promulgated, and effectively enforced, policies to prevent inventory loading. *See, e.g., Omnitrition*, 79 F.3d at 783 ("[T]here must be evidence that the program's safeguards are enforced and actually serve to deter inventory loading and encourage retail sales."); *FTC v. Vemma Nutrition Co.*, 2015 WL 11118111, *4 (D. Ariz. 2015) (granting preliminary injunction where "Affiliates are very likely engaging in inventory loading" and "Vemma's purported anti-inventory-loading safeguards are neither effective nor enforced"); *Bostick v. Herbalife Int'l of Am., Inc.*, 2013 WL 12131732, *4 (C.D. Cal. 2013) ("A party may rebut allegations of a pyramid scheme by showing that its policies prevent inventory loading . . . ."). For example, in *Omnitrition*, the Ninth Circuit noted that Amway was not a pyramid scheme in part because the company would only pay a monthly bonus to participants who could prove that (1) they had resold at least 70% of the products purchased that month and (2) they had made retail sales to at least 10 different consumers. 79 F.3d at 782-83 (citation omitted).

Here, such evidence is wholly lacking. SBH does not even attempt to track Affiliates' retail sales or track how much inventory a particular Affiliate possesses.[10] SBH also adheres to a "no refund" policy.[11] And during his deposition in this case, Noland couldn't identify any compliance-related SBH policies, procedures, or guidance. (Doc. 81-3 at 18 [lines 104:9-18].) This places SBH in an even less defensible position than the enjoined business in *Vemma Nutrition*, which at least purported to prevent inventory loading.[12] Additionally, the FTC has identified training sessions during which Noland and

---

[10]    *Compare* Doc. 35 ¶ 61 ("SBH does not separately track sales made by Affiliates to ultimate users of SBH products.") *with* Doc. 92 ¶ 1 (admitting same).

[11]    *Compare* Doc. 35 ¶ 95 ("Defendants do not offer any consumers . . . the option to cancel their order and obtain a refund.") *with* Doc. 92 ¶ 1 (admitting same). *See also* Doc. 76 at 26 (acknowledging that SBH has a "transparent no refund policy" but stating that SBH occasionally overlooks this policy and issues refunds).

[12]    The Court thus agrees fully with Dr. Bosley's observations that SBH's no-refund policy "is highly unusual and represents the antithesis of a safeguard" and that other "MLM firms, even those who have been prosecuted for pyramid scheme activity, typically pay— at a minimum—lip service to safeguard policies including a minimum retail requirement,

- 14 -

other SBH principals talked approvingly about inventory loading. (*See, e.g.*, Doc. 8-12 at 7 ["A few people have said . . . I've already got, like, $1,000 worth of product at my house. And I said, well good for you. A thousand dollars' worth of products, if you're lucky, might even fill two orders"]; *id.* at 8 ["Mr. Noland and I used to carry around 10, 15, 20, $25,000 or more in products. We'd have it in several different cities. We had apartments. We kept it in our apartments. We kept it in each office in each city. We had a locker. We kept some in our car when the weather was right."]. *See also* Ex. 34 [pamphlet entitled "The Power of an Auto-Order Program," tying Affiliate success and chances at commissions to signing up for automatic monthly orders.)[13]

Fourth, the Court assigns significant weight to the opinions of the FTC's expert, Dr. Bosley. As an initial matter, the Court was unpersuaded by Defendants' attempt to show that Dr. Bosley harbors a bias against the MLM industry. The Court found her to be credible, careful in her opinions, and helpful.[14]

In her report, Dr. Bosley concluded that SBH's structure "undermine[s] retail activity" (Doc. 8-21 at 17), that compensation can be earned "exclusively through recruitment and internal purchases without any verified retail sales to ultimate users" (*id.*), and that SBH does not create any financial incentive to engage in retail sales—the only conduct that's incentivized is recruitment (*id*. at 18). Importantly, "[e]nrollment pack

_____

70 percent rule, and refund policy." (Doc. 8-21 at 77-78.)

[13] Defendants' claim that Affiliates "have no structural incentive to 'inventory load' under the SBH plan because they do not have to meet any minimum volume requirements to be eligible for commissions" (Doc. 76 at 15) is unavailing. As the FTC correctly stated in its reply, "Defendants' *practice*—regardless of what their commission plans says—is to compel Affiliates to buy products, including by threatening them with removal from the program. In footage obtained from Defendants' offices, for example, Noland told Affiliates not to sign up as an Affiliate if they were not going to order products every month, later adding that if Affiliates wanted to earn $1 million per year, they needed $500 in 'personal volume' each month." (Doc. 81 at 12, citing Ex. 70-9.) The FTC also submitted evidence showing that Noland once encouraged Affiliates to purchase $15,000 in products so they could qualify for a financial incentive that would otherwise become unavailable in a few hours. (Doc. 8-13 at 280.)

[14] Although Defendants (and their expert, Mr. Fahlman) are correct that Dr. Bosley shouldn't have suggested in her report that Defendants acted with a fraudulent mindset (Doc. 76 at 14; Doc.76-1 at 25-27)—she is not qualified to opine on that topic—the Court doesn't view that isolated instance of overreach as a reason to discount her other opinions or question her objectivity.

bonuses are one example of the disconnect between Affiliate compensation and product sales, as the Affiliate earns immediate commission from the purchase of an enrollment pack whether the products in the pack are ever sold to customers or not." (*Id.* at 18.)[15] Dr. Bosley further found that of the six types of compensation offered by SBH, five require massive recruitment efforts and do not turn on retail sales. (*Id.* at 21-32.)

Dr. Bosley's conclusion that SBH is a pyramid scheme is bolstered by her careful assessment of SBH's training program, which she concludes emphasizes recruitment "with some limited attention to retail." (Doc. 8-1 at 42.) The training begins by "explicitly connecting the size of the enrollment pack to the level of commitment and the magnitude of financial rewards in SBH." (*Id.* at 42-43.) "Higher priced enrollment pack[s] . . . open[] up qualification for higher Tier Commissions." (*Id.* at 44.) Moreover, "[f]or the new Affiliate seeking maximum rewards, the Fast Start System trains the individual to enter with the largest enrollment pack, establish a monthly auto-order, attend paid trainings, then 'build a team' to 'duplicate.'" (*Id.* at 50.) Notably, none of those keys to success are retail sales. In fact, Dr. Bosley points to an example of SBH stating that "[w]e'll pay you four [of the six] tiers" of commissions and bonuses if an Affiliate does nothing but recruit. (Doc. 8-21 at 44.) That is, with zero product bought and zero product sold, Affiliates could earn money simply for recruiting. This is strong evidence that sales to ultimate users are not the primary source of financial rewards to SBH Affiliates.

Dr. Bosley's report is replete with similar conclusions. The Court won't reproduce them all here. Based on just what the Court has already quoted, there is ample evidence that SBH operates a pyramid scheme. Dr. Bosley put it succinctly: "SBH and its promoters are marketing a pyramid scheme and are misrepresenting to consumers the amount of money consumers are likely to make by joining SBH . . . The anticipated result of SBH's program is an endless recruitment chain." (Doc. 8-21 at 79.)

Defendants retained their own expert, Mr. Fahlman, to respond to Dr. Bosley's

---

[15]   *Cf. Omnitrition*, 79 F.3d at 782 (compensation structure was "'facially unrelated to the sale of the product to ultimate users' because it is paid based on the suggested retail price of the amount *ordered* from Omnitrition, rather than *actual sales* to consumers").

report. (Doc. 76-1 at 20-31.) Beyond challenging Dr. Bosley's improper conclusion about Defendants' state of mind, Mr. Fahlman contends that Dr. Bosley's financial and economic analysis is flawed because she failed to account for retail sales and internal consumption, the ability of Affiliates to resell product at, near, or below the wholesale price, the value of product included in discount packs, and the value of SBH's professional training services. (*Id.* ¶¶ 19, 25, 38.) This criticism dovetails with a broader argument that Defendants made before and during the evidentiary hearing—that the FTC failed to account for retail sales and personal consumption. (Doc. 76 at 16-18.)

To some extent, the Court agrees with Defendants (and with Mr. Fahlman) that the FTC and Dr. Bosley made things more difficult by failing to analyze (1) the extent to which Affiliates profitably resell the product they purchase from SBH, and (2) the extent to which Affiliates personally consume the product they purchase from SBH (because such consumption creates value from the Affiliate's perspective). Instead, the FTC's and Dr. Bosley's loss analyses looked solely to how much money each Affiliate made or lost relative to SBH (*i.e.,* netting the Affiliate's $49 fee and purchases against the overall amount of commission received back from SBH).[16] Although *BurnLounge* makes clear that the presence of retail sales doesn't automatically preclude a finding of a pyramid scheme, the proffered loss analyses don't tell the whole picture. In cases (like this case) where it's possible for a customer to resell the products or goods at issue, the second element of the *BurnLounge* test turns on whether the company places "primary" emphasis on recruitment or sales to ultimate users. In making this assessment, it obviously would have been helpful to have data concerning retail sales and internal consumption. The absence of such data makes things more complicated, particularly when the FTC is the movant and bears a heavy burden in the preliminary injunction context.

Nevertheless, Mr. Fahlman's report contains no substantive analysis at all concerning the prevalence of retail sales and internal consumption—he simply faults Dr.

---

[16] Dr. Bosley acknowledged that her "net profit numbers . . . may underestimate revenue" because they do not account for "any offline retail profit." (Doc. 8-21 at 70.)

Bosley for failing to account for such activity. And Defendants failed to present much, if any, other evidence of substance regarding retail sales and internal consumption. The Affiliate declarations that Defendants filed the night before the hearing are unpersuasive— many simply track commissions received from SBH, which is not the same thing as profits earned from retail sales (Doc. 85-2), and the few that do touch upon profits from retail sales fail to establish that such profits are SBH's primary source of Affiliate compensation (Doc. 85-1).[17] Additionally, although Defendants' counsel pointed to the audience during the evidentiary hearing and asserted that the attendees were all people who were engaging in meaningful retail sales activity, that's not cognizable evidence.[18] Indeed, Defendants ultimately acknowledged during closing argument that their evidence of retail sales was "anecdotal." This is unsurprising, given that SBH does not track retail sales or enforce anti-inventory loading protocols.

The Court also assigned significant weight to the testimony of the FTC's data analyst, Ms. Wilson, who testified that the 26 unique Affiliates whose declarations were submitted by Defendants the night before the hearing paid $572,000 to SBH in fees and purchases but received only $207,000 in commissions. There is no evidence these individuals nevertheless made more than $365,000 of retail sales (or were such lovers of SBH products that they engaged in over $365,000 in internal consumption) sufficient to

---

[17] For example, one declaration is from an Affiliate who contends that "I've been more successful with SBH than any of the other MLMs I've been in. I've earned more in SBH than in a little over 2 years than I have in all the offers over 4-5 years." (Doc. 85-1 at 14.) However, this Affiliate later acknowledges that "I don't do a lot of retail sales yet." (*Id.* at 15.) It is puzzling that Defendants would view this sort of declaration as proof that SBH's compensation plan emphasizes sales to ultimate users over recruitment commissions. Similarly, another pair of Affiliates state that "we have made between 200 USD-500 USD in retail sales every month" but then acknowledge that "[w]e have earned AROND [sic] (*This does not include retail*) $28,500 with SBH since we started." (Doc. *Id.* at 34-35, emphasis added.) Again, this is hardly evidence that retail sales are the primary source of rewards. (*See also Id.* at 5 ["I have done approximately $22,000 from commission and 15,000 generated through retailsale"]; Doc. 85-1 at 53-54 [although Affiliate earned substantial profits from retail sales ($44,922), Affiliate's commissions were more than 2.5 times greater ($110,006)].)

[18] Similarly, the social media posts that Defendants submitted following the hearing (Docs. 95-20, 95-21, 95-22, 95-23, 95-24) have little evidentiary value. These posts were not submitted under penalty of perjury and constitute, at most, anecdotal evidence that some Affiliates enjoyed modest financial success when reselling SBH products.

offset these losses. It's telling these were the best Affiliates Defendants could identify. Moreover, Dr. Bosley concluded that such resale profits would be next to impossible to achieve—even assuming a 75% mark-up, retail sales would be "trivial" in the broader compensation scheme. (Doc. 8-21 at 33.)

Again, the FTC is the movant and bears the burden of demonstrating that a preliminary injunction is warranted. The point of recounting what Defendants failed to produce is not to burden-shift but simply to note that Defendants' presentation was, from the Court's perspective as fact-finder, ultimately unpersuasive. Viewing SBH "in light of the [program] design as well as its training and marketing materials," there is compelling evidence that "[i]n all likelihood, Affiliates' purchases of [SBH] products are incidental to the right to qualify for and obtain bonuses." *Vemma*, 2048 WL 11118111 at *4. In written marketing materials and during training sessions, recruitment is constantly stressed while retail is an afterthought. The very structure of SBH, as Dr. Bosley points out, prioritizes recruitment over retail to the point that SBH is an "endless recruitment chain." (Doc. 8-21 at 79.) The bottom line is that SBH allows non-Affiliates to purchase goods through its website at wholesale prices, doesn't even bother to track whether Affiliates are engaging in retail sales, affirmatively encourages inventory loading, doesn't have any compliance policies, and adheres to a strict no-refunds policy. Thus, even if profitable retail sales are possible and sometimes do occur despite these policies, such sales cannot and do not serve as SBH's "primary" source of financial rewards to Affiliates. *BurnLounge*, 753 F.3d at 886.

Finally, the Court need not rely on conjecture and theory when reaching these conclusions. The last factor supporting the Court's analysis is that the receiver—whose credibility hasn't been attacked by Defendants in the same way as Dr. Bosley's—reached nearly identical conclusions as Dr. Bosley after assuming control of the company and seeing how it actually works. In the receiver's words, although "[o]n strictly economic terms, SBH's business is potentially profitable," that theoretical profitability derives from "making promises to its Affiliates that are unrealistic and unobtainable." (Doc. 82-1 at 15.)

In the course of her duties, the receiver issued "approximately 830 1099s to Affiliates for tax year 2019." (*Id.* at 17.) Based on those records, the receiver found that "272 Affiliates earned commission of $500 or greater in 2019; this equals approximately 4% of Affiliates." (*Id.*) In contrast, "the Temporary Receiver believes that the number of Affiliates that lose money is over 90%."[19] (*Id.*)

At bottom, the receiver "does not believe that the business can be operated without violating the TRO"—that is, the receiver doesn't think SBH can be operated legally. (*Id.* at 19.) She continues: "The inaccurate marketing statements, the organization of the commission system, and the movement of large amounts of cash to insiders strongly suggests that the business is structured in such a fashion that prevents Affiliates from realizing the promoted business opportunities." (*Id.*) This is powerful evidence supporting a likelihood of success on the pyramid scheme claim.[20]

## B.    **False Statements**

The FTC also alleges that Defendants violated 15 U.S.C. § 45(a) by misrepresenting the income potential of SBH Affiliates. Generally, "[a]n act or practice is deceptive" for purposes of Section 45 if "first, there is a representation, omission, or practice, that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material." *FTC v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001) (quoting *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994)). A representation is material if it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." *FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006) (internal quotation marks and

---

[19]    After the hearing, Defendants submitted their own breakdown of commissions paid to Affiliates. (Doc. 95-4 at 5.) Although these numbers differ slightly from the receiver's, Defendants' own accounting shows that only 4.74% of Affiliates earned more than $1,000 through commissions. (*Id.*)

[20]    Defendants' objection to the receiver's report (Doc. 94) is unavailing. Defendants criticize the receiver for concluding SBH is not liquid, for not using GAAP, and for other purported oversights. (Doc. 94-1.) But even assuming these criticisms are correct, they are irrelevant. The key takeaways from the receiver's report do not turn on the liquidity of the company or its total valuation. Instead, as discussed, the Court affords great weight to the receiver's conclusions that the company cannot be operated legally and that Affiliates are doomed to lose more money than they put in.

citation omitted).  "Courts consistently conclude that misrepresentations regarding income potential are material and violate the FTC Act."  *Vemma*, 2015 WL 11118111 at * 5.

The FTC is likely to succeed on this claim. The key misrepresentation, repeated again and again, concerns the concept of "financial freedom."  That term refers to the ability of an SBH Affiliate to not only quit his or her job, but to generate massive amounts of "residual income" such that an Affiliate will never have to work again.  For example:

▪ "You cannot get free unless you make residual income."  (Doc. 8-27 at 49.)

▪ "Who in this room would like to be free? Right? Have financial freedom, do what you want, when you want, wherever you want?"  (*Id.* at 50)

▪ "I've been financially free, completely time and money free, since I was 36.  I've not had to work a job since I was 31. . . since I was 27."  (*Id.*)

▪ "Jay, please tell me how you created a financial freedom life, to where your son before he was born was already retired?  And his kids are retired.  And his kids' kids are retired.  I'm now working on my fourth generation . . . this is simple, all you gotta do is listen to me."  (*Id.* at 56.)

▪ "I can't get free unless I find these 10 to get 10.  That's how I want you to think . . . anybody that tells me they want financial freedom and will not go do to get these 10 are an enemy.  They're an imposter.  They're a spy that came into the camp.  They want to steal from you."  (Doc. 69-11 at 1:00:12.)

Defendants proffer a variety of reasons why these "financial freedom" claims shouldn't be viewed as deceptive, but none are availing.  For example, Defendants' counsel asserted at times during the hearing that "financial freedom" doesn't mean enough money to quit one's job or retire—it could simply be a modest supplementation of income.  At other times during the hearing, Defendants' counsel stated, "I don't think it's an objectively measurable term, [financial] freedom, I think it's inherently subjective."  These arguments ignore the surrounding statements that Defendants made when talking about financial freedom.  It was always linked to making enough money to quit one's job, retire, and otherwise live a wealthy lifestyle.

Defendants' attempts to redefine "financial freedom" are further belied by SBH's own marketing materials and training videos. As noted, those materials state that Affiliates fall into one of three "types." (Exs. 28, 37.) The first category encompasses "[s]omeone who wants to Use the Products, Supplement Their Income, and gain Great Tax Benefits." (Ex. 37 at 8.) But again, that is type *one*. This is followed by type two, the "Replace Their Income" group. (*Id.*) This group "realizes that they can't financially survive on what they are currently making, nor do they want to continue to work for someone else." (*Id.*) This group wants to replace a full-job income in six months. (*Id.*) This group, in turn, is followed by type three, those seeking "Financial Freedom." (*Id.*) This group is encouraged to "Get Started Now. Take Massive Action" so they can "live the Life of Their Dreams." (*Id.*) They didn't want "to settle for average." (*Id.*)

It's true that the description of the third type of Affiliate doesn't make an income claim that is quantifiable down to the penny, but it's still functionally an income claim. The ordering of the types—one, two, three—implies that each is greater than the last. Type two, a job income, is greater than type one, supplemental income. The implication is that whatever type three is, it is greater than a job income. Indeed, Defendants visually emphasized this point during their training videos:



(Doc. 8-21 at 60.) Thus, Defendants' suggestion that "financial freedom," for some people, might be supplementation of income is contradicted by the types themselves. If that

suggestion were correct, SBH would have marketed two types (one and two), not three. Put simply, SBH's own marketing materials indicate that "financial freedom" refers to some level of wealth beyond replacing a job income. Combined with Noland's other statements, the Court concludes, as the finder of fact, that Defendants used the term "financial freedom" as a functional income claim that referred to a fabulous level of wealth beyond completely replacing a job income.[21]

Defendants also seek to defend the challenged statements by arguing they constituted mere "puffery" and "empty superlatives" that were "designed to be motivational and inspiring." (Doc. 76 at 20-21.) This argument lacks merit. As discussed above, the context makes clear that Defendants employed the term "financial freedom" as a functional income claim, not as an empty superlative.

Defendants also engaged in deception by claiming that some SBH Affiliates had *already* obtained financial freedom. For example, Defendants included in SBH's official magazine ("Success By Health: The Mag") a quotation from an Affiliate that "When I was introduced to SBH, I had 3 jobs and debt from years of never being taught how to properly invest my income. Within 2 weeks, I had quit my job and was on a plane to Las Vegas to be trained by the best CEO in the industry. I have not looked back since finding the power of retail in this wonderful company." (Doc. 8-15 at 25.) In fact, the Affiliate in question paid over $12,000 to SBH but received only $2,237.88 in commissions. (Doc. 8-23 at 24.)

This was not an isolated incident. For example, Noland once told an audience that that earning $23,500 per month in commissions was possible because "I got people in my network globally, they make that look silly. . . . Because you're sitting on top of the 10[']s 10 getting 10, and now your front tier making 23,500. You're now a coffee millionaire. . . . You got a million coming in." (Doc. 8-27 at 60.) Similarly, the "SBH 3-Way Call

---

[21] Noland has acknowledged that he avoids making quantifiable income claims in an attempt to avoid scrutiny from the FTC. (Doc. 8-27 at 101 ["[T]hey said you cannot tell people how much you make because it unfairly entices them . . . . Yes, your Federal Trade Commission people said, hey, Jay, listen, you make people feel like they can run through walls . . . . So what we started doing is instead of telling people how much we make, we just go, okay, last week I made enough to buy that Maserati cash."].)

Script," which was provided to Affiliates, included the representation that "We've also got several people that are achieving [sic] Financial Freedom *already* with our company." (Doc. 8-5 at 33, emphasis added.)  These are statements of historical fact, and they are false (at least based on the evidence presented as part of the preliminary injunction proceedings). The FTC presented evidence that nearly all Affiliates lost money and that the few Affiliates who were net-positive earned relatively little.  The receiver confirmed that conclusion.  Dr. Bosley's report indicates that such success is impossible.  And Defendants failed to introduce evidence (as opposed to anecdote) establishing that any Affiliate had ever earned enough money from SBH to achieve "financial freedom."[22]

On a somewhat related note, the FTC showed that Noland also made false statements about his own financial condition, including a claim that "I've been financially free since I was 36" (Ex. 69-1, clip 1) and a claim that he was so rich his son and grandchild would never have to work (Ex. 69-1, clip 2).  The FTC argues those claims were false because Noland submitted a post-TRO declaration conceding he has a negative net worth. (Doc. 81-2 ¶ 32.)  During the hearing, Defendants didn't try to justify all of Noland's statements but suggested that, because he is the plaintiff in a different lawsuit that is currently "up on appeal," in which he "would receive a recovery of $45 million" if he prevailed, he had an arguable basis for his generational wealth claim.

This argument is unpersuasive.  The only record evidence of the other lawsuit was submitted after the hearing (Doc. 95-1 ¶ 6) and refers to *Noland v. Organo Gold Int'l, Inc.*, No. 18-cv-01275-JAD-DJA (D. Nev.) and a related Canadian case (*id.* ¶¶ 6-8).  In the Nevada case, the district court issued an order of dismissal in September 2019 because all of Noland's federal claims were time-barred.  (Dkt. 149.)  It should be obvious that this

---

[22]     In their pre-hearing memorandum, Defendants argued their income claims "are mathematically correct and, therefore, not false.  In other words, it is possible for some affiliates to earn thousands of dollars a month in commissions and bonuses as an SBH affiliate, and, in fact, some have." (Doc. 76 at 21.)  However, the only supporting evidence identified by Defendants was a cross-reference to SBH's Facebook page.  (*Id.* at 21 n.5.) Additionally, this argument overlooks that Defendants didn't just make prospective statements about wealth generation—they falsely stated that some Affiliates had already achieved "financial freedom."

failed lawsuit didn't give license to Noland to dupe SBH Affiliates into believing he had already achieved multi-generational wealth and "financial freedom." Moreover, the fact that Noland is now improperly siphoning money out of the company for luxury cars and homes—as discussed in Part II below—is further inconsistent with these claims.[23]

Defendants also accuse the FTC of cherry-picking Noland's quotes out of context. (Doc. 76 at 19-25; Doc. 95 at 2-3.) The Court disagrees. Setting aside that the "context" often appears far removed from the misrepresentation, the challenged statements remain misleading and false even after the context proffered by Defendants (such as in Ex. 131) is supplied.

At bottom, Defendants, through their marketing, training, and sales pitches, repeatedly emphasized that, through SBH, it was possible to obtain "financial freedom," a level of wealth that would exceed the income from standard employment. They advertised this could be accomplished in as little as a year and claimed that several Affiliates had already done so. These claims were false. These repeated, materially false representations were likely to mislead consumers. Thus, the FTC has shown a substantial likelihood of success on the merits of its deceptive practices claim.

II.    Balancing The Equities

The FTC must "show that the balance of equities tips in its favor and that a preliminary injunction is in the public interest." *Vemma*, 2015 WL 11118111 at *7. "Although private equities may be considered, public equities receive far greater weight." *Warner Comm's Inc.*, 742 F.2d at 1165. In their response, Defendants largely seek to relitigate the merits of the FTC's claims, rather than argue about the equities themselves. (Doc. 72 at 28.) However, they do mention one equitable consideration cutting against the

---

[23]    Defendants' post-hearing submission of the Nolands' personal net worth statement (Doc. 95-2 at 2) doesn't change this conclusion. Although the accounting in the statement seems suspect, it is unnecessary to dive down that rabbit hole—this filing is unpersuasive because it is unsworn and relies largely on speculation about the value of Noland's uncollected "receivables" and claims in pending and dismissed lawsuits. In contrast, Noland's sworn financial disclosures indicate a net worth of negative $28,000 (Doc. 81-2 ¶ 32), and in his deposition Noland responded that he "would have to ask his accountant" when asked if he had ever had a positive net worth (Doc. 81-3 at 16).

FTC's request—that "a preliminary injunction that includes a continued asset freeze and appointment of a receiver, will likely put Success By Media out of business." (*Id.*) At the evidentiary hearing, Defendants also suggested a preliminary injunction would have a negative impact on SBH's Affiliates, depriving them of income upon which they have come to rely. (*See also* Doc. 72-1 at 40-163 [compiling social media posts detailing how the TRO impacted SBH Affiliates]; Docs. 95-20, 95-21, 95-22, 95-23, 95-24 [post-hearing submission of social media posts].)

These "private injuries are entitled to serious consideration," but "private equities alone do not outweigh the Commission's showing of likelihood of success." *Warner Comm's*, 747 F.2d at 1165. In addition to the FTC's likelihood of success, the FTC is acting on behalf of the "public interest in halting Defendants' deceptive acts." *Vemma*, 2015 WL 11118111 at *8. Thus, the public equities, combined with the FTC's likelihood of success, outweigh Defendants' interest in continuing their business as-is. *Warner Comm's*, 747 F.2d at 1165. Accordingly, the FTC has demonstrated that a preliminary injunction is warranted in this case.

III.    Scope Of The Injunction

Having concluded that injunctive relief is warranted, the only remaining question is the scope of that relief. Injunctive relief should be tailored to prevent the alleged harm. *Vemma*, 2015 WL 11118111 at *8. Defendants argue that the terms of the TRO are excessive and that a receiver and an asset freeze are unnecessary. (Doc. 72 at 31-33.) They also argue that if there is a receiver, they are entitled to a bond. (*Id.* at 33.) To replace the TRO, the Defendants offer their own plan to continue operating pending the outcome of this litigation, which could include a monitor instead of a receiver. (*Id.* at 9-11.)

These arguments are unavailing. A receiver is necessary, and Defendants' alternative request to insert a monitor but allow them to reassume control is inadequate, because the FTC has presented evidence that Noland has used the company as a personal piggy bank, using corporate funds to pay for homes in the United States and Uruguay as well as a fleet of flashy and expensive cars, including a $145,000 Range Rover and a pair

of motorcycles worth a total of $50,000. (*See, e.g.*, Doc. 81-2 ¶ 35.) Additionally, SBM doesn't follow corporate formalities and allows several different "verticals," such as "Success By Coaching" and "Success by Networking," to commingle funds in the same bank account as SBH. (*Id.* at 18.) The illusion of these businesses operating separately from SBH falls away in light of the fact that 95% of payments made to SBM (the umbrella for all of the businesses at issue here) came from SBH Affiliates. (*Id.* at 18-19.) These considerations heighten the Court's concern that, if Defendants were given access to the bank accounts and company, assets would be depleted.

A related reason why a receiver is necessary is that, at the time of the conduct at issue in this case, Noland was operating under a permanent injunction issued as part of an enforcement action that the FTC brought against Noland pertaining to a different pyramid scheme. The Court's finding of a likelihood of success on the merits as to SBH suggests that Noland likely violated that injunction (although the Court has not prejudged Noland's arguments to the contrary, *see* No. 00-cv-2260-PHX-DWL, Doc. 82). It would be folly to reinsert a recidivist pyramid scheme operator into management and hope the third time will be the charm.

The Court also rejects Defendants' suggestion (made during closing argument) that Noland would voluntarily step aside and allow his business partners to assume control of SBH. Not only does that outcome appear unlikely, but the FTC has presented evidence that some of Noland's business partners have also made deceptive statements.

Similarly, the Court is unwilling to modify the injunction to allow two of the "verticals" ("Success By Coaching" and "Success By Networking") to continue operating. The receiver's report makes clear that these businesses are hopelessly entangled with SBH and observe no corporate formalities. There's no practical way to disaggregate them. Defendants chose not to observe any corporate formalities and to have all of the "verticals" use the same bank account—that all of SBM must now be enjoined is the consequence of that choice.

The FTC also presented evidence that Noland didn't comply with the TRO after it

was issued by, for example, disregarding the requirement that it be immediately disseminated to Affiliates and instead going on Facebook to give another pitch from the beach. (Doc. 81 at 3-4; Doc. 81-2 ¶¶ 39-40.) Additionally, the receiver reported "considerable difficulty" in obtaining account passwords and other information. (Doc. 82-1 at 4.) Although the Court doesn't assign a tremendous amount of weight to these considerations—Defendants were under enormous time pressure after the TRO was served, and it's understandable that some things may have fallen through the cracks—they still tend to suggest it would be inappropriate to allow Defendants to continue having any role in running a business that is likely deceiving and harming consumers.

To be clear, the Court recognizes that a receiver "is an extraordinary equitable remedy" and that there are multiple factors to consider before appointing one. *Canada Life Assurance Co. v. LaPeter*, 563 F.3d 837, 844 (9th Cir. 2009). The Court has considered those factors and has concluded that a receiver is necessary. For the reasons articulated above, the Court rejects Defendants' arguments to the contrary. (Doc. 72 at 30-33.)

In her report, the receiver indicated that she had taken control of "quantities of numerous SBH products" and that a limited reactivation of shipping operations could help mitigate production costs while consumer demand for the products still existed. (Doc. 82-1 at 16.) This is a sensible request, and it will also provide some relief to the Affiliates who feel harmed by the TRO. The Court has carefully reviewed the Affiliates' social media posts and understands that some are frustrated by the lack of access to SBH products, which some view as vital to their health. Accordingly, the Court will modify the preliminary injunction to allow the receiver to reactivate shipping and sell what SBH products she has in her possession.

The Court also declines to order a receiver's bond. The United States and its agencies are not required to post one. *See* Fed. R. Civ. P. 65(c). Although the Court retains broad discretion to impose one of if need be, the burden of showing the necessity of a bond falls on Defendants. *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882-83 (9th Cir. 2003) ("We do not believe, however, that Rule 65(c) absolves the

party affected by the injunction from its obligation of presenting evidence that a bond is needed."). No such evidence has been presented here.

Finally, the Court will leave the asset freeze in place. As Defendants correctly note, "[a] party seeking an asset freeze must show a likelihood of dissipation of the claimed assets." *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009). Defendants assert the FTC hasn't made such a showing (Doc. 72 at 33-34) but the Court disagrees. The Nolands' spending spree in Uruguay was financed with SBH funds, and a substantial portion of SBH's revenue is dealt to Noland, Sacca, Harris, or their associated companies. This indicates that, absent a freeze, further dissipation of SBH's assets is likely.

## CONCLUSION

Based on the evidence presented, the Court finds there is compelling evidence that Defendants are operating a pyramid scheme and that they have otherwise engaged in deceptive practices in violation of 15 U.S.C. § 45. The balance of equities favors the prevention of further deception and the Court finds that extensive injunctive relief is necessary to protect consumers from further harm.

Accordingly, **IT IS ORDERED** that the FTC's motion for a preliminary injunction (Docs. 8, 81) is **granted**, as follows:

(1)    The Court adopts sections I through XXV of the temporary restraining order (Doc. 38) as the preliminary injunction in this case. The receiver may reactivate shipping to sell what remains of SBH's inventory.

(2)    Kimberly Friday shall continue in her role as receiver. Every three months, the receiver shall submit a report to the Court containing:

(A)    a summary of her operations;

(B)    an inventory of the receivership assets and their estimated value;

(C)    her receipts and disbursements;

(D)    a list of all known creditors with their addresses and the amounts of their claims;

(E)    the steps she intends to take to protect receivership assets, recover

assets from third parties, and adjust receivership liabilities;

        (F)    her recommendation for a continuation or discontinuation of the receivership, or any changes, and her reasons for those recommendations;

        (G)    any other matters that should be brought to the Court's attention; and,

        (H)    the first report shall be due no later than May 12, 2020.

    (3)    The TRO exempted Defendant Sacca from several of its provisions. Upon further review of the evidence, the Court now concludes that the FTC has met its burden as to Sacca, and all provisions of the preliminary injunction apply to him with the same force as they apply to the other Defendants.

    Dated this 27th day of February, 2020.

_____
Dominic W. Lanza
United States District Judge