**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Federal Trade Commission, | No. CV-20-00047-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| James D. Noland, Jr., et al., | |
| Defendants. | |

Pending before the Court is a motion to release non-party Enhanced Capital Funding ("ECF") from the Receiver's control.  (Doc. 157.)  For the following reasons, the motion will be denied.

## BACKGROUND

I.    Factual Background

    A.    **The "Success By" Entities**

The parties are familiar with the facts underlying this case, which are set out in the February 2020 order granting the Federal Trade Commission's ("FTC") motion for a preliminary injunction.  (Doc. 106.)  To briefly summarize, this case concerns the business activities of Success By Health ("SBH").  (*Id.*)  SBH is an unincorporated division of Success by Media Holdings, Inc. ("SBM") and once did business as Success By Media LLC (together, "the Corporate Defendants"), which are owned and/or operated in part by James Noland, Jr. ("Noland") and his wife, Lina Noland, who are also named as individual defendants in this action.  (*Id.*)

SBH is "an affiliate-marketing program that sells coffee products and other nutraceuticals through its online platform and network of affiliates." (*Id*. at 2, quotations omitted.)  Affiliates, by paying an annual fee, were able to purchase products at a wholesale rate from SBH and resell those products at a marked-up rate to the public.  (*Id*. at 2.)  The structure of SBH also provided substantial incentives and encouragement for affiliates to recruit new affiliates, including receiving commissions on purchases of SBH products made by affiliates they recruited and bonuses that accrued when affiliates (and affiliates they recruited) achieved certain recruitment milestones.  (*Id*. at 2-4.)

Although affiliates were told that participation in SBH could supplement or replace their job income and even make it possible to achieve "financial freedom," the FTC alleges that the vast majority of SBH participants lost money.  (*Id*. at 5.)  The FTC further alleges that SBH operated as an illegal pyramid scheme because it incentivized recruiting new affiliates over selling SBH products.  (*Id*. at 5-6.)

B.   **ECF**

Non-party ECF is owned, at least in significant part, by Noland.[1]  ECF also sits on the board of directors of SBM.  (Doc. 163-1 at 24 [Noland's deposition testimony: "Enhanced Capital Funding . . . sits on the board of Success By Media."].)

ECF does not interact directly with SBH's customers.  (Doc. 157-1 ¶¶ 3, 5.)  Instead, ECF has a "commercial contractual relationship for licensing [intellectual] property" to SBM.  (*Id.* ¶ 6.)  This relationship is memorialized in a "Royalty Agreement" between ECF and SBM, which explains that ECF possesses the rights to certain "trademarks, service marks and secret ingredients" that were originally "created and registered" by Noland. (Doc. 163-1 at 37.)  The Royalty Agreement further explains that SBM "desires to make use of [this] property" for the next 10 years.  (*Id.*)  Thus, the Royalty Agreement grants SBM the right to use ECF's intellectual property over the specified 10-year period in

---

[1]    ECF asserts in its motion that Noland is its "sole owner, officer, and director."  (Doc. 157 at 11.)  In response, the FTC presents evidence that Noland is an 80% owner of ECF and that the remaining 20% is owned by Lina Noland.  (Doc. 163-1 at 5 ¶ 10.)  ECF does not dispute this point in its reply.

exchange for "$500,000 as lump sum or installment payments" and "15 percent of [SBM's] Net Profits." (*Id.* at 38.)  In an earlier SEC filing, and again during his deposition in this case, Noland characterized the Royalty Agreement as an "*exclusive* licensing agreement" under which SBM obtained the "*exclusive* rights to manufacture and distribute [ECF's] formula for the coffees, teas, and healthy product mixes." (*Id.* at 32, emphases added.)

The FTC and Receiver both express concerns over the legitimacy of the SBM-ECF relationship.  Among other things, the FTC contends that the Royalty Agreement was not negotiated at arms' length ("Noland signed . . . for ECF, and it appears Lina Noland signed for SBM"), that Noland was unable, during his deposition in this case, to explain the basis for the $500,000 and 15% figures in the Royalty Agreement,[2] that Noland owned and controlled each entity's bank account, and that an array of key documents pertaining to ECF's business (including its bylaws, financial statements, and a purported software licensing agreement) have never been produced.  (Doc. 163 at 3-9.)  The Receiver raises similar (and additional) concerns.  (Doc. 164 at 6-12.)

As for the flow of money between the entities, Crystal Roney (ECF's accountant) avers that ECF has received $443,000 from SBM in the form of royalty payments.  (Doc. 157-1 at 6 ¶ 5.)  Adam Rottner (an FTC Investigator) provides a slightly different figure, asserting that ECF has received $448.251.90 from SBM.  (Doc. 163-1 at 7 ¶ 14.)  The FTC contends these payments represent over 97% of ECF's revenues since July 2017.  (Doc. 163 at 3.)

II.   Procedural Background

On January 8, 2020, the FTC initiated this action by filing a complaint.  (Doc. 3.)  That same day, the FTC moved for an *ex parte* temporary restraining order ("TRO").  (Docs. 7, 8.)

On January 9, 2020, the Court held an *ex parte* hearing on the FTC's request for a

---

[2]   Specifically, when Noland was asked during his deposition in this case "Who came up with the $500,000 amount?", he answered: "I think it would be myself, Scott Harris, Crystal Roney, and my wife." (Doc. 163-1 at 33.)  And when asked whether there was any documentation that might support the $500,00 figure, Noland said: "I'm not sure.  I would have to check." (*Id.*)

1   TRO.  (Doc. 17.)

2          On January 13, 2020, the Court substantially granted the FTC's motion.  (Docs. 19,

3   38.)[3]  In the TRO, the Court appointed Kimberly Friday (the "Receiver") to serve as the

4   temporary receiver of both the Corporate Defendants and "any other entity that has

5   conducted any business related to Defendants' marketing of programs, opportunities, or

6   services offered by Success By Media, including receipt of Assets derived from any

7   activity that is the subject of the Complaint in this matter, and that the Temporary Receiver

8   determines is controlled or owned by any Defendant" (collectively, "the Receivership

9   Entities").  (Doc. 38 at 5, 16.)   That order also provided: "If the Temporary Receiver

10  identifies a nonparty entity as a Receivership Entity, [she must] promptly notify the entity

11  as well as the parties, and inform the entity that it can challenge the Temporary Receiver's

12  determination by filing a motion with the Court."  (*Id.* at 20.)

13         On the afternoon of January 13, 2020 (the same day the TRO was issued), the

14  Receiver gave notice to Noland and ECF that she was designating ECF as a Receivership

15  Entity.  (Doc. 157 at 1 n.2; Doc. 163-2 at 6.)  Afterward, as part of the discovery process

16  in this case, Noland signed a financial disclosure form on ECF's behalf.  (Doc. 163-1 at

17  77-90.)  The form reported that ECF had only $7,913 in its bank accounts.  (*Id.* at 84.)

18  However, the form also stated that ECF owned "seven categories of other assets with a

19  claimed acquisition cost of $370,000 and a stated current value of $3,950,000.  This

20  included trademarks, nutraceutical formulas, and 'affiliate marketing software system' at

21  $1 million each, a $500,000 royalty agreement, a $300,000 'affiliate marketing software

22  system licensing agreement,' $125,000 in 'publishing/copyright,' and $25,000 in 'domain

23  arbitrage assets.'"  (Doc. 163-3 at 3-4 ¶ 7.  *See also* Doc. 164-1 at 2 [actual form].)

24  However, "[n]o documentation or explanation accompanied those valuations" (Doc. 163-

25  3 at 3-4 ¶ 7) and the FTC has expressed skepticism toward them, noting that the same assets

26  were valued at only $621,000 in ECF's 2017 balance sheet.  (Doc. 163 at 4 n.5.)

27  _____

[3]       The TRO was later amended.  (Docs. 20, 21.)  The final, unsealed version of the
28  TRO was filed on January 17, 2020.  (Doc. 38.)  The language concerning the Receiver
    and her responsibilities was identical in each iteration.

1    On January 24, 2020, the parties stipulated to keep the TRO in place until the Court
2  ruled on the FTC's preliminary injunction request.  (Doc. 43.)   The hearing was
3  rescheduled for February 12, 2020.  (Doc. 52.)

4    On February 12, 2020, the preliminary injunction hearing took place. (Doc. 86.)
5  After the hearing, the Court took the matter under advisement.  (*Id*.)

6    On February 27, 2020, the Court issued an order granting the FTC's motion for a
7  preliminary injunction. (Doc. 106.) In that order, the Court rejected Defendants' argument
8  that a receiver and asset freeze were unnecessary.  (*Id*. at 26-29.)  Thus, the preliminary
9  injunction reaffirmed the Receiver's authority to "[a]ssume full control of Receivership
10  Entities" and "[t]ake exclusive custody, control, and possession of all Assets and
11  Documents of, or in the possession, custody, or under the control of, any Receivership
12  Entity." (Doc. 109 at 12, Part XIV ¶¶ A, B.  *Compare* Doc. 38 at 16, Part XV ¶¶ A, B
13  [same].)

14    On June 26, 2020, ECF filed an amended motion to be released from the Receiver's
15  control.  (Doc. 157.) [4]

16    On July 9, 2020, the FTC filed a response.  (Doc. 163.)

17    On July 10, 2020, the Receiver filed a response.  (Doc. 164.)

18    On July 16, 2020, ECF filed a reply.  (Doc. 166.)

19    On July 29, 2020, the Court issued a tentative ruling.  (Doc. 169.)

20    On August 4, 2020, at ECF's request, the Court heard oral argument.

21    …

22  [4]    The motion itself states that "Enhanced Capital, through its owner, objects to being
23  a Receivership Entity and asks this court to reverse the receiver's decision that made
   Enhanced Capital a company controlled by the receiver."  (Doc. 157 at 1.)  Given this
24  verbiage, the Court assumed (and stated in its tentative order) that the motion was being
   filed by ECF.  However, during oral argument, movant's counsel stated that the motion
25  was actually being filed by the individual defendants, not ECF.  It is unclear to the Court
   whether the individual defendants would have standing to file such a motion, as most of
26  them have no ownership interest in ECF.  Moreover, the preliminary order provided that
   "[i]f the Receiver identities a nonparty entity as a Receivership Entity," she must "inform
27  *the entity* that *it* can challenge the Receiver's determination by filing a motion with the
   Court."  (Doc. 109 at 16, emphases added.)  This language underscores that a motion
28  seeking release from the Receiver's control should be filed by the entity seeking release.
   For these reasons, the Court will continue to refer to the pending motion as ECF's motion,
   although the outcome would be the same if it were the individual defendants' motion.

**ANALYSIS**

I.    Legal Standard

The decision whether to modify or dissolve a preliminary injunction has two steps: first, the party seeking modification or dissolution must "establish[] a significant change in facts or law," and second, "[i]f this showing has been made, the court must then address whether this change warrants dissolution of the injunction." *Karnoski v. Trump*, 926 F.3d 1180, 1198 (9th Cir. 2019) (internal quotations and ellipses omitted).  The burden is on the party seeking modification. *Id.*

The Ninth Circuit "has repeatedly approved imposition of a receivership in appropriate circumstances.  The power of a district court to impose a receivership . . . derives from the inherent power of a court of equity to fashion effective relief." *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980).  "[A] primary purpose of equity receiverships is to promote orderly and efficient administration of the estate by the district court for the benefit of creditors." *SEC v. Hardy*, 803 F.2d 1034, 1038 (9th Cir. 1986). *See also Liberte Capital Grp., LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006) ("A district court enjoys broad equitable powers to appoint a receiver over assets disputed in litigation before the court.  The receiver's role, and the district court's purpose in the appointment, is to safeguard the disputed assets, administer the property as suitable, and to assist the district court in achieving a final, equitable distribution of the assets if necessary.").  "[A] district court's power to supervise an equity receivership and to determine the appropriate action to be taken in the administration of the receivership is extremely broad." *Hardy*, 803 F.2d at 1037.  When "the public interest is involved in a proceeding . . . those equitable powers assume an even broader and more flexible character than when only a private controversy is at stake." *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946).

II.   Discussion

ECF's motion does not have any headings.  (Doc. 157.)  Instead, it raises—in somewhat shotgun fashion and in often colorful and hyperbolic language—an array of

- 6 -

1   challenges to the Receiver's designation of ECF as a Receivership Entity.  Each set of

2   arguments is addressed below.

3       A.    **Effect Of *Liu v. SEC***

4       ECF's primary argument is that the Supreme Court's recent decision in *Liu v. SEC*,

5   140 S.Ct. 1936 (2020), has changed the legal landscape.  (Doc. 157 at 2-6.)  ECF contends

6   that, post-*Liu*, the FTC is only allowed to pursue one specific type of remedy—an

7   injunction to prevent future deceptive conduct—and further contends that, because "no

8   consumers were ever involved" with ECF, it follows that the Receiver lacks any legitimate

9   basis for asserting control over ECF or freezing ECF's assets.  (*Id.* at 2-6.)  In response,

10  the FTC argues that *Liu* does not disturb longstanding Ninth Circuit precedent allowing it

11  to seek restitution as a remedy and to pursue asset freezes to preserve the possibility of that

12  remedy.  (Doc. 163 at 15-18.)  The Receiver agrees with the FTC, noting that "[t]he right

13  of the FTC to obtain a receiver is embodied in existing case law and available to all civil

14  litigants."  (Doc. 164 at 3.)

15      The Ninth Circuit has "repeatedly held that § 13 [of the FTC Act] empowers district

16  courts to grant any ancillary relief necessary to accomplish complete justice, including

17  restitution."  *FTC v. AMG Capital Mgmt., LLC*, 910 F.3d 417, 426 (9th Cir. 2018)

18  (quotations omitted).  *See also FTC v. Commerce Planet, Inc.*, 815 F.3d 593, 599 (9th Cir.

19  2016) ("[D]istrict courts have the power to order payment of restitution under § 13(b) of

20  the FTC Act.").  Receiverships are also a common feature of FTC enforcement actions.

21  *See*, *e.g.*, *FTC v. World Wide Factors, Ltd.,* 882 F.2d 344, 348 (9th Cir. 1989); *FTC v.*

22  *Johnson*, 567 Fed. App'x 512 (9th Cir. 2014).

23      In *Liu*, the Supreme Court addressed an entirely different issue—the scope of the

24  SEC's ability to seek the remedy of disgorgement in enforcement actions brought in federal

25  court.  140 S.Ct. at 1940.  On the one hand, the Court rejected the challengers' contention

26  that the SEC can never seek disgorgement, holding that disgorgement is an equitable

27  remedy and thus falls within the SEC's statutory authority to seek "equitable relief" on

28  behalf of investors.  *Id.* at 1942-44.  On the other hand, the Court held that SEC had gone

1   too far in past cases, by failing to limit disgorgement awards to the "defendant's net profits

2   from wrongdoing" and thus "transforming it into a penalty outside [the SEC's] equitable

3   powers." *Id.* at 1944-47.

4   Given this backdrop, ECF's reliance on *Liu* is misplaced. As an initial matter, it is

5   notable that *Liu* rejected the challengers' argument that the SEC can never seek

6   disgorgement. Instead, it held that disgorgement awards may be pursued by the SEC so

7   long as they are properly constrained. It is unclear why ECF would construe this outcome

8   as categorically precluding the FTC from seeking any equitable remedy with a monetary

9   component.

10   Additionally, *Liu* addressed the disgorgement remedy the SEC may seek under its

11   governing statute and didn't once discuss the FTC, which is governed by an entirely

12   different statute. Given the presence of textual differences between the two statutes, it

13   would be improper to read *Liu* as necessarily curtailing the scope of the FTC's authority.

14   *Cf. FTC v. Cardiff*, 2020 WL 3867293, *5-6 (C.D. Cal. 2020) ("*Liu* does not appear . . . to

15   preclude the FTC from seeking restitution under the FTCA. *Liu*'s holding is cabined to

16   disgorgement in SEC actions under a distinct provision of the SEC Act—which the Court

17   previously held constitutes penalties, not equitable relief. . . . By contrast, the FTC here

18   seeks restitution of consumer losses, not disgorgement of profits. . . . Given the broad

19   sweep of this section of the FTCA compared to § 78u(d)(5) of the SEC Act, *Liu*'s reasoning

20   does not affect the FTC's calculation of restitution owed to consumers based on total

21   revenues.") (internal emphasis and citations omitted).

22   With that said, it must be acknowledged that the Supreme Court recently granted

23   certiorari in *AMG Capital Management*, in which the Ninth Circuit concluded that Section

24   13(b) of the FTC Act permits restitution, and in *FTC v. Credit Bureau Ctr., LLC*, 937 F.3d

25   764 (7th Cir. 2019), which reached the opposite conclusion. ECF very well may be correct

26   that, once the dust settles in those cases, the FTC's ability to seek restitution and asset

27   freezes will be significantly curtailed, if not eliminated.[5]   Nevertheless, contrary to ECF's

28

---

[5]      Indeed, at the very outset of this case, when ruling on the FTC's *ex parte* motion for
a TRO, the Court noted that it had "some concern" about granting certain categories of

1    suggestion, this Court is not at liberty to disregard a published Ninth Circuit decision based

2    on a litigant's assertion that "[t]he holding in the 7th Circuit is clearly right, and holdings

3    in the 9th Circuit otherwise are clearly wrong."  (Doc. 157 at 6.)  Unless and until the

4    Supreme Court or Ninth Circuit decides otherwise, this Court must follow existing Ninth

5    Circuit precedent, which permits the FTC to seek restitution, to seek a freeze of assets held

6    by non-parties, and to seek appointment of a receiver.  *Liu* is not "clearly irreconcilable"

7    with that precedent.  *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (to implicitly

8    overrule a Ninth Circuit decision, "the relevant court of last resort must have undercut the

9    theory or reasoning underlying the prior circuit precedent in such a way that the cases are

10   clearly irreconcilable").

11           During oral argument, ECF sought to develop an additional *Liu*-related argument

12   that its motion raised in only skeletal form.  Specifically, ECF argued that even if *Liu* does

13   not foreclose the FTC from securing some sort of monetary award in an enforcement

14   action, *Liu* precludes the FTC from basing such an award on the defendant's gross revenues

15   or automatically holding all defendants liable under a joint-and-several liability theory.

16   ECF further argued that the FTC made no effort to abide by those principles when coming

17   up with its restitution estimate in this case, which is that "[e]quitable restitution to

18   consumers of Defendants' net revenue may be approximately $8 million, depending on the

19   outcome of discovery."  (Doc. 163 at 19.)  Thus, ECF argued that the FTC hasn't

20   established the need to freeze anybody's assets, let alone its assets.

21           This argument is unavailing.  Disgorgement and restitution are different remedies,

22   governed by different standards, that are intended to achieve different objectives.  *See, e.g.,*

23   *Osborn v. Griffin*, 865 F.3d 417, 461 (6th Cir. 2017) ("As used in modern parlance,

24   disgorgement and restitution are distinct remedies that serve different purposes."); *SEC v.*

25   *Huffman*, 996 F.2d 800, 802 (5th Cir. 1993) ("Despite some casual references in our

26   caselaw to the contrary, disgorgement is not precisely restitution.  Disgorgement wrests ill-

27   _____

28   relief that were not expressly contemplated by the governing statute, before concluding
     that such relief should be deemed available in light of earlier Ninth Circuit precedent.
     (Doc. 21 at 3 n.1.)

- 9 -

gotten gains from the hands of a wrongdoer . . . [and] does not aim to compensate the victims of the wrongful acts, as restitution does.  Thus, a disgorgement order might be for an amount more or less than that required to make the victims whole.  It is not restitution.").  It therefore remains unclear what, if any, effect *Liu* may have on the calculation of restitution awards.  Because ECF's motion identified no other reason to challenge the accuracy of the FTC's restitution estimate, and in light of the FTC's explanation during oral argument that its methodology for estimating the award (Doc. 163-1 at 8 ¶ 16) is consistent with Ninth Circuit law, the Court accepts that $8 million is an appropriate restitution estimate in this case and that an asset freeze remains necessary.

### B.    "Balancing Of Equities"

ECF next argues that, "[q]uite apart from the lack of a legal basis for the receiver's seizure of Enhanced Capital, a balancing of equities militates in favor of releasing Enhanced Capital."  (Doc. 157 at 6-7.)  ECF states that its owner, Noland, wishes to use ECF's assets to pay his attorneys' fees in this case and argues that it would be inequitable to curtail his access to those assets before a final determination of liability has been made.  (*Id.*)  The FTC responds that (1) even if ECF weren't considered a Receivership Entity, it would still be subject to an asset freeze because it is owned by the Nolands and the preliminary injunction included a separate provision freezing the individual defendants' assets (Doc. 157 at 14); (2) the Ninth Circuit has repeatedly held that district courts may freeze non-party assets during the pendency of an FTC enforcement action and there are several different theories (including "constructive trust," "fraudulent transfer," and "reverse-veil-piercing") under which it may pursue recovery against ECF at the conclusion of this case (Doc. 163 at 15 & n.13); (3) the continuation of the asset freeze is necessary because this case may result in a restitution award exceeding $8 million and the existing "frozen assets fall well short of these liabilities" (*id.* at 16-17 & n.14); and (4) the Receiver's assertion of control over ECF is not interfering with the Noland's ability to earn income because he was able to raise $130,000 following the issuance of the TRO and nothing is preventing him from engaging in income-generating activities unrelated to ECF

1   (*id.* at 20).

2       The Court has carefully considered the equities and concludes, in its discretion, that

3   they do not support ECF's request.  First, as a legal matter, "[a] district court may freeze

4   assets" in an FTC enforcement action "when doing so is necessary to preserve the

5   possibility of full relief."  *Johnson*, 567 Fed. App'x at 514.  This power extends to assets

6   held by non-parties, at least where the non-parties are "controlled partially or entirely by

7   receivership defendants."  *Id.  See also FDIC v. Garner*, 125 F.3d 1272, 1280 (9th Cir.

8   1997) ("A court is authorized to impose a preliminary injunction on assets which were

9   controlled by a party, even if that party did not expressly own or possess those assets."); *In*

10  *re San Vicente Med. Partners*, 962 F.2d 1402, 1408 (9th Cir. 1992) ("[A] district court has

11  the power to include the property of a non-party . . . in [a] receivership order as long as the

12  non-party meets the minimum contacts standard set out in *International Shoe* and receives

13  actual notice and an opportunity for a hearing."); *FTC v. Productive Mktg., Inc.*, 136 F.

14  Supp. 2d 1096, 1103 n.7 (C.D. Cal. 2001) (applying *San Vicente* to FTC proceedings).

15  Thus, even though ECF is a non-party that didn't transact directly with any of SBH's

16  customers, the undisputed fact that ECF is owned and controlled by Noland (and may be

17  owned by Lina Noland, too) makes the freezing of its assets permissible.[6]

18      Second, although the question of whether ECF's assets *may* be frozen is different

19  from the question of whether they *should* be frozen, the facts and equities of this case

20  support the freeze.  ECF's argument is that the freeze is interfering with its owner's ability

21  to pay his attorneys' fees in this case.  Although this is a legitimate interest to which the

22  Court assigns serious weight, it is not the only interest at play.  As noted, an asset freeze

23  may be justified when it "is necessary to preserve the possibility of full relief."  *Johnson*,

24  567 Fed. App'x at 514.  Here, even assuming that Noland's nearly $4 million valuation of

25  ECF's assets (which the FTC disputes) is correct, the FTC has established that "full relief"

26  in this case may entail a restitution award exceeding $8 million.  Thus, ECF's assets may

27

28  _____

[6]    Although due process issues are discussed further below, ECF doesn't tether its due process argument to any alleged lack of minimum contacts with Arizona.

be necessary to achieve complete relief.  An asset freeze is permissible in this circumstance, even if the freeze undermines a defendant's ability to pay his attorneys to continue litigating.  *See, e.g., World Wide Factors*, 882 F.2d at 347 ("Courts regularly have frozen assets and denied attorney fees . . . ."); *CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 775 (9th Cir. 1995) ("A district court may, within its discretion, forbid or limit payment of attorney fees out of frozen assets.  According to the record, the frozen assets fell far short of the amount needed to compensate [the alleged victims].  This was reason enough in the circumstances of this case for the district court, in the exercise of its discretion, to deny the attorney fee application.  We do not, however, intimate that attorney fee applications may always be denied where the assets are insufficient to cover the claims.  Discretion must be exercised by the district court in light of the fact that wrongdoing is not yet proved when the application for attorney fees is made.") (citations omitted); *FTC v. Ideal Financial Solutions, Inc.*, 2014 WL 4541191, *2 (D. Nev. 2014) (rejecting defendants' unfreezing request, where the frozen funds were sought for attorneys' fees, and noting that "[t]he Ninth Circuit recognizes district courts' discretion in civil cases to 'forbid or limit payment of attorney fees out of frozen assets'") (citation omitted).

In weighing the equities, the Court has also considered the current posture of this case.  Noland and his co-defendants were previously represented by a different law firm that vigorously litigated on their behalf before, during, and after the preliminary injunction hearing.  Despite that advocacy, the Court concluded the FTC had demonstrated a likelihood of success on its claims.  In *FTC v. IAB Marketing Associates, LP*, 2013 WL 2433214 (S.D. Fla. 2013), the court rejected an unfreezing request in an FTC enforcement action under analogous circumstances: "[T]he preliminary-injunction hearing and the legal work leading up to it [was] a chance for a defendant to show that the FTC is not likely to prevail on the merits.  So although the merits of an action are not finally resolved when a preliminary injunction is entered, a highly relevant finding concerning the merits is made at that point. . . .  [N]o further funds need to be released for attorney fees."  *Id.* at *3.

Again, the Court has afforded serious consideration to Noland's desire to be able to

pay his attorneys to put on the best possible defense to the pending allegations. Nevertheless, there are countervailing considerations that, in the Court's view, outweigh that interest.  Additionally, the FTC has presented evidence that Noland was able to raise substantial sums of money after ECF was deemed a Receivership Entity in January 2020.

Third, and finally, the fight over the control of ECF isn't a fight over existing ECF assets that might otherwise be used to pay Noland's attorneys.  As noted, ECF has less than $8,000 in the bank.  Instead, the parties' motion papers suggest the fight is actually over the fact that, under the Royalty Agreement (whose provenance and legitimacy is hotly disputed), SBM is supposed to be making large payments to ECF.  Those payments—which, according to the FTC's undisputed evidence, comprised over 97% of ECF's income over the last few years—stopped as soon as the Receiver assumed control of ECF in January 2020.  In its motion, ECF intimated that, if it were freed from the Receiver's control, it would sue the Receiver and SBM in an attempt to recoup the missing payments. (Doc. 157 at 12 n.4, citations omitted ["Enhanced Capital licensed formulas to Success By Media in January 2017.  These licenses provide the basis upon which Success By Health can market products. . . .  The receiver is not paying royalties to Enhanced Capital in breach of contract."].)  In response, the Receiver argued that such litigation would undermine the asset freeze.  (Doc. 164 at 2 ["[T]he practical effect of granting Defendants' request would be a significant cost to the Receivership Estate.  Defendants aim to force SBM to honor the lopsided royalty agreement and begin paying obligations related to a non-arm's length transaction whose terms were set by Mr. Noland.  The Receiver would have to resist these requests—generating further litigation and further cost to the Receivership Estate (something all parties should hope to avoid)."].)

The Court agrees with the Receiver that avoiding such expensive, distracting, and complex satellite litigation is a further reason to maintain the status quo.  The Ninth Circuit has specifically recognized that "[t]he basis for [the] broad deference to the district court's supervisory role in equity receiverships arises out of the fact that most receiverships involve multiple parties and complex transactions." *SEC v. Capital Consultants, LLC*, 397

F.3d 733, 738 (9th Cir. 2005) (internal quotations and citation omitted).  Here, the relationship between ECF and SBM is complex and disputed and the Court has already determined that SBM's assets should be frozen because they may be necessary to afford complete relief to consumers should the FTC ultimately prevail in this action.  A new lawsuit directed against the Receiver, aimed at securing a competing claim to SBM's frozen assets, would undermine these objectives.

During oral argument (and presumably in response to the tentative order's discussion of the need to avoid satellite litigation over the royalty payments), ECF stated for the first time that it wouldn't attempt to sue SBM and the Receiver over the royalty payments if its motion were granted.  Instead, ECF argued that it was merely seeking relief so it could resume engaging in business activity unrelated to SBM (which might generate profits that its owner, Noland, could use for attorneys' fees).  Although this argument has some merit in the abstract, it fails under the facts of this case.  As noted, Noland stated in earlier SEC filings, and again during his deposition in this case, that the Royalty Agreement granted SBM the "exclusive" right to utilize ECF's intellectual property for the next 10 years.  It is therefore difficult to understand how ECF could, if the receivership were lifted, immediately start licensing that intellectual property to other companies.  Additionally, when asked during his deposition to identify any other companies (apart from SBM) that pay to license software and other products from ECF, Noland couldn't identify any.  Finally, ECF has not disputed the FTC's showing that over 97% of its revenues since July 2017 have come from SBM.  Given all of this, ECF has not demonstrated that the receivership is interfering in any practical way with its ability to engage in profitable business activity unrelated to SBM.

C.     **Other Arguments**

ECF also complains about the unfairness inherent in the FTC's *modus operandi*, alleges that the FTC is blinded by "confirmation bias" against Noland, accuses the Receiver of serving as the "majordomo" of the FTC, and contends that what gave rise to the FTC's enforcement action was a "vendetta" by a former employee pursued to "exact revenge for

getting caught committing adultery." (Doc. 157 at 7-13.)  The FTC and Receiver do not address these arguments in detail.

These arguments are largely unencumbered by legal citation and authority.  The Court's best guess as to their intended significance is that they bear on the "balancing of equities" addressed in Part B above.  To the extent this was ECF's intention, the Court is not persuaded that the analysis in the order granting the preliminary injunction was wrong. (Doc. 106 at 25-26.)[7]

### D.   Due Process

ECF's motion contains a handful of undeveloped references to due process.  Among other things, it asserts that designating ECF as a Receivership Entity was "a clandestine, *ultra vires* injunction that subverts due process," that "depriving the defendants of funds for defense is violative of due process rights" because "the only remedy available to the FTC is an injunction against illegal conduct," and that ECF's assets were "seized without due process." (Doc. 157 at 5, 7, 15.)  The FTC does not discuss due process in its response. The Receiver does, stating that "the TRO and Preliminary Injunction granted any entities designated as Receivership Entities certain due process rights—they could challenge the designation as a Receivership Entity by Motion." (Doc. 164 at 3.)

The preliminary injunction and the TRO provided the following instructions to the Receiver: "If the Receiver identifies a nonparty entity as a Receivership Entity, promptly notify the entity as well as the parties, and inform the entity that it can challenge the Receiver's determination by filing a motion with the Court." (Doc. 109 at 16 [preliminary injunction]; Doc. 38 at 20 [TRO].)  The Receiver followed that instruction here—she notified Noland and ECF on January 13, 2020 that ECF was being designated as a

---

[7]      There is one exception.  The Court agrees with ECF (Doc. 157 at 8 & n.3) that, because the 2002 consent order in *FTC v. Netforce Seminars* (which "permanently restrained and enjoined" Noland from "engaging, participating or assisting in any manner or capacity whatsoever . . . in any prohibited marketing scheme," which included "a pyramid sales scheme," and from "making . . . any false or misleading statement or misrepresentation of material fact" "in connection with . . . any multi-level marketing program") included a clause clarifying that it "shall not be construed as an admission or finding of guilt or wrong doing on the part of the Defendant," that order does not provide a basis for characterizing Noland as a recidivist pyramid scheme operator.

1    Receivership Entity.  (Doc. 157 at 1 n.2.)  The notification letter specifically advised that,

2    "[a]s set forth in the TRO, ECF may contest that determination by filing a motion in the

3    Arizona District Court."  (Doc. 163-2 at 6.)

4         The Ninth Circuit has approved the use of summary proceedings[8] in receivership

5    proceedings with respect to assets held by nonparties.  *See, e.g.*, *Hardy*, 803 F. 2d at 1040

6    ("We have repeatedly held . . . that the use of summary proceedings to determine

7    appropriate relief in equity receiverships, as opposed to plenary proceedings under the

8    Federal Rules, is within the jurisdictional authority of a district court."); *Johnson*, 567 F.

9    App'x at 515 ("This Court has long approved of the use of summary proceedings to

10   determine possession of the assets of nonparties in receivership proceedings.").  Summary

11   proceedings in this context "satisfy due process so long as there is adequate notice and

12   opportunity to be heard."  *CFTC v. Topworth Int'l, Ltd.*, 205 F.3d 1107, 1113 (9th Cir.

13   1999) (quotation omitted).

14        ECF's motion doesn't purport to explain *why* its inclusion in the receivership

15   violated due process—the motion merely asserts, in conclusory fashion, that the injunction

16   and seizure of assets were without due process.  That alone is grounds for denying the

17   motion.  *Cf. Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need

18   not consider arguments raised for the first time in a reply brief.").

19        The reply indicates that the problem is that ECF "has never had a hearing, much less

20   a meaningful one at a meaningful time."  (Doc. 166 at 2.)  However, the TRO and

21   preliminary injunction specifically provided ECF with an opportunity to be heard and to

22   challenge its inclusion in the receivership—an opportunity that it has belatedly invoked by

23   filing the present motion and could have invoked at any point over the last six months.

24   Additionally, the Court granted ECF's request for oral argument on its motion (and ECF

25   did not request an evidentiary hearing).  For summary proceedings in the receivership

26   ───────────────
     [8]      Summary proceedings differ from normal civil actions, governed by the Federal
27   Rules of Civil Procedure, in that they "may be conducted without formal pleadings, on
     short notice, without summons and complaints, generally on affidavits, and sometimes
28   even *ex parte*."  *SEC v. McCarthy*, 322 F.3d 650, 655 (9th Cir. 2003) (internal quotations
     omitted).

context, this is a sufficient opportunity to be heard.  *Cf. Johnson*, 567 F. App'x at 515 (finding that the district court's procedures "easily satisf[ied] the requirements of due process" where "each appellant was afforded the opportunity to respond to the clarification motion in writing, to submit evidence in support of that response, and to present oral argument at a hearing on the motion").

Accordingly, **IT IS ORDERED** that ECF's motion to be removed from the receivership (Doc. 157) is **denied**.

Dated this 6th day of August, 2020.

Dominic W. Lanza
United States District Judge