**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Federal Trade Commission, | No. CV-20-00047-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| James D. Noland, Jr., et al., | |
| Defendants. | |

In this action, the Federal Trade Commission ("FTC") alleges that Success By Health ("SBH"), an affiliate-marketing program that sells coffee products and other nutraceuticals through an online platform and network of affiliates, is an illegal pyramid scheme. The FTC further alleges that Jay Noland, Lina Noland, Thomas Sacca, and Scott Harris (together, the "Individual Defendants"), who are affiliated with SBH in various capacities, made false statements and otherwise contributed to SBH's illegal conduct.

In February 2020, after considering the parties' extensive evidentiary submissions and holding an evidentiary hearing, the Court issued a 30-page order granting the FTC's request for a preliminary injunction. (Doc. 106.) In that order, the Court concluded "there is compelling evidence that Defendants are operating a pyramid scheme and that they have otherwise engaged in deceptive practices in violation of 15 U.S.C. § 45. The balance of equities favors the prevention of further deception and the Court finds that extensive injunctive relief is necessary to protect consumers from further harm." (*Id.* at 29.) Additionally, the Court authorized Kimberly Friday, a court-appointed receiver, to

"continue in her role as receiver" and authorized the continuation of an asset freeze.  (*Id.* at 29-30.)

Notably, the Individual Defendants didn't appeal the order granting the preliminary injunction, which has remained in effect for the last eight months.  Instead, in September 2020, the Individual Defendants—who are now represented by new counsel—filed a motion to dissolve or modify the preliminary injunction.  (Doc. 187.)  The motion is now fully briefed.  (Docs. 195, 203, 207, 212.)  For the following reasons, it will be denied.[1]

## DISCUSSION

I.   <u>Legal Standard</u>

"[A] party that has failed to appeal from an injunction cannot regain its lost opportunity simply by making a motion to modify or dissolve the injunction."  *Karnoski v. Trump*, 926 F.3d 1180, 1198 (9th Cir. 2019) (internal quotation marks omitted).  Thus, "[a] party seeking modification or dissolution of an injunction bears the burden of establishing that a significant change in facts or law warrants revision or dissolution of the injunction." *Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000).

Put another way, "a subsequent challenge to the injunctive relief must rest on grounds that could not have been raised before."  *Alto v. Black*, 738 F.3d 1111, 1120 (9th Cir. 2013).  Courts must carefully "look beyond the motion's caption to its substance," because it is impermissible for a litigant who "merely seeks to relitigate the issues underlying the original preliminary injunction order" to raise such challenges through the guise of a modification/dissolution motion.  *Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119, 1124 (9th Cir. 2005) (citations and internal quotation marks omitted).

II.   <u>Analysis</u>

The Individual Defendants argue that significant changes of law and fact support their dissolution request.  (Doc. 187 at 1-2.)

…

---

[1]   The Individual Defendants requested oral argument.  This request will be denied because the issues are fully briefed and oral argument will not aid the Court's decision. *See* Fed. R. Civ. P. 78(b); LRCiv. 7.2(f).

1

A.      **Significant Change In Law**

2         The Individual Defendants' change-in-law argument concerns the FTC's statutory

3   authority to seek equitable monetary relief and pursue asset freezes in enforcement

4   proceedings in federal court.  (Doc. 187 at 18-20.)  In a nutshell, although the Individual

5   Defendants concede that the Ninth Circuit has repeatedly upheld the FTC's authority to

6   pursue such forms of relief, *see, e.g., FTC v. AMG Capital Mgmt.*, LLC, 910 F.3d 417 (9th

7   Cir. 2018), they argue the Ninth Circuit's decisions in this area should no longer be

8   considered good law in light of recent decisions by other Circuits reaching the opposite

9   conclusion, the Supreme Court's recent decision to grant certiorari to resolve the Circuit

10  split, and the Supreme Court's recent decision in *Liu v. SEC*, 140 S. Ct. 1936 (2020), which

11  addressed the SEC's authority to seek the remedy of disgorgement.

12        The Court has already addressed (and rejected) these arguments in earlier orders.

13  As previously noted, "this Court is bound to follow existing Ninth Circuit law, which

14  allows the FTC to seek an asset freeze, and may not disregard that binding precedent based

15  on guesses about future Supreme Court decisions."  (Doc. 199 at 2.)  Similarly, "this Court

16  is not at liberty to disregard a published Ninth Circuit decision based on a litigant's

17  assertion that '[t]he holding in the 7th Circuit is clearly right, and holdings in the 9th Circuit

18  otherwise are clearly wrong.'"   (Doc. 177 at 9.)   Thus, even though the Individual

19  Defendants "very well may be correct that, once the dust settles . . . , the FTC's ability to

20  seek restitution and asset freezes will be significantly curtailed, . . . [u]nless and until the

21  Supreme Court or Ninth Circuit decides otherwise, this Court must follow existing Ninth

22  Circuit precedent, which permits the FTC to seek restitution, to seek a freeze of assets held

23  by non-parties, and to seek appointment of a receiver."  (*Id.* at 8-9.)[2]

24        …

25  _____

26  [2]      The Court additionally notes that, in a motion for stay filed only a few days ago, the
    Individual Defendants seemed to acknowledge that *AMG Capital* remains good law in the
    Ninth Circuit.  (Doc. 220 at 1-2 ["The Ninth Circuit has acquiesced to the view that Section

27  13(b) empowers courts to provide any ancillary relief necessary to accomplish complete
    justice.  In *AMG Capital*, the Ninth Circuit noted that the argument Section 13(b) does not

28  authorize non-injunctive relief had force, but the three-judge panel was bound by . . . prior
    interpretation."], citations and internal quotation marks omitted.)

1

       **B.**    **Significant Change In Fact**

2
       In the challenged order, the Court found the FTC was likely to succeed on two

3 different theories of liability: *first*, that SBH was operating as an illegal pyramid scheme

4 (Doc. 106 at 10-20); and *second*, that "Defendants violated 15 U.S.C. § 45(a) by

5 misrepresenting the income potential of SBH affiliates" (*id.* at 20-25). Additionally, the

6 Court rejected the Individual Defendants' argument "that a receiver and an asset freeze are

7 unnecessary," finding that "extensive injunctive relief is necessary to protect consumers

8 from further harm." (*Id.* at 26-29.)

9
       In their motion, the Individual Defendants identify an array of alleged "significant

10 changes in fact" that undermine these conclusions. (Doc. 187 at 2-17.) Each set of alleged

11 factual changes is addressed below.

12
          **1.**    <u>Pyramid Scheme</u>

13
       The Individual Defendants identify three alleged factual changes that undermine the

14 pyramid scheme finding. (*Id.* at 2-8.)

15
          **a.**    **Sales Growth**

16
       First, the Individual Defendants argue that SBH's track record of increasing sales

17 growth, both before and after the receivership came into effect, necessarily shows that SBH

18 is not a pyramid scheme, because such sales growth "is contrary to the must-collapse effect

19 when a pyramid is at play." (*Id.* at 2-5.)

20
       As an initial matter, the Individual Defendants cannot rely on evidence of pre-

21 receivership sales growth as their basis for seeking dissolution or modification of the

22 preliminary injunction. This evidence was available to the Individual Defendants at the

23 time of the preliminary injunction hearing. Although the Individual Defendants' new

24 counsel may disagree with predecessor counsel's failure to emphasize that evidence during

25 the hearing, such disagreement does not provide a proper basis for seeking dissolution or

26 modification of the injunction. *Alto*, 738 F.3d at 1120 ("[A] subsequent challenge to the

27 injunctive relief must rest on grounds that could not have been raised before.").

28
       As for how SBH has fared since the receivership came into effect, the Individual

Defendants are wrong about the facts.  In the introduction to their motion, the Individual Defendants assert that "[p]roduct sales are steady, voluminous, and growing."  (Doc. 187 at 1.)  However, the sole evidence of post-receivership sales growth cited in the motion is the Receiver's August 2020 status report.  (Doc, 187 at 3, citing Doc. 179-1 at 4.)  That report characterized SBH's product sales as "steady if not voluminous" and then provided the actual sales figures.  Those figures reveal anemic daily sales and weak demand for SBH's products.

The parties agree that, in 2019, SBH made $2,982,113 in product sales, which works out to $8,170 per day.  (Doc. 187 at 3 [chart showing revenue from "Packs Sales" and "Individual Product Sales"]; Doc. 203 at 7.)  The parties further agree that SBH didn't sell any product between January 2020 and May 2020.  (*Id.*)  And as for sales since the Receiver resumed sales activity in May 2020, the FTC has submitted undisputed evidence establishing that SBH "sold $66,558 of product during the period of May 11 through September 15, 2020," consisting of "a total of 212 orders . . . placed by 120 unique customers."  (Doc. 203-1 ¶¶ 7, 9.)  This works out to sales of only $524 per day.[3]  The evidence, in short, suggests that demand for SBH's products has evaporated since the Receiver eliminated the recruitment incentives that were in place when the Individual Defendants were operating SBH.  Daily revenue from product sales has decreased by approximately 94%.

It is telling that the Individual Defendants chose to identify "product sales [that] have steadily increased" (Doc. 187 at 3) as their first, seemingly best argument supporting dissolution or modification of the preliminary injunction.  To the extent SBH's post-receivership sales trajectory has any bearing on the propriety of the preliminary injunction, it supports, rather than undermines, the Court's earlier conclusion that the FTC has established a likelihood of success on its pyramid scheme claim.

---

[3]     There are 127 days between May 11, 2020 and September 15, 2020.  $66,558 divided by 127 is $524.  Furthermore, even if the 30-day period between May 20, 2020 and June 19, 2020 is excluded (the Receiver didn't sell any products during that period, *see* Doc. 203-1 ¶¶ 2-3), the daily figure remains quite low: $66,558 divided by 97 is $686.

1

b.   **First Prong Of *Koscot* Test**

2        The Ninth Circuit applies the following test (sometimes known as the *Koscot* test)

3   to determine whether a multi-level marketing business is a pyramid scheme: "A pyramid

4   scheme is characterized by the payment by participants of money to the company in return

5   for which they receive (1) the right to sell product and (2) the right to receive in return for

6   recruiting other participants into the program rewards which are unrelated to sale of the

7   product to ultimate users."  *FTC v. BurnLounge, Inc.*, 753 F.3d 878, 883 (9th Cir. 2014)

8   (internal  quotation  marks  omitted).   In  the  challenged  order,  the  Court  noted  that

9   "Defendants don't dispute that the first element is satisfied."  (Doc. 106 at 11.)

10       In their motion, the Individual Defendants seek to challenge that determination.

11   (Doc. 187 at 6 ["The $49 fee does not satisfy the first prong of the *Koscot* test."].)  Notably,

12   the Individual Defendants don't proffer any new facts or evidence that arose following the

13   preliminary injunction hearing.  Instead, they simply offer legal arguments—which weren't

14   advanced  by  their  previous  counsel—concerning  why  SBH's  $49  membership  fee

15   shouldn't be considered a payment for the right to sell SBH's products.  (*Id.*)

16       The Individual Defendants are not entitled to dissolution or modification on this

17   basis.  Again, "a subsequent challenge to the injunctive relief must rest on grounds that

18   could not have been raised before."  *Alto*, 738 F.3d at 1120.  Granting relief would be

19   particularly inappropriate here because the Individual Defendants' previous counsel

20   conceded (or, at a minimum, didn't dispute) that the first element of the pyramid-scheme

21   test was satisfied.  In the amended complaint, the FTC alleged that "[c]onsumers pay an

22   annual membership fee of $49 to become SBH Affiliates, making them eligible to sell SBH

23   products and receive rewards for doing so." (Doc. 35 ¶ 20.)  In their answer to the amended

24   complaint, the Individual Defendants admitted this allegation is true.  (Doc. 93-1 ¶ 1.)

25   Similarly, in their response to the FTC's motion for a preliminary injunction, the Individual

26   Defendants acknowledged that "[a] required purchase to become a distributor satisfies the

27   first prong of the *Koscot* test" and did "not dispute that a $49 annual fee is required to

28   become an affiliate of SBH."  (Doc. 76 at 13-14.)  Instead, the Individual Defendants only

chose to argue that "[t]he FTC has not shown that SBH satisfies the second prong of the *Koscot* test." (*Id.* at 14-18.)  And during the preliminary injunction hearing, the FTC's counsel stated in closing argument that "there's no dispute as to the first element" (Doc. 105 at 114) and the Individual Defendant's counsel didn't dispute this assertion (*id.* at 129-53).  Although the Individual Defendants and their new counsel may now regret the wisdom of that litigation strategy, such regret—untethered to any change in fact or law— doesn't provide a permissible basis for dissolving or modifying a preliminary injunction.

### c.   **Second Prong Of *Koscot* Test**

In the challenged order, the Court noted that "the second element [of the *Koscot* test] is present when participants purchase the right to earn profits by recruiting other participants, who themselves are interested in recruitment fees rather than the sale of products.  Notably, the second element does not require that rewards be completely unrelated to product sales.  If that were the rule, any illegal MLM business could save itself from liability by engaging in some retail sales.  Thus, in the Ninth Circuit, an MLM business may be considered an illegal pyramid scheme if the rewards the participants received in return were largely for recruitment, not for product sales." (Doc. 106 at 11, citations and internal quotation marks omitted).  Applying these standards, the Court concluded "[t]here is ample evidence that SBH meets the second requirement of offering rewards that are 'largely' based on recruitment, not sales to ultimate users" and identified an array of evidence supporting this conclusion. (*Id.* at 11-20.)[4]

[4]      Specifically, the Court identified the following six categories of evidence as supporting this conclusion: (1) "SBH's sales videos and transcripts . . . show that SBH and Noland focus overwhelmingly on recruitment as the path to commissions and profits"; (2) "SBM's written marketing and sales materials focus on recruitment, rather than sales to ultimate users, as the primary pathway to profits"; (3) "SBH does not even attempt to track Affiliates' retail sales or track how much inventory a particular Affiliate possesses," "adheres to a 'no refund' policy," lacks "any compliance-related . . . policies, procedures, or guidance," and encourages "inventory loading"; (4) "the opinions of the FTC's expert, Dr. Bosley"; (5) "the testimony of the FTC's data analyst, Ms. Wilson, who testified that the 26 unique Affiliates whose declarations were submitted by Defendants the night before the hearing paid $572,000 to SBH in fees and purchases but received only $207,000 in commissions"; and (6) the Receiver's determination, after "assuming control of the company and seeing how it actually works[,]" that she "doesn't think SBH can be operated legally" because "[t]he inaccurate marketing statements, the organization of the commission system, and the movement of large amounts of cash to insiders strongly suggests that the business is structured in such a fashion that prevents Affiliates from

1    The Individual Defendants' final challenge to the pyramid scheme finding concerns

2    the second prong of the *Koscot* test.  (Doc. 187 at 7-8.)  Here, they largely reprise the

3    argument addressed in Part II.B.1(a) above concerning sales growth—they contend that

4    "[t]he financial results shown above and the receiver's report that sales of product continue

5    and are increasing notwithstanding the end of recruiting are inconsistent with the court's

6    preliminary finding that recruitment was SBH's real product."  (*Id.* at 7.)  Additionally, the

7    Individual Defendants proffer evidence that at least one SBH affiliate testified during a

8    post-hearing deposition that his motivation when purchasing products was "to retail it," as

9    opposed to "not do[ing] anything with it."  (*Id.* at 8.)

10    As discussed, the undisputed evidence shows that SBH's product sales have

11    plummeted by nearly 94% since the challenged recruitment incentives were removed, with

12    only 120 customers choosing to purchase SBH products during the four-month period

13    between May and September 2020.  This is not, to put it mildly, a significant change in fact

14    that undermines the Court's previous conclusion that SBH was "offering rewards that are

15    'largely' based on recruitment, not sales to ultimate users."  (Doc. 106 at 11.)  If anything,

16    the new evidence corroborates that conclusion.

17                              2.    Underline False Statements

18    In the challenged order, the Court concluded that the FTC was likely to succeed on

19    its false statements claim, explaining that "[t]he key misrepresentation, repeated again and

20    again, concerns the concept of 'financial freedom.'  That term refers to the ability of an

21    SBH Affiliate to not only quit his or her job, but to generate massive amounts of 'residual

22    income' such that an Affiliate will never have to work again."  (Doc. 106 at 21.)  Among

23    other things, the Court (1) rejected the Individual Defendants' "attempts to redefine

24    'financial freedom'" as "simply . . . a modest supplementation of income," finding that this

25    phrase "was always linked to making enough money to quit one's job, retire, and otherwise

26    live a wealthy lifestyle"; (2) rejected the Individual Defendants' attempts to characterize

27    _____

28    realizing the promoted business opportunities."  (Doc. 106 at 11-20, internal quotation
     marks omitted).

the statements as "mere 'puffery' and 'empty superlatives,'" because "context makes clear that Defendants employed the term 'financial freedom' as a functional income claim, not as an empty superlative"; (3) found that "Defendants also engaged in deception by claiming that some SBH Affiliates had *already* obtained financial freedom," because "[t]he FTC presented evidence that nearly all Affiliates lost money and that the few Affiliates who were net-positive earned relatively little" and "Defendants failed to introduce evidence (as opposed to anecdote) establishing that any Affiliate had ever earned enough money from SBH to achieve 'financial freedom'"; and (4) found that "Noland also made false statements about his own financial condition, including a claim that 'I've been financially free since I was 36' and a claim that he was so rich his son and grandchild would never have to work," which claims were untrue in part because "Noland submitted a post-TRO declaration conceding he has a negative net worth." (*Id.* at 21-25, citations and internal quotation marks omitted.)

In their motion, the Individual Defendants seem to raise two challenges to these findings. (Doc. 187 at 15-17.) Each challenge is addressed below.

### A.   **"Financial Freedom"**

The Individual Defendants argue that, although "[t]his Court was led to believe . . . the defendants told affiliates that SBH affiliates *had already achieved* financial freedom . . . . [T]he tense if the word makes a difference here.  The defendants actually said that people *are* achieving, not *had* achieved financial freedom." (*Id.* at 15.)  The Individual Defendants then proffer evidence showing that, during post-hearing declarations and "video testimonials," several SBH affiliates stated that they had earned enough money from SBH to quit their old jobs or otherwise "f[ind] financial freedom in various degrees." (*Id.* at 15-16.)  The Individual Defendants also proffer evidence that, in 2013, Mr. Noland operated a different multi-level marketing company (Organo Gold) in which four individuals earned annual incomes far in excess of $1 million. (*Id.* at 17, citing Doc. 187-1 ¶ 16.)

As an initial matter, to the extent the Individual Defendants' position is that the

Court misinterpreted the verb tense of the challenged income claims or otherwise erred in defining the term "financial freedom," this is not a permissible basis for seeking dissolution or modification.   Instead, it constitutes a backdoor request for reconsideration of the February 2020 order.   But the time for seeking reconsideration expired long ago. *Grunwald*, 400 F.3d at 1124.

Meanwhile, to the extent the Individual Defendants' position is that they have new evidence showing that SBH and/or Organo Gold affiliates actually achieved "financial freedom," this argument fails for two independent reasons.  First, the SBH affiliates whose statements are discussed in the motion quit their old jobs long before the preliminary injunction hearing.  One claims to have "stopped working my jobs in November of 2017" and others "walk[ed] away from [their] traditional jobs in the public school system and pursue[d] SBH on a full-time basis by midyear 2018." (Doc. 187 at 16.)  It is unclear how such evidence could qualify as "grounds that could not have been raised before."  *Alto,* 738 F.3d at 1120.  Similarly, the Organo Gold information dates back to 2013.

Second, the proffered evidence also fails on the merits.  As discussed in detail in the challenged order, SBH's own marketing and training materials identified three different types of SBH affiliates—the first type hoped to supplement their income, the second type "want[ed] to replace a full-job income in six months," and the third type was "seeking 'Financial Freedom.'"  (Doc. 106 at 22.)  Thus, "[t]he implication is that whatever type three is, it is greater than a job income. . . .  [T]he Court concludes, as the finder of fact, that Defendants used the term 'financial freedom' as a functional income claim that referred to a fabulous level of wealth beyond completely replacing a job income." (*Id.* at 22-23.)  Given this backdrop, the new evidence submitted by the Individual Defendants does little to undermine the Court's earlier findings.  At most, it shows that some SBH affiliates had achieved "type two" income.  But the key misstatement was that SBH affiliates were earning, or had earned, "type three" income.

Nor does the Organo Gold evidence change the analysis.  As noted in the challenged order, SBH's marketing materials stated that "[w]e've also got several people that are

achieveing [sic] Financial Freedom already with our company." (Doc. 106 at 24.) "Our company" is not the same thing as "a different company that one of our company's principals operated six years ago."

B. **Disclaimers**

The Individual Defendants contend that the FTC's false-statements theory "is a *non sequitur*" because SBH's income claims were "always accompanied by a disclaimer." (Doc. 187 at 17.) To support this argument, the Individual Defendants submit a declaration from Mr. Noland, who avows that he always provided income disclaimers. (Doc. 187-1 ¶ 18.)

This is not a cognizable basis for seeking modification or dissolution of the preliminary injunction. The Individual Defendants made the same argument, premised on the same evidence, when opposing the FTC's request for a preliminary injunction. (Doc. 76 at 21, 25.)

It should also be noted that the Individual Defendants make no effort to challenge one of the other bases on which the Court grounded its finding that the FTC was likely to succeed on the false statements claim—that Noland falsely characterized *himself* as multi-millionaire, even though he had a negative net worth. During the hearing, defense counsel sought to defend that claim by arguing that Noland hoped to recover $45 million in a case "up on appeal." (Doc. 106 at 24.) In the February 2020 order, the Court concluded that "[i]t should be obvious that this failed lawsuit didn't give license to Noland to dupe SBH Affiliates into believing he had already achieved multi-generational wealth and 'financial freedom.'" (*Id.* at 24-25.) That conclusion seems to have been borne out by recent developments—in August 2020, the Ninth Circuit affirmed the dismissal of Noland's other lawsuit. *Noland v. Chua*, 816 Fed. App'x 202 (9th Cir. 2020).

3. "False Or Unsubstantiated Claims" By The FTC

In the middle portion of their motion, the Individual Defendants accuse the FTC of making eight "false or unsubstantiated claims" when seeking the preliminary injunction. (Doc. 187 at 10-15.)

1
2
3
4
5
6
7

The Court notes, as an initial matter, that the Individual Defendants make little effort to link these alleged false statements to the factual findings contained in the challenged order.  Indeed, in some instances, the Court specifically rejected the FTC's position on these points.  It is therefore unclear how the Individual Defendants' arguments on these points might trigger an entitlement to relief under the demanding standards governing a motion for dissolution or modification of a preliminary injunction.  In any event, each point is addressed below.

8

### A.    98% Of Affiliates Lost Money

9
10
11
12
13
14
15
16

First, the Individual Defendants criticize the FTC for asserting, in a declaration filed in January 2020 in support of its request for a TRO, that 98% of SBH affiliates lost money. (Doc. 187 at 10, citing Doc. 9.)  According to the Individual Defendants, the FTC's calculations on this issue are flawed because the FTC failed to account for the inherent value of the product being received, the revenue earned through retail sales, and the inherent value of training sessions.  (*Id.* at 10-11.)  The Individual Defendants also submit evidence that some SBH affiliates stated, during post-hearing depositions, that they believed the training sessions were valuable and worthwhile.  (*Id.*)

17
18
19

This argument is unavailing.  The Individual Defendants made the exact same arguments during the preliminary injunction hearing.  And in the order granting the preliminary injunction, the Court agreed with their criticisms in part, explaining:

20
21
22
23
24
25
26
27
28

> [T]he Court agrees with Defendants . . . that the FTC and Dr. Bosley made things more difficult by failing to analyze (1) the extent to which Affiliates profitably resell the product they purchase from SBH, and (2) the extent to which Affiliates personally consume the product they purchase from SBH (because such consumption creates value from the Affiliate's perspective). Instead, the FTC's and Dr. Bosley's loss analyses looked solely to how much money each Affiliate made or lost relative to SBH (*i.e.,* netting the Affiliate's $49 fee and purchases against the overall amount of commission received back from SBH).  Although . . . the presence of retail sales doesn't automatically preclude a finding of a pyramid scheme, the proffered loss analyses don't tell the whole picture.  In cases (like this case) where it's possible for a customer to resell the products or goods at issue, the second element of the [pyramid scheme] test turns on whether the company places "primary" emphasis on recruitment or sales to ultimate users.  In making this

- 12 -

1
2
3

> assessment, it obviously would have been helpful to have data concerning
> retail sales and internal consumption. The absence of such data makes things
> more complicated, particularly when the FTC is the movant and bears a
> heavy burden in the preliminary injunction context

4
5
6
7
8
9
10

(Doc. 106 at 17.)  Nevertheless, despite these concerns, the Court concluded that "[t]he bottom line is that SBH allows non-Affiliates to purchase goods through its website at wholesale prices, doesn't even bother to track whether Affiliates are engaging in retail sales, affirmatively encourages inventory loading, doesn't have any compliance policies, and adheres to a strict no-refunds policy. Thus, even if profitable retail sales are possible and sometimes do occur despite these policies, such sales cannot and do not serve as SBH's 'primary' source of financial rewards to Affiliates." (*Id.* at 19.)

11
12
13

Given this backdrop, the Individual Defendants are not entitled to dissolution or modification. They have not proffered any new evidence and are simply attempting to reargue a point that was extensively litigated by their prior counsel.

14

### B.    "Forcing" Affiliates To Buy Product

15
16
17
18
19

Second, the Individual Defendants argue that "SBH does not force affiliates to buy product." (Doc. 187 at 11-13.) In support of this claim, the Individual Defendants proffer post-hearing deposition testimony in which some affiliates stated that "[n]obody forced them to buy anything" and others acknowledged that "[b]usiness is not a guaranteed success." (*Id.*)

20
21
22
23
24

Once again, the Individual Defendants made the same arguments during the preliminary injunction hearing. (*See, e.g.,* Doc. 106 at 9-10 [discussing the evidence submitted by the Individual Defendants before the hearing, which included "various audio and video clips during which Noland . . . stated there was 'no pressure' on Affiliates"].) There is no significant new evidence and no change in law.

25
26
27
28

Additionally, this is something of a strawman argument. The FTC did not suggest (and the Court did not find) that affiliates were somehow physically compelled to buy product. Instead, the Court found that SBH's structure and policies, coupled with the Individual Defendants' statements and tactics, created pressure to do so. For example, the

Court quoted at length from "training sessions during which Noland and other SBH principals talked approvingly about inventory loading" (*id.* at 14-15) and discussed "footage obtained from Defendants' offices . . . [in which] Noland told Affiliates not to sign up as an Affiliate if they were not going to order products every month, later adding that if Affiliates wanted to earn $1 million per year, they needed $500 in 'personal volume' each month" (*id.* at 15 n.13).

## C.   "Forcing" Affiliates To Attend Training Sessions

Third, the Individual Defendants criticize the FTC for asserting, in a January 2020 declaration, that "SBH forces affiliates to attend training." (Doc. 187 at 13, citing Doc. 9.) The Individual Defendants contend this assertion was false and proffer post-hearing deposition testimony in which one SBH affiliate acknowledged he wasn't "physically forced" to attend training sessions and another characterized the training sessions as "stressed but not required." (*Id.*)

It is unclear why the Individual Defendants believe this argument provides a valid basis for dissolving or modifying the preliminary injunction. They made the same argument during the hearing. (Doc. 106 at 9-10 [discussing the evidence submitted by the Individual Defendants before the hearing, which included "various audio and video clips during which Noland . . . stated that training sessions were not required"].) And in the order granting the preliminary injunction, the Court didn't suggest that affiliates were "physically forced" to attend training sessions—instead, they were pressured to do so. (*Id.* at 5 ["Affiliates are also pressured to attend every training put on by SBH and Noland, even if they must max out their credit cards and take out loans to afford the attendance fees. For example, SBH asks Affiliates to sign a 'Million Dollar Contract.' Among other things, this contract purports to require the Affiliate to 'attend all SBH corporate trainings and events no matter what.'"].) The evidence discussed in the Individual Defendants' motion does not contradict, and indeed is consistent with, this conclusion.

## D.   *Vemma*

During its opening statement in the preliminary injunction hearing, the FTC's

1    counsel referred to *FTC v. Vemma Nutrition Co.*, 2015 WL 11118111 (D. Ariz. 2015), as

2    a case in which the challenged business "was held to be a pyramid."  (Doc. 105 at 12.)

3    According to the Individual Defendants, this assertion was inaccurate because the *Vemma*

4    litigation was resolved via a settlement agreement that did not include an admission of

5    wrongdoing.  (Doc. 187 at 13.)

6            Once again, it is unclear why the Individual Defendants view this issue as providing

7    a basis for dissolving or modifying the preliminary injunction.  The challenged statement

8    occurred on February 12, 2020, which is more than two weeks before the Court ruled on

9    the preliminary injunction request.  This is not new evidence.

10           Nor is this significant evidence.  In *Vemma*, the district court granted the FTC's

11   request for a preliminary injunction, finding that the evidence "leaves little doubt that the

12   FTC will ultimately succeed on the merits in demonstrating that Vemma is operating a

13   pyramid scheme."  2015 WL 11118111 at *4.  Afterward, the case settled.  Although the

14   Individual Defendants are correct that the preliminary injunction ruling in *Vemma* wasn't

15   the same thing as a final adjudication of liability, any technical error in the FTC's

16   description of that case's procedural posture had no bearing on the outcome of this case.

17   (Doc. 106 at 14 [characterizing *Vemma* as a case "granting preliminary injunction" and

18   comparing SBH to "the enjoined business in *Vemma*"].)

19                       E.    **Public Can Purchase At Same Price As Affiliates**

20           Next, the Individual Defendants criticize the FTC for asserting that members of the

21   public can purchase SBH products via the SBH website for the same "wholesale" price as

22   SBH affiliates.  (Doc. 187 at 13-14.)  According to the Individual Defendants, "[n]on-

23   affiliates can only buy through an affiliate, which earns the affiliate a 10% retail

24   commission."  (*Id.* at 14.)

25           There are several problems with this argument.  As an initial matter, the Individual

26   Defendants do not contend it is based on new, significant evidence that was unavailable at

27   the time of the preliminary injunction proceedings.

28           In a related vein, the Individual Defendants do not proffer any *evidence* in support

1    of their claim that members of the public must purchase through an affiliate.  Instead, they

2    simply offer an unsupported assertion.

3         The Individual Defendants also fail to disclose that they previously conceded that

4    the FTC's description of the SBH purchasing process is accurate.  In the amended

5    complaint, the FTC alleged that "[a]ny member of the public can buy SBH products from

6    the company's website, or an Affiliate Website, at the same 'wholesale' price that SBH

7    offers to Affiliates.  SBH sets the pricing both on its website and on the Affiliate Websites.

8    Affiliates do not have the ability to offer different prices on the internet."  (Doc. 35 ¶ 22.)

9    In their corrected answer to the amended complaint, the Individual Defendants admitted

10   that the portion of this allegation concerning the public's ability to purchase at wholesale

11   prices through the website was true: "Defendants deny that Affiliates do not have the ability

12   to offer different prices than stated for internet sales but otherwise admit the allegations in

13   Paragraph 22 of the Complaint."  (Doc. 93-1 ¶ 10.)[5]  Nor did the Individual Defendants

14   dispute this point during the preliminary injunction hearing.

15        Finally, the Individual Defendants also fail to disclose that, during his deposition in

16   this case, Noland conceded that the FTC's description of the purchasing process was

17   accurate:

18      Q:    Does Success By Health have a website?

19      A:    Yes, sir.

20      Q:    What's the URL for that website?

        A:    SuccessByHealth.com

21      Q:    And if a consumer wants to buy products from Success By Health, do

22            they have to do that through that website?

23      A:    *They can purchase through that website . . . or through an affiliate's*

24            *replicated website link of Success By Health.*

25   (Doc. 203-3 at 27, emphasis added.)

26   _____
     [5]    Additionally, the FTC recently filed a second amended complaint.  (Doc. 205.)  It
27   repeats the first amended complaint's allegations concerning the SBH purchasing process.
     (*Id.* ¶ 25.)  The Individual Defendants recently filed their answer to the second amended
28   complaint.  (Doc. 222.)  They again admit the truth of the FTC's allegation that members
     of the public can purchase products via the SBH website at wholesale prices.  (*Id.* ¶ 14.)

In sum, the Individual Defendants are seeking to dissolve the preliminary injunction based on their unsupported assertion that a particular fact isn't true, even though they conceded that fact was true in their answer and then testified that fact was true during their depositions. This does not qualify as "a significant change in facts or law warrants revision or dissolution of the injunction," *Sharp*, 233 F.3d at 1170, or "grounds that could not have been raised before," *Alto*, 738 F.3d at 1120.

### F.     Retail Sales Activity

Next, the Individual Defendants criticize the FTC's expert for purportedly opining that she "does not think retail sales can be made." (Doc. 187 at 14.) In an attempt to rebut this purported opinion, the Individual Defendants proffer declarations from several affiliates who claim to have earned anywhere from a few hundred to a few thousand dollars in monthly profits from retail sales. (*Id.*)

The Individual Defendants are not entitled to dissolution or modification of the preliminary injunction on this basis. As an initial matter, the proffered declarations do not qualify as "grounds that could not have been raised before." *Alto*, 738 F.3d at 1120. Before the preliminary injunction hearing, the Individual Defendants gathered a large number of declarations from affiliates and submitted those declarations in an attempt to show the existence of retail sales activity. (Doc. 85.) After carefully analyzing those declarations, the Court concluded they did not reveal any significant evidence of profits arising from retail sales.[6] The Individual Defendants don't explain why the new batch of declarations couldn't have been gathered and submitted at the same time as the earlier batch of

---

[6]     Doc. 106 at 18 ("Defendants failed to present much, if any, other evidence of substance regarding retail sales and internal consumption. The Affiliate declarations that Defendants filed the night before the hearing are unpersuasive—many simply track commissions received from SBH, which is not the same thing as profits earned from retail sales, and the few that do touch upon profits from retail sales fail to establish that such profits are SBH's primary source of Affiliate compensation.") (citations omitted); *id.* at 18 n.17 ("For example, one declaration is from an Affiliate who contends that 'I've been more successful with SBH than any of the other MLMs I've been in. I've earned more in SBH than in a little over 2 years than I have in all the offers over 4-5 years.' However, this Affiliate later acknowledges that 'I don't do a lot of retail sales yet.' It is puzzling that Defendants would view this sort of declaration as proof that SBH's compensation plan emphasizes sales to ultimate users over recruitment commissions.") (citations omitted).

1    declarations.

2        In any event, the Individual Defendants' current argument concerning retail sales

3    activity is another example of a strawman argument.  The FTC's expert did not, as the

4    Individual Defendants suggest, opine that it would be impossible for an SBH affiliate to

5    earn a profit from retail sales.  To the contrary, she made clear that her opinions "do[] not

6    preclude the existence of some genuine retail sales in SBH."  (Doc. 8-21 ¶ 39.)  Thus, the

7    Individual Defendants' current showing—which is that eight SBH affiliates (Mehler,

8    Baier, Monroe, B. and R. Wright, Te. and Ty. Sherfield, and Augustsson), who compose

9    about 0.1% of SBH's more than 6,500 affiliates, earned profits ranging from a few hundred

10   to a few thousand dollars each (or, in Baier's case, $44,922)—does nothing to undermine

11   the FTC's expert's broader point.

12       It is also important to note that, as discussed above, one of the key alleged

13   misrepresentations in this case is that SBH had enabled its affiliates to achieve "financial

14   freedom," which is a fabulous level of generational wealth that goes beyond replacement

15   of job income.  Nevertheless, 10 months into this case, the Individual Defendants have only

16   been able to identify a handful of affiliates (again, out of a universe of more than 6,500

17   affiliates) who profited from retail sales and those profits were mostly in the three- and

18   four-digit range.

19                    G.    **Affiliates' Reasons For Product Purchases**

20       The next alleged false statement by the FTC and its expert was the claim "that the

21   purchase of product by affiliates was not tied to consumer demand but was instead

22   'purchased merely as a way to participate in the pyramid scheme payoff structure.'"  (Doc.

23   187 at 14-15.)  In this section of their motion, the Individual Defendants do not identify

24   any specific new evidence and instead attempt to incorporate by reference certain

25   unspecified evidence "shown above."  (*Id.*)

26       This argument fails for many reasons.  It is not based on new evidence, the proffered

27   evidence is not significant (and, if anything, undermines the Individual Defendants'

28   position), and the Individual Defendants are improperly attempting to reargue a point they

already made (unsuccessfully) during the preliminary injunction hearing.

H.   **Ku Klux Klan**

During the preliminary injunction hearing, the Individual Defendants sought to impeach the FTC's expert by suggesting she had once written an academic article that compared multi-level marketing businesses to the Ku Klux Klan.  (Doc. 105 at 72-73.)  In response, the FTC's expert explained that she hadn't made such a comparison—instead, a different set of academic researchers had once written an article on that topic and she had merely been asked questions about their article on certain occasions.  (*Id.*)  When asked why she had been asked questions about their article, she stated that some people are "intrigued" by it.  (*Id.*)

Somewhat remarkably, the Individual Defendants now proffer this exchange as proof that "this case was and is motivated by racial animus" because "Mr. Noland is an African American executive that has achieved what those who are sympathetic with the KKK think is impossible or cannot be explained without fraud."  (Doc. 187 at 15.)  They continue: "Racial outrage has no place in the courtroom and should not affect this court's judgment."  (*Id.*)

This is a frivolous argument and the Individual Defendants' counsel should be ashamed for raising it.  Putting aside the fact that the Individual Defendants have not proffered any new evidence that was unavailable to them at the time the preliminary injunction was issued, and further putting aside the fact that this episode doesn't even purport to be an example of a "false or unsubstantiated claim" by the FTC (which is how the Individual Defendants characterize it in their motion), the FTC's expert did not write the article in question or make any positive comments concerning its substance.  Being asked a question that touches indirectly on the KKK doesn't magically transform the person being questioned into a KKK supporter.

4.   Scope Of Injunctive Relief

The Individual Defendants raise two challenges to the portion of the challenged order addressing the scope of the preliminary injunction.  (Doc. 187 at 8-10.)  Each

- 19 -

1  challenge is addressed below.

2  ## A. **Recidivist**

3  In the challenged order, the Court concluded that the appointment of a receiver

4  (rather than a monitor) was appropriate for a host of reasons, including that "at the time of

5  the conduct at issue in this case, Noland was operating under a permanent injunction issued

6  as part of an enforcement action that the FTC brought against Noland pertaining to a

7  different pyramid scheme.  The Court's finding of a likelihood of success on the merits as

8  to SBH suggests that Noland likely violated that injunction (although the Court has not

9  prejudged Noland's arguments to the contrary).  It would be folly to reinsert a recidivist

10  pyramid scheme operator into management and hope the third time will be the charm."

11  (Doc. 106 at 27, citation omitted).

12  In their motion, the Individual Defendants argue that the characterization of Noland

13  as a "recidivist" was inaccurate.  (Doc. 187 at 8.)  The Individual Defendants further argue

14  that the Court is "require[d] . . . to revisit its order" in light of this inaccurate statement.

15  (*Id.*)

16  The Individual Defendants are not entitled to relief on this basis.  As an initial

17  matter, this argument is not based on a significant change of fact or law that occurred after

18  the preliminary injunction was issued.  Instead, the Individual Defendants are effectively

19  making an untimely request for reconsideration.  This is impermissible.  *Grunwald*, 400

20  F.3d at 1124.

21  More important, the Court has already acknowledged that its use of the word

22  "recidivist" was unfortunate "because the 2002 consent order in *FTC v. Netforce Seminars*

23  (which permanently restrained and enjoined Noland from [operating] a pyramid sales

24  scheme, and from making . . . any false or misleading statement or misrepresentation of

25  material fact in connection with . . . any multi-level marketing program) included a clause

26  clarifying that it shall not be construed as an admission or finding of guilt or wrong doing

27  on the part of the Defendant." (Doc. 177 at 15 n.7.)  Nevertheless, this clarification doesn't

28  undermine the overall point the Court was attempting to make in the preliminary injunction

order—that Noland's track record, which included the likely violation of a court order issued in a different case, counseled against allowing him to continue operating SBH.[7]

## B. **Uruguay**

Another reason supporting the appointment of a receiver was that "the FTC has presented evidence that Noland has used the company as a personal piggy bank, using corporate funds to pay for homes in the United States and Uruguay as well as a fleet of flashy and expensive cars, including a $145,000 Range Rover and a pair of motorcycles worth a total of $50,000." (Doc. 106 at 26-27.) The "spending spree in Uruguay" was also identified as one of the reasons to keep the asset freeze in place. (*Id.* at 29.)

In their motion, the Individual Defendants contend that, in a recent filing, the FTC conceded that $47,000 of the funds used to finance purchases in Uruguay weren't SBH's corporate funds and instead constituted funds raised by Noland in his personal capacity. (Doc. 187 at 8.) The Individual Defendants then argue, in seemingly contradictory fashion, that although the funds at issue were SBH's corporate funds, the spending was permissible because the transactions were memorialized in loan agreements and the "expenditures were for an expansion of the company into Uruguay." (*Id.* at 9.) Finally, the Individual Defendants contend that the asset freeze has caused them to experience significant personal hardship. (*Id.* at 10.)

As an initial matter, these arguments are not, for the most part, based on significant new evidence that was unavailable to the Individual Defendants at the time of the preliminary injunction proceedings. This alone precludes dissolution or modification.

The one potential exception is the FTC's alleged concession in a recent filing that $47,000 of the funds used for purchases in Uruguay were Noland's personal funds, not

---

[7]     The Court made this point more precisely during the evidentiary hearing: "Mr. Noland is under a permanent injunction that arose from a previous FTC enforcement action . . . . If I find that there's a success of likelihood on the . . . merits, I have found effectively that he's probably violated that court order from the previous case in operating this company. So how on earth under those circumstances, if I find that the FTC has established a likelihood of success on the merits, should I nevertheless be persuaded . . . to put the company back in the hands of the folks who are currently operating it . . . ?" (Doc. 105 at 148.)

SBH's corporate funds.   However, as the FTC clarifies in its response, the $47,000 referenced in its recent filing was "*in addition to* the money spent in Uruguay before the TRO." (Doc. 203 at 9 n.8.)  Thus, there was no concession.

The Individual Defendants' Uruguay-based arguments also fail on the merits. Although the Court accepts the general proposition that the expenditure of corporate funds in a foreign country may be permissible to advance the company's expansion into that country, the Individual Defendants make no effort to explain how the purchase of extravagant $50,000 motorcycles could be part of a coffee company's legitimate foreign expansion plan.  As for the Range Rover, the Nolands identified it as a *personal* asset in the financial disclosure forms they were required to complete as part of this case.  (Doc. 203-2 at 16.)  Again, the Individual Defendants have not explained why a legitimate part of SBH's foreign expansion plan was to use corporate funds to acquire a $145,000 vehicle that Noland would then claim as his own.[8]

***

Accordingly, **IT IS ORDERED** that the Individual Defendants' motion to dissolve or modify the preliminary injunction (Doc. 187) is **denied**.

Dated this 27th day of October, 2020.

Dominic W. Lanza
United States District Judge

---

[8]      The Individual Defendants also contend in their reply that "[i]t is strange the FTC claims the Nolands used SBH money to make a downpayment on the Range Rover when the money came from Jeffrey Wright." (Doc. 207 at 3.)  But in their motion, the Individual Defendants argued that "Jeffrey Wright loaned the company $96,250.00, and this cash was used as a down payment on the car." (Doc. 187 at 9.)  Thus, it doesn't matter that the money initially came into SBH's coffers by way of a loan.  The point is that SBH then used that money, which it was obligated to repay, to acquire a luxury vehicle that Noland now claims as his own.  This is a textbook example of using corporate funds as a personal piggy bank.