EVAN M. MENDELSON, DC Bar No. 996765
JONATHAN W. WARE, DC Bar No. 989414
Federal Trade Commission
600 Pennsylvania Avenue NW, CC-9528
Washington, DC 20580
(202) 326-3320; emendelson@ftc.gov (Mendelson)
(202) 326-2726; jware1@ftc.gov (Ware)

Attorneys for Plaintiff Federal Trade Commission

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Federal Trade Commission, | No. CV-20-0047-PHX-DWL |
|      Plaintiff, | **PLAINTIFF FEDERAL TRADE COMMISSION'S MOTION FOR SUMMARY JUDGMENT AS TO MONETARY REMEDIES** |
|      v. | |
| James D. Noland, Jr., *et al.*, | |
|      Defendants. | |

# **TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 1

I. DEFENDANTS' FAILURE TO PROVIDE REFUNDS FOR LATE OR
UNSENT SHIPMENTS ...................................................................................... 1

    A. Defendants' Late or Unsent Shipments ($630,377)...................................... 2

        1. Founder Packs ($370,130) .................................................................. 2

        2. "Pre-Orders" and Other Out-of-Stock Products  ($260,247)............. 2

        3. Other Shipping Delays (Unquantifiable) ........................................... 4

    B. Defendants' Refusal to Offer or Provide Refunds for Late and Unsent
Shipments ..................................................................................................... 5

II. DEFENDANTS' FAILURE TO OFFER REFUNDS OF HIGH-PRESSURE
"DOOR-TO-DOOR" SALES ................................................................................ 7

    A. Sales at Major "Training" Events ($526,488.50)......................................... 7

    B. Other "Door-to-Door" Sales (Unquantifiable)............................................. 9

LEGAL STANDARD..................................................................................................... 10

ARGUMENT .................................................................................................................. 11

I. DEFENDANTS MUST REFUND CONSUMERS FOR LATE OR
UNSHIPPED ORDERS....................................................................................... 11

II. DEFENDANTS MUST REFUND CONSUMERS FOR DEPRIVING THEM
OF THE REQUIRED COOLING-OFF PERIOD. ................................................ 13

    A. Defendants Bear the Burden of Proving that Fully-Informed Consumers
Would Not Have Exercised Their Refund Rights....................................... 13

    B. Defendants Cannot Satisfy Their Burden of Proving that Fully Informed
Consumers Would Not Have Exercised Their Refund Rights.................... 15

III. DEFENDANTS ARE LIABLE FOR OVER $1 MILLION IN CONSUMER
HARM. ................................................................................................................ 17

CONCLUSION................................................................................................................ 17

ii

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Bigelow v. RKO Radio Pictures*, 327 U.S. 251 (1946) ...................................................... 14

*FTC v. BlueHippo Funding, LLC*, 762 F.3d 238 (2d Cir. 2014) ................................. 15, 16

*FTC v. Bronson Partners, LLC*, 654 F.3d 359 (2d Cir. 2011) ........................................ 16

*FTC v. DiscountMetalBrokers, Inc.*, No. 16-cv-2112, 2017 WL 4442998

    (C.D. Cal. Oct. 4, 2017) ............................................................................................. 11

*FTC v. Febre*, 128 F.3d 530 (7th Cir. 1997) ................................................................... 17

*FTC v. Figgie Int'l, Inc.*, 994 F.2d 595 (9th Cir. 1993) ............................................. 15, 16

*FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502 (S.D.N.Y. 2000) ........................ 16

*FTC v. Inc21.com Corp.*, 745 F. Supp. 2d 975 (N.D. Cal. 2010) .................................... 17

*In re Koscot Interplanetary, Inc., et al.*, 86 F.T.C. 1106 (1975) ...................................... 7

*In re Sanctuary Belize Litig.*, 482 F. Supp. 3d 373 (D. Md. 2020) ................................. 15

*McGregor v. Chierico*, 206 F.3d 1378 (11th Cir. 2000) ................................................. 17

*Raishevich v. Foster*, 247 F.3d 337 (2d Cir. 2001) ........................................................ 14

*Rookaird v. BNSF Railway Co.*, 908 F.3d 451 (9th Cir. 2018) ....................................... 10

*SEC v. First City Fin. Corp., Ltd.*, 890 F.2d 1215 (D.C. Cir. 1989) ............................... 14

*Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978 (9th Cir. 2007). .................................. 10

**Statutes**

15 U.S.C. § 57b ............................................................................................................... 11

39 U.S.C. § 3009 ............................................................................................................. 12

**Rules**

Fed. R. Civ. P. 56(a) ....................................................................................................... 10

**Regulations**

16 C.F.R. § 429.0(a) ........................................................................................................ 13

16 C.F.R. § 429.1(a) ........................................................................................................ 13

16 C.F.R. § 429.1(b) ........................................................................................................ 13

16 C.F.R. § 429.1(c) .................................................................................................... 13

16 C.F.R. § 429.1(e) .................................................................................................... 13

16 C.F.R. § 435.2(a)(1) ................................................................................................. 1

16 C.F.R. § 435.2(b)(1) .............................................................................................. 11

16 C.F.R. § 435.2(c)(5) ......................................................................................... 11, 12

16 C.F.R. § 435.2(d) .................................................................................................. 12

Promulgation of Trade Regulation Rule and Statement of Its Basis and Purpose,

    37 Fed. Reg. 22934 (Oct. 26, 1972) ......................................................................... 14

**INTRODUCTION**

The FTC's Motion for Summary Judgment as to Liability (the "Liability MSJ") established the Defendants violated the Merchandise Rule and Cooling-Off Rule in connection with over $1 million in sales.  In particular, Defendants unlawfully failed to pay refunds for late or never-shipped products and failed to offer a three-day refund window for ticket and product orders made in high-pressure sales settings.  Section 19 of the FTC Act, 15 U.S.C. § 57b, permits this Court to order monetary relief to redress consumers for the harm caused by Defendants' rule violations.  Based on the undisputed facts described herein, Defendants' Merchandise Rule violations caused $630,377 in consumer harm, and their Cooling-Off Rule violations caused $526,488.50 in consumer harm.  The FTC therefore respectfully requests that the Court enter a judgment against all Defendants for $1,156,865.50.

**STATEMENT OF FACTS**

The FTC's Liability MSJ described the facts establishing Defendants' liability for the rule violations.  (Doc. 285 at 15-17, 32-25.)   To support the FTC's request for monetary relief, this Motion provides additional detail regarding Defendants' untimely shipments, high-pressure sales at live events, and illegal no-refund policy.

**I.     DEFENDANTS' FAILURE TO PROVIDE REFUNDS FOR LATE OR UNSENT SHIPMENTS**

Defendants consistently took orders for products that were out of stock and, in some cases, did not exist.  Sometimes they provided estimated shipping dates, and other times they did not, triggering the Merchandise Rule's 30-day default shipping deadline (16 C.F.R. § 435.2(a)(1)(ii)).[1]  In either case, Defendants routinely held consumers' money indefinitely without sending products or paying refunds.

---

[1] In fine-print terms and conditions, Defendants said products "usually" ship within 48 hours, but may not ship for up to 60 days "or more."  (Doc. 285 at 15.) Because these shipping times are not "clearly and conspicuously stated," they do not affect the Merchandise Rule analysis.  *See* 16 C.F.R. § 435.2(a)(1)(i).

1

A. **Defendants' Late or Unsent Shipments ($630,377)**

1. **Founder Packs ($370,130)**

From the start, Defendants encouraged affiliates seeking financial freedom to purchase "Founder Packs."  Defendants claimed the packs, ranging from $2,495 to $3,495 (plus $95-$150 shipping and handling), contained thousands of dollars in Success By Health ("SBH") products and would provide other benefits, such as membership in a forthcoming (but never-created) SBH "retirement pool" and a share of the company's revenues over a limited period.  (Ex. 161 at 9:23-11:17; Ex. 158; Doc. 286-3 (Ex. 14)[2] at 5; Doc. 335-6 at 15.)  Jay Noland told affiliates he planned to make founders "richer than rich, wealthier than wealthy, . . . . generationally set."  (Ex. 161 at 12:18-13:2.)

As of March 13, 2018, however, Defendants still owed approximately 200 Founder Pack purchasers *$370,130* in products.  (Doc. 286-3 (Ex. 14) ¶ 22; Ex. 151.)  At least 150 "founders" had ordered their products at least four months earlier, and all 200 had purchased their packs at least 6 weeks earlier.  (Doc. 286-3 (Ex. 14) ¶ 21.)  This backlog is consistent with Defendants' admission that they "sold out" of all products for a "month, month-and-a-half" in early 2018.  (Doc. 299-2 (Ex. 147) at 16:7-11; *see also* Ex. 182 ("we are on backorder of everything right now").)  Some Founder Pack shipments remained outstanding several months later.  *See* Ex. 175 (still waiting on half of products in August, ten months post-order); *infra* p. 6 (majority of pack products for three affiliates still unsent in July); Doc. 285-10 (Ex. 11) ¶ 11 (never received all products).

2. **"Pre-Orders" and Other Out-of-Stock Products  ($260,247)**

Defendants also frequently listed products for sale (or "pre-order") while the products were out of stock or did not exist.  Even when Defendants provided estimated shipping dates, they frequently missed those dates by up to nine months.

**Hot Cocoa ($51,337).**  In April 2018, Defendants claimed to start "pre-

---

[2] The FTC references exhibits attached to its Liability MSJ (Doc. 285) by both docket an exhibit number.  Exhibits to this Motion start from Exhibit 150 because they are numbered consecutively with the Liability MSJ exhibits.

production" of their Hot Cocoa product and began accepting pre-orders with an estimated shipping date of June 20, 2018.  (Doc. 298-3 (Ex. 138) at 1.)  Seven months later, Defendants still had not finalized the product's *formulation*.  (Ex. 192.)  As a result, Defendants did not start shipping Hot Cocoa until January 10, 2019 (or, potentially, March 1, 2019) at the earliest.  (Doc. 286-3 at 9-10 ¶ 24.)  Nevertheless, between April 2018 and December 11, 2018, Defendants accepted $51,337 in nonrefundable Hot Cocoa pre-orders.  (Ex. 150 ¶ 16.)  Unsurprisingly, Defendants' customers were troubled by the delay.  *See, e.g.*, Ex. 169 ($359 order not shipped ten months later); Doc. 285-8 (Ex. 9) ¶ 12 (over one year to receive Hot Cocoa); Ex. 174 (four "cases" of Hot Cocoa not received nine months post-order); Doc. 285-6 (Ex. 7) ¶ 15 (six-month wait).

**Rooibos Tea ($27,643).**  Defendants also claimed to start "pre-production" of their "Rooibos Tea" in March 2018, opening pre-orders with an estimated shipping date of May 20, 2018.  (Doc. 294-6 (Ex. 100) at 1.)  Eleven months later, in February 2019*,* Noland finally ordered Rooibos Tea from his supplier, explaining that he was "really behind the 8-Ball on this" with "many pre-orders . . . outstanding for over 6 months." (Ex. 168.)  Defendants did not start shipping until March 1, 2019 (or potentially June 1, 2019) at the earliest.  (Doc. 286-3 (Ex. 17) ¶ 23.)  Nevertheless, on or before January 29, 2019, Defendants accepted $27,643 in Rooibos orders.  (Ex. 150 ¶ 15.)

**Chai Tea ($61,815).**  Defendants purportedly started "pre-production," and opened pre-orders, of Chai Tea on March 5, 2018, with an estimated shipping date of April 20, 2018.  (Ex. 152.)  They "sold out" of pre-orders in March.  (Ex. 159.)  As of May 2018, however, Defendants had not even formulated the product.  (Ex. 185.) Defendants did not start shipping until September 21, 2018 at the earliest.  (Doc. 286-6 (Ex. 17) at 3 ¶ 11.)  (Noland admits, however, that "most" pre-orders did not ship until December 2018.  *See* Ex. 160; Doc. 286-6 (Ex. 17) ¶ 11.)  Nevertheless, through August 22, 2018, Defendants accepted $61,815 in nonrefundable chai orders.  (Ex. 150 ¶ 13.)

**Time Capsule ($47,955).**  Defendants launched pre-orders of their "anti-aging" "Time Capsule" on September 9, 2019, claiming the product was "about to be here!" (Ex. 154.)  At the time, they did not even have a manufacturer.  (Ex. 184.)  Defendants did not start shipping Time Capsule until November 17, 2019 at the earliest.  (Ex. 157.)  Nevertheless, they made $47,955 in Time Capsule sales (excluding shipping and handling) on or before October 10, 2019.  (Doc. 286-3 (Ex. 14) ¶ 26.)

**G-HCBD AM/PM ($71,497).**  Defendants opened pre-orders of one of their CBD products, G-HCBD AM/PM ("AM/PM"), on February 26, 2019.  (Ex. 153.)  They had no AM/PM in stock until April 26, 2019 at the earliest.  (Doc. 286-6 (Ex. 17) ¶ 13.)  Nevertheless, they sold $41,687 of AM/PM products (excluding shipping and handling) on or before March 26, 2019.  (Ex. 150 ¶ 18.)  Defendants made an additional $29,810 (excluding shipping and handling) in AM/PM sales between June 14 and October 10, 2019, notwithstanding the fact that they had *no* AM/PM in stock between June 14, 2019 and November 9, 2019.  (*Id.*)

### 3.    Other Shipping Delays (Unquantifiable)

There is substantial evidence showing the categories described above significantly undercount Defendants' missing or late shipments.  For example, a March 13, 2018 email references almost $25,000 in "backorders" not captured above.  (Ex. 150 ¶ 24; Ex. 188.)  A separate March 2018 email lists 35 additional backorders of unidentified quantities of "G-Clear."  (Ex. 190.)  One month earlier, Defendants circulated a list of over 100 backorders of a variety of other products.  (Ex. 181.)  As of late April 2018, SBH was "Back Ordered like crazy" on "Aller-G-Stop."  (Ex. 176.)

Customers also routinely complained to Defendants about not receiving other expensive orders.  *See, e.g.*, Ex. 171 ($2,212 case of "G-FYX" arrived after seven weeks with most products missing); Ex. 170 (one-plus-month delay on $1,995 "Super Accelerator Pack"); Ex. 189 (two-plus-month delay on $560 case of coffee); Ex. 186 (two-plus-month delay on $500 "Accelerator Pack"); Ex. 167 ("several-week" delay on Accelerator Pack); Ex. 150 ¶¶ 19-22 (listing cost of products referenced herein).

4

Finally, consumers confirmed Defendants' extensive delays.  One affiliate testified products were "often late" and he got "tons of complaints" from other affiliates.  (Doc. 285-5 (Ex. 6) ¶ 17.)  Another added that products were "repeatedly late" and that she never received a Founder Pack purchased for her daughter or a $5,000 Global Ambassador Pack purchased by her and her husband.  (Doc. 285-6 (Ex. 7) ¶¶ 14-15.)  Yet another affiliate never received the complete set of Founder Pack products.  (Doc. 285-10 (Ex. 11) ¶ 11.)  Even the Individual Defendants themselves were not immune to SBH's shipping woes.  In August 2018, Defendant Thomas Sacca asked an SBH employee for an update on an order of "G-Burn" for which he had waited two months.  (Ex. 183.)

## B.  Defendants' Refusal to Offer or Provide Refunds for Late and Unsent Shipments

Defendants' refund policy was simple, albeit not legal:  no refunds "for any reason whatsoever."  (Doc. 8-2 at 19.)  As a result, Defendants neither offered nor paid refunds to consumers who had already paid for their products and were forced to wait lengthy, indefinite periods for shipment.  (Doc. 222 ¶¶ 106-107 (admitting in part Second Amendment Complaint (Doc. 205) ¶¶ 170, 172).)  Defendants also threatened draconian punishment for "violating" their policy by simply seeking a refund:  "Each time an AFFILIATE violates the No Refund Policy and files a chargeback or disputes a purchase they made from the Company, the liquidated damages will be three (3) times the amount of each of AFFILIATE's disputed payments(s) [sic] to the Company, but not less than $1,000 . . . ."  (*Id.*)  But that was not all.  Defendants threatened customers seeking refunds, or even questioning their order status, with termination from the company, not only for themselves, but also for the person who recruited them.  (Doc. 290-3 (Ex. 57) at 5:23-6:15.)

The threats were not idle.  One affiliate's membership was "Suspended pending Termination" because, in the company's own words, he "complained about not receiving [his] pre-Order of Chai Tea among other things," which violated the company's "very

strict stance against negativity in any shape, form, or fashion."  (Ex. 173.)

In another instance, an affiliate ("BJ") filed chargebacks for three Founder Pack orders—placed on behalf of herself and two other affiliates—totaling $7,770. Defendants immediately emailed BJ that her membership was "hereby Suspended pending Termination, Criminal Prosecution, and a Civil Lawsuit filed against you." (Ex. 165.)  The email—sent on March 18, 2018, at the height of Defendants' Founder Pack shipping woes (*see supra* p. 2)—claimed the three affiliates "received the high majority" of the Founder Pack products and gave BJ one day to reverse the chargebacks before being reported for "Criminal Theft," along with facing a treble-damages lawsuit. (Ex. 165.)  In June 2018, Defendants apparently won the chargeback disputes by claiming to have shipped the products.  (Ex. 166.)  They then told BJ her account was terminated because of her "criminal" action of "filing multiple credit card chargebacks for product that you already had received."  (Ex. 166.)  One week later, in an email to Jay Noland, Lina Noland listed $2,065 in products *still* owed to each of BJ, CP, and GJ for their $2,600 Founder Pack purchases.  (Ex. 150 ¶ 23; Ex. 178.)  Lina asked Jay what she should do about the products owed.  (Ex. 178.)  Jay appears not to have responded in writing.  (Ex. 150 ¶ 23.)

An October 2018 email (Ex. 177) from one of SBH's most active affiliates (Ex. 150 ¶ 25) to Defendants Harris and Sacca captures the extent of Defendants' shipping problems and other affiliates' fears of raising the issue:

> Do you really believe people are reading policies and terms?  If they did and saw it might take 60 days for delivery to get a bag of coffee that they would order?  Come on those talking points won't hunt!
>
> How long has there been a problem with shipping and the warehouse?  I believe from day one.  It's 14 months later and still not fixed, that is not a pre-launch problem. . . .
>
> We are not the problem and our customers are not the problem fix the dam [sic] thing. . . .
>
> You are field rep's, how long have you known about these

problems?  Better yet what are you doing to fix them?  Are you scared of Jay like most of my team is?  Do I need to private message this to Jay?  Are you going to get me terminated for telling the truth?

## II.    DEFENDANTS' FAILURE TO OFFER REFUNDS OF HIGH-PRESSURE "DOOR-TO-DOOR" SALES

On top of their widespread deception, Defendants used high-pressure settings to maximize sales.  Rather than provide purchasers in these settings the required three-day "cooling-off" period, Defendants expressly barred them from seeking refunds.

### A.    Sales at Major "Training" Events ($526,488.50)

At each of their "training" events (for which tickets cost $300-$3,500 apiece (Doc. 286-3 (Ex. 14) ¶ 37)), Defendants created a frenzied atmosphere, featuring chanting, dancing, crying, and affiliates standing on chairs shouting at each other.  *See, e.g.*, Doc. 18 (PX 1, Atts. 15, 23); Doc. 302 (Exs. 1-03, 1-11, 2-02, 2-04.)  The impact on attendees is apparent.  In one video, a woman is almost in tears when she attests, "every single time [Jay Noland] makes me tear up because he pulls all that sincerity out.  You are, just, totally not doing yourself justice if you don't sit and give Jay the time that he deserves.  Your life will *totally* be different."  (Doc. 8-01 at 11 (¶ 25(f)).)  Another attendee described how Noland "kinda gets subconsciously into you."  (*Id.* at 10 (¶ 25(a)(iii)).)  At a Dallas event, one attendee explained how "this training has completely transformed my way of thinking.  And I, I'm ready to go out there and conquer."  (*Id.* at 11-12 (¶ 25(g)).)  Defendants use that emotional high to take consumers' money.[3]  At each event, Defendants distributed order forms for tickets to future events or multi-

---

[3] This strategy is straight out of the *Koscot* playbook.  *See In re Koscot Interplanetary, Inc., et al.*, 86 F.T.C. 1106 (1975).  In its *Koscot* opinion, the Commission described "opportunity meetings" that were "generally conducted in such a manner as to excite most of those attending and to induce them to make an emotional decision to invest in the program."  *Id.* ¶ 71. The meetings "took on the charged atmosphere of an old-fashioned revival meeting, except that the god was [the Defendant]."  *Id.*  One former Koscot official described the "extremely high pressure" tactics:  "things like grabbing people's lapels, pulling their ties off, hitting them on the back, yelling in their ear, . . . any bizarre, odd things that could change a person's state of consciousness so much that he would just unthinkingly invest in the company, on the spot sometimes."  *Id.* ¶ 73.

thousand-dollar product packs and pressured attendees to make nonrefundable purchases on the spot.  (Docs. 293-6 – 294-4 (Exs. 90-98) (order forms); Doc. 287-7 (Ex. 31) at 9:23-29:5.)

Transcripts and videos from the events confirm Defendants' violations and their misleading, high-pressure tactics.  At the 2018 "RED" event, for example, Defendants distributed order forms (Doc. 293-7 (Ex. 91) at 2) for $495 tickets for the following year's RED.  As he passed out forms, Noland reminded the audience to "think about your future here," asking them when they were "going to step up and really lead."  (Ex. 162 at 9:2-9.)  He told the audience, falsely, that one affiliate was on track to earn $100,000 a month in the next 120 days because he had so many team members at the current event.  (*Id.* at 10:1-23.)  Later, Noland claimed that "dominating tickets" is how his "number one student" got to a "million a month."  (*Id.* at 13:6-12.)  "Before you leave," he told the audience, "you got to hand in these forms to the ladies at the back table."  (*Id.* at 14:2-7.)  The next morning, Noland picked up where left off, threatening to cancel the following year's event if there were not 50 more ticket orders by lunch.  (Doc. 288-5 (Ex. 39) at 10:13-12:17.)  Minutes later, he reminded the audience that "we [don't] talk about" people who do not attend events, referring to them as "broke ass[es]."  (Ex. 163 at 11:10-12:9.)

Similarly, at the end of the first day of the three-day, $3,500-per-person "ICON" event, Noland, in front of the whole room, individually asked each attendee how many tickets they and their downline team would be ordering for the upcoming "Kickoff" event.  (Doc. 289-8 (Ex. 52) at 5:10-18:11.)  When one affiliate was insufficiently enthused about her two-ticket commitment, Noland lectured her for disrespecting him:

> Don't say another word.  Let me talk.  No talk, no talk, because [you're] right up here on the line with me.  Don't ever do what you did with me again, ever.  You understand?  Never do what you did with me again.  I'm going to tell you why, because I'm in the trenches with you, and I'm going to help you get your goals.  Don't fight with your teacher that's teaching you to get rich and dominate.

(*Id.* at 12:11-23.)[4]  The next day, Noland ridiculed attendees for not buying enough tickets: "Right then, at that moment, you were a con.  You were a fake."  (Doc. 289-10 (Ex. 54) at 10:9-23.)  Ultimately, Defendants sold $49,050 in Kickoff tickets, plus $43,065 in tickets for the RED event, at ICON.  (Doc. 286-3 (Ex. 14) at 18 (¶ 36(j)).)

At the same ICON event, Defendants also pushed $5,000 "Global Ambassador Packs."  Noland told attendees how they should pitch the pack to others:  "Here's the Global Ambassador pack, it can set you free financially forever to buy 25 Lamborghinis. Give me $5,000.  You got ten seconds."  (Ex. 164 at 8:9-22.)  Noland also expressed disbelief that some ICON attendees were not "Global Ambassadors" already.  (Doc. 290-1 (Ex. 55) at 13:2-14:3.)  Ultimately, SBM sold $59,940 in Global Ambassador Packs at ICON.  (Doc. 286-3 (Ex. 14) at 18 (¶ 36(j)).)

Consumers confirmed pressure to make large purchases at Defendants' events. One affiliate described Noland as an "intense motivational speaker" who was able to convince her to buy a $5,000 Global Ambassador Pack.  (Doc. 285-6 (Ex. 6) ¶ 10.) Another affiliate, who traveled from Sweden to California to attend ICON, explained that Jay "encouraged" attendees "to buy tickets for more SBH training events if we were serious about SBH, so . . . I spent $2,645 on [future] tickets."  (Doc. 285-5 (Ex. 5) ¶ 14.) Yet another affiliate wrote, "At the SBH events I attended, they usually started by telling people you had to buy tickets to future events to succeed and asked us to do so at the event."  (Doc. 285-8 (Ex. 9) ¶ 13); *see also id.* ¶ 9 ("I bought so many tickets because Jay and the SBH leaders pushed us to buy as many tickets as we could.").)

The FTC's Liability MSJ provided evidence of $526,488.50 in nonrefundable ticket and product sales at these events.  (Doc. 286-3 (Ex. 14) at 16-18 (¶ 36).)

**B.    Other "Door-to-Door" Sales (Unquantifiable)**

Although difficult to quantify, it is certain that SBM made significant amounts of additional door-to-door sales outside of their major events.  That is because SBM

---

[4] A video recording of the portion of the ICON training that included this exchange is Ex. 2-05 (Doc. 302) to the FTC's Liability MSJ.  The excerpt starts at 5:40.

encouraged such sales at local recruiting events and meetings.  The SBH "Fast Start System," for example, tells new recruits to "host at least 4 group presentations within your first month, and host one (SBH Launch Party/Event) within your first 7 days." (Doc. 8-4 at 116.)  Sacca and Harris described attending at least 80-115 and 40-50 such events, respectively.  (Doc. 287-6 at 110:24-111:20; Doc. 287-8 at 133:16-135:25.)  The SBH Home Group Presentation Success Tips tell affiliates how to host events, including "money/close tips" such as not leaving the room at the end and instead "circl[ing] up" with guests so that SBH "leaders" can "close the deal."  (Doc. 8-5 at 18; *see also* Doc. 8-5 at 30 ("We want to circle up and give you an opportunity to start experiencing our products and position you for Prosperity with SBH.").)  Consumers provided examples of their own purchases in such settings.  (Doc. 285-3 (Ex. 4) ¶ 15 ($2,495 VOZ "Founder Pack" purchase); Doc. 285-4 (Ex. 5) ¶ 9 ($2,795 VOZ "Founder Pack" purchase); Doc. 286-9 (Ex. 22) at 81:19-82:15 ($3,645 SBH "Founder Pack" purchase).)

## LEGAL STANDARD

"Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Rookaird v. BNSF Railway Co.*, 908 F.3d 451, 459 (9th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). "Where the moving party will bear the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail by pointing out that there is an absence of evidence to support the nonmoving party's case."  *Id.*   In either case, "[i]f the moving party meets its initial burden, the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial."  *Id.*

**ARGUMENT**

Under Section 19 of the FTC Act, the Court may "grant such relief as the court finds necessary to redress injury to consumers or other persons, partnerships, and corporations resulting from [Defendants'] rule violations." 15 U.S.C. § 57b(b).[5] "Such relief may include . . . the refund of money." *Id.* For the reasons explained in Sections I-II below, the proper relief here is a judgment sufficient to provide full refunds to all consumers whose purchases were tainted by the flagrant rule violations identified above.[6] Section III provides the FTC's calculation of that judgment amount: $1,156,865.50.

## I. DEFENDANTS MUST REFUND CONSUMERS FOR LATE OR UNSHIPPED ORDERS.

The Merchandise Rule required Defendants, in response to their late shipments, to offer consumers "an option either to consent to a delay in shipping or to cancel the . . . order and receive a prompt refund." 16 C.F.R. § 435.2(b)(1). Because the Defendants failed to give consumers this option, the Rule required them to cancel the order**s** and make a "prompt refund." 16 C.F.R. § 435.2(c)(5). They did not do so. (Doc. 285 at 33.) The injury caused by Defendant's violations is clear: consumers did not receive refunds to which they were entitled as a matter of law. Worse yet, Defendants deceived consumers into thinking they had no right to a refund (or to even question the matter). *See supra* pp. 5-7. Therefore, the appropriate remedy is equally clear: a judgment in the amount of the funds to which those consumers remain entitled.

---

[5] Section 19 gives the Court this authority when a party has "violated any rule under [the FTC Act] respecting unfair or deceptive acts or practices." 15 U.S.C. § 57b(a). Both the Merchandise Rule and the Cooling-Off Rule qualify. *See* Doc. 351 at 11 n.5.

[6] FTC counsel is unaware of any court having addressed the proper monetary remedy for a Cooling-Off Rule violation or a standalone Merchandise Rule violation. *Cf. FTC v. DiscountMetalBrokers, Inc.*, No. 16-cv-2112, 2017 WL 4442998, at *4 (C.D. Cal. Oct. 4, 2017) (in response to deceptive, material omissions and related Merchandise Rule violations, entering, under Section 13(b), judgment equal to value of unfulfilled orders).

Defendants, presumably, will argue that consumers were not harmed because they *eventually* received the products.  As a threshold matter, that is wrong.  In many cases, consumers *never* received their orders.[7]  (*E.g.*, Doc. 285-2 at 6; Doc. 285-10 (Ex. 11) ¶ 11.)  In any event, the Rule does not permit Defendants to choose their own remedy.  By law, consumers' orders were cancelled when Defendants failed to offer them the opportunity to consent to or cancel a delayed shipment.  16 C.F.R. § 435.2(c)(5).  The fact that Defendants nevertheless chose to send the products makes those products unordered merchandise, which consumers by law may treat as a gift, and for which they have no obligation to return.  *See* 39 U.S.C. § 3009 ("Any merchandise mailed in violation of subsection (a) of this section [without authorization] . . . may be treated as a gift by the recipient, who shall have the right to retain, use, discard, or dispose of it in any manner he sees fit without any obligation whatsoever to the sender.").

---

[7] At the very least, if Defendants intend to argue that consumers who eventually received their orders are not entitled to refunds, they must bear the burden of proving which late orders were eventually sent.  *See infra* pp. 13-15 (burden shifts to Defendants where they created uncertainty), p. 16 (burden shifts to Defendants after FTC provides reasonable calculation of harm). This is particularly true here, given Defendants' poor shipping records.  *See* 16 C.F.R. § 435.2(d) (creating "rebuttable presumption" of noncompliance where defendant lacks "records or other documentary proof establishing it use of systems and procedure which assure compliance").  For example, although Defendants used Stamps.com to ship orders, there is no way to look for a particular order number in their Stamps.com account; instead, one must try to match orders by name, date, and shipping weight.  (Doc. 287-7 (Ex. 31) at 42:23-44:9.)  That process is complicated by the fact that Defendants, because of their constant backorders, often sent orders in multiple parts.  (*Id.* at 44:1-9.)  Additionally, the fact that a "batch" of shipments is marked "finalized" in Defendants' database does not mean that the products were ever actually shipped.  (*Id.* at 45:2-46:7.)  To make matters worse, when a consumer saw that an order was "shipped," it also did not actually mean that the order was shipped; instead, it simply meant that "the warehouse has received the order and will ship out when product is available to ship."  (Doc. 294-5 (Ex. 99) at 1; Doc. 287-8 (Ex. 31) at 47:18-50:25.)

## II. DEFENDANTS MUST REFUND CONSUMERS FOR DEPRIVING THEM OF THE REQUIRED COOLING-OFF PERIOD.

Assessing consumer injury caused by Defendants' Cooling-Off Rule violations requires the Court to consider what would have happened had Defendants provided the three-day cooling-off period.   For the reasons explained below, Defendants bear the burden of proving consumers would *not* have exercised their refund rights, even if fully informed of Defendants' deceptive claims.  Because they cannot meet that burden, they are required to provide full refunds to consumers in all transactions that violated the Rule.

### A. Defendants Bear the Burden of Proving that Fully-Informed Consumers Would Not Have Exercised Their Refund Rights.

The Cooling-Off Rule requires that for each of their "door-to-door"[8] sales, Defendants provide notice of the consumer's right to cancel the transaction within three business days (16 C.F.R. § 429.1(a), (e)) and provide a form Notice of Cancellation to effectuate the cancellation (16 C.F.R. § 429.1(b), (c)).  There is no dispute that in *all* of their door-to-door sales, Defendants violated each of these requirements.  (Doc. 285 at 17, 33.)  By doing so, Defendants locked consumers in to purchases made in response to deceptive claims in high-pressure environments.

For at least three reasons, Defendants must bear the burden of proving that consumers would *not* have exercised their right to refunds if (1) Defendants had properly informed them of those rights and (2) Defendants had disabused them of Defendants' extensive prior misrepresentations by informing them of the truth:  *e.g.*, that almost all of consumers will never recoup their money from ticket purchases (Doc. 285 at 21-23); that only 11 of the 7,000 affiliates netted more than $10,000 total, averaging just $1,581 annually from SBH (Doc. 285 at 21); and that Jay Noland actually had no money, homes,

---

[8] "Door-to-door" sales include not only sales that occur at the "buyer's residence," but also at any place "other than the place of business of the seller," including "facilities rented on a temporary or short-term basis [by the seller], such as hotel or motel rooms, convention centers, fairgrounds and restaurants."  16 C.F.R. § 429.0(a).

or history of business success (Doc. 285 at 4).

*First*, shifting the burden to Defendants is consistent with the "most elementary conceptions of justice and public policy," which "require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946) (applying burden-shifting in antitrust context). "That principle is an ancient one . . . and is not restricted to proof of damage in antitrust suits . . . ." *Id.*; *see also SEC v. First City Fin. Corp., Ltd.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989) ("[T]he risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty."). The principle "applies to situations in which," as here, "the amount of damages, although not specifically ascertainable because of misconduct by the defendant, falls within a certain range," thereby "prevent[ing] the defendant from profiting by his wrongdoing at the expense of his victim." *Raishevich v. Foster*, 247 F.3d 337, 343 (2d Cir. 2001) (internal quotation marks omitted).

*Second*, shifting the burden to the Defendants—and requiring them to prove that *fully informed* consumers would not have requested refunds—is consistent with the purpose of the Cooling-Off Rule. In particular, the Rule was the Commission's response to the prevalence of "high-pressure sales tactics" and "misrepresentations" in "door-to-door" sales. *See* Promulgation of Trade Regulation Rule and Statement of Its Basis and Purpose, 37 Fed. Reg. 22934, 22937-38 (Oct. 26, 1972). The cooling-off period gives purchasers "some opportunity to discover misrepresentations made by the salesman, or to realize . . . that [they are] paying too high a price for the product." *Id.* at 22942. In short, the cooling-off period is a "weapon of self-help with which to combat [high-pressure] tactics." *Id.* at 22944. Here, Defendants should not be permitted to benefit from having deprived consumers of that weapon, nor should they be permitted to benefit from their lies about affiliates' income potential. In fact, allowing Defendants to assume that buyers would continue to be deceived by their misrepresentations creates a perverse result, in

which parties who make compelling, but false, claims about their products can more easily avoid monetary liability for rule violations than those who make less enticing, but true, claims.  The bolder the lie, the harder it would be to prove consumer harm.

*Third*, courts have ordered similar burden-shifting in other FTC Act cases so as not to frustrate the FTC's ability to redress victims.  For example, in the context of material misrepresentations, the FTC need not prove "actual reliance [on misrepresentations] by any particular consumers because *requiring such proof 'would thwart the effective prosecutions of large consumer redress actions and frustrate the statutory goals of the' FTC Act*."  *In re Sanctuary Belize Litig.*, 482 F. Supp. 3d 373, 434 (D. Md. 2020) (emphasis added) (quoting *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 605 (9th Cir. 1993)).  Instead, once the FTC proves material, widespread misrepresentations, "the burden shifts to the defendant to prove the absence of reliance." *Figgie*, 994 F.2d at 606.  The Second, Eighth, Ninth, Tenth, and Eleventh Circuits all adopted this burden-shifting framework to address the "inherent difficulty of demonstrating individual harm in FTC cases." *FTC v. BlueHippo Funding, LLC*, 762 F.3d 238, 244 (2d Cir. 2014).  The same principle applies here:  once the FTC proves the violation, the burden shifts to Defendants to show that complying would not have changed consumers' decisions.

**B.    Defendants Cannot Satisfy Their Burden of Proving that Fully Informed Consumers Would Not Have Exercised Their Refund Rights.**

Defendants promoted their events as a necessary step on the path to vast riches. (Doc. 285 at 16-17.)  There can be little doubt that if consumers had been provided a cooling-off period *and* been fully informed of their actual income potential, of other affiliates' actual results, and of Jay Noland's lies about his own wealth and business acumen, they would have rescinded their purchases. *See, e.g.*, Doc. 286-9 (Ex. 22) at 78:9-15; Doc. 286-10 (Ex. 23) at 40:13-18; Doc. 287-1 (Ex. 24) at 77:14-78:7; Doc. 287-2 (Ex. 25) at 145:25-146:12 (affiliates all stating they would have made different decisions if fully informed).

1    Defendants, in their opposition to FTC's Motion for Preliminary Injunction, make

2    two counterarguments:  (1) consumers say they were not tricked into buying tickets and

3    (2) consumers, even today, still believe the products were worth the amount paid.  (Doc.

4    360-1 at 29.)  Both arguments fail.

5    First, some consumers' *belief* that they were not lied to does not change the fact

6    that they were.  The FTC has definitively established that Defendants made

7    representations about SBH affiliates' income potential and that those representations

8    were false.  (Doc. 285 at 2-5, 18, 21-23, 31-32.)  Declarants do not dispute that they

9    relied on these statements; instead, they simply still believe that the statements are true.

10   Those beliefs do not overcome the actual evidence of falsity.[9]  *See FTC v. Five-Star Auto*

11   *Club, Inc.*, 97 F. Supp. 2d 502, 530 (S.D.N.Y. 2000) (rejecting argument that evidence of

12   satisfied pyramid scheme customers "show[s] that no consumers were deceived").

13   Second, declarants' present-day belief regarding the value of the products or

14   services received in illicit transactions is irrelevant.  The relevant question is whether

15   declarants would have exercised their refund rights *during the three-day cooling-off*

16   *period*.  Because fully informed consumers would have exercised those rights, it does not

17   matter what happened later.  *See Figgie*, 994 F.2d at 606 (9th Cir. 1993) (rejecting

18   argument that consumers' losses should be offset against value of product received

19   because "[t]he fraud is in the selling, not the value of the thing sold"); *BlueHippo*

20   *Funding*, 762 F.3d at 244-45 ("full amount paid by the injured consumer must serve as

21   the baseline for calculating damages because the 'seller's misrepresentations tainted the

22

23   _____

24        [9] Additionally, even if the Court determines that the declarants would not have
     exercised their Cooling-Off Rule rights, that is only sufficient for Defendants to carry
25   their burden as to those particular consumers.  Defendants would remain liable for
     refunding all non-declarant purchasers.  *See, e.g.*, *FTC v. Bronson Partners, LLC*, 654
26   F.3d 359, 369 (2d Cir. 2011) (Defendants can rebut presumption of consumer reliance by
     demonstrating that "*individual* transactions were atypical and resulted in a lower-than-
27   expected gain to the wrongdoer").

28

customer's purchasing decisions'" (quoting *McGregor v. Chierico*, 206 F.3d 1378, 1388 (11th Cir. 2000)).  Again, Defendants have offered nothing more than a legally baseless "satisfied customer" defense.

## III.   DEFENDANTS ARE LIABLE FOR OVER $1 MILLION IN CONSUMER HARM.

The FTC bears the burden of "show[ing] that its calculations reasonably approximate[] the amount of customers' net losses."  *FTC v. Inc21.com Corp.*, 745 F. Supp. 2d 975, 1011 (N.D. Cal. 2010) (quoting *FTC v. Febre*, 128 F.3d 530, 535 (7th Cir. 1997)).  Once the FTC makes that showing, "the burden shifts to the defendants to show that those figures [are] inaccurate."  *Id.*

As detailed *supra* pp. 1-4, 7-9, Defendants caused at least $1,156,865.50 in consumer harm through their rule violations—$630,377 for the Merchandise Rule violations and $526,488.50 for the Cooling-Off Rule violations.  In fact, given the likely volume of unquantified (and unquantifiable) rule violations (*supra* pp. 4-5, 9-10), the omission of shipping and handling charges from some of the FTC's calculations (*supra* p. 4), and the FTC's conservative assumptions regarding shipping dates (Ex. 150 ¶¶ 13-18), the true amount of consumer harm is likely much higher.  The burden is now on Defendants to prove the FTC's calculation incorrect.

## CONCLUSION

For the foregoing reasons, the FTC respectfully requests that the Court enter judgment against the Defendants in the amount of $1,156,865.50.

1

Dated:  June 23, 2021                     Respectfully submitted,

2

3                                                           /s/ Evan M. Mendelson
                                                            EVAN M. MENDELSON, DC Bar No. 996765
4                                                           JONATHAN W. WARE, DC Bar No. 989414
5                                                           Federal Trade Commission
                                                            600 Pennsylvania Ave. NW
6                                                           Mailstop CC-9528
7                                                           Washington, DC 20580
                                                            (202) 326-3320; emendelson@ftc.gov
8                                                           (202) 326-2726; jware1@ftc.gov
                                                            (202) 326-3197 (Fax)
9

10                                                         Attorneys for Plaintiff
                                                            FEDERAL TRADE COMMISSION
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28