1    **WO**

2

3

4

5

6                  **IN THE UNITED STATES DISTRICT COURT**

7                     **FOR THE DISTRICT OF ARIZONA**

8

9    Federal Trade Commission,              No. CV-20-00047-PHX-DWL

10                    Plaintiff,             **ORDER**

11   v.

12   James D. Noland, Jr., et al.,

13                    Defendants.

14

15         In this action, the Federal Trade Commission ("FTC") alleges that Defendants

16   James "Jay" Noland ("Noland"), Lina Noland, Thomas Sacca ("Sacca"), and Scott Harris

17   ("Harris") (together, the "Individual Defendants") operated a business venture called

18   Success by Health ("SBH"), as well as a related travel enterprise called VOZ Travel, as

19   unlawful pyramid schemes.  (Doc. 205 ¶¶ 17-135.)  The FTC further alleges that the

20   Individual Defendants made false representations in the course of operating these ventures

21   (*id.* ¶¶ 160-62) and that SBH's product-shipping and refund practices violated various FTC

22   rules (*id.* ¶¶ 165-81).  All told, the FTC accuses the Individual Defendants of committing

23   six violations of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 41 *et seq.*

24   (*Id.* ¶¶ 156-81.)

25         During the early stages of the case, the Court granted the FTC's requests for a

26   temporary restraining order ("TRO") and then a preliminary injunction.  (Docs. 19, 38,

27   106, 109.)  These orders resulted in the appointment of a Receiver to operate SBH and an

28   asset freeze, among other things.  As set out in greater detail below, the parties have

continued to actively litigate this case since the entry of the preliminary injunction. Additionally, the Court recently granted the FTC's motion for sanctions against the Individual Defendants based on their intentional destruction of evidence.  (Doc. 401.)

Now pending before the Court is the FTC's motion for summary judgment as to liability.  (Docs. 285, 381-4.)  The motion is fully briefed and neither side has requested oral argument.  For the following reasons, the motion is granted.

## BACKGROUND

I.    Factual Background

The following facts are derived from the parties' summary judgment submissions and other evidence in the record.  Notably, the Individual Defendants failed to address (let alone dispute) many of the facts submitted by the FTC in support of its motion.[1]  As a result, those facts are considered undisputed for present purposes.  *See* Fed. R. Civ. P. 56(e)(2).  Additionally, many of the factual assertions in the Individual Defendants' response are not accompanied by citations to specific documents in the record, while others rely on vague citations to voluminous exhibits.[2]  This approach is insufficient to create a genuine dispute as to those facts.  *See, e.g.,* Fed. R. Civ. P. 56(c)(1); *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).

A.    **The Corporate And Individual Defendants**

The three Corporate Defendants in this action are Success by Media, LLC, Success by Media Holdings, Inc., and Enhanced Capital Funding ("ECF").  (Doc. 205 ¶¶ 6-8.)[3]  The Court will collectively refer to Success by Media, LLC and Success by Media Holdings, Inc. as "SBM," as the two entities operated as a common enterprise and are treated effectively as a single corporation.  (Doc. 205 ¶¶ 14, 142; Doc. 222 ¶ 1, 6 [admitting these facts].)[4]  ECF is a shareholder and director of SBM.  (Doc. 205 ¶¶ 140-41; Doc. 222 ¶ 1.)

---

[1]    The FTC identifies some of the undisputed facts in its reply.  (Doc. 381-10 at 1-5.)

[2]    The FTC identifies some of the unsupported and/or vague citations in its reply. (Doc. 381-10 at 5-7.)

[3]    A fourth Corporate Defendant, Rinpark SA (Doc. 205 ¶ 9), was dismissed for lack of personal jurisdiction (Doc. 258).

[4]    The Individual Defendants' admissions in their answer constitute judicial

1    From July 2017 onward, over 97 percent of ECF's income came from SBM.  (Doc. 205

2    ¶ 145; Doc. 222 ¶ 85.)

3           SBM is the parent company of SBH.  (Doc. 8-1 at 8 ¶ 1; Doc. 205 ¶¶ 6-7; Doc. 222

4    ¶ 1.)[5]  SBH is a multilevel marketing ("MLM") enterprise that markets coffee, tea, other

5    beverages, and nutraceutical products through a network of individuals known as

6    "Affiliates."  (*See, e.g.*, Doc. 8-2 at 27-39.)

7           As for the Individual Defendants, Noland is a principal of all three Corporate

8    Defendants (Doc. 8-1 at 61-69, 71-75; Doc. 8-2 at 4-8) and, as discussed in more detail

9    below, served as a the central figure in the SBH and VOZ Travel enterprises.  Noland was

10   also charged with violations of the FTC Act in a previous enforcement action brought by

11   the FTC.  That action, which was resolved without any admissions or findings of

12   wrongdoing as to Noland, resulted in the entry of an order that "permanently restrained and

13   enjoined" Noland from "engaging, participating or assisting in any manner or capacity

14   whatsoever . . . in any prohibited marketing scheme," including "a pyramid sales scheme,"

15   and from "making . . . any false or misleading statement or misrepresentation of material

16   fact" "in connection with . . . any multi-level marketing program."  *FTC v. Netforce*

17   *Seminars*, No. 2:00-cv-02260-DWL, Doc. 66.[6]

18          Lina Noland is a principal of SBM (Doc. 8-1 at 61-69, 71-75) and also describes

19   herself as a principal of SBH.  (Doc. 335-6 at 9 ¶ 1.)  She provided initial training to SBH

20   personnel and at different times supervised the customer service department and warehouse

21   employees.  (Doc. 287-7 at 6-7, 10.)

---

admissions that "have the effect of withdrawing a fact from issue and dispensing wholly
with the need for proof of the fact."  *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224,
226 (9th Cir. 1988).  The Court may rely on these admissions when ruling on the motion
for summary judgment.  *SEC v. Neman*, 2015 WL 12746213, *7 (C.D. Cal. 2015) ("[T]he
admissions in Defendant's Answer are 'judicial admissions' and were within the Court's
purview at the time it decided Plaintiff's summary judgment motion.").

[5]    SBM also operated other ventures, including Success by Coaching and Success by
Networking.  (Doc. 72 at 3; Doc. 106 at 2, 27; Doc. 335, Ex. B-6.)

[6]    The FTC has filed motions to show cause why Noland, Sacca, and Harris should
not be held in contempt for violating the terms of this injunction.  *FTC v. Netforce
Seminars*, No. 2:00-cv-02260-DWL, Docs. 74, 91.  These motions are on hold pending the
resolution of this case.  *Id.*, Doc. 101.

- 3 -

Harris is listed in SBH's promotional materials either as SBH's President or Executive Vice President.  (Doc. 8-3 at 27; Doc. 8-4 at 102.)  He is also on the board of Success by Media Holdings, Inc.  (Doc. 205 ¶ 12; Doc. 222 ¶ 5; Doc. 287-5 at 10.)

Sacca is listed in SBH's promotion materials as SBH's "Chief Visionary Officer" or "Sales Director."  (Doc. 8-3 at 27; Doc. 8-4 at 102.)  In addition to these roles, he was also a senior field advisor for SBM and SBH.  (Doc. 205 ¶ 13; Doc. 222 ¶ 5.)

### B.     Facts Related To SBH Pyramid Scheme Allegations

SBH began operations in or around 2017.  (Doc. 8-14 at 136; Doc. 8-16 at 38; Doc. 293-6; Doc. 298-10 at 2; Doc. 299-4.)  As noted, SBH sells an array of coffee and other beverages and nutraceutical products through a network of Affiliates.  Affiliates must pay a $49 annual membership fee; in return, they receive the ability to earn commissions for sales and recruitment, as well as back office, marketing, and training benefits.  (Doc. 8-5 at 41; Doc. 8-11)  A key product in SBH's product line is a coffee that is blended with the "Ganoderma" a/k/a "Reishi" mushroom.  (Doc. 8-9 at 19-30.)  SBH's promotional materials assert that this blended coffee, known as "MycoCafe," offers various health benefits.  (*Id.* at 27-29.)

SBH's promotional materials tout coffee as a powerful vehicle to generate "residual income" because many people drink a large volume of coffee on a regular basis.  (Doc. 8-9 at 21; Doc. 8-10 at 3-6.)  SBH defines residual income as "passive income," or income that is generated irrespective of whether the earner works, and suggests that such wealth generally comes from owning "a system" or "investments."  (Doc. 8-10 at 2.)  The promotional materials state that customers will first sample and enjoy the coffee, then order more coffee and explore other SBH products, then become habitual consumers of SBH products, and eventually become "natural promoters" of the product and "experience residual income."  (*Id.* at 11.)  SBH set a five-year goal of capturing 1 percent of the global coffee market.  (*Id.* at 14.)  The promotional materials stated that this goal was reachable because of the product's taste, price, and health benefits, and because Affiliates could earn abundant rewards through SBH's Six-Phase Commission Program (and thus, presumably,

1  would consume and market large amounts of SBH's product).  (*Id.* at 15.)

2           1.  <u>Six-Phase Commission Program</u>

3      SBH uses a Six-Phase Commission Program for its Affiliates.  (Doc. 8-5 at 38.)

4  Each phase emphasizes different approaches for Affiliates to generate income, and the

5  phases are advertised as incrementally more profitable.  (*Id.* at 38-42.)  Affiliates are given

6  their own URLs on the SBH website through which they can sell SBH products and earn

7  10 percent of each sale made via that website.  (Doc. 8-5 at 40.)

8          a.  **Phase 1: Retail Sales**

9      At Phase 1, Affiliates, as well as any member of the general public, can order

10  products directly from SBH's website "at wholesale pricing."  (*Id.* at 38.)  Affiliates (and

11  members of the general public) can then resell the products at a markup price.  (*Id.*)  SBH's

12  promotional materials suggest that Affiliates generally make $15 in profit per box of coffee

13  sold and that, if an Affiliate built a base of 100 monthly retail customers, an Affiliate could

14  make up to $54,000 in retail profit per year.  (*Id.*)

15          b.  **Phase 2: Auto-Order Program**

16      At Phase 2, Affiliates or members of the general public who join SBH's Monthly

17  Auto-Order Program receive five percent of their order credited in "SBH Product Points."

18  (*Id.* at 39.)  Each point is worth $1.  (*Id.*)  These "points/dollars" can then be used to place

19  future SBH orders.  (*Id.*)  Affiliates also gain the benefit of SBH Product Points for

20  Affiliates they recruit to join SBH who themselves make a minimum amount of auto-order

21  purchases every month.  (*Id.*)  These benefits kick in once an Affiliate directly refers at

22  least five Affiliates, and the rewards increase once at least ten Affiliates are directly

23  referred.  (*Id.*)  SBH's promotional materials explain: "Our Auto Order Program helps

24  incentivize your affiliate team to place consistent orders, thus producing more income for

25  you and for them."  (*Id.*)

26          c.  **Phase 3: Accelerator Bonus**

27      At Phase 3, an Affiliate can earn a cash bonus for the sale of a $500 Accelerator

28  Pack or a $1,995 Super Accelerator Pack.  (*Id.*)  The contents of these packs are described

in greater detail below, but in short, purchase of these packs entitles the purchaser to a large volume of product at discounted rates, plus eligibility for certain bonuses.  At this Phase, an Affiliate gets a direct cash bonus for each pack the Affiliate sells to his or her downline SBH Affiliate team members.  (*Id.*)  An Affiliate can also earn product credits in this phase by selling a certain number of Accelerator or Super Accelerator Packs within the first week as an Affiliate.  (*Id.*)

### d.   **Phase 4: SBH 6-Tier Bonus Program**

At Phase 4, an Affiliate earns sales commissions on purchases made through his or her own personal SBH website, as well as from purchases made by the Affiliate's direct recruits, the recruits' recruits, and so on through the last tier.  (*Id.* at 40.)  According to SBH, there is "NO LIMIT" on the income an Affiliate can earn at this Phase.  (*Id.*)  The commissions paid to the Affiliate at Phase 4 are as follows:

- Tier 0:  10 percent on all orders placed through the Affiliate's SBH website.
- Tier 1:  10 percent on all sales made by the Affiliate's direct recruits.
- Tier 2:  6 percent on all sales by the Affiliate's recruits' recruits, *i.e.*, "Tier 2" of recruits.
- Tier 3:  4 percent on all sales.
- Tier 4:  3 percent on all sales.
- Tier 5:  2 percent on all sales.[7]

(*Id.*)

### e.   **Phase 5: "4 Generation Super Business Affiliate Infinity Bonus"**

At Phase 5, Affiliates who have recruited a downline Affiliate team "that generates at least $15,000 in sales in one calendar month"—*i.e.*, "Super Business Affiliates"—become eligible for "Infinity Bonuses."  (*Id.*)  There are four levels of Super Business Affiliates.  (*Id.*)  At the low end, an Affiliate can become a Super Business Affiliate 1

---

[7]   To earn Tier 4 and 5 commissions, Affiliates are required to meet additional conditions related to the purchase of accelerator packs or overall monthly sales.  (Doc. 8-5 at 40.)

("SBA1") if the Affiliate's downline sales team makes at least $15,000 in sales in a calendar month, with no more than $7,500 in sales coming from any one team.  (*Id.*)  At the high end, one can become a Super Business Affiliate 4 ("SBA4") once $150,000 in team affiliate sales have been reached in a calendar month, with no more than $75,000 in sales coming from any one team.  (*Id.*)  Once eligible, Affiliates earn 1% commissions "down to the next Super Business Affiliate." (*Id.* 40-41.)  In other words, an SBA1 would earn a 1% commission on all purchases made by those in the Affiliate's downline until that downline hit another Super Business Affiliate.  Higher ranking Super Business Affiliates can earn commissions on successive generations (earning down to the next two, three, or four Super Business Affiliates in the downline). (*Id.*)  SBH's promotional materials explain that Phase 5 "gives you the opportunity to earn up to an additional 4% sweeping infinity affiliate bonus on your entire affiliate organization."  (*Id.* at 41.)

### f. **Phase 6: BAM Bonus Program**

At Phase 6, Affiliates become eligible for one-time bonuses "when certain milestones are achieved." (*Id.*)  Affiliates are told they can earn more than $5 million in such bonuses.  (Doc. 8-11 at 14.)  This bonus relies on the "Power of 10."  In a nutshell, the Power of 10 and the BAM bonus are premised on an Affiliate recruiting 10 downline affiliates, each of whom purchases at least $100 of product per month from SBH.  Then, when the Affiliate's 10 recruits each recruit 10 more Affiliates, the Affiliate has completed a "10x10" and is entitled to a $1,000 BAM bonus. (*Id.*)  When the recruits' recruits each recruit 10 more recruits of their own, the initial Affiliate has completed a "10x10x10" and can now receive a $10,000 bonus. (*Id.*)  Continuing on, an Affiliate can earn a $100,000 bonus for completing a 10x10x10x10 and a $1 million bonus for completing a 10x10x10x10x10. (*Id.*)  Additionally, SBH's marketing materials state that if each downline recruit purchases at least $500 of product per month, an Affiliate with a 10x10x10x10x10 will earn a one-time bonus of $5 million. (*Id.*)  In other words, an Affiliate earns the full BAM bonus only by having 111,110 individuals in a downline network.

2.   Product Packs

SBH markets different "packs" that include various beverage and nutraceutical products. (Doc. 335-4 at 2-4.)  For instance, an "Accelerator Pack," which sells for $500 (before shipping or the $49 membership fee), includes "[o]ver $600 in wholesale SBH products" and qualifies Affiliates for various incentives including five tiers of commissions for two months, pay match bonuses plus two tiers in accelerator match, and "Power 500 [and] Power 1000 Eligibility." (*Id.* at 2.)  The "Accelerator Plus Pack" includes more products, is sold for $1,000 (excluding shipping and the membership fee), and provides more significant commission tiers and other bonuses. (*Id.* at 3.)  The "Super-Accelerator Pack" is sold for $1,995 (excluding shipping and the membership fee), comes with more products, opens up "all 6 Tiers of Commissions" for four months, offered other incentives, and is marketed as the "Fastest way to grow SBH Affiliate Business." (*Id.* at 4.)  There is also a "Founders Pack" that is sold for $3,495, plus $150 in shipping and handling, and includes a markedly larger amount of product and a variety of incentives including, among others, "25% off all Success By Health Trainings for life" and immediate eligibility "to be paid on all 6 Tiers of commissions." (Doc. 335-6 at 15.)  This option is reportedly available only to "a limited number of SBH Affiliates." (*Id.* at 16.)

Affiliates are encouraged to purchase large packs.  For example, at an "ICON" training event, Noland asked the audience: "If you're going to be an ICON, are you at least a country founder?" (Doc. 290-1 at 3.)  On the screen was a description of the "SBH Country Founders Pack" for $2,995. (Doc. 285, Ex. 2-08 at 4:00.)  Noland then asked those who were *not* Country Founders to stand up and instructed them that "if you're going to be an ICON, do iconic stuff," criticizing them for seeing the "cost," but not the "value," of being a Country Founder. (Doc. 290-1 at 3-4.)  He then encouraged Affiliates who could not afford the upfront cost to use "other people's money" by using a credit card or "borrow[ing] somebody else's credit card." (*Id.* at 4.)  He suggested that the increased credit card payments could be covered by selling "three pouches of coffee" per month. (*Id.*)

3.      Additional Bonuses, Promotions, And Rewards

SBH also offers incentives outside of the 6-Phase Commission Program.   One category is the "Power 500" and "Power 1000" bonuses, which are available to Affiliates who, within 14 days of joining SBH, purchase certain types of packs and recruit more affiliates who auto-order their own packs.  (Doc. 8-11 at 5.)  Another category of bonuses are 3 X 3, 4 X 4, and 5 X 5 Bonuses, which provide up to $17,000 in cash bonuses for recruiting three, four, or five new Affiliates who themselves recruit the same number of affiliates each, and if all the new recruits purchase certain types of product packs.  (Doc. 8-13 at 192-93.)

4.      Three Types Of People

SBH's marketing materials state that there are three types of people who participate in SBH: "supplementers," "income replacers," and "financial freedom seekers."  (Doc. 8-11 at 24.)  "Supplementers" are individuals who want to use the products, supplement their income, and enjoy other Affiliate benefits.  (*Id.*)  "Income replacers" are individuals whose goal is to develop residual income so they can replace their current job or "replace current income in . . . six months or so."  (*Id.  See also* Doc. 8-5 at 30.)  "Financial freedom seekers" are individuals who want to "achieve complete Financial Freedom" for themselves and their families.  (Doc. 8-11 at 24.)  Individuals falling in this category want to "live the Life of Their Dreams.  They don't want to settle for average."  (Doc. 8-5 at 30.)

5.      Four Steps To Success

SBH's promotional materials also advise that there are "Four Steps to Success" as an Affiliate: (1) "Get Started" by paying the $49 fee and choosing what products or product pack to purchase; (2) "Be a Product of the Product" by using the products, taking note of the experience of the products, and sharing those experiences with others; (3) "Build a Team" by contacting people who could potentially be a part of a team; and (4) "Pay Attention to Training [and] Duplicate" by engaging with training modules, following the guidance, and teaching members of the Affiliate's team to do the same.  (Doc. 8-8 at 20.)  Duplication is touted as the "key to long term success."  (Doc. 8-4 at 98.)  Affiliates are

encouraged to "duplicate Mr. Noland." (Doc. 288-4 at 5.)  SBH employs these same four steps—its "fundamental training system"—for all three "types" of Affiliates. (Doc. 8-4 at 112.)

6.  Training Events

The Individual Defendants emphasized the value of training events led by Noland and strongly encouraged Affiliates to attend.  For example, in an August 2019 video posted by Sacca, Noland stated that the only way an Affiliate who attended his trainings alongside his or her downline recruits could fail to achieve financial success was "to shoot yourself in the head." (Doc. 8-1 at 32-33 ¶ 54(c).)  At a September 2019 event, Noland admonished those who hesitated to commit to buying tickets to a future training event: "Right then, at that moment, you were a con.  You were a fake.  Right there, it caught you." (Doc. 289-10 at 4.)  In early 2020, Noland told Affiliates that an upcoming training event was "so critical" that each seat at the event "is prime, absolute legendary real estate that will never be forgotten.  Your seat will go down in history, that's how important this seat is." (Doc. 290-7 at 3.)

Harris once told a group of Affiliates: "I had someone tell me yesterday, they said, look, if I do this [*i.e.*, attend a training], I'm going to have to get a loan to be able to go there.  And I said, oh, so it's not worth getting a loan to come here and build something that's going to take care of your family for generations, right?  I mean, yeah, I would get a loan if I needed one." (Doc. 8-13 at 238.)  Harris then encouraged the audience members to call their credit card companies to request increased balance limits. (*Id.*)  SBH also posted on its Facebook page a "Million Dollar Contract" that states, among other things, "I will attend all SBH corporate trainings and events no matter what." (Doc. 8-1 ¶ 53(a); Doc. 8-13 at 189.)  Similarly, SBH's "1 Year Commitment Form" asks an Affiliate to "commit that I will . . . [a]ttend all Major Corporate Events (typically 2 or 3 per year)." (Doc. 8-5 at 2.)  Tickets ranged from $195 to $3,495. (Doc. 8-1 ¶ 86.)

7.  Recruitment Versus Retail Sales

SBH Affiliates were encouraged to recruit new Affiliates.  For example, in an

1    October 2019 online video post, Noland stated: "When a person joins [SBH], I'm like,
2    'great, way to go.'  But I'm not super fired up until that person recruits somebody else to
3    join.  When they recruit somebody else to join, I go, 'Alright!  Now okay, I've got
4    somebody now.  I've got me an inviter.'  See the most important thing in this industry if
5    you want residual income, you have to recruit inviters."  (*Id.* ¶ 59.)

6         Evidence acquired through the FTC's undercover investigation of SBH indicates
7    that the company did not track whether Affiliates personally consumed the products or
8    resold them to third parties or generally what Affiliates did with the products they
9    purchased.  (*Id.* ¶ 65(k).)

10        Further evidence of the recruiting focus can be found in the Individual Defendants'
11   frequent reference to "getting ten" recruits.  For example, Harris once told Affiliates that
12   "your ten-by-ten is the most important thing you can ever build in this company.  The most
13   important thing you can do is think about it every day, I've got to get my ten . . . ."  (Doc.
14   8-14 at 81.)  Another SBH officer told Affiliates that although "[r]etailing is a great way to
15   make some extra part-time money," the "key" to gaining residual income is getting a "10
16   by 10 by 10 by 10 by 10" structure.  (Doc. 8-12 at 83-84.)   He then summarized:
17   "[R]ecruiting is key."  (*Id.*)

18        Noland similarly told Affiliates that "You need to – out of the seven billion people
19   in the world, you need to find 10. . . .  You need 10."  (Doc. 8-27 at 57-58.)  As noted
20   above, getting ten recruits is a key step in reaching the "BAM Bonus."  In one video
21   presentation, Sacca said that SBH's "commission plan is driven 100 percent, not – not 95,
22   not 85, not 75 – it's driven 100 percent by our [BAM] bonus."  (Doc. 8-13 at 291.)  He
23   added: "All other five plans are going to be driven by the [BAM] bonus."  (*Id.*)

24        To recruit successfully, Noland advised Affiliates that they should ask "four people
25   a day for money to join the business."  (Doc. 290-9 at 19.)  Variations of this advice appear
26   in many presentations.  (Doc. 291-1 at 5; Doc. 291-2 at 13; Doc. 291-4 at 3; Doc. 295-9 at
27   38.)

28        The Individual Defendants also stressed the importance of recruitment during

- 11 -

training sessions.  For example, Harris at one point told a group of trainees to "[b]e polite, be professional, and smile, but have a plan to kill everybody you meet.  [Laughter]  Be polite, be professional, and smile, and have a plan to recruit everybody you meet."  (Doc. 288-4 at 3.)[8]  Similarly, Noland once told attendees "[y]ou know you're supposed to recruit your ass off."  (Doc. 288-8 at 10.)

At another event in April 2019, Noland told attendees:  "You better go get me one [recruit]. . . .  [S]oon as I bring you in, you better put somebody in in 48 hours or I am almost never going to talk to you again."  (Doc. 289-5 at 4.)  He warned the attendees not to move slowly:  "And guess what will happen if you go slow.  More than likely, you're going to die.  More than likely, you're going to quit.  If you got it in your core, you'll go get one.  I'm going to go out and recruit people."  (*Id.*)

On another occasion, Noland went through the audience asking each person to tell him how many people he or she was "good for" by January 2020, *i.e.*, how many people they would have on their downline teams by that date.  (Doc. 289-8 at 3-6.)

Although the Individual Defendants focused much of their effort on training, recruitment, and encouraging Affiliates to purchase product packs and to recruit others to do the same, it should be noted that SBH meetings did at times emphasize the health and wellness benefits of SBH products.  For example, on a January 8, 2020 call, Noland invited an SBH Affiliate to speak about her best practices in growing her business, and she spoke at length about the importance of telling potential customers or recruits about the purported benefits of the products.  (Doc. 290-7 at 6-9.)  In other words, an important part of this Affiliate's sales pitch to potential customers or recruits was not solely the promise of making money by joining SBH, but also the benefit flowing from the company's wellness products.  (*Id.*)  This Affiliate, who was invited to speak because of her success, also

---

[8]      During the same presentation, Harris said:  "[W]hen people say, is this one of those pyramid things, I say, hell, yeah, it is.  If it wasn't, I wouldn't be doing it.  [Laughter]  Do I look dumb enough to go get a job again?"  (Doc. 288-4 at 3.)  Noland made a similar statement during an earlier event:  "I build pyramids, man.  [Laughter]  That's what I do.  I build some little pyramids.  Right?  Except I'm at the top of the ones I built."  (Doc. 8-27 at 96.)

stressed how important retail sales were to her business, stating that "I probably spend more time with my customer base than I spend with the affiliate base." (*Id.* at 9.)

C.     **SBH-Related Income Representations**

Many of the Individual Defendants' communications about SBH centered on the potential income Affiliates could earn.

Noland repeatedly stressed the potential for Affiliates to earn "residual income," *i.e.*, income that continues to accrue even after an initial sale is made. For example, in a YouTube video called "Let's Talk Coffee," Noland broke down why coffee is a good product from which to derive residual income. Lets Talk Coffee w/ Jay Noland, https://www.youtube.com/watch?v=XmaxDg8-hqs (last visited Aug. 16, 2021). In short, Noland argued that because so many people in the world regularly drink coffee, if SBH could capture even a small percentage of that global market, the yearly sales revenues would be in the billions of dollars. *Id.*

The Individual Defendants frequently made representations about SBH's potential to generate residual income for Affiliates and how such income could create "financial freedom." For example, Noland told Affiliates:

■   "You cannot get free unless you make residual income." (Doc. 8-27 at 49.)

■   "Who in this room would like to be free? Right? Have financial freedom, do what you want, when you want, wherever you want?" (*Id.* at 49-50.)

■   "Y'all got to just listen to me. Because in this room tonight, it's going to be somebody that walks in for the first time, 18 months from now will never have to work again." (*Id.* at 56-57.)

■   "And if you listen to me and you listen to our top leadership council and our top leaders that are developing with SBH, you're going to be able to get out of that job in about six months if you pay close attention." (*Id.* at 17.)

Affiliates were also given a sales script that encouraged them to tell potential recruits that "SBH[] is helping thousands of people supplement or replace their current income. We've also got several people that are achieving Financial Freedom already with

- 13 -

our company." (Doc. 8-5 at 33; *id.* at 35 [same statement].)

As for the meaning of the term "financial freedom," the Individual Defendants repeatedly indicated that it represented a level of income beyond merely being able to quit a job. For instance, during one training, Noland contrasted a person who would "just rather, you know, supplement or replace my income" with "financial freedom, high-level leader, *multimillionaire* stuff." (Doc. 289-10 at 5, emphasis added.) Additionally, as noted above, SBH's marketing materials stated that there are three types of people who participate in SBH: "supplementers," "income replacers," and "financial freedom seekers." (Doc. 8-11 at 24.) As discussed in the order granting the preliminary injunction, "[t]he ordering of the types—one, two, three—implies that each is greater than the last. Type two, a job income, is greater than type one, supplemental income. The implication is that whatever type three is, it is greater than a job income." (Doc. 106 at 22.) Indeed, the Individual Defendants visually emphasized this point during their training videos:



(Doc. 8-21 at 60.) On the other hand, the Individual Defendants have submitted declarations from individual SBH Affiliates who contend that they had more modest understandings of what the term "financial freedom" meant. (*See generally* Doc. 335-3; *see, e.g.*, *id.* at 612 [explaining that financial freedom means "[h]aving a profitable and positive income stream"].)

In any event, a great deal of Noland's marketing efforts toward SBH Affiliates

centered on the representation that he would help them become millionaires.  For example, during one online video post, he stated he would create "1,000 millionaires" through SBH. (Doc. 8-1 ¶ 57(j).)  During another video session, he instructed each audience member to type "I'm going to be a millionaire in SBH."  (*Id.* ¶ 57(e).)  Nearly 100 members of the audience did, including Sacca, who typed, "Millionaire thru SBH!! Guaranteed!"  (*Id.*)  In a September 2018 video called "How to be a MILLIONAIRE in SBH," Noland stated "you will be a millionaire if you apply this training."  (*Id.* ¶ 57(m).)

Many of these representations took place during training sessions.  For example, during a April 2018 training, Noland told Affiliates that "[i]f I'm sitting down working with you personally, I'm tell – I know within three years, if you listen to me, I'm going to make you a millionaire."  (Doc. 288-3 at 6-7.)  During an October 2018 training, Noland told the trainees:  "Ya'll going to be rich.  Don't worry about it.  I'll make you a millionaire. Y'all got that?  You three, I'm going to make you millionaires.  Boom."  (Doc. 288-8 at 8.)  He then said "ya'll going to see me go do billions and create multi-multi-multi-millionaires.  So they're all going to make at least several million."  (*Id.* at 9.)  Later that day, Noland added that a trainee "can put in 18 months and get out 100,000 a month."  (Doc. 288-9 at 5.)

The Individual Defendants made similar representations directly to Affiliates and recruits.  For example, during a text message exchange, Sacca told one person that it "literally only takes 2-3 folks catching the vision to create millions!!"  (Doc. 259-1 at 8.) Harris texted another person that "[m]illions will be made" in SBH.  (*Id.* at 11.)  Harris also texted a different Affiliate: "You'll make $100K+ in 2018."  (*Id.* at 12.)  Harris contends, however, that he later had a follow-up phone call with this Affiliate in which they discussed "the work required to achieve that goal."  (Doc. 335-6 at 12 ¶ 4.)

D.   **Representations Concerning Noland's Personal Wealth And The Wealth Of Others Trained By Noland**

Noland repeatedly spoke about his own massive wealth when addressing Affiliates. For example, he told a group of Affiliates during an October 2018 training that he had

sufficient wealth to "probably give away a couple million a year" but did not "even feel it, though" because he had "freedom." (Doc. 288-8 at 11.)  Noland also stated that he owned houses and warehouses in places such as Colombia, Hong Kong, London, Panama, and Uruguay. (Doc. 8-1 ¶¶ 60(a), 62.)  During an April 2019 presentation, Noland stated rhetorically: "Jay, just please tell me how you created a financial freedom life to where your son before he was born was already retired?  And his kids are retired.  And his kids' kids are retired.  I'm now working on my fourth generation." (Doc. 8-27 at 56.)  In a related vein, Noland stated during the same presentation that "I'm 50 years old . . . [and] I've been financially free, completely time and money free since I was 36" due to "this thing called residual income." (*Id.* at 50.)

During the discovery process in this case, Noland was required to make sworn certifications concerning his personal wealth.  The information he provided during this process was not consistent with the representations set forth above.  For example, following the issuance of the TRO, Noland was required to submit a sworn financial statement. (Doc. 81-2 at 12 ¶¶ 30-32; Doc. 203-2 at 17-19.)  In this statement, Noland reported that he had a negative net worth and owed more than $210,000 in state and federal taxes. (*Id.*)  During a follow-up deposition in February 2020, Noland confirmed that he had "total assets of $298,640.32" and "total liabilities of $326,376" (Doc. 287-4 at 5)—that is, a negative net worth of over $27,000.  During the same deposition, Noland was unable to identify a time when he ever had a positive net worth. (*Id.*)  Separately, the FTC has submitted undisputed evidence—in the form of an email from Noland to his accountants—that Noland was "living on Credit Cards" in 2005 and 2006; that in December 2007, the IRS issued an order requiring Noland to pay $187,000 in back taxes; that Noland "did not have the ability to pay that amount" at the time; that Noland sustained financial "losses from SereniGy," which is one of the MLMs he operated before SBH, "for years 2013 – 2017." (Doc. 293-5.)

Noland and the other Individual Defendants also represented that individuals who had been trained by Noland went on to achieve great financial success.  For example, in

one December 2017 video post, Noland represented that past trainees owned "Lamborghinis; Rolls Royces; Bentleys; multimillion-dollar homes in single-, double-, and trip[le]-gated communities." (Doc. 8-1 ¶ 57(e).) During an April 2018 training event, Noland said "I literally have helped so many people make millions and millions, stupendous amounts of millions of dollars." (Doc. 288-5 at 5.) On a different occasion, Noland told a group of Affiliates that some people sitting among them had achieved "[c]omplete time and money freedom" in only "12 months." (Doc. 288-8 at 15.) Noland elaborated that these people "[n]ever have to work again. Ever. No less than 20,000 a month." (*Id.*) And during an "SBH Blitz Call" in September 2018 call, the script for which was forwarded from Harris to Noland, Harris stated that "Mr. Noland is known as 'The Millionaire Maker.' He's created many 6 Figure earners in the Direct Sales Industry. Some of his students have even earned in excess of $1M a month and many have earned over $1M a year." (Doc. 295-6 at 1-2; *see also* Doc. 287-6 at 35.)

During the discovery process in this case, the FTC propounded an interrogatory to Noland asking him to "[i]dentify all people that you have 'personally trained . . . who have been fabulously successful in multi-level marketing business,' or who you claim regularly make at least $23,500 per month, and describe in detail how you determined and verified that those people are 'fabulously successful' or earn that amount." (Doc. 259-1 at 70-71.) In response, Noland cross-referenced a declaration he filed during an earlier stage of the case in which he identified four individuals who purportedly earned more than $1 million year per year after receiving training from him as part of a different coffee-related MLM business. (Doc. 187-1 ¶ 16.) Noland did not, however, describe how he determined and verified these individuals' earnings. (*Id.*)

E.     **VOZ Travel**

In October 2019, the Individual Defendants started a new enterprise based around the marketing of travel package discounts. (Doc. 8-1 ¶ 40; Doc. 8-17 at 20-34; Doc. 8-18 at 1-39; Doc. 81-2 at 7-8 ¶ 18.) This venture, known as VOZ Travel, has a six-tier structure similar to SBH. (Doc. 81-2 at 7-8 ¶¶ 18-19.) Like SBH, VOZ Travel markets product

"packs" that range in price from $1,000 to $2,795 and offers different commissions and cash and travel benefits.  (*Id.* ¶ 19; Doc. 8-18 at 36-37.)  There is significant overlap between SBH and VOZ Travel, with SBH beverage products being "featured as commissionable products in the Travel Affiliate Packs" and "SBH Elite Travel Affiliates" being allowed to use the "VOZ Pass" to seek travel discounts, rewards, and commissions. (Doc. 8-18 at 27-28.)  As with SBH, participants in VOZ Travel (who were drawn from the pool of SBH Affiliates) are strongly encouraged to recruit new Affiliates by selling them packs and could become eligible for cash bonuses for doing so.  (Doc. 297-9; *see also* Doc. 297-4 [Noland congratulating Affiliates for selling VOZ Packs and stating there was "no telling what I'm going to do SPECIAL" for top performers]; Doc. 296-3 [Harris instructing others to tell Affiliates "it is crucial that they duplicate with selling at least one VOZ Pack in the first 48 hours"]; Doc. 293-2 [repeated encouragement from SBH to Affiliates who had sold product packs to "Keep Growing"].)

To achieve at least some of the bonuses offered through the VOZ Travel program, a person had to be an SBH Affiliate and pay a $49 annual membership fee.  (Doc. 8-18 at 35; Doc. 287-5 at 45.)  Noland summed up the relationship between SBH and VOZ Travel by describing SBH as VOZ Travel's "mothership" and "shield."  (Doc. 290-7 at 4.)

When VOZ Travel was announced in early October 2019, SBM had not yet entered into any contractual agreement to provide the advertised travel services with any travel service provider.  (Doc. 287-5 at 32-33.)  However, there had been discussions with "multiple companies."  (*Id.*)

At the end of October 2019, SBM entered a contract with one such company, Advantage Services.  (Doc. 81-2 at 27-55.)  Noland announced that VOZ Travel's "pre-launch" ended on December 18, 2019, and "Beta Access" would be unveiled in the third or fourth week of December 2019.  (*Id.* at 65.)

During a December 20, 2019 call, Noland told listeners that a deal had been "inked" that would put himself and the VOZ Travel participants "in a position, with the help of my incredible staff, to separate us like no separation has ever happened in the travel position"

and to "absolutely dominate in the financial space." (Doc. 290-6 at 4.) He said the "biggest travel deal ever" had just been reached. (*Id.* at 5.) He went on: "I want to scream, I want to run out of here, I want to shout, it just happened, a multi billion dollar inked deal, it's happened, and you're all a part of it." (*Id.*) He said, however, that this deal "did a slight push on the release," so he would have to put a "slight push" on the beta release of the program for two to three weeks. (*Id.*) He then informed the listeners that he would be opening up VOZ Travel again to allow Affiliates to purchase packs, telling them that to be a VOZ Travel VIP "you've got to have a pack and you got to sell a pack." (*Id.* at 7-8.) Noland concluded the call by stating: "Some of y'all this time next year, you're never going to have to work again, I'm telling you. Not everybody, not a ton of people, but there's going to be some people . . . ." (*Id.* at 10.)

The Individual Defendants admit in their answer that, notwithstanding these representations, no new travel contract had been signed in the days or hours leading up to the December 20, 2019 call. (Doc. 205 ¶ 129; Doc. 222 ¶ 77.) Indeed, starting on January 4, 2020, SBH's relationship with Advantage Services began to deteriorate in a series of increasingly acrimonious emails that culminated with the CEO of Advantage Services raising concerns about SBM's "legal compliance and ethical conduct." (Doc. 295-3.) Ultimately, the parties terminated the agreement on January 6 and 8, 2020. (Doc. 81-2 at 71-76; Doc. 205 ¶ 131; Doc. 222 ¶ 79.)

On January 8, 2020, despite the termination of the Advantage Services agreement, Noland and SBH's Vice President of International Sales Duvon Botero ("Botero") held a call encouraging Affiliates to continue to purchase VOZ Travel packs. (Doc. 290-7.) Noland stated that "[w]e are only selling [VOZ] movement packs, which are tied directly to the ethos, the fundamental character, the underlying sentiment" of VOZ Travel, and that "you have to make the decision on are you going to fulfill the purchase you made and be a part of the vision, which is the movement, the ethos, of [VOZ]." (*Id.* at 4-5.) Botero urged Affiliates to purchase a VOZ Travel pack and recruit another person to purchase a VOZ Travel pack, who would also sell another person a VOZ Travel pack, all within 48 hours,

1    in order to meet the "requirement for the reduced Aruba qualifications." (*Id.* at 3.) Noland
2    added that VOZ Travel is more than just "a discount on your travel," it is "freedom,"
3    "experiences," and "memories." (*Id.* at 5.)

4         As of January 13, 2020, when the Court entered the TRO, the Individual Defendants
5    had not retained a vendor to replace Advantage Services to build the VOZ Travel platform.
6    (Doc. 205 ¶ 134; Doc. 222 ¶ 1.)[9]

7         F.     **Shipping And Refund Policies**

8         The FTC alleges that the Individual Defendants' shipping and refund practices
9    violated two FTC Rules and further support the allegation that SBH and VOZ Travel are
10   pyramid schemes. (Doc. 205 ¶¶ 4, 20, 89-111, 165-81.)

11        SBH's website states that products "typically ship within 48 business hours from
12   the time they are ordered. However, due to the high demand of our products, from time to
13   time, we will sell out of products and will go into a 'back order' status. As such, at times
14   it may take an extended time frame to fill back orders (up to 60 days or more in some
15   cases)." (Doc. 8-2 at 18.) In another section of the website, SBH's shipping policy states
16   that orders "typically ship within 48 – 72 business hours from when the order is placed,"
17   without noting that there can be delays of up to 60 days. (Doc. 8-11 at 28.) Elsewhere, in
18   the section about refunds, the website states that SBH has a strict "no refund" policy and
19   includes the "up to 60 days or more" of delays language. (Doc. 8-12 at 2.)

20        A number of people complained that SBH either failed to deliver products within a
21   reasonable timeframe or failed to deliver orders entirely. For example, one former Affiliate
22   who had over 100 people in his downline sales team states that he "received tons of
23   complaints from other Affiliates and customers about delays." (Doc. 285-5 ¶¶ 7, 17.)
24   Another former Affiliate testified that her orders "[q]uite often" arrived at least 30 days
25   after she'd ordered them and that on some occasions her orders never arrived. (Doc. 286-

26

27
28

---

[9]      In response to the FTC's summary judgment motion, Noland submitted a
declaration in which he avers that "[w]e have obtained a new travel service provider."
(Doc. 335-6 at 3 ¶ 7.) Noland does not, however, provide any information about this new
travel service provider, such as its name, or provide any details about the genesis and details
of the new arrangement.

9 at 3, 11.)  Another former Affiliate testified that hundreds of dollars' of product packs never arrived and no refund was ever offered.  (Doc. 287-2 at 2, 10.)  Some foreign Affiliates discovered, only after they purchased expensive product packs, that SBH legally could not ship those packs to their home countries, so they had to travel to the United States to collect them.  (Doc. 285-3 ¶ 5; Doc. 285-10 ¶ 7.)  When these issues led to one of the Affiliates being unable to sell SBH products, Sacca and other senior SBH personnel urged her to "just continue to sell the SBH vision and recruit others to join."  (Doc. 285-3 ¶ 6.)

The Individual Defendants at times acknowledged issues with fulfilling orders.  For example, in October 2018 Noland discussed how there was a "month, month and a half where we were out of everything."  (Doc. 299-2 at 5; *see also* Doc. 290-3 at 3 [Noland stating that "we're having just an, a crazy amount of people calling our 800 number asking where their orders are at.  That means just terrible leadership, so whoever's referring those people, they're doing a terrible job . . . ."].)  Other evidence confirms that there were serious delays in shipping or nonfulfillment of orders peaking in early 2018 and lingering into late 2019.  (Doc. 286-3 ¶¶ 22-27; Doc. 294-8.)  The Individual Defendants acknowledge that there were serious shipping delays but dispute the extent of the problem.  (Doc. 348 at 4 n.2, 9.)  They point to some evidence in the record suggesting that certain new products were made available to order in 2018 (Docs. 294-6, 298-3) and that pre-orders on these products were placed (Doc. 296-7).  They also attach evidence that "[a]part from being sold out of product early on and pre-orders, the average shipment time for SBH orders was 3.9 days."  (Doc. 348 at 9; Doc. 335, Ex. B-5.)

In any event, it is undisputed that SBH adhered to a strict no-refund policy.  (Doc. 205 ¶¶ 98-99; Doc. 222 ¶¶ 55-56 [admitting relevant portion of allegations of non-refundability].)  SBH's website terms state "SBH has a strict NO REFUND POLICY on all SBH nutritional and other physical health products."  (Doc. 8-12 at 2; *see also* Doc. 8-2 at 19 ["SBH Affiliate Membership fees, product purchases, event ticket purchases, and courses are completely Non-Refundable.   NO EXCEPTIONS."].)   As Noland once instructed Affiliates, "if you complain, great chance you're going to be terminated, out,

bam.  Isn't that amazing.  You can't complain.  People say I can't complain?  Nope, can't complain, you can't."  (Doc. 288-2 at 6.)

II.     Relevant Procedural History

On January 8, 2020, the FTC initiated this action.  (Doc. 3.)  That same day, the FTC moved for an *ex parte* TRO (Docs. 7, 8), which the Court substantially granted (Docs. 19, 38).  In the TRO, the Court appointed Kimberly Friday (the "Receiver") to preside over the receivership of the Corporate Defendants.  (Doc. 38 at 16.)

On January 17, 2020, the FTC filed a first amended complaint ("FAC").  (Doc. 35.)

On February 6, 2020, the Individual Defendants filed their answer to the FAC. (Doc. 70.)

On February 10, 2020, the Receiver issued an initial report concluding that she "does not believe that the business can be operated without violating the TRO.  The inaccurate marketing statements, the organization of the commission system, and the movement of large amounts of cash to the insiders strongly suggests that the business is structured in such a fashion that prevents Affiliates from realizing the promoted business opportunities."  (Doc. 82-1 at 19.)

On February 12, 2020, the preliminary injunction hearing took place.  (Doc. 86.) After the hearing, the Court took the matter under advisement.  (*Id.*)

On February 18, 2020, the Individual Defendants filed an amended answer to the FAC.  (Doc. 93-1.)

On February 27, 2020, the Court issued an order granting the FTC's motion for a preliminary injunction.  (Doc. 106.)  The Court found that the FTC was likely to succeed on the merits of its claim that SBH functioned as a pyramid scheme.  (*Id.* at 10-20.)  This conclusion was based, among other things, on:

- There being "ample evidence" that SBH offers Affiliates rewards that are "'largely' based on recruitment, not sales to ultimate users" (*id.* at 11-13);
- SBH not having any policies to prevent inventory loading (*id.* at 14-15); and
- The report of the FTC's expert, Dr. Bosley, who opined that SBH operates a

1    pyramid scheme (*id.* at 15-18).

2    The Court also concluded that the FTC was likely to succeed on the merits of its claim that

3    the Individual Defendants misrepresented the income potential of SBH Affiliates.  (*Id.* at

4    20-25.)  In particular, the Court found that the repeated representations about the possibility

5    of attaining "financial freedom" functionally amounted to income claims "that referred to

6    a fabulous level of wealth beyond completely replacing a job income."  (*Id.* at 22-23.)  The

7    Court also found, based on the evidence presented during the preliminary injunction

8    proceedings, that the Individual Defendants' claims about several Affiliates having already

9    attained high levels of wealth, and about such levels of wealth being reached in as little as

10   a year, were materially false representations likely to mislead consumers.  (*Id.* at 23-25.)

11   On March 23, 2020, the attorneys who had been representing the Individual

12   Defendants filed a motion to withdraw as counsel.  (Doc. 116.)

13   On April 2, 2020, after full briefing, the Court granted defense counsel's motion to

14   withdraw.  (Doc. 124.)  The Court appointed the Receiver as counsel for the Corporate

15   Defendants, while the Individual Defendants were ordered to proceed *pro se* until they

16   retained new counsel.  (*Id.* at 3.)

17   On April 3, 2020, Daryl M. Williams and Daniel B. Mestaz (collectively, "Defense

18   Counsel") filed a notice of appearance on behalf of three of the four Individual Defendants.

19   (Doc. 126.)[10]  Defense Counsel remain the Individual Defendants' counsel of record.

20   On May 1, 2020, the parties filed their joint Rule 26(f) report.  (Doc. 137.)

21   On June 23, 2020, the Individual Defendants filed a motion to allow Defense

22   Counsel to represent the Corporate Defendants.  (Doc. 153.)  After full briefing, the Court

23   denied the motion.  (Doc. 168.)  In the parties' briefing of this motion, the FTC stated that

24   its proceedings against the Corporate Defendants would be stayed pending the resolution

25

26   [10]   Defense Counsel later filed a notice of appearance on behalf of the remaining
     Individual Defendant.  (Doc. 145.)  Defense Counsel originally attempted to appear on
27   behalf of the Corporate Defendants as well (Doc. 126), but after the Court issued an order
     questioning the propriety of this representation and Defense Counsel discussed the matter
28   with the Receiver, Defense Counsel withdrew from representation of the Corporate
     Defendants.  (Docs. 129, 135.)

of the litigation against the Individual Defendants.  (*Id.* at 6, 12-13.)  Accordingly, the instant order on the FTC's motion for summary judgment is applicable only to the Individual Defendants.

On June 26, 2020, the Individual Defendants filed a motion to release ECF from the Receiver's control.  (Doc. 157.)  After briefing and oral argument, the Court denied the motion.  (Doc. 177.)

On July 28, 2020, the Individual Defendants filed a motion to dismiss this action or compel the joinder of roughly 4,500 additional parties to this action under Federal Rule of Civil Procedure 19.  (Docs. 167, 167-1.)  After full briefing, the Court denied the motion. (Doc. 200.)

On August 28, 2020, the FTC filed a motion for leave to file the SAC.  (Doc. 182.) After the Individual Defendants stated they had no objection to the proposed SAC (Doc. 202), the Court allowed the SAC to be filed (Doc. 204).  The SAC (Doc. 205) remains the operative complaint.

Also on August 28, 2020, the Individual Defendants filed a motion to amend their answer to the FAC.  (Doc. 183.)  The proposed amended answer added tort counterclaims against various individuals, including the FTC's counsel in this action and the Receiver. (Doc. 183-2 at 8-15.)  After full briefing, the Court granted in part and denied in part the motion.  (Doc. 223.)  The Individual Defendants were permitted to amend inadvertent admissions in their prior answer, but the counterclaims were stricken.  (*Id.*)  The Individual Defendants filed the amended answer (Doc. 222), which remains their operative answer. The Receiver  also filed answers to the SAC on behalf of the Corporate Defendants.  (Docs. 217, 218.)

On September 7, 2020, the Individual Defendants filed a motion to dissolve or modify the preliminary injunction.  (Doc. 187.)   Among other things, the Individual Defendants argued that the Supreme Court's grant of certiorari of the Ninth Circuit's decision in *FTC v. AMG Capital Management, LLC*, 910 F.3d 417 (9th Cir. 2018), established a change in law requiring the modification or dissolution of the preliminary

1    injunction.  (*Id.* at 19.)  After full briefing, the Court denied the motion, reasoning that
2    "even though the Individual Defendants very well may be correct that, once the dust settles,
3    the FTC's ability to seek restitution and asset freezes will be significantly curtailed . . . this
4    Court must follow existing Ninth Circuit precedent, which permits the FTC to seek
5    restitution, to seek a freeze of assets held by non-parties, and to seek appointment of a
6    receiver."  (Doc. 224 at 3, cleaned up.)  The Individual Defendants appealed this order.
7    (Doc. 239.)

8           On October 21, 2020, the Individual Defendants filed a motion to stay proceedings
9    pending the Supreme Court's decision in *AMG Capital*.  (Doc. 220.)  After full briefing,
10   the Court denied the motion.  (Doc. 242.)

11          On October 23, 2020, the Individual Defendants filed a motion to dismiss Rinpark,
12   SA, an entity added as a defendant in the SAC, for lack of personal jurisdiction.  (Doc.
13   221.)  After briefing and oral argument, the Court granted the motion.  (Doc. 258.)

14          On December 23, 2020, fact discovery closed.  (Doc. 211.)

15          On January 28, 2021, the FTC filed a motion for spoliation sanctions against the
16   Individual Defendants.  (Doc. 259.)  After full briefing, the Court granted the motion,
17   noting that "[t]he Individual Defendants' systematic efforts to conceal and destroy
18   evidence are deeply troubling and have cast a pall over this action."  (Doc. 401 at 2.)

19          On February 18, 2021, hundreds of SBH Affiliates filed a motion to intervene in
20   this action as a putative class of Proposed Intervenors.  (Doc. 274.)  After full briefing, the
21   Court denied the motion.  (Doc. 313.)

22          On March 12, 2021, the FTC filed the pending motion for summary judgment as to
23   the Defendants' liability ("Liability MSJ").  (Docs. 285-302, 381-4.)[11]  Afterward, the
24   Court granted the parties' stipulations to extend the time for the Individual Defendants to
25   respond to this motion.  (Docs. 311, 324.)

26   _____
     [11]    The original Liability MSJ, as well as the Individual Defendants' response and the
27   FTC's reply, all contained errors and were thus revised after the parties' filed notices of
     errata. (Docs. 347-48, 380-81.)  For convenience, the Court will cite the corrected versions
28   of the Liability MSJ (Doc. 381-4), response (Doc. 348), and reply (Doc. 381-10) when
     discussing the parties' arguments.

On April 22, 2021, the Supreme Court issued its decision in *AMG Capital*.  That same day, this Court ordered the parties to meet and confer about *AMG Capital*'s effect on this case and submit a joint memorandum summarizing their positions.  (Doc. 325.)  After the parties submitted the joint memorandum (Doc. 330), the Court held a telephonic status conference (Doc. 334).  During the status conference, the Court authorized the Individual Defendants to file a motion to dissolve or modify the preliminary injunction and receivership.  (*Id.*)  After the Individual Defendants filed a memorandum (Doc. 352), which was later fully briefed (Docs. 355, 357), the Court declined to modify or dissolve the preliminary injunction, in part because the Court lacked jurisdiction to dissolve or modify the asset freeze and receivership in light of the Individual Defendants' then-pending appeal.  (Doc. 362.)

On May 3, 2021, the Individual Defendants filed a response to the Liability MSJ.  (Docs. 335, 347-48.)

On May 18, 2021, the FTC filed another motion for a preliminary injunction with an asset freeze and receivership.  (Docs. 351, 380-81.)  The motion is fully briefed (Docs. 360, 363) and will be addressed in due course.

On June 1, 2021, the Proposed Intervenors, now numbering nearly 1,000 persons, filed a renewed motion to intervene as a putative class.  (Doc. 358.)  After full briefing, the Court denied the motion.  (Doc. 386.)

On June 23, 2021, the FTC filed a motion for summary judgment as to monetary remedies ("Remedies MSJ").  (Docs. 365-69.)  The motion is now fully briefed and will be resolved in due course.

Also on June 23, 2021, the FTC filed a reply in support of the Liability MSJ.  (Docs. 370, 381-10.)

On July 27, 2021, the Receiver filed a notice of her impending resignation and moved for the appointment of Peter S. Davis as her replacement.  (Doc. 379.)  After briefing, the Court granted the motion.  (Doc. 395.)

On July 28, 2021, the Ninth Circuit affirmed the Court's order denying the

1    Individual Defendants' request to modify or dissolve the preliminary injunction, noting

2    that the Court "correctly concluded" the grant of certiorari in *AMG Capital* had not

3    constituted a significant change in the law, and "leav[ing] it to the district court in the first

4    instance to consider whether and to what extent the *decision* in *AMG Capital* . . . bears on

5    the preliminary injunction." *FTC v. Noland*, 854 F. App'x 898 (9th Cir. 2021).  As the

6    Court has noted elsewhere, unless the Individual Defendants file a petition for rehearing,

7    the mandate will issue on September 18, 2021.  (Doc. 395 at 2.)

8         On July 30, 2021, the Individual Defendants filed a motion to dissolve the

9    preliminary injunction and to stay or dismiss the § 13(b) proceedings in this case.  (Doc.

10   383.)  This motion is now fully briefed and will be addressed in due course once the

11   mandate from the Individual Defendants' appeal issues.

12        On September 6, 2021, the Individual Defendants filed an untimely and

13   procedurally deficient Rule 56(d) motion for leave to supplement the summary judgment

14   record.  (Doc. 402.)  That motion was denied.  (Doc. 405.)

15                                    **DISCUSSION**

16   I.   Legal Standard

17        "The court shall grant summary judgment if [a] movant shows that there is no

18   genuine dispute as to any material fact and the movant is entitled to judgment as a matter

19   of law." Fed. R. Civ. P. 56(a).  "A fact is 'material' only if it might affect the outcome of

20   the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue

21   in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d

22   1119, 1125 (9th Cir. 2014).  The court "must view the evidence in the light most favorable

23   to the nonmoving party and draw all reasonable inference in the nonmoving party's favor."

24   *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018).  "Summary judgment is

25   improper where divergent ultimate inferences may reasonably be drawn from the

26   undisputed facts." *Fresno Motors*, 771 F.3d at 1125 (internal quotation marks omitted).

27        A party moving for summary judgment "bears the initial responsibility of informing

28   the district court of the basis for its motion, and identifying those portions of 'the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "If . . . [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103.

"If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Id.* There is no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted). At the same time, the evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254. Thus, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

II.   Analysis

As noted, the FTC asserts six counts in its complaint. In Count One, the FTC alleges that SBH and VOZ Travel each constituted illegal pyramid schemes, in violation of § 5(a) of the FTC Act, 15 U.S.C. § 45(a). (Doc. 205 ¶¶ 158-59.)

In Count Two, the FTC alleges that the Individual Defendants made misleading representations about the likelihood of earning substantial income in SBH and VOZ Travel, in violation of § 5(a) of the FTC Act. (*Id.* ¶¶ 160-62.)

In Count Three, the FTC alleges that the Individual Defendants furnished SBH Affiliates and VOZ Travel participants with materials containing false or misleading representations, thereby providing the means and instrumentalities for the commission of deceptive acts or practices, in violation of § 5(a) of the FTC Act.  (*Id.* ¶¶ 163-64.)

In Counts Four and Five, the FTC alleges that the Individual Defendants violated the FTC's Merchandise Rule, 16 C.F.R. § 435.2(b)-(c), by failing to offer customers the ability to consent to a delay in shipping or to cancel delayed orders (Count Four) and by not canceling or providing a refund for delayed orders or complying with buyers' requests to cancel orders (Count Five).  (*Id.* ¶¶ 170-73.)

In Count Six, the FTC alleges that the Individual Defendants violated the FTC's Cooling-Off Rule, 16 C.F.R. § 435.1, by failing to give buyers written or oral notice of the buyers' right to cancel orders.  (*Id.* ¶¶ 179-81.)

The FTC now moves for summary judgment on all counts.  (Doc. 381-4.)

## A.    **Effect of *AMG Capital***

The Individual Defendants argue that, under the recent *AMG Capital* decision, because "there is no rule or cease and desist order that has been violated" with respect to Counts One, Two, and Three, the FTC is not entitled to summary judgment on those claims. (Doc. 348 at 1-2, 17.)  The Individual Defendants further suggest that the legal test applied by the Ninth Circuit to determine whether an enterprise is an illegal pyramid scheme is no longer relevant because of *AMG Capital*.  (*Id.* at 16.)  The FTC replies that *AMG Capital* "has no effect on the FTC's ability to seek non-monetary relief."  (Doc. 381-10 at 17.)

The Individual Defendants' arguments are without merit.  Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides that "in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction."  Under this provision, a "district court has the power to issue a permanent injunction to enjoin acts or practices that violate the law enforced by the Commission."  *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1111 (9th Cir. 1982).  *See also FTC v. Gill*, 71 F. Supp. 2d 1030, 1047 (C.D. Cal. 1999), *aff'd*, 265 F.3d 944 (9th Cir. 2001) ("The second proviso of Section 13(b) . . . has been interpreted to

authorize this Court to permanently enjoin defendants from violating the FTC Act if there is some cognizable danger of recurring violation.") (citations omitted).

Further, the FTC may seek "injunctive relief . . . [in] any case involving a law enforced by the FTC." *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1086-87 (9th Cir. 1985). The FTC's authority to seek such relief is not, in other words, "limit[ed] . . . to cases involving 'routine fraud' or violations of previously established FTC rules." *Id.* Nor is the FTC's authority to seek permanent injunctive relief under § 13(b) "condition[ed] . . . upon the initiation of administrative proceedings." *H.N. Singer,* 668 F.2d at 1110. Instead, the FTC possesses "the power to seek an injunction in the district court in proper cases without also initiating administrative proceedings." *Id.*

In *AMG Capital*, the Supreme Court overruled existing Ninth Circuit law in one respect, by holding that the FTC may not obtain a particular category of relief—"equitable monetary relief such as restitution or disgorgement"—pursuant to its authority under § 13(b) to seek a permanent injunction. *AMG Capital*, 141 S. Ct. at 1344 ("Section 13(b) of the Federal Trade Commission Act authorizes the Commission to obtain, 'in proper cases,' a 'permanent injunction' in federal court against 'any person, partnership, or corporation' that it believes 'is violating, or is about to violate, any provision of law' that the Commission enforces. The question presented is whether this statutory language authorizes the Commission to seek, and a court to award, equitable monetary relief such as restitution or disgorgement. We conclude that it does not.") (citation omitted). Nevertheless, this holding is not "clearly irreconcilable" with the Ninth Circuit's previous holdings in *H.N. Singer* and *Evans Products* that the FTC may (as in this case) rely on § 13(b) to seek a permanent injunction to restrain conduct that violates a law the FTC is tasked with enforcing (*i.e.*, § 5 of the FTC Act), irrespective of whether the FTC has initiated administrative proceedings related to that conduct and irrespective of whether the conduct qualifies as "routine fraud" or violates a rule promulgated by the FTC. To the contrary, *AMG Capital*'s recognition that § 13(b) broadly authorizes the FTC to seek a permanent injunction concerning "any provision of law the Commission enforces" seems

to reaffirm—or, at a minimum, does not disturb—*H.N. Singer*'s and *Evans Products*'

recognition that a permanent injunction may issue under § 13(b) without regard to the

existence of administrative proceedings, "routine fraud," or the violation of an FTC-

promulgated rule. *See also AMG Capital*, 141 S. Ct. at 1348 (recognizing that the text of

§ 13(b) can be interpreted "as granting authority for the Commission to . . . dispense with

administrative proceedings to seek what the words literally say (namely, an injunction)");

*id.* at 1349 ("The Commission may obtain monetary relief by first invoking its

administrative procedures and then § 19's redress provisions . . . [and] may use §

13(b) . . . when it seeks only injunctive relief."). Accordingly, *H.N. Singer*'s and *Evans

Products*' holdings on those points remain binding on district courts within the Ninth

Circuit. *Miller v. Gammie*, 335 F.3d 889, 899-900 (9th Cir. 2003) (concluding, in response

to the question of "when, if ever, a district court . . . is free to reexamine the holding of a

prior [Ninth Circuit] panel in light of an inconsistent decision by a court of last resort on a

closely related, but not identical issue," that "the relevant court of last resort must have

undercut the theory or reasoning underlying the prior circuit precedent in such a way that

the cases are clearly irreconcilable").

This interpretation of *AMG Capital* is supported by *FTC v. Hoyal & Associates,

Inc.*, 2021 WL 2399707 (9th Cir. 2021). There, the district court granted a permanent

injunction and issued monetary relief in an FTC enforcement action under § 13(b)

predicated on deceptive marketing practices in violation of § 5 of the FTC Act. *Id.* at *1.

While the case was on appeal, *AMG Capital* was decided. Although the Ninth Circuit

proceeded to vacate the monetary portion of the judgment based on *AMG Capital*, it

otherwise affirmed the permanent injunction. *Id.* at *2. In the course of doing so, it

observed that "[w]e have long held that the FTC can obtain injunctive relief without

initiating administrative proceedings" and continued to cite *H.N. Singer* and *Evans

Products* as good law on issues unrelated to the availability of monetary relief under

§ 13(b). *Id.*

Other recent Ninth Circuit decisions similarly undermine the Individual

Defendants' expansive reading of *AMG Capital*.  In *FTC v. VPL Medical, Inc.*, 846 F. App'x 561 (9th Cir. 2021), the Ninth Circuit vacated a preliminary injunction that was entered "to preserve assets pending a final judgment that could include equitable monetary relief" in a § 13(b) action but remanded to the district court "for further proceedings consistent with the Supreme Court's decision in *AMG Capital*." *Id.*  As the Court has noted (Doc. 362 at 4 n.1), the implication is that further § 13(b) proceedings could be conducted in that case consistent with *AMG Capital*.  *See also FTC v. AMG Capital Mgmt., LLC*, 998 F.3d 897 (9th Cir. 2021) (on remand from Supreme Court, "REVERSING the district court's order awarding equitable monetary relief to the FTC" but otherwise not ordering the district court to make any changes as to liability findings); *FTC v. Publishers Bus. Servs., Inc.*, 849 F. App'x 700 (9th Cir. 2021) (reversing nearly $24 million award of equitable monetary relief, in FTC enforcement action brought under § 13(b) of the FTC Act, because "[t]he Supreme Court's decision in *AMG Capital* precludes the equitable monetary relief awarded in this case," but otherwise affirming the district court's order granting the permanent injunction and remanding "for further proceedings consistent with this decision to determine if any other relief is warranted").

The Court also disagrees with the Individual Defendants' passing contention that the two-prong pyramid-scheme test applied in the Ninth Circuit (known as the *Koscot* test) is "now irrelevant" in light of *AMG Capital*.  (Doc. 348 at 16.)  *AMG Capital* did not address the applicability of this test or the legality or characteristics of pyramid schemes more generally.  The Individual Defendants do not explain how *AMG Capital* "undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Miller*, 335 F.3d at 900.  The *Koscot* test is not clearly irreconcilable with *AMG Capital*.

In sum, *AMG Capital* does not disturb the FTC's ability to seek a permanent injunction pursuant to § 13(b) in this case or to prevail on the theory that a business is being operated as a pyramid scheme.  Thus, it does not prevent the FTC from seeking summary judgment as to liability on Counts One, Two, and Three.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

B.     **Count One—Illegal Pyramid Scheme**

Section 5(a) of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce."  The Ninth Circuit has recognized that "[t]he operation of a pyramid scheme constitutes an unfair or deceptive act or practice in or affecting commerce for the purposes of § 5(a)."  *FTC v. BurnLounge, Inc.*, 753 F.3d 878, 880 (9th Cir. 2014) (citing *In re Koscot Interplanetary, Inc.*, 86 F.T.C. 1106, 1178, 1181 (1975)).

"Not all MLM businesses are illegal pyramid schemes."  *Id.* at 883.  "To determine whether an MLM business is a pyramid scheme, a court must look at how the MLM business operates in practice."  *Id.*  "[A] pyramid scheme is characterized by the payment by participants of money to the company in return for which they receive (1) the right to sell a product *and* (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users."  *Id.* (internal quotation marks omitted).  Satisfaction of the second prong is "the *sine qua non* of a pyramid scheme and is characterized by recruitment with rewards unrelated to product sales."  *Id.* at 883-84 (internal quotation marks omitted).  Put another way, the second prong is satisfied when "participants purchase the right to earn profits by recruiting other participants, who themselves are interested in recruitment fees rather than the sale of products."  *Id.* (quoting *In re Amway Corp.*, 93 F.T.C. 618, 716 (1979)).  Notably, the second element "does not require that rewards be *completely* unrelated to product sales." Id. at 885 (emphasis in original).  If that were the rule, "any illegal MLM business could save itself from liability by engaging in *some* retail sales."  *Id.* at 886 (emphasis in original). Thus, in the Ninth Circuit, an MLM business may be considered an illegal pyramid scheme if "the rewards the participants received in return were largely for recruitment, not for product sales." *Id.*

1.     Parties' Arguments

The FTC argues that both SBH and VOZ Travel satisfy the two-prong *Koscot* test. (Doc. 381-4 at 26-31.)

As for SBH, the FTC argues the first prong is satisfied because Affiliates had to pay

a yearly $49 membership fee to be able to sell SBH products through a personalized website and because new Affiliates were strongly encouraged to purchase non-refundable product packs as a practical requirement for participation.  (*Id.* at 27.)  The FTC argues the second prong is satisfied because Affiliates' rewards were tied to the amount of product ordered from SBH, rather than sales to ultimate consumers.  (*Id.*)  The FTC contends that "(1) Defendants pay rewards based entirely on recruiting or *purchases from* SBH, rather than *sales* to ultimate users, (2) defendants encourage affiliates to recruit to max their earnings, and (3) Defendants employ no safeguards to prevent, and in fact encourage, inventory loading."  (*Id.* at 28.)

As for VOZ Travel, the FTC argues that VOZ Travel participants had to make an upfront payment in order "to sell discount travel to the public through the VOZ booking platform" and that, because the VOZ Travel discount booking platform never actually existed, there was no product to sell and the rewards offered were necessarily based on recruiting.  (*Id.* at 30-31.)  Thus, the FTC argues, the VOZ Travel program satisfies both prongs of the pyramid scheme test.  (*Id.*)

The Individual Defendants' responsive arguments focus almost exclusively on SBH.  Indeed, the word "VOZ" only appears once throughout the Individual Defendants' entire brief.  (Doc. 348 at 3 ["only 10% of VOZ customers requested a refund"].)  As for SBH, the Individual Defendants argue that the first prong of the pyramid-scheme test is not satisfied because the two types of payments identified by the FTC "comprise approximately 1/3 of product revenue into the company."  (*Id.* at 10-11.)  The Individual Defendants argue the second prong is not satisfied because, in practice, SBH Affiliates purchased product packs because they wanted to get more products—which they valued for personal consumption and retail sale potential—at steeper discounts.  (*Id.* at 12-14, 16.)  The Individual Defendants also contend that there is a genuine dispute of material fact about "what, if any, purchases were merely incidental to the right to qualify for commissions" because, under SBH's commission structure, the first four tiers of commissions were available to all Affiliates and higher-tier commissions were available to

Affiliates who either met certain monthly sales thresholds or, on a temporary basis, when Affiliates purchased certain product packs.  (*Id.* at 14-15.)  The Individual Defendants also attack the FTC's evidence that most Affiliates lost money as ignoring "the value received by affiliates in the form of personal consumption or the value affiliates received from an affiliate's personal sales effort."  (*Id.* at 15.)  The Individual Defendants finally argue, in conclusory fashion, that there is a genuine issue of fact about whether rewards are based on recruitment, but then assert "that commissions depend on recruitment is a red herring. It completely misses the point of what a pyramid scheme is."  (*Id.* at 16.)

In reply, the FTC argues there "is simply no requirement that payments that satisfy the first prong of the pyramid test amount to a particular amount of a company's revenues." (Doc. 381-10 at 14.)   As for the second prong, the FTC argues that the Individual Defendants do not meaningfully address whether rewards were paid based on retail sales, do not address SBH's forms of compensation that seem to focus more on recruitment (such as the Infinity and BAM Bonuses), and do not address that new Affiliates were strongly encouraged to purchase product packs, among other things.  (*Id.* at 14-16.)  The FTC also contends that the Individual Defendants did not dispute any of the evidence related to VOZ Travel (*id.* at 3), more generally failed to grapple with the FTC's evidence, and offered insufficient evidentiary support for their arguments (*id.* at 1-13).

### 2.   Analysis

#### a.   **VOZ Travel**

The Individual Defendants largely ignore the FTC's evidence and arguments related to the VOZ Travel program.  Whatever the reason for this approach, it effectively dictates the outcome here—the FTC's initial evidentiary submissions are sufficient to meet its burden of production on the pyramid-scheme claim as applied to VOZ Travel and, because that evidence is essentially undisputed, it follows that the FTC is entitled to summary judgment.

Specifically, as for the first prong of the *Koscot* test, the FTC has submitted undisputed evidence that consumers had to pay at least one form of upfront fee—in the

form of the SBH annual $49 fee, a separate VOZ annual fee, and/or an initial purchase of VOZ Travel packs—in order to participate in the VOZ Travel program.  (*See, e.g.,* Doc. 8-14 at 107 [Noland, stating during an October 2019 webinar that Affiliates "get access to VOZ as well as become an affiliate of all of SBH['s] offering for the same $49 that people have been paying"]; Doc. 8-18 at 35 [$49 annual membership fee to be an "elite travel affiliate"]; Doc. 8-18 at 36-37 [consumers had to buy a $1,295 "Movement Pack" or a $2,795 "Movement Founder's Pack" in order to "[m]arket the full line of travel products available through VOZ" and "[o]pen-up all 6 Tiers of Commission"]; Doc. 81-2 at 8 ¶ 19 [same]; Doc. 287-5 at 45 [Noland, answering "Yes" to whether "you ha[d] to be an SBH affiliate to earn a 3-by-3, 4-by-4, or 5-by-5 bonus" in VOZ Travel].  Such required fees and purchases satisfy the first prong of the *Koscot* test.  *BurnLounge*, 753 F.3d at 883 ("Moguls were required to purchase a package . . . in order to access a BurnPage. BurnPages provided Moguls with the ability to sell music, merchandise, and packages. The sale of packages thus conveyed 'the right to sell a product,' which satisfies the first prong . . . ."); *FTC v. Vemma Nutrition Co.*, 2015 WL 11118111, *4 (D. Ariz. 2015) ("Vemma's bonus structure and training materials are designed to make new Affiliates buy a $600 Affiliate Pack, which makes payment for the right to sell a Vemma product if not a written requirement, a practical one.")

As for the second prong of the *Koscot* test, the FTC has submitted undisputed evidence that the VOZ Travel packs were sold solely to provide VOZ Travel participants with the right to recruit other participants and were unrelated to the sale of product to ultimate users.  (Doc. 8-18 at 36-37; Doc. 81-2 at 8 ¶ 19; Doc. 297-4; Doc. 297-9.)  Unlike with SBH, where Affiliates acquired products that could then be consumed or sold, with VOZ *there was no product at all*.  Of note, even after the contract with Advantage Services fell through and no product was foreseeably available, the undisputed evidence shows that the Individual Defendants continued to push Affiliates to join VOZ Travel, purchase VOZ Travel packs, and recruit others to do so.  (Doc. 290-7.)

The Individual Defendants make no arguments and cite no evidence to demonstrate

1    that there is a genuine dispute of material fact regarding VOZ Travel.  Indeed, the sole
2    mention of VOZ Travel in the Individual Defendants' response is to note that "only 10%
3    of VOZ customers requested a refund" since the appointment of the Receiver.  (Doc. 348
4    at 3.)   The Individual Defendants' failure to make any effort to defend the legality and
5    legitimacy of VOZ Travel is telling.[12]

6         Based on the evidence in the record, no reasonable factfinder could find in favor of
7    the Individual Defendants with respect to the VOZ Travel pyramid-scheme claim.

8                              b.    **SBH**

9         Although the findings above regarding VOZ Travel make it unnecessary to resolve
10   whether the FTC is also entitled to summary judgment on its pyramid-scheme claim
11   regarding SBH (which simply provides an alternative basis for liability under Count One,
12   *see* Doc. 205 ¶¶ 158-59), the Court will address that claim for the sake of completeness
13   and in an abundance of caution.

14        There is no genuine dispute of material fact regarding the satisfaction of prong one
15   of the *Koscot* test with respect to SBH.  The parties do not dispute that consumers were
16   required to pay an annual fee of $49 to be SBH Affiliates.   Indeed, the Individual
17   Defendants' Affiliate declarations repeatedly attest that, by paying this fee, Affiliates
18   gained the right to sell SBH products on their personal webpage.  (*See, e.g.*, Doc. 335-3 at
19   5, 941, 1409, 1661.)  This satisfies prong one.  *BurnLounge*, 753 F.3d at 883.  Further, in
20   practice, newly recruited Affiliates were strongly encouraged to purchase product packs

21

22   ―――――――――――――――
     [12]      Although several of the Affiliate declarations submitted by the Individual
23   Defendants include fleeting references to the purchase of VOZ Travel packs (*see, e.g.*, Doc.
     335-3 at 92, 209, 470), the Individual Defendants do not proffer these portions of the
24   declarations as creating a genuine issue of material fact as to the VOZ Travel pyramid-
     scheme allegations.   At any rate, any such proffer would fail.   The surveys focus
25   exclusively on SBH and do not even mention VOZ Travel.  Accordingly, when declarants
     discuss the value they received from product purchases or what benefits they expected to
26   receive from their purchases, they refer to SBH products (which makes sense given that
     SBH offered actual products while VOZ Travel did not).  (*See, e.g.*, *id.* at 470.)  It is
27   undisputed that no VOZ Travel participant received any product that could be retailed to
     ultimate users or enjoyed for personal consumption.   In such circumstances, the
     hypothetical, as-yet-nonexistent products can only be viewed as "incidental" to "the right
28   to participate in the money-making venture."   *BurnLounge*, 753 F.3d at 888.   The
     Individual Defendants do not argue otherwise.

                                         - 37 -

soon after joining SBH, either through incentives such as bonuses or increased commissions or through verbal goading. When an MLM designs its promotional materials and incentives to make new Affiliates buy certain products as a practical condition of membership, prong one is satisfied. *Vemma Nutrition*, 2015 WL 11118111 at *4. It is irrelevant that the $49 annual fees and fees from product-pack sales may have constituted only one-third (or 39%) of SBH's overall sales revenues—the Individual Defendants do not cite, and the Court is unaware of, any case tying the satisfaction of prong one to the proportion of revenue generated by payments for the right to sell product. There is no genuine dispute of material fact regarding prong one of the *Koscot* test.

Prong two presents a closer call as it pertains to SBH. The FTC offers a mountain of evidence demonstrating that SBH's structure, incentives, policies, and the repeated statements of the Individual Defendants were all focused on getting Affiliates to recruit new members. The FTC's evidence also shows that there were comparatively few incentives to make retail sales.

In response, the Individual Defendants seem to suggest that sales of product and product packs to downline SBH Affiliates constituted sales to ultimate users for purposes of prong two. (*See, e.g.*, Doc. 348 at 7-8 ["No affiliate gets anything for recruiting someone else. The financial focus is on the sale of product. . . . If a new customer orders straight from the affiliate's website or becomes an affiliate themselves, the sponsoring affiliate gets a commission for sales without putting in further work."]; *id.* at 14 ["[R]ewards are not largely based on commissions from something other than bona fide sales. Under Success By Health's marketing plan no one made a commission unless someone made the voluntary decision to buy product."].) The Court does not necessarily agree. In *BurnLounge*, the Ninth Circuit rejected the argument that internal sales to other members automatically constitute sales to ultimate users while also rejecting the argument that such transactions can never constitute sales to ultimate users. The court reasoned that, on one hand, "when participants bought packages in part for internal consumption . . . the participants were the 'ultimate users' of the merchandise and that this internal sale alone does not make

BurnLounge a pyramid scheme." 753 F.3d at 887. On the other hand, "whether the rewards are related to the sale of products depends on how BurnLounge's bonus structure operated in practice." *Id.* In practice, the court found, rewards were paid for recruiting new members, as evidenced "by the necessity of recruiting to earn cash rewards and . . . that the scheme was set up to motivate Moguls through the opportunity to earn cash. . . . BurnLounge incentivized recruiting participants, not product sales." *Id.* Under these circumstances, "that some sales occurred that were unrelated to the opportunity to earn cash rewards [did] not negate the evidence that the opportunity to earn cash rewards was the major draw." *Id.* at 888. Accordingly, the company was an illegal pyramid scheme. *Id.*

Here, the FTC has submitted a significant amount of evidence demonstrating that, in practice, SBH emphasized recruiting new Affiliates rather than sales to ultimate users. In particular, there is evidence that retail sales of coffee would not and could not provide a significant source of income for Affiliates (Doc. 286-7 at 53-54 [expert report of Dr. Bosley]); that SBH lacked safeguards to prevent inventory loading or to encourage retail sales (*id.* at 95-99 [same]); and that myriad statements from the Individual Defendants and other senior SBH personnel consistently stressed the need for Affiliates to "get ten" recruits and to redouble their recruiting efforts. There is also the simple fact that, although SBH closely tracked Affiliates' recruiting efforts, there was no comparably systematic tracking of revenues generated by offline retail sales. (Doc. 287-6 at 49.)

On the other hand, the declarations from SBH Affiliates that the Individual Defendants attached to their response raise a factual dispute about the emphasis on recruitment. These declarants largely testified that they purchased SBH product packs not for recruitment bonuses but because (1) they enjoyed using the products for themselves and (2) they wanted to buy the products at a discount in order to be able to retail them at a greater profit margin. (*See, e.g.*, Doc. 335-3 at 2-45, 596-612, 1352-77, 1739-64.) Additionally, these declarants generally testified that they focused on sales to ultimate consumers and generally denied that they ever loaded up on SBH product purchases in

1   order to reach higher commission tiers.  (*See, e.g.*, *id.* at 3, 30, 39, 606, 1353, 1740, 1758

2   [declarant Affiliates bought product for personal consumption and to sell to others, and

3   never bought product for any other purpose]; *id.* at 3 [ranking the importance of selling

4   product as "very important" and denying that he made money by recruiting people without

5   regard to product sales]; *id.* at 1353 [stating that she was informed that she would fail as

6   an SBH Affiliate if she did not make retail sales].)[13]

7          Given this conflicting evidence, if Count One were based solely on the claim that

8   SBH operated as a pyramid scheme (that is, if VOZ Travel were excluded from the

9   equation), the Court would conclude that the Affiliate declarations create a triable issue of

10  material fact as to whether "the rewards the participants received in return were largely for

11  recruitment, not for product sales." *BurnLounge, Inc.*, 753 F.3d at 886.  The FTC's

12  arguments to the contrary (as they pertain to the SBH-related allegations) are unpersuasive.

13  For example, the FTC argues that the probative value of the Affiliates' declarations is

14  undermined by the leading and conclusory manner in which the survey questions are

15  phrased.  (Doc. 381-10 at 9-10.)  The Court agrees with the FTC that the wording of the

16  survey questions raises potential credibility questions.  (*See, e.g.*, Doc. 335-3 at 2 ["Were

17  you induced to become an affiliate of SBH by any false or misleading statements?"]; *id.* at

18  8 ["Were you ever promised or led to believe that you could obtain a certain level of income

19  simply by being an affiliate of SBH rather than working to sell product?"].)  Additionally,

20  Noland's efforts to shape the substance of Affiliate declarations via encrypted

21  communications that he failed to disclose and sought to destroy—efforts that recently came

22  to light and are discussed in more detail in the recent order imposing spoliation sanctions

23  against the Individual Defendants (Doc. 401)—raise additional credibility questions.

24  Nevertheless, the existence of such credibility questions undermines, rather than supports,

25

26  [13]    The declarant Affiliates, to be clear, do not agree on everything.  For example, some
27  declare that they did not make any money by recruiting people in the absence of those
    recruits themselves making product sales (*id.* at 3), while some declare that they *did* make
    money by recruitment regardless of product sales by recruits (*id.* at 12).  In addition, many
28  of the declarant Affiliates acknowledge that recruitment of other Affiliates was important
    for the expansion of their businesses.  (*See, e.g.*, *id.* at 1374.)

- 40 -

the FTC's entitlement to summary judgment.  At summary judgment, the Court must view all the evidence in the light most favorable to the nonmoving parties and draw all inferences in their favor.  *Anderson*, 477 U.S. at 255.

Viewed in the light most favorable to the Individual Defendants, the declarations create a dispute of fact about the extent to which—for purposes of SBH but not VOZ Travel—Affiliates were driven primarily to recruit rather than to make sales to ultimate users.  Viewed in the light most favorable to the Individual Defendants, the declarations suggest that, notwithstanding the structural components of SBH that encouraged recruitment, and notwithstanding the Individual Defendants' and others' repeated exhortations to drive business growth primarily by recruitment, Affiliates in practice bought SBH product packs because they wanted to get those products at a discount for their own personal use and to be able to retail them at higher margins.  And if this were true, a reasonable factfinder could potentially conclude that, notwithstanding the many pyramid-like features of SBH, the operation of SBH in practice was a legitimate MLM business.  *Cf. Omnitrition*, 79 F.3d at 783-84 (reversing summary judgment in favor of alleged pyramid scheme because operation of company policies in practice was a factual question that could not be resolved as a matter of law); *FTC v. Ross*, 2012 WL 2126533, *4 (D. Md. 2012) (denying FTC's motion summary judgment on § 5(a) claim, even though "the FTC has clearly been able to compile a substantial and impressive amount of evidence" in support of that claim, because "this Court's role in evaluating evidence in the context of summary judgment is markedly different than in the context of a bench trial. . . . Notwithstanding the fact that the FTC's evidence is substantial, at this stage in the litigation, this Court is unable to conclusively determine whether the FTC is entitled to summary judgment . . . because to do so would require this Court to make credibility findings, inferences, and findings of fact that are more properly made in the context of a bench trial").

### c.   **Conclusion**

The FTC has established, and the Individual Defendants do not seriously dispute, that VOZ Travel operated as a pyramid scheme.  Accordingly, the FTC is entitled to

1   summary judgment as to liability on Count One, irrespective of the presence of any disputes

2   of fact as to whether SBH also operated as a pyramid scheme.

3          B.    **Count Two—False Income Claims**

4          A defendant may also violate the FTC Act's prohibition against "unfair or deceptive

5   acts" by making materially false representations.  *See, e.g., FTC v. Stefanchik*, 559 F.3d

6   924, 928 (9th Cir. 2009); *FTC v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001).  "An act or

7   practice is deceptive if 'first, there is a representation, omission, or practice that, second, is

8   likely to mislead consumers acting reasonably under the circumstances, and third, the

9   representation, omission, or practice is material.'"  *Gill*, 265 F.3d at 950 (citation omitted).

10   "Deception may be found based on the 'net impression' created by a representation."

11   *Stefanchik*, 559 F.3d at 928 (citation omitted).

12          1.    Parties' Arguments

13          The FTC argues that the Individual Defendants had a practice of representing that

14   joining SBH or VOZ Travel would allow consumers to earn substantial income up to

15   millions of dollars and become "financially free" in as little as 18 months.  (Doc. 381-4 at

16   31.)  The FTC contends these representations were likely to mislead customers because

17   they were false—the vast majority of Affiliates are mathematically doomed to fail and

18   actual data suggest that 94% of SBH Affiliates in fact lost money.  (*Id.*)  The FTC also

19   asserts that the Individual Defendants' representations about Noland's personal wealth and

20   the success of his trainees were false.  (*Id.* at 31-32.)  Finally, the FTC argues that the

21   representations were material because they are express claims deliberately made, address

22   the central characteristic of income potential, and are thus presumed to be material.  (*Id.* at

23   32.)

24          The Individual Defendants' response brief does not address the alleged false

25   statements concerning Noland's wealth, the success of Noland's trainees, or the VOZ

26   Travel program.  Instead, the Individual Defendants focus all of their arguments on the

27   alleged false statements regarding the income potential associated with SBH.  Specifically,

28   they argue that the Affiliate survey declarations "show that affiliates were not misled about

how one made money under Success by Health, and the time and effort required to reach one's goals." (Doc. 348 at 17.)  Further, they argue that the FTC's contention that "very few will achieve the projected [income] potential" is actually "consistent with what the company repeatedly represented and reinforced to affiliates." (*Id.*)

The FTC replies that the Individual Defendants do not dispute that they made income representations or that these representations were material. (Doc. 381-10 at 16.) As to whether the representations were likely to mislead, the FTC argues that the Individual Defendants do not dispute the actual evidence of falsity and mischaracterize the representations as being that substantial earnings are merely possible, when in fact the Individual Defendants represented that financial freedom was "achievable for the masses." (*Id.* at 16-17.)

2.    Analysis

The FTC is entitled to summary judgment on Count Two for the simple reason that the Individual Defendants do not even attempt to defend some of the categories of misrepresentations identified in the FTC's motion.  As noted, the FTC specifically argues that Individual Defendants made false income claims regarding VOZ Travel. (Doc. 205 ¶¶ 116, 118, 119, 160-162; Doc. 381-4 at 31.)  For example, Noland stated during an October 2019 presentation that VOZ Travel participants "can make a multiple six-figure income just saving people money on travel" (Doc. 8-14 at 107) and Sacca stated during a December 2019 video that "[y]es, there will be [VOZ] Travel ETAs making over $1.5 million per year" (Doc. 290-5 at 6).  Additionally, the official marketing materials associated with VOZ Travel stated that, through "Casual Effort," participants could expect to earn $230,040 in "avg/year potential." (Doc. 8-18 at 33.)  These representations were obviously false, as VOZ Travel did not even offer a product for sale.[14]

---

[14]    These were not the only misrepresentations and omissions concerning VOZ Travel. Notably, the Individual Defendants admit in their answer that Noland was not telling the truth when he stated, during a December 2019 presentation, that VOZ Travel had "just" entered into a "multi billion dollar inked deal." (Doc. 205 ¶ 129; Doc. 222 ¶ 77; Doc. 290-6 at 5.)  Additionally, the FTC has also presented undisputed evidence that the Individual Defendants continued encouraging Affiliates to purchase VOZ Travel packs even after the termination of the Advantage Services agreement, without disclosing that the agreement

- 43 -

The FTC contends these representations were, due to their falsity, likely to mislead consumers and material.  (Doc. 381-4 at 31-32.)  The Individual Defendants make no effort to argue otherwise and the Court agrees.  "Courts consistently conclude that misrepresentations regarding income potential are material and violate the FTC Act." *Vemma*, 2015 WL 11118111 at * 5.  *See also FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1267-68 (S.D. Fla. 2007) (misrepresentations as to income potential "were material and likely to mislead consumers acting reasonably under the circumstances"); *FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 529 (S.D.N.Y. 2000) ("The case law is clear that representations regarding the profit potential of a business opportunity are important to consumers, and therefore such are material misrepresentations in violation of Section 5."); *FTC v. Kitco of Nev., Inc.*, 612 F. Supp. 1282, 1291-92 (D. Minn. 1985) ("In particular, it is deceptive to misrepresent the benefits of a business opportunity. Misrepresentations concerning expected profits from a business or investment opportunity made to a prospective purchaser violate Section 5(a).").

Given this conclusion, it is unnecessary to resolve whether the FTC is also entitled to summary judgment as to the additional categories of alleged false statements (*i.e.,* false statements concerning Noland's personal wealth, the success of other individuals trained by Noland, and the income potential associated with SBH).  Nevertheless, in an abundance of caution and for the sake of completeness, the Court will address those categories of alleged misrepresentations, too.

As for the representations about Noland's personal wealth, the FTC has presented evidence (which is set forth in more detail in Part I.D of the statement of facts) that, although Noland made statements during presentations in 2018 and 2019 boasting of his massive wealth (*i.e.,* he is wealthy enough to give away millions of dollars each year, has been "financially free" since 2005, and is so wealthy that his children, grandchildren, and great-grandchildren will never have to work), Noland was actually living on credit cards

_____

had been terminated.  (Doc. 290-7.)

- 44 -

during stretches of the alleged period of financial freedom, currently has a negative net worth, can't remember when he ever had a positive net worth, owes hundreds of thousands of dollars in back taxes, and sustained significant financial losses from his previous MLM. The Individual Defendants conspicuously fail to address this topic in their response brief.[15] Thus, on this record, the FTC has established that Noland made false representations about his personal wealth.

With that said, it is unclear whether these representations, standing alone, would entitle the FTC to summary judgment on Count Two. Although the FTC has repeatedly invoked Noland's wealth-related misrepresentations over the course of this case, they are not mentioned in the complaint itself. Additionally, the specific allegation in Count Two is that the Individual Defendants violated § 5(a) of the FTC Act by making false representations concerning whether "SBH Affiliates and VOZ Travel members are likely to earn substantial income" (Doc. 205 ¶¶ 160-61), and there is a colorable argument that Noland's misrepresentations about his own wealth fall outside the scope of that allegation. At any rate, it is unnecessary to decide whether Noland's false representations about his own wealth could trigger liability under Count Two because, as discussed above, the FTC has separately established that the Individual Defendants made materially false representations about the income potential associated with VOZ Travel (which is specifically identified as one of the potential bases for liability under Count Two).

---

[15]     Although the Individual Defendants' brief makes no effort to defend the accuracy of Noland's representations concerning his personal wealth, the Individual Defendants did include, as an attachment to their brief, a "personal net worth statement" from Noland. (Doc. 335-6 at 4-7.) It reflects a joint net worth for Noland and Lina Noland of over $90 million  (*Id.*)  As the FTC correctly points out, the Court found this unsworn statement unpersuasive when ruling on the preliminary injunction in part because it contradicts Noland's earlier *sworn* financial disclosure, which states that Noland has a negative net worth. (Doc. 106 at 25 n.23.) The Individual Defendants have make no effort to explain why the Court's previous analysis was incorrect. *Cf. United States v. $715,031.27 Seized From Wachovia Bank*, 587 F. Supp. 2d 1275, 1278 (N.D. Ga. 2008) ("In a last-ditch effort to prevent summary judgment . . . Ortiz has submitted an unsworn statement which is in direct contradiction to the prior sworn testimony given at his deposition. This court will not consider unsworn statements submitted in the context of summary judgment. However, even if Ortiz had made such a statement in the form of an affidavit, this court would disregard it as a 'sham' affidavit, as no explanation was provided explaining why this new statement is in direct contradiction to his previous sworn testimony.").

1   Next are the alleged misrepresentations about the success of Noland's past trainees.

2   Although the FTC asserts in his motion that it has proved these statements were false (Doc.

3   381-4 at 3-5, 31-32), and although the Individual Defendants make no effort to defend the

4   accuracy of these statements in their response brief,[16] it is unclear whether the evidence

5   proffered by the FTC is sufficient to meet its initial burden of production at the summary

6   judgment stage.  As discussed in more detail in Part I.D of the statement of facts, when the

7   FTC asked Noland during the discovery process to supply proof that some of his past

8   trainees had earned more than $1 million per year, Noland responded by submitting a sworn

9   affidavit in which he identified four such trainees.  Although the FTC suggests that Noland

10  lacks personal knowledge of these individuals' earnings, because he left the prior company

11  in 2009 and the earnings weren't achieved until 2013 (Doc. 381-10 at 15), this foundational

12  challenge is raised in only cursory fashion.  If the FTC's motion turned on the resolution

13  of this issue, the Court would likely order supplemental briefing.  But because the FTC has

14  already established that it is entitled to summary judgment on Count Two for other reasons,

15  there is no need to solicit such briefing.

16      Finally, as for the alleged misrepresentations concerning the income potential

17  associated with SBH, the FTC has not established an entitlement to summary judgment

18  (which, again, is irrelevant because the FTC is entitled to summary judgment on Count

19  Two based on the VOZ Travel-related misrepresentations).  Specifically, the Court finds

20  that the evidence proffered by the Individual Defendants creates a disputed issue of

21  material fact as to whether the SBH-related income claims would likely mislead a

22  reasonable consumer.  Although, as noted, some of the survey questions are conclusory

23  and argumentative, it is nevertheless significant that many declarant Affiliates reported that

24

---

25  [16]    As with the personal wealth issue, although the Individual Defendants fail to discuss the "success of trainees" issue in their brief, they attach certain evidence bearing on that

26  issue to their brief.  For example, Noland's declaration states that "[o]ne of the people I trained was Holton Buggs, an individual who has been recognized in the industry as one

27  of the most successful multi-level marketers ever" and that "[a]s a principal of OrganoGold, I know that Holton Buggs was able to make over $1 million a month by his

28  multi-level marketing efforts."  (Doc. 335-6 at 2 ¶¶ 2-3.)  The Individual Defendants also attach videos of Noland introducing Buggs at an event.  (Doc. 335, Exs. B-1, B-2.)

they were not misled, that they were not led to believe that they "could obtain a certain level of income simply by being an affiliate of SBH rather than working to sell product," and that they believed achieving financial freedom (which the Affiliate declarants define in a variety of ways) could take years or decades and would require significant amounts of work. (*See, e.g.*, *id.* at 2, 8-9, 29, 35-36, 38, 44-45, 605, 611-12, 1352, 1358-59, 1739, 1745-46, 1757, 1763-64.)  Further, although many of the Individual Defendants' statements can fairly be read as representing that Affiliates could realistically make hundreds of thousands or millions of dollars in a short time period, these statements were often couched in disclaimers. (*See, e.g.*, Doc. 288-9 at 2-4 [Noland discussing how many people who seek success fail because of insufficient focus]; Doc. 290-6 at 10 ["Some of y'all this time next year, you're never going to have to work again, I'm telling you.  Not everybody, not a ton of people, but there's going to be some people . . . ."].)  Although the Court as factfinder at the preliminary injunction stage could weigh the tendency of these statements to mislead, at summary judgment the Court must view these statements in the light most favorable to the Individual Defendants and draw all reasonable inferences in their favor. The presence of such qualifying language, combined with the declarations suggesting that many Affiliates did not feel misled, suggests that a factfinder could reasonably conclude, after viewing the evidence in the light most favorable to the Individual Defendants, that the Individual Defendants' SBH-related income representations were not likely to mislead a reasonable consumer.

At any rate, the FTC is entitled to summary judgment on Count Two based on the VOZ Travel-related misrepresentations.

## C.   Count Three—Means And Instrumentalities

"Those who put into the hands of others the means by which they mislead the public, are themselves guilty of a violation of Section 5 of the [FTC] Act." *Waltham Watch Co. v. FTC*, 318 F.2d 28, 32 (7th Cir. 1963).  *See also Vemma Nutrition Co.*, 2015 WL 11118111 at *7 ("The FTC has also provided ample evidence that Vemma provides the 'means and instrumentalities' for Affiliates to deceive consumers by providing them with

- 47 -

1   promotional, recruiting and training materials containing false or misleading income

2   representations, which is a further violation of the FTC Act.").

3                      1.      Parties' Arguments

4        The FTC's arguments regarding Count Three are based substantially upon the

5   assertion that the Individual Defendants themselves made misleading representations.

6   (Doc. 381-4 at 32.)   The Individual Defendants do not address this argument in their

7   response except to assert, incorrectly, that this claim cannot be brought post-*AMG Capital*.

8   (Doc. 348 at 2.)   The FTC replies that it is entitled to summary judgment because the

9   Individual Defendants ignore this claim.  (Doc. 381-10 at 4, 13.)

10                     2.      Analysis

11       The FTC is entitled to summary judgment on Count Three.   As the FTC correctly

12  notes, liability on this claim flows from the finding of liability on Count Two, and the

13  Individual Defendants make no effort to address this claim in their response.

14       D.    **Counts Four And Five—Merchandise Rule**

15       The FTC's Merchandise Rule is codified at 16 C.F.R. § 435.2.  The relevant text of

16  the Merchandise Rule provides that it is a violation of the FTC Act:

17

18  (b)(1)  Where a seller is unable to ship merchandise within [the time clearly
        and conspicuously stated in the solicitation or within 30 days if no
19        time is clearly and conspicuously stated], to fail to offer to the buyer,
        clearly and conspicuously and without prior demand, an option either
20        to consent to a delay in shipping or to cancel the buyer's order and
        receive a prompt refund.  Said offer shall be made within a reasonable
21        time after the seller first becomes aware of its inability to ship within
        the applicable time set forth in paragraph (a)(1) of this section, but in
22        no event later than said applicable time.
23

24  * * *

25  (c)     To fail to deem an order cancelled and to make a prompt refund to the
        buyer whenever:
26
        (1)     The seller receives, prior to the time of shipment, notification
27              from the buyer cancelling the order pursuant to any option,
              renewed option or continuing option under this part;
28
        (2)     The seller has, pursuant to paragraph (b)(1)(iii) of this section,

provided the buyer with a definite revised shipping date which is more than thirty (30) days later than the applicable time set forth in paragraph (a)(1) of this section or has notified the buyer that it is unable to make any representation regarding the length of the delay and the seller:

    (i)    Has not shipped the merchandise within thirty (30) days of the applicable time set forth in paragraph (a)(1) of this section, and

    (ii)    Has not received the buyer's express consent to said shipping delay within said thirty (30) days;

(3)    The seller is unable to ship within the applicable time set forth in paragraph (b)(2) of this section, and has not received, within the said applicable time, the buyer's consent to any further delay;

(4)    The seller has notified the buyer of its inability to make shipment and has indicated its decision not to ship the merchandise;

(5)    The seller fails to offer the option prescribed in paragraph (b)(1) of this section and has not shipped the merchandise within the applicable time set forth in paragraph (a)(1) of this section.

A violation of this Rule constitutes an unfair or deceptive act or practice in or affecting commerce under § 5(a) of the FTC Act.  15 U.S.C. § 57a(d)(3).

    1.    <u>Parties' Arguments</u>

The FTC notes that the Individual Defendants admit in their answer that they violated the Merchandise Rule, disputing only how often they did so.  (Doc. 381-4 at 33.) Putting aside this admission, the FTC argues that the Individual Defendants were required to disclose a shipping date clearly and conspicuously and, because they failed to do so, the 30-day default applied.  (*Id.*)  The FTC further asserts it is undisputed that for at least $570,000 in product sales, the Individual Defendants failed to ship products within 30 days and did not provide refunds when requested.  (*Id.*)

In response, the Individual Defendants argue in a footnote that there is a dispute over "what product was not shipped within thirty days, or, even if product was not shipped in thirty days, whether or not there was a rule violation because affiliates agreed to the

delay." (Doc. 348 at 4 n.2.) The Individual Defendants also assert that "[a]part from being sold out of product early on and pre-orders, the average shipment time for SBH orders was 3.9 days." (*Id.* at 9.)

The FTC replies that the Individual Defendants have failed to genuinely dispute the alleged Merchandise Rule violations, because (1) they "cite no evidence and assert no facts to dispute the FTC's detailed identification of their late shipments," and (2) there is no evidence of consent, "much less consent in response to a refund offer, as required by 16 C.F.R. § 435.2(b)(1)." (Doc. 381-10 at 17.)

2.   <u>Analysis</u>

The FTC is entitled to summary judgment on Counts Four and Five.

As an initial matter, the Individual Defendants' answer admits that Merchandise Rule violations occurred, objecting only to the assertion that such violations were "numerous." (Doc. 205 ¶¶ 170-73; Doc. 222 ¶ 1, 106-07.) This admission, standing alone, compels the entry of summary judgment in the FTC's favor on the issue of liability.

Even if the Individual Defendants hadn't admitted liability, the FTC has introduced detailed evidence that shipping delays of longer (in some cases much longer) than 30 days occurred. (Doc. 286-3 ¶¶ 18-27.) Further, as discussed above, it is undisputed that the Defendants had a strict no-refund policy.

The evidence proffered by the Individual Defendants demonstrates, at most, that the parties dispute how many violations occurred. For example, the Individual Defendants proffer a spreadsheet (Doc. 335, Ex. B-5) purportedly showing that "*[a]part from being sold out of product early on and pre-orders*, the average shipment time for SBH orders was 3.9 days." (Doc. 348 at 9, emphasis added.) Even assuming the veracity of this spreadsheet, the authenticity of which is not supported by a sworn declaration, the Individual Defendants' exclusion of two entire categories of orders from their 3.9-day calculation (*i.e.,* "being sold out of product early on" and "pre-orders") indicates that the Individual Defendants acknowledge (or, at least, do not dispute) the existence of frequent shipping delays with respect to those two categories of orders.

1    In short, the Individual Defendants have potentially raised a factual dispute about

2 the extent of their Merchandise Rule violations, but there is no dispute about whether such

3 violations occurred.  The scope of the violations is better taken up in the Remedies MSJ.

4 Whether few or many violations took place goes to the proper remedy, not whether a

5 violation in fact occurred.

6    E.    **Count Six—Cooling-Off Rule**

7    The Cooling-Off Rule, codified at 16 C.F.R. § 429.1, gives consumers the right to

8 cancel, within three business days, any purchase of at least $130 in goods or services that

9 occurs at a location other than the merchant's place of business.  *Id.* §§ 429.0(a), 429.1(g).

10 The Rule also requires a seller to provide written or oral notice of this right and to provide

11 a form "Notice of Cancellation" that the buyer can use to cancel the sale.  *Id.* § 429.1(a)-

12 (b), (e).  As with the Merchandise Rule, a violation of the Cooling-Off Rule constitutes a

13 violation of § 5(a) of the FTC Act.  15 U.S.C. § 57a(d)(3).

14    1.    Parties' Arguments

15    As an initial matter, the FTC argues that the Individual Defendants admit they

16 violated the Cooling-Off Rule.  (Doc. 381-4 at 33.)  The FTC further points to evidence in

17 the record that at least $500,000 in qualifying sales were completed without providing any

18 buyer with the notices or rights required under the Rule and argues that the Individual

19 Defendants "in effect, enforced an *anti*-Cooling-Off Rule by prohibiting refunds of any

20 kind." (*Id.*)

21    The Individual Defendants' sole argument regarding the Cooling-Off Rule is that

22 they admit "to not providing a three-day right of [rescission] for categories of sales falling

23 within the definition of the cooling off rule, but dispute whether any harm was caused."

24 (Doc. 348 at 4 n.2.)

25    2.    Analysis

26    There is no genuine dispute of material fact as to Count Six—the Individual

27 Defendants admit they violated the Cooling-Off Rule.  (Doc. 205 ¶ 181; Doc. 222 ¶ 1.)

28 The parties' dispute about the extent of harm caused by these violations will be addressed

1    when the Court resolves the Remedies MSJ.

2        F.    **Joint And Several Liability**

3        "Where corporate entities operate together as a common enterprise, each may be

4    held liable for the deceptive acts and practices of the others."  *FTC v. Grant Connect, LLC*,

5    763 F.3d 1094, 1105 (9th Cir. 2014).  Multiple entities "constitute a common enterprise

6    when they exhibit either vertical or horizontal commonality—qualities that may be

7    demonstrated by a showing of strongly interdependent economic interests or the pooling

8    of assets and revenues."  *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1142-43 (9th

9    Cir. 2010).  Indicia of a common enterprise include also pooling of "resources, staff, and

10   funds," common ownership, and joint participation in a common venture.  *Id.* at 1143.

11            1.    Parties' Arguments

12       The FTC argues that the Individual Defendants admit that the Corporate Defendants

13   operated as a common enterprise and satisfy the relevant indicia of a common enterprise

14   and that the undisputed facts support these admissions.  (Doc. 381-4 at 34.)  The Individual

15   Defendants do not contest this point in their response.

16            2.    Analysis

17       There is no genuine dispute of material fact regarding whether the Corporate

18   Defendants operated as a common enterprise.  The Individual Defendants have admitted

19   as much and do not raise a dispute in response to the Liability MSJ.  (Doc. 205 ¶¶ 14-15;

20   Doc. 222 ¶ 6-7.)

21       The Court notes, however, that the FTC has stated it will not pursue its claims

22   against the Corporate Defendants while they are under a receivership and lack counsel

23   independent of the Receiver.  (Doc. 168 at 6, 12-13.)  Accordingly, the Court's conclusion

24   that there is no genuine dispute of fact about the common enterprise among the Corporate

25   Defendants is, like the rest of this order, not binding on the Corporate Defendants should

26   they seek to contest at a later date any of the FTC's allegations against them.  The common

27   enterprise conclusion is addressed because it is relevant to the discussion of the Individual

28   Defendants' liability in the following section of this order.

1

### G.    **Individual Defendants' Liability**

2

"Individuals may be held liable for injunctive relief based on corporate entity

3

violations of the FTC Act if (1) the corporation committed misrepresentations of a kind

4

usually relied on by a reasonably prudent person and resulted in consumer injury, and (2)

5

individuals participated directly in the violations or had authority to control the entities."

6

*Grant Connect*, 763 F.3d at 1101. For an individual to be liable for monetary relief, "the

7

FTC must also show that the individual had knowledge that the corporation or one of its

8

agents engaged in dishonest or fraudulent conduct, that the misrepresentations were the

9

type upon which a reasonable and prudent person would rely, and that consumer injury

10

resulted." *Id.* (internal quotation marks omitted). "To satisfy the knowledge requirement,

11

the FTC must show that a defendant had actual knowledge of material misrepresentations,

12

was recklessly indifferent to the truth or falsity of a misrepresentation, or had an awareness

13

of a high probability of fraud along with an intentional avoidance of the truth." *Id.* at 1101-

14

02 (cleaned up). "The FTC need not show that a defendant intended to defraud consumers

15

in order for that individual to be personally liable" and the "extent of an individual's

16

involvement in a fraudulent scheme alone is sufficient to establish the requisite knowledge

17

for personal restitutionary liability." *Id.* (internal quotation marks omitted).[17]

18

#### 1.    Parties' Arguments

19

The FTC argues that both the injunctive and monetary relief standards are satisfied

20

because of the ample evidence of the Individual Defendants' direct participation and

21

central involvement in the unlawful acts, their status as corporate officers in the small,

22

closely-held corporations, and the Individual Defendants' admission that they had control

23

over and knowledge of the acts and practices of the Corporate Defendants. (Doc. 381-4 at

24

34-35.) The Individual Defendants do not address these assertions in their response.

25

…

26
27
28

---

[17]    This test applies to violations of FTC rules such as the Merchandise Rule and Cooling-Off Rule because violations of those rules are themselves unfair or deceptive acts or practices under § 5(a) by operation of 15 U.S.C. § 57a(d)(3). *See, e.g.*, *FTC v. Marshall*, 781 F. App'x 599, 601-02 (9th Cir. 2019) (affirming individual liability ruling on summary judgment for violations of the FTC Act and an FTC rule).

- 53 -

2.    <u>Analysis</u>

There is no genuine dispute of material fact regarding the Individual Defendants' control or direct participation or knowledge of the acts as to which the Court grants summary judgment.  Of note, the Individual Defendants admit to having both control over and knowledge of the conduct of the Corporate Defendants.  (Doc. 205 ¶ 15; Doc. 222 ¶ 7.)  Further, as outlined in the factual background section of this order, the Individual Defendants played a direct role in the unlawful acts.  The FTC has therefore carried its burden of production on the Individual Defendants' individual liability.  And because the Individual Defendants wholly failed to respond to the FTC's evidence or arguments on this point, it follows that the FTC is entitled to summary judgment.

Accordingly,

**IT IS ORDERED** that the FTC's motion for summary judgment on liability (Doc. 285) is **granted**.

Dated this 9th day of September, 2021.

Dominic W. Lanza
United States District Judge

- 54 -