EVAN M. MENDELSON, DC Bar No. 996765
JONATHAN W. WARE, DC Bar No. 989414
Federal Trade Commission
600 Pennsylvania Avenue NW, CC-9528
Washington, DC 20580
(202) 326-3320; emendelson@ftc.gov (Mendelson)
(202) 326-2726; jware1@ftc.gov (Ware)

Attorneys for Plaintiff Federal Trade Commission

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Federal Trade Commission, | No. CV-20-0047-PHX-DWL |
| Plaintiff, | **PLAINTIFF'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| v. | |
| James D. Noland, Jr., *et al.*, | |
| Defendants. | |

# **TABLE OF CONTENTS**

I.    BACKGROUND ................................................................................ 1

    A.   The "First Action" (No. CV-00-2260) ........................................ 1

        1.   The FTC's 2000 Complaint Against Jay Noland ............................. 1

        2.   The Court's 2002 Permanent Injunction ...................................... 1

        3.   The FTC's Contempt Allegations ............................................. 2

        4.   The Court's Order Holding Noland, Harris, and Sacca in
            Contempt and Reserving Some Issues for Trial ............................ 2

    B.   The FTC's 2020 Lawsuit (the "Second Action") (No. CV-20-0047) ........... 4

        1.   The FTC's Complaint ....................................................... 4

        2.   The Court's Temporary Restraining Order and Preliminary
            Injunction ............................................................... 4

        3.   The Court's Partial Grant of Summary Judgment ........................... 5

        4.   Stay of Proceedings as to Corporate Defendants ........................... 6

    C.   The Parties .............................................................. 6

II.   THE SUCCESS BY HEALTH PYRAMID SCHEME ....................................... 7

    A.   Defendants Promised Consumers Substantial Income .......................... 7

        1.   Defendants Promised Prospective and Current SBH Affiliates
            "Financial Freedom" or Other Financial Rewards .......................... 7

            a.   Promises of "Financial Freedom" ...................................... 7

            b.   Meaning of "Financial Freedom" ...................................... 8

            c.   Promises of Other Lucrative Rewards ................................. 10

        2.   Defendants Touted Noland's (Fictitious) Wealth as Attainable
            for Affiliates. .......................................................... 15

        3.   Defendants Touted the Purported Wealth of Noland's Students. ..... 18

        4.   Defendants Promised Substantial Income to Affiliates Who
            Chose Not to Pursue Financial Freedom ................................ 20

        5.   Defendants' "No Guarantees" Disclaimers Did Not Alter the
            Net Impression that Affiliates Could Expect Substantial Income. .. 24

    B.   Defendants Incentivized and Emphasized Recruiting, Rather Than
        Sales to Ultimate Users, as the Key to Financial Success. ................. 26

        1.   The Structure of the SBH Commission Plan and SBH's Bonus
            Programs Prioritized Recruiting ....................................... 27

a.    SBH's Six-Phase Commission Plan ..................................... 27

b.    SBH Bonuses and Promotions ................................................ 30

2.    Defendants Instructed Affiliates to Focus on Recruiting Rather Than Sales to Ultimate Users. ................................................... 31

a.    Defendants' "Four Steps to Success" Encouraged Recruiting and Omitted Retail Sales. ................................... 31

b.    Defendants' "Power of Ten" Model Encouraged Exponential Recruiting. ....................................................... 33

c.    Defendants Expressly Instructed Each Other and SBH Affiliates to Focus on Recruiting. .......................................... 39

3.    Affiliates Understood Defendants Wanted Them to Focus on Recruiting. ......................................................................... 42

4.    Defendants Undermined Retail Sales to Ultimate Users of SBH Products. ........................................................................... 44

a.    Defendants Did Not Reward Offline Retail Sales. .............. 45

b.    Defendants Allowed *Non*-Affiliates to Purchase from SBH at "Wholesale Pricing." ............................................... 45

c.    Defendants Created Additional Obstacles to Retail Sales. ... 47

d.    Defendants' Training Did Not Emphasize Offline Retail Sales. ..................................................................................... 48

C.    Defendants Encouraged Affiliates to Buy Excessive Amounts of Products to Achieve "Financial Freedom." .................................... 51

1.    Defendants Told New Affiliates to Make Large Up-Front Purchases. ....................................................................... 51

2.    Defendants Told Affiliates Seeking Financial Freedom They Needed to Spend Thousands on "Founder" and "Global Ambassador" Packs. ................................................................ 52

3.    Defendants Encouraged, and Often Required, Monthly Product Orders of up to $500 Regardless of User Demand. ...................... 56

4.    Defendants Required "Founders" and "Global Ambassadors" to Buy Hundreds of Dollars in Products Per Month. ...................... 57

5.    Defendants Created Incentives to Promote Product Purchases Untethered from Demand. ................................................... 58

a.    "CORE" Team .................................................................... 58

b.    "Millionaire Insider" Calls ................................................. 60

c.    "All Out, All In" Team ....................................................... 61

d.      Rank Advancement ................................................ 62

6.      Defendants Employed No Safeguards to Protect Consumers from Holding Excess Inventory. ...................................... 64

7.      Affiliates Confirmed They Bought Products to Achieve Promised Financial Freedom, Rather Than for Personal Consumption or Resale. .............................................................................. 65

8.      Defendants Did Not Treat Sales to Affiliates as Being for Personal Consumption. ....................................................... 67

9.      The Sharp Decline in Post-TRO Product Sales Confirms Affiliate Purchases Were Not Driven by Actual Demand. .............. 67

D.      Defendants Paid Commissions and Bonuses Based Almost Entirely on *Purchases from* SBH by Affiliates and Their Recruits. ...................... 70

E.      Defendants Used the False Promise of Sustainable Retail Sales to Advance Their Scheme. ............................................................... 71

1.      Defendants Told Affiliates to Give Away Products for Free and Treat Retail Sales as a One-Off Recruiting Tool. ............................ 72

2.      Defendants Used the False Promise of Sustainable Retail Sales to Induce Excessive Product Purchases. ............................... 73

F.      Defendants Used Their "Training" Events to Magnify the SBH Fraud. ........................................................................................ 75

1.      Dates, Cost, and Location of Events ................................ 75

2.      Defendants Told Affiliates Attending the Events Was Necessary to Achieve Financial Freedom. ....................................... 77

a.      SBH Training Materials Emphasized Event Attendance. ...... 77

b.      Defendants Imposed Attendance Requirements on Some Affiliates. ............................................................. 77

c.      Defendants Instructed Affiliates That Event Attendance Was a Prerequisite for Reaching Financial Freedom. .......... 78

d.      Defendants Encouraged Affiliates to Assume Thousands in Debt to Attend Events. ........................................ 79

e.      Affiliates Understood the "Need" to Attend Events. ........... 80

3.      At their Events, Defendants Pushed Non-Refundable, Expensive Tickets to Future Events .................................................. 81

a.      Defendants Used High-Pressure Sales Tactics to Sell Tickets for Future Events. ......................................... 81

b.      Defendants Sold Almost $600,000 Future Event Tickets

at SBH Events. ..................................................................... 83

G.  Defendants' Promises of Substantial Income Were False. ...................... 85

1.  No SBH Affiliates Achieved "Financial Freedom," and the
Overwhelming Majority Lost Money. ............................................... 86

2.  SBH's Structure Ensured that Affiliates Would Lose Money. ........ 88

3.  Noland Was Broke, Not Financially Free. ...................................... 88

4.  Noland's Past Students Did Not Achieve Financial Freedom. ........ 91

H.  Individual Defendants' SBH Results Prove Their Recruitment Focus
and the Falsity of Their Promises of Financial Freedom. .......................... 93

I.  Consumers Lost Thousands of Dollars Following Defendants'
Instructions. ......................................................................................... 95

1.  Kory and Leah W. ........................................................................... 95

2.  Stephanie and Jason Underhill ....................................................... 98

3.  Jason and Kayla Johnson .............................................................. 100

J.  Dr. Stacie Bosley Concluded SBH Was a Pyramid Scheme That
Defendants Marketed Using Deceptive Income Claims. ......................... 102

1.  Dr. Bosley's Background and Qualifications ................................ 102

2.  Dr. Bosley Determined SBH Was a Pyramid Scheme. ................ 103

a.  The SBH Commission Plan Incentivized Recruitment
and Product Purchases from SBH, Not Retail Sales. .......... 103

b.  Defendants' Training Materials and Instructions
Emphasized How Recruitment and Large Product
Purchases Are Incentivized. ............................................... 105

c.  Defendants Did Not Emphasize Retail Sales Relative to
the Rewards for Recruiting. ................................................ 106

d.  Defendants Lacked Anti-Pyramid Safeguards and Instead
Imposed "the Antithesis of Safeguards." ........................... 108

3.  Dr. Bosley Found Defendants Made False Representations
Regarding SBH Affiliates' Income Potential ................................ 109

a.  Defendants Told Consumers They Could Expect to Earn
Substantial Income. ............................................................ 109

b.  SBH's Structure Ensured That 90% or More of SBH
Affiliates Would Lose Money By Following Defendants. . 111

c.  SBH Affiliates' Results Matched Dr. Bosley's
Expectations. ....................................................................... 112

III.   **DEFENDANTS' SBH SHIPPING WOES** ........................................................ 113

    A.    Defendants Shipped over $600,000 in SBH Products Several Months Late, if at All. ...................................................................................... 113

        1.    Founders Packs  ($370,130) ............................................................ 113

        2.    Product "Pre-Orders" and Backorders ($254,091) ...................... 115

            a.    Hot Cocoa (9-month delay) ($51,337) ................................ 115

            b.    Rooibos Tea (12-month delay) ($28,002) ........................... 116

            c.    Chai Tea (6-month delay) ($60,320) ................................... 116

            d.    Time Capsule (2-month delay)  ($47,955) ........................... 117

            e.    G-HCBD AM/PM (2- and 3-month delays) ($66,477) ....... 118

        3.    Other Shipping Delays (Unquantified) ......................................... 118

    B.    Defendants Threatened and Tricked Consumers Into Not Seeking Refunds or Even Questioning Their Order Status. ................................. 120

        1.    Defendants Told Affiliates Orders Were "Shipped" Before They Were Actually Shipped. ......................................................... 121

        2.    Defendants Barred Affiliates from Asking About the Status of Delayed Orders or Seeking or Obtaining Refunds. ...................... 122

    C.    Defendants' Records Are Insufficient to Determine Which Orders Defendants Actually Shipped, and When. ................................................ 125

IV.   **DEFENDANTS' VOZ TRAVEL PYRAMID SCHEME** ............................... 128

    A.    Defendants Lured Consumers to Purchase VOZ Memberships with Promises of Substantial Income and Fantastical Travel Benefits. ........... 128

        1.    Promises of Substantial Income ...................................................... 128

        2.    Promises of Travel Benefits ........................................................... 129

    B.    Defendants' Vendor Could Not Provide the Services Defendants Promised to VOZ Members. ............................................................................ 130

    C.    Defendants Had No Ability to Fulfill Their Promises to VOZ Members. ................................................................................................... 131

    D.    Defendants Continued to Promote VOZ's Imminent Launch Even After Their Travel Vendor Refused to Work with Them. ....................... 132

V.    **DEFENDANTS' NET REVENUES** ............................................................ 134

VI.   **DEFENDANTS' PRE- AND POST-TRO MISCONDUCT REVEALS A HEIGHTENED LIKELIHOOD OF RECIDIVISM** ...................................... 136

    A.    Contempt Defendants Disregarded the Court's Prior Permanent Injunction Against Jay Noland. ...................................................... 136

1.    Contempt Defendants Lied About the 2002 Noland Order and Used It as a Selling Point. ............................................................ 136

2.    Harris and Sacca Disregarded the 2002 Noland Order. ................. 138

B.    Defendants Reacted to the FTC's Investigation by Destroying Evidence and Then Lying About It. ............................................................ 139

C.    Defendants Violated the Court's TRO and Preliminary Injunction. .......... 141

1.    Failure to Turn Over Information to Receiver ............................... 141

2.    Failure to Repatriate Assets ........................................................... 142

3.    Failure to Notify SBH Affiliates of TRO or Cease SBH Operations ...................................................................................... 143

D.    Defendants Lied to Former SBH Affiliates in Order to Raise Money. .... 143

E.    Defendants Have Lied to the Court, IRS, SEC, and Potential Investors. ...................................................................................................... 146

1.    Noland, During Litigation, Fabricated a "Royalty Agreement" Between Two of His Companies. ................................................... 146

2.    Defendants Lied to the SEC and Potential Investors. .................... 147

3.    Noland Lied in a Sworn Declaration to the IRS. ........................... 149

4.    Harris Twice Sold Securities Using Materially False or Misleading Statements or Omissions. ............................................ 150

5.    In the First Action, Noland Asserted Sovereign Citizen Conspiracy Theories to Reject the Court's Authority.................... 150

F.    Defendants' New Business Ventures Raise Significant Red Flags. .......... 151

1.    MYB Publishing.............................................................................. 151

2.    Total Growth Technologies ............................................................ 153

3.    TravelNU.......................................................................................... 153

4.    SBH Products, Inc. and Vibra360 .................................................. 155

G.    Defendants Refused to Accept Responsibility. ......................................... 155

H.    Defendants Enriched Themselves Through their Pyramid Schemes. ....... 156

**CONCLUSIONS OF LAW** ........................................................................................ **157**

**I.    THE COURT HAS JURISDICTION OVER THIS MATTER.** .................... **157**

**II.    CORPORATE DEFENDANTS VIOLATED THE FTC ACT BY DECEPTIVELY MARKETING THE SBH PYRAMID SCHEME.** ............ **158**

A.    Success By Health Was a Pyramid Scheme (Count I). ............................ 158

1.    Prong 1:  The Court Already Found Participants Paid Money to

Defendants for the Right to Sell Products.................................... 159

2.   Prong 2:  SBH Participants Paid Money to Defendants in Return for the Right to Receive Recruiting-Based Rewards. ........ 159

a.   SBH Is Facially a Pyramid Scheme Because It Bases Rewards on *Purchases from* the Company......................... 160

b.   Defendants Paid Rewards Based on Recruiting, Rather than Ultimate-User Sales. ................................................ 161

c.   Defendants Encouraged Affiliates to Buy Products in Pursuit of the SBH Business Opportunity, Not for Personal Consumption. ...................................................... 164

d.   Defendants Lacked Safeguards to Prevent Inventory Loading or Tie Affiliate Purchases to User Demand.......... 166

B.   Defendants' False Promises of Substantial Income Violated the FTC Act (Count II). ....................................................................................... 168

1.   Defendants Told Consumers They Could Reasonably Expect Financial Freedom or Other Substantial Income. ......................... 168

2.   Defendants' Promises of Substantial Income Were Misleading.... 170

3.   Defendants' Misrepresentations Were Material. .......................... 171

C.   Defendants Provided Affiliates with the Means and Instrumentalities to Violate the FTC Act (Count III). ............................................................. 172

D.   SBH Affiliates' Status as "Consumers" Is Irrelevant to FTC Act Liability on Counts I-III. ..................................................................... 173

III.   **INDIVIDUAL DEFENDANTS ARE LIABLE FOR CORPORATE DEFENDANTS' SBH-RELATED FTC ACT VIOLATIONS...................... 174**

IV.   **CONTEMPT DEFENDANTS VIOLATED THE 2002 NOLAND ORDER.................................................................................................. 176**

A.   The Court Found the Contempt Defendants Violated the 2002 Noland Order with Respect to Their Compliance Program and VOZ Travel. ................................................................................................. 176

B.   The Court Already Found Sections I, II, and III of the 2002 Noland Order Are "Specific and Definite," and Therefore Enforceable. .............. 177

C.   The Court Already Found the 2002 Noland Order Binding on Harris and Sacca. ............................................................................................ 177

D.   Contempt Defendants Violated Section I of the 2002 Noland Order by Operating SBH as a "Prohibited Marketing Scheme." ..................... 177

1.   The 2002 Noland Order Added Additional Restrictions Beyond the Ninth Circuit's Pyramid Scheme Test..................................... 177

2.   SBH Violated the 2002 Noland Order By Paying Rewards Based Primarily on Sales to SBH Affiliates. ................................ 179

E.   Contempt Defendants Violated Section II of the 2002 Noland Order by Making False Claims About Consumers' Income Potential. ............... 179

F.   Contempt Defendants Violated Section III of the 2002 Noland Order by Providing the Means and Instrumentalities for Others to Make Misrepresentations About SBH. ................................................... 180

V.   **THE APPROPRIATE COMPENSATORY CONTEMPT SANCTIONS FOR CONTEMPT DEFENDANTS' ORDER VIOLATIONS ARE DEFENDANTS' NET REVENUES. ................................................... 180**

A.   For Contempt Defendants' VOZ Travel Violations, Consumers Are Entitled to Full Refunds. .............................................. 181

B.   Defendants' Net Revenues from SBH Are Necessary to Compensate Consumers for Defendants' SBH-Related Contempt. ............................. 181

1.   Consumer Loss Is Measured by Defendants' Net Revenues. ........ 182

2.   The Court Need Not Offset the "Value," If Any, of Products Received by Consumers, Nor Require Their Return. .................... 186

3.   The Trainings, Memberships, and Products Sold by Defendants Had, at Most, *De Minimis* Value. ................................... 188

C.   *Liu v. SEC* Does Not Cap Compensatory Contempt Sanctions at Defendants' Profits. ................................................. 190

D.   *AMG Capital* Does Not Affect the Availability of Compensatory Contempt Sanctions. .............................................. 191

VI.   **CONSUMERS ARE ENTITLED TO FULL REFUNDS TO REMEDY THE HARM FROM DEFENDANTS' RULE VIOLATIONS. ..................... 193**

A.   Defendants' Net Revenues in Connection with Their Merchandise Rule Violations Are Necessary to Redress Consumers' Injury. .............. 194

1.   The Injury the FTC Seeks to Redress Is the Harm from Defendants' Failure to Pay Required Refunds. .............................. 194

2.   Defendants Cannot Establish a Right to Offset the "Value" of Products Eventually Received. ....................................... 195

a.   Defendants Cannot Prove Customers Eventually Received Delayed Shipments. .............................. 195

b.   Defendants' Products Had Minimal, If Any, Value. .......... 197

3.   At a Minimum, Consumers Who Asked for Refunds for Delayed Shipments Before Receiving Them Are Entitled to Refunds. ....................................................... 198

B.    Defendants' Net Revenues in Connection with Their Cooling-Off Rule Violations Are Necessary to Redress Consumers' Injury. ............... 198

    1.    Defendants Must Bear the Burden of Proving that Fully Informed Consumers Would Not Have Exercised Their Cooling-Off Rights........................................................................ 199

    2.    The Court Need Not Provide Any Offset for the "Value" of the Event Tickets Sold in Violation of the Cooling-Off Rule. ............ 200

    3.    At a Minimum, Consumers Are Entitled to Refunds for Purchases of Tickets to Events That Never Occurred. ................. 201

C.    SBH Affiliates' Status as "Consumers" Is Irrelevant to Section 19 Monetary Relief for Individual Defendants' Rule Violations. ................ 202

VII.    **INJUNCTIVE RELIEF IS NECESSARY TO PROTECT CONSUMERS AND PREVENT FUTURE VIOLATIONS. .................................................... 202**

A.    There Is a Cognizable Danger that Individual Defendants Will Continue to Defraud Consumers and Violate the Law. ............................ 203

B.    The FTC's Proposed Injunctive Relief Is Necessary To Protect Consumers. ............................................................................................ 205

    1.    The Facts of This Case, Combined with Defendants' History, Warrant Broad Relief. ....................................................................... 206

    2.    The FTC's Proposed Injunctive Relief, Including Bans on Multilevel Marketing, Pyramid Schemes, and Business Coaching, Is Necessary. .................................................................... 208

    3.    The FTC's Proposed Compliance Monitoring Provisions Are Appropriate. .................................................................................... 210

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3

*AMG Capital Mgmt., LLC v. FTC*,  141 S. Ct. 1341 (2021). ........................ 184, 191, 202

4

5

*AngioDynamics, Inc. v. Biolitec AG*, 823 F.3d 1 (1st Cir. 2016) .................................... 192

6

*Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251 (1946) .......................... 194, 196, 200

7

*Bostick v. Herbalife Int'l of Am., Inc.*, 2013 WL 12131732
   (C.D. Cal. Oct. 11, 2013) ............................................................................................ 167

8

9

*CFTC v. Hunt*, 591 F.2d 1211 (7th Cir. 1979) .................................................................. 204

10

*Donaldson v. Read Magazine, Inc.*, 333 U.S. 178 (1948)................................................ 169

11

*FEC v. Furgatch*, 869 F.2d 1256 (9th Cir. 1989)............................................................. 203

12

*FTC v. Acquinity Interactive, LLC*, 2021 WL 3603594 (S.D. Fla. Aug. 13, 2021)........ 191

13

*FTC v. Affordable Media, LLC*, 179 F.3d 1228, (9th Cir. 1999) .................................... 176

14

15

*FTC v. Am. Screening, LLC*, 2022 WL 2752750 (July 14, 2022)........................... 188, 194

16

*FTC v. BlueHippo Funding, LLC*, 762 F.3d 238 (2nd Cir. 2014)........... 182, 183, 184, 185

17

*FTC v. Bronson Partners, LLC*, 654 F.3d 359 (2nd Cir. 2011) ...................................... 185

18

*FTC v. BurnLounge, Inc.*, 753 F.3d 878 (9th Cir. 2014)............................................ passim

19

*FTC v. Cantkier*, 767 F. Supp. 2d 147 (D.D.C. 2011) .................................................... 173

20

*FTC v. CD Capital Invs., LLC*, 2016 WL 4468549 (C.D. Cal. Aug. 22, 2016) ............. 211

21

*FTC v. Colgate-Palmolive Co.*, 380 U.S. 374 (1965) ..................................................... 206

22

23

*FTC v. Commerce Planet, Inc.*, 815 F.3d 593 (9th Cir. 2016)........................................ 184

24

*FTC v. Crittenden*, 19 F.3d 26 (9th Cir. 1994) (Table)................................................... 174

25

*FTC v. Cyberspace.com LLC*, 453 F.3d 1196 (9th Cir. 2006) ........................ 169, 171, 173

26

*FTC v. Dayton Family Prods.*, 2016 WL 1047353 (D. Nev. Mar. 16, 2016)................. 187

27

*FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1 (1st Cir. 2010)............................. 194, 196

28

*FTC v. DiscountMetalBrokers Inc.*, 2017 WL 6940502 (C.D. Cal. Oct. 13, 2017) ....... 204

*FTC v. EDebitPay, LLC*, 2011 WL 486260 (C.D. Cal. Feb. 3, 2011) ........................... 183

*FTC v. EDebitPay, LLC*, 695 F.3d 938 (9th Cir. 2012) ............................................. passim

*FTC v. Elegant Solutions, Inc.*, 2022 WL 2072735 (9th Cir. June 9, 2022) .................. 193

*FTC v. EMP Media, Inc.*, 2018 WL 3025942 (D. Nev. June 15, 2018) ........................ 211

*FTC v. Equinox Int'l Corp.*, 1999 WL 1425373 (D. Nev. Sept. 14, 1999) ............... passim

*FTC v. Figgie Int'l, Inc.*, 994 F.2d 595 (9th Cir. 1993) ............................................. passim

*FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502 (S.D.N.Y. 2000) ............... 171, 209

*FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192 (10th Cir. 2005) ........................ 170, 171

*FTC v. Gill*, 265 F.3d 944 (9th Cir. 2001).............................................................. 168, 208

*FTC v. Gill*, 71 F. Supp. 2d 1030 (C.D. Cal. 1999) ............................................... 202, 204

*FTC v. Grant Connect, LLC*, 763 F.3d 1094 (9th Cir. 2014)................. 175, 202, 205, 206

*FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199 (D. Nev. 2011) ............................ 209

*FTC v. IFC Credit Corp.*, 543 F. Supp. 2d 925 (N.D. Ill. 2008) .................................. 174

*FTC v. Int'l Computer Concepts, Inc.*, 1995 WL 767810
   (N.D. Ohio Oct. 24, 1995)...................................................................................... 209

*FTC v. Ivy Capital, Inc.*, 2013 WL 1224613 (D. Nev. Mar. 26, 2013)......................... 201

*FTC v. John Beck Amazing Profits LLC*, 888 F. Supp. 2d 1006 (C.D. Cal. 2012)......... 208

*FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052 (C.D. Cal. 2012)......... 171

*FTC v. Jones*, 2017 WL 2807420 (C.D. Cal. May 31, 2017) ........................................ 211

*FTC v. Kitco of Nev., Inc.*, 612 F. Supp. 1282 (D. Minn. 1985) ........................... 172, 206

*FTC v. Kutzner*, 2017 WL 4685065 (C.D. Cal. Sept. 21, 2017).................................... 211

*FTC v. Kuykendall*, 2002 WL 32141578 (W.D. Okla. Mar. 4, 2002)........................... 187

*FTC v. Kuykendall*, 371 F.3d 745 (10th Cir. 2004) ............................... 182, 184, 187, 194

*FTC v. Lanier Law, LLC*, 194 F. Supp. 3d 1238 (M.D. Fla. 2016) ................................ 208

*FTC v. Leshin*, 618 F.3d 1221 (11th Cir. 2010) ............................................... 180

*FTC v. LoanPointe*, 525 F. App'x 696 (10th Cir. 2017) .................................... 174

*FTC v. M&T Fin. Group*, 2018 WL 10834041 (C.D. Cal. June 8, 2018) ........................ 211

*FTC v. Medlab, Inc.*, 615 F. Supp. 2d 1068 (N.D. Cal. 2009) ........................................ 170

*FTC v. MyLife.com, Inc.*, 567 F. Supp. 3d 1152 (C.D. Cal. 2021) ................. 182, 184, 201

*FTC v. Mytel Int'l, Inc.*, 2022 WL 3350391 (Aug. 11, 2022) ........................................ 190

*FTC v. Nat'l Lead Co.*, 352 U.S. 419 (1957) .................................................... 205

*FTC v. Nat'l Urological Group*, 2017 WL 6759868 (N.D. Ga. Oct. 10, 2017) ..... 183, 185

*FTC v. Nat'l Urological Group, Inc.*, 2021 WL 5774177
(N.D. Ga. Sept. 30, 2021) ................................................................... 192

*FTC v. Natural Solution, Inc.*, 2007 WL 8315533 (C.D. Cal. Aug. 7, 2007) ................ 171

*FTC v. NHS Sys., Inc.*, 936 F. Supp. 2d 520 (E.D. Pa. 2013) ........................... 208

*FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994) ............................... 170, 171

*FTC v. Pointbreak Media, LLC*, 376 F. Supp. 3d 1257 (S.D. Fla. 2019) ..................... 208

*FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168 (9th Cir. 1997). ........................... 175

*FTC v. Publishers Bus. Servs., Inc.*, 821 F. Supp. 2d 1205 (D. Nev. 2010) .................. 174

*FTC v. Pukke*, 53 F.4th 80 (4th Cir. 2022) .............................................. 187, 191

*FTC v. QYK Brands LLC*, 2022 WL 3138761 (C.D. Cal. Apr. 6, 2022) ...................... 188

*FTC v. Ross*, 897 F. Supp. 2d 369 (D. Md. 2012) ........................................... 206

*FTC v. Ruberoid Co.*, 343 U.S. 470 (1952) .................................................. 205

*FTC v. Sec. Rare Coin & Bullion Corp.*, 931 F.2d 1312 (8th Cir. 1991) ..................... 189

*FTC v. Shkreli*, 581 F. Supp. 3d 579 (S.D.N.Y. 2022) ....................................... 209

*FTC v. Skybiz.com, Inc.*, 2001 WL 1673645 (N.D. Okla. Aug. 31, 2001) ................... 160

*FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009) ............................................................ 168

*FTC v. SuperTherm Inc.*, 2021 WL 3419035 (D. Ariz. Aug. 5, 2021) ... 202, 204, 206, 210

*FTC v. Tatto, Inc.*, 2014 WL 12571043 (C.D. Cal. Aug. 14, 2014) ............................... 211

*FTC v. ThinkAchievement Corp.*, 144 F. Supp. 2d 1013 (N.D. Ind. 2000) ............. 208, 210

*FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247 (S.D. Fla. 2007) ..................... 171

*FTC v. Trudeau*, 579 F.3d 754 (7th Cir. 2009) ............................................................. 187

*FTC v. Vemma Nutrition Co.*, 2015 WL 11118111 (D. Ariz. Sept. 18, 2015) .......... passim

*FTC v. Wellness Support Network, Inc.*, 2014 WL 3805755
   (N.D. Cal. Feb. 20, 2014) .......................................................................................... 211

*FTC v. Wetherill*, 1993 WL 264557 (C.D. Cal. June 10, 1993) ..................................... 208

*Goodman v. FTC*, 244 F.2d 584 (9th Cir. 1957) ................................................... 170, 172

*In re Koscot Interplanetary, Inc.*, 86 F.T.C. 1106 (1975) .............................. 158, 159, 161

*In re McLean*, 794 F.3d 1313 (11th Cir. 2015) ............................................................. 193

*In re: Amway Corp.*, 93 F.T.C. 618, 1979 WL 198944 (1979) ............................... 166, 167

*Irwin v. Mascott*, 370 F.3d 924 (9th Cir. 2004) ........................................................... 177

*Julia v. Swift Transp. Co.*, 2019 WL 7282025 (D. Ariz. Dec. 27, 2019) ....................... 194

*Liu v. SEC*, 140 S. Ct. 1936 (2020) ....................................................................... 190, 194

*McComb v. Jacksonville Paper Co.*, 336 U.S. 187 (1949) ............................. 180, 190, 191

*McConnell v. Wal-Mart Stores, Inc.*, 995 F. Supp. 2d 1164 (D. Nev. 2014) ................. 196

*McGregor v. Chierico*, 206 F.3d 1378 (11th Cir. 2000) ............................................ passim

*Nat'l Dynamics Corp. v. FTC*, 492 F.2d 1333 (2d Cir. 1974) ....................................... 169

*NLRB v. Laborers' Int'l Union of N. Am.*,  882 F.2d 949 (5th Cir. 1989) ..................... 181

*Noland v. Chua*, 816 F. App'x 202 (9th Cir. 2020) ......................................................... 90

*Noland v. Organo Gold Int'l, Inc.* 2019 WL 4576259 (D. Nev. Sept. 20, 2019) ............. 90

xiii

quoting *C. Howard Hunt Pen Co. v. FTC*, 197 F.2d 273 (3d Cir. 1952) ....................... 172

*Raishevich v. Foster*, 247 F.3d 337 (2d Cir. 2001) ............................................ 200

*Removatron Int'l Corp. v. FTC*, 884 F.2d 1489 (1st Cir. 1989) ..................................... 169

*Resort Car Rental Sys., Inc. v. FTC*, 518 F.2d 962 (9th Cir. 1975) .............................. 168

*Robbins v. Barnhart*, 205 F. Supp. 2d 1189 (D. Kan. 2002) ............................................ 196

*Sears, Roebuck and Co. v. FTC*, 676 F.2d 385 (9th Cir. 1982) ................................... 206

*SEC v. First City Fin. Corp., Ltd.*, 890 F.2d 1215 (D.C. Cir. 1989) .............................. 200

*Shillitani v. United States*, 384 U.S. 364 (1966) ............................................. 157, 176, 190

*Smith v. United States,* 568 U.S. 106 (2011) ................................................ 196

*Telebrands Corp. v. FTC*, 457 F.3d 354 (4th Cir. 2006) ........................................ 206

*Torres v. S.G.E. Mgmt., LLC*, 838 F.3d 629 (5th Cir. 2016) ............................................ 158

*United States v. Asay*, 614 F.2d 655 (9th Cir. 1980) ........................................ 176

*United States v. Ayres*, 166 F.3d 991 (9th Cir. 1999) ......................................... 2

*United States v. Com. Recovery Sys., Inc.*, 2016 WL 9244671
  (E.D. Tex. April 28, 2016) ................................................................... 211

*United States v. Dominguez-Mestas*, 687 F. Supp. 1429 (S.D. Cal. 1988) ................... 196

*United States v. Laerdal Mfg. Corp.*, 73 F.3d 852 (9th Cir. 1995) ................................ 203

*United States v. United Mine Workers of Am.*, 330 U.S. 258 (1947) ........................... 180

*United States v. Zaken Corp.*, 57 F. Supp. 3d 1233 (C.D. Cal. 2014) ......................... 194

*United States v. W.T. Grant Co.*, 345 U.S. 629 (1953) ....................................... 203

*Waltham Watch Co. v. FTC*, 318 F.2d 28 (7th Cir. 1963) ................................... 172

*Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776 (9th Cir. 1996). ............................... passim

**Statutes**

15 U.S.C. § 2301(3) .............................................................................. 173

15 U.S.C. § 45(a) ................................................................ 157, 158, 173

15 U.S.C. § 45(a)(2) .......................................................................... 174

15 U.S.C. § 45(n) ............................................................................... 173

15 U.S.C. § 53(b) ...................................................................... 157, 202

15 U.S.C. § 57b ..................................................... 157, 182, 193, 202

15 U.S.C. § 78u(d)(5) ...................................................................... 190

15 U.S.C. § 8404 ............................................................................... 201

28 U.S.C. § 1331 ............................................................................... 157

28 U.S.C. § 1337(a) .......................................................................... 157

28 U.S.C. § 1345 ............................................................................... 157

Pub. L. No. 93-637, 88 Stat. 2183 (1975) ........................................ 174

**Other Authorities**

9 J. Wigmore, *Evidence* § 2486 (J. Chadbourn rev. 1981) ............................ 196

S. Rep. No. 93-151 (1973) ............................................................... 174

**Rules**

Fed. R. Civ. P. 65(d)(2)(C) ............................................................. 177

**Regulations**

16 C.F.R. § 429 .................................................................................. 193

16 C.F.R. § 429.1 ............................................................................... 199

16 C.F.R. § 435 .................................................................................. 193

16 C.F.R. § 435.2(b)(1) ..................................................................... 194

16 C.F.R. § 435.2(d) .......................................................................... 196

37 Fed. Reg. 22934, 22937-38 (Oct. 26, 1972) ................................ 199

Plaintiff Federal Trade Commission ("FTC" or "Commission") submits these Pretrial Proposed Findings of Fact and Conclusions of Law in accordance with paragraph 6 of the Court's July 26, 2022 Order (Doc. 517).  The FTC reserves the right to amend these findings and conclusions to conform to the evidence as presented at trial, including to provide additional citations in support of the facts herein and to provide additional findings as necessary to address additional evidence adduced through cross-examination or offered in rebuttal.

## PROPOSED FINDINGS OF FACT

I.   **BACKGROUND**

   A.   **The "First Action" (No. CV-00-2260)**

   1.   **The FTC's 2000 Complaint Against Jay Noland**

1.   In 2000, the FTC sued Defendant James D. Noland, Jr. ("Jay Noland" or "Noland").  (First Action, Doc. 1.)

2.   In the First Action, the FTC alleged Noland deceptively promoted the "Bigsmart" pyramid scheme, in which participants purchased their own "internet malls" and received compensation for recruiting others to do the same.  (First Action, Doc. 1 ¶¶ 6-7, 11-24.)

3.   The FTC also alleged Noland misrepresented that "many persons who become Bigsmart members will make substantial amounts of money" and that "almost everyone will make some money."  (First Action, Doc. 1 ¶¶ 22, 24.)

   2.   **The Court's 2002 Permanent Injunction**

4.   To resolve the First Action, Noland stipulated to entry of a permanent injunction against him, which the Court entered on July 1, 2002.  (First Action, Doc. 66 (Ex. 1); the "2002 Noland Order.")

5.   Among other things, the 2002 Noland Order prohibits Noland and persons in "active concert or participation" with him from:  (1) operating a "prohibited marketing scheme" (including a pyramid scheme), (2) making any "false or misleading statement

. . . of material fact" in connection with a multilevel marketing program, and (3) failing to take "reasonable steps" to monitor compliance with the Order, including by investigating and resolving consumer complaints.  (Ex. 1 at 3-4, 6-7.)

### 3.    The FTC's Contempt Allegations

6.    On January 17, 2020, the FTC lodged its Motion for Order to Show Cause why Jay Noland should not be held in contempt of the 2002 Noland Order.  (First Action, Doc. 74.)  The motion was filed on February 6, 2020.  (First Action, Doc. 78.)

7.    The FTC argued Noland violated the 2002 Noland Order by, *inter alia*, (1) operating a prohibited marketing scheme, (2) making false and misleading statements about consumers' earnings, and (3) failing to monitor compliance with the Order and to investigate and resolve consumer complaints.  (First Action, Doc. 78.)

8.    In response to the FTC's show-cause motion, Noland submitted declarations from Scott Harris and Thomas Sacca, in which they swore that Noland "advised" them of the "2002 Permanent Injunction entered against him and of the limitations imposed by that Injunction."  (Ex. 39 ¶ 4; Ex. 40 ¶ 4.)  The declarations showed Harris and Sacca had notice of the 2002 Noland Order.

9.    On April 10, 2020, the FTC moved for an order to show cause why Harris and Sacca, too, should not be held in contempt.  (First Action, Doc. 91.)

10.    On July 6, 2020, the Court granted, in relevant part, the FTC's show-cause motions.  (First Action, Doc. 101.)

### 4.    The Court's Order Holding Noland, Harris, and Sacca in Contempt and Reserving Some Issues for Trial

11.    On June 23, 2021, the FTC moved for civil compensatory contempt sanctions against, *inter alia*, Noland, Sacca, and Harris for violating the 2002 Noland Order.  (First Action, Doc. 106.)  The FTC argued that the Court need not hold an evidentiary hearing before making a finding of contempt where the alleged contemnors do not "present any arguments which create[] any material issue of fact."  (First Action, Doc. 106 at 5 (quoting *United States v. Ayres*, 166 F.3d 991, 996 (9th Cir. 1999)).)

12.     On March 22, 2022, the Court granted in part and denied in part the FTC's contempt motion.  (First Action, Doc. 130.)

13.     The Court found Harris and Sacca worked in "active concert" with Noland and therefore were bound by the 2002 Noland Order.  (First Action, Doc. 130 at 7.)

14.     The Court found the FTC had established, by clear and convincing evidence, that Noland, Harris, and Sacca, through their "VOZ Travel" scheme, violated Section I (barring certain marketing schemes), Section II (barring misrepresentations), and Section III (barring the distribution of means and instrumentalities to violate Section II) of the 2002 Noland Order.  (First Action, Doc. 130 at 7.)

15.     The Court also held that Sections I-III of the 2002 Noland Order were valid and that Defendants had the ability to comply with them.  (First Action, Doc. 130 at 7-8.)

16.     The Court further found that the FTC had established, by clear and convincing evidence, that Noland, Harris, and Sacca violated the 2002 Noland Order's "compliance-related obligations"—*e.g.*, to "investigate and resolve promptly any consumer complaint."  (First Action, Doc. 130 at 8.)

17.     The Court added that, because Noland stipulated to the Order, and gave Harris and Sacca notice of it, they were "precluded from arguing that the relevant [Order] provisions are vague and ambiguous."  (First Action, Doc. 130 at 8.)

18.     As for Defendants' Success By Health ("SBH") scheme, the Court wrote that the FTC had not established, "at least at this stage," that the Contempt Defendants *also* violated the 2002 Noland Order "in the course of operating SBH" because there remained "triable issues of fact."  (First Action, Doc. 130 at 9.)

19.     The FTC moved for reconsideration (First Action, Doc. 131), and the Court acknowledged its analysis of whether SBH was a "prohibited marketing scheme" under Section I of the 2002 Noland Order "fail[ed] to address the FTC's arguments concerning the difference between how the term 'pyramid scheme' is defined under Ninth Circuit law and how the term 'prohibited marketing scheme' is defined in the permanent

3

injunction."  (First Action. Doc. 134 at 3.)  The Court reserved that decision for trial. (*Id.*)

20.     The Court subsequently consolidated the First Action with this matter (Doc. 516) and scheduled a trial to resolve both actions. (First Action, Doc. 134 at 3; Doc. 517.)

**B.     The FTC's 2020 Lawsuit (the "Second Action") (No. CV-20-0047)**

**1.     The FTC's Complaint**

21.     On January 8, 2020, the FTC sued Noland and others, alleging, *inter alia*, that they made false and misleading statements to promote their "Success By Health" ("SBH") pyramid scheme in violation of Section 5 of the FTC Act.  (Doc. 3.)

22.     The FTC also alleged Defendants violated the FTC's Merchandise Rule, 16 C.F.R. § 435, and Cooling-Off Rule, 16 C.F.R. § 429, by not offering and providing required refunds.  (Doc. 3.)

23.     On September 23, 2020, the FTC filed its Second Amended Complaint, alleging Defendants made false and misleading statements to promote another pyramid scheme:  VOZ Travel.  (Doc. 205.)

**2.     The Court's Temporary Restraining Order and Preliminary Injunction**

24.     On January 13, 2020, the Court entered a Temporary Restraining Order, including appointment of a receiver over the Corporate Defendants, after finding "good cause to believe" SBH was an "illegal pyramid scheme" and that Defendants had promoted SBH by "[f]alsely representing that [SBH members] are likely to earn substantial income."  (Doc. 21 at 2, *as amended*, Doc. 38 at 2.)

25.     On February 12, 2020, the Court held a full-day evidentiary hearing on the FTC's request for a preliminary injunction.  (Doc. 86.)

26.     On February 27, 2020, the Court imposed a preliminary injunction.  (Doc. 106.)  The Court found the FTC likely to prevail based on "compelling evidence" that "Defendants are operating a pyramid scheme [SBH] and . . . engaged in deceptive practices."  (*Id.* at 29.)  Specifically, the Court found "Defendants don't dispute that the first element [of the two-step pyramid scheme test] is satisfied," and found "ample

evidence that SBH meets the second." (*Id.* at 11.)  The Court found Defendants' income claims "were false," material, and "likely to mislead consumers." (*Id.* at 25.)

**3.    The Court's Partial Grant of Summary Judgment**

27.    On March 12, 2021, the FTC filed its Motion for Summary Judgment as to Liability.  (Doc. 285.)

28.    On September 9, 2021, the Court granted in part the FTC's Motion for Summary Judgment.  (Doc. 406.)  The Court found there was no genuine dispute of material fact that (1) VOZ Travel was a pyramid scheme, (2) Defendants promoted VOZ Travel using false claims that consumers could reasonably expect to earn substantial income, and (3) Defendants provided the means and instrumentalities for others to violate the FTC Act by promoting VOZ Travel.  (Doc. 406 at 35-37, 43-44, 48.)

29.    The Court also found no genuine dispute of material fact that Defendants had violated the FTC's Merchandise Rule and Cooling-Off Rule.  (Doc. 406 at 50-52.)

30.    The Court found Corporate Defendants acted as a common enterprise (at least for purposes of the case against the Individual Defendants) and that the Individual Defendants, having "admit[ted] to having both control over and knowledge of the conduct of the Corporate Defendants," were individually liable for the Corporate Defendants' unlawful acts.  (Doc. 406 at 52-54.)

31.    As to SBH, the Court found the FTC presented a "mountain of evidence demonstrating that SBH's structure, incentives, policies, and the repeated statements of the Individual Defendants were all focused on getting Affiliates to recruit new members." (Doc. 406 at 37-38.)  Nevertheless, the Court, citing a set of declarations from former SBH affiliates (which the Court found had "credibility questions" that could not be resolved at summary judgment), found a "triable issue of material fact" as to whether SBH was a pyramid scheme and whether Defendants made misrepresentations about SBH members' potential income.  (Doc. 406 at 40, 46.)

32.    Although the Court first stated that there would be no need for a trial on whether SBH was a pyramid scheme (Doc. 407 at 1), the Court later wrote that "one of

the issues that will need to be addressed [at trial] is whether SBH qualifies as a pyramid scheme as that term is defined by Ninth Circuit law."  (First Action, Doc. 134 at 3.)

### 4.    Stay of Proceedings as to Corporate Defendants

33.    On February 17, 2022, the Court stayed the FTC's claims against the Corporate Defendants (Success By Media, LLC, Success By Media, Holdings, Inc., and Enhanced Capital Funding).  (Second Action, Doc. 473 at 14.)

### C.    The Parties

34.    Defendant Success By Media Holdings, Inc. ("SBM Holdings"), also doing business as SBH and Success By Media, is a Nevada corporation.  (Ex. 49; Doc. 222 ¶ 1 (admitting Doc. 205 ¶ 6).)

35.    Defendant Success By Media, LLC ("SBM LLC"), also doing business as SBH and Success By Media, is a Nevada limited liability company.  It is a subsidiary of SBM Holdings.  SBH was also an unincorporated division of SBM  LLC.  (Doc. 222 ¶ 1 (admitting Doc. 205 ¶ 7).)

36.    Defendant Enhanced Capital Funding ("ECF") is a Nevada corporation. (Doc. 222 ¶ 1 (admitting Doc. 205 ¶ 8).)

37.    Defendant Jay Noland ("Noland") was a director, the CEO and majority shareholder of SBM Holdings and a manager and CEO of SBM LLC.  (Ex. 48 at 2, 5, 7-8 (manager); Ex. 279 at 7 (CEO), 9, 11 (shareholder), 23.)  He described himself as SBH's CEO.  (Ex. 3 at 10; *see also* Doc. 222 ¶ 5 (admitting in relevant part Doc. 205 ¶ 10).)

38.    Noland was ECF's sole owner, director, officer, and employee.  (Ex. 316 at 2, 12.)

39.    Defendant Lina Noland (Jay Noland's wife) was a director of SBH Holdings and a manager of SBM LLC.  (Ex. 48 at 2, 5, 7-8; Ex. 49 at 2.)  She described herself as a "Co-Owner at Success By Health."  (Ex. 156.)  Lina Noland supervised SBH's product shipping and customer service.  (L. Noland Dep. Tr. (12/16/20) at 20:6-21:8, 33:3-5; *see also* Doc. 222 ¶ 5 (admitting in relevant part Doc. 205 ¶ 11).)

40.    Defendant Scott Harris ("Harris") served as a senior field advisor and as

president of SBM LLC and SBH.  (Doc. 222 ¶ 5 (admitting in relevant part Doc. 205 ¶ 12).)  Harris also served as president of SBM Holdings as of May 2019.  (Ex. 333.)  Harris was on the board of SBM Holdings.  (J. Noland Dep. Tr. (12/14/20) at 46:5-47:4.)

41.    Defendant Thomas Sacca ("Sacca") served as senior field advisor, chief sales officer, and "chief visionary officer" of SBM LLC and SBH.  (Doc. 222 ¶ 5 (admitting in part Doc. 205 ¶ 13).)

## II.    THE SUCCESS BY HEALTH PYRAMID SCHEME

42.    As described below, Defendants lured consumers into SBH with promises that joining would lead to "financial freedom" or, at a minimum, substantial income sufficient to replace, or meaningfully supplement, their job income.  (*See infra* ¶¶ 43-120.)  Once consumers became SBH "affiliates," Defendants emphasized recruiting and excessive product purchases, rather than sales to product users, as the key to financial success.  (*See infra* ¶¶ 134-372.)  Defendants pressured affiliates to attend expensive "training" events if they wanted to attain financial freedom.  (*See infra* ¶¶ 373-425.)  At the end of the day, Defendants' promises were false:  affiliates did not, and could not, attain anywhere near the level of success claimed by Defendants.  (*See infra* 426-520.)

### A.    Defendants Promised Consumers Substantial Income.

43.    Defendants promised consumers financial success in four related ways: (1) offering "financial freedom," or other lucrative rewards, to those who followed their instructions (*see infra* ¶¶ 44-76), (2) telling consumers they would achieve the same (fictitious) wealth as Jay Noland if they followed his instructions (*see infra* ¶¶ 77-94), (3) touting the purported success of Noland's prior students (*see infra* ¶¶ 95-108 ), and (4) promising consumers that even if they did not want to push for "financial freedom," they could still earn hundreds or thousands of dollars per month (*see infra* ¶¶ 109-120).

#### 1.    Defendants Promised Prospective and Current SBH Affiliates "Financial Freedom" or Other Financial Rewards.

##### a.    Promises of "Financial Freedom"

44.    Defendants told current and prospective SBH affiliates there were three

types of affiliates—those looking to:  (1) supplement their income, (2) "replace [their] income (no more job)," and (3) obtain "financial freedom."  (Ex. 3 at 33.)

45.     Defendants told affiliates that the choice of what type of affiliate to be is "yours" (Ex. 3 at 33), but that if they chose to seek financial freedom (*i.e.*, be a #3) and "pa[id] close attention," they would "be able to get out of that job in about six months" and attain financial freedom in 18 months.  (Ex. 54 at 9:5-9; Ex. 84 at 41:2-9.)

46.     Noland also told affiliates they could have a "reasonable expectation" of replacing their job income in six months by being "result-oriented and focused," adding if they "just applied [his system], without fail, you should be able to be finally free in 18 months."  (Ex. 72 at 7:23-8:6.)

47.     The Court previously found:  "The Individual Defendants frequently made representations about SBH's potential to generate residual income for Affiliates and how such income could create 'financial freedom," citing (Doc. 406 at 13):

  a.  "You cannot get free unless you make residual income."  (Ex. 84 at 12:10-15.)

  b.  "Who in this room would like to be free?  Right?  Have financial freedom, do what you want, when you want, where you want?"  (Ex. 84 at 12:21-13:3).)

  c.  "Y'all got to just listen to me.  Because in this room tonight, it's going to be somebody that walks in for the first time, 18 months from now will never have to work again."  (Ex. 84 at 41:2-9.)

  d.  "[Y]ou listen to me and you listen to our top leadership council and our top leaders that are developing with SBH, you're going to be able to get out of that job in about six months if you pay close attention."  (Ex. 54 at 9:5-9.)

### b.     Meaning of "Financial Freedom"

48.     On summary judgment, the Court found Defendants "repeatedly indicated" "financial freedom" "represented a level of income beyond merely being able to quit a job."  (Doc. 406 at 14.)  The Court cited the following examples:

a.   "[D]uring one training," the Court wrote, "Noland contrasted a person who would 'just rather, you know, supplement or replace my income' with 'financial freedom, high-level leader, *multimillionaire* stuff.'"  (Doc. 406 at 14 (quoting Ex. 108 at 13:19-14:3) (emphasis added by Court)).)

b.   The Court pointed to three types of people who participate in SBH: "supplementers," "income replacers," and "financial freedom seekers." (Doc. 406 at 14 (quoting Ex. 16 at 67); *see infra* ¶¶ 109-120.)  The Court explained:  "The ordering of the types—one, two, three—implies that each is greater than the last.  Type two, a job income, is greater than type one, supplemental income.  The implication is that whatever type three is, it is greater than a job income."  (Doc. 406 at 14.)

c.   The Court added that "the Individual Defendants visually emphasized this point during their training videos," (Doc. 406 at 14), and re-produced the following image from one training video (Ex. 350-85 at 5:10):



49.   At a minimum, the Court found, "financial freedom" meant earning income greater than one's current job income.  (Doc. 106 at 22.)

50.   Defendants described "financial freedom seekers" as those who want to "live the Life of Their Dreams.  They don't want to settle for average."  (Doc. 406 at 9 (Ex. 10 at 8), *cited at* Doc. 406 at 9 (as Doc. 8-5 at 30).)

51.     On an early SBH "Heat" conference call, Noland explained:  "I'm talking about financial freedom, where you just do not have to work again and money keeps coming in, over and over and over again."  (Ex. 346 at 13:9-16; *see also* Ex. 84 at 13:1-3.)  Later, he explained "financial freedom" meant, at a minimum, a perpetual stream of $20,000 monthly payments:  "[W]hen we talk about financial freedom, independence, and wealth, . . . [w]e got to get to that [$]20,000-plus a month coming in consistently. Whether you work or not, here comes [$]20,000 every month."  (*Id.* at 14:4-8; *see also* Ex. 74 at 53:3-16 ("Some people in this room, 12 months.  That's the fastest I've had it done.  Complete time and money freedom. . . . Never have to work again.  Ever.  No less than [$]20,000 a month.").)

52.     On another SBH Heat call, Noland defined "financial freedom" as "[n]ever, ever, ever having to work again, and having executive-style income, minimum six figures per year, whether you work or not, for the rest of your life. . . . [People seeking financial freedom] want to spend the majority of their years doing what they want to do, living their dreams, exploring the world, having all the things that most people will never even touch. . . . I'm talking about six figures, maybe even seven figures, per year . . . . [A]nd it just keeps coming in, and you don't do any work that day."  (Ex. 349 at 9:4-10:2.)

53.     Former SBH affiliate Jason Johnson testified that financial freedom was "never having to worry about money and having residual income, and, therefore, having the time to do what you want any time you want."  (Johnson Dep. Tr. at 147:21-148:2.)

54.     Former SBH affiliate Jason Underhill testified "financial freedom" was to be "[w]here you wouldn't have to work again; you could just live the life that you want to live, wouldn't have to worry about money."  (J. Underhill Dep. Tr. at 38:13-20.)

### c.     Promises of Other Lucrative Rewards

55.     Defendants admit using images of yachts and cars, piles of cash, and exotic vacations to promote consumers' potential financial earnings.  (Doc. 222 ¶1 (admitting Doc. 205 ¶¶ 50(b), 52 ("marketing materials feature images of luxury yachts and cars, piles of cash, and exotic vacations.").)  The following screenshots, for example, are from

one of Defendants' promotional videos (Ex. 350-84 at 0:41-0:51):



56.     Noland admitted he referred to the ability to buy luxury goods and services, instead of using specific numbers, to avoid government scrutiny.  (Ex. 51 at 75:1-8 ("[T]he Government told me, this little country boy, I'm telling you, they called me up. They delivered me paperwork, and they said you cannot tell people how much you make . . . . I said, no problem . . . . So what we started doing is instead of telling people how much we make, we just go, okay, last week, I made enough to buy that Maserati cash.").)

57.     Defendants, in fact, instructed affiliates to avoid making what Defendants called "income claims" by instead referring to "lifestyle enhancements."  (Ex. 4 at 5.)  On one conference call, for example, Harris told affiliates not to make "income claims," but instead to say that that they had been "able to make [their] credit card payment or house payment" or "walk away" from their jobs.  (Ex. 99 at 8:12-22.)

58.     On a conference call, Noland told affiliates that they could not "say *exact* income to recruit," but that they could say that one affiliate made more money in two weeks than most people make in 4-5 months.  (Ex. 76 at 24:17-25:11 (emphasis added).)

11

59.     In one SBH-produced recruiting video, the narrator asked consumers to "[i]magine taking back control . . . of your time, cash flow, and quality of life.  You know . . . [t]hose people driving the finest cars, living in the nicest neighborhoods.  Chances are they own their own business and they own their life.  The good news is, you can too." (Ex. 52 at 8:13-9:12.)

60.     At Defendants' SBH "Wealth Warriors Bootcamp" training event, Noland offered attendees the opportunity to "get paid like a professional athlete" through "RESIDUAL INCOME" via SBH.  (Ex. 21 at 9.)

61.     Noland called SBH a "literal golden goose," and "perpetual money and health machine," that would make affiliates millions of dollars.  (Ex. 67 at 10:3-5.)

62.     Defendants' written training materials touted affiliates' "UNLIMITED income" potential, adding that you can "earn as much money as you want."  (Ex. 13 at 4.)

63.     Defendants' "Prospecting System" instructed SBH affiliates, using the visual below (Ex. 4 at 10), to ask a recruit how much money the recruit wants to make and then to say that they can make exactly that much.

## PROSPECTING SYSTEM
### (4 CLOSING QUESTIONS)

1.     "Now, how much money would you need to make on a monthly basis, for this business to be worth your time?"

2.     "How many hours per week could you put towards working your SBH business in order to get to $_____ / month?"

3.     "How long (months or years) would you be willing to work _____ hours per week to reach $_____ / month?"

4.     "If I could show you how to get to $_____ / month working _____ hours per week for _____ months, you'd be ready to getting going, wouldn't you?"

**IMPORTANT: Give 2 quick examples of "How We Make Money."**

A.  RETAILER- Show 100 Customer Example (100 x 3 boxes of product/mo/cust at $45 profit per customer = $4,500 per month, $54,000/yr)
B.  RECRUIT- 6 Tier Example at just 6 bags per week per Affiliate (10 Referring 10 and so forth...) ($500 / $3,500 / $23,500 / $173,500 / $1,173,500/mo)

64.     Noland repeatedly vowed to create "1,000 millionaires" in SBH.  (Ex. 60 at 18:16-22, *cited at* Doc. 406 at 15; Ex. 58 at 28:10-21; Ex. 136; Ex. 59 at 39:22-40:9 ("I want a thousand real millionaires. . . . I want 2,000 millionaires, when they reach retirement they've got a million dollars, a year, coming in, not from the stock market, but from coffee that people re-order . . . ."; Ex. 59 at 44:6-11 ("I'm going to create a thousand millionaires that make a million dollars residual income a year.").)

65.     Noland referred to many videos he posted to Facebook as "Millionaire Mentorship." (Anticipated Testimony of Adam Rottner.)  In one, he told his audience to each type, "I'm going to be a millionaire through SBH." (Ex. 56 at 13:17-18.)  Close to 100 did so, including Defendant Sacca, who wrote, "Millionaire thru SBH!! Guaranteed!" (Anticipated Testimony of Adam Rottner; Ex. 135 at 4, *cited at* Doc. 406 at 15.)

66.     In a 2018 video, "How to be a MILLIONAIRE in SBH," Noland stated, "You will be a millionaire if you apply this training, you're going to be a millionaire. You can go look in the mirror and say I'm going to be a millionaire if I apply the training that Jay Noland just gave me."  (Ex. 71 at 13-21, *cited at* Doc. 406 at 15.)

67.     Noland told attendees at Defendants' "ICON" event—at which all attendees were SBH affiliates (Ex. 105 at 9:8-11:5)—that he was training them not just for "financial freedom," but to make "tens of millions of dollars:"  "If you can't take that, you got to go.  You got to go. . . . If that's too heavy . . . , I would definitely go."  (Ex. 105 at 9:7.)  Noland later said:  "I'm not here to train you to make a million dollars. What am I training you to do so? . . . Tens of millions."  (Ex. 112 at 15:19-16:2.)

68.     At another training, Noland told affiliates:  "If I'm sitting down, working with you personally, . . . I know within three years, if you listen to me, I'm going to make you a millionaire."  (Ex. 62 at 20:23-21:11, *cited at* Doc. 406 at 15.)

69.     During Defendants' October 2018 "MVP" event, Noland told the all-SBH affiliate audience (Ex. 148):  "Y'all going to be rich.  Don't worry about it.  I'll make you a millionaire.  Y'all got that?  You three, I'm going to make you millionaires.  Boom."

(Ex. 74 at 28:19-24, *cited at* Doc. 406 at 15 (as Doc. 288-8).)  He added:  "[Y]a'll going to see me go do billions and create multi-multi-multi-millionaires.  So they're all going to make at least several million. . . . Some of y'all can be hanging around the flame and make you a few million.  That's cool."  (*Id.* at 29:8-13, *cited at* Doc. 406 at 15.)  Noland added that an affiliate "can put in 18 months and get out [$]100,000 a month."  (Ex. 75 at 13:23-14:3, *cited at* Doc. 406 at 15 (as Doc. 288-9 at 5).)

70.     At the same "MVP" event, Noland asked those who had spent their adult life working a standard job, but fell short of "financial freedom":  "What if you could get to just [$]50,000 a month at 18 months?  But it never stops . . . .  What if your kids and your grandkids could get paid from Success By Health?  How would that feel?"  (Ex. 75 at 18:3-19:7.)  Later, Noland approved of an attendee's statement that, "[I]f I work the plan for 18 months, I will never have to work for 40 years like . . . some of the people in this room did and don't have freedom."  (*Id.* at 23:1-5.)

71.     Harris told one SBH affiliate by text message:  "You'll make $100k+ in 2018."  (Ex. 280, *cited at* Doc. 406 at 15.).  (Seven months later, the affiliate updated Harris:  "Before I go for a payday loan, do you know anyone that would take [my personal property] as collateral for a $1200 loan?  I am still hustling to recover what I invested and I need to make some payments . . . ."  (Ex. 285.).)

72.     Harris messaged another SBH recruit that he wanted "serious guys who want to make $100K a month in 3 years or less," adding, "[m]illions will be made" and that recruits needed just "10 hours per week to replace one's job income."  (Ex. 284.)

73.     Sacca messaged a recruit that it "literally only takes 2-3 folks catching the vision to create millions!!" (Ex. 281, *cited at* Doc. 406 at 15.)

74.     The Court infers that if Defendants had not intentionally destroyed emails and text messages, there would be more evidence of their promising substantial income to affiliates and recruits. (Doc. 401 at 24-27 (entering adverse inference sanction); *see infra* ¶¶ 738-755 (describing document destruction).)

75.     Former affiliate Kaci Wood recalled Noland saying that if "you listened to him that you would" make $1 million per month:  "If you did exactly what he said, went out and got your ten people to buy the packages to be a part of the company and continue to do that, they did the same thing, that that was how you would get that way."  (Wood Dep. Tr. at 78:23-79:6.)

76.     Former affiliate Stephanie Underhill confirmed Noland "would tell us that in six months we would be able to quit our jobs.  And, actually, that was encouraged, to quit your job and put it all into Success By Health, to just put your all in there, work hard, and your income potential . . . would be unlimited." (S. Underhill Dep. Tr. at 72:1-9.)

### 2.     Defendants Touted Noland's (Fictitious) Wealth as Attainable for Affiliates.

77.     Defendants repeatedly used Jay Noland's purported wealth to both recruit new affiliates and convince existing ones to spend more money.  (*See infra* ¶¶ 78-94.)

78.     At one recruiting event, for example, Noland rhetorically asked:  "Jay, just please tell me how you created a financial freedom life to where your son before he was born was already retired?  And his kids are retired, and his kids' kids are retired?  I'm now working on my fourth generation. . . . [I]t's going to be somebody that walks in here for the first time, 18 months from now will never have to work again."  (Ex. 84 at 40:15-19), *cited at* Doc. 406 at 16.)

79.     At the same event, Noland, now 54, claimed he had been "financially free, completely time and money free since I was 36" (in 2005), and had not "had to work a job . . . since I was 27," "due to this thing called residual income."  (Ex. 84 at 14:19-23, *cited at* Doc. 406 at 16; J. Noland Dep. Tr. (12/14/20) at 9:11-13 (Noland born in 1968).)

80.     Noland made effectively the same claim on an early SBH "Heat" conference call, claiming that as of 2004 (when he was 36 years-old), he already "had reached complete time and money freedom" and had been "generationally set-up for a long time." (Ex. 350-93 at  24:20.)

81.     Noland told another audience he had "made more [money] than most

people will make in 10 lifetimes, or maybe even 20."  (Ex. 55 at 7:25-8:7.)

82.    Noland said he owned houses and warehouses in places like Colombia, Hong Kong, London, and Panama.  (Ex. 70 at 21:3-5 ("I got an office in Colombia.  We have a home there, too.  South America."); Ex. 98 at 17:14-15, 4:16-5:11 (Noland referring to he and Lina Noland's "house over in Colombia" and identifying a house he purchased in Panama in 2012, while describing potential purchase of another Panamanian "oceanfront lot[]"); Ex. 69 at 16:20-24 (Noland:  "When you pay your 49 bucks [to become an SBH affiliate], it's as if you put up the [$]10 million, because now you have the whole infrastructure that I've got.  So my warehouse in London, my warehouse in Colombia, my warehouse in Hong Kong, that's now part of your infrastructure."); *see also* Doc. 406 at 16 (Court finding:  "Noland also stated that he owned houses and warehouses in places such as Colombia, Hong Kong, London, Panama, and Uruguay.").)

83.    At one "training" event for SBH affiliates, Noland claimed to have rejected multiple $100,000 speaking gigs because they were inferior to his "residual income." (Ex. 89 at 7:20-8:8.)

84.    At another "training" event, Noland claimed to have given away "a couple million per year" to family, friends, and others, adding that he did not "even feel it, though" because he had "freedom."  (Ex. 74 at 36:18-37:5, *cited at* Doc. 406 at 15-16.)

85.    At yet another event, Noland explained he could "lay down here today and not say another word," "go to sleep," and still "make more in 24 hours than most people make in two or three months."  (Ex. 112 at 11:25-12:6.)

86.    Noland regularly attributed his wealth to the "residuals" he received from prior multilevel companies.  (*E.g.*, Ex. 84 at 16:10-17:5.) ("I'm telling y'all as I'm talking to you right now, I'm making money.  If I lay down and got to sleep, I'm making money. Every night I sleep, I got money coming in. . . . Over 2 million people are part of my team.  And every time they do something, I make some money.").)

87.    SBH affiliates confirmed the obvious:  Noland's boasts of tremendous

wealth enticed them both to join SBH and to continue to pour money into the program. (*See infra* ¶¶ 88-93.)

88.     Former SBH affiliate Jason Johnson testified he and others were "pushed" into the company by Noland's "whole spiel; that he's a millionaire maker, he owns all these properties, all these vehicles, has generational wealth." (Johnson Dep. Tr. at 92:24-93:16.) Johnson added that he "got into [SBH]" because Noland said that he was "fabulously wealthy because this is what he did and he trained people to do the same thing." (Johnson Dep. Tr. at 94:16-24.)

89.     Johnson also explained that Noland "never put a number on" his wealth, but instead talked about "properties and houses and things that he's owned" while also referencing "generational wealth"—*i.e.*, that his "kids' kids' kids' kids would never have to worry about anything financially." (Johnson Dep. Tr. at 142:18-143:9.)

90.     Former SBH affiliate Krystian Sarzynski recalled hearing Defendants say Noland "owned multiple houses, and that he can afford anything, that he can buy his wife anything, . . . constantly talking about his own lifestyle and what he's able to do; and that if you trust him and if you commit fully to Success By Health, that that's what awaits you." (Sarzynski Dep. Tr. at 73:7-18.) He added that Noland said multiple times "he owned multiple homes and that he could buy and purchase any home he [wanted]" and that Noland claimed to have "generational wealth . . . that his kids' kids and kids of their kids . . . will never have to work a day in their life." (*Id.* at 75:15-19, 77:6-13.)

91.     Former SBH affiliate Kaci Wood testified Noland "portrayed his lifestyle as owning multiple homes and traveling a lot and living in – in excess and – and encouraged us that if we wanted to be like him, to listen to him to do the same." (Wood Dep. Tr. at 127:22-128:4.)

92.     Former SBH affiliate Stephanie Underhill recalled Noland calling himself the "millionaire maker" and saying he "owned homes, he took elaborate vacations" and "could travel anywhere he wanted." (S. Underhill Dep. Tr. at 69:16-70:3.) Underhill

testified that Harris confirmed Noland "was a millionaire" and that if affiliates "put in the hard work, we would be just as wealthy as him."  (*Id.* at 71:8-19.)

93.     Former SBH affiliates repeatedly testified they would not have joined SBH, stayed in SBH, purchased product packs, attended events, or even quit their jobs if they had known Noland was lying about this wealth.  (Johnson Dep. Tr. at 143:19-146:12, 170:13-17; Sarzynski Dep. Tr. at 74:18-78:7; S. Underhill Dep. Tr. at 76:22-78:15; J. Underhill Dep. Tr. at 38:21-40:18.)

94.     As described *infra* ¶¶ 439-457, Defendants' claims were all lies.  Noland cannot remember when he ever had a positive net worth, owns no real property, and, during much of the time he claimed to be financially free, he was "living on credit cards."

### 3.     Defendants Touted the Purported Wealth of Noland's Students.

95.     Defendants not only explained that SBH affiliates could achieve the same level of wealth as Noland, but claimed that some of Noland's former students had done just that.  (*See infra* ¶¶ 96-108.)

96.     Defendants ubiquitously referred to Noland as the "Millionaire Maker." (Doc. 222 ¶ 1 (admitting Doc. 205 ¶ 46:  "Defendants also frequently tell SBH Affiliate and recruits that Jay Noland is the 'Millionaire Maker' and has trained many millionaires in past multilevel marketing programs."); Ex. 207 at 2; *see supra* ¶¶ 88,92.)

97.     In one video post, Noland asserted that his past students owned "Lamborghinis; Rolls Royces; Bentleys; multimillion-dollar homes in single-, double-, and trip[le]-gated communities.  Bahamas trips, Bali.  Oh, man.  All that stuff they've been hoping and dreaming for, it came."  (Ex. 56 at 22:5-11, *cited at* Doc. 406 at 16-17.)

98.     At Defendants' "RED" 2018 event, Noland said:  "I literally have helped so many people make millions and millions, stupendous amounts of millions of dollars . . . . I've taken people off the street corner, selling furniture, and helped them make over a million a month . . . . I've had people sleeping in their car get up to 2- or [$]300,000 a month . . . ."  (Ex. 65 at 16:19-17:6, *cited at* Doc. 406 at 17.)

99.     At Defendants' "MVP" 2018 event, Noland said some of his prior trainees

in the "coffee game" had achieved "[c]omplete time and money freedom" in only "12 months."  (Ex. 74 at 53:3-11, *cited at* Doc. 406 at 17.)  Those people, Noland added, "[n]ever have to work again.  Ever.  No less than [$]20,000 a month."  (*Id.*)

100.    At Defendants' "ICON" 2019 event, Noland told attendees that they were in a "19-year-in-the-making training" "[t]hat has already produced billions . . . of dollars in revenue.  Multi-millions of team members have come before you came.  And here you sit, ready to be an Icon."  (Ex. 105 at 8:3-13.)

101.    In a set of talking points for "SBH Blitz Calls," Harris told affiliates to say, "Mr. Noland is known as the 'Millionaire Maker.'  He's created many 6 Figure earners in the Direct Sales Industry!  Some of his students have even earned in excess of $1M a month and many have earned over $1M a year."  (Ex. 207 at 2, *cited at* Doc. 406 at 17.)  Harris forwarded the script to Noland.  (*Id.*)

102.    On one video posted to Facebook, Harris told affiliates:  "Believe.  Mr. Noland is the real deal.  I've watched it for 23 years with my own eyes.  I've watched his students go out and have the lifestyles of the rich and famous.  If his students got that lifestyle, what do you think his has been like over the last 10, 15, 20 years?  Guys, it's ridiculous, right?"  (Ex. 86 at 31:12-18.)

103.    Noland instructed SBH leaders to recruit people by saying Noland "taught 30 People to make $50k or more a month within 3 years.  50 to make $20k or more a month within 3 years."  (Ex. 283.)

104.    The Court previously found that Defendants told recruits (falsely, *see infra* ¶¶ 427-437) that "several people" are "achieving Financial Freedom already with our company."  (Doc. 406 at 13-14 (citing Exs. 11, 12); Doc. 222 ¶ 1 (admitting Doc. 205 ¶ 45); Doc. 106 at 23-24 & n.22.)

105.    Defendants also told recruits (falsely) that SBH was "helping *thousands* of people supplement or replace their current income."  (Exs. 11, 12 (emphasis added).)

106.    Former SBH affiliate Krystian Sarzynski recalled Jay Noland telling SBH

affiliates that they could make "a million a month, similar to his students, but more." (Sarzynski Dep. Tr. at 67:18-68:19.)

107.   Former SBH affiliate Kaci Wood testified Noland claimed "he had trained people to earn a million dollars a month."  (Wood Dep. Tr. at 74:2-9.)  Wood added that she "thought that [Noland] knew what he was talking about, because he told us that he was the millionaire maker and that if we followed his plan and what he told us to do that we would become millionaires or make a million dollars a month.  Those are all his phrases."  (Wood Dep. Tr. at 29:3-12.)

108.   As discussed *infra* ¶¶ 458-462, the statements above were all lies.  Noland, in an interrogatory response, could only identify *four* past students who he claimed earned even $22,000 per month, and he has provided no admissible evidence to support even that comparatively modest claim.

### 4.   Defendants Promised Substantial Income to Affiliates Who Chose Not to Pursue Financial Freedom.

109.   As explained above, Defendants divided affiliates into three categories: #1s, #2s, and #3s.  (*See supra* ¶¶ 44-45; *see also, e.g.*, Ex. 16 at 67.) Defendants described all three categories in terms of income potential.  (*Id.*)  Number 1s wanted to supplement their income, #2s wanted to replace their income, and #3s wanted financial freedom.  (*Id.*)

110.   Defendants acknowledged 80% of people would say, at least at first, that they were #3s—*i.e.*, seeking financial freedom.  As Noland explained on one video posted to Facebook, "80 percent, when they sign up and they see the potential income, they'll say they want financial freedom." (Ex. 59 at 35:15-24; *see also* Ex. 20 at 21; Ex. Ex. 21 at 33; Ex. 22 at 28. Ex. 23 at 63; Ex. 24 at 42.)  (As explained, below, #3s were affiliates who were expected to pay the most money to Defendants, especially at or around the time of their enrollment.  (*See infra* ¶¶ 254-316.)  Noland then went on to state that in "two or three weeks, maybe two or three months . . . . most of [the #3s] . . . go all the way back to supplementing [their income], rather than striving for financial freedom,"

because they are not having enough recruiting success.  (Ex. 59 at 35:15-36:10*.*)  Noland challenged listeners not to fear "rejection" or be someone who "would rather go work a job for 40 years to be dependent upon the system, to be standing in the line for Social Security."  (*Id.* at 35:25-38:2.)  Ultimately, Defendants told affiliates, 10% of them have the "work ethic" to achieve financial freedom.  (*See infra* ¶ 119.)

111.    Regardless of which option affiliates chose, Defendants promised to provide the steps they would need to earn substantial income.  (*See infra* ¶¶ 112-117.)  Defendants told affiliates they were giving them "simple" steps to meet those goals, even if the steps would not be "easy."  (Ex. 346 at 21:5-6 ("And here's what so crazy.  Getting wealthy is simple.  I didn't say easy."); Ex. 347 at 13:13-15 (referencing #1s:  "It's very simple to learn the four questions, start making an extra $300 to $500, maybe $1,000 extra a month."); *id.* at 14:8-12 (referencing #3s:  "If you want financial freedom, you are going to simply do this.  Look how simple this is.  It's not going to make it easy because you got to go to work.").)

112.    For #1s (those looking to "supplement" their income), Defendants explained that with minimal commitment, they could expect to make "$300 to $500, maybe $1,000 extra a month."  (Ex. 347 at 13:13-15; *see also* Ex. 511 (#1s "want to Supplement Their Income (Make and [sic] extra $300 - $1,000/mo)"); Ex. 346 at 30:6-8 ("I'm telling you, 80 percent need to just make an extra $2-, $300, maybe an extra $1,000 a month."); Ex. 349 at 6:9-12 ("Number ones, these are people that are just looking to supplement their income.  They're looking for maybe an extra $300, $500, maybe tops an extra $1,000 per month.").)

113.    Defendants were clear that the money that #1s would earn, without much effort, would make a substantial difference in their lives:  "An extra $300 a month changes most people's lives and keeps them from ever filing for bankruptcy. . . We are impacting lives all over!"  (Ex. 532 (ellipses in original)); *see also* Ex. 349 at 6:19-25 ("[M]ost people would be shocked to know if they just added an extra $100 to $300 per

month to their mortgage [payment], they would . . . knock off years, some cases a decade [if] you had a 30-year mortgage.")

114.    In order to be a #1, affiliates needed to "ask two people per week for money to join [their SBH] business."  (Ex. 349 at 17:6-10; *see also* Ex. 20 at 22; Ex. 21 at 34; Ex. 22 at 29; Ex. 23 at 64; Ex. 24 at 43.)

115.    Defendants estimated that #2s (those trying to replace their income) would make a minimum of about $2,500-3,000 per month.  (*E.g.*, Ex. 346 at 16:12-16 ("I think that replacement income comes right around the $2,500 to $3,000 a month mark . . . .").)

116.    Defendants told affiliates they could get to the job-replacement level and quit their jobs in six months, if they spent just 1-2 hours per day, five day per week, asking two people per day to join their SBH business.  (Ex. 346 at 16:25-17:4 (referencing married couple:  "[B]oth of us are gonna take at least an hour a day during the next six months, and we're getting out of this job."); Ex. 347 at 26:4-13 ("If you're a number two, what you can get out of your job, you just simply ask two people a day for money to join the business; you do it five days a week . . . . You're going to do that for six months. . . . It usually takes an hour or two a day out of [your] life."); Ex. 349 at 18:15-22 ("So over the course of six months, five days a week, you're going to ask people, what, two times per day for money to join the business.  That's what I've watched in 22 years of people who consistently break through and never have to work again . . . . They replace their income.  And it typically takes a person around six months."); Ex. 20 at 22; Ex. 21 at 34; Ex. 22 at 29; Ex. 23 at 64; Ex. 24 at 43.)

117.    Noland also told #2s that it did not matter what their current income was; as long as they spent 1-2 hours per day, five days per week, asking two people to join SBH, they could expect to replace their income in 6 months:  "[E]verybody that I know that is a beast on that . . . [u]sually, they're out of their job within six months.  They don't ever have to work again.  They've replaced their income.  And it's funny, no matter what their income is, when they go ahead and ask at least two people a day . . . [they're] going to

grow it to whatever their income is, it's just weird . . . ."  (Ex. 347 at 26:14-27:1.)

118.    Defendants also touted the fluidity of their numerical categories.  They told affiliates, for example, that "several #1s . . . will end up becoming #2s and #3s" (Ex. 350-94 at 15:50).  Several people, in other words, would go from earning up to $1,000 per month to at least $20,000 per month (if not much more).  (*See supra* ¶¶ 112-117; *see also* Ex. 346 at 18:22-23 ("And once you give people some success, they gonna get a little bit more.  You watch.").)

119.    Defendants told affiliates that the difference between #1s, #2s, and #3s was work ethic, discipline, and determination.  Noland, for example, explained that 80% of SBH affiliates would seek only to supplement their income because they would not have "the mental makeup . . . the discipline that's required in order to do anything higher than that."  (Ex. 348 at 20:18-23; *see also* Ex. 349 at 10:24-11:6 ("[T]he vast majority of the population, are only going to supplement their income.  That's all they need to do.  You know why?  Because if they push any more than that, their bran can't handle it, they get dissatisfied, they get distraught, and then they quit, quick.").)  An additional 10%, Noland explained, "are going to have a work ethic to replace their income"—*i.e.*, be #2s.  (Ex. 349 at 11:23-12:4 ("If they follow my system specifically, they're getting out of the job."); *see also* Ex. 348 at 22:2-5 ("Now you got 10 percent of the people that join . . . they're going to work hard enough, they'll have the work ethic to replace their income.").  The last 10% would be #3s because they "have the work ethic for financial freedom," which requires asking four people to join SBH per day for 18 months.  (Ex. 348 at 22:24-23:2; *see also* Ex. 346 at 12:8-15 ("80% of the people that you meet . . . will tell you they are a #3, when only 10% of them are going to give a decent effort at being a #3.").)

120.    As FTC expert witness Dr. Stacie Bosley explained, Defendants treated "residential income and financial freedom" as a "self-determined choice," with affiliates simply having to choose what level of income they want and Defendants then "literally show[ing] people exactly what to do.  There is no guessing."  (Ex. 25 at 59 ¶ 106 (citing

23

Ex. 10).)

### 5. Defendants' "No Guarantees" Disclaimers Did Not Alter the Net Impression that Affiliates Could Expect Substantial Income.

121.    Defendants sometimes told SBH affiliates that Defendants were merely giving them "theoretical examples" of affiliates' earning potential and that such earnings were not guaranteed.  (Ex. 3 at 20-21; Ex. 10 at 5; Ex. 84 at 53:20-54:2; Ex. 336 at 27:5-17.)

122.    Defendants would then typically undo even that limited, "theoretical example" cautionary note by explaining the example is only theoretical "[b]ecause you just ain't done it yet" and adding, "But are there people that do it? . . . Yes.  I got people in my network globally, they make that look silly."  (Ex. 84 at 53:20-54:5; *see also* Ex. 115 at 9:5-13 ("So if we talk about anything with theoretical examples, we say they're theoretical because you haven't done it yet.  If you do it, you get paid.  If you don't do anything, you don't get paid.").)

123.    Robert Mehler, SBH's then-Director of Sales, went even further, telling affiliates, for example, that a five-figure monthly income was *not* a "theoretical example," but instead a "fact" based on Noland's past results.  (Ex. 337 at 6:23-7:5.)

124.    Duvon Botero, SBH's then-Vice President of Sales quoted Noland to affiliates in October 2019, telling them: "'I'm teaching you from experience, I am teaching you from example …. But if you follow my system,' this is Mr. Noland, I'm quoting Mr. Noland, 'If you'll follow my system, I can guarantee you' . . . . This is a call for people who are looking for the business opportunity.  'But I can guarantee you, you will find success with our company because the system is a proven system.'" (Ex. 763 at 0:06-0:11, 15:55-16:35).

125.    Defendants also sometimes told affiliates that income was not "guaranteed."  (*E.g.*, Ex. 3 at 20-21.)  That statement, of course, was consistent with their message that affiliates could "reasonably expect" to get out of their job in six months or achieve financial freedom in "18 months."  (*See supra* ¶¶ 45-47.)

126.   On one SBH "Heat" conference call, Noland added that the income described in the "theoretical examples" is "what you're not going to get if you don't do this work, financial freedom."  (Ex. 346 at 15:11-13.)

127.   The hollowness of Defendants' "no guarantee" policy is exemplified by an exchange between Sacca and Noland.  Sacca asked Noland:  "Can I do a Facebook live on my personal page showing how someone can get to the $23,500 per month?"  (Ex. 286.)  Noland replied:  "If [sic] course[.]  Just say no guarantees of income."  (Ex. 286.)

128.   At the same time that Defendants claimed income was not "guaranteed," they reassured affiliates, in their training materials, that financial freedom was "achievable for the masses."  (Ex. 10 at 6.)

129.   Similarly, although Defendants sometime equivocated by saying not everyone *would* get million-dollar payments, they explained that "the masses" *could* earn $1 million per year if they just put the time in:  "Now, what percentage of the people that are participating . . . in SBH are going to accomplish [$1 million per year]?  Minimal.  Why?  It's not because it's not possible.  ***The masses can do it.***  The masses won't do it."  (Ex. 83 at 7:13-18 (emphasis added).)

130.   On one SBH conference call, Noland explained that the reason there are "no guarantees of income" was that "[i]f you don't do anything and your people don't do anything, you don't make any money."  (Ex. 97 at 34:13-17.)

131.   On one "millionaire mentorship training," Noland told affiliates that his plan was "literally dummy-proof. . . . [M]an, you know, they came out with this for dummies and that for dummies, this is literally direct sales for dummies.  A dummy can just go follow these instructions and create wealth.  That's how crazy step-by-step this is."  (Ex. 77 at 29:3-13.)

132.    Defendants' recruiting presentation also included the following slide, intended to calm people's doubts (Ex. 16 at 58):



133.    Defendants' written "no guarantee" disclaimers in their training materials are not conspicuous.  Their "Business Overview" recruiting presentation, for example, states that income is not "guaranteed" and "[i]ndividual income may vary significantly." That text is in small-print, faint text at the bottom of the slide, while Defendants highlight in a contrasting color and much larger font a potential $1.2 million monthly payment. (Ex. 16 at 50 (pictured below ¶ 174, *infra*).)

**B.    Defendants Incentivized and Emphasized Recruiting, Rather Than Sales to Ultimate Users, as the Key to Financial Success.**

134.    Defendants compelled affiliates seeking the promised financial gains to focus on recruiting new affiliates rather than selling products to ultimate users.  They did so through the structure of their compensation plan and bonuses, their instructions to affiliates, and the obstacles they imposed to making sales to ultimate users.  (*See infra* ¶¶ 136-253.)

135.    As the Court previously wrote, "The FTC offers a mountain of evidence demonstrating that SBH's structure, incentives, policies, and the repeated statements of the Individual Defendants were all focused on getting Affiliates to recruit new members." (Doc. 406 at 38; *see also id.* at 39 ("[T]he FTC has submitted a significant amount of

evidence demonstrating that, in practice, SBH emphasized recruiting new Affiliates rather than sales to ultimate users.").)

### 1. The Structure of the SBH Commission Plan and SBH's Bonus Programs Prioritized Recruiting.

#### a. SBH's Six-Phase Commission Plan

136.    Affiliates could "sell" SBH products by having others buy from SBH using an SBH website URL unique to each affiliate.  (Doc. 222 ¶ 1 (admitting Doc. 205 ¶ 24).)

137.    Affiliates earned commissions on purchases from SBH by themselves and their "downline" team members, in addition to purchases by others through the affiliate's unique URLs and the unique URLs of their downline.  (Doc. 222 ¶ 1 (admitting Doc. 205 ¶ 26).)

138.    SBH promoted a "six-phase" commissions plan—with six more phases added in August 2019 (just five months before the Court's TRO)—and other bonuses. (Ex. 13; Ex. 14.)

139.    As explained below, other than Phase 1 of the SBH commission plan (which did not involve any actual payments by SBH to affiliates), each form of compensation paid by SBH required recruiting, but not says to ultimate users, to earn any meaningful amount of money.  (*See infra* ¶¶ 140-159.)

140.    To receive any commissions at all, SBH affiliates were required to buy at least $200 in SBH products (or have others do the same through the affiliate's URL). (Doc. 222 ¶ 1 (admitting Doc. 205 ¶ 27).)

141.    The Court previously summarized the SBH commission plan in its Summary Judgment Order.  (Doc. 406 at 5-7.)

142.    Phase 1 (Retail Sales) of the SBH commission plan did not involve any money paid by SBH to affiliates.  Rather, it simply referred to affiliates' (and non-affiliates', *see infra* ¶¶ 225-235) ability to buy products from SBH at a "wholesale price" and resell them at a mark-up.  (Ex. 13 at 2.)

143.    Phases 2-6 of the SBH commission plan provided cash payments or product credits based solely on *purchases from* SBH by an affiliate and the affiliate's recruits (and those recruits' recruits, and so on), rather than *sales to* ultimate users of the SBH products.  In each phase, Defendants paid rewards without regard to whether affiliates ever consumed the products or sold them to someone who did.  (*See infra* ¶¶ 144-148.)

144.    Phase 2 (Auto Orders) of the SBH commission plan provided "product credits" to affiliates who made recurring purchases from SBH, and whose direct recruits did, too.  (Ex. 13 at 3.)  Defendants described Phase 2 as "[l]oyalty rewards on yours and your referrals' recurring purchases."  (Ex. 16 at 44.)

145.    Phase 3 (Accelerator Bonus) of the SBH commission plan paid a cash bonus to affiliates whose newly enrolled recruits purchased $500 "Accelerator Packs" or $1,995 "Super Accelerator Packs" from SBH.  (Ex. 13 at 3.)  Noland encouraged affiliates to take advantage of Phase 3 by "step[ping] up to the plate and . . . building a real home-based business [for] 500 bucks, and you go out there and personally refer three other people, and they're doing [$]500 each."  (Ex. 54 at 10:18-22.)

146.    Phase 4 (6-Tier Commissions) of the SBH commission plan rewarded affiliates for purchases from SBH by themselves and their downline teams.  (Ex. 13 at 4.)  Defendants told affiliates to take advantage of the 6-Tier commissions through the "Power of Ten"—*i.e.*, by recruiting ten affiliates who bought hundreds of dollars of products per month and themselves recruited ten affiliates to do the same (with the chain continuing through six tiers).  The Power of Ten is explained in far greater detail below.  (*See infra* ¶¶ 172-197.)  Defendants added that the 6-tier commissions provided for "UNLIMITED Income," with "NO LIMIT" on the number of affiliates one could recruit into the program.  (Ex. 13 at 4.)

147.    Phase 5 (Infinity Bonus) of the SBH Commission Plan paid SBH affiliates who achieved a rank of "SBA1" an additional commission on certain purchases by their

recruits.  (Ex. 13 at 4-5; *see also infra* ¶¶ 149-152, 304-316 (explaining SBH "ranks").)

Defendants explained that the purpose of Phase 5 was to "encourage[] you to develop a

deep, strong Affiliate Team."  (Ex. 3 at 22.)

148.    Phase 6 (BAM Bonus) of the SBH Commission Plan paid "one-time 'hit'

bonuses" to SBH affiliates who achieved the "Power of Ten" structure promoted by SBH.

(Ex. 13 at 5; Ex. 16 at 57; *see also infra* ¶¶ 172-197 (explaining the "Power of Ten").)

As depicted below (Ex. 16 at 57), the smallest BAM bonus for completing a "10x10"

structure (recruiting ten affiliates who each recruited ten affiliates, with each of those 100

affiliates ordering $100 per month), was $1,000, while the largest (for a completing a

"10x10x10x10x10" with each affiliate ordering $500 per month) was $5 million.

Although Defendants promoted the BAM Bonus as providing "relatively fast lump sum

bonuses" (Ex. 3 at 23), Defendants never paid a single BAM bonus, even at the $1,000

bonus level, because no affiliate ever completed a "10x10."  (Ex. 350-82 (Columns S,

AB); Ex. 83 at 20:2-9 ("There's been nobody doing a ten-by-ten."); Doc. 222 ¶ 1

(admitting Doc. 205 ¶ 73:  "[A]s of April 2019, not a single SBH affiliate at even

completed Tier 2 of the Power of 10 at the $100-per-month level . . . .").)



149.    Affiliates' compensation within the SBH commission plan varied, to a

limited extent based on their SBH "rank."  (*E.g.*, Ex. 14; *see also infra* ¶¶ 304-316)

Affiliates' ranks, in turn, were based solely on *purchases from* SBH by the affiliate or the affiliate's downline team or customers.  (*E.g.*, Ex. 14 at 4 (defining "team volume").)

150.    SBH ranks ranged from "Business Affiliate," which required $5,000 in monthly purchases from the affiliate or the affiliate's downline team or customers, to "5 Star Diamond," which required $1.25 million in purchase volume.  (Ex. 14 at 4.)

151.    Affiliates' ranks reset every month (Ex. 166 at 2 ("Where you finish the volume month his month will be the Rank that you are "PAID AS" the entire following month."); Sacca Dep. Tr. at 158:11-159:8 ("once you hit the rank, you get to keep the rank just for title's sake, but you have to redo it the following month").

152.    Defendants' training materials instructed affiliates to "Focus on Rank Advancing."  (Ex. 5 at 22.)

### b.    SBH Bonuses and Promotions

153.    Defendants offered other rewards—outside of the six-phase commission plan—for recruiting new SBH affiliates.  (*See also infra* ¶¶ 154-160.)

154.    Defendants' "Power 500" and "Power 1000" bonuses—for affiliates "looking to jumpstart their business"—paid affiliates who bought a product pack (for at least $125) and, within 14 days, recruited new affiliates who also made purchases exceeding a certain price threshold.  (Ex. 16 at 48.)

155.    Defendants' "5x5 bonus" paid up to $10,000 for recruiting five new affiliates, each of whom bought a $500 "Accelerator Pack" and themselves recruited five new affiliates who also purchased Accelerator Packs.  (Ex. 18; Doc. 222 ¶ 16 (admitting in part Doc. 205 ¶ 34).)

156.    Defendants paid a $200 bonus to each month's "Top Referrer"—*i.e.*, the top recruiter.  (Ex. 144; Ex. 142; Ex. 327.)

157.    During one promotion, Defendants provided product credits as a reward for recruiting ten new affiliates.  (Ex. 210; Ex. 211.)

158.    For another promotion, Defendants gave product credits to affiliates who enrolled at least 20 new affiliates, while recognizing anyone who enrolled at least 10 new affiliates as a "top performer."  (Ex. 169.)

159.    An SBH "USA Tour Challenge" awarded $1,000 for recruiting affiliates. (Ex. 240.)

160.    Defendants did not pay any bonuses based on affiliates' retail sales—*i.e.*, sales from an affiliate's personal inventory to third-party ultimate users.

### 2.    Defendants Instructed Affiliates to Focus on Recruiting Rather Than Sales to Ultimate Users.

161.    Defendants reinforced their recruitment-focused commission plan through their training documents and instructions to affiliates.  They promoted "four steps to success" that encouraged recruiting, but not product sales (*see infra* ¶¶ 162-171), and encouraged affiliates to harness the "Power of Ten" by building a team of ten "Tier 1" affiliates who duplicated the same process (*see infra* ¶¶ 172-197).  They also made numerous direct statements to focus affiliates on recruiting.  (*See infra* ¶¶ 198-210.)

### a.    Defendants' "Four Steps to Success" Encouraged Recruiting and Omitted Retail Sales.

162.    Defendants promoted "Four Steps to Success" to "Hit the Ground Running as a new SBH Affiliate."  (Ex. 16 at 68.)

163.    The Court summarized the Four Steps to Success in its summary judgment liability ruling.  (Doc. 406 at 9-10.)

164.    As the Court explained, SBH "employs these same four steps—its 'fundamental training system'—for all three 'types' of Affiliates."  (Doc. 406 at 10 (quoting Doc. 8-4 at 112 (Ex. 5 at 16).)

165.    Defendants described the Four Steps to Success as follows (Ex. 16 at 68):

166.   The "Four Steps to Success" omit retail sales to ultimate users.  (Ex. 16 at 68.)

167.   In Step 1 ("Get Started"), Defendants urged consumers to make large, up-front purchases of "business packs," which cost up to $1,995.  (Ex. 16 at 64-66, 68; Ex. 5 at 17.)  Defendants added that starting with a more expensive pack would create "more initial commission plan benefits."  (Ex. 5 at 17.)

168.   In Step 2 ("Be a Product of the Product"), Defendants told consumers to set up a monthly product "auto-order" to get products "to [u]se, [s]ample, and to [s]ell."  (Ex. 5 at 18.)  By "sample," Defendants instructed affiliates to "hand out [free] samples to at least 60 people within your first 30 days," and continue to give products away for free to induce consumers to join SBH.  (*Id.* at 21.)  Defendants told consumers to auto-order at least $60 per month (or $500 for an affiliate seeking "financial freedom").  (Ex. 16 at 44; Ex. 58 at 25:1-4 ("Do you have a 500 auto-order set up minimum . . . to prove that you're ready to go after these millions?"); Ex. 17; Ex. 228 (reminding new "Global

Ambassadors" to "set up at least a $250 (preferably $500) Auto-Order"); Although Defendants sometimes equated *buying* $500 in products per month from SBH with *selling* six bags of coffee to consumers per week (*e.g.*, Ex. 58 at 25:1-4), affiliates' compensation depended only on their purchases from SBH, not what they ultimately did with the products.  (*See supra* ¶¶ 136-160.)

169.   In Step 3 ("Build A Team"), Defendants focused on recruiting.  They instructed affiliates to "be sure to personally refer at least two new Affiliates within your first 48 Hours if you are Aiming for Financial Freedom" or "within your first 7 Days if you are aiming to Replace Your Income (No More Job)."  (Ex. 5 at 21.)  After the first seven days, affiliates were encouraged to "keep building every month," "duplicate the system," and "focus on rank advancing."  (*Id.* at 22.)

170.   In Step 4 ("Pay Attention to the Training and Duplicate"), Defendants told SBH affiliates to use SBH-provided materials to "[t]each your team to do the same" steps identified above.  (Ex. 16 at 68.)

171.   Defendants described "duplication" as the "key to long term success as an SBH affiliate."  (Ex. 5 at 2.)

### b.   Defendants' "Power of Ten" Model Encouraged Exponential Recruiting.

172.   Defendants highlighted their "Power of Ten" "success strategy," in which "Affiliates need to get 'my 10' Affiliate Team Members" and teach new recruits to "do the same."  (Ex. 16 at 50.)

173.   Defendants told affiliates they could achieve the full "Power of Ten" by recruiting ten affiliates as their "Tier 1," each of whom recruit ten as the initial affiliate's "Tier 2," and so on through Tiers 3-5.  (Ex. 16 at 50-52.)

174.   An SBH presentation for recruits and new affiliates included the following visual directing Affiliates to "get 'my 10' Affiliate Team Members" and to "teach[] each

new Team Member to do the same thing, get 'their 10.'"  (Ex. 16 at 50.)



175.    Defendants promoted an example of the Power of 10 wherein each of the top affiliate's 111,110 downline affiliates (through five tiers) generated purchases from SBH of $500 per month, for a cumulative monthly purchase volume of over $55 million. Defendants used the following visual to highlight that the top affiliate in this example receives a $1,173,500 monthly commission.  (Ex. 16 at 52.)



176.    Upon completing the full Power of Ten, an affiliate also became eligible to receive the full $5 million "BAM Bonus."  (Ex. 16 at 57.)

177.    Defendants admitted urging affiliates to achieve the Power of Ten.  (Doc. 222 ¶ 1 (admitting Doc. 205 ¶¶ 69-72).)

178.    The Court previously found:  "[E]vidence of [Defendants'] recruiting focus can be found in the Individual Defendants' frequent reference to 'getting ten' recruits."  (Doc. 406 at 11.)

179.    The Court added:  "[T]here is evidence that . . . myriad statements from the Individual Defendants and other senior SBH personnel consistently stressed the need for Affiliates to 'get ten' recruits and to redouble their recruiting efforts."  (Doc. 406 at 39.)

180.    Noland told affiliates:  "You need to – out of the seven billion people in the world, you need to find 10. . . . You need 10."  (Ex. 84 at 44:23-25, *cited at* Doc. 406 at 11.)

181.    In one video posted to Facebook, Harris told affiliates:  "[Y]our ten-by-ten is the most important thing you can ever build in this company.  The most important thing you can do is think about it every day, I've got to get my ten . . . ."  (Ex. 86 at 26:16-19, *cited at* Doc. 406 at 11 (as Doc. 8-14 at 81).)

182.    In another video, Harris told affiliates:  "You want that to be the most important thing in the world to everybody in your team, that you're trying to fill in your first ten as quickly as possible, that will either order a hundred or [$]500 in product . . . ."  (Ex. 86 at 27:10-18.)

183.    In yet another Facebook video post, Noland told affiliates:  "If you're not creating a ten-by-ten, you're not doing your job.  Until you get ten-by-tens, you got to be relentless, because that's the job we need done to become number one."  (Ex. 83 at 34:6-12.)  A few minutes later, Noland emphasized the gravity of the situation:  "[A]nybody that tells me that they want financial freedom and will not go . . . get these ten, they are

35

an enemy.  They are an imposter.  They're a spy.  They come in to the camp to steal from you.  Steal what?  Your time.  They want to talk to you, though.  They want to—hey, they want to have meetings.  They want to have strategy sessions.  They want to do everything but get them ten." (*Id.* at 44:8-15.)

184.    At one of Defendants' live training events, Noland treated the obligation to recruit ten affiliates as almost spiritual:  "[NOLAND:]  What if you were sent here to help ten people change their whole life forever?  And they're scattered.  And if you find them, you're completely free.  What's the only thing you should be talking about that day?  [AUDIENCE:]  My ten.  Ten.  [NOLAND:]  Those ten.  That's why SBH is so awesome.  It has brought you into your purpose."  (Ex. 106 at 10:9-16.)

185.    At the same event, Noland told affiliates that even if they currently were "$200,000 in debt," they could be "free" in just "four months" through the Power of Ten:  "So if you're [$]200,000 in debt and you go out and get ten and get ten and get ten who's moving one pack each, and you're [$]200,000 in debt, how many months does it take you to get free? . . . You're free in four months.  Right?"  (Ex. 107 at 14:5-11.)

186.    In what the Court previously called a "damning statement" (Doc. 106 at 12), Defendant Sacca, during a Facebook video post, told affiliates that the SBH commission plan is "driven 100 percent, not—not 95, not 85, not 75—it's driven 100 percent by our [Power of Ten BAM] bonus. . . ."  (Ex. 82 at 11:6-16; Doc. 106 at 4 n.4.)  Sacca emphasized that he had come to this realization "last week, with Mr. Noland and Mr. Harris."  (Ex. 82 at 11:6-16.)

187.    Three days following Sacca's "damning statement" described in the paragraph immediately above, Noland emphasized that he fully agreed with Sacca:  "Tommy Sacca did a phenomenal training the other night when he talked about the ten sheets.  He was with me.  I trained him on ten sheets . . . . As a matter of fact, it's the greatest training since I've met Tommy Sacca that he's ever done."  (Ex. 83 at 11:16-

12:7.)

188.   In yet another video about "how to be a millionaire in SBH," Noland declared:  "If people want to be a dumb ass [by declining to join SBH], let them be a dumb ass!  You don't need everybody.  Type in how many of them you need.  10.  That's what's so astounding about this.  You only need 10, you only need 10, so if you know you only need 10 and there's seven billion people in the world and four billion of them drink [coffee], . . . why do you spend any dumb ass energy on you when all you got to do is find 10, that's it.  Now does that help y'all?  I needed to be that raw because this is a millionaire training . . . ."  (Ex. 71 at 4:3-7, 37:2-14.)

189.   Affiliates understood Defendants' message that if they wanted to attain financial freedom, they needed to build their ten by ten.  (*See infra* ¶¶ 190-192.)

190.   Former SBH affiliate Jason Johnson testified that Defendants told him:  "[I]f you build a ten by ten by ten by ten you can make hundreds of thousands up to millions monthly and/or yearly."  (Johnson Dep. Tr. at 18:6-20.)  He added:  "The playbook was, build a ten by ten by ten by ten.  And you do that by going and talking to ten people a day and asking four people a day for money."  (*Id.* at 25:15-19.)  Johnson, in fact, explained that "the whole reason why I got into the business" was to achieve the Power of Ten "BAM Bonus."  (*Id.* at 57:18-24.)

191.   Former SBH affiliate Kaci Wood testified:  "We understood that we were supposed to get more people involved so that we could make more money and do what— get a ten-by-ten was the way that [Noland] explained it.  Get ten people to do exactly what you were doing."  (Wood Dep. Tr. at 28:12-18.)  Wood added:  "[T]he focus of the company was to become a millionaire.  In order to do that, was to build a ten-by-ten to get people to come in the same way that you did, purchasing large packs."  (Wood Dep. Tr. at 41:1-8.)

192.   When asked by Defendants' counsel whether the "name of the game" in

SBH was "retailing product," former SBH affiliate Stephanie Underhill replied:  "The way that I understood it . . . was to go get ten people to join, and then those people go get . . . ten people . . . . That was what I understood it to be and what was told to me every time."  (S. Underhill Dep. Tr. at 35:16-36:13.)

193.    To build the Power of Ten, Defendants told affiliates seeking financial freedom to ask four people to join SBH every day.  (*See infra* ¶¶ 194-197.)

194.    The SBH "Million Dollar Contract," for example, told affiliates to ask four people to join SBH "at least 5 days a week for at least 18 months."  (Doc. 222 ¶ 1 (admitting Doc. 205 ¶ 47); Ex. 17.)  Defendants admit to "encourag[ing] Affiliates to sign [the] 'Million Dollar Contract.'"  (Doc. 222 ¶ 1 (admitting Doc. 205 ¶ 47).)

195.    Noland told affiliates, on one training call, that if they wanted to show "the utmost commitment to developing a financially free lifestyle," they needed to ask "four people a day for money to join the business."  (Ex. 102 at 19:9-13, *cited at* Doc. 406 at 11; *see also* Ex. 92 at 37:13-14 (same, from a Facebook video post).)

196.    At their live "training" events, Defendants frequently told affiliates seeking financial freedom to ask four people to join SBH every day.  (Ex. 24 at 43; Ex. 19 at 13; Ex. 23 at 64; Ex. 22 at 29; Ex. 20 at 22.)

197.    In the slide deck from Defendants' 2018 SBH "Kickoff" event, Defendants equated asking four people to join SBH every day for 18 months with becoming a millionaire (Ex. 19 at 13):

An 18 Month Contract With Yourself...

4/day = $1M

### c. Defendants Expressly Instructed Each Other and SBH Affiliates to Focus on Recruiting.

198.   Defendants reinforced their recruiting-focused program through explicit recruiting instructions.  (*See infra* ¶¶ 199-210.)

199.   For example, Noland told affiliates that the goal of one cash promotion was to focus them on "what you should be focusing on right now, which is new people getting into the company." (Ex. 117 at 24:18-21.)

200.   At a live "training" event, Noland remarked, "[Y]ou know what to do.  You know you're supposed to recruit your ass off.  Freedom." (Ex. 74 at 33:6-9, *cited at* Doc. 406 at 12.)

201.   At the 2018 "RED" event, Harris told affiliates to "have a plan to recruit everyone you meet." (Ex. 64 at 8:2-5.)  Just prior to that comment, Harris told affiliates that when people ask him, "*Is this one of those pyramid things?*," he says, "*Hell, yeah it is*.  If it wasn't, I wouldn't be doing it.  Do I look dumb enough to go get a job again?" (Ex. 64 at 7:15-21 (emphasis added), *cited at* Doc. 406 at 12 & n.8.)

202.   At the following year's RED event, Harris made the same confession: "Some people are embarrassed or ashamed to say they're in direct sales because people ask stupid questions like, 'is this one of those pyramid things?'  I'm like, 'hell yeah.  If it wasn't, I wouldn't be doing it.' . . . And I explain residual income.  And I'm like, 'you damn right I'm doing this.' . . . Or I could be a wage slave." (Ex. 91 at 7:7-18.)

203.   At another event, Noland predicted dire consequences for any new affiliate who did not recruit someone within 48 hours:  "Soon as I bring you in, you better put somebody in in 48 hours, or I am almost never going to talk to you again . . . Guess what will happen if you go slow?  More than likely you're going to die.  More than likely, you're going to quit." (Ex. 90 at 9:13-23, *cited at* Doc. 406 at 12.)

204.   On a training call, Noland stated:  "When a person joins [SBH], I'm like, 'great, way to go.'  But I'm not super fired up until that person recruits somebody else to

join.  When they recruit somebody else to join, I go, 'Alright!  Now okay, I've got somebody now.  I've got me an inviter.'  See the most important thing in this industry if you want residual income, you have to recruit inviters."  (Ex. 116 at 11:11-20, *cited at* Doc. 406 at 10-11.)

205.   Defendants' slide deck from their June 2018 SBH "Bootcamp" event bluntly told affiliates:  "You Have To Get Great At RECRUITING."  (Ex. 21 at 24.)



206.   At Defendants' October 2018 "MVP" event, Noland went around the room asking affiliates, in front of the whole audience, how many new affiliates they had recruited recently and criticized them for not doing more.  (Ex. 74 at 14:13-24:3; *see id.* at 24:11-19 ("I love you and I want you to be extremely successful.  And the best way for me to get you to be successful is to go find new people that will outperform you.").)

207.   On one conference call, SBH's then-director of sales, Robert Mehler, explained that although retail sales could help affiliates "make some extra, part-time money," "recruiting is key," and affiliates should pursue getting a "10x10x10x10x10":

> I'll tell you something, folks.  I'm thinking about this.  We got a couple calls to close out with.  I'm thinking about most of these calls have been about retailing.  Okay?  And a little bit – Sonya had one about recruiting.

Folks, let me clue you into something. Retailing is a great way to make some extra part-time money, to make some quick, quick money to be able to put in your pocket and to plant some seeds in the business.

But remember I spoke earlier about multiplying . . . . You do something once and you make money over and over and over again. But it's also multiplicative. That's the key about this. When you look at how we structured 10 by 10 by 10 by 10 by 10, all of a sudden 10 by 10, it's 100 people. 10 by 10 by 10, it's 1,000 people. . . . How many more lives can we change if we have 1,000 people doing it instead of just ourselves or instead of 10 or instead of 100?

So, you know *recruiting is key*.

(Ex. 94 at 20:8-23:25 (emphasis added), *cited at* Doc. 406 at 11.)

208.    Defendants' internal discussions confirm their recruiting focus is deliberate. In one frank series of text messages from Noland to Harris and Sacca, Noland made clear that "RECRUITING" is the "MAIN FOCUS," writing:

Need you guys to get people RECRUITING. That has to be the MAIN FOCUS. No Recruiting = No Residual Income. As Sr. Field Advisors, your #1 Job is to move the field to build . . . . Scott, you and Tommy buckle up hard today with each other and get people moving. RECRUIT and REPORT . . . You two need to personally start RECRUITING your asses off as well. Lead.

(Ex. 288.)

209.    Noland asked his employees to provide a monthly report on the company's top recruiters. (*E.g.*, Ex. 212 (providing report "as requested"); Ex. 338 (composite of monthly emails sending "recruitment reports").) There was no comparable report or request for the company's top retail sellers. (Anticipated Testimony of Adam Rottner.)

210.    The Court infers that if Defendants had not intentionally destroyed emails and text messages, there would be more evidence of their instructing affiliates and each other to focus on recruiting. (Doc. 401 at 24-27 (entering adverse inference sanction); *see also infra* ¶¶ 738-755 (describing document destruction).)

### 3. Affiliates Understood Defendants Wanted Them to Focus on Recruiting.

211.    Affiliates understood Defendants expected them to focus on recruiting. (*See infra* ¶¶ 212-220.)

212.    One affiliate, for example, texted Sacca:  "[W]e know we have to constantly keep recruiting."  (Ex. 287.)

213.    The Court infers that if Defendants had not intentionally destroyed emails and text messages, there would be more evidence that affiliates understood they needed to focus on recruiting.  (Doc. 401 at 24-27 (entering adverse inference sanction); *see also infra* ¶¶ 738-755 (describing document destruction).)

214.    Former SBH affiliate Jason Johnson testified:  "Based on the video and the playbook by Mr. Noland, if you recruit enough people into the business and they recruit enough people in and they recruit enough people in, if you build a ten by ten by ten by ten you can make hundreds of thousands up to millions monthly and/or yearly."  (Johnson Dep. Tr. at 18:6-20.)  Johnson added that "it was based on the number of people you recruited into the business, which could lead to million—million-dollar-a-month earner."  (Johnson Dep. Tr. at 136:16-24.)  Johnson also explained that he understood that seeking financial freedom in SBH "meant you were all in/all out, you recruited, you went out and talked to ten people a day, asked . . . four people a day for money.  That means recruiting four people a day into the company, into the business."  (Johnson Dep. Tr. at 24:24-25:6.)

215.    Former SBH affiliate Krystian Sarzynski estimated that 90-95% of the focus in SBH was on recruiting new affiliates and convincing them to "purchas[e] the big packages."  (Sarzynski Dep. Tr. at 79:2-80:3.)  He explained that "the emphasis on what would bring the biggest profit, basically, was more on recruiting than it was on selling the products.  And it was spoken about on multiple Heat calls that selling the product is cool and all, but ultimately the way you build a successful business is to become a master at selling the dream, selling the vision of—of the potential income."  (*Id.* at 83:10-18.)

216.    Former SBH affiliate Kaci Wood testified that "initially" she thought that the purpose of SBH was to sell products, but she eventually realized "that was not really what we were told.  We were told to get people involved in the company.  That was repetitive.  Get people involved in the company.  Build your ten-by-ten.  That was drilled into our heads."  (Wood Dep. Tr. at 30:20-31:12.)  Wood reiterated the "focus" in SBH was "bringing people into the company," not selling products.  (Wood Dep. Tr. at 40:3-25.)

217.    Kaci Wood also explained that in her first month in SBH, she "didn't really sell any product; it was all focused on recruiting more people into the company.  So I became the top recruiter of May.  And May is when I joined."  (Wood Dep. Tr. at 122:22-123:10.)  Wood received a reward for her recruiting efforts.  (Ex. 144.)  She explained that she focused on recruiting because "we were being told if we wanted to be successful and have the lifestyle that Jay Noland had, [the focus] was to recruit people in the company, build a ten-by-ten, get ten people to do the same thing you did, which was purchase large packs within 30 days of joining the company."  (Wood Dep. Tr. at 123:11-24.)

218.    Former SBH affiliate Daniel Moncayo testified that he never tried to sell SBH products because he "was told to recruit" in order to "build a ten-by-ten." (Moncayo Dep. Tr. at 4:6-23, 5:4-22.)

219.    Former SBH affiliate Stephanie Underhill testified that the focus at SBH was "more about recruiting, not selling the coffee.  It was more about recruiting affiliates."  (S. Underhill Dep. Tr. at 7:1-4.)  "We were told that if we recruited people, we got a percentage of that.  So it was really based on, like, a ten by ten.  We recruit ten people, they recruit ten people, and we were encouraged to have them buy the biggest— the largest package in Success By Health."  (*Id.* at 7:5-13.)  She added that she understood that the "purpose" of SBH "was to recruit people and to get as many affiliates

as we possibly could underneath us who were buying products [from SBH] for themselves.  And then they were, in turn, recruiting people, and then those people were recruiting people." (*Id.* at 29:2-10.)  As a result, Underhill "didn't focus on retail; we focused on recruiting affiliates." (*Id.* at 32:15-25.)  Underhill described a "constant just pressure every single day to – to go out and to recruit people into the company." (*Id.* at 72:12-73:6; *see also id.* at 73:24-76:7 ("So it was just a constant pressure of recruiting and buying product.").)

220.    Former SBH affiliate Jason Underhill confirmed that SBH "wasn't really about the selling, though.  It was always about getting people, and it was about recruiting affiliates constantly.  You know, you've got to get more people in, more people in." (J. Underhill Dep. Tr. at 6:13-18.)  He added:  "[E]very meeting we had, it was to get affiliates.  Recruit, recruit, recruit.  That's what it was about.  It wasn't about sell; it was about recruit, recruit.  Get as many people as you can under you to come into the company and buy the big pack, the [$]1,995 pack.  That [was] what was beat into us every week." (*Id.* at 22:6-13.)

### 4.    Defendants Undermined Retail Sales to Ultimate Users of SBH Products.

221.    Affiliates could sell SBH products to non-affiliate ultimate users online through their replicated version of the SBH website or "offline" from their personal inventory.  Online sales to non-affiliates were extremely rare (*see infra* ¶¶ 349-355), and, as explained below, Defendants put little emphasis on, and in fact undermined, offline retail sales to ultimate users.  (*See infra* ¶¶ 222-253.)

222.    The Court previously agreed that "there is evidence that retail sales of coffee would not and could not provide a significant source of income for Affiliates." (Doc. 406 at 39 (citing Doc. 286-7 (Ex. 25) at 53-54).)  Affiliates confirmed this fact.  Former SBH Affiliate Krystian Sarzynski testified that he was only able to make $800-900 on retail sales during his time in SBH.  (Sarzynski Dep. Tr. at 82:18-83:18.)

Similarly, former SBH Affiliate Kaci Wood testified:  "We attempted to retail [products] . . . . But it was not an easy product to move, because it was a very expensive coffee and people didn't want to pay that kind of price for it."  (Wood Dep. Tr. at 26:22-27:7.)

### a.   Defendants Did Not Reward Offline Retail Sales.

223.   Defendants did not reward, or even track, affiliates' offline sales.  (Doc. 222 ¶ 34 (admitting in part Doc. 205 ¶ 64:  that "SBH does not separately track sales made by Affiliates to ultimate users of SBH products"); Doc. 106 at 14; Harris Dep. Tr. at 270:6-25; Sarzynski Dep. Tr. at 85:7-9; Wood Dep. Tr. at 122:14-21; S. Underhill Tr. at 84:6-13; J. Underhill Dep. Tr. at 43:18-44:4.)

224.   The Court previously found:  "Evidence acquired through the FTC's undercover investigation of SBH indicates that the company did not track whether SBH affiliates personally consumed the products or resold them to third parties or generally what Affiliates did with the products they purchased."  (Doc. 406 at 11.)  In fact, the opportunity to make offline retail sales was not even unique to SBH affiliates.  As explained immediately below, anyone, including non-affiliates, could buy the products from Defendants at wholesale price and then attempt to resell them to others.

### b.   Defendants Allowed *Non*-Affiliates to Purchase from SBH at "Wholesale Pricing."

225.   Defendants, through the SBH website, sold products to the public at the same "wholesale" price at which affiliates could buy from SBH.  (Ex. 13 at 2 ("Affiliates and the general public can order directly from our Success By Health website . . . and purchase our products at wholesale pricing.").)

226.   Defendants' practice of offering the "wholesale" price directly to non-affiliates made any meaningful amount of offline retail sales all but impossible for affiliates because non-affiliates had no reason to pay affiliates' marked-up "retail" price. (Ex. 25 at 53 ¶ 96; *see also infra* ¶¶ 227-235.)

227.   As the Court previously acknowledged, this "pricing structure raises serious

questions about whether retail sales can and do serve as a legitimate pathway to profits." (Doc. 106 at 2.)

228.    Affiliates, in fact, complained to Defendants that Defendants' sale of products to non-affiliates at the same "wholesale" price as affiliates undercut their ability to make retail sales.  (*See infra* ¶¶ 229-232.)

229.    One SBH affiliate, for example, wrote to Defendants:  "How can I charge [retail customers] $35 for coffee when it states on the site that it is $22?"  (Ex. 174.)

230.    Another affiliate complained that when she and her husband "send people to the [web]site . . . , they assume they will get the products at the wholesale price listed." The affiliate requested that the website "not include the Wholesale Price as the main price for the general public to see" and that the site instead list the "retail price."  (Ex. 192.)

231.    Yet another affiliate bluntly asked:  "Why can a customer order [a product] from my website for [$]59.00 plus 11.95 shipping and I have to pay the same when I order for myself?"  (Ex. 243.)

232.    The Court infers that if Defendants had not intentionally destroyed emails and text messages, there would be even more evidence of consumers complaining about SBH's offering "wholesale" pricing to the general public. (Doc. 401 at 24-27 (entering adverse inference sanction); *see also infra* ¶¶ 738-755 (describing document destruction).)

233.    Former SBH affiliate Daniel Moncayo raised the same issue in his testimony:  "[H]ow are we supposed to retail [the products] when we were told people needed to join the company to get the product at our wholesale price?"  (Moncayo Dep. Tr. at 7:16-21.)

234.    Former SBH affiliate Stephanie Underhill explained that she could only make retail sales at cost "because, unfortunately, [customers] could go on to the website and buy their own, and so that was no help to us."  (S. Underhill Dep. Tr. at 32:15-25.)

235.    Former SBH affiliate Jason Underhill testified:  "I mean, why are they going to buy the product off me when they can just go to the site without being a member and buy the product? . . . [W]hen we found all that out it was like . . . [i]t makes no sense. . . . They can go straight to the site and buy the product just like me, whether they're [an] affiliate or not."  (J. Underhill Dep. Tr. at 6:13-7:3.)  Later, Underhill said that his attempts to sell products were not successful in part because "why are they going to buy from me when they can go—they can get the same price I'm getting it for?"  (J. Underhill Dep. Tr. at 17:3-9.)

### c.    Defendants Created Additional Obstacles to Retail Sales.

236.    Defendants placed other restrictions on retail sales that limited their viability.  (*See infra* ¶¶ 237-244.)

### i.    No Retail Sales on Amazon or eBay

237.    Defendants barred affiliates from making retail sales on Amazon or eBay.  (Ex. 241 ("No one is allowed to sell SBH products on Amazon or eBay."); Ex. 204 (Harris to Noland:  "Amazon Sales against policies and procedures").

238.    Defendants enforced the no-selling-on-Amazon policy notwithstanding that they provided affiliates no advance notice that such sales would be barred.  (Ex. 205 (Harris, on August 29, 2018:  "Had a discussion about [Amazon sales] today.  It's a no go.  Policies and procedures being updated regarding this."); Ex. 2 (Terms of Use from March 2019, still containing no Amazon sales policy); Anticipated Testimony of Adam Rottner (for date of capture); *contra* Ex. 241 (claiming, falsely, that no-Amazon policy is in "Terms of Use").)

### ii.    No UPC Codes

239.    Defendants' products also lacked UPC barcodes, which created another obstacle for affiliates looking to resell products through local retail businesses, like grocery or convenience stores.  (Anticipated Testimony of Adam Rottner; *see also infra* ¶¶ 240-241.)

240.    One affiliate, for example, explained that she had received a "commitment to place products at a Shell station," but could only do so if the product had a "UPC bar code."  (Ex. 198 at 2.)

241.    Another affiliate was attempting to place SBH products in a university store, but was told that the store needed a "16 digit barcode for each product."  (Ex. 226.)

<b>iii.       Price Floors</b>

242.    Defendants also barred affiliates from selling products below Defendants' suggested retail price.  (*E.g.*, Ex. 254 at 1 (Sacca pledging to "have compliance get involved" because an affiliate was selling G-Burn for $79 instead of $89; affiliate writes: "I was told in no uncertain terms that if I didn't change my sale price to the retail of $89 immediately I could be terminated so it was changed that very day I was notified!").)

243.    Harris defended Defendants' price floors, even for affiliates with large stockpiles of expiring SBH products, by explaining "let's say, for example, somebody goes on eBay and they're selling their coffee at a lower price than what they paid for it. That's really not fair, in my opinion."  (Harris Dep. Tr. at 227:2-7.)

244.    Defendants' price floors not only prohibited consumers from pricing products at a level that consumers wanted to pay, but also prohibited them from competing with Defendants themselves, who offered products direct to the public at "wholesale" rather than "retail" price (*see supra* ¶¶ 225-235).

<b>d.       Defendants' Training Did Not Emphasize Offline Retail Sales.</b>

245.    Defendants' training materials did not instruct affiliates that retail sales were important to their financial success.

246.    Defendants' "One Year Commitment Form" form for new affiliates (Ex. 6), which they asked all affiliates to sign (Ex. 5 at 18), required affiliates to make ten commitments, none of which involve selling products to non-Affiliate consumers:

**I hereby commit that I will:**

• Give 110% to my SBH Business.
• Be a Product of the SBH Products.
• Launch my Business by hosting at least 4 SBH Business Mixers within my first 30 days.
• Expose my SBH business to at least 2 people per day (5 days per week).
• Make sure my team goes through the SBH "Fast Start System" Training.
• Host or Attend at least 1 SBH Business Mixer (CTM) per week for the next year.
• Attend all Major Corporate Events (typically 2 or 3 per year).
• Attend all local weekly "Getting Started Trainings" and "Regional Events" in my area.
• Practice at least 30 minutes of Self Development Daily. Commit to "Conquer Myself" and  control my destiny.
• Be an Honorable Person that KEEPS MY WORD.

**I WILL CONDUCT MY BUSINESS BY THESE CORE PRINCIPLES AND I FURTHER COMMIT THAT I WILL BE HERE 1 YEAR FROM NOW!**

247.    Defendants' "Four Steps to Success" (*see supra* ¶¶ 162-171) also do not mention sales to actual users of the SBH products.

248.    Defendants' primary recruiting pitch deck—the "Affiliate Business Tour" (Ex. 16)—tells consumers (implausibly) that they can make an extra "*$54,000 per year*" from offline retail sales, but that doing so would require locating *100* retail customers who purchase products at "retail" prices monthly (despite the fact that they could just go to the SBH website and pay "wholesale" prices instead).  (Ex. 16 at 43 (emphasis added); *see also supra* ¶¶ 225-235 (wholesale pricing).)  The same pitch deck, by contrast, shows how affiliates can earn over *$1 million per month* by recruiting just *10* affiliates to start their Power of Ten pyramid.  (Ex. 16 at 49-52.)

249.    Defendants also told affiliates that "Units" needed to be a "MAJOR focus." (Ex. 147.)  They defined Units as "sale[s] in the SBH Online System," which they made clear were "*Not* Retail."  (*Id.* (emphasis added); *see also* Ex. 21 at 33 (same).)  Thus, Noland trained affiliates that their purchases from SBH—the "sales" that paid

commissions—were "Not Retail."  (Ex. 147.)

250.    Defendants also trained affiliates to continue recruiting and making "sales" even when they did not have any products.  In a post to the SBH Heat Facebook group, Noland boasted about the success of one of his prior companies that also lacked products: "[W]hen I started [my] last company without any product . . . none of these people received any product until 4 months after this event . . . Did over $600k in volume up until this point.  By the time these folks received their product we had done over $1 Million."  (Ex. 132.)

251.    In a December 2017 Facebook video, Noland responded to complaints about shipping delays by simply telling affiliates they did not even need the products, and should just focus on the business opportunity.  (Ex. 57.)  Noland, for example, explained that people who complained about not getting their product shipments "are going to suffer forever financially.  They're going to deserve it because they don't have vision . . . ."  (Ex. 57 at 19:9-23.)  Later, he promised that the "products are coming"—possibly in a "few months"—and that, in the meantime, affiliates should be "selling the vision and selling where we're going and it's your [commission] check."  (Ex. 57 at 27:23-28:15.)  Noland later made the same point, calling it "stupid" and a "waste of time" to ask about one's order status when one could instead "take the same energy" and "go sell the vision and build your check."  (Ex. 57 at 29:25-30:6.)  Noland concluded:  "Go get people in here.  Go sell vision.  Product's coming, it's coming soon, man, just go sell, because the commission checks are coming on the 1st and the 15th, no matter what.  Why in the hell wouldn't you sell if the commission checks are coming on the 1st and the 15th, no matter what."  (Ex. 57 at 33:12-18.)

252.    Former SBH affiliate Jason Johnson got the message.  He testified Defendants told him:  "Keep going out there and keep recruiting. . . . We can even sell without product."  (Johnson Dep. Tr. at 32:15-33:10.)

253.   At the end of the day, Noland, actually admits what is obvious from his words and actions:  the products are, in fact, irrelevant.  Shortly before launching SBH, Noland claimed he could "plug any company or product into [his] process, and you can be free financially if you want to be."  (Ex. 51 at 19:4-6.)

**C.     Defendants Encouraged Affiliates to Buy Excessive Amounts of Products to Achieve "Financial Freedom."**

254.   Defendants preached that if affiliates wanted financial freedom, they had to buy SBH products—without any meaningful consideration of whether they would be able to sell or consume those products.  (*See infra* ¶¶ 255-335.)  Defendants therefore ensured that product purchases would be driven not by the "value" of the products themselves, but by affiliates' desire to attain financial freedom.

**1.     Defendants Told New Affiliates to Make Large Up-Front Purchases.**

255.   Defendants urged consumers to join SBH and buy large product packs, telling them (without any apparent evidence) that the "more inventory you have to start your business, the faster your business typically will grow."  (Ex. 5 at 17.)

256.   Step 1 of Defendants' "Four Steps to Success" included directing affiliates to "[d]ecide on Accelerator Pack."  (Ex. 4 at 12.)

257.   Defendants instructed affiliates to tell their new recruits that the "[t]he higher the Pack you initially start with, the more money you can make" and that, by buying a $2,000 product pack, they could "[m]ake 50% Profit on your money FAST!"  (Ex. 10 at 7.)

258.   Defendants' "Fast Start System" told affiliates that a "very simple way" to achieve a higher SBH "rank" after enrolling is "for you to start with a [$2,000] Super Accelerator Pack and then have the initial 2 people you [recruited] start with a Super Accelerator Pack."  (Ex. 5 at 3-4.)

259.    Defendants' recruiting slide deck told potential affiliates that buying a $2,000 Super Accelerator Pack was the "fastest way to grow SBH Affiliate Business" and would "maximize profit potential." (Ex. 16 at 32 (pictured below).)



260.    Referencing the need to "get started" with a $2,000 product pack, Noland told recruits that they could just use "other people's money":  "What I'm going to do is this[,] I'm going to put it on a credit card.  I'm going to use other people's money."  (Ex. 84 at 67:12-13.)

261.    Former SBH affiliate Kaci Wood confirmed that even though consumers could join SBH by paying $49, "they were told they needed to buy a [product] pack to do anything. . . . What they wanted us to do was bring people into the company.  They wanted people to buy the large packs, because the large packs was how we got the points to actually rank up in the company."  (Wood Dep. Tr. at 42:1-43:8.)

**2.    Defendants Told Affiliates Seeking Financial Freedom They Needed to Spend Thousands on "Founder" and "Global Ambassador" Packs.**

262.    SBH "Founders Packs" cost between $2,495 and $3,495 (plus $95-$150 shipping and handling); contained thousands of dollars in SBH products; and entitled the purchaser to "Founder" status, which included a share of the company's revenues over a

limited period and membership in the purportedly forthcoming (but never-created) SBH "retirement pool."  (Ex. 170 at 6; Ex. 130; Ex. 53 at 9:23-11:7.)

263.    SBH "Global Ambassador Packs" cost $4,995, plus $225 shipping and handling.  (Ex. 324 at 4; Ex. 149.)  Like the Founders Packs, Global Ambassador Packs contained various products and other benefits, including, again, a share of the company's revenues over a limited period and membership in the purportedly forthcoming (but never-created) SBH "retirement pool."  (Ex. 149.)

264.    At one training event, Defendants promoted the Founder and Global Ambassador Packs with the following slide (Ex. 24 at 3):



265.    Defendants told affiliates seeking financial freedom (#3's) that they needed to become Founders and Global Ambassadors.  (*See infra* ¶¶ 266-274.)

266.    On an early SBH "Heat" conference call, for example, Noland told affiliates that #3's should, "first and foremost," "step up and get a Founders Pack."  (Ex. 346 at 3-7.)

267.    At Defendants' "ICON" training event, Noland demanded of attendees (who already had paid thousands of dollars to attend, Ex. 329 at 11):  "If you want to be an Icon, are you at least a country founder? . . . If you are not a country founder, stand up.

53

. . . So if you're going to be an Icon, do iconic stuff.  Don't leave no money on the table.

Don't let cost cost you everything . . . . You got to get to the point where you ain't

standing up during those sessions because the only reason you stood up is what?  You're

looking at the [cost.]  You ain't looking at the [value.]"  (Ex. 109 at 8:1-25.)

268.    For those still worried about the cost of the Founders Pack, Noland

reminded them:  "Now, all you got to do is use OPM if you ain't got your own money.

Use other people's money [OPM].  Stick it on a credit card, or borrow somebody's credit

card.  The only reason you won't do it is because you're too prideful. . . . The problem is

you're too prideful, and that'll keep you in the cellar.  Call some people, I need to borrow

your credit card, I need some help.  If they're not going for financial freedom and you

are, don't they need you?  They going to need you, so go on and help me out, let me use

your credit, I'll get that paid back. . . . It should take you 30 days, 60 days max, right?

Paying 18 percent interest . . . . Let me use your credit card, and then I'll pay whatever

interest charges you get."  (Ex. 109 at 11:20-12:25.)

269.    While encouraging attendees to go into debt (and drag their friends and

families into debt with them), Noland used the accompanying graphic, demonstrating the

"value" of using other people's money or "OPM" (Ex. 24 at 20):



270.    Noland then pivoted immediately to the even more expensive Global Ambassador Pack:  "You're going to be an ICON, and you sitting in the room at the ICON training, and you ain't a global ambassador?"  (Ex. 109 at 13:23-14:1.)  He continued:  "[I]f they say they want to be wealthy in SBH and you ain't global ambassador, you making an extremely—let me be raw—unwise unwise[sic] decision that you are for sure—listen to me—going to regret.  Fact:  if you're not a global ambassador and you want financial freedom, and I was sitting in front of your face, and all it took was for you to hustle to get the money that's going to evaporate, it's going to come right back to you in product, that you can just turn right back into the money that you went and got, if you just hustle . . . .".  (Ex. 110 at 8:7-21.)

271.    As with the Founder's Pack, Defendants again recommended using "other people's money" for the $5,000-plus Global Ambassador Pack (Ex. 24 at 6):



272.    When SBH affiliates purchased Global Ambassador Packs, they "commit[ted] to lead by example and set the standard for all SBH Affiliates globally as a 'Financial Freedom' builder."  (Ex. 324 at 3.)

273.    Former SBH affiliate Jason Johnson confirmed that Defendants told affiliates who "wanted a reasonable expectation at achieving financial freedom" to buy

Founders Packs.  (Johnson Dep. Tr. at 147:7-10.)

274.    Similarly, former SBH affiliate Krystian Sarzynski testified that Defendants told him his income potential in SBH would be "limited" if he did not buy a Founders Pack.  (Sarzynski Dep. Tr. at 62:12-63:16.)

### 3. Defendants Encouraged, and Often Required, Monthly Product Orders of up to $500 Regardless of User Demand.

275.    Defendants directed new affiliates to establish monthly "auto-orders" of SBH products, explaining that their success in the company depended on doing so.  (Ex. 7 at 2-3; Ex. 5 at 18.)

276.    After affiliates enrolled, Defendants continued to push them to make monthly product purchases untethered from retail demand.  (*See infra* ¶¶ 277-283.)

277.    At the end of each month, for example, Defendants sent emails telling affiliates to "qualif[y] to the Highest Rank Possible!" and reminding them that "your Personal Orders count toward" rank advancement.  (Ex. 166.)

278.    Noland admitted that the purpose of the month-end emails was to "create urgency" for affiliates.  (Ex. 247.)

279.    In one end-of-month video message to affiliates, Harris boasted about the purported benefit of inventory loading:  "If you've got $1,000 worth sitting in your house, congratulations.  If you've got four or $5,000 worth, congratulations.  If you've got more than that, congratulations.  Mr. Noland and I [in a prior MLM business] used to carry around 10, 15, 20, $25,000 or more in products."  (Ex. 95 at 30:11-17.)

280.    In another end-of-month message, Harris encouraged affiliates who were $2,000-3,000 away from hitting a higher SBH "rank" to simply buy the products themselves, despite the fact that those "ranks" reset every single month and affiliates might find themselves in the exact same situation the following month.  (Ex. 93 at 14:23-15:9 ("I'm two or [$]3,000 away from ranking up, I'm going to buy those products."); *see also infra* ¶¶ 304-316 (discussing "rank advancement").)

281.    Noland told one live audience not to bother with SBH if they were not going to order products every month.  (Ex. 127 at 23:2-4 ("So every month, you got a back office.  When I look at your name, there should be no months I see a zero. . . . Otherwise, do not give me $49 [to join SBH].").)  He later added that if affiliates wanted to earn millions, they needed $500 in "personal volume" per month (Ex. 127 at 28:4-29:4 ("[I]f you are a number three—who wants financial freedom in this room . . . , [w]hen I look at your ID number in the [back office], your personal volume should say at least [$]500.").)

282.    In a video posted to Facebook, Noland boasted that in a prior multilevel marketing company, anyone seeking millions of dollars in earnings was expected to "have at least an 850 dollar order in."  (Ex. 56 at 23:1-4.)  He added:  "I would go into cities and there would be promotions for private trainings with me but you've got to be on the 850 club, which means you had to have an 850 dollar order and 850 dollar auto order set up.  You've got to have both."  (Ex. 56 at 23:14-22.)

283.    Unsurprisingly, affiliates heeded Defendants' warnings, with data showing purchase volume more than doubling on the last two days of each month.  (Anticipated Testimony of Elizabeth Anne Miles.)

### 4.    Defendants Required "Founders" and "Global Ambassadors" to Buy Hundreds of Dollars in Products Per Month.

284.    Defendants also required SBH "Founders" and "Global Ambassadors" to purchase $100-600 in products per month.  (Ex. 324 at 3 ($250 or $500 order for Global Ambassadors); Ex. 170 at 4-5 ($100 for Founders); Ex. 289; Ex. 102 at 33:10-23 ("So from the time you purchase it, the following month you need to have at least $100 auto-order . . .and every month during the duration of the Founder Pool payout as well.  If you ever miss a $100 . . . auto-order by the end of the calendar month, you'll be out of being an SBH USA Founder."); *see also supra* ¶¶ 262-274 (explaining Founder and Global Ambassador programs).)

285.     In their end-of-month, urgency-creating emails (Ex. 166), Defendants also reminded Founders and Global Ambassadors of their purchase obligations.  (Ex. 166 at 3, 5, 8, 10, 13 16, 19, 21, 24, 26, 29, 33, 36, 39, 41, 43, 48, 50, 53, 56 (Founders "must . . . maintain a $100 (US) order every month for the life of the SBH Founder Pool"); *id.* at 13, 16, 19, 21, 24, 26, 29, 33, 36, 39, 41, 43, 48, 50, 53, 56 (Global Ambassadors "[m]ust maintain at least a $250 monthly order every month while packs are being sold, and then $500 per month after last of the 600 [global ambassador packs] are sold for the life of the bonus pool").)

286.     Defendants' emails confirm that SBH Founders and Global Ambassadors made purchases to maintain their status in the company.  (*See, e.g.*, Ex. 220 (SBH affiliate:  "I am trying to set up my auto-order this month in order that I can fulfill my commitments as per my Global Ambassador contract."); Ex. 224 at 1 (Harris:  "From what I understand, [an affiliate is] trying to get her $250 order in because she's a Global Ambassador. . . . Has to be done before tomorrow night."); Ex. 229 (SBH affiliate:  "In November 2018 I have bought a Global ambassador package.  I have been asked to do an auto order for 250.00 USD this month.  Until now I have not received half of the Supplements and coffee and tea from the [Global Ambassador Pack].  I have paid a lot of money for it and shall do now another order for 250.00 USD.")

### 5.     Defendants Created Incentives to Promote Product Purchases Untethered from Demand.

287.     Defendants further encouraged excessive product purchases untethered from product demand by inventing "elite" (but sometimes non-existent) groups for affiliates in which they would receive purportedly exclusive benefits.  (*See infra* ¶¶ 288-316.)

### a.     "CORE" Team

288.     In November 2017, Defendants released a set of "base requirements" for the "CORE Team," which would have "exclusive advantages" within SBH and "help us

58

build out the key leaders and trainers for the company's future."  (Ex. 133.)

289.    The November 2017 CORE "base requirements" included recruiting three new affiliates within two weeks, each of whom placed a $100 product order.  (Ex. 133.) There was no requirement to make any retail sales.

290.    SBH affiliates reported to Defendants that they had completed the "CORE" base requirements, including by recruiting three new affiliates.  (Ex. 332.)

291.    In 2018, Defendants declared it was now "time for us to build the SBH CORE Team!"  (Ex. 140.)  That team would include 20 affiliates and would be the "only way to be on the same page mentally with [Noland] on this Millionaire Making SBH Journey."  (Ex. 140.)

292.    In addition to the November 2017 "base requirements," in order to join the Core Team, affiliates had to, at a minimum, subscribe to three Jay Noland training series ($100 per month, plus approximately $1,500 up front), establish a $500 monthly auto-order, buy a ticket to an upcoming training, and have three recruits also buy tickets.  (Ex. 140; Ex. 309 (showing cost of Defendants' "StrongXP," "Third & Grow Rich," and "Million Dollar Energy" courses).)  Again, there was no requirement to make any retail sales.

293.    Affiliates again submitted applications to the CORE Team, in which they confirmed that they had met the onerous qualification requirements.  (Ex. 265.)

294.    Defendants, however, never even selected a CORE team.  At his deposition, Sacca admitted:  "So it was never really—never really anything done with it, with the CORE team.  It was the concept, just something we kind of kicked around." (Sacca Dep. Tr. at 139:13-140:6.)  He added that Defendants had "very few conversations about CORE" because "it literally was just something that was a concept, if you will." (*Id.* at 142:23-143:8.)  Sacca could not remember if there was ever a retail sales requirement to be part of the CORE team because CORE "was never installed, if you

will." (*Id.* at 148:1-25.)  Noland, similarly, testified that he was "not sure" if he ever filled the CORE team.  (J. Noland Dep. Tr. (12/14/20) at 279:3-280:23.)

295.    Almost two years after the first "CORE" team incentive, however, Defendants continued to string along the same group of applicants.  Sacca, for example, in August 2019, emailed a group of affiliates that had "been a part of all the discussions concerning the 'CORE GROUP' here at SBH!!  Believe me . . . you want to be a part of this Elite Group!" (Ex. 244.)  Sacca announced yet more eligibility criteria in order for affiliates to "stay in the conversation" for the CORE team, including instructing affiliates that they must compete the "Power 500" and "Power 1000" challenges.  (Ex. 244.)  Those challenges, in turn, required affiliates to buy a product pack for $125 or more from SBH and, within 14 days, recruit new affiliates who also made purchases from SBH exceeding a certain price threshold.  (Ex. 16 at 48.)  Once again, there was no retail-sale requirement.

### b.    "Millionaire Insider" Calls

296.    In early 2018, Noland hosted a series of "Millionaire Insider" conference calls.  (Ex. 167.)  Defendants wrote that "if you are truly focused on Financial Freedom, you can't miss these calls," adding that their mission was "to build and create 1,000 Millionaires.  It's going to fun [sic] watching it happen!" (Ex. 167 at 1, 3, 4, 9.)

297.    In order to join Defendants' Millionaire Insider calls, affiliates had to satisfy certain "criteria."  Those criteria included personally purchasing $500 or $1,000 in products from SBH within a four-day window or recruiting a new affiliate to do the same. (Ex. 167 at 1, 3, 4, 9.)  There was no retail-sale requirement.

298.    Affiliates eager to obtain the wealth Defendants dangled in front of them did as Defendants said, placing large product orders or recruiting new affiliates to do the same.  (Ex. 167 at 6 (listing 48 affiliates who qualified for one call); Ex. 266 (affiliate emails submitting their qualifications).)

### c.      "All Out, All In" Team

299.    In mid-2018, Defendants began promoting an SBH "All Out, All In" Team. (Ex. 168.)  Defendants explained:  "These are the most committed people in SBH.  These are the people who are ready to go for Financial Freedom with all they've got. . . . The elite of the elite from SBH will come out of this group."  (*Id*.)

300.    Defendants sent an email to interested affiliates, laying out the qualifications for the All Out, All In team.  (Ex. 267 at 1.)  Among other things, Defendants required affiliates to buy $1,500 in SBH products or recruit a new SBH affiliate to do the same, and buy two of Defendants' training programs at a cost of approximately $1,500.  (*Id.*; Ex. 309 (showing cost of Defendants' "Third & Grow Rich" and "Million Dollar Energy" courses).)  There was no retail-sale requirement.

301.    Once again, affiliates eager to show their commitment to attaining financial freedom reported that they had placed large product orders to qualify for the team.  (Ex. 267.)

302.    Two weeks after affiliates reported their "qualifications" for the All Out, All In team, Defendants congratulated them on "meeting the requirements to be *considered* as part of the SBH ALL OUT, ALL IN Team."  (Ex. 193 (emphasis added).)  Defendants then told the affiliates that "[i]n order to remain a part of this team, you must perform the tasks that need to be done."  (*Id.*)  For meeting the previous set of qualifications, affiliates were merely rewarded with "seats upfront at the [next] training with your name on them."  (*Id.*)

303.    Shortly after the event at which "All Out, All In" candidates obtained front-row seats, Defendants posted another "All Out/All In Challenge" to their Facebook group.  (Ex. 145.)  Just like the last challenge, it required, *inter alia*, affiliates or their new recruits to purchase $1,500 in products from SBH.  (*Id.*)  Once again, there was no retail-sale requirement.

### d.     Rank Advancement

304.     As described above, SBH awarded affiliates "ranks" ranging from "Business Affiliate," which required $5,000 in monthly purchases from the affiliate or the affiliate's downline team or customers, to "5 Star Diamond," which required $1.25 million in monthly purchase volume.  (*E.g.*, Ex. 14 at 4.)

305.     Affiliates' compensation varied, to a minimal degree, with their SBH "rank."  The SBH commission plan, for example, only allowed affiliates to earn on "5th and 6th tier sales" (*i.e.*, for the fifth tier, purchases by affiliates' recruits' recruits' recruits' recruits' recruits) if they achieved a "rank" of SBA1.  (Ex. 13 at 4.)  In order to take advantage of that, however, an affiliate would, of course, need a five-tier downline team and, even then, would only receive a 2% commission on fifth-tier purchases.  (*Id.*)  The SBH Commission plan also featured a complicated, rank-based "4 Generation Super Business Affiliate Infinity Bonus" (Ex. 13 at 4-5), but, excluding payments to the Defendants themselves, Defendants paid out less than $30,000 total in Infinity Bonuses during SBH's 29-month existence (Ex. 350-82, Column R).

306.     SBH ranks were unrelated to an affiliate's retail sales of products to ultimate users.  Instead, SBH based ranks solely on *purchases from* SBH by the affiliate and the affiliate's downline team (or, in rare cases, customers who purchased through the affiliate's or the affiliate's teams replicated SBH website).  (Ex. 13 at 4; *see infra* ¶¶ 354-355 (customer purchases accounted for just 5% of SBH sales).)

307.     Primarily, Defendants used the promise of higher "ranks" to encourage affiliates to load up on SBH products.  (*See infra* ¶¶ 308-313.)

308.     From the start, Defendants focused affiliates on rank advancing (and large personal purchases to achieve that goal).  Their Fast Start System, for example, told affiliates to "[s]tart growing solid Residual Income right away by" achieving the lowest ("Business Affiliate") rank.  (Ex. 5 at 3.)  To do so, they instructed affiliates to buy a $2,000 "Super Accelerator Pack" and recruit two new affiliates to do the same.  (Ex. 5 at

3-4.)  "The key," Defendants added, "is to get [to the Business Affiliate rank] within your first 2 months in the business."  (Ex. 5 at 4.)  Later, the Fast Start System tells *all* affiliates (whether #1s, #2s, or #3s) to reach the Business Affiliate rank within 1-4 months—one month if seeking financial freedom or four months if seeking to supplement income.  (Ex. 5 at 21.)  Affiliates then must "Keep Building Every Month" by "Focus[ing] on Rank Advancing."  (Ex. 5 at 22.)

309.   To make matters worse, SBH reset affiliates' ranks each month (Ex. 166 at 2.)

310.   Defendants took advantage of the monthly rank reset.  At the end of each month, they told affiliates to "qualif[y] to the Highest Rank Possible!" and reminded them that "your Personal Orders count toward" rank advancement.  (Ex. 166.)

311.   As described above, in one end-of-month video posted to the SBH "Heat" Facebook group, Harris encouraged affiliates who were $2,000-3,000 away from hitting a higher SBH rank to simply buy the products themselves.  (Ex. 93 at 14:23-15:9 ("I'm two or [$]3,000 away from ranking up, I'm going to buy those products.").)

312.   On an end-of-month "Heat" conference call, Noland encouraged all affiliates to reach the "Business Affiliate" rank by recruiting two affiliates to order $2,000 Super Accelerator Packs and "do a $1,000 order yourself."  (Ex. 336 at 33:10-20.) Noland continued:  "*You want to get ranked up,* you got a p[i]n coming to you in the mail.  You want to be able to say, look at this.  Tell your team, you know what this p[i]n represents?  It's a step in my freedom.  I'm going to tear a hole in this debt, in this freedom, in this system. . . . You want to be the boss?  Just get these ranks moving."  (*Id.* at 33:21-34:25.)

313.   In late August 2019, on another "Heat" conference call, Harris told affiliates:  "The higher your rank, the more money you make. . . . This is the time to dig in and get your people paid."  (Ex. 99 at 37:34-38:7.)

314.   Defendants also regularly promoted a $2 million "takeover" challenge that Sacca described as a "rank advancements challenge."  (Ex. 101 at 9:9-17.)  He added:  "If you rank and you're the first person in a state . . . to hit SBA-1, SBA-2, 3, 4, or one-star diamond, there is bonus money in it for you.  $1,000 for SBA-1, $2,000 or SBA-2, $5,000 for SBA-3, $10,000 for SBA-4, and, yes, $20,000 for somebody hitting and ranking to [one-star diamond]."  (*Id.*)

315.   Defendants also awarded affiliates with a trip to Hawaii if they achieved a certain rank.  (Sacca Dep. Tr. at 149:1-151:24 ("It was just people that hit a certain rank in the company, and it was just an awards trip.").)  Because Defendants based the trip on SBH "ranks," "achieving" it had nothing to do with retail sales.

316.   Defendants also teased a December 2019 trip to Aruba for affiliates who "quality for [the SBA 4 rank] two months in a row or hit [the Diamond rank] one month." (Ex. 345.)  That trip never occurred.  (Sacca Dep. Tr. at 151:4-8.)

### 6.   Defendants Employed No Safeguards to Protect Consumers from Holding Excess Inventory.

317.   Not only did Defendants encourage excessive buying untethered to ultimate-user demand (*see supra* ¶¶ 254-316), but, as the Court previously concluded, "there is evidence that . . . SBH lacked safeguards to prevent inventory loading or to encourage retail sales . . . ."  (Doc. 406 at 39.)  In other words, Defendants lacked any policies to ensure that affiliates' inventory ended up in the hands of ultimate users rather than accumulating in affiliates' garages.  (*See infra* ¶¶ 318-323.)

318.   For example, Defendants' no refunds "for any reason whatsoever" policy (Ex. 2 at 3; *see infra* ¶¶ 637-652) left consumers who were unable to sell their personal inventory with no realistic option but to take losses.  (Ex. 25 at 55 ¶ 99 (Dr. Bosley referring to Defendants' no-refund policy as an "anti-safeguard").)

319.   Defendants also had no policy requiring affiliates to personally use or resell, to third-party users, *any* of the products they purchased from SBH, much less to

certify that they had done so.  (Ex. 2 (Terms of Use, lacking any such policy); Anticipated Testimony of Adam Rottner.)

320.    Defendants placed no restrictions on affiliates' ability to order more products while they still had excessive inventory on hand.  Ex. 2 (Terms of Use, lacking any such policy; Anticipated Testimony of Adam Rottner.)

321.    Noland testified that he "[didn't] believe" SBH had any compliance policies of any kind.  (J. Noland Dep. Tr. (2/5/20) at 104:9-21.)

322.    Former SBH affiliates Krystian Sarzynski, Kaci Wood, Stephanie Underhill, and Jason Underhill confirmed Defendants never asked them to report on their retail sales.  (Sarzynski Dep. Tr. at 85:7-9; Wood Dep. Tr. at 122:14-21; S. Underhill Tr. at 84:6-13; J. Underhill Dep. Tr. at 43:18-44:4.)

323.    Defendants also admitted they did not track affiliates' offline sales.  (Doc. 222 ¶ 34 (admitting in part Doc. 205 ¶ 64:  that "SBH does not separately track sales made by Affiliates to ultimate users of SBH products"); Doc. 106 at 14; Harris Dep. Tr. at 270:6-25.)

### 7.    Affiliates Confirmed They Bought Products to Achieve Promised Financial Freedom, Rather Than for Personal Consumption or Resale.

324.    As described above, Defendants encouraged SBH affiliates to buy products from SBH in order to achieve "financial freedom," without regard for whether the consumer intended to consume or sell the products and without any safeguards to aid consumers who stockpiled excess inventory.  (*See supra* ¶¶ 254-323.)

325.    Defendants, for example, encouraged monthly product orders of $500 for those seeking financial freedom and created various incentives for SBH affiliates to purchase large volumes of products.  (*See supra* ¶¶ 275-316.)

326.    Affiliates confirmed buying products to earn rewards or meet challenges set by Defendants, rather than to satisfy their own or other consumers' demand.

Unsurprisingly, affiliates ended up with excess inventory.  (*See infra* ¶¶ 327-329.)

327.     Former SBH affiliate Jason Johnson, for example, testified that when he left SBH, he had approximately $2,000 in products in his possession.  He consumed some of those products and also sold some at a loss.  (Johnson Dep. Tr. at 156:4-21.)  Johnson confirmed that Defendants promised rewards to affiliates for purchasing products, but that he never heard Defendants suggest affiliates should not buy products if they had no use for them.  (Johnson Dep. Tr. at 154:10-155:2.)

328.     Similarly, former SBH affiliate Jason Underhill testified that he "ended up having to throw most of [his SBH product inventory] out" when he quit SBH because "we couldn't do nothing with it," "[d]idn't nobody want it," and "[m]ost of it went out of date."  (J. Underhill Dep. Tr. at 21:14-22.)

329.     Former SBH affiliate Kaci Wood explained that affiliates "were told to invest and continue to buy, even though we had some in our house and needed to actually get rid of that somehow and couldn't get rid of that . . . . All they were focused on was getting more people involved to buy these packages, that no one could sell that amount of product. . . . We had plenty of product, and we were told that we needed to invest more into that, even though we already had plenty of product, because they continued the cycle of telling you that you needed to reinvest into the company."  (Wood Dep. Tr. at 27:25-29:2.)  Wood estimated that she bought approximately $30,000 in SBH products and that, after she left SBH, $18,000 "went straight to the trash."  (Wood Dep. Tr. at 26:9-27:7.)  (Wood later clarified these estimates were based not on Wood's purchase price, but rather what Defendants told her was the marked-up "retail" value of the products.  (Wood Dep. Tr. at 35:10-14.).)

330.     Unsurprisingly, the data shows that consumers were motivated by Defendants' threats and incentives rather than demand to consume the product.  Product purchases spiked at the end of each month, with more than twice as much purchase

volume occurring then as on all other days, on average.  (Anticipated Testimony of Elizabeth Anne Miles.)

### 8. Defendants Did Not Treat Sales to Affiliates as Being for Personal Consumption.

331.   Contrary to Defendants' litigation position, Defendants, when they ran SBH, never treated SBH product sales as being sales to ultimate users.  (*See infra* ¶¶ 332-335.)

332.   Defendants, for example, declined to collect or pay any sales tax on their sales to affiliates because they considered themselves "a direct *wholesaler* to the public" and did "not hav[e] any Retail Pricing" on their site.  (Ex. 171.)  Noland added:  "I'm putting the onus on the Affiliates if they 'Retail Resale' the products, they need to collect and remit the sales tax to appropriate states."  (*Id.*)

333.   Similarly, in a sworn declaration to the IRS, Noland described SBH as a "company that sells directly to wholesale distributors"—*not* individual consumers.  (Ex. 222 at 5.)

334.   Elsewhere, Lina Noland confirmed to an SBH affiliate that SBH was a "wholesale company first and foremost."  (Ex. 243.)

335.   Defendants also told affiliates that their purchases from SBH were "Not Retail."  (Ex. 147; *see supra* ¶ 249.)

### 9. The Sharp Decline in Post-TRO Product Sales Confirms Affiliate Purchases Were Not Driven by Actual Demand.

336.   When the Court entered its Preliminary Injunction, it let the Receiver resume SBH product sales in the hope that it would "provide some relief to the Affiliates who feel harmed by the TRO."  (Doc. 106 at 28.)  The Court "allow[ed] the receiver to reactivate shipping and sell what SBH products she has in her possession."  (*Id.*)

337.   The Receiver re-opened sales on May 11, 2020.  (Ex. 568.)  When she did, she did *not* reactivate the SBH commission structure or offer to pay rewards based on

purchases.  (*Id.*)  She applied a 10% discount on SBH products and only allowed sales to affiliates.  (*Id.*)  In this way, she explained, affiliates would be in the same net position as when they received a 10% commission on their SBH purchases.  (*Id.*)

338.    When stripped of Defendants' pyramid commission structure, deceptive income claims, and push to load inventory, SBH product sales plummeted.  The Receiver offered products for sale for 275 days between May 11, 2020 and March 10, 2021 (Ex. 33 at 5-6; Anticipated Testimony of Kimberly Friday)—which is the data the FTC's data analyst analyzed in the FTC's summary judgment briefs.  (Ex. 38 at 10-11.)

339.    In the 2.5 years prior to entry of the TRO, affiliates bought an average of $6,694.23 in SBH products per day.  (Ex. 38.)  In 2019 (using Defendants' own numbers, Doc. 187 at 3), Defendants made $8,170 in product sales per day ($2,982,113 for 2019).

340.    In the 275 days the Receiver sold products from May 11, 2020 to March 10, 2021, *SBH product sales averaged $413.56 per day—a decrease of nearly 95% from pre-TRO sales*, even though demand had (purportedly) built up for four months post-TRO, while affiliates could not buy products from SBH.  (Ex. 38 at 12.)

341.    Extending the analysis of post-TRO sales beyond March 2021 provides even more compelling evidence of plummeting product demand.  Before halting sales in November 2021, the Receivership made $155,744.93 in product sales between May 11, 2020 and October 21, 2021—499 days, after excluding the 29 days the Receiver paused sales (Ex. 30 at 4; Ex. 35 at 8; Anticipated Testimony of Kimberly Friday & Peter Davis.) In total, from May 2020 through November 2021, SBH product sales averaged *$312.11 per day*—a decrease of over 95% from pre-TRO sales.

342.    As the Court wrote (based on post-TRO sales through September 2020): "The evidence, in short, suggests that demand for SBH's products has evaporated since the Receiver eliminated the recruitment incentives that were in place when the Individual Defendants were operating SBH.  Daily revenue from product sales has decreased by

approximately 94%."  (Doc. 224 at 5.)  The Court added:  "To the extent SBH's post-receivership sales trajectory has any bearing on the propriety of the preliminary injunction, it supports, rather than undermines the Court's earlier conclusion that the FTC has established a likelihood of success on its pyramid scheme claim."  (*Id.*)

343.    Even the anemic post-TRO sales, however, cannot be attributed purely to actual product demand because Defendants continued to try to prop up sales based on factors other than true demand.  (*See infra* ¶¶ 344-346.)

344.    Defendants and their former counsel, for example, told consumers they would eventually receive commissions from their and their recruits' post-TRO purchases, once Defendants prevailed in the litigation.  Defendants' counsel, for example, wrote to the Receiver:  "I am pleased to inform you that affiliates will get the benefit of downline purchases and will be awarded commissions for purchases of product because my clients have made that promise and are true to their word. . . . I will tell you right now that I will tell every affiliate with whom I speak that my legal opinion is that this case is going to turn around for my clients and that affiliates will be paid in accordance with the multilevel marketing plan."  (Ex. 271 at 5.)

345.    Defendants and their counsel also encouraged affiliates to buy products because it would create a strategic advantage in litigation.  On "SBH Friends and Family" calls—conference calls among affiliates who supported Defendants in this case—affiliate Jo Dee Baer encouraged product purchasing unrelated to product demand by repeatedly relaying the following "words from our attorney":  "MOVE this Inventory in the Warehouse and I can WIN this CASE."  (Ex. 322.)  Some affiliates, therefore, may have bought products to support Defendants rather than to consume or resell it.

346.    The Court infers that if Defendants had not intentionally destroyed emails and text messages, there would be more evidence of Defendants urging former SBH affiliates to buy SBH products for reasons unrelated to actual demand for the products.

(Doc. 401 at 24-27 (entering adverse inference sanction); *see also infra* ¶¶ 738-755 (describing document destruction).)

**D.    Defendants Paid Commissions and Bonuses Based Almost Entirely on *Purchases from* SBH by Affiliates and Their Recruits.**

347.    The SBH commission plan is summarized *supra* ¶¶ 136-152.

348.    SBH paid commissions and bonuses based on *purchases from* the company. (*See supra* ¶¶ 136-160.)  The overwhelming majority of purchases from SBH, in turn, were by SBH affiliates themselves, rather than non-affiliate ultimate users of the products outside the SBH pyramid.  (*See infra* ¶¶ 349-355.)

349.    FTC Data Analyst Elizabeth Anne Miles reviewed data that Defendants produced to the FTC and created a "comprehensive spreadsheet that identifies each product and [event] ticket purchased from Success By Media, the date and amount of each purchase, and, for each affiliate, the total commissions (earned and disbursed)." (Ex. 38 ¶¶ 4-5.)

350.    Miles also prepared a "summary profile that for each affiliate and consumer shows the total value of purchases, the first and last invoice date for purchases, the total value of ticket sales, the total value of VOZ purchases, the total value of product credits, and total commissions (earned and disbursed)."  (Ex. 38 ¶ 5.)

351.    Miles limited her analysis to transactions occurring between July 1, 2017 and January 13, 2020—what she termed the "Period of Review."  (Ex. 38 ¶ 5.)  (SBH started operating in July 2017 (see first sales in Ex. 350-79 (Tab "6. SBH Shipped Items")), and the Court issued its TRO on January 13, 2020, halting SBH's operations.)

352.    Miles identified 51,612 unique transactions that occurred within the Period of Review, involving 10,910 unique ID numbers (either SBH affiliates or non-affiliate consumers).  Miles identified 6,962 of those unique ID numbers as belonging to SBH affiliates.  (Ex. 38 ¶ 11.)

353.    For purposes of her analysis, Miles excluded five ID numbers belonging to the four Individual Defendants from the group of SBH "affiliates."  (Ex. 38 Dec. ¶ 12.)

As a result, Miles had three categories of consumers/ID numbers:  affiliates, non-affiliates, and the Individual Defendants.

354.    Miles determined that *94.7%* of all of Defendants' SBH sales were to SBH affiliates during the Period of Review.  (Ex. 38 at 6.)  SBH sales (all of Defendants' non-event and non-VOZ sales) were the basis for SBH commissions.  Mathematically, Miles divided $6,205,551.29 in affiliate SBH purchases by total sales of $6,551,382.04.  (*Id.*)

355.    Defendants have sometimes claimed that large volumes of purchases from SBH were by non-affiliates.  (*E.g.*, Doc. 348 at 5 (claiming that in 2019, 14% of revenues were from non-affiliates and 42% of purchasers were non-affiliates).)  Defendants' assertions, however, are based on bad data.  They rely, for example, on spreadsheets (Doc. 343, Ex. B-4) listing one consumer, "Ulla Ramstedt," as having nine separate non-affiliate accounts, each making one non-affiliate order, *but she is an affiliate* (Ex. 350-79, tab "3a. Affiliate Commissions," Row 123).  The same spreadsheet (Doc. 343, Ex. B-4) lists *Defendant* Thomas Sacca three times as a *non*-affiliate customer.  The identification of "customers" and "affiliates" in Defendants' Trial Exhibits 822, 823 ("tables" tab, Column H) suffers from the same flaws.

356.    Because SBH paid bonuses and commissions based on purchases from SBH and because 95% of those purchases were by SBH affiliates, SBH paid commissions and bonuses based almost entirely on purchases by SBH members themselves, rather than outside, ultimate users of the products.

**E.    Defendants Used the False Promise of Sustainable Retail Sales to Advance Their Scheme.**

357.    Defendants, to be sure, did not ignore retail sales.  But when they mentioned them, they generally did so (1) as a recruiting or "confidence-building" strategy or (2) to induce affiliates to inventory load (telling that affiliates they could simply sell it for a large profit if they needed the money back).  (*See infra* ¶¶ 358-372.)

**1.      Defendants Told Affiliates to Give Away Products for Free and Treat Retail Sales as a One-Off Recruiting Tool.**

358.    Defendants instructed affiliates to give away SBH products for free "[t]o attract both SBH Customers and Business Builders," *i.e.,* affiliates.  They also used retail sales as a recruiting or "confidence-building" strategy, and consistently urge affiliates to convert their customers into affiliates.  (*See infra* ¶¶ 359-364.)

359.    Specifically, SBH's "Fast Start System" training directed affiliates to first give away 60 product samples in their first 30 days for free (at a loss to affiliates) to induce recipients to become affiliates.  (Ex. 5 at 21.)

360.    Defendants then told affiliates to tell recipients of the samples that they could get the products for "FREE" by enrolling as an affiliate—which Defendants claim "most people" will take.  (Ex. 5 at 21.)  This "strategy," of course, eliminates affiliates' ability to make future retail sales to that customer—trading what Defendants claim would be a $15 profit on a $20 bag of coffee (*e.g.*, Ex. 16 at 42) for a 10% ($2) commission.

361.    Defendants' "retail sales script" doubles down eliminating any route to sustainable retail sales.  (Ex. 8.)  That script directs affiliates to ask their friends or family members to "help me out by buying at least *a bag or two of coffee from me one time* at Retail Pricing."  (Ex. 8 (emphasis added).)  The affiliate is told to say, "If you like it, I will show you how to get it at wholesale" directly from SBH.  (*Id.*)

362.    Harris, similarly, directed affiliates to tell potential retail customers:  "I just started a new coffee business; would you do me a favor *and just buy a few bags of coffee from me at retail*?  It would mean a lot to me.  And if you love this coffee as much as I do, and I believe you will, *I can show you how to get it at wholesale or even for free*."  (Ex. 113 at 23:21-24:4 (emphasis added).)

363.    Noland responded approvingly when an SBH affiliate posted to the SBH "Heat" Facebook group his strategy for approaching consumers:  "Would you help me out and *buy a bag or two bags from me this one time TODAY at retail* and if you like it

I'll show you how to get it at a discounted price." (Ex. 334 (emphasis added).)

364.    Former Affiliate Stephanie Underhill confirmed that Noland urged affiliates "[e]very single time" they made a retail sale, to try to enroll the purchaser in SBH. (S. Underhill Tr. at 83:25-84:5.)

### 2.    Defendants Used the False Promise of Sustainable Retail Sales to Induce Excessive Product Purchases.

365.    As detailed above, Defendants encouraged affiliates to purchase excessive amounts of SBH products. (*See supra* ¶¶ 254-330.)

366.    One way Defendants tried to reassure affiliates worried about stockpiling inventory was to convince them that they would always be able to resell it to get their money back. (*See infra* ¶¶ 367-372.) Of course, such promises were false, given the obstacles Defendants imposed on sustainable retail sales. (*See supra* ¶¶ 221-244.)

367.    For example, when Noland pressured event attendees to spend over $3,000 on Founders Packs (*see supra* ¶¶ 262-274), he justified it by telling affiliates they'd simply get the money back by retailing: "You're just giving [the money] to SBH, but SBH will give you more value. . . . You give me this, I give you something back more valuable. . . . So you're going to take it, take the [$3,200 in products]. What's plus 50 percent of that? . . . So you turn [$]3,200 into . . . [$]4,500. I keep it in the bank, how much am I going to make over the course of a year? . . . Ninety bucks, right? Silly. Why would I take the money and let it sit in the bank, and I'm not getting any major benefit out of it, when I can take the same money and stick it in the bank of me and turn it into 50 percent [retail] profit . . . ." (Ex. 109 at 10:8-25.) Noland added that because "[i]t should take you 30 days, 60 days max" to sell the products, consumers would have no trouble paying off the 18% interest incurred on theirs or their families' and friends' credit cards, which they could use to purchase the products from SBH. (Ex. 109 at 12:14-21.)

368.    Similarly, when pressuring attendees to spend over $5,000 on "Global Ambassador Packs," Noland, again referencing the possibility of retail sales reminded

affiliates:  "Fact:  if you're not a global ambassador and you want financial freedom, and it was sitting in front of your face, and all it took was for you to hustle to get the money that's not going to evaporate, it's going to come right back to you in product, that you can just turn right back into the money that you went and got, if you just hustle, which you in charge of . . . ."  (Ex. 110 at 8:7-21.)

369.    On one end-of-month call urging affiliates to order products to hit SBH "ranks," Harris told affiliates not to worry about buying products because they could just resell them for a profit:  "I'm [$2,000-3,000] away from ranking up, I'm going to go buy those products.  Why?  Because I'm going to sell those products at retail and make a profit. Or I'm going to use those products for me and my family, or, guess what, I'm going to sample those products . . . . But if I just go retail those products, I'm going to make a huge profit off of [$2,000-$3,000] worth of products."  (Ex. 93 at 15:6-18.)

370.    Defendants' recruiting slides encourages new affiliates to buy a $500 "Accelerator Pack" because it has products "retail-able at up to $900."  (Ex. 16 at 65.)

371.    Similarly, Defendants promoted the $500 monthly auto-orders that they urged, and sometimes compelled, financial-freedom seekers to make (*see supra* ¶¶ 275-283) by telling them they just needed to sell six bags of coffee per week to clear the products from their inventory.  (*E.g.*, Ex. 127 at 28:16-29:4.)

372.    As explained in greater detail below (*see infra* ¶¶ 545-549) expert witness Dr. Stacie Bosley found that "[d]iscussions of retail also serve to justify instructions for Affiliates to purchase product, both at the time of joining and over time."  (Ex. 25 at 53 ¶ 98.)  She elaborated:  "As Affiliates are trained to purchase the largest enrollment packs and establish an auto-order to maximize rewards from the business opportunity, assurances of consistent, strong retail demand for SBH products allow SBH leaders to promote and justify inventory loading."  (Ex. 25 at 53 ¶ 98.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**F.      Defendants Used Their "Training" Events to Magnify the SBH Fraud.**

373.    As the Court found:  "The Individual Defendants emphasized the value of training events led by Noland and strongly encouraged Affiliates to attend."  (Doc. 406 at 10.)  Tickets and other costs of attending the events were high, and Defendants pressured event attendees to buy more products and buy tickets for future events.

**1.      Dates, Cost, and Location of Events**

374.    Defendants held their "SBH Legacy Training" event in Las Vegas, Nevada from November 10-12, 2017.  (Ex. 329 at 1.)  Tickets cost $295.  (*Id.*)

375.    Defendants held their "SBH Kick-Off" ("Kickoff 2018") event in Nashville, Tennessee from January 27-28, 2018.  (Ex. 172 at 2; Ex. 329 at 2.)  Tickets cost $295.  (Ex. 172 at 2.)

376.    Defendants held their 2018 "RED" event in Las Vegas, Nevada from April 21-22, 2018.  (Ex. 175 at 2; Ex. 329 at 3.)  Tickets cost $795 if purchased in advance.  (Ex. 175 at 2.)

377.    Defendants had their "SBH Wealth Warriors Bootcamp" ("Bootcamp") event in Lexington, Kentucky from June 23-24, 2018.  (Ex. 329 at 5.)  Tickets cost $295-395.  (*Id.*)

378.    Defendants held their "MVP Unlimited" event in Carlsbad, California from October 12-14, 2018.  (Ex. 329 at 6.)  Tickets cost $2,495-2,995 each.  (*Id.*)  Although Defendants said this event was not an SBH event (and was instead run by Defendants' "Success By Networking" division), all attendees were SBH affiliates.  (Ex. 148.)

379.    Defendants held their "SBH 2019 Kick-Off" ("Kickoff 2019") event in Orlando, Florida from January 26-27, 2019.  (Ex. 194 at 2; Ex. 329 at 7.)  Tickets cost $195-295.  (Ex. 194 at 2.)

380.    Defendants hosted an SBH "Advanced Presenters Training" in Dallas, Texas on March 9, 2019.  (Ex. 329 at 8.)  Tickets cost $195.  (Ex. 329 at 8.)

381.    Defendants held their 2019 "RED" event ("RED 2019") in Las Vegas,

75

Nevada from April 27-28, 2019.  (Ex. 187 at 2; Ex. 206 at 2; Ex. 232 at 2; Ex. 329 at 9.)  Tickets cost $495-995.  (Ex. 187 at 2; Ex. 206 at 2; Ex. 232 at 2; Ex. 329 at 9.)  Although Defendants said this event was not an SBH event (and was instead run by Defendants' "Success By Networking" division), all attendees were SBH affiliates, and Noland, from the stage at the event, declared it an SBH event.  (Ex. 88 at 4:11-14, 6:6-23.)

382.    Defendants held their "ICON" event in Carlsbad, California from September 6-8, 2019.  (Ex. 329 at 11.)  Tickets cost $3,495, if purchased in advance.  (Ex. 329 at 11.)  Although Defendants said this event was not an SBH event (and was instead run by Defendants' "Success By Networking" division), all attendees were SBH affiliates.  (Ex. 105 at 9:8-11:5 (Noland confirming fact so that he can "go all in SBH").)

383.    Defendants also scheduled, and sold tickets for, at least three events that never occurred.  (*See infra* ¶¶ 384-386.)

384.    Defendants announced and sold at least $23,709.25 in tickets to an "SBH Millionaire Workshop" that was supposed to be held in Lexington, Kentucky from August 27-28, 2019.  (*See infra* ¶ 421; Ex. 329 at 14.)  Tickets cost $995.  (Ex. 232 at 2.)  Defendants cancelled it, claiming they needed "another year of growth and Leadership development, in order to be prepared for this particular Training."  (Ex. 329 at 14.)  (They claimed it would be held a year later (Ex. 329 at 14), but had taken no steps to do so as of the TRO (Anticipated Testimony of Adam Rottner).)  Defendants did not offer refunds to those purchasers, instead allowing them to apply the price of the ticket as a credit toward two other events, one of which (Kickoff 2020) did not occur.  (Ex. 329 at 14.)

385.    Defendants also sold $123,091 in tickets to an "SBH 2020 Kick-Off" event that was supposed to be held in San Diego, California from January 18-19, 2020.  (Ex. 329 at 12; Ex. 350-83 (sum all "SBH 2020 Kick-Off Training" ticket sales).)  Tickets cost $395.  (Ex. 248 at 3-4.)  Defendants cancelled the event after being served with the Court's TRO on January 13, 2020.  (Ex. 121 at 4:25-5:4.)

386.   Defendants announced and sold at least $175,620 in tickets to the 2020 edition of their "RED" event, which was scheduled for April 18-19, 2020.  (Ex. 237 at 2; *infra* ¶ 422.)  Following the Court's TRO, the RED 2020 event did not go forward.

### 2. Defendants Told Affiliates Attending the Events Was Necessary to Achieve Financial Freedom.

387.   Attending all of Defendants' in-person trainings cost at least $4,000 annually.  (*See supra* ¶¶ 374-386.)  Defendants convinced affiliates to pay that amount by telling them it was necessary to achieving financial freedom and by requiring certain subsets of affiliates to attend.  (*See infra* ¶¶ 388-399.)

### a. SBH Training Materials Emphasized Event Attendance.

388.   The SBH "1 Year Commitment Form" for new affiliates told affiliates to commit to attending "all Major Corporate Events."  (Ex. 6, *cited at* Doc. 406 at 10.) Defendants asked all affiliates to sign the form.  (Ex. 5 at 18.)

389.   Defendants' "Fast Start System" also told affiliates that getting their new recruits to buy event tickets is the "fastest way to build a large, long term team," and told new enrollees to "GET PRE-REGISTERED FOR THE NEXT MAJOR EVENT IMMEDIATELY."  (Ex. 5 at 22.)

390.   In Defendants' "Million Dollar Contract," affiliates pledged to attend "all SBH corporate training and events no matter what."  (Ex. 17, *cited at* Doc. 406 at 10.) Defendants admit to "encourag[ing] Affiliates to sign [the] 'Million Dollar Contract.'" (Doc. 222 ¶ 1 (admitting Doc. 205 ¶ 47).)

### b. Defendants Imposed Attendance Requirements on Some Affiliates.

391.   Defendants' perpetual requirements to qualify for their never-created "CORE team" (*see supra* ¶¶ 288-295) also included requirements to buy expensive event tickets.  (*E.g.*, Ex. 140.)

392.   In addition to requiring SBH "Founders" and "Global Ambassadors" to

purchase excess products (*see supra* ¶¶ 284-286, Defendants also forced Global Ambassadors to attend all training events or lose their status.  (Ex. 324 at 1 (Global Ambassadors).)  Founders were, at a minimum, strongly encouraged to attend events. (*E.g.*, Ex. 346 at 26:22-25 ("If you're going to be a Founder, you get to [the upcoming SBH Legacy Event in] Vegas.  That's what you do.").)

393.    Defendants even forced one affiliate, who missed an event on her doctor's orders because of "[c]racked discs," to make up for it by achieving a rank of "SBA1" in three months or lose her Global Ambassador status.  (Ex. 290.)  When Sacca reminded Noland that the affiliate's doctor forbade her from traveling for health reasons, Noland replied, "she would have to do something" to keep her status.  (Ex. 290.)

### c.    Defendants Instructed Affiliates That Event Attendance Was a Prerequisite for Reaching Financial Freedom.

394.    Defendants consistently pressured affiliates to pay hundreds or thousands of dollars to attend future events by stating that doing so was necessary to attain the promised "financial freedom."  (*See infra* ¶¶ 395-399.)

395.    Noland told affiliates the only way they could fail to get wealthy, if they and their downline teams attended an upcoming event, was to "shoot yourself in the head."  (Ex. 350-78 at 1:52:20, *cited at* Doc. 406 at 10.)

396.    Noland boasted that, early in his multilevel marketing career, he missed his only sister's wedding because he was taking people to a weekly training event.  As a result, Noland explained, he is now able to help his family financially and "do whatever [he] want[s] to do when [he] want[s] to do it."  (Ex. 346 at 28:16-29:8.)

397.    Defendant Sacca told affiliates that the ICON event—for which tickets cost $3,500—"[t]here's no way you can fail if you utilize the training that Mr. Noland is going to give us."  (Ex. 96 at 8:20-22; Ex. 329 at 11 (cost).)  He added:  "Those people that get to ICON, you're going to see them explode.  Those people that get to Icon and bring a team with them, you're going to see them rise up to the elite in this industry. . . . I

guarantee it."  (Ex. 96 at 8:12-19.)

398.   On an early SBH "Heat" conference call—to which Defendants invited both current members and recruits—Noland explained that if "you want to really lock in your success," affiliates needed to not only attend an upcoming event, but get as many of their team members to attend as possible:  "[S]ome of you are going to show up by yourselves.  It's, going to be tough on you for momentum. . . . If you show up with a section [of team members], you're going to be staring at financial freedom.  Now, what's a section?  Twenty or more [attendees] . . . [i]n your team."  (Ex. 347 at 22:14-25.)

399.   As the Court stated in its Summary Judgment order, Noland told affiliates in January 2020 that an upcoming training event was "so critical" that each seat at the event "is prime, absolute legendary real estate that will never be forgotten.  Your seat will go down in history, that's how important this seat is."  (Ex. 120 at 8:8-16, *cited at* Doc. 406 at 10 (as Doc. 290-7 at 3).)

### d.   Defendants Encouraged Affiliates to Assume Thousands in Debt to Attend Events.

400.   Defendants' promises of financial freedom were coupled with pressure for affiliates to take on debt to attend SBH events.  (*See infra* ¶¶ 401-402.)

401.   Prior to a Florida event, Harris told affiliates they should max out credit cards and take out loans to attend:  "I had someone tell me yesterday. . . , 'I'm going to have to get a loan to be able to go there.'  And I said, 'oh, so it's not worth getting a loan to come here and build something that's going to take care of your family for generations, right?  I mean, yeah, I would get a loan if I needed one.  Guess what I did back in the 1990s [in a prior multilevel marketing company].  I got loans; I—I increased my credit card. . . . I got them increased to the point where I couldn't even use them no more.  I borrowed money from people in my family and [from] some of my friends."  (Ex. 78 at 6:20-7:9; *see also* Doc. 222 ¶ 1 (admitting Doc. 205 ¶ 78).)  Harris later added:  "This is the one.  This is the time. . . . This is what it takes, guys.  If you really want to make it to

the top . . . . [I]f you're a three [*i.e.*, an affiliate seeking "financial freedom"], you have to.  You have to figure it out.  I've had a couple of threes tell me there's no way, and I'm like, 'yes, there is a way.'  If you wanted it bad enough, you would find a way."  (Ex. 78 at 8:14-9:1.)

402.    On another video promoting the ICON event, Sacca boasted that affiliates "are using multiple credit cards to get to Icon because they . . . see the value."  (Ex. 100 at 5:12-15.)  He added:  "[T]his is just the cold, hard facts, if you're telling SBH that you're a number two or number three, especially the number threes, you can't miss, you can't miss Icon. . . . And I know of several people that are putting together funds, trying to get the money to get this put, put to bed tonight. . . . Humble yourself and ask for help, because this is what we know, those people that attend Icon, their lives are going to be changed."  (*Id.* at 5:16-6:5.)

### e.    Affiliates Understood the "Need" to Attend Events.

403.    Affiliates abided by Defendants' calls that they do anything necessary to attend Defendants' expensive events.

404.    Noland replied "Money" to affiliate Francois Hewing who echoed Noland's teachings in a SBH Facebook group post on January 5, 2018.  Hewing wrote: "I say the same thing a multimillionaire, transparent, humble, high energy, C.E.O. [*i.e.,* Noland] Who[sic] hustles and has integrity says.  No secret really if you stay plugged in.  *You need to be on every heat call, every late night Latte, every Facebook Live training and at every event if you [are] a 2 or 3.*"  (Ex. 334 (emphasis added).)

405.    Affiliate Jason Johnson and his wife, for example, withdrew $45,000 in retirements savings and sold their house to continue "trying to build SBH."  (Johnson Dep. Tr. at 159:3-162:14.)  They also filed for bankruptcy in the summer of 2018, during their time in SBH.  (Johnson Dep. Tr. at 158:10-22.)  Even after all that, Johnson and his wife spent $7,000 on tickets to the SBH "MVP" event in October 2018 and drove 17

hours to attend because it was "supposed to be a . . . life-changing event, according to Mr. Noland." (Johnson Dep. Tr. at 161:16-162:14.)

406.    Former affiliate Kaci Wood recalled that Noland said "you weren't good enough . . . if you didn't attend all of the meetings . . . to become a millionaire." (Wood Dep. Tr. at 34:1-10.) She testified: "[Noland] told us that the training was the only way we would ever get to be – to making a million dollars a month and be like him, yes." (*Id.* at 44:10-16.)

### 3.    At their Events, Defendants Pushed Non-Refundable, Expensive Tickets to Future Events

407.    At Defendants' "training" events, pressure to spend hundreds or thousands of dollars on yet more tickets (or products) did not relent. (*See infra*  ¶¶ 408-416.)

#### a.    Defendants Used High-Pressure Sales Tactics to Sell Tickets for Future Events.

408.    At each event, Defendants distributed order forms for tickets to future events or multi-thousand-dollar products packs, and pressured attendees to make nonrefundable purchases on the spot. (Exs. 172, 175, 187, 194, 206, 232, 233, 237, 248; L. Noland Dep. Tr. (12/16/20) at 9:23-29:5 (confirming forms were handed out).)

409.    At Defendants' 2018 "RED" event, for example, Noland passed out order forms (Ex. 175) promoting $495 tickets to the following year's "RED." As he passed out the forms, Noland reminded the audience to "think about your future here," asking them when they were "going to step up and really lead." (Ex. 63 at 9:2-13.) He then told the audience (falsely) that one specific affiliate was on track to earn $100,000 a month in the next 120 days because he had so many team members at the event. (*Id.* at 10:1-23.)

410.    At the same RED 2018 event, Noland also claimed that "dominating tickets" (*i.e.*, ticket purchases for events) was how his "number one student" got to a "million a month" in earnings. (Ex. 63 at 13:6-12.) (There is no admissible evidence that *any* of Noland's students even approached $1,000,000 per month in earnings, *see infra*

81

¶¶ 458-462, much less that they did so by "dominating tickets.")

411.    The following morning of the RED 2018 event, Noland picked up where he left off, threatening to cancel the following year's RED event if there were not 50 more ticket orders by lunch.  (Ex. 65 at 10:13-12:17).  He claimed that "approximately" 10% of the audience members "are going to end up being the millionaire" and encouraged attendees to buy more tickets to be part of that 10%.  (*Id.* at 11:18-24.)   Minutes later, Noland told the audience that "we [don't] talk about" people who do not attend events, referring to them as "broke ass[es]."  (Ex. 85 at 11:10-12:9.)

412.    At the three-day, $3,500-per-person "ICON" event, Noland, in front of all present, individually asked each attendee how many tickets they and their downline team would be ordering for the upcoming SBH Kickoff 2020 event.  (Ex. 103 at 5:10-18:11.)

413.    When one ICON attendee reported a two-ticket commitment, Noland lectured her for disrespecting him: "Don't say another word.  Let me talk.  No talk, no talk, because [you're] right up here on the line with me.  Don't ever do what you did with me again, ever.  You understand?  Never do what you did with me again.  I'm going to tell you why, because I'm in the trenches with you, and I'm going to help you get your goals.  Don't fight with your teacher that's teaching you to get rich and dominate."  (Ex. 103 at 12:11-23.)

414.    The following day at ICON, Noland ridiculed attendees for not buying enough tickets:  "Right then at that moment, you were a con.  You were a fake."  (Ex. 108 at 10:9-23.)  By the end of the ICON event, Defendants had sold $49,050 in SBH Kickoff tickets and $43,065 in tickets for the RED event.  (*See infra* ¶¶ 423-424.)

415.    At the same ICON event, Defendants also pushed $5,000 "Global Ambassador Packs."  Noland told attendees how they should pitch the pack to others: "Here's the Global Ambassador pack, it can set you free financially forever to buy Lamborghinis.  Give me $5,000.  You got ten seconds."  (Ex. 111 at 8:9-22.)   Noland

also expressed disbelief that some ICON attendees were not "Global Ambassadors" already.  (Ex. 109 at 13:2-14:3 ("You're going to be an ICON, and you sitting in the room at the ICON training, and you ain't a global ambassador?") .)

416.   As detailed below, across all of their training events, Defendants sold $581,024.75 in tickets for future events. (*See infra* ¶¶ 417-425 (sum of bolded numbers).)

**b.      Defendants Sold Almost $600,000 Future Event Tickets at SBH Events.**

417.   At Defendants' 2017 SBH Legacy Event from November 10-12, 2017 (Ex. 329 at 1), Defendants distributed order forms for their Kickoff 2018 event.  (Ex. 172.)  At Legacy, Defendants sold **$18,335** in tickets to their Kickoff 2018 event.  (Ex. 350-80 (filter "July-Dec 2017" tab to view all rows where "description" includes "Kickoff" and "created" date for charge is November 12-13, 2017[1]; then sum Column E).)

418.   At Defendants' SBH Kickoff 2018 event from January 27-28, 2018 (Ex. 329 at 2), Defendants distributed order forms for their RED 2018 event.  (Ex. 175.)  At Kickoff 2018, Defendants sold **$50,085** in tickets to their RED 2018 event.  (Ex. 350-81 (sum Column L for all charges with January 28, 2018 order date).)

419.   At their "RED 2018" event from April 21-22, 2018 (Ex. 329 at 3), Defendants distributed order forms for their RED 2019 event.  (Ex. 187.)  They sold **$166,950** in tickets to RED 2019.  (Ex. 350-83 (filter "Ticket Type" column for "RED 2019" and sum Column L ("Ticket Price") where "order date" is April 22-23, 2018[2]).)

420.   At their SBH Bootcamp event from June 23-24, 2018 (Ex. 329 at 5), they distributed order forms for their Kickoff 2019 event.  (Ex. 194.)  At Bootcamp, Defendants sold **$84,660** in tickets to the SBH Kickoff 2019 event.  ((Ex. 350-80 (filter

---

[1] Although the Legacy event ended on November 12, 2017, Defendants appear to have input some affiliates' ticket purchases on November 13, 2017.

[2] The exhibit indicates that the date and time stamp for the credit card charges is in "UTC"—universal time code, or Greenwich mean time.  Once adjusted to Pacific standard time, the April 23 charges actually occurred on April 22, during the RED 2018 event.

"Jan-Dec 2018" tab to view all rows where "description" includes "SBH 2019 Kick-Off Training!" and "created" date for charge is June 23-25, 2018[3]; then sum Column E).)

421.   At their SBH "Kickoff 2019" event from January 26-27, 2019 (Ex. 329 at 7), Defendants distributed ticket orders forms for their "RED 2019" and "Millionaire Workshop" events and a "combination" ticket for the two events. (Ex. 232.) At Kickoff 2019, Defendants sold $6,350 in tickets to the RED 2019 event, $12,781.25 in tickets to their SBH "Millionaire Workshop" event, and $18,070 in "combination" tickets for the RED and Millionaire Workshop events.   ((Ex. 350-80 (filter "Jan-Dec 2019" tab to view all rows where "description" is "RED 2019," "SBH MILLIONAIRE WORKSHOP (LEXINGTON)," or "RED/MILLIONAIRE WORKSHOP COMBO" and "created" date for charge is January 27-28, 2019).)   Based on the relative cost of the two tickets (Ex. 232 at 2), $10,046.92 of the $18,070 in "combination" sales are attributable to Millionaire Workshop, and $8,023.08 are attributable to RED.[4]  Therefore, in sum, Defendants sold **$14,373.08**[5] in RED 2019 tickets and **$22,828.17**[6] in SBH "Millionaire Workshop" tickets at their SBH "Kickoff 2019" event.

422.   At their "RED 2019" event, which took place from April 27-28, 2019 (Ex. 329 at 9), Defendants distributed order forms for their "RED 2020" event. (Ex. 237.) At RED 2019, Defendants sold **$133,545** in tickets to the RED 2020 event.  ((Ex. 350-80 (filter "Jan-Dec 2019" tab to view all rows where "description" includes "RED 2020,"

---

[3] Although the Bootcamp event ended on June 24, 2018 Defendants appear to have input some affiliates' ticket purchases on June 25, 2018.

[4] Individual tickets to RED 2020 cost $795, while individual tickets to Millionaire Workshop cost $995.  (Ex. 232 at 2.)  Based on the relative price of RED and Millionaire Workshop tickets, RED accounted for 44.4% of all "combination" sales ($795 / $1790), and Millionaire Workshop ticket sales accounted for the remaining 55.6%.

[5] $6,350  + $8,023.08 = $14,373.08

[6] $12,781.25 + $10,046.92 = $22,828.17

84

and "created" date for charge is April 28-29, 2019[7]; then sum Column E).)

423.    At their ICON event from September 6-8, 2019 (Ex. 329 at 11), Defendants distributed order forms for their RED 2020 event.  (Ex. 24 at 10-11.)   At ICON, Defendants sold **$42,075** in tickets to the RED 2020 event.  ((Ex. 350-80 (filter "Jan-Dec 2019" tab to view all rows where "description" includes "RED 2020," and  "created" date for charge is September 7-9, 2019; then sum Column E).)

424.    Also at their ICON event, Defendants distributed order forms for their "Kickoff 2020" event.  (Ex. 248.)  At ICON, Defendants sold **$48,173.50** in tickets to their Kickoff 2020 event.  ((CL093414 (filter Jan-Dec 2019 tab to view all rows where "description" includes "SBH 2020 Kick-Off Training," and  "created" date for charge is September 7-9, 2019[8]; then sum Column E).)

425.    For each ticket sale described above, Defendants did not tell affiliates that they had a right to rescind the purchase (and obtain a refund).  Instead, they said purchases were "non-refundable."  (Exs. 172, 175, 187, 194, 206, 232, 233, 237, 248.)

**G.        Defendants' Promises of Substantial Income Were False.**

426.    In fact, Defendants' claims that SBH affiliates could make substantial income pursuing SBH (*see supra* ¶¶ 43-120) were false.  First, consumers' actual results show that almost all SBH affiliates lost money, and none attained "financial freedom." (*See infra* ¶¶ 427-437.)  Second, SBH's structure ensured that very few affiliates ever *could* make substantial income.  (*See infra* ¶¶ 438, 567-573.)  Third, Noland put himself on a pedestal  as what affiliates could earn—but, as the Court has already determined, he is actually broke and could not recall a time he had a positive net worth.  (*See infra*  ¶¶

---

[7] The exhibit indicates that the date and time stamp for the credit card charges is in "UTC"—universal time code, or Greenwich mean time.  Adjusted to Pacific standard time, the April 29 charges actually occurred on April 28, during the RED 2019 event.

[8] The exhibit indicates that the date and time stamp for the credit card charges is in "UTC"—universal time code, or Greenwich mean time.  Adjusted to Pacific standard time, the September 9 charges actually occurred on September 8, during the ICON event.

439-457.)  Fourth, Defendants identified just four past students of Noland who they claim have achieved financial freedom, and Defendants have produced no admissible evidence to support even that underwhelming assertion.  (*See infra* ¶¶ 458-462.)  In short, Defendants lied about what SBH affiliates could achieve, what Noland achieved, and what Noland's past students achieved.

## 1.    No SBH Affiliates Achieved "Financial Freedom," and the Overwhelming Majority Lost Money.

427.    As described above (¶¶ 349-353) FTC Data Analyst Elizabeth Anne Miles reviewed data that Defendants produced to the FTC and created a "comprehensive spreadsheet that identifies each product and [event] ticket purchased from Success By Media, the date and amount of each purchase, and, for each affiliate, the total commissions (earned and disbursed)."  (Ex. 38 ¶¶ 4-5.)  Miles then prepared a "summary profile that for each affiliate and consumer shows the total value of purchases, the first and last invoice date for purchases, the total value of ticket sales, the total value of VOZ purchases, the total value of product credits, and total commissions (earned and disbursed)."  (Ex. 38 ¶ 5.)

428.    For purposes of her analysis, Miles excluded five ID numbers belonging to the four Individual Defendants from the group of SBH "affiliates."  (Ex. 38 ¶ 12.)  As a result, Miles had three categories of consumers/ID numbers:  affiliates, non-affiliates, and the Individual Defendants.

429.    Miles determined that SBH affiliates paid $6,205,551.29 (excluding purchases made with product credits) to Defendants for SBH products.  (Ex. 38 at 6.)  Significantly, this excludes shipping and taxes—which Defendants omitted in the spreadsheet Miles used.  Defendants calculated those costs at $437,072.96.  (Ex. 350-79, "Data Pie Charts" tab, Cell H24.)  Because 94.7% of all SBH sales were to affiliates (*see supra* ¶ 354), affiliates paid approximately $414,000 in shipping and taxes.

430.    Miles determined that SBH affiliates paid *at least* $1,059.525.70 to Defendants for tickets to the events described in ¶¶ 374-386 above.  (Ex. 38 ¶¶ 12-13.)

As Miles described, however, that is almost certainly an underestimate, as Defendants' ticket data omits affiliate ID numbers. Miles therefore tried to name-match ticket purchasers to affiliates IDs—a process made incalculably difficult by Defendants' poor data quality. (Ex. 38 ¶¶ 8, 13.) The actual amount spent by affiliates on events is likely close to Defendants' total ticket revenues: $1,411,522.01. (Ex. 350-83 (sum column L for all "event dates" (Column C) starting in October 2017 and excluding "Zija" events). That is true because, other than RED 2018, each of Defendants' events was either an SBH event (open only to SBH affiliates) or was attended only by SBH affiliates. (*See supra* ¶¶ 374-386.) Therefore, *almost all* event ticket purchases were by affiliates.

431. Miles determined that SBH affiliates earned $2,174,301.09 in commissions from Defendants. (Ex. 38 at 6.) (Affiliates did not receive all of these funds because some left money in their SBH "e-Wallets.")

432. Based on ¶¶ 429-431, the 6,962 SBH affiliates lost a total of $5,504,775.90 pursuing SBH alone.[9]

433. The net loss of $5,504,775.90 omits gains from affiliates' offline retail sales. For the reasons explained above, however, retail sales were rare and untracked. (*See supra* ¶¶ 221-253.) The net loss also figure omits the "value" of products consumed by SBH affiliates, but the products had minimal value outside of the claim that buying them would lead to financial freedom, and Defendants did not treat *any* of their sales as being for personal consumption (*see supra* ¶¶ 331-335). Defendants also encouraged inventory loading—buying products beyond what was necessary for personal consumption or to meet retail demand. (*See supra* ¶¶ 254-316.) Moreover, Defendants instructed affiliates to give away products to *each* potential new customer to induce them to join SBH. (*See supra* ¶¶ 168, 359-360.)

434. The net loss of $5,504,775.90 also likely underestimates affiliate ticket purchases by at least $300,000. (*See supra* ¶ 430.)

---

[9] $6,205,551.29 + $414,000 + $1,059.525.70 - $2,174,301.09 = $5,504,775.90

435.    The net loss of $5,504,775.90 also omits any costs to affiliates beyond purchases made directly from SBH.  Affiliates, for example, spent considerable sums traveling to Defendants' events.  (*E.g.*, Sarzynski Dep. Tr. at 91:15-92:12; S. Underhill Dep. Tr. at 87:20-88:5; Johnson Dep. Tr. at 157:1-20, 161:23-162:14.)  Affiliates also incurred other costs—for example, office space—associated with pursuing their SBH business.  (*E.g.*, Sarzynski Dep. Tr. at 92:13-93:9.)

436.    Miles also determined that less than 6% of affiliates (420 of the 6,957 total affiliates) received more money from SBH than they paid to SBH.  (Ex. 38 ¶ 17.)  These affiliates received, on average, a net total of $1,001.80 from SBH during their active time with SBH (an average of 132 days between first and last purchase—meaning that, on average, the top 6% of highest-earning affiliates made $227 per month).  (Ex. 38 ¶ 17.)  Again, this figure excludes affiliates' gains from retail sales, in addition to affiliates' costs for shipping, product giveaways, some ticket purchases, travel expenses, and other business-related expenses.

437.    Miles found that only 110 affiliates (less than 2%) netted over $100 from SBH.  (Ex. 38 ¶ 18.)

### 2.    SBH's Structure Ensured that Affiliates Would Lose Money.

438.    As discussed in detail below (*see infra* ¶¶ 567-573), Dr. Bosley modeled scenarios in which affiliates followed Defendants' instructions for how to maximize earnings under the SBH commission.  Dr. Bosley found that at least 90% of affiliates would lose money (which proved correct in practice)—a stark contrast to Defendants' claims that 80% of affiliates would supplement their income, with the remainder either replacing their job income or attaining financial freedom (*see supra* ¶¶ 109-120).

### 3.    Noland Was Broke, Not Financially Free.

439.    The undisputed evidence establishes that Defendants' extravagant boasts of Jay Noland's wealth (*see supra* ¶¶ 77-93) were all lies.

440.    The Court previously found, in its Summary Judgment Order:  "[A]lthough Noland made statements during presentations in 2018 and 2019 boasting of his massive

wealth (*i.e.*, he is wealthy enough to give away millions of dollars each year, has been 'financially free' since 2005, and is so wealthy that his children, grandchildren, and great-grandchildren will never have to work), Noland was actually living on credit cards during stretches of the alleged period of financial freedom, currently has a negative net worth, can't remember when he ever had a positive net worth, owes hundreds of thousands of dollars in back taxes, and sustained significant financial losses from his previous MLM." (Doc. 406 at 44-45.)  The Court therefore found:  "[T]he FTC has established that Noland made false representations about his personal wealth."  (Doc. 406 at 45.[10])

441.    In his January 2020 sworn financial statement, Noland reported he had a negative net worth and owed over $210,000 in state and federal taxes.  (Ex. 310 at 8, 10.)

442.    At his deposition, Noland confirmed that he had "total assets of $298,640.32" and "total liabilities of $326,376."  (J. Noland Dep. Tr. (2/5/20) at 37:1-12, *cited at* Doc. 406 at 6.)

443.    Noland, at his deposition, was also unable to identify a time he had a positive net worth.  (J. Noland Dep. Tr. (2/5/20) at 37:14-18, *cited at* Doc. 406 at 16.)

444.    Noland admitted to the tax advocate assisting him in dealing with the IRS that he was "living on Credit Cards" in 2005 and 2006; that, in 2007, the IRS ordered him to pay $187,000 in back taxes (which Noland admittedly "did not have the ability to

---

[10] In its Summary Judgment Order, the Court, without resolving the issue, stated "there is a colorable argument that Noland's misrepresentations about his own wealth fall outside the scope of the allegation" in the FTC's Second Amended Complaint that Defendants lied about SBH affiliates' income potential  (Doc. 45 at 8.)  The misrepresentations are within the FTC's allegation because they are one way Defendants made income misrepresentations—they used Noland as proof that the system creates financial freedom.  (*See supra* ¶¶ 77-93.)  For the same reason, the fact that Noland's wealth is fictitious is evidence that the income claims were false—*i.e.*, that the system does not work.  In any event, the Second Amended Complaint does not control the scope of contempt proceedings in the First Action, and Defendants' false statements about Noland's wealth clearly violate the 2002 Noland Order's ban on "[m]isrepresenting the potential earnings or income derived from [a] multi-level marketing program."  (Ex. 1 at 4; *see infra* Conclusions of Law ("COL") ¶¶ 117-120.)

pay"); and that Noland had financial losses from "SereniGy"—a previous multilevel marketing coffee company he ran—from 2013-2017.  (Ex. 201, *cited at* Doc. 406 at 16; J. Noland Dep. Tr. (2/5/20) at 70:24-71:25 (SereniGy description).)

445.    Noland has, at times, claimed he was owed tens of millions of dollars based on his prior relationship with another multilevel marketing company:  Organo Gold. (*E.g.*, Doc. 95-2 at 4-5.)  Noland's claims are baseless.  (*See infra* ¶¶ 446-453.)

446.    Noland claims to have co-founded Organo Gold in 2008.  (J. Noland Dep. Tr. (2/5/20) at 66:11-16.)  Noland stopped being on "good terms" with Organo Gold and left the company in November 2009.  (*Id.* at 70:7-12.)  Noland has not received any money from Organo Gold since 2009.  (*Id.* at 70:13-18.)

447.    In November 2009, Noland filed suit, in Canada, against Organo Gold and the individuals he alleged had wrongfully cut him out of the company.  (J. Noland Dep. Tr. (2/5/20) at 70:7-12.)

448.    In May 2022, the Canadian court dismissed Noland's case and ordered Noland to pay the defendants' costs, approximately $139,000.  (Exs. 317, 318, 319.)

449.    As this Court previously discussed, Noland, in 2018, also filed suit against the same Organo Gold defendants in the District of Nevada:  *Noland v. Organo Gold Int'l, Inc.*, No. 18-cv-01275-JAD-DJA (D. Nev.)  (Doc. 106 at 24.)

450.    The District of Nevada court dismissed Noland's lawsuit against Organo Gold in September 2019.  (Doc. 106 at 24; *Noland v. Organo Gold Int'l, Inc.* 2019 WL 4576259 (D. Nev. Sept. 20, 2019).)

451.    In August 2020, the Ninth Circuit affirmed the District of Nevada's dismissal of Noland's lawsuit against Organo Gold.  *See Noland v. Chua*, 816 F. App'x 202 (9th Cir. 2020).

452.    Based on the findings above, Noland has never established a valid claim to any equity ownership in Organo Gold, or residual payments from it since he left.

453.    As this Court previously wrote, in reference to Noland's District of Nevada

lawsuit: "It should be obvious that this failed lawsuit didn't give license to Noland to dupe SBH Affiliates into believing he had already achieved multi-generational wealth and 'financial freedom.'" (Doc. 106 at 24-25.)

454.    Even if Noland had a legitimate claim to Organo Gold millions (he does not), that would not justify many of his boasts. (*See infra* ¶¶ 455-457.)

455.    Noland, for example, told SBH affiliates that he had been "financially free" since at least 2006, at least two years *before* Organo Gold. (Ex. 84 at 14:19-23; Ex. 350-93 at 24:20.) In fact, Noland was "living on Credit Cards" in 2005 and 2006. (Ex. 201.)

456.    Noland also told SBH affiliates that he owned houses and warehouses worldwide. (*See supra* ¶ 82.) In fact, he owns no real property. (Ex. 310 at 8.)

457.    In addition, Noland claimed that he received an ongoing stream of residual income from his other prior multilevel marketing companies. (*See supra* ¶ 86.) In fact, Noland *never* received a payment ("residual" or otherwise) from any MLM after leaving it. Noland first participated in Equinox in the 1990s. (J. Noland Dep. Tr. (2/5/20) at 60:19-21.) Noland testified he does not believe he received any money from it after he left in November 1999. (*Id.* at 60:22-61:5, 61:15-20.) (In fact, Noland does not even remember whether he made a profit in Equinox. (*Id.* at 62:2-4.)) Noland next went to the "Bigsmart" MLM for five months but testified he has not received any money from it since leaving it in July 2000. (*Id.* at 62:8-25.) Noland started with Organo Gold in 2008 and left in 2009; as described above, he has not since received any money from it, and, as of today, has no claim to any money. (*See supra* ¶¶ 446-453; J. Noland Dep. Tr. (2/5/20) at 70:8-23.) Next, Noland started SereniGy, a company that he swore to the IRS actually *lost* him money. (Ex. 222 at 4.) From there, Noland went to "Rain," but admits he has no claim to any money from Rain. (J. Noland Dep. Tr. (2/5/20) at 73:18-74:13.) After Rain, Noland started Success By Health. In sum, Noland admits to not receiving residual income from *any* company after leaving it. (*Id.* at 199:6-200:23.)

### 4.    Noland's Past Students Did Not Achieve Financial Freedom.

458.    As described above (*see supra* ¶¶ 95-107), Defendants told SBH affiliates

that countless numbers of Noland's past students achieved fabulous wealth.  Like their claims about Noland's wealth, Defendants' boasts about Noland's students were lies.

459.    In response to an FTC interrogatory asking Noland to identify all his trainees who "regularly make at least $23,500 per month" or who were "fabulously successful," Noland identified just *four*, all Organo Gold members or co-founders, who purportedly earned millions in 2013 and owed their success to Noland.  (Ex. 42 at 8-9 (citing Doc. 187 at 17, and Doc. 187-1 ¶ 16).)  The Court recognized this inconsistency and Defendants' lack of proof in its Summary Judgment Order (Doc. 406 at 17).

460.    For the four purportedly successful prior students, Noland could not explain how he knew their income.  In one motion, Defendants cited a hearsay internet post. (Doc. 187 at 17 (citing June 2013 post on www.businessforhome.org).)  In interrogatory responses, Noland claimed that he "had access to the back office in OrGano gold [sic], and independently saw the checks those people were receiving."  (Ex. 42 at 9.)  But Noland left Organo Gold in November 2009 (J. Noland Dep. Tr. (12/14/20) at 254:18-255:7), sued it, and was no longer on "good terms" with it (J. Noland Dep. Tr. (2/5/20) at 70:3-12).  He therefore would have no personal knowledge of Organo Gold members' earnings in 2013, four years later.

461.    Defendants also have made no effort to explain their claims that Noland, for example, "literally . . . helped so *many people* make millions and millions, stupendous amounts of millions of dollars" (Ex. 65 at 16:19-17:6 (emphasis added)) or "taught *30 People* to make $50k or more a month within 3 years.  *50* to make $20k or more a month within 3 years" (Ex. 283 (emphasis added)).

462.    The Court previously found that Defendants told recruits (falsely) that "several people" are "achieving Financial Freedom already with our company."  (Doc. 406 at 12-14 (citing Exs. 11, 12); Doc. 222 ¶ 1 (admitting Doc. 205 ¶ 45); Doc. 106 at 23-24 & n.22.)  The Court also rejected Defendants' reliance on Organo Gold members' performance to justify this claim.  As the Court explained, "'Our company' is not the

same thing as a 'different company that one of our company's principals operated six [in fact, 13] years ago.'" (Doc. 224 at 11.)

## H.    Individual Defendants' SBH Results Prove Their Recruitment Focus and the Falsity of Their Promises of Financial Freedom.

463.    Noland, Harris, and Sacca all "earned" commissions in SBH.  As described below, they sat atop the SBH pyramid and were the highest commission earners in SBH, while making de minimis retail sales.  After 29 months, they still fell well short of what Defendants claimed the top affiliates would achieve in just 18 months.

464.    Noland placed himself at the top of the SBH pyramid, such that all SBH affiliates were below him.  (J. Noland Dep. Tr. (2/5/20) at 123:4-25.)  From that perch, Noland "earned" $206,009.29 in commissions, or $7,103.77 per month over SBH's 29-month existence.  (Ex. 350-79, Tab 3a, "ID" number 400000, 90225.)

465.    No non-Defendant SBH affiliate came close to Noland's earnings.  Next in line was Jo Dee Baer, at $99,002.46 in commissions over roughly the same 29-month period.  (Ex. 350-79, Tab 3a.)

466.    Noland purchased $300 in SBH products.  (Ex. 350-82, Row 275 - "Affiliate#" 400000.)

467.    Noland admitted he made "de minimis sales of his personal inventory." (Ex. 44 at 2.)  Lina Noland made the same or "no" sales of personal inventory.  (*Id.*)

468.    In sum, Noland made over $200,000 in SBH commissions—double any affiliate—while spending almost nothing on products and making hardly any retail sales.

469.    Even Noland's earnings, however, were far below what Defendants told affiliates SBH's top-earning #3s (affiliates seeking financial freedom) would make.  (Harris Dep. Tr. at 140:1-141:2 (Harris identifying Noland as a #3).)  Specifically, Noland averaged just over $7,000 per month over 29 months, not the $20,000 per month that Defendants told #3s they could reasonably expect, at a minimum after 18 months (*see supra* ¶¶ 51).

470.    Harris was directly below Noland in the SBH pyramid.  (Ex. 350-82, Row

93

278 (Affiliate ID #400003 – "Arcadia Integrated Solutions"; "referred" by Affiliate ID #400000, Noland); Harris Dep. Tr. at 89:23-25 (Arcadia is Harris's company).)

471.    Harris "earned" $120,812.22 in SBH commissions, or $4,165.94 per month over SBH's 29-month existence.  (Ex. 350-79, Tab 3a, "ID" number 400003.)

472.    Harris purchased $16,298.40 in SBH products, using product credits given to him by SBH for $10,897.95 of that amount.  (Ex. 350-82, Row 278, Columns K, L.) Harris therefore spent $5,400.45 of his own money on SBH products.

473.    Harris admitted to making "few if any" offline retail sales.  (Ex. 44 at 2.)

474.    Subtracting Harris's out-of-pocket product purchases from his commissions earned, Harris netted $115,411.77 from SBH, or $3,979.69 per month over 29 months.

475.    Harris's $4,000 monthly commission earnings from SBH were, like Noland's, more than any affiliate, but still far below the $20,000 per month that Defendants told #3s they could reasonably expect after 18 months.  (Harris Dep. Tr. at 140:1-141:2 (Harris identifying himself as a #3).)

476.    Sacca, like Harris, was directly below Noland in the SBH pyramid.  (Ex. 350-82, Row 280 (Affiliate ID #400005, belonging to Sacca, "referred" by Affiliate ID #400000, belonging to Noland).)

477.    Sacca "earned" $108,712.67 in SBH commissions, or $3,748.71 over SBH's 29-month existence.  (Ex. 350-79, Tab 3a, "ID" number 400003.)

478.    Sacca purchased $12,725.45 in SBH products, using product credits given to him by SBH for $10,997.95 of that amount.  (Ex. 350-82, Row 280, Columns K, L.) Sacca therefore spent $1,727.50 of his own money on SBH products.

479.    Sacca admitted "de minimis sales of personal product."  (Ex. 44 at 2.)

480.    Subtracting Sacca's out-of-pocket product purchases from his commissions earned, Sacca netted $106,985.17 from SBH, or $3,689.14 per month over 29 months.

481.    Sacca's less-than-$4,000 monthly commission earnings from SBH were, like Noland, more money that any affiliate earned, but still far below the $20,000 per

month that Defendants told #3s they could reasonably expect after 18 months.  (Sacca Dep. Tr. at 245:24-248:3 (Sacca identifying himself as a #3).)

### I.   Consumers Lost Thousands of Dollars Following Defendants' Instructions.

482.   Defendants' instructions to buy excess products and attend expensive events, while leaving affiliates without meaningful retail sales opportunities, meant nearly all consumers inevitably would lose money.  It also had disastrous consequences for some SBH affiliates.  Three examples are described below.

### 1.   Kory and Leah W.

483.   Kory W. was among SBH's first affiliates, joining SBH with his wife Leah in August 2017.  (Ex. 350-82, Row 282, Column J.)  Until he left SBH, Kory considered himself a "#3"—*i.e.*, someone seeking financial freedom.  (Ex. 356 at 11.)  By following Defendants' instructions to buy large product packs, attend all events, and chase Defendants' promotions, he lost tens of thousands of dollars.  (*See infra* ¶¶ 484-496.)

484.   On October 12, 2017, the W's purchased a $2,500 "Founders Pack," as Defendants instructed #3s to do.  (Ex. 350-79, Tab 6, Row 291; *see supra* ¶¶ 265-269.)

485.   In January 2018, Kory W. expressed frustration to Sacca that his SBH commission check was just $30.  (Ex. 356 at 1.)  Kory W., accurately, blamed the problem not on his team's failure to *sell* SBH products, but rather on their failure to *purchase* products from SBH.  (Ex. 356 at 1 ("Why are none of my people not [sic] ordering product?").)  Sacca said Kory W.'s team had "no belief."  (*Id.*)

486.   In March 2018, Kory and Leah W. applied for the SBH "CORE" team. They said they met Defendants' requirements by buying SBH-related training courses— "Strong XP," "Million Dollar Energy," and "Think and Grow Rich."  (Ex. 265 at 6; *see supra* ¶¶ 288-295).  They also reported a *$500* monthly SBH auto-order.  (*Id.*; *see also* Ex. 350-79, Tab 6, Rows 2412, 3625, 4981, 6169, 7491, 9518, 11281, 13507, 16540, 19145, 22756, 24812, 26817, 28941 (showing $500 monthly "subscription" orders).) They promised to buy tickets to the "RED" 2018 event and have three of their recruits

buy RED tickets.  (Ex. 265 at 6.)

487.    In April 2018, Kory and Leah W. attended the RED event in Las Vegas.  At the event, Kory W. messaged Sacca that he had "spent right at $6,000 for this trip."  (Ex. 356 at 2.)  Sacca responded, "How much should you be willing to pay for success?"  Kory W. told Sacca, "I'll earn it back in the next 6-8 weeks."  (Ex. 356 at 2.)  He later told Sacca that he actually spent $8,000 (not $6,000) on RED and had done so "to make sure we were in [the CORE team]."  (Ex. 356 at 4.)

488.    In June 2018, Kory W. asked Sacca when Noland would announce the CORE team.   (Ex. 356 at 3.)  He added that he wouldn't have paid for a team member to attend RED had he known it would not lead to CORE membership.  (*Id.*)  (As discussed *supra* ¶¶ 290-297, Defendants *never* announced the CORE team, instead dangling the promise of CORE team benefits while repeatedly changing the requirements.)

489.    Two months later, Kory W. asked Sacca if he could borrow $2,500-5,000.  (Ex. 356 at 4.)  He explained that he had already purchased one ticket for MVP (at a price of $2,995) using his father's credit card, but needed to find money to buy another ticket for his wife.  (*Id.*; Ex. 350-83, Row 760.)  Sacca replied it will be worthwhile when "we're making 35K per month" and that Kory W. "just gotta put in the time."  (*Id.*)  Kory and Leah W. eventually bought a second MVP ticket for $2,995.  (Ex. 350-83, Row 809.)

490.    The next month, Kory W. vented to Sacca about not achieving the "SBA2" rank.  (Ex. 287.)  Kory W. knew what he needed to do—recruit:  "We have to have more people.  It's just simple.  I don't think we're close to SBA2 based on activity. . . .  Thankfully *we know we have to constantly keep recruiting*. . . . I'm looking at a 70 hour work week so I can get Leah an MVP ticket."  (Ex. 287 (emphasis added).)

491.    In December 2018, Kory W. told Sacca that he was about to purchase a $5,000 Global Ambassador Pack with a $3,500 bank loan.  (Ex. 356 at 8.)  Sacca replied, "Great!  Jay will be glad to hear."  (Ex. 356 at 8.)  After buying it, Defendants immediately emailed the W's, reminding them to "keep in mind your commitments as an

SBH Global Ambassador Founders club Member.  Be sure to set up a least a $250 (preferably $500) Auto-Order to successfully process next month."  (Ex. 228.)

492.    Three months later, in March 2019 Sacca told Kory W. to double-down on his commitment to SBH:  "You and Leah are literally a Lottery Ticket that is guaranteed to hit you just gotta buy the ticket . . . go all out all in."  (Ex. 356 at 9 (ellipses original).)

493.    Kory and Leah W. had finally had enough chasing Defendants' illusory riches.  On May 31, 2019, Kory W. told Sacca he and his wife could no longer "commit to being '#3s' anymore."  ((Ex. 356 at 11.))  He added that, in 2018 alone, they had "irresponsibly spent in excess of *$58,000*" on SBH and *were on the same pace midway through 2019*.  (Ex. 356 at 11 (emphasis added).)

494.    But Defendants were not yet done with the W's.  They continued to try to get them back, with Kory W. reporting to Sacca, in June 2019, that Harris and SBH's then-Director of Sales Robert Mehler were "constantly blowing our phones up that it's borderline harassment."  (Ex. 356 at 13.)  Sacca replied that Harris was "doing it with good intentions on Jays [sic] behalf."  (Ex. 356 at 14.)

495.    Kory and Leah W.'s last SBH product order was on May 27, 2019.  (Ex. 350-79, Tab 6, Row 32891.)  Defendants' records show that, during his 22 months in SBH, they ordered $43,000 in SBH products, with *$41,000* coming out of pocket and the remaining $2,000 covered by SBH "product credits."  (Ex. 350-82, Row 282, Columns K-L.)  They also spent at least *$15,000* on tickets to Defendants' events.  (Ex. 350-83 (sum "ticket price" column for any row where both the "buyer" and attendee are Kory or Leah W.).) [11]  Against that $56,000 sent directly to Defendants, Kory and Leah W. received just *$16,000* in commissions, leaving themselves with a *loss of $40,000*.  (Ex.

_____
[11] Kory and Leah W. spent over $27,000 on ticket purchases.  (Ex. 350-83.) Because, however, many of those tickets were "transferred" to different attendees, the FTC has assumed that they recouped the money they spent on the transferred tickets (for example, by selling the tickets to the ultimate attendees).  For that reason, the FTC has only counted tickets purchased by Kory and Leah W. where they were also listed as the "attendees" associated with the tickets.

350-82, Row 282, Column AF.)

496.    Even the $40,000 loss does not capture the extent of loss.  Their SBH business expenses—e.g., travel—were considerable.   Kory W. estimated, for example, that he and his wife had spent $8,000 attending RED 2018.  (Ex. 356 at 4.)  Even if that includes the $4,000 that Kory W. and his wife spent on tickets (Ex. 350-83, Rows 1160, 1161, 1223, 1224), that leaves $4,000 in expenses for the one event.  They also travelled from their Mississippi home to: Las Vegas for the Legacy and RED 2019 events; Nashville for Kickoff 2018; Lexington, Kentucky for Bootcamp; Dallas for the Advanced Presenters' Training; Carlsbad, California for MVP; and Orlando for Kickoff 2019.  (Ex. 350-83, Rows 153, 156, 760, 809, 1850, 2102, 2363, 2364, 2988, 2989, 4737, 4739.)

### 2.    Stephanie and Jason Underhill

497.    Stephanie and Jason Underhill lost well over $10,000 by following Defendants' instructions to seek financial freedom.  (*See infra* ¶¶ 498-508.)

498.    The Underhills joined SBH on April 29, 2018. (Ex. 350-82, Row 2609). Following Defendants' advice, they immediately bought large product packs.  On May 1, 2018, they purchased a $500 "Accelerator Pack," and, just six days later, added a $3,500 "Founders Pack."  (Ex. 350-79, Tab 6, Rows 6466, 6621.)

499.    The Underhills quickly became some of the top commission earners in SBH.  (Ex. 812 at 4 (congratulating Underhills on being top earners in May 2018).)

500.    In August 2018, the Underhills began a $500 monthly auto-order, as Defendants instruct.  (Ex. 350-79, Tab 6, Rows 11949, 17563, 19742; *see supra* ¶¶ 275-283.)  Defendants soon congratulated them for achieving the "SBA1" rank.  (Ex. 812 at 10.)  They were the fifth-highest commission earners in the company for the August 15-31, 2018 time period.  (Ex. 812 at 13.)

501.    One month later, the Underhills bought one ticket to Defendants' MVP event for $2,995.  (Ex. 350-83, Row 798.)  The Underhills spent an additional $2,000 on associated travel expenses.  (S. Underhill Dep. Tr. at 87:20-88:5.)

502.    At MVP, the Underhills agreed to buy a "Global Ambassador Pack" for

$5,000, which they did on October 19, 2018.  (Ex. 250-79, Tab 6, Row 18606.)

503.   Just three weeks later, Defendants emailed the Underhills regarding five attempted credit card chargebacks, telling them they were under "Temporary Suspension for precautionary reasons."  (Ex. 343.)  (The chargebacks actually related to orders by their daughter.  (Ex. 343.))  In response, the Underhills resigned from SBH.  (Ex. 221.)  Defendants then threatened the Underhills that "we are determining if 'Theft by Conversion' was done on the part of Mrs. Stephanie Underhill."  (Ex. 221.)  Defendants demanded that the Underhills stop talking about SBH and talking to SBH affiliates: "You are hereby put on notice to . . . Cease and Desist from any further communication . . . [with] SBH Affiliates, Customers, or . . . any third party [about] SBH's policies, practices . . . ."  (Ex. 221.)

504.   Jason Underhill testified that when the Underhills left SBH, they "ended up having to throw most of [their SBH product inventory] out" because "we couldn't do nothing with it," "[d]idn't nobody want it," and "[m]ost of it went out of date."  (J. Underhill Dep. Tr. at 21:14-22.)

505.   In just over six months in SBH, the Underhills, according to Defendants' records, spent just under *$18,000 on SBH products*.  (Ex. 350-82, Row 2609 (subtract product credit expenditures (column L) from total product orders (column K).)  They also spent at least $5,000 on a ticket and travel to Defendants' MVP event.  Stephanie Underhill estimated that their total spending was closer to $30,000.  (S. Underhill Dep. Tr. at 91:10-24.)  Offsetting $23,000-30,000 in expenditures, the Underhills earned $8,291.73 in SBH commissions and compensation.  (Ex. 350-82 (column AF).)  Stephanie Underhill also estimated that they made $2,000 in retail sales (S. Underhill Dep. Tr. at 36:14-17), leaving them with *net losses of $13,000-20,000 in just six months*.

506.   Stephanie Underhill explained the devastating impact SBH had on her family:  "my husband and I are middle class people.  We do well.  But that was my savings.  You know, that's our savings.  And we were – and it's gone.  And so it took a

huge financial hit on us.  And I'm not trying to – I'm sorry to get emotional.  But it was financially straining to us and to our marriage, you know, because finances – we struggled.  And we have come up out of it, but we lost a lot."  (S. Underhill Dep. Tr. at 91:10-24.)

507.   When pressed by defense counsel to explain why they put so much money into SBH, Stephanie Underhill answered:  "My husband and I – my husband joined, and he was trying to secure a future for our family.  And we were told that Jay was a millionaire maker; that if we worked hard, these things would happen.  We were told a lot of lies. . . . I lost 30-something-thousand dollars in this company. . . . And I'm going to tell you, it was a loss.  And for you, $30,000 might be a drop in the bucket.  But it wasn't for us. . . . My husband was trying to secure a future for our family. . . . I trusted [Jay Noland] that what he said was the truth.  And it was not the truth.  And I was making a way for my family.  I also have a special-needs son.  So I was trying to make extra income for my family.  So I trusted what Mr. Noland said was true, and it was not true."  (S. Underhill Dep. Tr. at 97:18-98:19.)

508.   After all that, *Defendants sued the Underhills* for, among other things, "disseminating disparaging information about SBH."  (Ex. 321 at 12.)

### 3.   Jason and Kayla Johnson

509.   Jason and Kayla Johnson enrolled in SBH by buying a $2,495 Founders Pack on October 24, 2017.  (Ex. 350-82, Row 602; Ex. 350-79, Tab 6, Row 482.)

510.   One month later, they added two $500 Accelerator Packs.  (Ex. 350-79, Tab 6, Rows 1197, 1198.)

511.   A month later, the Johnsons added a $1,995 "Super Accelerator Pack" and a third $500 "Accelerator Pack."  (Ex. 350-79, Tab 6, Rows 2395, 2685.)

512.   The Johnsons, who lived in Florida, traveled to Las Vegas for the November 2017 "Legacy" event and to Nashville for the January 2018 "Kickoff" event. (Johnson Dep. Tr. at 5:10-6:10 (Florida residence), 134:1-7 (attendance); Ex. 350-83, rows 681, 682, 2064, 2065.)  At Kickoff, the Johnsons spent $1,600 on tickets to the RED

2018 event in Las Vegas.  (Ex. 350-83, Rows 1139, 1140.)

513.   In February 2018, Jason Johnson quit his job to commit himself full-time to SBH.  (Johnson Dep. Tr. at 20:11-21:2.)

514.   In or around March 2018, Jason Johnson moved to Las Vegas "for about a month" to grow the SBH business there.  (Johnson Dep. Tr. at 165:10-166:6, 168:5-8 (March 2018 date).)

515.   By mid-2018, however, the Johnsons filed for bankruptcy protection. (Johnson Dep. Tr. at 158:10-24.)  Jason Johnson attributes the bankruptcy filing, at least in part, to his pursuit of SBH.  (*Id.*)  The Johnsons also "cashed out" Kayla Johnson's entire 401(k) account (approximately $45,000) to use as "a cushion [and] relieve some of the financial stress to continue trying to build SBH."  (*Id.*at 159:3-160:11.)

516.   In October 2018, the Johnsons sold their Florida house "to go all-in with SBH."  (Johnson Dep. Tr. at 5:22-6:7.)  They also moved to Montana, at least in part to "earn money to further pursue the SBH business."  (*Id.* at 161:3-15.)

517.   Even after all that, the Johnsons spent $7,000 on tickets to the SBH "MVP" event in October 2018 and drove 17 hours to attend because it was "supposed to be a . . . life-changing event, according to Mr. Noland."  (Johnson Dep. Tr. at 161:16-162:14.)   At the event, the Johnsons agreed to buy a "Global Ambassador Pack" for $5,200, completing the purchase on October 19, 2018.  (Ex. 250-79, Tab 6, Row 18607.) (Defendants never sent the $5,200 pack to the Johnsons, but they eventually obtained a refund from their bank.  (Johnson Dep. Tr. at 133:2-134:18).)

518.   On November 13, 2018, Defendants suspended Jason Johnson's SBH membership because, they claimed, he was "involved in soliciting SBH Affiliates to a competitive company involved in 'cryptocurrency' and also participating in disparaging comments against the company."  (Ex. 344 at 2.)  (Defendants did not explain how a "cryptocurrency" company competes with SBH.)  In response, Johnson resigned from SBH on November 15.  (Ex. 344 at 1.)

519.    In just over one year in SBH, the Johnsons spent $17,000 on SBH products, ultimately receiving a $5,000 refund from their bank for the products Defendants never delivered.  (Ex. 350-82, Row 602.; Johnson Dep. Tr. at 133:2-134:18 (chargeback).)  The Johnsons also spent $8,600 on SBH event tickets (*see supra*) and incurred considerable expenses travelling to and from SBH events and, in Jason Johnson's case, relocating to Las Vegas for a month to pursue SBH.  In sum, Jason Johnson estimated that he and his wife spent $20,000-25,000, "maybe more," pursuing SBH.  (Johnson Dep. Tr. at 162:15-163:18.)  Beyond that, the Johnsons emptied their 401(k), sold their house, and had to declare bankruptcy, all in order to pursue the riches that Defendants said affiliates could reasonably expect to gain.  Rather than financial freedom, the Johnsons received just $7,000 in commissions, resulting in *total losses over one year of $13,000-$18,000, or more*.  (Ex. 350-79, Tab 3a, Row 59.)

520.    After all that, *Defendants sued Jason and Kayla Johnson* for, among other things, "disseminating disparaging information about SBH."  (Ex. 321 at 12 ¶ 60.)

**J.     Dr. Stacie Bosley Concluded SBH Was a Pyramid Scheme That Defendants Marketed Using Deceptive Income Claims.**

521.    The FTC's expert on pyramid schemes and multi-level marketing, Dr. Stacie Bosley, concludes SBH was a pyramid scheme that used deceptive income claims. Dr. Bosley previously issued a report and testified in support of the FTC's request for a preliminary injunction.  (Doc. 8-21.)  The Court assigned "significant weight" to Dr. Bosley's opinions and found her to be "credible, careful in her opinions, and helpful." (Doc. 106 at 15.)  The Court was "unpersuaded by Defendants' attempt to show that Dr. Bosley harbors a bias against the MLM industry."  (*Id.*)  Dr. Bosley has bolstered her analysis with further evidence from the Defendants, SBH affiliates, and the FTC.

**1.     Dr. Bosley's Background and Qualifications**

522.    Dr. Stacie Bosley has a Ph.D. in Applied Economics from the University of Minnesota and is the William Kahlert Endowed Professor of Economics at Hamline University.  (Ex. 25 at 2 ¶ 2; Ex. 27.)  Her research focuses on multi-level marketing,

direct selling, and pyramid schemes. (Ex. 25 at 2 ¶ 2.) Dr. Bosley teaches quantitative analysis, microeconomics, managerial economics, and behavioral economics. (*Id.*)

523. Dr. Bosley's qualifications are set out in full in her expert report (Ex. 25 at 2-3 ¶¶ 2-5) and in her curriculum vitae (Ex. 27).

524. Dr. Bosley's peer-reviewed publications include a 2022 paper titled "Income Disclosure and Consumer Judgment in a Multi-Level Marketing Experiment," in *The Journal of Consumer Affairs*; a 2022 paper titled "Multi-Level Marketing as 'Gig Work': Work Motivations, Characteristics, and Outcomes in the U.S.," in *Journal of Labor & Society*; a 2020 paper titled "Voluntary Disclosure and Earnings Expectation in Multi-Level Marketing," in *Economic Inquiry*; a 2019 paper titled "Decision-Making and Vulnerability in Pyramid Scheme Fraud," in the *Journal of Behavioral and Experimental Economics*; and a 2015 paper titled "Multilevel Marketing Diffusion and the Risk of Pyramid Scheme Activity: The Case of Fortune Hi-Tech Marketing in Montana," in the *Journal of Public Policy and Marketing*. (Ex. 27 at 1-2.)

525. Dr. Bosley has presented her research on multi-level marketing at numerous economic and other academic conferences. (Ex. 27 at 2-3.)

526. Dr. Bosley applied her expertise to analyze whether Defendants' SBH program was "operating as [a] pyramid scheme[]" and whether Defendants and their representatives made "misleading representations to consumers." (Ex. 25 at 3 ¶ 7.)

## 2. Dr. Bosley Determined SBH Was a Pyramid Scheme.

### a. The SBH Commission Plan Incentivized Recruitment and Product Purchases from SBH, Not Retail Sales.

527. Dr. Bosley reviewed the SBH Commission Plan, summarized above (*see supra* ¶¶ 138-152), as well as more than 200 evidentiary sources from this case that detail how SBH worked on paper and in practice. (Ex. 25 at 19-42 and 106-110.)

528. Dr. Bosley's findings concerning SBH's compensation structure are set forth in full in her expert report. (Ex. 25 at 19-42.)

529. Dr. Bosley observed Defendants' tiered commissions (Phase 4 of the

Commission Plan) are "directly tied to the 'Power of Ten.'"  (Ex. 25 at 24 ¶ 47.)  Dr. Bosley added that Defendants' projections of what affiliates could earn through the "Power of 10" are "based exclusively on Affiliate purchases and are not dependent on the sale of products to bona fide ultimate users."  (Ex. 25 at 27 ¶ 50.)  She noted, for example, that one SBH presentation described its Power of 10 example as involving "SBH Affiliates *who each place a $500 monthly order each*."  (Ex. 25 at 27 ¶ 50 (emphasis added).)

530.    Dr. Bosley also observed that, in promoting the SBH "BAM Bonus" (Phase 6), Defendants "focus[ed] on the connection between additional downline recruitment, monthly Affiliate purchases, and the largest BAM Bonuses."  (Ex. 25 at 29 ¶ 54.)

531.    Dr. Bosley found that the SBH tier commissions, accelerator bonuses, and BAM bonuses "are based on Affiliate recruitment and Affiliate purchases and are structurally independent of sales to retail customers."  (Ex. 25 at 30 ¶ 55.)

532.    Dr. Bosley added that, although Noland sometimes promoted offline retail sales, such sales "are not required to earn rewards" and Defendants offered "limited incentive to devote time and energy to retail."  (Ex. 25 at 30 ¶ 55.)

533.    Dr. Bosley noted that "SBH Affiliates can earn compensation exclusively through recruitment and internal purchases without any verified retail sales to ultimate users."  (Ex. 25 at 17 ¶ 33.)  She then cited "enrollment pack bonuses" as "one example of the disconnect between Affiliate compensation and product sales" because "the Affiliate earns immediate commission from the purchase of an enrollment pack whether the products in the pack are ever sold to consumers or not."  (*Id.*)  Dr. Bosley explained that because "it is commonly understood that an MLM firm cannot make a direct payment for recruitment of a new distributor," "firms sometimes use enrollment pack bonuses to indirectly pay for such recruitment."  (*Id.*)  In this way, Dr. Bosley added, "the SBH enrollment pack bonus serves as a thinly veiled recruitment reward."  (*Id.*)

534.    "In sum," Dr. Bosley concluded, "the SBH incentive structure promotes

ongoing recruitment of Affiliates and internal purchases, creating an endless recruitment chain that is expected to leave the vast majority of participants in a loss position, by design." (Ex. 25 at 41 ¶ 73.)

535.   Dr. Bosley opined that "[r]elative to other pyramid schemes I have reviewed, SBH's marketing program is particularly egregious." (Ex. 25 at 17 ¶ 34.) She explained: "SBH's 10-by-10 structure is especially aggressive and deceptive given that so few will find enough recruits to move out of a loss position. Positive profit relies on the ongoing ability to recruit individuals into the system, but the recruitment targets (10 + $10^2 + 10^3$ and so on) will be unattainable for the overwhelming majority of participants." (*Id.*)

> **b.    Defendants' Training Materials and Instructions Emphasized How Recruitment and Large Product Purchases Are Incentivized.**

536.   Dr. Bosley's review of Defendants' training materials is described in full in her expert report. (Ex. 25 at 42-56 ¶¶ 74-101.)

537.   Dr. Bosley found that "SBH focuses its training, advancement, and earnings on the recruitment of new SBH Affiliates and the purchases made by those Affiliates. Recruitment-centered training and incentives dwarf those associated with retail to ultimate users." (Ex. 25 at 17 ¶ 32.)

538.   Dr. Bosley started her review of Defendants' training materials with the "Fast Start System" (Ex. 5), which, she explained, "exemplif[ied] the content in other SBH training materials." (Ex. 25 at 42 ¶ 74.) Dr. Bosley found that the Fast Start System was "centered on Affiliate purchases, ongoing Affiliate recruitment, and training for duplication, with some limited attention to retail sales." (Ex. 25 at 42 ¶ 74.)

539.   Dr. Bosley noted that in audio accompanying the Fast Start System, Noland "explicitly connect[ed] the size of the enrollment pack to the level of commitment and the magnitude of financial rewards in SBH." (Ex. 25 at 43 ¶ 76.)

540.   "One of the primary messages in SBH training," Dr. Bosley explained, "is

the importance of Affiliate purchases.  Affiliate purchases include the initial enrollment pack and ongoing purchases (*e.g.*, monthly product auto-orders and paid training events)."  (Ex. 25 at 42 ¶ 75.)

541.   Dr. Bosley explained, that even beyond the Fast Start System, SBH training materials repeatedly emphasize that larger enrollment packs will lead to more substantial earnings.  (Ex. 25 at 43-46 ¶¶ 78-83.)

542.   Dr. Bosley noted that at a live recruiting presentation and in audio accompanying the Fast Start System, Noland recommended using one's own credit card, or someone else's credit card ("other people's money"), to finance the purchase of a high-priced enrollment pack.  (Ex. 25 at 44-45 ¶¶ 79-80.)

543.   Dr. Bosley also explained that Defendants continued to push affiliates to make purchases even after the initial enrollment pack.  She described Defendants' encouragement that affiliates set up monthly auto-orders, explaining that Defendants attempted to "establish[] a direct connection between auto-order and affiliate success."  (Ex. 25 at 47-49 ¶¶ 84-87.)

544.   Defendants' Fast Start System, Dr. Bosley explained, and other SBH training materials, focus affiliates on how to "build a team." (Ex. 25 at 50-51 ¶¶ 91-92.) Dr. Bosley stated:  "Recruitment and duplication, framed in terms of the Power of Ten, are discussed frequently and consistently in videos . . . and in documents . . . . [T]heir Power of Ten provides specific recruitment targets for the SBH Affiliates . . . . The Four Steps to Success, the Fast Start System and the Power of Ten train the new recruit to participate in and promote a pyramid scheme."  (Ex. 25 at 52 ¶ 94.)

> **c.    Defendants Did Not Emphasize Retail Sales Relative to the Rewards for Recruiting.**

545.    Dr. Bosley acknowledged that "there is some discussion of retail sales" in SBH training materials, but concluded these mentions "seem to serve three basic purposes:  income claims, rationalization of Affiliate purchases, and risk mitigation."

(Ex. 25 at 52 ¶ 95.)  She added that although there may be "some genuine retail sales in SBH," Defendants' "intended mode of operation treats retail as incidental."  (Ex. 25 at 19 ¶ 39.)

546.    "[R]etail profit," Dr. Bosley explained, was also "yet another avenue for [Defendants to] inflat[e] expected earnings."  (Ex. 25 at 52 ¶ 95.)  Defendants, for example, claim that affiliates can make $54,000 per year in retail profit, with "no basis for these projections."  (Ex. 25 at 52-53 ¶¶ 95-96.)  Among other problems, Dr. Bosley explained, the "retail customer with consistent demand would be expected to purchase the product directly through the Affiliate's replicated website or the company's website to access the wholesale price."  (Ex. 25 at 53 ¶ 96.)

547.    Dr. Bosley also concluded that "[d]iscussion of retail also serve to justify instructions for Affiliates to purchase product, both at the time of joining and over time."  (Ex. 25 at 53 ¶ 98.)  "As Affiliates are trained to purchase the largest enrollment packs and establish an auto-order to maximize rewards from the business opportunity, assurances of consistent, strong retail demand for SBH products allow SBH leaders to promote and justify inventory loading."  (Ex. 25 at 53 ¶ 98.)

548.    While Defendants undoubtedly mention retail sales, Dr. Bosley explained that "it is common for MLM-based pyramid schemes to discuss retail sales in promotional material and policies while having no meaningful training or incentives associated with retail activity."  (*Id.* at 54 ¶ 98.)

549.    Dr. Bosley concluded:  "Though retail profit may be discussed to elevate expectations, create the impression of legitimacy, or to create early confidence, the balance of training undermines retail and focuses the Affiliate's attention on recruitment of new Affiliates.  This emphasis on recruitment matches the incentives in the SBH Commission Plan."  (Ex. 25 at 55 ¶ 99.)

### d.   Defendants Lacked Anti-Pyramid Safeguards and Instead Imposed "the Antithesis of Safeguards."

550.   Dr. Bosley explained that not only did Defendants lack any "safeguards that might curb potential harm by ensuring a minimum amount of genuine retail activity," Defendants also had policies that "represent the antithesis of safeguards."  (Ex. 25 at 18 ¶ 36.)  "For example," Dr. Bosley wrote, "SBH prohibits refunds which would allow an Affiliate to sell back unsold product and instead articulates penalties an Affiliate would face if they attempt to return products."  (*Id.*)

551.   Dr. Bosley noted that SBH's refund policy "states that all products and purchases are non-refundable, and the policy outlines the negative consequences of seeking a refund from SBH."  (Ex. 25 at 98 ¶ 159.)  Dr. Bosley called the policy "highly unusual."  (*Id.*)

552.   Referencing what are sometimes known as *Amway* safeguards, Dr. Bosley explained that "SBH has no minimum retail sales requirement, no 70 percent rule (requiring Affiliates to certify that 70% of their purchases were made to actual consumers of the products) or other specific inventory loading rule, and does not allow refunds."  (Ex. 25 at 98 ¶ 159.)  Dr. Bosley added that "MLM firms, even those that have been prosecuted for pyramid activity, typically pay – at a minimum – lip service to policies including a minimum retail requirement, 70 percent rule, and refund policy."  (*Id.*)  SBH, however, "does not even pretend to have such safeguards."  (*Id.*)

553.   "The absence of enforced and effective safeguards," Dr. Bosley explained, "compounds an existing problem within the Commission Plan, that compensation is almost exclusively based on purchase volume, regardless of whether purchases lead to sales to ultimate users or not."  (Ex. 25 at 99 ¶ 161.)

554.   Dr. Bosley explained that "SBH's compensation scheme directly rewards recruiting."  (Ex. 25 at 17 ¶ 33.)  She added: "Affiliates are trained and encouraged to buy and recruit and to train others to do the same, and the SBH compensation system will

theoretically pay millions of dollars in rewards without a single dollar of product sold. SBH does not even have the pretense of a policy or procedure that would require a minimum level of retail sales."  (*Id.*)

### 3. Dr. Bosley Found Defendants Made False Representations Regarding SBH Affiliates' Income Potential.

#### a. Defendants Told Consumers They Could Expect to Earn Substantial Income.

555.    Dr. Bosley's analysis of Defendants' income misrepresentations is set out in full in her expert report.  (Ex. 25 at 57-68 ¶¶ 103-120.)

556.    Dr. Bosley observed that "SBH and Mr. Noland make frequent use of general and specific earnings claims.  Some of these claims related to Mr. Noland's personal wealth and ability to help others achieve 'financial freedom.'"  (Ex. 25 at 57 ¶ 103.)

557.    Dr. Bosley added:  "Mr. Noland argues that his personal financial freedom stems from his ability to tap into residual income, and that SBH is the vehicle to provide this type of income to 'the masses.'"  (Ex. 25 at 57-58 ¶ 104.)

558.    Defendants, Dr. Bosley explained, treated "residential income and financial freedom" as a "self-determined choice," with affiliates simply having to choose what level of income they want and Defendants then "literally show[ing] people exactly what to do.  There is no guessing."  (Ex. 25 at 59 ¶ 106 (citing Ex. 10).)

559.    Dr. Bosley noted that "Mr. Noland claims that Affiliates who continue to build, using the Power of Ten, will generate wealth that can finance luxury purchases and can be handed down to descendants."  (Ex. 25 at 60 ¶ 108.)

560.    Dr. Bosley explained that Defendants often "frame[] the SBH financial rewards as a form of generosity, as Affiliates are told they will be helping their downline members achieve financial and time freedom as they seek those same rewards for themselves."  (Ex. 25 at 63 ¶ 116.)

561.    Dr. Bosley explained how the SBH "Prospecting System" (Ex. 4 at 11)

teaches affiliates to ask questions "imply[ing] that any income level is possible, and that [results are] directly connected to the number of hours and months that person commits to the SBH business opportunity."  (Ex. 25 at 64 ¶ 117.)

562.    Dr. Bosley also addresses Defendants' purported "disclaimers."  Those disclaimers, she explains, are "clearly contradicted by Noland's own statements, where he claims that projected income levels are assured so long as the Affiliate puts forth sufficient effort and follows the SBH instructions."  (Ex. 25 at 62 ¶ 113.)

563.    Later, Dr. Bosley explained that "Mr. Noland attributes good outcomes to effort and adherence to the system, suggesting that poor outcomes for the overwhelming majority are attributable to a lack of desire, time, effort, and commitment on the part of the Affiliate him/herself."  (Ex. 25 at 71 ¶ 126.)

564.    Dr. Bosley observed that "SBH and its representatives make no attempt to articulate the range of possible outcomes, nor the likelihood of those outcomes."   (Ex. 25 at 64 ¶ 119.)  As a result, Dr. Bosley added, due to a phenomenon known as "availability bias," consumers are likely to "inflate the perceived likelihood of earning" significant income.  (Ex. 25 at 71 ¶ 127 & n.19.)

565.    In Dr. Bosley's view, "no disclaimer could adequately counteract the problematic nature of the SBH compensation structure nor the misleading nature of the income claims," but, even if one could, Defendants fall well short in part because they "proactively undermine the[ir] disclaimer[s]."  (Ex. 25 at 64 ¶ 119.)

566.    "In sum," Dr. Bosley wrote, "if a new recruit enters with commitment and a willingness to be trained, recruit others, and train them for duplications, the income potential at SBH is described as 'massive.'  On the other hand, expenditures are described as trivial, both in relation to investments that would be required in other forms of wealth-creation and in relation to the income that will be generated. . . . Recruits may be deceived into believing that profit potential is large and likely, and they are actively trained to repeat those claims and expectations to others."  (Ex. 25 at 67-68 ¶ 120.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**b.      SBH's Structure Ensured That 90% or More of SBH Affiliates Would Lose Money By Following Defendants.**

567.    In her expert report, Dr. Bosley modeled outcomes for SBH affiliates who followed Defendants' instructions for how to take advantage of the SBH Commission Plan.  (Ex. 25 at 32-36 ¶¶ 58-63, Tables 2-4.)

568.    Specifically, Dr. Bosley modeled a scenario in which a new affiliate enrolled in SBH, purchased a $500 product pack, maintained a $100 monthly auto-order, and recruited 10 affiliates.  (Ex. 25 at 32-33 ¶ 58.).  Each of those 10 new affiliates themselves repeated the process each month, such that, by month 6, the original affiliate has completed the "Power of 10" pyramid, down through a fifth tier containing 100,000 affiliates.  (*Id.*)  Even in this scenario, Dr. Bosley found, *at least 90% of SBH affiliates are losing money at any given time*.  (Ex. 25 at 33 ¶ 59, Table 2 (at 34).)

569.    Dr. Bosley's model described immediately above omits retail sales. Including such sales, however, does not meaningfully alter the result.  In fact, Dr. Bosley also modeled the scenario in which each consumer sells their initial $500 product pack and $100 monthly auto-order at a 75% markup.  (Ex. 25 at 33 ¶ 61.)  In that scenario, the original affiliate makes only an additional **$1,318 per year**—an insignificant result compared to **over $1 million** in recruiting-based tier commissions that the affiliate is receiving.  (*Id.*)

570.    Dr. Bosley explained that retail sales are unimportant to the original affiliate because that affiliate's compensation is unaffected by the final "use" of the product purchased by the affiliate's 100,000-plus downline team members.  (Ex. 25 at 33 ¶ 61.)  In other words, it does not matter to the original affiliate what his or her downline team members do with the products they buy.  The only products whose "use" matter to the original affiliate are the affiliate's own purchases, and the potential retail profit from those products is "trivial relative to other rewards and incentives."  (*Id.*)

571.    Although an affiliate may buy products to sell at a markup, Dr. Bosley concluded, "the affiliate would be taking this risk in pursuit of a small reward relative to

111

the commissions and bonuses that can be earned through recruitment of additional affiliates." (Ex. 25 at 36 ¶ 62.) The affiliate might also run into difficulty, Dr. Bosley explained, because a "rational, cost-minimizing retail customer would be incentivized to purchase product directly through the affiliate's customer website (or the company's website) to access the SBH wholesale price," resulting in, at most, 10% commission to the affiliate rather than a 75% retail markup. (Ex. 25 at 36 ¶ 62.)

572.   Dr. Bosley also modeled a scenario matching that described *supra* ¶¶ 568-570, in which the original affiliate and each downline team member also sells coffee to 100 retail "customers," as Defendants suggested an affiliate might do in order to achieve $54,000 in annual retail profits. (Ex. 25 at 36 ¶ 63.) By the time the affiliate reaches the full Power of 10 (five tiers down), that one affiliate's teams' members and their retail customers total over *11 million* people. (Ex. 25 at 36 ¶ 63.) With other SBH affiliates trying to build the same structure, world population is quickly exhausted.

573.   Dr. Bosley concluded: "I would expect loss rates in the SBH Affiliate base to exceed 90%, especially as participation grows and recruitment becomes increasingly more difficult." (Ex. 25 at 33 ¶ 60.) She added: "Ultimately, the SBH marketing program and representations of that program mislead consumers into a pyramid scheme that will deliver losses to the vast majority of participants, by design. These losses are attributable to the structure and execution of the SBH program, rather than the actions or failures of individual participants." (Ex. 25 at 19 ¶ 39.)

### c.   SBH Affiliates' Results Matched Dr. Bosley's Expectations.

574.   In her expert report, Dr. Bosley reviewed the FTC's data analysis of SBH affiliates' actual results, alongside data from Defendants' themselves. (Ex. 25 at 68-71, 85-94 ¶¶ 121-127, 142-152.)

575.   Dr. Bosley explained that affiliates' actual results matched her expectations, with 94-98% of affiliates in a loss position (compared to Dr. Bosley's prediction that over 90% of affiliates would that in that position). (Ex. 25 at 68-69, 86 ¶¶ 122-123, 143.)

576.     Dr. Bosley added that although her "loss position" analysis may underestimate affiliates' revenues by omitting retail profit, "it also may underestimate Affiliates expenses," including "foregone income; . . . travel and lodging expenses . . . ; and costs associated with hosting house parties or promoting SBH through kiosks, trade shows, or at other venues."  (Ex. 25 at 86 ¶ 143.)  Dr. Bosley also reiterated that she expected retail profit to be minimal in SBH because, *inter alia*, "incentives for recruitment vastly outweigh retail incentives; no retail sales are required; [and] a rational retail customer would be incentivized to purchase products directly through the company's website or the replicated website made available for Affiliates."  (*Id.*)

577.     Dr. Bosley also reviewed subpoena responses from a subset of affiliates who had provided sworn declarations in support of the Defendants.  (Ex. 25 at 87 ¶ 144.) She determined that "Affiliate profit is negative for all but one of the consumers in this group [out of 11 total] . . . *even after factoring in the Affiliates' reported retail sales*." (Ex. 25 at 87 ¶ 144 (emphasis added).)

578.     Finally, Dr. Bosley opined that the steep post-TRO decline in SBH product sales, "[w]hile an imperfect measure," "demonstrates a limited retail market for SBH products and limited demand for personal consumption by Affiliates themselves."  (Ex. 25 at 88-89 ¶¶ 146-47.)

## III.   DEFENDANTS' SBH SHIPPING WOES

579.     Defendants consistently took orders for products that were out of stock and, in some cases, would not exist for 6-12 months.  (*See infra* ¶¶ 580-610.)  They nevertheless refused to refund affiliates, routinely holding consumers' money indefinitely without sending products.  (*See infra* ¶¶ 624-652.)

### A.     Defendants Shipped over $600,000 in SBH Products Several Months Late, if at All.

#### 1.     Founders Packs  ($370,130)

580.     Defendants, for example, waited months to send "Founders Packs" to affiliates who paid thousands of dollars to receive them.  (*See infra* ¶¶ 580-586.)

581.    As described above, Defendants encouraged consumers seeking financial freedom to purchase Founders Packs.  (*See supra* ¶¶ 262-274.)  Noland told affiliates he planned to make founders "richer than rich, wealthier than wealthy, . . . . generationally set."  (Ex. 53 at 12:18-13:2.)

582.    Defendants used the Founders Pack sales to raise cash shortly after their launch.  Defendants sold over 150 Founders Packs prior to November 10, 2017 (Ex. 131) and had sold 200 by January 23, 2018 (Ex. 137).

583.    The 200 Founders Pack purchasers spent approximately $570,000 on these Founder Packs.  (Ex. 170 at 6 (pre-November 10 price of $2,495 plus $95 shipping and handling); Ex. 131 (150 packs sold at pre-November 10 price); Ex. 130 (post-November 10 price of $3,495, plus $150 shipping and handling); Ex. 137 (remaining 50 packs sold at post-November 10 price).)

584.    Nevertheless, as of March 13, 2018—49 days after the final Founders Pack purchase and over four months after at least 150 Founders Pack purchases—Defendants still owed these Founders Pack purchasers *$370,130* in SBH products.  In particular, as of March 13, 2018, Defendants still owed Founders pack purchasers 6,208 packages of Latte ($136,576, at $22 per package), 570 packages of Black Coffee ($11,400, at $20 per package), 1,322 bottles of "G-Drops" ($38,338, at $29 per bottle), 420 bottles of "Life 120" ($33,180, at $79 per bottle), 458 bottles of "Aller G Stop" ($17,862, at $39 per bottle), 704 bottles of "G-Burn" ($41,536, at $59 per bottle), 592 bottles of "G-Shield" ($23,088, at $39 per bottle), 564 bottles of "Fruit & Veggie" ($33,276, at $59 per bottle), 552 bottles of "Essential" ($21,528, at $39 per bottle), and 334 bottles of "G-Clear" ($13,026, at $39 per bottle).  (Ex. 180 (for amount of each product owed to consumers); Ex. 236 (for cost of each product).)

585.    The fact that Defendants were months late shipping over $100,000 of their Latte product to Founders Pack purchasers is unsurprising, given that Defendants did not even finish *formulating* the product until March 2018.  (Ex. 138 ("The Latte to fulfill all

Founders Packs starts going into production tomorrow. . . . What took a bit longer was that I eliminated an 'artificial flavoring' that was originally in the [version of the product from a prior Noland company].").)

586.    As Noland later admitted, Defendants "sold out" of all products for a "month, month-and-a-half" in early 2018.  (Ex. 73 at 16:7-11.)

## 2.    Product "Pre-Orders" and Backorders ($254,091)

587.    Defendants also routinely exceeded their estimated shipment dates for "pre-orders," again holding consumers' money for up to a year without any refund offer.

### a.    Hot Cocoa (9-month delay) ($51,337)

588.    On April 13, 2018, Defendants told SBH affiliates they had started "pre-production" of their Hot Cocoa product.  (Ex. 143 at 1.)

589.    Also on April 13, 2018, Defendants began accepting "pre-orders" for Hot Cocoa, with an estimated shipping date of *June 20, 2018*.  (Ex. 143 at 1.)

590.    Nevertheless, as of November 29, 2018—over *7 months* after starting to accept pre-orders (and purportedly starting "pre-production") and five months after Defendants' estimated shipping date—Defendants had not even finalized the *formulation* of the Hot Cocoa product.   (Ex. 225 ("FIRST NEED TO QUICKLY NAIL DOWN FORMULA" for hot cocoa (emphasis in original)).)

591.    Defendants did not *begin* shipping Hot Cocoa until January 10, 2019 at the earliest—seven months after the estimated shipping date.  (Ex. 151 ("SBH R&D Hot Cocoa just hit the warehouse and the Pre-Orders start shipping out today!").)

592.    Between April 2018 and December 11, 2018 (30 days pre-shipment), Defendants accepted $51,337 in Hot Cocoa pre-orders.  (Ex. 350-79 (Tab 6, filter Column L for "SBH Gourmet Hot Cocoa" and sum all orders between April 13, 2018 and December 11, 2018; then add $29 shipping and handling per order, *see* Ex. 143).) Approximately half of those orders were made in July 2018 or earlier—*six months* pre-shipment.  (*Id*.)

**b.     Rooibos Tea (12-month delay) ($28,002)**

593.    On March 26, 2018, Defendants claimed to have started "pre-production" of their "Rooibos Tea" product.  (Ex. 184 at 1.)

594.    Also on March 26 2018, Defendants opened pre-orders of Rooibos Tea with an estimated shipping date of May 20, 2018.  (Ex. 184 at 1.)

595.    It was not for another *eleven months* (February 24, 2019) that Defendants even *ordered* Rooibos tea from their supplier.  (Ex. 234.)  At that time, Noland admitted that he was "really behind the 8-Ball on this," with "many pre-orders . . . outstanding for over 6 months."  (Ex. 234.)

596.    Defendants did not start shipping Rooibos tea until March 8, 2019 at the earliest—almost a full year from the first pre-orders and over nine months after the estimated shipping date—and did not claim to have shipped all pre-orders until May 24, 2019.  (Ex. 268 at 51-59 (first appearance of Rooibos on inventory report is March 8, 2019 and first non-zero entry for Rooibos is June 1, 2019); Ex. 152 (Rooibos "about to hit the SBH Warehouse"); Ex. 154 (May 24:  "ALL Back Orders have been Shipped Out").)

597.    Between March 2018 and January 31, 2019 (at least 36 days pre-shipment), Defendants accepted $28,002 in Rooibos Tea Orders.  (Ex. 350-79 (Tab 6, filter Column L for "R&D MycoCafe Gourmet Rooibos Tea (15 POUCHES) PRE-ORDER" and sum all orders between March 26, 2018 and December 11, 2018; then add $29 shipping and handling per order, *see* Ex. 184 at 1).)  Approximately half of those orders were made in March 2018—*one year pre-shipment*.  (Ex. 350-79.)

**c.     Chai Tea (6-month delay) ($60,320)**

598.    On March 5, 2018, Defendants announced that they had started "pre-production" of their Chai Tea product.  (Ex. 139.)

599.    Also on March 5, 2018, Defendants began accepting "pre-orders" of Chai Tea, with an estimated shipping date of April 20, 2018.  (Ex. 139.)  They declared that they had "sold out" of pre-orders on March 30, 2018.  (Ex. 141.)

600.    In fact, over two months after Defendants claimed to have started "pre-production" and over one month after they "sold out" of pre-orders, Defendants had not even *formulated* the Chai Tea product.  (Ex. 191.)

601.    Defendants did not start shipping Chai Tea until September 18, 2018, at the earliest.  (Ex. 328.)  Noland admitted that "most" pre-orders did not ship until December 2018.  (Ex. 150; *see also* Ex. 268 at 37-47 (no chai in stock from October 6, 2018-January 11, 2019).)

602.    Between March 5, 2018 and August 19, 2018 (30 days pre-shipment), Defendants accepted $60,320 in nonrefundable Chai Tea orders.  (Ex. 350-79 (Tab 6, filter Column L for "MycoCafe Chai Tea Pack (12 Pouches)" and "Chai Tea (12 Pouch Pack) [subscription]" and sum orders between March 26, 2018 and December 11, 2018; then add $29 shipping and handling per order, *see* Ex. 139).)  Approximately half of those orders were made by May 2018—at least four months pre-shipment.  (Ex. 350-79.)

### d.    Time Capsule (2-month delay)  ($47,955)

603.    On September 9, 2019, Defendants launched pre-orders of their "anti-aging" "Time Capsule" product, claiming it was "about to be here!"  (Ex. 157.)

604.    In fact, as of September 9, 2019, the Time Capsule products were not "about to be here!" because Defendants had not even chosen the vendor that would manufacture them.  (Ex. 250.)

605.    Defendants did not start shipping Time Capsule until November 17, 2019 at the earliest.  (Ex. 161.)

606.    Between September 8, 2019 and October 10, 2019 (at least 38 days pre-shipment), Defendants accepted at least $47,955 in Time Capsule pre-orders (excluding shipping and handling).  (Ex. 350-79 (Tab 6, filter Column L for "Time Capsules (PRE-RELEASE 6 BOTTLES)" and "Time Capsules (PRE-RELEASE CASE – 12 BOTTLES)," and sum all orders between September 8, 2019 and October 10, 2019).)  Approximately two-thirds of those orders were made on September 8-10 alone—at least two months pre-shipment.  (*Id.*)

e.  **G-HCBD AM/PM (2- and 3-month delays) ($66,477)**

607.  On February 26, 2019, Defendants opened pre-orders of one of their CBD products:  G-HCBD AM/PM ("AM/PM").  (Ex. 153.)

608.  Defendants did not start shipping AM/PM until April 26, 2019 at the earliest.  (Ex. 268 at 56 (first appearance of "AM/PM" on inventory reports).)

609.  Defendants sold $41,687 in AM/PM products (excluding shipping and handling) on or before March 26, 2019 (30 days pre-shipment).  (Ex. 350-79 (Tab 6, filter Column L for "SBH R&D G-HCBD AM/PM (PRE-SALE 6 Pouches)" and "SBH R&D G-HCBD AM/PM (Case – 12 Pouches)" and "SBH R&D G-HCBD AM/PM (1 Purch – 30 day supply)," and sum all orders between February 26, 2019 and March 26, 2019).)  Approximately half of those orders were made on February 26-28 alone—about two months pre-shipment.  (*Id.*.)

610.  Additionally, Defendants made $24,790 in AM/PM sales (excluding shipping and handling) between June 14 and October 10, 2019, notwithstanding that they had *no* AM/PM in stock between June 14, 2019 and November 9, 2019.  (Ex. 268 at 60-78 (no AM/PM in stock between June 14, 2019-November 15, 2019); Ex. 160 (Noland announcing AM/PM coming back in stock); Ex. 350-79 (Tab 6, filter Column L for "SBH R&D G-HCBD AM/PM (PRE-SALE 6 Pouches)" and "SBH R&D G-HCBD AM/PM (Case – 12 Pouches)" and "SBH R&D G-HCBD AM/PM (1 Pouch – 30 day supply)," and sum all orders between June 14, 2019 and October 10, 2019).)  Approximately half of those orders were made by mid-August 2019—at least three months pre-shipment.  (*Id.*)

3.  **Other Shipping Delays (Unquantified)**

611.  There is substantial evidence that the shipping delays identified above (*supra* ¶¶ 580-610), which are the only delays for which the FTC seeks monetary relief, are just a portion of Defendants' missing or late shipments.  (*See infra* ¶¶ 612-623.)

612.  As the Court previously wrote:  "A number of people complained that SBH either failed to deliver products within a reasonable timeframe or failed to deliver orders

entirely."  (Doc. 406 at 20.)

613.    One internal SBH document, for example, identifies "[h]ow much we owe on backorders" as of March 13, 2018.  (Ex. 181.)  The document lists 403 pouches of Latte (at $22 per pouch), 442 pouches of "Black Coffee" (at $20 per pouch), 39 bottles of "Life 120" (at $79 per bottle) and 97 bottles of Aller G Stop (at $39 per bottle).  (Ex. 181; Ex. 236 (for cost of products).)  The cumulative cost of the "backorders" is almost $25,000.  Nevertheless, because the FTC cannot determine the order date on these "backorders," it does not seek recovery of this $25,000.

614.    As of late April 2018, Noland admitted Defendants were "Back Ordered like crazy" on "Aller-G-Stop" and had "been out for about a month."  (Ex. 189.)

615.    A February 2018 internal document listed over 100 "backorders" of a variety of products.  (Ex. 178.)

616.    In October 2018, SBH employee Lorenzo Valentini emailed Lina Noland: "Is there a chance to know when G-Burn will become available again?  I have several affiliates inquiring for the G-Burn orders."  (Ex. 219.)  Lina Noland responded: "people should not be contacting us for that because [Jay Noland] said in a call about G-Burn being on backorder."  (Ex. 219; *see also infra* ¶¶ 636-652 (explaining Defendants' "no complaining" and "no negativity" policies).)

617.    An October 2018 email (Ex. 215) from an SBH affiliate to Harris and Sacca described Defendants' shipping problems:  "How long has there been a problem with shipping and the warehouse?  I believe from day one.  It's 14 months later and still not fixed . . . . You are field rep's, how long have you known about these problems?  Better yet what are you doing to fix them?  Are you scared of Jay like most of my team is? . . . Are you going to get me terminated for telling the truth?"

618.    Former SBH affiliate Stephanie Underhill testified that her products "[q]uite often" arrived at least 30 days after she had ordered them and that some orders never arrived.  (S. Underhill Dep. Tr. at 86:15-87:9.)

619.    Former SBH affiliate Jason Johnson testified that hundreds of dollars of product packs never arrived at his house and that Defendants never offered him a refund. (Johnson Dep. Tr. at 148:3-17, *cited at* Doc. 406 at 20.)

620.    Jason Johnson also ordered a $5,245 Global Ambassador Pack at Defendants' October 2018 MVP event.  (J. Johnson Dep. Tr. at 133:2-14.)  When Johnson did not receive the pack, he requested, and received, a chargeback from his bank. (*Id.* at 133:2-18.)  Defendants never offered Johnson a refund or provided a revised shipping date.  (*Id.* at 134:5-18.)

621.    Former SBH affiliate Kaci Wood testified that Defendants "continuously had" backorders, resulting in affiliates not receiving products for "several months." (Wood Dep. Tr. at 29:16-27:3.)  Wood testified that "to this day"—August 10, 2020— she still had not received some of her SBH orders.  (Wood. Dep. Tr. at 103:10-104:7.) She never received "cases of hot chocolate" and "chai tea."  (*Id.* at 133:4-24; *see supra* ¶¶ 588-592, 598-602 (describing hot chocolate and chai delays).)  Wood added that when products took more than 30 days to ship, and she and others asked why "we couldn't just get our money back or purchase something different," they were told "that wasn't possible and that's not how they ran the company."  (*Id.* at 131:5-17.)

622.    Former SBH affiliate Krystian Sarzynski testified it "would take anything from two months to three months before coffee arrived."(Sarzynski Dep. Tr. at 65:12-19.)

623.    SBH affiliates complained to Defendants about not receiving expensive orders, which Defendants acknowledged.  (*See, e.g.*, Ex. 238 ($2,000-plus case of "G-FYX" (*see* Ex. 350-79, Tab 2, Row 82 for cost) arrived after seven weeks with most products missing; then back-ordered and so could not be completed at the time); Ex. 200 (one-plus-month delay on $1,995 "Super Accelerator Pack" (*see* Ex. 16 at 66 for cost)).

**B.    Defendants Threatened and Tricked Consumers Into Not Seeking Refunds or Even Questioning Their Order Status.**

624.    Defendants gave SBH affiliates plenty of reasons not to question the status of their late shipments or ask for refunds.  Among other things, they falsely told affiliates

orders were "shipped," and they threatened affiliates who asked questions or sought refunds with removal from the company or other discipline.  (*See infra* ¶¶ 625-652.)

### 1.   Defendants Told Affiliates Orders Were "Shipped" Before They Were Actually Shipped.

625.   SBH affiliates could check their orders' shipping status in the SBH "back office."  (Ex. 216.)

626.   When the SBH back office told an affiliate that an order had been "shipped," however, it did not mean that the order actually had been shipped.  Rather, a status of "shipped" meant that "the warehouse has received the order and will ship out when product is available to ship."  (Ex. 216 at 1.)

627.   Lina Noland admitted that when an affiliate saw "shipped" in the SBH back office that did "not necessarily" mean that the order was shipped.  (L. Noland Dep. Tr. (12/16/20) at 50:18-25.)

628.   Jay Noland was bewildered by SBH's inaccurate use of "shipped," emailing Lina Noland:  "I'm trying to make sense of this. . . . Please help . . ."  (Ex. 216 at 1 (ellipses in original).)

629.   Harris was also confused by the meaning of "shipped," asking Noland to confirm that it was accurate.  (Ex. 216 at 1.)

630.   Unsurprisingly, SBH affiliates consistently had confusion about orders that claimed to have been "shipped," but that they had not received.   (*See infra* ¶¶ 631-635.)

631.   One affiliate questioned Defendants as to why her team member's three-month-old chai order had not been sent even though the back office said it was "shipped." (Ex. 230.)  Defendants confirmed that the chai was "still on backorder."  (Ex. 230.)

632.   Another affiliate questioned the status of his one-month-old chai tea order because the back office said it was "shipped."  (Ex. 218.)  Again, Defendants' staff confirmed the chai was "still on backorder."  (Ex. 218 at 2 (bottom of page).)

633.   Another affiliate questioned the status of his "rooibos tea" order, which the back office claimed was "shipped," but which Defendants clarified was "not available

yet." (Ex. 214.)

634. In one instance, an SBH employee, Lorenzo Valentini, forwarded and described an affiliate's complaint to another SBH employee, Andrea Selby. Valentini wrote: "[T]his affiliate is reading 'shipped' on the system. In truth the order is still on hold. . . . I had previously another Affiliate bringing this to my attention." (Ex. 208.) Selby forwarded the email to Lina Noland, adding: "Lorenzo said that he has several affiliates ask him about orders. Orders say shipped when in fact that have not been sent out yet." (Ex. 208.) The affiliate referenced in Valentini's email expressed his frustration with the situation: "I have no issue paying for a product I receive. My issue with this auto shipment was that it stated it was shipped when it was on back order which is very deceiving. . . . " (Ex. 209 at 2.)

635. Despite the confusion over the incorrect use of the word "shipped," Defendants never fixed the "shipped" issue.

### 2. Defendants Barred Affiliates from Asking About the Status of Delayed Orders or Seeking or Obtaining Refunds.

636. Because SBH told consumers orders were "shipped" before they were shipped, a reasonable consumer would assume any delivery delay was not SBH's fault.

637. Even if consumers did figure out that an order labeled "shipped" had not actually shipped, Defendants dissuaded them from seeking refunds (or even asking about their order status). (*See infra* ¶¶ 638-652.)

638. As the Court found, "it is undisputed that SBH adhered to a strict no-refund policy." (Doc. 406 at 21 (citing Doc. 205 ¶¶ 98-99; Doc. 222 ¶¶ 55-56); *see also* Ex. 2 at 3 (Defendants' policy was to allow no refunds "for any reason whatsoever").)

639. In one example, an affiliate asked Defendants to "[p]lease refund me the chai tea order from 4 months ago and put the money back in my wallet. I [haven't] received it after being promised it months ago. I could use the money for the holidays." (Ex. 223.) Defendants responded by stating, "we do not do refunds." (Ex. 223.)

640. In another example, an affiliate wrote: "It's been well over 4 months

since I placed that order.  I'm going to need you to please return my money because your customer service is not up to par so, I'm not interested in what your policy says."  (Ex. 227.)  SBH employee Valentini responded:  "Per our policies and procedures any order cannot be cancelled once processed.  Chai is on backorder right now."  (Ex. 227.)

641.    Defendants went even further than barring refunds; they threatened customers seeking refunds or questioning their order status with termination from the company, not only for themselves, but also for the person who recruited them.  (*E.g.*, Ex. 114 at 5:23-12:3.)

642.    Noland, for example, complained to affiliates on a conference call that "we're having just an, a crazy amount of people calling our 800 number asking where their orders are at."  (Ex. 114 at 5:23-6:1.)  As a result, Noland explained, "there's just going to be some people they can't be a part of SBH anymore."  (*Id.* at 6:2-15.)  Noland added:  "So if you want your people if you want your people that you spend your time recruiting to stay in and build this long-term opportunity with you with SBH, then you've got to manage their expectations. . . . If they say where's my product?  So *nobody should have their people coming in asking the company where's their products*."  (*Id.* at 7:14-23 (emphasis added).)  Noland then compared people who complain about delayed orders to "little gnats."  (*Id.* at 8:11-21.)

643.    In one case, Defendants "suspended pending termination" an affiliate's membership because, in the Defendants' words, the affiliate "complained about not receiving his pre-Order of Chai Team among other things," which violated SBH's "very strict stance against negativity in any shape, form, or fashion."  (Ex. 196.)

644.    Defendants also threatened draconian punishment for violating their "No Refund" Policy by seeking a credit card chargeback (regardless of whether justified) or otherwise "disput[ing]" a purchase:  "Each time an AFFILIATE violates the No Refund Policy and files a chargeback or disputes a purchase they made from the Company, the liquidated damages will be three (3) times the amount of each of AFFILIATE's disputed

payments(s) [sic] to the Company, but not less than $1,000 . . . ."  (Ex. 2 at 3.)

645.    Consistent with Defendants' policy against "negativity," Noland once told Affiliates, "if you complain, great chance you're going to be terminated, out, bam.  Isn't that amazing.  You can't complain.  People says, 'I can't complain?'  Nope, can't complain, you can't."  (Ex. 59 at 10:20:4-15, *cited at* Doc. 406 at 21-22 (as Doc. 288-2 at 6).)  Noland also expressed frustration that customers "were just going in and ordering and then all of a sudden things were on back order and it was taking two or three weeks, right, and they were getting upset."  (*Id.* at 29:11-15.)

646.    Former SBH affiliate Kaci Wood explained that Defendants, referencing product delays, "always said that—to just not ask questions; that's not how they ran the company; to stop being weak; that we would get them when we got them."  (Wood Dep. Tr. at 133:12-134:5.)

647.    In one example, an affiliate (Brooke J. ) filed chargebacks for three Founders Pack orders—placed on behalf of herself and two other affiliates (Gwen J. and Celeste P.)—totaling $7,770.  (Ex. 183.)  In addition to filing chargebacks, Brooke J. also requested refunds from Defendants.  (Ex. 331.)

648.    Brooke J. had placed the Founders Pack orders on or around November 1, 2017 (Ex. 330), but over four months later—as of the date of the chargeback request— each of the three affiliates had not received $2,065 in products from their $2,600 Founder Packs.  (Ex. 197 (listing products that "we owe them all," referencing Brooke J., Gwen J., and Celeste P.); Ex. 130 at 6 (cost of pack); Ex. 236 (cost of products owed).)

649.    Nevertheless, Defendants responded to Brooke J.'s chargeback request by immediately telling her that her membership was "hereby Suspended pending Termination, Criminal Prosecution, and a Civil Lawsuit Filed against you."  (Ex. 183.) In that email, Defendants falsely claimed that Brooke J. and the other affiliates "received the high majority" of the Founder Pack products and gave her one day to reverse the chargebacks before being reported for "Criminal Theft," along with facing a treble-

damages lawsuit.  (Ex. 183.)

650.    Defendants won the chargeback dispute in June 2018 (preventing Brooke J. from obtaining any refund), presumably by relying on the misstatement that they had shipped all or most of the products.  (Ex. 195 ("[W]e were able to successfully dispute your actions with the Merchant Processor and they agreed to return the monies owed to our company back to us.").)

651.    After winning the chargeback dispute on false pretenses, Defendants wrote Brooke J.:  "Based on your actions of filing multiple credit card chargebacks for product that you already had received (illegal actions), we have concluded that it is in the best interest of the company to terminate our relationship with you.  Your actions were in fact criminal . . . ."  Defendants accused her of "destructive and immoral behavior" and warned her that if she "attempt[ed] to cause our company any further damage whatsoever, we will immediately file a lawsuit against you for damages."  (Ex. 195.)

652.    After all that, Defendants finally sent Brooke J. and the other affiliates the $6,000-plus in products they owed them, but which they clearly no longer wanted.  (Doc. 392 at 4; Doc. 392-1 at 7 (showing July 14, 2018 shipment of combined *135 pounds* of SBH products).)

**C.    Defendants' Records Are Insufficient to Determine Which Orders Defendants Actually Shipped, and When.**

653.    Defendants' shipping records do not allow one to determine when *any* product order was shipped.  (*See infra* ¶¶ 654-666.)

654.    When SBH received an order from an affiliate or other consumer for one or more products, it assigned that order an "invoice number" or "order number" in the SBH "back office" system.  (L. Noland Dep. Tr. (12/16/20) at 35:5-11.)

655.    When an order was first placed—before an employee took any steps to fulfill the order—it was considered "unbatched."  (L. Noland Dep. Tr. (12/16/20) at 35:23-36:1.)

656.    Periodically, SBH employees would select a set of unbatched

invoices/orders in the "back office" and create a "batch" of those invoices/orders. The "batch" then received a batch number. (L. Noland Dep. Tr. (12/16/20) at 36:2-9.)

657. A "batch" of SBH orders would include orders for which products were in stock *and* orders for which products were not in stock—for example, because they were on backorder. (L. Noland Dep. Tr. (12/16/20) at 36:12-15.) Defendants did not exclude from the batching process orders that included backordered products or were otherwise not ready for shipment.

658. After creating the "batch," the employee would create a "ship file," which the employee would then load into Stamps.com, for domestic shipments. (L. Noland Dep. Tr. (12/16/20) at 41:18-42:25.)

659. Defendants then used Stamps.com to prepare shipping labels and track shipments. (L. Noland Dep. Tr. (12/16/20) at 45:2-7.)

660. Defendants' Stamps.com account did *not* associate an SBH invoice/order/batch number with a particular shipment or USPS tracking number because, in Lina Noland's words, "stamps[.com] does not provide something that will easily adopt to our system." (L. Noland Dep. Tr. (12/16/20) at 42:23-43:6.) As a result, Defendants could not query their Stamps.com account for an SBH affiliate's order number to find the shipment associated with a particular order. (*Id.*).

661. Instead, to locate shipment information in Stamps.com for a particular SBH order, Defendants had to review the Stamps.com shipping records for shipments appearing to match the order information, including "the name of the person [who made the order], the date the product was ordered, and the weight." (L. Noland Dep. Tr. (12/16/20) at 43:7-18.)

662. Defendants sometimes sent products from a single order over multiple shipments—for example, when some products in an order were not available at the time of the first shipment. (L. Noland Dep. Tr. (12/16/20) at 45:17-46:7.) When they did so, there was no indication in their own back office or in Stamps.com that this had occurred.

(L. Noland Dep. Tr. (12/16/20) at 44:1-9.)   As a result, even if one could match a Stamps.com shipment with an SBH order/invoice, there was no way to know, without checking with an SBH warehouse employee, whether the shipment actually contained all of the products ordered.  (*Id.*)

663.   After completing the steps above, Defendants' employees would mark a batch "finalized" in the SBH back office.  (L. Noland Dep. Tr. (12/16/20) at 45:8-15.)

664.   When a batch was marked "finalized," that did not necessarily mean every item in the batch had been shipped—again, because certain products within the batch may have been on backorder.  (L. Noland Dep. Tr. (12/16/20) at 45:16-46:7, 46:24-47:4.)

665.   Even though an order being part of a "finalized" batch did not mean that all products in the order had actually been shipped, Defendants, in sworn representations to the Court about shipping times, used the "finalized" date as equivalent to a shipping date. (Doc. 76 at 1; Doc. 76-1 ¶¶ 52-53 (Defendants claiming that average time to fulfill orders starting on May 30, 2018 was 3.9 days); Doc. 335 at 9-10 (same) (citing Doc. 343 (DVD Ex. B-5); Ex. 44 at 1, 2 (admitting that the basis for the shipment claim was the date an order was "finalized," not the date on which all products in the order actually shipped).)

666.   For example, SBH affiliate Samuel R. placed a Chai Tea order and "G-Burn" order on July 21, 2018.  (Ex. 350-79, Tab 6, Rows 10926-27).)   According to SBH shipping "records," the entire order was shipped two days later, July 23.  (Doc. 343 (DVD Ex. B-5, Row 1786).)  That is false.  When Samuel R. complained over four months later about not receiving his Chai Tea, Defendants acknowledged that it had *not* been shipped.  (Ex. 227.)  To make matters worse, Defendants' Stamps.com records (Ex. 350-79, Tab 7) do not show *any* shipments (of G-Burn, Chai, or any other product) to him in July 2018.  Rather, it appears Defendants shipped the G-Burn on August 13 (not July 23, as claimed by SBH's records), at the earliest.  (Ex. 350-79, Tab 7, Row 22333).

## IV.    DEFENDANTS' VOZ TRAVEL PYRAMID SCHEME[12]

667.    In late August 2019, SBH's accountant, Crystal Roney, sent Jay Noland "internal reporting" showing SBM's net operating income for the year was negative, with SBH product sales plummeting nearly 33%.  (Ex. 246 at 1, 9.)

668.    Defendants admit that their SBH product and membership sales declined in 2019.  (Doc. 222 ¶ 1 (admitting Doc. 205 ¶ 112).)

669.    In response to Defendants' declining sales and net operating losses, Roney warned Jay Noland that he needed an "income run."  (Ex. 246 at 1.)

670.    In October 2019, Defendants responded by announcing that they would start selling memberships in their "VOZ Travel" program.  (Ex. 115 at 36-69.)

671.    The VOZ program required enrollees to buy $1,000-$2,795 "packs" to access a (never-completed) travel platform.  (Doc. 406 at 17-18, 36.)

### A.    Defendants Lured Consumers to Purchase VOZ Memberships with Promises of Substantial Income and Fantastical Travel Benefits.

#### 1.    Promises of Substantial Income

672.    From the outset, Defendants promoted VOZ in much the same way as SBH:  with promises of fantastic wealth.  (*See infra* ¶¶ 673-678.)

673.    In one VOZ sales video, Sacca boasted:  "Yes, there will be [VOZ] Travel ETAs making over [$]1.5 million per year.  We cannot guarantee you income . . . . We can guarantee you that, if you go to work, you're going to change your life."  (Ex. 118 at 17:14-18:8, *cited at* Doc. 406 at 53.)

674.    Noland introduced VOZ to SBH affiliates by telling them they could make a "six-figure income just saving people money on travel."  (Ex. 115 at 51:19-25, *cited at* Doc. 406 at 43.)

_____

[12] The Court already determined that Defendants VOZ Travel program was a pyramid scheme and that Defendants made deceptive earnings claims to promote it, in violation of the FTC Act and the 2002 Noland Order.  (Doc. 406 at 35-37, 43-44, 48; First Action, Doc. 130 at 7-8.)  The facts in this section are relevant to the injunctive relief to be entered against the Defendants and to compensatory contempt sanctions for Defendants' VOZ-related Order violations.

675.    Defendants' VOZ recruiting presentation touted consumers' ability to earn $230,000 per year with "casual effort" and $1.53 million per year by being "on the ball." (Ex. 298 at 48-49, *cited at* Doc. 406 at 43.)

676.    Defendants told VOZ recruits:  "You will MAKE significant earnings on sharing the [VOZ] platform with others."  (Ex. 298 at 35.)  Defendants elaborated:  "Our lucrative compensation and rewards model presents a fun and profitable path towards financial independence."  (Ex. 298 at 42.)

677.    As with SBH, Defendants claimed VOZ would allow affiliates to "Literally replace your current income."  (Ex. 297 at 4.)

678.    VOZ also returned to SBH's "Power of Ten" pitch (*see supra* ¶¶ 172-197), telling affiliates they could earn $115,000 per month by completing the VOZ Power of Ten.  (Ex. 297 at 7.)

## 2.    Promises of Travel Benefits

679.    On October 7, 2019, when Jay Noland announced VOZ Travel (Ex. 115), Defendants had not yet retained a travel service provider to provide the service they were selling.  (J. Noland Dep. Tr. (12/14/20) at 133:6-137:18.)  In fact, Defendants were talking to "multiple companies about filling that role."  (*Id.* at 133:6-137:18.)

680.    Despite having no vendor to provide travel services, Noland told listeners to the October 7 webinar that VOZ members would save "up to 75 percent" on hotel and rental car prices available through Priceline, Orbitz, or similar "competitors."  (Ex. 115 at 39:5-16.)  Later, he reiterated that consumers could "literally save up to 70 to 75 percent on all your travel" and that VOZ members' savings would be so impressive that "[t]ravel agencies are going to also become some of your customers."  (Ex. 115 at 48:2-17.)

681.    On October 18, 2019, Defendants (still lacking a travel service provider) posted the VOZ PowerPoint presentation used by Noland on October 7 to the "SBH Heat" Facebook group.  (Ex. 158; promoting version of presentation that is Ex. 299.)

682.    That presentation promised "discounts up to 75% from retail prices," adding users would "SAVE on all your travel, all the time."  (Ex. 299 at 32, 41.)

129

683.    The presentation made elaborate promises about travel features beyond mere savings.  (*See infra* ¶¶ 684-686.)

684.    Defendants, for example, promised to determine members' "travel DNA" (or "tDNA") "by collecting a host of data points . . . from your online behavior" to create the "highest level of personalization for your travel."  (Ex. 299 at 28.)

685.    Defendants also promised VOZ users access to an artificial intelligence assistant, "Dina," similar to "Siri, Alexa, Cortano, or Google Assistant."  (Ex. 299 at 28.)

686.    Defendants promised VOZ members a "unique rewards engine," or "complete gamification engine," that would reward VOZ members for "providing feedback and insights regarding our curated experiences."  (Ex. 299 at 23, 36.)

**B.      Defendants' Vendor Could Not Provide the Services Defendants Promised to VOZ Members.**

687.    On October 21, 2019—*after* making the elaborate promises described above—Defendants contracted with a vendor (Advantage Services) to provide the VOZ Travel service.  (Ex. 295.)

688.    Shortly after contracting, Advantage Services expressed concerns about the benefits Defendants had promised to consumers.  (Ex. 251 at 2-4.)

689.    Advantage Services' Vice President of Business Development, Tonya Yeager, explained to Defendants that their claim that members "will save on all your travel all the time" was not true because "[n]ot all travel will have the savings, for example airfare."  (Ex. 251 at 4.)

690.    Yeager also wrote, in response to Defendants' promises to create "travel DNA" for VOZ members (*see supra* ¶ 684), "This is not a thing."  (Ex. 251 at 3-4.)

691.    Yeager added that Advantage Services had no "unique rewards engine" as Defendants had promised.  (Ex. 251 at 3; *see supra* ¶ 686.)

692.    After flagging yet more concerns with the presentation, Yeager asked Defendants to "please remove [the presentation] from use."  (Ex. 251 at 4.)

693.    After receiving Yeager's email, Defendants asked affiliates to stop using

the existing VOZ presentation so that Defendants could "perform our final compliance verifications" and make "minor revisions."  (Ex. 159.)  Confusingly, Defendants added, in bold font:  "[T]o be clear, the nature of the VOZ program and future benefits as presented and sold remain unchanged."  (Ex. 159.)

694.    Even after revising the VOZ presentation in response to Ms. Yeager's reality check, Defendants continued to promise travel discounts "up to 75%+ from retail prices," without even mentioning any exclusion for airfare.  (Ex. 298 at 24.) Additionally, rather than remove references to "tDNA," the virtual assistant named "Dina," the "complete gamification engine," and other services that did not exist, Defendants simply added a "VOZ Tomorrow" stamp to some, but not all, slides referencing these purported offerings.  (Ex. 298 at 28-31 ("VOZ Tomorrow" stamp), 32, 38-39 (no "VOZ Tomorrow" stamp).)

**C.    Defendants Had No Ability to Fulfill Their Promises to VOZ Members.**

695.    All of Defendants' claims referenced above regarding their VOZ offerings were false, unsubstantiated, or both.  (*See infra* ¶¶ 696-699.)

696.    At his deposition, Noland's only defense of the 75%-savings claims was to reference his own, undocumented, "market research."  (J. Noland Dep. Tr. (12/14/20) at 138:11-140:17; Anticipated Testimony of Adam Rottner (no documentation).)

697.    Noland also testified that Defendants themselves (and not Advantage Services) were developing, or maybe already developed—Noland, confusingly, was unsure—the "tDNA" system, the Siri-like virtual assistant Dina, and the "complete gamification engine" that they promised to consumers.  (J. Noland Dep. Tr. (12/14/20) at 151:17-152:9, 153:14-154:16, 169:5-170:13; *see supra* ¶¶ 679-686.)  To the contrary, Defendants have neither identified nor produced any evidence of this.  (Anticipated Testimony of Adam Rottner; J. Noland Dep. Tr. (12/14/20) at 153:14-154:20.)

698.    Despite neither producing nor identifying *any* evidence of "tDNA," "Dina," or the "gamification engine," Noland swore under oath that VOZ's Dina—a rival to Apple's Siri—would have been ready in six months but for the TRO.  (Anticipated

Testimony of Adam Rottner; J. Noland Dep. Tr. (12/14/20) at 153:14-154:20.)

699.    The gulf between what Defendants promised VOZ members and what they might have been able to provide is demonstrated by the disparity between what they contracted to pay Advantage Services and what they asked consumers to pay them. Specifically, Defendants charged consumers *$1,000-2,795 up front* (Doc. 406 at 17-18) and an additional *$49 per month* (Ex. 297 at 6).  (Defendants initially described the $49 recurring fee as an annual fee (Ex. 298 at 50), before changing it to monthly.)  Advantage Services, by contrast, planned to charge Defendants *an up-front fee of $6-13* for each new VOZ member, plus *$1-7 per month*.  (Ex. 295 at 6-7.)  Defendants thus charged a *20,000% markup on the VOZ up-front fee and a 1,200% markup on the VOZ monthly fee.*

D.    **Defendants Continued to Promote VOZ's Imminent Launch Even After Their Travel Vendor Refused to Work with Them.**

700.    By December 16, 2019, Noland knew VOZ would not be ready to start that month.  (Ex. 252 (December 16 email: Defendants' employee tells Noland they will be adding "3 weeks . . . to the timeline," resulting in a January 13, 2020 launch date).)

701.    Nevertheless, on December 18, 2019, Noland reiterated that he would unveil VOZ "Beta Access" by year's end.  (Ex. 162, *cited at* Doc. 406 at 18.)  He used that lie to convince consumers that December 18 was their final day to gain "some fantastic benefits."  (Ex. 162.)

702.    On December 20, 2019 Noland did what he knew he would have to do all along:  explain that VOZ would not launch until mid-January 2020.  (Ex. 119.)

703.    On a December 20, 2019 SBH conference call, Noland claimed that the delay in releasing VOZ was because "two weeks ago something mega happened . . . the biggest travel deal ever."  (Ex. 119 at 13:17-14:7, *cited at* Doc. 406 at 19.)  He continued: "I want to scream, I want to run out of here, I want to shout, it just happened, multibillion dollar inked deal, it's happened, and you're all a part of it."  (Ex. 119 at 14:15-18, *cited at* Doc. 406 at 19.)  Noland called the new contract the result of weeks of negotiations involving "all kind of attorneys" and involving "hotels, cruise lines, airlines, [and] rental

cars." (Ex. 119 at 13:14-14:18.)

704.    Noland's boast of a "multibillion dollar inked deal" was a lie.  Defendants have admitted that there was no new contract at all.  (Doc. 222 ¶ 77, *cited at* Doc. 406 at 19.)  The Court, similarly, found that "Defendants admit in their answer that Noland was not telling the truth when he stated . . . that VOZ Travel had 'just' entered into a 'multibillion dollar inked deal.'"  (Doc. 406 at 43 n.14 (citing Doc. 205 ¶ 129; Doc. 222 ¶ 77; Doc. 290-6 at 5).)

705.    Noland explained the (non-existent) new contract would result in a "slight push" on the VOZ release until January 10-15, 2020.  (Ex. 119 at 22:10-19, 23:1-9.)

706.    Noland concluded the call announcing the VOZ delay by promising, "Some of y'all this time next year, you're never going to have to work again, I'm telling you.  Not everybody, not a ton of people, but there's going to be some people . . . ."  (Ex. 119 at 35:4-9, *cited at* Doc. 406 at 19.)

707.    The relationship between Defendants and Advantage Services deteriorated shortly after Noland announced the VOZ delay.  On January 6 and 8, 2020, both parties expressed their intent to terminate the agreement.  (Ex. 255 at 6; Ex. 562 at 1-2.)

708.    In terminating the contract, Craig Morganson, Advantage Services' CEO, expressed concern about Defendants' "desire[] to engage in misrepresentations and other deceptive business practices."  (Ex. 255 at 5.)  Morganson added that Defendants had "embellish[ed] and misrepresent[ed]" the travel services offered by Advantage Services, which made it "impossible for [Advantage Services] to fulfill as you have promised." (*Id.* at 6.)  Morganson concluded:  "[W]e have witnessed an escalating unwillingness to operate within the confines of realistic expectations.  In other words you desire to market in ways that sell memberships, but are resistant to marketing in a manner that can be realistically serviced." (*Id.*)

709.    Defendants' Chief Marketing Officer, Tony Potter, agreed that Defendants had oversold VOZ Travel's purported benefits.  In an email predating the termination,

Potter wrote that "in compiling comparatives" between Advantage Services and Travelocity, he had "not seen nearly the level of discounts/savings that will catapult [VOZ] to the forefront of this race." (Ex. 255 at 9.) Potter added that Noland had "terrible experiences in trying to perform two real bookings." (*Id.*) Noland agreed. (J. Noland Dep. Tr. (12/14/20) at 181:18-182:9.)

710.    Despite the contract's termination (and the fact that Defendants would therefore be starting from scratch with finding an actual travel provider), Noland and SBM's then-Vice President of International Sales, Duvan Botero, on January 8, held a call encouraging affiliates to continue purchasing VOZ "packs." (Ex. 120, *cited at* Doc. 406 at 19.) Noland, apparently recognizing his inability to actually provide a travel product, added that VOZ is more than "a discount on your travel"—it is "freedom," "experiences," and "memories." (Ex. 120 at 13:5-24, *cited* at Doc. 406 at 20.)

711.    Based on the evidence summarized above, the Court previously found that "even after the contract with Advantage Services fell through and no product was foreseeably available, the undisputed evidence shows that the Individual Defendants continued to push Affiliates to join VOZ Travel, purchase VOZ Travel packs, and recruit others to do so." (Doc. 406 at 36 (citing Doc. 290-7 (Ex. 120)).)

712.    As of the Court's January 13, 2020 TRO, Defendants had not engaged a vendor to replace Advantage Services. (Doc. 222 ¶ 1 (admitting Doc. 205 ¶ 134).)

713.    As the Court concluded, "Unlike with SBH, where Affiliates acquired products that could then be consumed or sold, with VOZ *there was no product at all*." (Doc. 406 at 36.)

## V.    DEFENDANTS' NET REVENUES

714.    Defendants' own reporting shows SBH sales from July 2017 through January 13, 2020  equal $7,470,722.70, inclusive of shipping and taxes but excluding sales of both VOZ Travel and Defendants' training events. (Ex. 350-79 (Tab 1, Cell H28).)

715.    Of the July 2017 through January 13, 2020 total SBH revenues, $327,814

were for SBH memberships or membership renewals.  (Ex. 350-79, Tab "Pie Charts," sum of Cells E26 and H26.)  Therefore, the non-membership SBH revenues were $7,142,908.70.[13]

716.    Based on FTC data analyst Elizabeth Anne Miles's determination that 94.7% of Defendants' SBH product revenue came from SBH affiliates (*see supra* ¶ 354), Defendants' SBH revenues from SBH affiliates buying products and memberships total approximately $7,092,148.54.[14]

717.    Defendants' own reporting shows that they disbursed $2,170,403.69 in commissions to SBH and VOZ members.  (Ex. 350-79 (Tab 3a, Column G, Row 5014).)

718.    Defendants also reported $438,121.49 in "accrued" commissions in consumers' SBH "e-wallets," with over $200,000 belonging to Jay Noland.  (*Id.* (Column E, Row 5014; *id.* "ID" numbers 400000 and 90225).  That "accrued" amount represented commissions earned by affiliates that had not yet been paid out.

719.    Of the total commissions Defendants disbursed to SBH and VOZ members, at least $15,932.99 in commissions are attributable to VOZ purchases.  (Ex. 38 ¶ 22.) Therefore, Defendants paid $2,154,470.70 in SBH-related commissions.[15]

720.    Defendants represent they provided affiliates with $237,223.72 in product credits that affiliates used to purchase products.  (Ex. 350-79, Tab "3b. Product Credits," cell G1310.)

721.    Using the inputs above, Defendants' revenues from SBH sales to affiliates, less the commissions they paid to affiliates in connection with those SBH sales, less the product credits, equal $4,700,454.12.[16]

722.    Defendants' own reporting shows their VOZ Travel revenues total $1,210,830.  (Ex. 902.)

---

[13] $7,470,722.70 - $327,814 = $7,142,908.70
[14] ($7,142,908.70 * 0.947) + $327,814 = $7,092,148.54
[15] $2,170,403.69 - $15,932.99 = $2,154,470.70
[16] $7,092,148.54 - $2,154,470.70 - $237,223.73 = $4,700,454.12

723.    Therefore, Defendants' revenues from VOZ Travel sales, less the $15,932.99 in commissions that are attributable to VOZ Travel (*see supra* ¶ 719), equal $1,194,897.01.[17]

724.    Defendants' revenues from all event ticket sales starting October 1, 2017 total $1,411,522.01, according to Defendants' own data and excluding "Zija" events. (Ex. 350-83 (sum Column L for all "order dates" (Column B) starting in October 2017).)

725.    In sum, Defendants' net revenues from SBH, VOZ, and event ticket sales are $7,306,873.14.[18]

## VI.    DEFENDANTS' PRE- AND POST-TRO MISCONDUCT REVEALS A HEIGHTENED LIKELIHOOD OF RECIDIVISM.

726.    Beyond establishing their liability, Defendants' pre-TRO misconduct, combined with their actions during this litigation, establish a likelihood of recurring violations.  (*See infra* ¶¶ 727-842.)

### A.    Contempt Defendants Disregarded the Court's Prior Permanent Injunction Against Jay Noland.

727.    In 2002, this Court entered a Permanent Injunction against Jay Noland (the "2002 Noland Order").

728.    Contempt Defendants not only violated the Order (*see infra* Conclusions of Law ("COL") ¶¶ 97-122), but misrepresented it to the point of touting it as an *endorsement* of Noland's teaching, all while ignoring its requirements.

#### 1.    Contempt Defendants Lied About the 2002 Noland Order and Used It as a Selling Point.

729.    Noland, with Harris's assistance, told one audience that the "Government" had told him he could not tell people how much money he makes because it "unfairly entices" them (Ex. 51 at 74:9-75:9):

JAY NOLAND: . . . [D]o y'all know how much that's paid me?  Huh?

---

[17] $1,210,830.00 - $15,932.99 = $1,194,897.01

[18] $4,700,454.12 + $1,194,897.01 + $1,411,522.01 = $7,306,873.14

AUDIENCE:  A lot.

JAY NOLAND:  It's paid me so much, literally, the Government told me, this little country boy, I'm telling you, they called me up.  They delivered me paperwork, and they said you cannot tell people how much money you  make because it unfairly entices them.

(Laughter.)

JAY NOLAND:  Promise.  Didn't they, Scott?

SCOTT HARRIS:  Absolutely.

JAY NOLAND:  Yes, your Federal Trade Commission said, hey, Jay, listen you make people feel like they can run through walls.

(Laughter.)

JAY NOLAND:  I had the Government officials tell me.  I said, what's wrong with that?  They said, don't worry about it.  We want you to understand that you just can't tell people how much you make.  I said, no problem . . . . So what we started doing instead of telling people how much we make, we just go, okay, last week, I made enough to buy that Maserati cash.

(Laughter.)

730.    In a video posted to the SBH "Heat" Facebook page in October 2019, Noland claimed it was "22 and a half years ago [in 1997] that I learned how to make 20,000 a month in this industry.  Do ya'll know what's happened since then?  The Government says I can't tell people.  It will unfairly entice people if I tell them.  It's ridiculous." (Ex. 116 at 20:25-21:6.)  (Noland's boasts on learning to make $20,000 a month in 1997 are also fiction.  At his deposition, Noland admitted that he did not know if he even made money in Equinox—the company with which he was affiliated from 1995-1999.  (J. Noland Dep. Tr. (2/5/20) at 60:19-61:5, 61:15-62:4.))

731.    Another time, Noland told an audience of SBH affiliates in a video posted to Facebook: "I can do this thing in my sleep.  I figured out how to go out and create billions of dollars in this industry teaching people how to make millions. . . . I've made so much that the Government has told me I can't even talk to people about how much I make.  They say it unfairly entices people if people figure out how much I've made in the direct sales industry.  Let's just say I made more than most people will make in 10

lifetimes, or maybe even 20." (Ex. 55 at 7:18-8:1.)

732.    A consultant Noland hired to find a credit card processor for SBH expressed frustration to Noland that he had not told him about the 2002 Noland Order. Noland wrote back and claimed, falsely, that the FTC litigation "had nothing to do with me" and that the 2002 Noland Order "concluded in 2008." (Ex. 269.)

**2.      Harris and Sacca Disregarded the 2002 Noland Order.**

733.    Harris and Sacca testified that their duties included "ensuring SBH Affiliate compliance with . . . [the 2002 Noland Order]." (Exs. 39 ¶ 11, 40 ¶ 11.)

734.    Harris testified that, despite Noland having told him about the Order before SBH's launch (Ex. 39 ¶ 4), he "*ha[s]n't actually read*" it, but recalled that it "prohibits a couple things." (Harris Dep. Tr. at 317:20-318:6 (emphasis added).) Harris added that it "says, like, no income claims and something along those lines." (*Id.* at 318:8-17.)

735.    Sacca learned about the Order before SBH's launch and handled compliance (Ex. 40 ¶¶ 4, 11); he read just "bits and pieces" of the Order—the "first parts of it"—but "*did not read the whole thing*." (Sacca Dep. Tr. at 109:5-14 (emphasis added).)

736.    When an affiliate asked Sacca how SBH was not violating the Order's pyramid prohibition, Sacca gave a nonsensical response, claiming that a pyramid scheme "is defined by two things[:]  1) no product is being sold [and] 2) you can't [out] earn the person above you or the person who put you in the business." (Ex. 335; *contra* Ex. 1 at 3 (Order definition of prohibited marketing scheme).)

737.    Similarly, when asked at his deposition what constitutes a pyramid scheme, Harris, too, gave a nonsensical response. "Well, a pyramid scheme," he explained, "would be something where … if you've got 100 people and truly only the people at the top can make money, and the people that own the business or run the business know – truthfully they know that they're trying to hurt people and just make money for them and the people at the top, that would be a pyramid scheme." (Harris Dep. Tr. at 29:3-17.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**B.      Defendants Reacted to the FTC's Investigation by Destroying Evidence and Then Lying About It.**

738.    As the Court already found, Defendants responded to learning of the FTC's investigation of them by destroying evidence.  (Doc. 401.)

739.    On May 15, 2019, Wells Fargo Bank inadvertently disclosed to Noland that the FTC subpoenaed bank records related to him and his companies.  (Doc. 401 at 3.)

740.    On May 16, 2019—just one day after learning of the FTC's investigation—Noland instructed the "SBH Leadership Council," which included Harris and Sacca, to install the Signal messaging application on their phones.  (Doc. 401 at 3.)  Defendants installed and began using Signal that same day.  (*Id.*)

741.    Defendants also instructed SBH employees and key affiliates to install the Signal app.  (Doc. 401 at 3.)

742.    Signal emphasizes user privacy, highlighting its end-to-end encryption and promise that messages cannot be seen by Signal or others.  (Doc. 401 at 3 n.1.)

743.    Defendants and their employees also switched to "ProtonMail," a Swiss encrypted email service that emphasizes user privacy.  (Doc. 401 at 3-4.)

744.    On May 20, 2019—after switching to Signal and ProtonMail—Noland, through counsel, contacted the FTC and offered to "cooperate" with the FTC's investigation.  (Doc. 401 at 4.)

745.    On May 29, 2019, the FTC responded that it was not seeking any information from Defendants at the time, but asked that they "suspend any ordinary course destruction of documents, communications, and records."  (Doc. 401 at 4.)

746.    Rather than suspend document destruction, Defendants accelerated it. Throughout the remainder of 2019, as the Court found, Defendants instructed each other (as well as other SBH employees and affiliates) to use Signal or ProtonMail for "anything sensitive" or "important things."  (Doc. 401 at 4.)

747.    As the Court previously concluded, it is "undisputed that the Individual Defendants used Signal to communicate about the SBH business," including after the

Court issued the TRO.  (Doc. 401 at 11; *see also id.* at 16 (noting that Harris and Sacca admitted using Signal to discuss SBH business).)  The Court added:  "The reasonable inference to be drawn from these undisputed facts is that the Individual Defendants continued their discussions of relevant matters on Signal and ProtonMail after switching over to those apps."  (*Id.* at 18.)

748.    It is also undisputed that Noland, at a minimum, used ProtonMail to send at least one email instructing witnesses what to say in declarations submitted to the Court in this litigation.  (Ex. 355.)  As Defendants admitted, Noland then deleted that email rather than produce it to the FTC.  (Doc. 276 at 3; Doc. 401 at 13 (referencing Ex. 355).)

749.    When the FTC asked Noland at his February 5, 2020 deposition—just three weeks after entry of the TRO—whether he used any encrypted messaging services or applications, he feigned confusion and then lied:

> Q. Have you ever used any type of encrypted communications to conduct Success By Media business?
>
> A. I'm not sure what you mean, sir.
>
> Q. Have you used any type of phone application or software system that encrypts the substance of the communication from point to point?
>
> A. I mean, I think it's like standard practice now. I don't know. It's standard practice.
>
> Q. Do you do that in your course of your work for Success By Media?
>
> A. I don't know.  Whatever communication.  I mean, it's a phone call. The encrypted, what Verizon offers.
>
> Q. Do you do anything separately to encrypt your communications apart from what a Verizon provider may do on their end?
>
> A. Just have, you know, I think WhatsApp uses that now.

(J. Noland Dep. Tr. (2/5/20) at 114:22-115:14, *cited at* Doc. 401 at 5.)

750.    Defendants also failed to disclose their use of Signal and ProtonMail in their MIDP responses, in violation of the requirement to list all "documents" and ESI "known by you to exist . . .  that you believe may be relevant to any party's claims or

defenses." (Doc. 401 at 5 (quoting D. Ariz. G.O. 17-08 § B.3).)

751. On August 17, 2020—*the day before they turned over their phones*—all four Individual Defendants deleted the Signal app, leading to irrevocable destruction of their Signal communications. (Doc. 401 at 6.)

752. Sacca *admitted* the Signal deletion was "part of a coordinated plan between himself, Harris, and Noland." (Doc. 401 at 8 (citing Sacca Dep. Tr. at 267:12-268:9).)

753. When the FTC sought spoliation sanctions based on Defendants' destruction of evidence, Defendants claimed they installed Signal in May 2019 not because they had learned of the FTC's investigation, but instead because they wanted to "avoid the hacking, eavesdropping, and infiltration efforts" of former SBH associates and "saboteurs." (Doc. 401 at 20-21 (quoting Doc. 276 at 3).) The Court "easily" rejected Defendants' bizarre explanation, finding the Defendants "acted with the intent to deprive the FTC of the information contained in the Signal and ProtonMail messages." (Doc. 401 at 22.) The Court found the "saboteur" defense to be "incredible." (Doc. 401 at 22.)

754. The Court called the Defendants' deletion of the Signal app just as they were turning over their phones the "*pièce de résistance*"—"an outrageous maneuver that raises a strong inference of bad faith." (Doc. 401 at 24.) The Court added that Defendants'' claim that they simply wanted to hide their Signal contact list "makes no sense." (*Id.*)

755. The Court also found an "adverse-inference sanction is appropriate" because "it is likely that the deleted Signal and ProtonMail communications addressed matters relevant to this litigation." (Doc. 401 at 25.)

**C. Defendants Violated the Court's TRO and Preliminary Injunction.**

756. Defendants not only ignored the Court's 2002 Noland Order, but violated the Court's TRO and Preliminary Injunction in this case.

**1. Failure to Turn Over Information to Receiver**

757. The Court entered its TRO on January 13, 2020. (Doc. 21, *as amended*, Doc. 38.)

758.    The TRO required Defendants to "immediately transfer or deliver to the Temporary Receiver," *inter alia*, "[a]ll Documents of or pertaining to the Receivership Entities, including all communications occurring via electronic mail, electronic message service, or *encrypted messaging service*," "[a]ll computers, electronic devices, mobile devices, and machines used to conduct the business of the Receivership Entities," and relevant passwords.  (Doc. 38 at 21 (emphasis added).)

759.    The Receiver, however, "encountered considerable difficulty" obtaining documents and electronic data, with Defendants providing no "meaningful access to the company's electronic data until . . . two weeks after service of the TRO" and leaving "several" of the Receiver's requests outstanding one month post-TRO.  (Ex. 28 at 7; Anticipated Testimony of Kimberly Friday.)

760.    Defendants also waited two weeks (until January 26) before providing *any* password credentials to SBM's systems, such as email, communications pages (*e.g.*, Facebook groups), or accounting/affiliate compensation systems.  (Ex. 28 at 7; Anticipated Testimony of Kimberly Friday.)

761.    Defendants hid from the Receiver their use of Signal and ProtonMail. (Anticipated Testimony of Kimberly Friday.)

762.    Defendants also withheld their SBH business phones from the Receiver for seven months, and then destroyed evidence located on them.  (Anticipated Testimony of Kimberly Friday; Doc. 401 at 6.)

### 2.    Failure to Repatriate Assets

763.    The TRO and Preliminary Injunction required Defendants to "immediately" "[t]ransfer to the . . . United States all . . . Assets located in foreign countries" that they owned or controlled.  (Doc. 38 at 12; Doc. 109 at 9.)

764.    In the weeks before the TRO, the Nolands used SBH money for extravagant expenditures in Uruguay, including a $72,000 down payment on a $145,000 Range Rover and $50,000 on luxury motorbikes.  (Ex. 41 at 4; Ex. 310 at 7; J. Noland Dep. Tr. (2/5/20) at 30:20-32:20, 33:4-34:17, 177:24-178:6.)

765.   The Nolands admitted all of these items were personal assets (Ex. 310 at 7), but took no steps to repatriate them.

### 3.   Failure to Notify SBH Affiliates of TRO or Cease SBH Operations

766.   The TRO required that Defendants, *inter alia*, "immediately" provide a copy of the TRO to each "affiliate[,] employee[,] and representative of any Defendant." (Doc. 38 at 27.)  It also barred Defendants from "[t]ransacting any business of the Receiver Entities."  (*Id.* at 23.)

767.   After being served with the TRO on January 13, Noland, rather than take steps to "immediately" comply with it, went to the beach and broadcast a six-minute soliloquy to SBH affiliates, never mentioning the TRO, but stressing how Defendants "do[] things the right way, bringing tons of integrity, transparency to the industry."  (Ex. 121 at 5:5-10.)  Noland then posted that message to the SBH Heat Facebook page, in violation of the TRO.  (Anticipated Testimony of Adam Rottner.)

768.   Noland and Harris continued to broadcast to affiliates on SBH's daily "Heat" conference calls until January 22—nine days after they were served with the TRO.  (Anticipated Testimony of Adam Rottner.)

769.   Defendants did not disclose the existence of the TRO to SBH affiliates until January 24, 2020.  (Doc. 351-2 at 7.)

### D.   Defendants Lied to Former SBH Affiliates in Order to Raise Money.

770.   Throughout this litigation, Defendants have continued to deceive SBH affiliates, in large part to take yet more money from them.  (*See infra* ¶¶ 771-784.)

771.   In 2020 alone—the only period for which the FTC has information—Defendants raised just under $750,000, almost exclusively from SBH affiliates, for their legal defense and to cover other expenses.  (*See infra* ¶¶ 772-774.)

772.    Defendants' former counsel, Gordon Rees Scully Mansukhani, LLP, received $100,000 for legal services from SBH affiliates Jeffrey and Amber Wright.  (Ex. 258 at 1 (date and amount); Ex. 45 at 3 (Wrights as source).)

773. Defendants' preliminary injunction expert witness also received $37,390 from the Wrights. (Ex. 272 at 8 (payment to Berkeley Research Group); Doc. 322 at 3-4 (source of funds).)

774. Defendants' subsequent counsel, Williams Mestaz LLP, received $466,517.58 as of *December 9, 2020*. (Ex. 45.) At least $247,800 of those funds came from SBH affiliates. (Ex. 45 at 7-12 (contributions from Joey Farley, Richard Boyd, Rick Rutherford, Carleigh Sherfield, Brooke Sherfield, Mike King, Sherry Harrod, Jo Dee Baer, Jill Boone, Melanie Summers, Linda Huff, Carlos Mendoza, and William Henderson; Ex. 350-79 (Tab 3A, identifying these individuals or their spouses as affiliates).) Almost all of the remaining funds came from unidentified donors, including one who contributed over $50,000 in Bitcoin. (Ex. 45 at 7-12.)

775. In addition to the over $600,000 in legal donations described above, Defendants Jay and Lina Noland received $5,000-per-month payments (totaling over $55,000) for their Las Vegas luxury rental house from SBH affiliates Jeff and Amber Wright and an "Affiliate Donations Account"—*i.e.*, an account accepting donations from former SBH affiliates. (Ex. 45 at 3-4.)

776. Although undisclosed by Defendants in their interrogatory responses, Jay and Lina Noland, after the TRO, also received $47,000 in the form of payments made to various creditors in Uruguay—for their new Range Rover, motorbikes, $10,000-per-month second rental home, and other expenses—from affiliate donations. (Ex. 272 at 8-9 (identifying payments to "Modifec," Guillermo Lijtmaer, "Farinto SA," "Sanchez," "Beleman," and Ariel Enrique); J. Noland Dep. Tr. (2/5/20) at 173:9-24, 175:12-19, 176:11-177:11, 177:24-178:6, 178:20-179:6 (identifying payees).)

777. In addition to the over $600,000 in legal donations, Defendant Harris received over $23,000 in donations from former SBH affiliates in 2020. (Ex. 46 at 2-3.)

778. In addition to the over $600,000 in legal donations, Defendant Sacca received over $20,000 in donations from former SBH affiliates in 2020. (Ex. 47 at 2-3.)

779.    Because Defendants destroyed communications with their affiliate donors (*see supra* ¶¶ 738-755), there is little evidence of what they said to these donors to elicit donations.  The available evidence, however, includes lies and falsehoods.  (*See infra* ¶¶ 780-784.)  The Court infers that if Defendants had not intentionally destroyed emails and text messages, there would be more evidence showing them lying to former SBH affiliates to get more money from them. (Doc. 401 at 24-27 (entering adverse inference sanction); *see also supra* ¶¶ 738-755 (describing document destruction).)

780.    In a May 4, 2021 interview, Noland claimed the FTC and Receiver had wrongfully denied affiliates access to a "designated bank account" with affiliates' commissions.  (Ex. 123.)  In fact, there was no such account, as Noland later admitted. (J. Noland Dep. Tr. (2/5/20) at 97:6-99:4.)  As of the TRO, no single SBM banking account held funds sufficient to cover e-Wallet balances, and corporate liabilities exceeded cash assets.  (Ex. 28 at 10, 12; Anticipated Testimony of Kimberly Friday.)

781.    In a fundraising video, Defendants' then-counsel, with a fundraising link scrolling along the bottom of the screen, claimed the FTC "took [the Nolands' six-year-old son's] money." (Ex. 124 at 46:3-6.)  Noland confirmed this was "fact." (Ex. 124 at 46:6-8.)  It was fiction.  There are no frozen funds in Noland's son's name, and Noland has admitted to not having saved any money from his son's education and to not having any meaningful savings at all.  (Anticipated Testimony of Adam Rottner; Ex. 310; J. Noland Dep. Tr. (2/5/20) at 155:8-11, 202:16-19.)

782.    In the same fundraising video (Ex. 124), Noland claimed—with the fundraising link scrolling—that the FTC had frozen Scott Harris's son's bank account, which left him "on the way going to college with no money," meaning that "volunteers had to give Scott's son money to go to college . . . . That is a fact. . . . [A]re we in North Korea?" (Ex. 124 at 12:12-18.)  Harris's sworn financial disclosures reveal the frozen account (on which Scott Harris is a signatory, resulting in the freeze) had about $200. (Anticipated Testimony of Adam Rottner; *see also* Harris Dep. Tr. at 279:2-280:6 (Harris

estimating, from memory, that son's account had "[$]6 or [$]700").)

783.    Donors relied on Defendants' false claims described above.  In one video, donor Jo Dee Baer stated:  "[The FTC] blew through that money once they illegally froze business and personal assets to the degree that college-aged children of one of the [SBH] officers couldn't even go ahead and they couldn't continue in college because there was a joint checking account."  (Ex. 125 at 8:18-22.)

784.    Defendants also asked for money through their "SBH Owners" webpage. (Ex. 308; Ex. 122.)  In a video on that site, Noland asked his victims, former SBH affiliates, to donate $1,000 each.  (Ex. 122 at 33:8-14.)  Noland claimed the FTC had been "terrorizing me" for "20 years."  (*Id.* at 34:3-5.)

**E.    Defendants Have Lied to the Court, IRS, SEC, and Potential Investors.**

785.    Even beyond lying about, ignoring, and violating the 2002 Noland Order (*see supra* ¶¶ 729-737; *infra* COL ¶¶ 97-122); intentionally destroying evidence in violation of discovery obligations and the Court's Preliminary Injunction (*see supra* ¶¶ 738-755); and committing other violations of the Court's TRO and Preliminary Injunction (*see supra* ¶¶ 756-769), Defendants lied to the Court and government agencies.  Noland, for example, fabricated evidence in this case and lied to the IRS; Defendants have lied to the SEC and potential investors; and Harris has twice been found to have sold securities through material misrepresentations.

**1.    Noland, During Litigation, Fabricated a "Royalty Agreement" Between Two of His Companies.**

786.    The evidence establishing Noland's fabrication of a "Royalty Agreement between Enhanced Capital Funding and Success By Media LLC is set forth in full in a prior FTC filing (Doc. 235).  Below, the Court summarizes that evidence.

787.    Noland told the Court, in a June 26, 2020 declaration, that "Enhanced Capital [Funding] [*i.e.*, a Noland-owned and -controlled entity] started licensing formulas to Success By Media in *January 2017 . . . .* These licenses provide the basis upon which Success By Health can market products."  (Doc. 157-1 at 2, 4 (emphasis added).)

788.    In fact, however, Noland had told his accountant, Crystal Roney, in April 2018 (16 months *after* the supposed licensing agreement he described to the Court) that there was *no* licensing agreement.  First, in an April 2, 2018 text message exchange, Roney asked Noland:  "Do you have license agreement in place with SBM [Success By Media] and SG [a prior Noland company]?  You should be receiving royalty payments." Noland replied:  "*I don't have that in place.*"  (Ex. 282 (emphasis added).)  On April 27, 2018, Noland confirmed the lack of a Royalty Agreement between Enhanced Capital Funding and Success By Media in an email exchange with Roney.  Specifically, Roney wrote Noland:  "There is no formal agreement between the corporation [SBM] and Enhanced Capital.  This has to be fixed. . . . [T]he corporation needs to sign an agreement and to pay royalties for rights to use the formulas."  (Ex. 190.)  Noland replied:  "Ok.  We will fix soon."  Defendants later told the Court they "formalized" the Royalty Agreement in the remaining three days of April 2018 (Doc. 232 at 2), but no emails, texts, ESI, or sworn testimony supports that claim (Anticipated Testimony of Adam Rottner).

789.    In fact, it was not until August 2019 that Roney sent Noland a *draft* "Royalty Agreement," telling him, "Please review this . . . it is a draft."  (Ex. 245.)  The document was an unsigned PDF with multiple blank placeholders and a "This is a RocketLawyer.com document" footer.  (*Id.*)

790.    In January 2020, *after* entry of the Court's TRO (and *after* the FTC requested a copy of the Royalty Agreement), a *signed* version of the agreement first appeared, in a document production by Defendants.  Defendants dated the document January 15, 2017.  (Ex. 326.)

791.    Five months later, Jay Noland not only swore to the Court that "Enhanced Capital stated licensing formulas to Success By Media in January 2017," but also accused the Receiver of being "in breach of contract" by not paying royalties on the fabricated agreement.  (Doc. 151-1 at 3.)

## 2.    Defendants Lied to the SEC and Potential Investors.

792.    Defendants filed a series of "Offering Statements" with SEC to raise money

for SBH and Success By Media.  (Exs. 275-279.)

793.    The SEC Offering Statements state falsely that "many" of Noland's past mentees and students "achieve incredible accomplishments as a result [of his teaching]." (Ex. 275 at 29; Ex. 276 at 29; Ex. 277 at 29; Ex. 278 at 35; Ex. 279 at 35; *see supra* ¶¶ 458-462.)  The Offering Statements also tout, without any apparent evidence, Noland's "legendary" ability to "increase companies three and five fold."  (Ex. 275 at 32; Ex. 276 at 32; Ex. 277 at 32; Ex. 278 at 38; Ex. 279 at 38.)

794.    In an April 29, 2019 Offering Statement, Defendants, for the first time, included a description of the purported Royalty Agreement between Enhanced Capital Funding and Success By Media LLC.  (Ex. 278 at 22; *see supra* ¶¶ 786-791.)  Defendants claimed, contrary to the evidence, that they had entered into the agreement in 2017.  They had not, however, disclosed the purportedly two-year-old agreement, which would have been critical to their business if it actually existed, in any of their prior filings.  (Exs. 275-277.)  The April 2019 Offering Statement's description of the Agreement does not even match the version that Noland and Crystal Roney created in January 2020 (but claim to have created much earlier).  *Compare* Ex. 278 at 22 ("exclusive" license agreement with royalty paid annually), *with* Ex. 326 at 2-3 (non-exclusive license, limited to the United States, with royalties paid quarterly).   Defendants' December 26, 2019 Offering Statement contains the same false description of the Royalty Agreement.  (Ex. 279 at 27.)

795.    The April and December 2019 Offering Statements contained other false or misleading (or simply bizarre) statements as well.  Defendants, for example, claimed success in "penetrating the corporate sector."  (Ex. 278 at 26; Ex. 279 at 26.)  Both Offering Statements, moreover, listed Jay Noland and Crystal Roney as the sole directors and officers of SBM Holdings.  (Ex. 278 at 7, 9; Ex. 279 at 7, 9.)  Defendants failed to disclose that Harris—who had twice been found to have engaged in the unlawful sale of securities (*see infra* ¶¶ 800-801)—was also a director and the President of the Company. (Harris Dep. Tr. at 97:15-98:5 (Harris confirming appointment as director);  Ex. 331 at 1

(Harris was President); J. Noland Dep. Tr. (12/14/20) at 46:5-19 (Noland confirming Harris was board member).).  Defendants also failed to disclose Lina Noland as a director or officer SBM Holdings.  (J. Noland Dep. Tr. (12/14/20) at 46:5-19, 47:18-48:3 (Jay Noland identifying Lina Noland as board member); Ex. 49 at 4-5 (Lina Noland as Secretary and Director of SBM Holdings).)

796.    When asked if he was concerned that SBM Holdings's SEC disclosures did not list him as an officer or director, Harris responded:  "It's definitely something we need to talk about and talk to our attorney about."  (Harris Dep. Tr. at 312:2-8.)

### 3.    Noland Lied in a Sworn Declaration to the IRS.

797.    In November 2018, Noland signed, under oath, a "Declaration of James Noland in Support of Penalty Abatement."  (Ex. 222.)  The declaration was part Noland's attempt to have the IRS withdraw a tax lien against him.  (Ex. 222 at 6.)

798.    In the declaration, Noland explained that he could not "have a Federal Tax Lien reported against me" because he was "in the process of taking [SBM Holdings] public" and "[f]inancial disclosures have to be made, including liens and judgments."  (Ex. 222 at 5.)  Noland swore that SBM Holdings had an "*independent and very aggressive*" Board of Directors that demanded a meeting to discuss his tax lien becoming public.  (Ex. 222 at 5-6 (emphasis added).)

799.    As noted above, the Board that Noland swore to the IRS was "independent and very aggressive" consisted solely of himself, his wife, Harris (his long-time friend and current business partner), and his long-time accountant Crystal Roney.  (J. Noland Dep. Tr. (12/14/20) at 45:3-15, 46:5-19.)  When asked at his deposition why he described this board of insiders as "independent," Noland, replied:  "I would—you know, again, if I am going back through my mind looking through the document here now, I mean, probably independent like meaning strong."  (J. Noland Dep. Tr. (12/14/20) at 115:23-116:3.)  When asked about his claim to the IRS that the "independent" board was also "very aggressive," Noland claimed he meant they "[w]ork hard. . . . The hardest workers you'll find."  (J. Noland Dep. Tr. (12/14/20) at 116:8-15.)

### 4. Harris Twice Sold Securities Using Materially False or Misleading Statements or Omissions.

800.    In July 2008, California's Department of Corporations found that Harris, in his role of as Senior Vice President of energy company Allied Syndications, Inc., "offered and sold a security by means of written or oral communications which included untrue statements of material facts and omitted material facts." (Ex. 342 at 10.)   The Department entered a Desist and Refrain Order barring Harris and Allied from selling securities in California. (*Id.* at 15-16.)

801.    Harris disregarded the California order.  In 2018, California's Department of Business Oversight (formerly the Department of Corporations) found that Harris "willfully violated" the 2008 Desist and Refrain Order and the California Corporations Code not only by continuing sell securities in California, but by once again misrepresenting or omitting material information in such sales. (Ex. 320 at 19.)  It assessed Harris $67,000 in administrative penalties. (*Id.* at 23.)

### 5. In the First Action, Noland Asserted Sovereign Citizen Conspiracy Theories to Reject the Court's Authority.

802.    In response to the FTC's first Complaint against him, Noland filed a "Request for Remedy." (First Action, Doc. 38.)  Noland asserted that by writing his name in the case caption in capital letters, the FTC had sued Noland's "VESSEL," a legal entity "registered with the Department of Transportation in Puerto Rico," rather than his person, which was the "secured/creditor/priority stockholder/holder-in-due-course" of his "VESSEL." (First Action, Doc. 38 at 2.)  Noland threatened that a refusal by the Court to release his "VESSEL" by "immediately" dismissing the case would be a "commercial dishonor" that would force Noland to take Judge Robert C. Broomfield into "involuntary bankruptcy." (*Id.*)  The Court, of course, rejected Noland's argument as "bizarre" and "entirely frivolous." (First Action, Doc. 51 at 3.)

803.    The Court in the First Action also sanctioned Noland for disregarding his discovery obligations. (First Action, Doc. 51 at 4.)

F.    **Defendants' New Business Ventures Raise Significant Red Flags.**

804.   Since entry of the TRO, Individual Defendants have started, or attempted to start, new business ventures that reveal a substantial risk that they will continue to deceive consumers.  (*See infra* ¶¶ 805-832.)

1.    **MYB Publishing**

805.   In June 2020, Jay Noland disclosed that he was forming a new business entity:  "MYB Publishing."  (Ex. 257.)  At the time, Noland claimed to be MYB's sole officer, director, principal, manager, and employee.  (*Id.*)  Defendants since identified Lina Noland as MYB's "Marketing Director" (Ex. 264 at 2), and Scott Harris identified himself (along with Jay and Lina Noland) as an "MYB Publishing member" and part of the "Jay Noland Mastery Team" (Ex. 257.)

806.   Defendants initially disclosed that MYB would engage in, *inter alia*, "[p]roduction and dissemination of information, literature, music, or media" and "[m]aking varied information available to the general public."  (Ex. 257.)

807.   The MYB Publishing website, as of July 2020, had testimonials from "Charity R." and "Susan W."  (Ex. 300.)  When the FTC asked for information about them, Defendants, without explanation, claimed the testimonials "cannot be located without dozens of man hours involved" and subsequently removed them. (Ex. 164 at 1.)

808.   Since December 2020, Defendants, through MYB Publishing, have promoted their  "ConfidenceTones" product—literal audio "tones" and "sound frequencies" that, Defendants claim, can "help relieve body aches and pains without dangerous medications," "help you lose weight," and "help you lower blood pressure." (Ex. 301 at 28, 38 (describing "Confidence Tones" as "supported by MYB Publishing").)

809.   In June 2022, Defendants, through MYB Publishing, also began promoting their "Special Universal Edition" of a book called "The Science of Getting Rich"— originally published in 1910.  (Ex. 163.)

810.   Noland's marketing posts for *The Science of Getting Rich* echoed Defendants' familiar sales pitch:  "Have you ever asked yourself how you can achieve

complete happiness, all your dreams, and have everything you want and deserve in life for you and those you love?  In 1910 Wallace D. Wattles originally wrote 'The Science of Getting Rich,' where he explains all a person needs to know to go from poverty and obscurity, to wealth."  (Ex. 163.)  Defendants added that the book "holds within its pages the secret to how anyone, no matter their circumstances, can achieve a rich and happy life" and that "[b]y closely adhering to the principles outlined in this best-selling classic, we can finally ensure our own success, wealth, and happiness. . . ."  (Ex. 163.)

811.    Harris and the Nolands joined together to promote *The Science of Getting Rich*.  (Ex. 303.)

812.    On a website the Nolands and Harris set up to promote their "edition" of *The Science of Getting Rich*, they feature a quote from the book's author:  "There is a science of getting rich.  It is an exact science, like algebra or arithmetic.  There are certain laws which govern the process of acquiring riches.  *Once a person learns and obeys these laws, they will get rich with mathematical certainty*."  (Ex. 304 (emphasis added.)

813.    Defendants used the book release to promote a companion "Science of Getting Rich Mastery Course," which is currently on "pre-order" from MYB Publishing for $795.  (Ex. 305.)  To promote the course, Defendants explain: "By closely adhering to the principles outline in this best-selling classic, we can finally ensure our own success, wealth, and happiness without feeling the need to compete with anyone or anything." (Ex. 305.)

814.    Through MYB Publishing, the Nolands and Harris also launched their "XPMentor" business.  (Ex. 264.)  It is a monthly subscription that they claim, is "tailored specifically for entrepreneurs and personal growth seekers" and will help "[m]aximize the lifespan of your business by setting up the appropriate corporate structures, minimize tax liabilities, and legally maintaining compliance," and "[d]evelop and maintain the appropriate conscious and subconscious mindset necessary to grow a profitable business."  (Ex. 306 at 1.)

815.   In announcing the launch of XPMentor, Noland posted a Facebook video comparing himself to Martin Luther King, Jr. and Ghandi:  "[A] lot of people come to me and say, how can you stay motivated with all the 'ish' you've been through the last couple of years.  I'm like, don't you understand what people like Martin Luther King went through, Mahatma Ghandi went through, even people like Muhammad Ali . . . . So what I know how to do—I just know how to do it ….  (Ex. 126 at 9:5-20.)

### 2.   Total Growth Technologies

816.   On November 10, 2020, Jay Noland disclosed another new business, "Total Growth Technologies."  (Ex. 260.)  He described it as providing "[i]nformation technology services that include, but not limited to, the production and delivery of data, training, knowledge, information, technology, and ongoing personal and professional development."  (Ex. 260.)

817.   The Total Growth Technologies website identified a "team of experts individually specializing in everything from development to delivery."  (Ex. 302.)  When the FTC asked about the "team of experts," Noland, through counsel, explained that, actually, the experts "had not been activated to fulfill any roles as of yet" but "may include individuals within Mr. Noland's global network."  (Ex. 263.)

818.   Confusingly, in April 2022, Total Growth Technologies disclosed that its "first venture" would actually be "[m]erchant processing . . . using the name Total Growth Payments."  (Ex. 262.)  Total Growth Payments markets itself to "high risk" businesses, among others.  (Ex. 307.)

### 3.   TravelNU

819.   On September 16, 2020, Individual Defendants disclosed to the FTC a "new" business:  "VOZ Travel."  (Ex. 273 at 1.)  The "new" VOZ, they claimed, was essentially the same as the old VOZ without the multilevel marketing component.  (Ex. 273 at 2-3.)  Noland, Sacca, and Harris were VOZ Travel officers.  (*Id.* at 1.)

820.   After the FTC pointed out that the Receiver possessed the "VOZ" tradename, Individual Defendants' counsel responded:  "Okay.  My clients will not use

the name VOZ Travel or anything similar to it (*TravelNU* is what they think will use)." (Ex. 273 (emphasis in original).)

821.   In May 2021, Jay Noland submitted a sworn declaration stating:  "We have obtained a new travel service provider."  (Doc. 335-6 at 3.)

822.   In September 2021, after Individual Defendants reiterated their plans for a new VOZ, the FTC asked for details.  (Doc. 475-2 at 12.)

823.   In December 2021, Individual Defendants' counsel responded, providing a website for the new business:  www.TravelNU.net.  (Ex. 339.)

824.   The TravelNU website contained facially aggressive claims.  It offered "Luxury Travel For Less" "at exclusive pricing unavailable to the general public," including "2.8 Million Accommodations," "900+ Airlines," and "345,000 Activities," in addition to "hundreds of thousands of hotels around the world at up to 80%+ off the best rates you can find online" and "stunning hotels, condos, villas, and destination resorts all around the world for as low as $10/person per night."  (Ex. 339 at 1, 3-4.)

825.   Individual Defendants planned to charge TravelNU customers *$1,500-$5,000 up front, plus a $50-100 monthly fee*.  (Ex. 339 at 4, 6, 7.)  The vendor they hired to provide the travel service, by contrast, offered to do so (in January 2020) for, at most, *$12.27 per month per customer without any apparent up-front charge*.  (Ex. 341 at 2.)

826.   When asked by the FTC to explain the factual basis for certain TravelNU claims, the Individual Defendants moved the Court for an order sanctioning the FTC for acting in "bad faith."  (Doc. 506 at 14-17.)  The Court denied that motion.  (Doc. 518.)

827.   Defendants claimed that through TravelNU, they could have provided VOZ purchasers with the same benefits they promised in VOZ.  (*See supra* ¶¶ 672-699 (describing benefits).)  There is no basis for that claim.  Defendants pitched VOZ as offering life-changing income, immense travel savings, and other unique travel benefits, including a "virtual assistant" named "Dina" and a novel "travel DNA" ("tDNA") profile for each member.  (*Id.*)  Defendants do not claim that TravelNU could provide life-

changing income, a virtual assistant, or "tDNA," and they have refused to explain the basis for their claims that TravelNU would provide travel savings.

### 4.   SBH Products, Inc. and Vibra360

828.   In July 2021, Individual Defendants disclosed their intent to start another not-quite-new business:  "SBH Products, Inc."  (Ex. 274.)  The officers and directors would be Noland, Harris, and Sacca.  (*Id.*)

829.   Individual Defendants explained:  "The business will engage in the sale of products previously sold by Success By Health via marketing that does not involve multi-level marketing or commissions for sales.  The business will commence immediately."  (Ex. 274 at 2.)

830.   The Receiver and FTC both objected to the Individual Defendants' plan to resume sales of SBH products because, *inter alia*, the right to sell SBH products belonged to the Receiver.  The Court agreed with the Receiver that the potential order violations from operating SBH Products, Inc. were "serious."  (Doc. 395 at 4.)

831.   Defendants then disclosed another new business:  "Vibra365 International."  (Ex. 261.)  The officers were Noland, Harris, and Sacca.  (Ex. 261.)  Vibra365 would offer "New Proprietary Nutraceutical Formulas, New Beverage Formulas, and New Health Product Formulas in various forms."  (Ex. 261.)

832.   Currently, Defendants are selling "mushroom coffee," "mushroom latte," "VDetox," "VDetox Lifestyle Pack," "SuperImmune Complex," and "BalaFlex" under the "Vibra360" tradename.  *See* www.vibra360.com.

### G.   Defendants Refused to Accept Responsibility.

833.   At their depositions, Defendants Noland and Harris—who admitted to reviewing all or most of the FTC's TRO motion and related exhibits (Doc. 8)—could not identify *anything* from the FTC's papers and evidence that they considered an "income claim."  (J. Noland Dep. Tr. (12/14/20) at 93:11-94:9; Harris Dep. Tr. at 12:24-15:3.)

834.   Individual Defendants not only have failed to recognize their wrongdoing, but rallied supporters to their cause through lies (*see supra* ¶¶ 770-784) and bizarre

conspiracy theories that put the blame for their situation on anyone but themselves.  As the Court wrote, Defendants "complain[] about the unfairness inherent in the FTC's *modus operandi*, allege[] that the FTC is blinded by 'confirmation bias' against Noland, accuse[] the Receiver of serving as the 'majordomo' of the FTC, and contest that what gave rise to the FTC's enforcement action was a 'vendetta' by a former employee pursued to 'exact revenue for getting caught committing adultery.'"  (Doc. 177 at 14-15.)  The Court was "not persuaded":  "These arguments are largely unencumbered by legal citation and authority."  (Doc. 177 at 15.)

835.    Defendants pivoted to accusing their former employee, FTC counsel, the FTC's expert witness, and the Court of "racial targeting."  (Ex. 340 at 17:2-21:15.)

836.    Seven months before Noland made the "racial targeting" comments in Exhibit 340, the Court addressed Individual Defendants' accusation that "this case was and is motivated by racial animus."  (Doc. 224 at 19 (quoting Doc. 187 at 5).)  The Court responded:  "This is a frivolous argument and the Individual Defendants' [former] counsel should be ashamed for raising it."  (Doc. 224 at 19.)

## H.    Defendants Enriched Themselves Through their Pyramid Schemes.

837.    From July 2017 to entry of the TRO, SBM LLC bank accounts sent **$590,264.20** to Jay Noland or his wholly-owned company, Enhanced Capital Funding.  (Anticipated Testimony of Roshni Agarwal & Adam Rottner.)  Lina Noland admitted the Nolands used Enhanced Capital Funding's corporate bank account as a "personal account" for things like "groceries" and swim lessons.  (L. Noland Dep. Tr. (12/16/20) at 112:21-113:12, 116:21-117:14.)

838.    From July 2017 to entry of the TRO, SBM LLC bank accounts sent **$408,380** to Lina Noland.  (Anticipated Testimony of Roshni Agarwal & Adam Rottner.)

839.    The Nolands sent an additional $262,035.31 to Uruguay from SBM LLC bank accounts in late 2019 and early January 2020.  (Anticipated Testimony of Adam Rottner.)  The majority of that money was for the Nolands' personal benefit, including a **$72,000** down payment (and a **$12,500** monthly financing payment) on a $145,000

Range Rover, **$50,000** on matching luxury motorbikes, and a **$10,000-per-month** beachfront rental condo.  (Anticipated Testimony of Adam Rottner & Roshni Agarwal; J. Noland Dep. Tr. (2/5/20) at 30:20-34:9, 175:12-19, 180:13-19.)

840.    From July 2017 to entry of the TRO, SBM LLC bank accounts sent **$412,538.55** to Scott Harris or his wholly-owned company, Arcadia Integrated Solutions.  (Anticipated Testimony of Adam Rottner & Roshni Agarwal.)

841.    From July 2017 to entry of the TRO, SBM LLC bank accounts sent **$280,244.43** to Thomas Sacca or his wife, Elizabeth.  (Anticipated Testimony of Adam Rottner & Roshni Agarwal.)

842.    Therefore, of Defendants' approximately $7 million in net revenues (*see supra* ¶¶ 714-725), almost $2 million went into their own pockets.

## CONCLUSIONS OF LAW

### I.    THE COURT HAS JURISDICTION OVER THIS MATTER.

1.    The Court has jurisdiction over the Second Action (No. CV-20-0047) pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 53(b), 57b.

2.    As to the First Action (No. CV-00-2260), the Court "unquestionably has subject-matter jurisdiction to entertain a claim for civil contempt sanctions based on the violation of a permanent injunction it previously issued."  (First Action, Doc. 136 at 5 (citing *Shillitani v. United States*, 384 U.S. 364, 370 (1966).)  The Court had jurisdiction to enter the 2002 Noland Order pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

3.    Individual Defendants dispute the Court's jurisdiction because, they claim, SBH affiliates were not "consumers" under the FTC Act.  Aside from being wrong (*see infra* ¶¶ 85-90, 209-211), that argument is not jurisdictional.  The provisions of the FTC Act that confer jurisdiction either do not mention "consumers" at all (15 U.S.C. § 53(b)) or state that relief is available to "consumers *or other persons*" (15 U.S.C. § 57b(b) (emphasis added)).   Similarly, 15 U.S.C. § 45(a)—which prohibits "unfair or deceptive acts in or affecting commerce" and which is the basis for all counts in the FTC's Second

Amendment Complaint (Doc. 205 ¶¶ 159, 162, 164, 171, 173, 181)—does not mention, or limit its application to, "consumers."

## II.   CORPORATE DEFENDANTS VIOLATED THE FTC ACT BY DECEPTIVELY MARKETING THE SBH PYRAMID SCHEME.[19]

### A.   Success By Health Was a Pyramid Scheme (Count I).

4.      Section 5(a) of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce."  15 U.S.C. § 45(a).

5.      "The operation of a pyramid scheme constitutes an unfair or deceptive act or practice in or affecting commerce for the purposes of § 5(a)."  *FTC v. BurnLounge, Inc.*, 753 F.3d 878, 880 (9th Cir. 2014) (citing *In re Koscot Interplanetary, Inc.*, 86 F.T.C. 1106, 1178, 1181 (1975)); *see also Torres v. S.G.E. Mgmt., LLC*, 838 F.3d 629, 641 (5th Cir. 2016) (en banc) ("Pyramid schemes are inherently deceptive because their very structure conceals the fact that those at the bottom of the pyramid will be unable to recoup their investment."); *FTC v. Vemma Nutrition Co.*, 2015 WL 11118111, at *1 (D. Ariz. Sept. 18, 2015) ("A pyramid scheme, like a simple chain letter, ensures that most of its participants will lose money and is thus, by design, unfair and deceptive under the FTC Act."); Doc. 106 at 11 ("The operation of an illegal pyramid scheme constitutes . . . a prohibited practice [under the FTC Act.].").

6.      To prove the Defendants operated a pyramid scheme, the FTC must show SBH affiliates paid money to Defendants "in return for which they receive[d] (1) the right to sell a product *and* (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to the sale of the product to ultimate users." *BurnLounge*, 753 F.3d at 883 (emphasis in original) (quoting *Webster v. Omnitrition*

---

[19] Although the case against the Corporate Defendants is stayed (Doc. 473 at 14), corporate liability is a predicate to individual liability.  (*See infra* COL ¶¶ 92-96.)  The FTC therefore seeks a finding of corporate liability that would only be binding on the Individual Defendants.  As the FTC previously has stated (Doc. 498 at 9), however, if it prevails against the Individual Defendants, it will argue that the Corporate Defendants are collaterally estopped from challenging their own liability.

*Int'l, Inc.*, 79 F.3d 776, 781 (9th Cir. 1996)).  This test is frequently referred to as the "*Koscot* test," after the FTC's decision in *In re Koscot Interplanetary, Inc.*, 86 F.T.C. 1106 (1975).  Here, the evidence establishes both prongs.

**1.     Prong 1:  The Court Already Found Participants Paid Money to Defendants for the Right to Sell Products.**

7.     The first prong of the *Koscot* test can be satisfied "by a required purchase to become [an affiliate]" or a "required purchase of non-returnable inventory to receive the full benefits of the program."  *Vemma*, 2015 WL 11118111, at *3.

8.     As the Court already held, "There is no genuine dispute of material fact regarding the satisfaction of prong one of the *Koscot* test with respect to SBH."  (Doc. 406 at 37.)  There is no "dispute that consumers were required to pay an annual fee of $49 to be SBH Affiliates" and that, "by paying this fee, Affiliates gained the right to sell SBH products on their [replicated SBH] webpage."  (Doc. 406 at 37.)

**2.     Prong 2:  SBH Participants Paid Money to Defendants in Return for the Right to Receive Recruiting-Based Rewards.**

9.     The second prong of the *Koscot* test is "the *sine qua non* of a pyramid scheme" and requires proof that SBH affiliates received rewards based on recruiting new participants into SBH rather than selling SBH products to ultimate users.  *See BurnLounge*, 753 F.3d at 883-84.

10.     The second prong is met when "rewards are received by purchasing product and recruiting others to do the same."  *FTC v. Equinox Int'l Corp.*, 1999 WL 1425373, at *6 (D. Nev. Sept. 14, 1999).

11.     "In evaluating whether the rewards paid to distributors come primarily from recruiting, rather than the sale of products to ultimate users, courts look beyond a company's policies and procedures and examine how the company operates in practice."  *Vemma*, 2015 WL 11118111, at *3 (citing *BurnLounge*, 753 F.3d at 883).

12.     "Notably, the second element 'does not require that rewards be *completely* unrelated to product sales.'"  (Doc. 106 at 11 (quoting *BurnLounge*, 753 F.3d at 885)

(emphasis in original).)

13.    The mere fact that a company's products have some value also "does not render an unlawful pyramid scheme lawful." *FTC v. Skybiz.com, Inc.*, 2001 WL 1673645, at *10 (N.D. Okla. Aug. 31, 2001), *aff'd*, 57 F. App'x 374 (10th Cir. 2003); *see also BurnLounge*, 753 F.3d at 883, 885 (defendant was an illegal pyramid scheme even though its "products had some value," because it "motivated [affiliates] through cash rewards earned by recruiting other participants").

14.    The evidence establishes SBH affiliates' rewards were based on recruiting rather than retail sales because (1) Defendants paid rewards based entirely on recruiting and *purchases from* SBH by those recruits, rather than *sales to* ultimate users, (2) Defendants, through their commission plan, training materials, and explicit instructions, encouraged affiliates to recruit to maximize their earnings, (3) Defendants urged SBH affiliates to inventory load by buying products without regard for demand by the buyer or third parties, and (4) Defendants employed no safeguards to connect affiliate purchasers to actual demand.

### a.    SBH Is Facially a Pyramid Scheme Because It Bases Rewards on *Purchases from* the Company.

15.    Rewards are "facially unrelated to the sale of the product[s] to ultimate users [when they are] paid based on the suggested retail price of the amount *ordered* from [the company], rather than based on *actual sales* to consumers." *Omnitrition*, 79 F.3d at 782 (emphasis original) (internal quotation marks omitted); *see also Equinox*, 1999 WL 1425373, at *6 ("Rebates and bonuses, the primary compensation emphasized by Equinox, are facially unrelated to sales to the ultimate user but are based on purchases made from Equinox by the distributor and his downline.").

16.    In *Omnitrition*, as here, a pyramid participant, in return for a payment to the company, "receive[d] the right to sell the products and *earn compensation based on product orders made by the [participant's] recruits.*" 79 F.3d at 782 (emphasis added). The Ninth Circuit held that the "mere structure of the scheme suggests that [the

company's] focus was in promoting *the program* rather than selling *the products*." *Id.* (emphasis original).

17.     SBH, therefore, is facially a pyramid scheme because it did not condition *any* of its rewards on whether affiliates sold products to ultimate users.  Rather, it paid affiliates based on amounts ordered from the company, without regard to who was ordering or for what purpose, and recruiting.  (*See supra* FOF ¶¶ 136-160.)

18.     In this respect, SBH is indistinguishable from *Omnitrition* and other companies found to be, or likely to be, pyramids.  *Omnitrition*, 79 F.3d at 782; *Equinox*, 1999 WL 1425373, at *6 ("rewards are received by purchasing product and recruiting others to do the same"); *Vemma*, 2015 WL 11118111, at *4.

> **b.     Defendants Paid Rewards Based on Recruiting, Rather than Ultimate-User Sales.**

19.     The FTC is not required to prove that rewards are "*completely* unrelated to product sales," and a company cannot "save itself from liability by engaging in *some* retail sales." *BurnLounge*, 753 F.3d at 885-86 (emphasis original).  As a result, a company is a pyramid scheme if "the rewards the participants received . . . were *largely* for recruitment, not for product sales." *Id.* at 886 (emphasis added).

20.     Rewards need not be based on recruiting alone; recruitment-based rewards include rewards earned "by getting recruits to buy inventory." *BurnLounge*, 753 F.3d at 886 (citing *Koscot*, 86 F.T.C. at 1178-79).

21.     In *Omnitrition*, for example, the Ninth Circuit agreed that the company's "product sales"—which, as here, were the basis for commissions—were "driven by enrolling people" who would then "buy exorbitant amounts of products that normally would not be sold in an average market by virtue of the fact that [members] enroll, get caught up in the process, in the enthusiasm. . . . It has nothing to do with the normal supply and demand in this world.  It has to do with getting people enrolled, enrolling people, getting them on the bandwagon and getting them to sell product." 79 F.3d at 782 (quoting witness testimony).

22.     The *Omnitrition* court's description applies to SBH.  Defendants drove SBH sales by pushing recruitment, taking advantage of the momentum from recruitment to sell large up-front product packs, urging large monthly purchases to stay on the path to financial freedom, and encouraging one's recruits to do the same (*i.e.*, to "duplicate").

23.     In *Equinox*, similarly, the court found the second prong satisfied (at least at the preliminary injunction stage) where pyramid members were "given unrealistic hypothetical examples that their profits will increase geometrically if distributors focus on recruitment rather than retail sales."  1999 WL 1425373, at *6.

24.     The *Equinox* court's description of geometrically-increasing profits leading to "unrealistic hypothetical examples" mirrors Defendants' use of the "Power of Ten" to focus affiliates on recruiting ("getting ten") to earn up to $1 million per month, rather than focus on retail sales.  (*See supra* FOF ¶¶ 172-197.)

25.     Additionally, the Court found Vemma likely to be a pyramid scheme in part because the company trained affiliates to follow a plan that matches SBH's "Four Steps to Success."  In particular, Vemma encouraged its distributors (akin to SBH "affiliates") to (1) enroll by purchasing a product pack, (2) set up an auto-order, (3) quickly recruit new participants, and (4) teach them to duplicate the process.  2015 WL 11118111, at *2; *see supra* ¶¶ 162-171 (same four steps).

26.     Even setting aside the parallels between SBH and past companies found to be pyramid schemes, the evidence is overwhelming that SBH paid recruitment-based rewards unconnected to ultimate-user sales.  Both the compensation structure and the manner Defendants operated SBH in practice support this conclusion.

27.     Many of Defendants' rewards paid consumers cash in direct exchange for recruiting.  (*See supra* FOF ¶¶ 153-160.)

28.     Other rewards paid affiliates for recruiting new SBH affiliates who quickly bought expensive product packs, which were marketed as the best way to launch an affiliate's business.  (*See id.*)

29.     Defendants' tier-based commissions, Generation Infinity Bonus, and BAM Bonus (Phase 4-6 of their commission plan) depended on recruiting massive downline teams.  (*See supra* FOF ¶¶ 146-148.)  Defendants were often explicit about this, explaining that the way to maximize tier-based commissions was to "get ten" recruits and that the Generation Infinity Bonus was to "encourage[] you to develop a deep, strong Affiliate Team."  (Ex. 3 at 22; Ex. 16 at 50.)

30.     By contrast, the script that Defendants provided affiliates to assist them with ultimate-user (retail) sales *directed the affiliate to only sell to the customer one time*, before showing them how to obtain products directly from SBH instead.  (Ex. 8.)

31.     If that were not enough, Defendants outright stated that recruiting was their "MAIN FOCUS."  (*E.g.*, Ex. 288; *see also supra* FOF ¶¶ 198-220 (repeating recruitment focus).)  Had defendants not destroyed emails and text messages, the Court infers that there would be more evidence of their recruiting focus in their emails and text messages.  (Doc. 401 at 24-27 (entering adverse inference sanction); *see also infra* FOF ¶¶ 738-755 (describing document destruction).)

32.     Regardless of whether an affiliate was a #1 (supplementing income), #2 (replacing income), or #3 (obtaining financial freedom), Defendants framed their instructions in terms of recruiting.  Number 1s were supposed to attempt to recruit two people per week, #2s recruited two people per day, and #3s recruited four people per day.  (*See supra* FOF ¶¶ 109-120, 193-197.)

33.     At the same time, Defendants undermined affiliates' ability to make retail sales, mandating, for example, that affiliates charge a "retail price" to the public that was substantially higher than the "wholesale price" that only Defendants were permitted to offer to the same customers.  (*See supra* FOF ¶¶ 242-244.)  When Defendants did encourage retail sales, they did so not as a sustainable income strategy, but as a confidence-builder or recruiting tool, or to justify their instructions that affiliates should hold excess inventory.  (*See supra* FOF ¶¶ 357-372.)

34.    "In sum," as Dr. Bosley concluded, "the SBH incentive structure promotes ongoing recruitment of Affiliates and internal purchases, creating an endless recruitment chain that is expected to leave the vast majority of participants in a loss position, by design."  (Ex. 25 at 41 ¶ 73.)

        **c.**    **Defendants Encouraged Affiliates to Buy Products in Pursuit of the SBH Business Opportunity, Not for Personal Consumption.**

35.    Defendants have argued that purchases by SBH affiliates—95% of all purchases from SBH—were ultimate-users sales and that commissions therefore were, in fact, based on ultimate-user sales.  For the reasons explained below, that argument fails.

36.    As this Court wrote, "[i]n *BurnLounge*, the Ninth Circuit rejected the argument that internal sales automatically constitute sales to ultimate users while also rejecting the argument that such transactions can never constitute sales to ultimate users." (Doc. 406 at 38.)  Instead, it held whether internal sales are considered ultimate user sales "depends on how BurnLounge's bonus structure operated in practice."  753 F.3d at 887.

37.    In *BurnLounge,* the court determined that internal sales generally were *not* ultimate-user sales because "BurnLounge incentivized recruiting participants, not product sales." *Id.*  "The fact that the rewards were paid for recruiting is shown by the necessity of recruiting to earn cash rewards and the evidence that the scheme was set up to motivate [participants] through the opportunity to earn cash." *Id.*  "[T]hat some sales occurred that were unrelated to the opportunity to earn cash rewards [did] not negate the evidence that the opportunity to earn cash rewards was the major draw." *Id.* at 888.

38.    In *Vemma*, Judge Tuchi, relying in part on Dr. Bosley's testimony in that case, elaborated on the *BurnLounge* internal-sale question:

> Courts have treated the analysis of incentives tied to sales to ultimate users—a critical aspect of the second *Koscot* prong—on a case-by-case basis.  In practice, distributors may themselves consume some inventory as ultimate users, and thus a program that permits internal consumption is not *per se* a pyramid scheme.  However, evidence that distributors purchase and consume product for the purpose of

qualifying for recruitment incentives is evidence of a pyramid scheme. *In other words, as the FTC's expert, Dr. Bosley, correctly stated in her report, an ultimate user under the second* Koscot *prong is limited to one who would have purchased a product even if not for the income opportunity.*

*Vemma*, 2015 WL 11118111, at *3 (citations omitted; emphasis added)

39.     Here, Dr. Bosley reached the same conclusion as she did in *Vemma*: "Internal purchases [in SBH] are expected to be induced by the incentive structure and Affiliate training within the SBM marketing program, rather than genuine consumer demand for the SBH products."  (Ex. 25 at 100 ¶ 164.)

40.     The evidence supports Dr. Bosley's conclusion.  There is ample evidence that affiliates would not have purchased products were they not attempting to achieve the promised levels of financial success.  (*See supra* ¶¶ 254-346.)  In fact, Defendants expressly told affiliates to purchase retail products *for* the income opportunity.  (*See id.*)

41.     Defendants encouraged "inventory loading"— "purchases not as a response to consumer demand, but instead as a strategy of growing one's business and advancing to higher . . . ranks."  (Doc. 106 at 6; *see also Vemma*, 2015 WL 1111811, at *4 ("Affiliates are very likely engaging in inventory loading.  The great majority of Vemma product sales is to its Affiliates and, as Dr. Bosley noted, under the current bonus system there is no way to unbundle the Affiliates' intent to consume Vemma products as ultimate users from their desire to remain qualified for bonuses. . . But their intent in purchasing Vemma products must be viewed in light of Vemma's program design as well as its training and marketing materials. . . . In all likelihood, Affiliates' purchases of Vemma products are incidental to the right to qualify for and obtain bonuses.")

42.     Defendants ubiquitously told affiliates seeking any amount of income that they needed to buy up-front product packs, with only the size of the pack varying by whether affiliate was a #1, #2, or #3.  (Ex. 5 at 17 ("Purchase the Business Pack that matches how you want to build your business.").)

43.     Defendants also explained that affiliates' success depended on their "auto-

orders"—once again, with only the magnitude of the auto-order changing based on the level of income sought.  (*See supra* FOF ¶¶ 144, 275-283.)  For affiliates seeking "financial freedom"—a label that Defendants admitted would apply to 80% of affiliates at one point or another (*see supra* FOF ¶ 110)—Defendants encouraged *$500 monthly* auto-orders (*see supra* FOF ¶¶ 275-283.)

44.    Defendants also created sometimes-nonexistent "elite" groups of affiliates, like the "CORE" Team, and required affiliates interested in joining those groups to purchase large amounts of products.  (*See supra* FOF ¶¶ 287-316.)

45.    Defendants artificially increased demand for SBH products to the point that affiliates were almost the only people buying the products, accounting for *95%* of SBH sales.  (*See supra* FOF ¶¶ 349-355.)   Similarly, in *Vemma*, affiliates accounted for 86% of Vemma sales in one year and 71% in the next.  2015 WL 11118111, at *2.

46.    To make matters worse for Defendants, their position—while they were operating SBH—was that none of their sales to affiliates were for personal consumption. (*See supra* FOF ¶¶ 331-335 (Noland, for example, swearing under oath that SBM's business was "sell[ing] to wholesale distributors").)

47.    The plunge in SBH product sales after the Receiver ended commission payouts confirms that affiliates bought products largely for the income opportunity from the pyramid scheme, not personal consumption or resale.  (*See supra* FOF ¶¶ 336-346.)

### d.    Defendants Lacked Safeguards to Prevent Inventory Loading or Tie Affiliate Purchases to User Demand.

48.    The Ninth Circuit has recognized that multilevel marketing companies may protect against inventory loading by adopting "anti-pyramiding rule[s]," or "safeguards," intended to "tie recruitment bonuses to actual retail sales in some way."  *Omnitrition*, 79 F.3d at 783.  The safeguards, if operating effectively, can prevent a company from "'pushing unrealistically large amounts of inventory onto' recruits."  *BurnLounge*, 753 F.3d at 886 (quoting *In re: Amway Corp.*, 93 F.T.C. 618, 716-17, 1979 WL 198944, at *69 (1979)); *see also* Doc. 106 at 14 ("[W]hen evaluating whether a company's rewards

are based primarily on recruitment or sales to ultimate users, courts also consider whether the company has promulgated, and effectively enforced, policies to prevent inventory loading.") (citing *Omnitrition*, 79 F.3d at 783; *Vemma*, 2015 WL 11118111, at *4; *Bostick v. Herbalife Int'l of Am., Inc.*, 2013 WL 12131732, at *4 (C.D. Cal. Oct. 11, 2013)).

49.     "For example, in *Omnitrition*, the Ninth Circuit noted that Amway was not a pyramid scheme in part because the company would only pay a monthly bonus to participants who prove that (1) they had resold at least 70% of the products purchased that month and (2) they had made retail sales to at least 10 different customers."  (Doc. 106 at 14 (citing *Omnitrition*, 79 F.3d at 782-83).)  Amway also had a "buy-back" rule, which required an Amway member's original recruiter to "purchase back . . . any unused, currently marketable products" from the member if the member left Amway.  *In re: Amway Corp.*, 93 F.T.C. 618, 1979 WL 198944, at *69 (1979) (cleaned up).  The Ninth Circuit explained that such a buy-back rule may "reduce or eliminate the possibility of inventory loading by insuring that program participants do not find themselves saddled with thousands of dollars of unsalable products."  *Omnitrition*, 79 F.3d at 784.

50.     Of course, safeguards must be "enforced and actually serve to deter inventory loading and encourage retail sales."  *Id.* at 783.

51.     As the Court found, Defendants were "wholly lacking" safeguards to ensure that products purchased by SBH affiliates—the sole basis for commissions—ended in the hands of ultimate users.  (Doc. 106 at 14.)  Noland, at his deposition, "could not identify *any* compliance-related SBH policies, procedures, or guidance."  (Doc. 106 at 14 (citing Noland Dep. Tr. (2/5/20) at 104:9-18 (emphasis added).)

52.     In fact, SBH went to the other extreme, adopting a strict *no*-refund policy (*see supra* FOF ¶¶ 636-652) that, contrary to Amway's buy-back rule, ensured consumers would be stuck with unsold inventory.  The Court, in entering its preliminary injunction, "agree[d] fully" with Dr. Bosley that "SBH's no-refund policy 'is highly unusual and

represents the antithesis of a safeguard' and that other 'MLM firms, even those who have been prosecuted for pyramid scheme activity, typically pay—at a minimum lip service to safeguard policies including a minimum retail requirement, 70 percent rule, and refund policy.'"  (Doc. 106 at 14-15 n.12 (quoting initial Bosley report:  Doc. 8-21 at 77-78).)

**B.**  **Defendants' False Promises of Substantial Income Violated the FTC Act (Count II).**

53.  "A defendant may also violate the FTC Act's prohibition against 'unfair or deceptive acts' by making materially false misrepresentations."  (Doc. 406 at 42 (citing *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009); *FTC v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001).)

54.  "An act or practice is deceptive if 'first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material."  (Doc. 406 at 42 (quoting *Gill*, 265 F.3d at 950).)   The evidence here establishes all three elements.

**1.**  **Defendants Told Consumers They Could Reasonably Expect Financial Freedom or Other Substantial Income.**

55.  "Deception may be found based on the 'net impression' created by a representation."  (Doc. 406 at 42 (quoting *Stefanchik*, 559 F.3d at 928).)

56.  "Advertising capable of being interpreted in a misleading way should be construed against the advertiser."  *Resort Car Rental Sys., Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975).

57.  Here, the net impression from Defendants' advertisements was clear: follow Defendants' instructions, and one can reasonably expect to make substantial, if not life-changing, amounts of money.  (*See supra* FOF ¶¶ 43-120.)

58.  Defendants told consumers that by enrolling in SBH and following their instructions, they could expect to be "financially free" in 18 months.  (*See supra* FOF ¶¶ 44-47, 55-76.)  That meant, at a minimum, receiving monthly "residual income" of at least $20,000 per month without ever having to work.  (*See supra* FOF ¶¶ 48-54.)

59.     Affiliates not seeking financial freedom could still expect to supplement or replace their current job income, earning hundreds if not thousands of dollars per month by following Defendants' instructions.  (*See supra* FOF ¶¶ 109-120.)

60.     Defendants bolstered their promises of substantial income by holding out Noland and his past students as proof that their plan worked.

61.     Defendants' purported "disclaimers"—saying income was not "guaranteed" or that they were presenting "theoretical examples" (*see supra*  FOF ¶¶ 121-133)—do not help them.  As an initial matter, saying income is not "guaranteed" does not contradict Defendants' statements that affiliates could "reasonably expect" financial freedom by following Defendants' instructions.  As Defendants claimed, the earnings were only theoretical because "you just ain't done it yet."  (Ex. 84 at 53:20-54:5.)

62.     Additionally, "[a] solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures."  *FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006) (use of "Washington, D.C." created deceptive impression [that] forms were issued by government, "even though the forms contained a small print disclaimer informing recipients that such was not the case"); *see also Donaldson v. Read Magazine, Inc.*, 333 U.S. 178, 188 (1948) ("Advertisements as a whole may be completely misleading although every sentence separately considered is literally true.").  Similarly, companies may not "mak[e] deceptive use of unusual earnings realized only by a few."  *Nat'l Dynamics Corp. v. FTC*, 492 F.2d 1333, 1335 (2d Cir. 1974).

63.     As in *Equinox*, Defendants' disclaimers here "do not accurately indicate the actual amount of earnings that can be expected and do not immunize [the company's] exaggerated claims of income."  1999 WL 1425373, at *6 (citing *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1497 (1st Cir. 1989) for the proposition that "disclaimers or qualifications in any particular advertisement are not adequate to avoid liability for deceptive advertising unless they are sufficiently prominent and unambiguous to change

[the] apparent meaning of claims and to leave accurate impression[s]").

**2.    Defendants' Promises of Substantial Income Were Misleading.**

64.    A representation is likely to mislead consumers if it is false.  *See, e.g.*, *FTC v. Pantron I Corp*., 33 F.3d 1088, 1096 (9th Cir. 1994); *see also FTC v. Medlab, Inc.*, 615 F. Supp. 2d 1068, 1079 (N.D. Cal. 2009) (same).

65.    The FTC is not required to show that consumers were *in fact* misled—only that Defendants' representations are *likely* to mislead.  *See FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1203 (10th Cir. 2005) ("Neither proof of consumer reliance nor consumer injury is necessary to establish a § 5 violation."); *Goodman v. FTC*, 244 F.2d 584, 604 (9th Cir. 1957) ("[C]apacity to deceive and not actual deception is the criterion by which practices are tested under the Federal Trade Commission Act.").

66.    Defendants' income claims—whether directed to affiliates considering themselves #1s, #2s, or #3s—were false in theory and in practice.

67.    As Dr. Bosley found, SBH's structure meant that the vast majority (over 90%) of SBH affiliates were doomed to fail.  (*See supra* FOF ¶¶ 567-573.)

68.    Dr. Bosley's prediction proved correct in practice.  (*See supra*  FOF ¶¶ 427-437, 574-578)

69.    Defendants claimed that 10% of SBH affiliates would be #3s, who could reasonably expect to attain financial freedom—a minimum of $20,000 monthly "residual" payments—by following their instructions.  (*See supra* FOF ¶¶ 44-76, 109-120.)  In fact, no one achieved or came close to that.  (*See supra* FOF ¶¶ 427-437.)

70.    Defendants claimed that an additional 10% of SBH affiliates would be #2s, who could reasonably expect to replace their job income—whatever it was—in about six months.  (*See supra* FOF ¶¶ 427-437.)  Noland estimated that, at a minimum, #2s would make around $3,000 per month.  (*Id*.)  Almost no one achieved that.  (*See supra* FOF ¶¶ 427-437; Anticipated Testimony of Elizabeth Anne Miles.)

71.    Defendants claimed the remaining 80% of SBH affiliates would be #1s— "supplementing" their income by earning $300-1,000 per month.  (*See supra* FOF ¶¶

170

427-437.)  At most, perhaps 10% of SBH affiliates achieved this result.  (*See supra* FOF ¶¶ 427-437, 574-578; Anticipated Testimony of Elizabeth Anne Miles.)

72. Defendants did not disclose that *any* affiliates would lose money in SBH, but, in fact, over 90% of affiliates did just that.  (*See supra* FOF ¶¶ 427-437, 574-578.)

73. Unsurprisingly, the claims about Noland and his students' wealth that Defendants used to bolster their substantial-income claims were also false.

74. While Noland claimed to be fantastically wealthy by using the same "system" he sold to SBH affiliates (*see supra* FOF ¶¶ 77-93, 124), he was, in fact, broke (*see supra* FOF ¶¶ 439-457).

75. Similarly, Defendants provided no proof that any of Noland's students are financially free, much less that a significant number are.  (*See supra* FOF ¶¶ 458-462.)

### 3. Defendants' Misrepresentations Were Material.

76. A misrepresentation is material "if it involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." *Cyberspace.com*, 453 F.3d at 1201 (internal quotation marks omitted).

77. Express claims are presumed to be material.  *Pantron*, 33 F.3d at 1095-96.

78. Implied claims are presumed material if they are "deliberately made," *FTC v. Natural Solution, Inc.*, 2007 WL 8315533, at *3 (C.D. Cal. Aug. 7, 2007), or if they "pertain to the central characteristics of the products or services being marketed," *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1076 (C.D. Cal. 2012).

79. "Misrepresentations concerning anticipated income from a business opportunity generally are material and likely to mislead consumers because such misrepresentations strike at the heart of a consumer's purchasing decision." *Freecom Commc'ns*, 401 F.3d at 1203; *see also Vemma*, 2015 WL 11118111, at *5 ("Courts consistently conclude that misrepresentations regarding income potential are material."); *FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1267-68 (S.D. Fla. 2007) (misrepresentations as to income potential "were material and likely to mislead consumers acting reasonably under the circumstances"); *FTC v. Five-Star Auto Club,*

*Inc.*, 97 F. Supp. 2d 502, 529 (S.D.N.Y. 2000) ("The case law is clear that representations regarding the profit potential of a business opportunity are important to consumers, and therefore such are material misrepresentations in violation of Section 5."); *FTC v. Kitco of Nev., Inc.*, 612 F. Supp. 1282, 1291-92 (D. Minn. 1985) ("In particular, it is deceptive to misrepresent the benefits of a business opportunity.  Misrepresentations concerning expected profits form a business or investment opportunity made to a prospective purchaser violate Section 5(a)." (citations omitted)).

80.     Here, Defendants made express claims relating to a "central characteristic" of SBH—affiliates' projected incomes.  Therefore, the claims are presumed material.

81.     Even without a presumption of materiality, Defendants' claims are material because their promises of substantial income are plainly important to consumers.

### C.     Defendants Provided Affiliates with the Means and Instrumentalities to Violate the FTC Act (Count III).

82.     Courts have "stressed the fact that one who 'places in the hands of another a means of consummating a fraud in violation of the Federal Trade Commission Act is himself guilty of a violation of the Act.'"  *Goodman*, 244 F.2d at 591 (quoting *C. Howard Hunt Pen Co. v. FTC*, 197 F.2d 273, 281 (3d Cir. 1952)); *see also Waltham Watch Co. v. FTC*, 318 F.2d 28, 32 (7th Cir. 1963) ("Those who put into the hands of others the means by which they mislead the public, are themselves guilty of a violation of Section 5 of the [FTC] Act."); *Vemma*, 2015 WL 11118111, at *7 ("Vemma provides the 'means and instrumentalities' for Affiliates to deceive consumers by providing them with promotional, recruiting and training materials containing false or misleading income representations, which is a further violation of the FTC Act.").

83.     This Court applied that principal in holding Individual Defendants liable for distributing the means and instrumentalities for VOZ members to further the VOZ Travel scheme.  (Doc. 406 at 47-48.)

84.     The same is true for SBH.  Defendants give affiliates marketing and training materials with which they could spread Defendants' false income claims,

including claims that affiliates are achieving "financial freedom" now and that such wealth is "achievable for the masses." (*See supra* FOF ¶¶ 44-108.)

### D. SBH Affiliates' Status as "Consumers" Is Irrelevant to FTC Act Liability on Counts I-III.

85. Individual Defendants argue that neither they nor the Corporate Defendants are liable for violating the FTC Act because SBH affiliates were not "consumers," but instead were "resellers." That is not a distinction in the FTC Act or case law, and the Individual Defendants' argument therefore fails. (*See infra* ¶¶ 86-90.)

86. The FTC brings Counts I-III under Section 5(a) of the FTC Act, which prohibits "deceptive acts or practices in or affecting commerce," without regard to the status of a victim (*e.g.*, as "consumer" or "reseller"). 15 U.S.C. § 45(a)(1). The provision does not mention "consumers" at all.

87. Individual Defendants point to 15 U.S.C. § 45(n), which mentions "consumers," but in the context of the FTC's ability to allege that an "act or practice is *unfair*." The FTC's Counts I-III, allege *deceptive*, not unfair, acts or practices. *See* Doc. 205 ¶¶ 159, 162, 164; *see also Cyberspace.com*, 453 F.3d at 1199 n.2 ("the plain language of … [15 U.S.C. § 45(n)] defeats" argument that unfairness test applies to case alleging deception); *FTC v. Cantkier*, 767 F. Supp. 2d 147, 152-53 (D.D.C. 2011) ( "Section 5(n) by its terms only applies to an act or practice that is 'unfair,' while Section 5(a) prohibits both 'unfair or deceptive acts or practices.'"). The reference to "consumers" in 15 U.S.C. § 45(n) is therefore irrelevant.

88. Individual Defendants also rely on the definition of "consumer" in an entirely different statute, the Magnusson-Moss Warranty Act: 15 U.S.C. § 2301(3). That provision, however, is preceded by a limiting clause declaring the definition applies only "[f]or the purposes of *this chapter*." *Id.* (emphasis added). That chapter, Chapter 50, covers "Consumer Product Warranties," and has nothing to do with this case.

89. For avoidance of doubt, the legislative history confirms the plain text: Congress recognized the definitions in 15 U.S.C. § 2301 do not apply to the FTC's

173

enforcement authority under Sections 5 and 19 of the FTC Act. Specifically, Title I of the enacting legislation created the Magnuson-Moss Warranty Act, Pub. L. No. 93-637, 88 Stat. 2183 (1975) (codified as amended at 15 U.S.C. § 2301), extending FTC jurisdiction over consumer product warranties.  Title II, separately known as the Federal Trade Commission Improvement Act ("FTCIA"), expanded the FTC's anti-fraud powers. S. Rep. No. 93-151, at 3 (1973); Pub. L. No. 93-637, 88 Stat. at 2193-2203 (codified as amended at 15 U.S.C. § 45). In contrast to the definition of "consumer" in § 2301, when dealing with the FTCIA, Congress said: "It should be noted that the word 'consumer' as used in [§ 2301] is not related to the definition of that term in [the FTCIA]. The use of the word 'consumer' in [the FTCIA] is to be read in its broadest sense and is not limited to those persons defined in [§ 2301]."  S. Rep. No. 93-151, at 27. Thus, even where "consumer" *does* appear in the FTC Act, it expressly does *not* carry the definition Defendants seek to impose.

90.    In any event, courts have repeatedly found that the FTC Act extends to businesses as well as individuals.  *See FTC v. LoanPointe*, 525 F. App'x 696, 701 (10th Cir. 2017) (The FTC need only prove "the likelihood that a consumer (here, employers)" would be deceived; *FTC v. Crittenden*, 19 F.3d 26 (9th Cir. 1994) (Table) (noting stipulated judgment with business-to-business office supplier); *FTC v. IFC Credit Corp.*, 543 F. Supp. 2d 925, 934 (N.D. Ill. 2008) (FTC Act applies to business-to-business sales).  The FTC routinely brings enforcement actions to protect small businesses.  *See* https://www.ftc.gov/business-guidance/small-businesses/protecting-small-businesses-cases.  By contrast, where Congress sought to exclude subjects from the FTC Act, it did so expressly.  *See* 15 U.S.C. § 45(a)(2) (excluding banks, others); *cf. FTC v. Publishers Bus. Servs., Inc.*, 821 F. Supp. 2d 1205, 1220 (D. Nev. 2010) (noting "business-to-business exemption" in FTC's Telemarketing Sales Rule).

## III. INDIVIDUAL DEFENDANTS ARE LIABLE FOR CORPORATE DEFENDANTS' SBH-RELATED FTC ACT VIOLATIONS.

91.    An individual defendant is liable for corporate defendants' violations of the

FTC Act or rules promulgated thereunder if that individual "had authority to control" the unlawful acts or "participated directly" in them.  *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997).

92.    "Individuals may be held liable for injunctive relief based on corporate entity violations of the FTC Act if (1) the corporation committed misrepresentations of a kind usually relied on by a reasonably prudent person and resulted in consumer injury, and (2) individuals participated directly in the violations or had authority to control the entities."  (Doc. 406 at 53 (quoting *FTC v. Grant Connect*, *LLC*, 763 F.3d 1094, 1102 (9th Cir. 2014).)

93.    "'The FTC need not show that a defendant intended to defraud consumers in order for that individual to be personally liable . . . .'"  (Doc. 406 at 53 (quoting *Grant Connect*, 763 F.3d at 1101-02).)

94.    In its Summary Judgment Order (Doc. 406), the Court held as to the counts on which it granted summary judgment (on VOZ Travel and Defendants' SBH-related rule violations): "There is no genuine dispute of material fact regarding the Individual Defendants' control or direct participation or knowledge of the acts."

95.    The same is true for Corporate Defendants' remaining SBH-related FTC Act violations.  There is no dispute that Individual Defendants both participated in and had the authority to control those violations.  In fact, in their Answer to the FTC's Second Amended Complaint, Individual Defendants *admitted* their authority to control Defendants' business practices and their participation in those practices.  (Doc. 222 ¶ 7 (admitting in relevant part Doc. 205 ¶ 15:  that the Individual Defendants "had knowledge of, and have formulated, directed, controlled, had the authority to control, or participated in, the acts and practices of the [Corporate Defendants]").)  That is sufficient to establish Individual Defendants' liability.

96.    Even absent Defendants' admissions, the factual findings above make clear that Defendants both controlled and participated in Defendants' unlawful promotion of

their unlawful pyramid scheme.  (*See supra* FOF ¶¶ 34-41, 44-316.)

## IV.   CONTEMPT DEFENDANTS[20] VIOLATED THE 2002 NOLAND ORDER.

97.   "There can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt."  (First Action, Doc. 130 at 4 (quoting *Shillitani v. United States*, 384 U.S. 364, 370 (1966)).)

98.   "The standard for finding a party in civil contempt is well settled:  The moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court.  The burden then shifts to the contemnors to demonstrate why they were unable to comply."  (First Action, Doc. 130 at 4-5 (quoting *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1239 (9th Cir. 1999)).)

99.   "Willfulness is not an element of civil contempt."  (First Action, Doc. 130 at 5 (quoting *United States v. Asay*, 614 F.2d 655, 661 (9th Cir. 1980)).)

100.   Contempt Defendants violated the 2002 Noland by deceptively marketing their VOZ and SBH pyramid schemes and through their deficient compliance program.

### A.   The Court Found the Contempt Defendants Violated the 2002 Noland Order with Respect to Their Compliance Program and VOZ Travel.

101.   The Court previously found that Contempt Defendants violated Sections I, II, and III of the 2002 Noland Order by "operating VOZ Travel as a pyramid scheme, by making false income-related statements in the court of operating VOZ Travel, and by providing the means and instrumentalities to make those false statements."  (First Action, Doc. 130 at 7.)

102.   The Court also found that "Contempt Defendants violated the compliance-related obligations created by Section V of the [2002 Noland Order]."

---

[20] For purposes of this document and the upcoming trial, the "Contempt Defendants" are Jay Noland, Scott Harris, and Thomas Sacca.  The Court stayed the FTC's contempt claims against Success By Media, LLC and Success By Media Holdings, Inc.  (Doc. 473 at 14.)

**B.     The Court Already Found Sections I, II, and III of the 2002 Noland Order Are "Specific and Definite," and Therefore Enforceable.**

103.    In finding Contempt Defendants "violated Sections I, II, and III" of the 2002 Noland Order, the Court held that those provisions were "specific and definite." (First Action, Doc. 130 at 7-8.)

104.    The Court added that Contempt Defendants were "precluded from arguing that the relevant provisions [of the 2002 Noland Order] are vague and ambiguous, and the Court concludes that the provisions are not, in any event, vague and ambiguous."  (Doc. 130 at 8; *see also FTC v. EDebitPay, LLC*, 695 F.3d 938, 944 (9th Cir. 2012) (defendant who stipulates to order "cannot collaterally attack [it] in contempt proceedings"); *Irwin v. Mascott*, 370 F.3d 924, 931 (9th Cir. 2004) (once a non-party, like Sacca or Harris, has notice of an order binding the non-party, any failure to "move to intervene or otherwise attack" the order means non-party "may not . . . challenge its legality in a contempt proceeding arising out of its violation").

**C.     The Court Already Found the 2002 Noland Order Binding on Harris and Sacca.**

105.    Court orders are enforceable against any party to the order and against any nonparty with "actual notice" of the order who acts "in active concert or participation" with a party to violate the order.  Fed. R. Civ. P. 65(d)(2)(C).

106.    When the Court found Contempt Defendants violated the 2002 Noland Order in connection with VOZ Travel and Defendants' deficient compliance program, it also found that Harris and Sacca were "in active concert" with Noland and therefore bound by the Order.  (First Action, Doc. 130 at 7.)

**D.     Contempt Defendants Violated Section I of the 2002 Noland Order by Operating SBH as a "Prohibited Marketing Scheme."**

**1.     The 2002 Noland Order Added Additional Restrictions Beyond the Ninth Circuit's Pyramid Scheme Test.**

107.    Section I of the 2002 Noland Order prohibits Contempt Defendants from "participating or assisting in any manner or capacity whatsoever . . . in any prohibited

177

marketing scheme."  (Ex. 1 at 3-4.)

108.   The Order, in turn, defines "prohibited marketing scheme" using the familiar *Koscot* test endorsed by the Ninth Circuit in *BurnLounge*:  a "pyramid sales scheme, Ponzi scheme, chain marketing scheme, or other marketing plan or program characterized by the *payment by participants of money to the program in return for which they receive:  (1) the right to sell a product or service; and (2) the right to receive, in return for recruiting other participants into the program, rewards which are unrelated to the sale of products or services to ultimate users*."  (Ex. 1 at 3 (emphasis added); *see also BurnLounge*, 753 F.3d at 883 (same test).)

109.   The Order, however, restricts Contempt Defendants beyond the Ninth Circuit test by adding definitions that limit their ability to pay rewards based on internal sales—*i.e.*, sales by SBH to SBH affiliates.  Specifically, the 2002 Noland Order adopted the *per se* rule proposed by the FTC in *BurnLounge*:  that "internal sales to other [members] cannot be sales to ultimate users" under *Koscot*.  *BurnLounge*, 753 F.3d at 887.

110.   In particular, the 2002 Noland Order states "[r]ewards are 'unrelated' to the sale of products or services to ultimate users"—and therefore prohibited by the Order—if the rewards "are not based primarily on revenue from retail sales."  (Ex. 1 at 3.)

111.   "**Retail sales**," in turn, are sales are "sales of products, services, or business ventures by Defendant, his successors, assigns, agents, servants, employees, and those persons in active concert or participation with him to *third-party* end users."  (Ex. 1 at 3 (emphasis added).)  Expressly *excluded* from "retail sales" are "sales made by participants in a multi-level marketing program *to other participants or recruits or to such a participant's own account*."  (*Id.* (emphasis added).)

112.   Putting everything together, rewards are "unrelated to the sale of products or services to ultimate users"—and therefore prohibited—if they are not based on primarily on sales to *non*-members.

### 2. SBH Violated the 2002 Noland Order By Paying Rewards Based Primarily on Sales to SBH Affiliates.

113.   As a threshold matter, SBH is a "prohibited marketing scheme" for the same reason it is a pyramid scheme under Ninth Circuit law—it paid rewards based on recruiting rather than sales to ultimate users.  (*See supra* COL ¶¶ 4-52.)

114.   SBH, however, is even more clearly a "prohibited marketing scheme" under the Order than it is a "pyramid scheme" under Ninth Circuit law because of the Order's *per se* ban on commissions based on internal sales.

115.   Defendants paid commissions based almost exclusively on sales by SBH, and 95% of those sales were to SBH affiliates—*i.e.*, internal sales.  (*See supra* FOF ¶¶ 136-160, 347-356.)

116.   As a result, SBH plainly compensated affiliates based almost exclusively on sales that were *not* to "*third-party* end users."  SBH was therefore a "prohibited marketing scheme" under the 2020 Noland Order.

### E. Contempt Defendants Violated Section II of the 2002 Noland Order by Making False Claims About Consumers' Income Potential.

117.   The 2002 Noland Orde bars Contempt Defendants, in connection with a "multi-level marketing program," from making "any false or misleading statement of material fact," including "[m]isrepresenting the potential earnings or income derived from such multi-level marketing program."  (Ex. 1 at 4.)

118.   Contempt Defendants admit that SBH was a multilevel marketing program. (Ex. 42 at 6 (RFA #35).)

119.   Therefore, Contempt Defendants were barred from making any false or misleading statements in connection with SBH, including regarding the "potential earnings or income derived from [SBH]."

120.   As explained above, Defendants made extensive, material misrepresentations about SBH members' income potential about Noland and past students' wealth.  (*See supra* COL ¶¶ 55-75.)  In so doing, they violated Section II of the 2002 Noland Order.

1

2

### F.   Contempt Defendants Violated Section III of the 2002 Noland Order by Providing the Means and Instrumentalities for Others to Make Misrepresentations About SBH.

3

4

5

6

121.   Section III of the 2002 Noland Order prohibits Contempt Defendants, in connection with a multi-level marketing program, "from providing to others the means and instrumentalities with which to make . . . any false or misleading representation, or representation that omits any material fact."  (Ex. 1 at 4-5.)

7

8

9

10

122.   As with VOZ Travel (First Action, Doc. 130 at 7-8), Defendants violated Section III of the 2002 Noland Order by providing SBH affiliates with training materials and related documents allowing them to make the same material misrepresentations that Defendants themselves made.  (*See supra* COL ¶¶ 82-84.)

11

12

### V.   THE APPROPRIATE COMPENSATORY CONTEMPT SANCTIONS FOR CONTEMPT DEFENDANTS' ORDER VIOLATIONS ARE DEFENDANTS' NET REVENUES.

13

14

15

16

17

123.   "Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes; to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained."  *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303-04 (1947).  Here, the FTC seeks compensatory sanctions.

18

19

20

21

22

124.   In civil contempt proceedings, consumers are entitled to "full remedial relief" for an order violation.  *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193 (1949) ("The measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief."); *see also EDebitPay*, 695 F.3d at 945 (using "consumer loss to calculate sanctions for civil contempt of an FTC consent order").

23

24

125.   Here, providing consumers "full remedial relief" requires compensatory contempt sanctions equal to Defendants' net revenues from VOZ and SBH.

25

26

27

28

126.   Contempt Defendants are jointly and severally liable for any compensatory sanction because they acted together to violate the 2002 Noland Order.  *See, e.g., FTC v. Leshin*, 618 F.3d 1221, 1237 (11th Cir. 2010) ("Where . . . parties join together to evade a

judgment, they become jointly and severally liable for the amount of damages resulting from the contumacious conduct.") (quoting *NLRB v. Laborers' Int'l Union of N. Am.,* 882 F.2d 949, 955 (5th Cir. 1989)).

**A.    For Contempt Defendants' VOZ Travel Violations, Consumers Are Entitled to Full Refunds.**

127.    As the Court already found, Contempt Defendants made material misrepresentations to induce SBH affiliates and others to buy VOZ "packs."  (Doc. 406 at 43-44; First Action, Doc. 130 at 7-8.)

128.    In return for paying Defendants $1,000-$2,795 for a VOZ "pack" (Doc. 406 at 17-18), VOZ purchasers received nothing, other than the right to earn commissions by recruiting others to buy packs.  (Doc. 406 at 37 n.12 ("It is undisputed that no VOZ Travel participant received any product that could be retailed to ultimate users or enjoyed for personal consumption."); Doc. 406 at 36 ("[W]ith VOZ *there was no product at all.*" (emphasis original)); Doc. 427 at 10-11 ("For example, even assuming that one consumer *believed* he was obtaining a 'travel opportunity' when he purchased a VOZ Travel pack, the undisputed evidence submitted by the FTC establishes that no such opportunity actually existed." (citation omitted).)

129.    Therefore, the only way to provide "full remedial relief" to consumers harmed by Defendants' contempt of the 2002 Noland Order is to provide full refunds of all VOZ purchases—equal to Defendants' revenues, net of any commissions paid on VOZ purchases.  That amount is $1,194,897.01.  (*See supra* FOF ¶¶ 722-723.)

**B.    Defendants' Net Revenues from SBH Are Necessary to Compensate Consumers for Defendants' SBH-Related Contempt.**

130.    Defendants, in violation of the 2002 Noland Order, made material misrepresentations to induce the purchase of SBH products, memberships, and event tickets.  For the reasons explained below, SBH affiliates are therefore entitled to full refunds, in the amount of Defendants' net revenues (after deducting commissions paid) from SBH.  There is no offset required for the "value" of the products, and, even if there

were, Defendants must bear the burden of establishing that the products had value beyond the substantial income that Defendants promised consumers would obtain after purchasing the products.  They cannot meet that burden.

### 1.   Consumer Loss Is Measured by Defendants' Net Revenues.

131.   In contempt, courts consistently have held that when defendants make material, widespread misrepresentations, consumers are presumed to have relied on those misrepresentations when purchasing defendants' products or services.  *See, e.g., McGregor v. Chierico*, 206 F.3d 1378, 1388 (11th Cir. 2000) ( "The evidence provided by the FTC creates a presumption that the fraudulent statements . . . induced consumers to accept and pay for unordered toner."); *FTC v. Kuykendall*, 371 F.3d 745, 766 (10th Cir. 2004) (agreeing that "a presumption of consumer reliance arises when the FTC shows that the misrepresentations or omissions were of a kind usually relied upon by reasonable and prudent persons, that they were widely disseminated, and that the injured consumers actually purchased the defendants' products" (cleaned up)); *FTC v. BlueHippo Funding, LLC*, 762 F.3d 238, 244 (2nd Cir. 2014) ("[T]he FTC is entitled to a presumption of consumer reliance upon showing that (1) the defendant made material misrepresentations or omissions . . . ; (2) the misrepresentations or omitted were widely disseminated; and (3) consumer actually purchased the defendants' products.").

132.   The Ninth Circuit has applied the same presumption of consumer reliance to material misrepresentations in the FTC Act Section 19 (15 U.S.C. § 57b) context.  *See FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 605-06 (9th Cir. 1993) ("A presumption of actual reliance arises once the Commission has proved that the defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased the defendant's product."); *see also FTC v. MyLife.com, Inc.*, 567 F. Supp. 3d 1152, 1170 (C.D. Cal. 2021) ("A presumption of actual reliance arises once the Government proves that MyLife made material misrepresentations, that they were widely disseminated, and that consumers bought [the] product.").

133.   Additionally, the Ninth Circuit, while not expressly relying on the

presumption of consumer reliance, also has approved the use of "consumer loss"—*i.e.*, Defendants' revenues—as a compensatory sanction for order violations.  *See EDebitPay*, 695 F.3d at 945.  The district court in *EDebitPay* awarded net revenues as a sanction in part because the FTC was "not required to prove that each individual consumer relied on and was injured by Defendant's marketing, or that each consumer was dissatisfied."  *FTC v. EDebitPay, LLC*, 2011 WL 486260, at *12 (C.D. Cal. Feb. 3, 2011), *vacated in part on other grounds*, 2011 WL 13268843 (C.D. Cal. Apr. 20, 2011).  The Ninth Circuit affirmed, finding that "full restitution . . . was appropriate because," as here, "Defendants disregarded the core provisions of the Final Order to not mislead consumers about the products they advertised."  *EDebitPay*, 695 F.3d at 945; *see also FTC v. Nat'l Urological Group*, 2017 WL 6759868, at *44-45 (N.D. Ga. Oct. 10, 2017) (awarding net-revenue contempt sanction in part based on "pervasiveness of [defendants'] contumacious conduct" and defendants' "pattern of contemptuous conduct"), *aff'd*, 786 F. App'x 947 (11th Cir. 2019), *cert. denied*, 141 S. Ct. 659 (2020).

134.    This Court too has acknowledged the "'presumption of actual reliance' that arises in the context of 'widely disseminated' 'material misrepresentations.'"  (Doc. 438 at 13 (quoting *Figgie*, 994 F.2d at 605-06).)  (The Court declined to apply the presumption at summary judgment in the Cooling-Off Rule context, because, in the Court's view, the rule violations did not "turn on the presence of material misrepresentations concerning the underlying product or service."  (Doc. 438 at 13.)  By contrast, Contempt Defendants' Order violations *do* turn on such misrepresentations.)

135.    After the presumption of reliance attaches, the baseline for calculating consumer loss—and therefore compensatory sanctions—is Defendants' revenues from the sales of the products.  *See BlueHippo*, 762 F.3d at 245 ("Here, in the context of a contempt action arising out of violations of a promise to refrain from misrepresentations concerning material terms or omissions of material terms, we hold that the calculation of the appropriate measure of loss begins with the defendants' gross receipts derived from

such contumacious conduct."); *Kuykendall*, 371 F.3d at 766 ("[W]here a defendant has

engaged in a pattern or practice of contemptuously misleading consumers in violation of

an FTC Act-authorized injunction, using the defendant's gross receipts is a proper

baseline in calculating the amount of sanctions necessary to compensated injured

consumers."); *McGregor*, 206 F.3d at 1388 (11th Cir. 2000) ( "While it may be true that

the defrauded businesses received a useful product, and though less likely, they may have

even received the product at a competitive price, the central issue here is whether the

seller's misrepresentations tainted the customer's purchasing decisions. . . . Accordingly,

we affirm the district court's assessment of damages in the amount of gross sales."); *see

also Figgie*, 994 F.2d at 606 ("Customers who purchased [fraudulently sold goods]

should have the opportunity to get all of their money back. . . . The fraud in the selling,

not the value of the thing sold, is what entitles consumers in this case to full refunds or to

refunds for each detector that is not useful to them."); *MyLife.com*, 567 F. Supp. 3d at

1170-71 (after presumption of reliance attaches, "appropriate measure of consumer

redress . . . is [defendant's] net revenues").

136.    Once the baseline, net-revenue sanction is determined, the burden is on

Defendants to prove offsets from that baseline.  *See, e.g.*, *BlueHippo*, 762 F.3d at 245

("After the court uses the defendants' gross receipts as a baseline for calculating

damages, the court must permit the defendants to put forth evidence showing that certain

amounts should offset the sanctions assessed against them." (cleaned up)); *Kuykendall*,

371 F.3d at 766 (same); *FTC v. Commerce Planet, Inc.*, 815 F.3d 593, 604 (9th Cir.

2016)[21] (in Section 13(b) case, explaining that after FTC establishes net revenues, the

"burden then shifts to the defendants").

137.    To prove offsets from the net-revenue baseline, Defendants must prove

---

[21] *Commerce Planet* was decided under Section 13(b) of the FTC Act, which the
Supreme Court has since held does not authorize monetary relief.  *See AMG Capital
Mgmt., LLC v. FTC*, 141 S. Ct. 1341 (2021).  The burden-shifting principle recognized
by *Commerce Planet* and the other, non-Section 13(b) cases cited above, is not affected
by the reasoning in *AMG Capital*.

184

"that *individual* transactions were atypical and resulted in a lower-than-expected gain to the wrongdoer." *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 369 (2nd Cir. 2011) (emphasis original)).  That is true because the presumption of reliance is not that all consumers relied on the misrepresentation, but rather that each individual consumer relied on the misrepresentation and was injured as a result.  *See McGregor*, 206 F.3d at 1388 ("[T]he seller's misrepresentations tainted *the customer's* purchasing decisions." (emphasis added)); *BlueHippo*, 762 F.3d at 245 ("[W]hen an injury by misrepresentation or omission precedes a purchase, the full amount paid by the injured consumer must serve as the baseline for calculating damages . . . .").

138.    Here, Defendants' misrepresentations about consumers' income potential from paying for SBH memberships, purchasing SBH products, and purchasing event tickets were, for the reasons explained above, material, widespread, and false.  (*See supra* COL ¶¶ 53-81.)  As a result, consumers are presumed to have relied on the misrepresentations and to have been harmed in an amount equal to Defendants' net revenues.  Additionally, the pervasiveness of Defendants' contumacious conduct—including their violations of Sections I, II, III, and V of the 2002 Noland Order—further support a net-revenue sanction.  *See, e.g.*, *EDebitPay*, 695 F.3d at 945 (awarding net revenues where "Defendants disregarded the core provisions of the Final Order to not mislead consumers about the products they advertised"); *Nat'l Urological Group*, 2017 WL 6759868, at *44-45 (awarding net-revenue contempt sanction in part based on "pervasiveness of their contumacious conduct" and defendants' "pattern of contemptuous conduct").

139.    Therefore, the appropriate contempt sanction is Defendants' net revenues from the SBH and event sales:  $6,111,976.13.  (*See supra* FOF ¶¶ 714-721.)  Inclusive of VOZ Travel sanctions, total contempt sanctions are $7,306,873.14.  (*See supra* FOF ¶¶ 714-725.)

2.      **The Court Need Not Offset the "Value," If Any, of Products Received by Consumers, Nor Require Their Return.**

140.    There is no need to offset the "value" of the products, memberships, or training received by SBH affiliates from the compensatory contempt sanction.

141.    In *Figgie*, the Ninth Circuit, in the Section 19 context, refused to offset the "value" of the product from the district court's net-revenues award. The Court analogized to a merchant who sells rhinestones while claiming they are diamonds. *Figgie*, 994 F.2d at 604, 606. The Court explained: "Customers who purchased rhinestones sold as diamonds should have the opportunity to get all of their money back. *We would not limit their recovery to the difference between what they paid and a fair price for the rhinestones*. The seller's misrepresentations tainted the customers' purchasing decisions. If they had been told the truth, perhaps they would not have bought rhinestones at all or only some. . . . The fraud in the selling, not the value of the thing sold, is what entitles consumers in this case to full refunds or to refunds for each detector that is not useful to them." *Id.* (emphasis added).

142.    The same logic applies here. Defendants sold SBH products and training to SBH affiliates by promising them substantial income would follow. In effect, when Defendants sold products or training, they actually sold (1) the product or service itself and (2) the promise that substantial income would follow. But consumers received the product or service alone, without any realistic chance at financial success. There is substantial evidence, moreover, that affiliates were far more focused on the promise of substantial income than the products; for example, once the income claims and pyramid compensation structure were removed by the Receiver, sales of the SBH products plummeted. (*See supra* FOF ¶¶ 336-346.) As in *Figgie*, consumers thought they were buying diamonds, but received rhinestones. As a matter of law, the Court need not offset the "value" of the rhinestones when compensating consumers.

143.    Every circuit to have addressed the issue in an FTC contempt action has reached the same conclusion as the Ninth Circuit in *Figgie*, refusing to give defendants

the benefit of an offset for the "value" of fraudulently sold goods.  *See Kuykendall*, 371 F.3d at 766 (refusing to "offset gross receipts by the value of the magazines the consumers received"); *McGregor*, 206 F.3d at 1388 (refusing to offset revenues from fraudulent sale of printer toner by value of the printer toner); *FTC v. Trudeau*, 579 F.3d 754, 773 n.16 (7th Cir. 2009) (when measuring consumer loss, "the award amount need not be reduced by the 'value' of the [fraudulently-sold] books"); *cf. FTC v. Pukke*, 53 F.4th 80, 105-06 (4th Cir. 2022) (without addressing value issue, affirming net-revenue compensatory contempt sanction of $120.2 million).

144.   District courts, similarly, have also declined to require value "offsets" in FTC contempt actions.  *See, e.g.*, *FTC v. Dayton Family Prods.*, 2016 WL 1047353, at *10 (D. Nev. Mar. 16, 2016) (no offset from net revenues required for "any 'value' in the sweepstakes booklets or *de minimis* check sent to some consumers as the victims paid based on false promises about valuable monetary prizes").

145.   The fact that the district court in *Figgie* required the return of the fraudulently-sold heat detectors (*Figgie*, 994 F.2d at 806) does not alter this conclusion. The *Figgie* court did not condition its refusal to award a "value offset" on the return requirement.  Instead, it simply referenced the return requirement in rejecting Figgie's argument that refunds would provide a windfall.  (Of course, even consumers who *did* return the heat detectors arguably received a windfall because they were able to use the detectors for 8-15 years before returning them for a full refund.)  The Court did not say what result it would have reached in the absence of a return requirement.  Other courts that *have* directly addressed the issue of whether a return is necessary to avoid creating an impermissible windfall have found it is *not* required.  *See Kuykendall*, 371 F.3d at 766 (no requirement to return fraudulently-sold magazines);[22] *McGregor*, 206 F.3d at 1388

---

[22] The district court order on appeal in *Kuykendall* contained no return requirement.  *FTC v. Kuykendall*, 2002 WL 32141578 (W.D. Okla. Mar. 4, 2002).  The Order did require the FTC to "submit a plan for the disbursement of consumer redress," but it gave the FTC "full and sole discretion" to "[d]etermine the criteria and parameters

(no requirement to return fraudulently-sold printer toner).[23]

146.    Recently, two Ninth Circuit district courts, in the Section 19 context, also refused to require the return (or offset the value of) fraudulently sold personal protective equipment.  *See FTC v. QYK Brands LLC, et al.*, 2022 WL 3138761, at *9 (C.D. Cal. Apr. 6, 2022) (rejecting defendants' argument that "to be entitled to a refund, customers should be required to return the hand sanitizer or else they will receive a 'windfall' by retaining their hand sanitizer and receiving a refund"); *see also FTC v. Am. Screening, LLC*, 2022 WL 2752750, at *11 (July 14, 2022) (adopting *QYK* court's rationale for awarding net-revenue sanction without requiring return or offset for value of product).[24]

147.    In this case in particular, a return requirement would be illogical. SBH products—perishable goods that are at least three years-old and live "training" courses—are effectively unreturnable.  If *Figgie* required product returns in cases such as this one, wrongdoers would be invited to perpetrate their frauds using consumable or intangible products, knowing that even if they were caught, the monetary remedy would be minimal or non-existent because the consumer already received the "value" of the product.

### 3.    The Trainings, Memberships, and Products Sold by Defendants Had, at Most, *De Minimis* Value.

148.    Because the Court chooses not to offset the "value" of Defendants' fraudulently sold products and services, it need not determine what that value is.  Even if the Court were to apply a value offset, however, the burden is on the Defendants to

---

for participation by injured parties in a redress program."  *Id.* at *3.  The FTC never submitted a redress plan because it was unable to collect on the judgment.

[23] Undersigned FTC counsel has been unable to locate a copy of the relevant district court order in *McGregor*, but the Eleventh Circuit decision makes no mention of a return requirement, and requiring consumers to return printer toner—which they already may have used—would have been illogical.

[24] *QYK* is on appeal in the Ninth Circuit (No. 22-55446).  Oral argument is scheduled for March 6, 2023.  The Ninth Circuit's opinion may clarify whether a net-revenue award must be paired with a return requirement or an offset for the fraudulently-sold product's "value."

establish that value.  (*See supra* COL ¶¶ 131-140147.)

149.   Defendants cannot meet that burden.  First, as to SBH memberships, affiliates plainly received no value from paying money to join a pyramid scheme.   SBH membership revenue was $327,814.00.  (*See supra* FOF ¶ 715.)

150.   Second, as to "training" events, SBH affiliates also received no value.  The events were sold as necessary steps to make substantial income (*see supra* FOF ¶¶ 373-425 ), but consumers who attended SBH events overwhelmingly lost money (Anticipated Testimony of Elizabeth Anne Miles).

151.   Additionally, three of the events to which Defendants sold tickets never happened.  (*See supra* FOF ¶¶ 383-386.)  Revenue from those events alone equals $322,420,25.  (*See supra* FOF ¶¶ 383-386.)

152.   Third, as to the SBH consumable products, the Court considers the value of the products as of the date of the judgment in this case, not the date of order or receipt of the products.  In *FTC v. Sec. Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir. 1991), the district court ordered "monetary rescission" because, as here, it was "impossible or infeasible to return the specific property at issue."  *Id*.  There, the proper remedy was "the difference between the amount paid for the property and its current market value"—*i.e.*, its market value as of the judgment date."  *Id.*

153.   Here, as in *Security Rare Coin*, it is impractical to require the return of the consumable products that consumers received.  And for the same reasons as in *Security Rare Coin*, the *current* market value of the SBH products is zero.   "[T]he market for the coins was essentially a product of Security Coin's own [unlawful] dealings and fell dramatically after Security Coin's collapse."  *Id.*  Here, too, the market for the SBH products was "essentially a product of [Defendants'] own [unlawful] dealings," and, as evidenced by post-TRO sales, "fell dramatically after SBH's collapse."

154.   Finally, even if the Court looks to historical market value of the SBH products instead of current market value, the FTC has presented substantial evidence that

consumers bought the products solely in pursuit of the substantial income Defendants promised them.  As detailed above, demand for the SBH products has plunged 95% since the Receiver removed the pyramid compensation structure and stopped encouraging inventory loading.  (*See supra* FOF ¶¶ 336-346.)  Therefore, if the Court were to provide an offset for the "value" of the SBH products, that offset should equal 5% of net product revenues:  $235,022.71.[25]

### C.   *Liu v. SEC* Does Not Cap Compensatory Contempt Sanctions at Defendants' Profits.

155.    Contempt Defendants argue that *Liu v. SEC*, 140 S. Ct. 1936 (2020) limits compensatory contempt sanctions to Defendants' profits, rather than their net revenues.  They are wrong.

156.    *Liu* is a statutory interpretation case.  The Supreme Court addressed whether the SEC Act's authorization of "equitable relief," 15 U.S.C. § 78u(d)(5), allowed the SEC to obtain "disgorgement."  *Liu*, 140 S. Ct. at 1940.  The Court determined that "equitable relief" under the SEC Act was limited to disgorgement of "net profits."   *Id.*

157.    This Court's compensatory contempt sanction authority flows not from any statute, but from its "inherent power to enforce compliance with [its] lawful orders." *Shillitani*, 384 U.S. at 370.  That entitles consumers to "full remedial relief" for an order violation.  *McComb*, 336 U.S. at 193 ("The measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief."); *see also EDebitPay*, 695 F.3d at 945 (using "*consumer loss* to calculate sanctions for civil contempt of an FTC consent order" (emphasis added)); *cf. FTC v. Mytel Int'l, Inc.*, 2022 WL 3350391, at *5 n.4 (Aug. 11, 2022) (collecting cases finding that "*Liu* does not apply to the FTC")).

158.    There is no basis for reading *Liu*'s interpretation of the SEC Act as

---

    [25] $7,142,908.70 in SBH product (non-membership) revenue - $2,154,470.70 commissions paid - $237,223.72 in product credits = $4,700,454.12 in net product sales. 5% of the latter figure is $235,022.71.  (*See supra* FOF ¶¶ 714-725.)

1    somehow constraining Court's inherent contempt authority.

2        **D.    *AMG Capital* Does Not Affect the Availability of Compensatory**
3            **Contempt Sanctions.**

4        159.    Contempt Defendants argue the Supreme Court's decision in *AMG Capital*

5    *Mgmt., LLC v. FTC*, 141 S. Ct. 1341 (2021) stripped this Court of its authority to order

6    civil compensatory contempt sanctions.  They are wrong, primarily because *AMG Capital*

7    interpreted Section 13(b) of the FTC Act, and did nothing to disturb courts' inherent

8    authority to enforce their own orders.

9        160.    The Supreme Court rejected Contempt Defendants' argument 70 years ago.

10   It explained that monetary relief is available for order violations even where such relief is

11   unavailable for violations of the statute underlying the order:

12           We have no doubts concerning the power of the District Court
             to order respondents, in order to purge themselves of contempt,
13           to pay the damages caused by their violations of the decree. *We
             can lay to one side the question whether the Administrator,*
14           *when suing to restrain violations of the Act, is entitled to a*
             *decree of restitution for unpaid wages. Cf. Porter v. Warner*
15           *Holding Co.*, 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332. We
             are dealing here with the power of a court to grant the relief
16           that is necessary to effect compliance with its decree. The
             measure of the court's power in civil contempt proceedings is
17           determined by the requirements of full remedial relief.
18

19   *McComb*, 336 U.S. at 193 (emphasis added); *see also* Doc. 242 at 7 (citing *McComb*).

20       161.    Unsurprisingly, all three courts to address Contempt Defendants' argument

21   have rejected it.

22       162.    First, in *FTC v. Pukke*, 53 F.4th 80, 105-06 (4th Cir. 2022), the Fourth

23   Circuit vacated, in light of *AMG Capital*, a $120.2 million judgment entered under

24   Section 13(b) of the FTC Act, but said doing so "does not help [defendant] . . . because

25   he already has a $120.2 million judgment against him for contempt of [an injunction]."

26       163.    Second, in *FTC v. Acquinity Interactive, LLC*, 2021 WL 3603594, at *6-7

27   (S.D. Fla. Aug. 13, 2021), the court granted the FTC's request for an asset freeze to
28

preserve funds for a future award of civil compensatory contempt sanctions.  The court explained that "contempt remedies are not limited by the bounds of the FTC Act," in part because "district courts are not required to reference a statute when crafting contempt sanctions."  *Id.* at *7.  Notably, the court rejected the precise argument made by Contempt Defendants:  that contempt is an "impermissible end-run" around *AMG Capital*.  *Id.* at *6.  The court explained the FTC merely was "utiliz[ing] another tool at its disposal to hold the Contempt Defendants accountable for allegedly violating [a permanent injunction]."  *Acquinity*, 2021 WL 3603594, at *6.

164.    Third, in *FTC v. Nat'l Urological Group, Inc.*, 2021 WL 5774177 (N.D. Ga. Sept. 30, 2021) (currently on appeal), contemnors subject to a $40 million contempt judgment moved to vacate the judgment in light of *AMG Capital*.  The court denied the motion, citing *Acquinity*.  Specifically, the court agreed that "*AMG Capital* has no bearing on contempt sanctions based on violations of an injunction."  *Nat'l Urological*, 2021 WL 5774177, at *4.  The Court rejected Contempt Defendants' argument (Doc. 127 at 20) that the FTC cannot recover money for violations of an order where that underlying order "is based solely on Section 13(b), which does not allow courts to impose monetary redress."  *See Nat'l Urological*, 2021 WL 5774177, at *3-4 (rejecting contemnors' argument that "everything that flowed from the FTC's initial pleading . . . was premised on an incorrect interpretation of the FTC Act"; "*AMG Capital* has no bearing on the injunction portion of the 2008 Judgment and Permanent Injunction").

165.    The cases relied upon by Contempt Defendants do not help them because those cases stand only for the unremarkable proposition that a Court's *jurisdiction* to hear contempt cases is coextensive with ("equal" to) its jurisdiction hear the underlying case.  *See AngioDynamics, Inc. v. Biolitec AG*, 823 F.3d 1, 7 (1st Cir. 2016) ("[I]f the court possesses subject-matter *jurisdiction* over an action, it would seem that it must possess contempt jurisdiction in equal measure to see that action through." (emphasis added)); *In*

*re McLean*, 794 F.3d 1313, 1319 n.2 (11th Cir. 2015) ("In our discussion of the *jurisdictional* nature of the contempt power, we noted that such a power was 'equal' to and reflecting of a court's power to issue an underlying order in the first place." (emphasis added).)  Neither case articulated the rule advanced by Defendants:  that contempt sanctions are somehow capped at the amount of monetary relief that could have been awarded in the underlying action.  Aside from being foreclosed by the Supreme Court in *McComb*, such a rule would, in many cases, leave federal courts crippled or unable to redress the harm caused by contempt of their orders.

## VI.   CONSUMERS ARE ENTITLED TO FULL REFUNDS TO REMEDY THE HARM FROM DEFENDANTS' RULE VIOLATIONS.

166.   If the Court provides the full net-revenue award that the FTC seeks for Contempt Defendants' 2002 Noland Order violations (*see supra* COL ¶ 139), the FTC seeks no further monetary relief from Contempt Defendants for their rule violations.  Any such relief would be duplicative of the contempt sanctions.  Nevertheless, the FTC still seeks Section 19 monetary relief against Lina Noland, who is not a Contempt Defendant, for her rule violations.  Ms. Noland's liability would be joint and several with Contempt Defendants' contempt liability.

167.   The Court already found that the Corporate Defendants violated the FTC's Merchandise Rule, 16 C.F.R. § 435, and Cooling-Off Rule, 16 C.F.R. § 429, and that Individual Defendants are monetarily liable for those violations.  (Doc. 406 at 50-52, 54.)

168.   Section 19 of the FTC Act, 15 U.S.C. § 57b(b), gives the Court authority "to grant such relief as the court finds necessary to redress injury to consumers . . . resulting from the rule violation[s, which] may include, but shall not be limited to, rescission or reformation of contracts [and] the refund of money or return of property."

169.   In Section 19 cases, "monetary relief based on a calculation of consumer loss, as opposed to a calculation of net unlawful profits," is appropriate because Section 19 "express authorizes 'the refund of money' to remedy a violation of a rule."  *FTC v. Elegant Solutions, Inc.*, 2022 WL 2072735, at *3 (9th Cir. June 9, 2022) (distinguishing

*Liu*, 140 S. Ct. at 1940).

170.   The FTC's burden is merely to "provid[e] a reasonable estimate of the appropriate monetary relief."  *United States v. Zaken Corp.*, 57 F. Supp. 3d 1233, 1243 (C.D. Cal. 2014); *see also FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 15 (1st Cir. 2010) (same).  "The burden then *shifts to Defendant* to show that the FTC's calculations are inaccurate." *Zaken*, 57 F. Supp. 3d at 1243 (emphasis added); *see also Direct Marketing*, 624 F.3d at 15 (same).

171.   "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 256 (1946).

172.   Therefore, the presence of uncertainty in a monetary relief calculation does not bar recovery; it merely requires the wrongdoer to assume the risk of that uncertainty. *See Kuykendall*, 371 F.3d at 765 (10th Cir. 2004) ("To the extent the large number of consumers affected by the defendants' deceptive trade practices create a risk of uncertainty, defendants must bear that risk."); *Am. Screening,* 2022 WL 2752750, at *11 (same, in Merchandise Rule case);  *Julia v. Swift Transp. Co.*, 2019 WL 7282025, at *5 (D. Ariz. Dec. 27, 2019) (defendant could not avoid damages award "merely because of some uncertainty regarding the exact damages [plaintiff is] entitled to recover"; "[t]he damages need only be approximate").

173.   Here, net revenues from Defendants' sales that violated the Merchandise Rule and Cooling-Off Rule are "necessary to redress" consumers.

**A.   Defendants' Net Revenues in Connection with Their Merchandise Rule Violations Are Necessary to Redress Consumers' Injury.**

**1.   The Injury the FTC Seeks to Redress Is the Harm from Defendants' Failure to Pay Required Refunds.**

174.   The Merchandise Rule required Defendants, in response to their 30-day-delayed shipments, to offer consumers an "option either to consent to a delay in shipping or to cancel the . . . order and receive a prompt refund."  16 C.F.R. § 435.2(b)(1).

175.    Because Defendants failed to give consumers this option, the Merchandise Rule required them to cancel the orders and make a "prompt refund."  *Id*. § 435.2(c)(5).

176.    Defendants did not offer consumers whose shipments were delayed a "prompt refund," or any at all.  (*See supra* FOF ¶¶ 636-652.)   Instead, they did the opposite, threatening consumers with retaliation if they even sought a refund.  (*See id.*)

177.    Therefore, consumers were injured in the amount of the refunds they did not receive, after netting out the 10% commissions that most consumers received on their own purchases):  $561,798.90.[26]  That is the injury that the FTC seeks to redress, rather than any injury caused by a delayed shipment in and of itself.

### 2.    Defendants Cannot Establish a Right to Offset the "Value" of Products Eventually Received.

178.    Defendants argue that SBH affiliates who received late products were not injured by Defendants' failure to pay the required refund.  They ask the Court, in other words, to offset the value of products eventually received from the injury caused by Defendants' failure to pay the required refund.

179.    Defendants bear the burden of proving that they are entitled to an offset of the value of the products.  (*See supra* COL ¶¶ 131-147.)

180.    They cannot meet that burden for two reasons.  First, they cannot prove that they eventually delivered the products at issue.  Second, they cannot establish that the products had anything more than minimal value.

### a.    Defendants Cannot Prove Customers Eventually Received Delayed Shipments.

181.    For at least four reasons, Defendants must bear the burden of proving that they actually shipped delayed products.

182.    First, they are the party seeking the offset from the FTC's reasonable calculation of damages.  (*See supra* COL ¶¶ 131-147.)

183.    Second, placing the burden on the FTC would force it to prove a negative—

---

[26] $624,221 in delayed shipments (*supra* FOF ¶¶ 580-610) * .90 = $561,798.90

that the products were never delivered.  This is a disfavored result.  *See Smith v. United States,* 568 U.S. 106, 113 (2011) (assigning burden to the defendant where "[i]t would be nearly impossible for the Government to prove the negative") (citing 9 J. Wigmore, *Evidence* § 2486, p. 288 (J. Chadbourn rev. 1981) ("It is often said that the burden is upon the party having in form the affirmative allegation.")); *United States v. Dominguez-Mestas*, 687 F. Supp. 1429, 1434 (S.D. Cal. 1988) (shifting burden to Defendant rather than "[r]equiring the government . . . to prove a negative," which would have been "an almost impossible burden"); *Robbins v. Barnhart*, 205 F. Supp. 2d 1189, 1199 (D. Kan. 2002) (forcing party to prove negative, "though not impossible, is fraught with logical, practical, and evidentiary problems").

184.    Third, a refusal to shift the burden of proving delivery to defendants would incentivize sellers to destroy, or never create, shipping records because the absence of records would make it impossible for the FTC (or other law enforcement agencies) to prove non-shipment.  In fact, the Merchandise Rule itself includes a recordkeeping requirement, which states if a seller fails to maintain "records or other documentary proof" establishing its compliance, there is a rebuttable presumption that the seller failed to comply.  16 C.F.R. § 435.2(d).  Allowing Defendants to benefit from their own poor records ignores this evidentiary presumption.

185.    Fourth, "elementary conceptions of justice and public policy require the *wrongdoer* shall bear the risk of the uncertainty which his own wrong has created." *Bigelow*, 327 U.S. at 265 (emphasis added); *see also McConnell v. Wal-Mart Stores, Inc.*, 995 F. Supp. 2d 1164, 1169 (D. Nev. 2014) (approving of collateral source rule, an "equitable rule specifically designed to ensure that the victim, and not the tortfeasor, benefits from any 'windfall'").  Here, defendants created the uncertainty by sending months-delayed shipments and lacking proper shipping records.  *Cf. Direct Mktg.*, 624 F.3d at 15 (defendants cannot fault FTC for "fuzzy figures" in a damages calculation when the imprecision is due to defendant's "uncertain bookkeeping").

186.    The Court, at the summary judgment stage, refused to shift the burden of proving delayed shipments based in part on the mistaken belief that, in light of the Receivership, the Individual Defendants no longer had "first-hand access to SBH's shipping records." (Doc. 438 at 8 n.1.)  The Receiver, however, let Individual Defendants maintain administrator access to the SBH "back office" system, and the FTC provided Individual Defendants a copy of SBH's Stamps.com shipping records.  (Ex. 28 at 7; Anticipated Testimony of Kimberly Friday & Adam Rottner.)  Therefore, Individual Defendants maintained the same level of access as they always had.

187.    Defendants have not, and cannot, meet their burden of proving product delivery because of their deficient shipping records.  (*See supra* FOF ¶¶ 653-666.)  In particular, when Defendants marked an order "finalized" in the SBH "back office," it did not necessarily mean that all products in the order had shipped.  Defendants' electronic shipping records from Stamps.com do not match shipments to order numbers.  That matching must be done manually by comparing shipping addresses, shipment weights, etc.  What is worse, Defendants often sent one order in multiple shipments, without any electronic record that they did so.

### b.    Defendants' Products Had Minimal, If Any, Value.

188.    To establish that SBH affiliates who eventually received delayed shipments were not harmed by Defendants' failure to pay required refunds, Defendants must prove that the "value" of their products equals the value of the refunds.  As discussed *supra* COL ¶¶ 148-154 in the contempt context, they cannot do this.  The FTC has presented substantial evidence that consumers bought the products solely in pursuit of the substantial income Defendants falsely promised them.  As detailed above, demand for SBH products plunged 95% after the Receiver removed the pyramid compensation structure.  (*See* FOF ¶¶ 336-346 .)  Therefore, if the Court offsets for the "value" of the SBH products, it should equal just 5% of product revenues, resulting in a redress amount

for the Merchandise Rule violations of $533,708.96.[27]

### 3. At a Minimum, Consumers Who Asked for Refunds for Delayed Shipments Before Receiving Them Are Entitled to Refunds.

189.    The FTC identified five transactions where, despite Defendants' threats and no-complaining rule, consumers sought refunds prior to receiving their products.  In those cases, at a minimum, Defendants cannot claim that consumers were not harmed by Defendants' failure to pay the refunds required by the Merchandise Rule.

190.    In one instance, three founders requested refunds when roughly 80% of the products in their $2,600 "Founders Packs" had not arrived four months after purchase. (*See supra* FOF ¶¶ 647-652.)  The Founders requested refunds from SBH and chargebacks through their credit card companies.  (*Id.*)  Defendants denied the requests, won the chargeback dispute, and kicked the "Founders" out of SBH.  (*Id.*)  Then, rather than refund the price of the undelivered products ($6,195 in sum), Defendants shipped them.  (*Id.*)

191.    A former SBH affiliate ordered Chai Tea for $317 on July 20, 2018.  (Ex. 350-79, Tab 6, Row 10,885; Ex. 139 (shipping cost).)  On November 20, 2018, the affiliate asked for a refund on the missing products to "use the money for the holidays." (Ex. 223.)  Defendants rejected the request because "we do not do refunds."  (*Id.*)

192.    Another former SBH affiliate ordered Chai Tea for $317 on July 21, 2018. (Ex. 350-79, Tab 6, Row 10926; Ex. 139 (shipping cost).)  Four months later, on December 5, the affiliate ask for a refund.  (Ex. 227.)   Defendants refused, stating: "any order cannot be cancelled once processed.  Chai is on backorder right now."  (*Id.*)

193.    The sum of the rejected refund requests described above is $6,829.[28]

### B. Defendants' Net Revenues in Connection with Their Cooling-Off Rule Violations Are Necessary to Redress Consumers' Injury.

194.    As described above (*see supra* FOF ¶¶ 417-425), Defendants, at their live

---

[27] $561,798.90 (*supra* COL ¶ 177) * .95 = $533,708.96

[28] $6,195 + $317 + $317 = $6,829

training events, sold tickets to future events.  Their total revenues for all such sales was $581,024.75.  (*See supra* FOF ¶¶ 416-425.)

195.    The Cooling-Off Rule required Defendants to tell consumers, prior to purchase, about their rights to rescind their ticket purchases within three days.  (Doc. 365 at 17; 16 C.F.R. § 429.1.)  Instead, Defendants did the opposite, falsely telling consumers that their purchases were *non*-refundable.  (*See supra* FOF ¶¶ 416-425.)  The Court found them liable for their Cooling-Off rule violations.  (Doc. 406 at 51-52.)

196.    Because Defendants' coupled their Cooling-Off Rule violations with misrepresentations about the wealth affiliates will achieve by attending, the only way to remedy the harm from the violations is to provide full refunds, unless Defendants can prove that fully-informed consumers (consumers who had not been lied to by Defendants) would not have exercised their cooling-off rights.  No offset for the "value" of the tickets is required because the tickets had no value (when decoupled from the pyramid scheme) and because some events never occurred.

### 1.    Defendants Must Bear the Burden of Proving that Fully Informed Consumers Would Not Have Exercised Their Cooling-Off Rights.

197.    The Cooling-Off Rule was created to prevent the very conduct Defendants engaged: high-pressure sales, coupled with material misrepresentations, to convince consumers to spend large sums on non-refundable goods or services.

198.    The Rule was the Commission's response to the prevalence of "high-pressure sales tactics" and "misrepresentations."  *See* 37 Fed. Reg. 22934, 22937-38 (Oct. 26, 1972).  The cooling-off period gives purchasers "some opportunity to discover misrepresentations made by the salesman, or to realize . . . that [they are] paying too high a price for the product."  *Id.* at 22942.  In short, the cooling-off period is a "weapon of self-help with which to combat [high-pressure] sales tactics."  *Id.* at 22944.

199.    Defendants cannot be permitted to benefit from their rule violation by requiring the FTC to prove that consumers would *not* have exercised their cooling-off

rights if properly informed of them.  As the party that created the "uncertainty" as to what would have happened had affiliates known of their cooling-off rights, Defendants must bear the burden of proving that fully informed consumers would *not* have exercised those rights.  *Bigelow*, 327 U.S. at 265 ("most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created"); *SEC v. First City Fin. Corp., Ltd.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989) ("[T]he risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty."); *Raishevich v. Foster*, 247 F.3d 337, 343 (2d Cir. 2001) (burden-shifting applies where, as here, "the amount of damages, although not specifically ascertainable because of misconduct by the defendants falls within a certain range" because such shifting "prevent[s] the defendants from profiting by wrongdoing at the expense of his victim").

200.    Burden shifting is also appropriate because Defendants made pre-purchase, materially misleading statements as to consumers' refund rights—telling them, falsely, that they had no such rights.  Just as pre-purchase materially misleading statements about a product create a rebuttable presumption that consumers relied on those statements when making their purchasing decisions (*see supra* COL ¶¶ 131-139), pre-purchase materially misleading statements about refund rights should create a rebuttable presumption that consumers relied on the misstatements when not requesting refunds.

201.    Defendants cannot meet their burden because they cannot show that fully informed consumers would not have exercised their refund rights.  In fact, numerous customers testified that they never would have bought event tickets to begin with had they known about Defendants' material misrepresentations.  (*See supra* FOF ¶ 93.)

### 2.    The Court Need Not Provide Any Offset for the "Value" of the Event Tickets Sold in Violation of the Cooling-Off Rule.

202.    The Court previously denied summary judgment on monetary remedies for Defendants' Cooling-Off Rule violations in part because the FTC's request for full refunds "fails to account for the inherent value of the products and services received by

1   consumers, thereby creating a windfall."  (Doc. 438 at 14.)

2        203.   As with the Merchandise Rule, the burden is on the Defendants to prove the

3   "value," if any, of the event tickets they sold in violation of the Cooling-Off Rule.

4        204.   Defendants cannot meet that burden.  There was no "value" in the products

5   and services consumers received because the "training" Defendants provided did not, as

6   was promised, increase affiliates' earnings in SBH.  (Anticipated Testimony of Elizabeth

7   Anne Miles.)   Affiliates who paid for event tickets overwhelmingly lost money.  *See,*

8   *e.g.*, *FTC v. Ivy Capital, Inc.*, 2013 WL 1224613, at *17 (D. Nev. Mar. 26, 2013)

9   (awarding monetary relief equal to total sales revenue" in response to scheme in which

10  defendants used "unsubstantiated and false earnings claims" to sell "business coaching

11  program"; no offset for "value" of the "coaching program"), *aff'd in relevant part and*

12  *vacated in part on other grounds*, 616 F. App'x 360 (9th Cir. 2015).

13       205.   The result in *United States v. MyLife.com, Inc.*, 567 F. Supp. 3d 1152 (C.D.

14  Cal. 2021) supports the FTC's position.  There, the defendants violated a law (which is

15  treated like an FTC rule, 15 U.S.C. § 8404) in part by failing to provide consumers

16  "simple mechanisms to cancel" recurring shipments.  Although this violation was not

17  based on a misrepresentation about the underlying product or service, the Court

18  concluded that the "appropriate method to redress these consumers under [Section 19] is

19  to refund the amount consumers paid."  *MyLife*, 567 F. Supp. 3d at 1171.

20        **3.    At a Minimum, Consumers Are Entitled to Refunds for**
           **Purchases of Tickets to Events That Never Occurred.**
21

22       206.   The FTC at trial presented evidence that three of the events for which

23  Defendants sold tickets in violation of the Cooling-Off Rule never even occurred:

24  Kickoff 2020, RED 2020, and Millionaire Workshop.  (*See supra* FOF ¶¶ 383-386.)

25       207.   Defendants' revenues from ticket sales that both violated the Cooling-Off

26  Rule and were for events that never occurred equaled $223,793.50.[29]   (*See supra* FOF

27  ¶¶ 422-424.)  Consumers plainly received no "value" from holding tickets for events that

28  _____
           [29] $133,545 + $42,075 + $48173.50 = $223,793.50

were cancelled.

208.    Therefore, at a minimum, the FTC is entitled to $223,793.50 to redress SBH affiliates' injuries for buying tickets to events that did not happen.

**C.    SBH Affiliates' Status as "Consumers" Is Irrelevant to Section 19 Monetary Relief for Individual Defendants' Rule Violations.**

209.    Individual Defendants argue that the Court cannot enter monetary relief under Section 19 of the FTC Act, 15 U.S.C. § 57b, because SBH affiliates were "resellers," not "consumers."  Above, the FTC addressed this argument in the context of its FTC Act deception counts.  (*See supra* COL ¶¶ 85-90.)

210.    Individual Defendants' argument fails because § 19 broadly permits the Court to provide monetary relief to "consumers or other persons."  15 U.S.C. § 57b(b).

211.    To the extent Individual Defendants try to challenge their *liability* under the rules, they are too late.  The Court already found them liable.  (Doc. 406 at 46-54.)

**VII.    INJUNCTIVE RELIEF IS NECESSARY TO PROTECT CONSUMERS AND PREVENT FUTURE VIOLATIONS.**

212.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes federal courts to grant permanent injunctive relief in response to FTC Act violations.  *See AMG Capital,* 141 S. Ct. at 1348-49.

213.    Injunctive relief is warranted if there is "some cognizable danger of recurring violation."  *FTC v. SuperTherm Inc.*, 2021 WL 3419035, at *6 (D. Ariz. Aug. 5, 2021) (Lanza, J.) (quoting *FTC v. Gill*, 71 F. Supp. 2d 1030, 1047 (C.D. Cal. 1999)).  Once a court determines that an injunction is appropriate, it must determine its scope.  "An injunction must bear a 'reasonable relation to the unlawful practices found to exist.'"  *SuperTherm*, 2021 WL 3419035, at *7 (quoting *Grant Connect*, 763 F.3d at 1105).

214.    Here, the evidence is clear that there is a high danger of recurring violation and that the FTC's proposed relief—including bans on multilevel marketing, pyramid schemes, and business coaching—is reasonably related to Defendants' violations and necessary to prevent future harm.  The same is true for the Order's prohibition on

material misrepresentations and certain refund- and shipping-related conduct.

**A.   There Is a Cognizable Danger that Individual Defendants Will Continue to Defraud Consumers and Violate the Law.**

215.   Individual Defendants' conduct before, during, and after their SBH and VOZ Travel schemes demonstrates, at the very least, "some cognizable danger of recurrent violation, something more than the mere possibility." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953).

216.   Factors considered by district courts in evaluating the risk of recurrent violation include "the degree of scienter involved; the isolated or recurrent nature of the infraction; the defendants' recognition of the wrongful nature of his conduct; the extent to which the defendants' professional characteristics might enable or tempt him to commit future violations; and the sincerity of any assurances against future violations." *United States v. Laerdal Mfg. Corp.*, 73 F.3d 852, 854-55 (9th Cir. 1995) (quoting *FEC v. Furgatch*, 869 F.2d 1256, 1263 (9th Cir. 1989)).

217.   Here, every factor favors a finding that there is, at minimum, a "cognizable danger" of recurrent violations.

218.   **Scienter.**  Individual Defendants all knowingly and intentionally lied about consumers' income potential in SBH.  (*See supra* FOF ¶¶ 43-120, 426-462.)  As company leaders, they had access to information showing affiliates' actual results, but chose to ignore it.  At a minimum, the Individual Defendants knew that they themselves—at the top of the SBH pyramid—were not attaining financial freedom.  (*See supra* FOF ¶¶ 463-481.)

219.   Beyond that, Noland knowingly and intentionally lied about their financial status, claiming they built generational wealth and owned real property worldwide when they, in fact, had no property and near no net assets.  (*See supra* FOF ¶¶ 77-93, 439-457.) Scott Harris and Thomas Sacca were, at the very least, recklessly indifferent to whether their own claims about the Nolands' wealth were true.  Sacca explained at his deposition that, in his insurance career, he found "sometimes people that had the biggest, nicest

houses, the biggest nicest cars, they were the ones that were broke.  And believe it or not, that was more times than not." (Sacca Dep. Tr. at 88:21-89:15.)  Yet Sacca ever even asked if the claims Defendants made about Noland's wealth were true.  (*Id.* at 59:24-35, 60:12-14.)

220.  Defendants' operation of VOZ Travel was egregious.  They promised consumers travel benefits that they knew did not exist, and, even after they lost the ability to provide *any* travel service at all, they continued selling memberships rather than telling consumers the truth or returning their money (some of which they had already spent on a Range Rover, motorbikes, and a beachfront condo).  (*See supra* ¶¶ 679-713, 839.)

221.  **Isolated or Recurrent Nature of Infractions.**  Individual Defendants' violations permeated their operations, spanning SBH's (and later VOZ's) two-and-a-half-year existence prior to the Court's TRO.  As this Court found in *SuperTherm*, the "misrepresentations constituted 'systematic wrongdoing,' and therefore there is a cognizable danger of recurring violation."  2021 WL 3419035, at *7; *see also Gill*, 71 F. Supp. 2d at 1047 (granting injunctive relief in part because violations were "predicated upon systematic wrongdoing, rather than isolated occurrence" (quoting *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979)); *FTC v. DiscountMetalBrokers Inc.*, 2017 WL 6940502, at *7 (C.D. Cal. Oct. 13, 2017)  (same).

222.  **Recognition of Wrongdoing**.  As described above, Defendants tried to blame anyone but themselves for their predicament, turning to conspiracy theories and baseless accusations.  (*See supra* FOF ¶¶ 833-836.)  Even when presented with dozens of examples of outlandish promises of substantial freedom and lies about Noland's own wealth, Defendants have expressed no regret or admitted to doing anything wrong.  (*See supra* FOF ¶ 833.)

223.  **Professional Characteristics.**  Defendants' "professional characteristics" will also enable them to commit future violations.  In particular, since the TRO, Individual Defendants have attempted to continue their SBH, VOZ, and money-making-

training schemes.  Noland, Harris, and Sacca attempted to launch (or re-launch) businesses called "SBH Products, Inc." and "VOZ Travel."  (*See supra* FOF ¶¶ 819-832.)  The Nolands and Harris have sold books claiming they can teach people how to get rich with mathematical certainty.  (*See supra* FOF ¶¶ 809-815.)  They also have started a business-coaching operation selling a "mastery course" on how to get rich.  (*Id.*)

224.    Additionally, Noland's pre-TRO career, dating back to 1995, focused almost entirely on multilevel marketing.  (J. Noland Dep. Tr. (2/5/20) at 60:11-61:5, 62:5-10, 65:3-10, 66:4-13, 67:11-68:1, 70:7-73:8, 73:19-74:13.)

225.    Harris, Sacca, and Lina Noland also have long histories in multilevel marketing.  (Harris Dep. Tr. at 52:5-11 (MLM Equinox from 1996-2000); Ex. 311 at 2 (MLM "Zija" from 2013-2017); Ex. 312 at 2 (Zija from 2011-2017).)  Lina Noland met Jay Noland as a member of his SereniGy MLM.  (Ex. 802 at 7.)

226.    As of December 2020 (one year into this litigation), Harris had not sought new employment.  (Harris Dep. Tr. at 281:19-282:5, 282:21-283:14.)

227.    **Sincerity of Assurances Against Future Violations.**  Other than with respect to their refund practices, Defendants have made limited, if any, assurances that they will not engage in future violations.  The sincerity of any such assurances, moreover, should be evaluated in context of both their refusal to acknowledge any wrongdoing and the fact that they followed their offer to "cooperate" with the FTC during its 2019 investigation by secretly destroying evidence.  (*See supra* FOF ¶¶ 738-755.)

B.    **The FTC's Proposed Injunctive Relief Is Necessary To Protect Consumers.**

228.    The FTC "is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past."  *Grant Connect*, 763 F.3d at 1105 (quoting *FTC v. Ruberoid Co.*, 343 U.S. 470, 473 (1952)).  Stated another way, those "'caught violating' the FTC Act 'must expect some fencing in.'"  *Id.* (quoting *FTC v. Nat'l Lead Co.*, 352 U.S. 419, 431 (1957)).

229.    "Accordingly, injunctive relief under the FTC Act may be framed 'broadly

enough to prevent respondents from engaging in similarly illegal practices in future advertisements.'" *Id.* (quoting *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965)).

230.   "[T]he egregious nature of past violations is a factor supporting the need for permanent injunctive relief of a broad nature." *FTC v. Ross*, 897 F. Supp. 2d 369, 387 (D. Md. 2012) (quoting *FTC. v. Kitco of Nevada, Inc.*, 612 F. Supp. 1282, 1296-97 (D. Minn. 1985)).

### 1.   The Facts of This Case, Combined with Defendants' History, Warrant Broad Relief.

231.   "An injunction must be a 'reasonable relation to the unlawful practices found to exist.'" *SuperTherm*, 2021 WL 3419035, at *7 (quoting *Grant Connect*, 763 F.3d at 1105). "In considering the scope of a permanent injunction, courts consider: "(1) the seriousness and deliberateness of the violation; (2) [the] ease with which the violative claim may be transferred to other products; and (3) whether the [defendant] has a history of prior violations." *Id.* (quoting same). These factors support a broad scope of the Court's permanent injunction.

232.   "The weight given a particular factor will vary. The more egregious the facts with respect to a particular element, the less important it is that another negative factor be present. In the final analysis, we look to the circumstances as a whole and not to the present of any single factor." *Sears, Roebuck and Co. v. FTC*, 676 F.2d 385, 392 (9th Cir. 1982); *see also Telebrands Corp. v. FTC*, 457 F.3d 354, 358 (4th Cir. 2006) ("The reasonable relationship analysis operated on a sliding scale—any one factor's importance varies depending on the extent to which the others are found. In other words, the more serious a violation, the less important transferability and prior history become.")

233.   **Seriousness and Deliberateness of the Violation**. For the reasons detailed above (*e.g., supra,* COL ¶¶ 218-220), Defendants' violations were serious and deliberate. Defendants earned consumers trust with boasts of their past success and promises of financial success. They used that trust to drive SBH affiliates off a financial cliff.

234.   **Ease of Transferring Scheme to Other Products**.  Defendants' violations are easily transferrable.  In fact, Noland has boasted about that precise fact.  Shortly before launching SBH, Noland claimed he could "plug any company or product into [his] process, and you can be free financially if you want to be."  (Ex. 51 at 19:4-6.) Defendants proved Noland right in this case.  When their SBH pyramid scheme started to falter, they simply started another one—VOZ Travel—featuring the same deceptive income claims and commission structure.  (*See supra* FOF ¶¶ 667-713.)

235.   In the wake of the Court's TRO and Preliminary Injunction, Individual Defendants have attempted to transfer the non-pyramid parts of their scheme to other businesses.  They have, for example, sold or attempted to resell the SBH and VOZ Travel products, marketed a book that provides the secret to getting rich with "mathematical certainty," and started selling yet more training courses.  (*See supra* FOF ¶¶ 804-832.)

236.   **History of Prior Violations**.  No Court has previously ruled that the Defendants violated the FTC Act.  Nevertheless, both in this case and in others, Defendants have shown a propensity to violate court or administrative orders.

237.   The California Department of Business Oversight *twice* determined that Harris made material misrepresentations or omissions in connection with the sale of securities, once doing so in violation of an order barring from even operating in California.  (*See supra* FOF ¶¶ 800-801.)

238.   Additionally, Contempt Defendants violated every operative provision of the 2002 Noland Order (*see supra* COL ¶¶ 97-122), and all of the Individual Defendants have violated the TRO Preliminary Injunction (*see supra* FOF ¶¶ 756-769).  The Court also found the Individual Defendants engaged in "systematic efforts to conceal and destroy evidence" in a manner that is "deeply troubling" and that has "cast a pall over this action."  (Doc. 401 at 2.)

1

2

**2.      The FTC's Proposed Injunctive Relief, Including Bans on Multilevel Marketing, Pyramid Schemes, and Business Coaching, Is Necessary.**

3      239.    "The [FTC Act] authorizes imposition of comprehensive prophylactic

4   injunctive relief. . . . In some instances, fencing in provisions are necessary to prevent

5   similar and related violations from occurring in the future.  Accordingly, courts have

6   routinely imposed some form of fencing in, barring violators from participating in certain

7   lines of business or forms of marketing."  *FTC v. John Beck Amazing Profits LLC*, 888 F.

8   Supp. 2d 1006, 1011 (C.D. Cal. 2012) (citations omitted).

9      240.    Courts found industry-wide "bans" appropriate where Defendants made

10   "systematic . . . misrepresentations" and "continuously ignored and violated both [a

11   statute] and the preliminary injunction," such that "giving Defendants another chance

12   might prove to be unwise."  *Gill*, 265 F.3d at 957 (9th Cir. 2001); *see also FTC v.

13   ThinkAchievement Corp.*, 144 F. Supp. 2d 1013, 1018, 1025 (N.D. Ind. 2000) (ban on

14   telemarketing and marketing "career advisory goods or services" in light of Defendants'

15   "extensive and prolonged engagement in fraudulent, deceptive trade practices, the failure

16   of prior enforcement efforts in requiring lawful activity and stopping unlawful activity,

17   and the likelihood of future violation"); *McGregor*, 206 F.3d at 1386 n.9 (ban in response

18   to "continued fraudulent practices after the entry of [prior injunction]"); *FTC v. Wetherill*,

19   1993 WL 264557, at *6 (C.D. Cal. June 10, 1993) ("telemarketing operations" ban as the

20   "most effective means of ensuring that no future violations of the FTC Act occur"); *FTC*

21   *v. Pointbreak Media, LLC*, 376 F. Supp. 3d 1257, 1272-73 (S.D. Fla. 2019) (bans on

22   "remotely created payment orders" and telemarketing based in part on "Defendants'

23   history of unlawful telemarketing"); *FTC v. NHS Sys., Inc.*, 936 F. Supp. 2d 520, 536-537

24   (E.D. Pa. 2013) (ban on telemarketing where, because defendants were still working in

25   telemarketing, "there is an imminent possibility that [her prior unlawful tactics] are

26   currently being utilized"); *FTC v. Lanier Law, LLC*, 194 F. Supp. 3d 1238, 1289 (M.D.

27   Fla. 2016) (ban on sale of mortgage-relief services where "Defendants have made no

28   assurances against future violations, and continue to deny the wrongful nature of their

conduct"); *FTC v. Shkreli*, 581 F. Supp. 3d 579, 639 (S.D.N.Y. 2022) (ban on "participating in the pharmaceutical industry" based on "egregious, deliberate, repetitive, long-running, and ultimately dangerous illegal conduct" and because defendant "has not expressed remorse or any awareness that his actions violated the law"); *FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1232-33 (D. Nev. 2011) (bans on "engaging in negative option marketing, continuity programs, preauthorized electronic fund transfers, [and] use of testimonials" given "Defendants' recidivism, extensive misconduct, willingness to flout the law, and highly adaptable scheme"), *aff'd in relevant part and vacated in part*, 763 F.3d 1094 (9th Cir. 2014); *FTC v. Int'l Computer Concepts, Inc.*, 1995 WL 767810, at *1, 7 (N.D. Ohio Oct. 24, 1995) (ban on "future involvement in business opportunities and franchises" because of "the egregious nature of the violations[,] prior disregard for court orders, the disdain he has shown for this Court by continuing to pursue an illegal course of conduct during the pendency of this litigation and, finally, because of the danger he poses to consumers in the future").

241.    In one pyramid scheme case, a court imposed a ban on multilevel marketing based on conduct substantially similar to that of the Defendants here.  "After participating in numerous multi-level marketing schemes, Mr. Sullivan developed, owned and operated his own multi-level marketing scheme that was deceptive to its core."  *Five-Star Auto Club*, 97 F. Supp. 2d at 536.  "After the Court entered a temporary restraining order, putting the Receiver in charge of Five Star, Mr. Sullivan posted a message on the corporate web site, and held a conference call with Five Star participants in violation of the TRO."  *Id.* at 536-37.  After entry of the TRO, "Mr. Sullivan participated in dozens of conference calls with Five Star participants, and exchanged correspondence with many participants.  In further violation of the Court's Order, he did not maintain copies of that correspondence and turn copies over to the Receiver and FTC."  *Id.* at 537; *see supra* FOF ¶ 766-769.

242.    Here, the FTC seeks bans on Defendants' participation in multilevel

marketing, pyramid schemes, and the sale of business coaching services.  Those business types played integral roles in Defendants' schemes and bans are justified and necessary to prevent further violations.  That is especially true given that the Contempt Defendants already had an opportunity to comply with the 2002 Noland Order, which stopped short of industrywide bans, and chose to simply ignore the Order.

### 3. The FTC's Proposed Compliance Monitoring Provisions Are Appropriate.

243. "Courts may order record-keeping and monitoring to ensure compliance with a permanent injunction." *ThinkAchievement Corp.*, 144 F. Supp. 2d at 1018.

244. In *SuperTherm*, for example, this Court approved requirements that defendants "acknowledge receipt of the order and seek and obtain written confirmation of notice of the order from principals, officers, directors, managers, members, and entities related to the Defendants."  2021 WL 3419035, at *8.  The FTC seeks that here.

245. This Court also has approved requirements to "submit a compliance report one year after entry of the permanent injunction, and provide other types of notice if certain changes occur [during a set time period]," "creat[e] certain records for [a set time period] after entry" of the injunction, and "submit compliance reports while authorizing continued monitoring by the FTC."  *Id.* at *8-9.  The FTC seeks that relief here as well. This Court in *SuperTherm* limited this relief to five years, noting "that other courts have imposed similar conditions for longer durations, but conclude[ing] such cases are distinguishable because they involved conduct that was more egregious or pervasive or involved defendants with more substantial track records of violating the FTC Act."  *Id.*

246. This is a "more egregious or pervasive" case.  The FTC therefore seeks durations of 10 years (for Lina Noland and Thomas Sacca), 15 years (for Scott Harris), and 20 years (for Jay Noland) for the notice and recordkeeping requirements, and an indefinite time period for the compliance-monitoring provision.  The FTC regularly obtains indefinite authority to monitor compliance, which is appropriate because the federal court injunctions monitored by the FTC do not expire.  *See, e.g.*, *FTC v. Jones*,

2017 WL 2807420, at *3-4 (C.D. Cal. May 31, 2017) (indefinite compliance monitoring; 20-year notice and recordkeeping); *FTC v. CD Capital Invs., LLC*, 2016 WL 4468549, at *5-6 (C.D. Cal. Aug. 22, 2016) (same) (Aug. 22, 2016); *FTC v. Wellness Support Network, Inc.*, 2014 WL 3805755, at *4-6 (N.D. Cal. Feb. 20, 2014) (same); *FTC v. EMP Media, Inc.*, 2018 WL 3025942, at *4-5 (D. Nev. June 15, 2018) (same); *United States v. Com. Recovery Sys., Inc.*, 2016 WL 9244671, at *4-5 (E.D. Tex. April 28, 2016) (indefinite compliance monitoring; 15-year recordkeeping and notice); *FTC v. Kutzner*, 2017 WL 4685065, at *7-8 (C.D. Cal. Sept. 21, 2017) (same); *FTC v. Tatto, Inc.*, 2014 WL 12571043, at *4-5 (C.D. Cal. Aug. 14, 2014) (same); *FTC v. M&T Fin. Group*, 2018 WL 10834041, at *8-10 (C.D. Cal. June 8, 2018) (indefinite compliance monitoring; 10-year recordkeeping and notice).

Dated:  January 8, 2023                    Respectfully submitted,

/s/ Evan M. Mendelson
EVAN M. MENDELSON, DC Bar No. 996765
JONATHAN W. WARE, DC Bar No. 989414
Federal Trade Commission
600 Pennsylvania Ave. NW
Mailstop CC-9528
Washington, DC 20580
(202) 326-3320; emendelson@ftc.gov
(202) 326-2726; jware1@ftc.gov
(202) 326-3197 (Fax)

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION