Stephen R. Cochell (*admitted PHV*)
*srcochell@gmail.com*
Jonathan L. Slotter (*admitted PHV*)
*jslotter@cochelllawfirm.com*
**COCHELL LAW FIRM P.C.**
5850 San Felipe Ste 500
Houston Texas 77057
Tel: (346)800-3500

Attorney for Defendants
James D. Noland, *et al*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Federal Trade Commission,

        Plaintiff,

    vs.

James D. Noland, Jr., et al,,

        Defendants.

Case No. 2:20-cv-00047-PHX-DWL

**INDIVIDUAL DEFENDANTS PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

1

2

## <u>TABLE OF CONTENTS</u>

3

TABLE OF CONTENTS ............................................................................................................. ii

PROPOSED FINDINGS OF FACT ............................................................................................ 1

  Introductory  Information ....................................................................................................... 1

  SBH's Products and Background ........................................................................................... 2

  SBH Promoted Sales ............................................................................................................. 2

  New Affiliates Introduction into SBH .................................................................................. 4

  SBH Trainings and Announcements ..................................................................................... 8

  Key SBH Statistics ............................................................................................................... 9

  SBH Shipping Practices and Data ...................................................................................... 15

  Kaci Wood & Daniel Moncayo ......................................................................................... 19

  Jason Johnson .................................................................................................................... 22

  The Underhills .................................................................................................................... 23

  Krystian Sarzynski.............................................................................................................. 24

  Susan Michelle Wilder ....................................................................................................... 25

  Stephanie Barnhouse .......................................................................................................... 26

  Craig Ballard....................................................................................................................... 27

  Crystal Bose ....................................................................................................................... 29

  Kathleen Van Liere ............................................................................................................ 30

  FTC Failure to Investigate and Communications with Complainants................................. 34

  Noland Has Coached and Trained Other Millionaires ....................................................... 38

  Noland Believed His Wealth At The Time the Statements Were Made .................................. 39

  VOZ .................................................................................................................................... 39

  Receiver Issues ................................................................................................................... 41

  FTC's Unwilling to Cooperate with Individual Defendants ................................................. 42

CONCLUSIONS OF LAW ....................................................................................................... 43

  Affiliates Were Independent Contractors ............................................................................. 46

  The Inherent Power of the Courts to Impose Contempt ...................................................... 48

  Discovery Issues ................................................................................................................. 50

      A. The MIDP Responses ................................................................................................. 51

      B. The Testimony of the Complaining Witnesses Was Not Credible...................... 53

      Kaci Wood & Daniel Moncayo........................................................................................ 54

      Jason Johnson .................................................................................................................. 56

  The FTC Failed to  Show SBH Made Representations to Induce Consumers to Become SBH

Affiliates and/or Created a Net Impression That Violates the Act and Continued to Violate the Act Thus Entitling the FTC To Damages. ................................................................... 57

SBH's Refund Policies ................................................................................................. 61

Contempt and the Presumption of Misrepresentation and Damages. ........................... 62

Whether Defendants Operated an Illegal Pyramid Scheme. ........................................ 66

Whether SBH Affiliates suffered injury from violations of the Merchandise Rule and Cooling Off Rules? ................................................................................................................. 72

Whether Congress authorized the district courts to create enterprise liability? ......................... 74

The FTC's Alleged Damages ........................................................................................ 75

Spoliation of Warehouse Records ................................................................................ 77

Defendants Substantially Complied with the Merchandise Rule. ................................. 78

Dr. Bosley's Report ...................................................................................................... 78

Whether there is a cognizable danger of future violation by the Individual Defendants. .......... 80

What, if any, injunctive relief should be imposed against the Individual Defendants? ............ 81

Pursuant to this Court's Order, Individual Defendants file their Proposed Findings of Fact and Conclusions of Law.   Defendants have proposed a number of conclusions of law in the alternative to take into account the Court's ruling on evidentiary and/or legal issues during the course of trial. Defendants do request an opportunity to update its Findings of Fact and Conclusions of Law following trial on the issues.

## PROPOSED FINDINGS OF FACT

### Introductory  Information

(1)    SBH was created by Jay and Lina Noland in July 2017 with Scott Harris and Tommy Sacca.  Luke Curry also joined in developing SBH. **Testimony of Jay Noland, Lina Noland, and Harris.**

(2)    SBH was managed by Jay and Lina Noland and Scott Harris, Tommy Sacca and Luke Curry were named as Senior Field Advisors to oversee operations. **Testimony of Jay Noland, Lina Noland, and Harris.**

(3)    Lina Noland was SBH's Chief Administrative Officer and provided overall oversight over customer service, warehouse/shipping, and events. Both Consumers and Affiliates were considered customers. **Testimony of Lina Noland.**

(4)    SBH was created as a direct sales company with a commission based incentive plan in order to create growth organically without the need to spend unnecessary capital on traditional marketing and other startup costs that often hold businesses back from profiting in their early years. **Testimony of Jay Noland and Harris.**

(5)    Unlike most Multi-Level Marketing companies, SBH is an Affiliate Marketing Company.  As a result, SBH did not use the terms "upline" or "downline" but Affiliates referred to their sales organization as their "Sales Team" and those above them as their "Up-Team" member. **Testimony of Jay Noland.**

**SBH's Products and Background**

(6)     SBH offered coffee, tea, nutritional products, and trainings (the "Products") to Affiliates. **Testimony of Jay Noland.**

(7)     Each affiliate owned their own business and were issued 1099's by SBH. **Ex. 506, 516, 545.**

**SBH Promoted Sales**

(8)     SBH primarily promoted the sales of product to consumers (or ultimate users) as the number one goal for every affiliate. **Ex. 3, 4, 5, 16, 510, 663-779.**

(9)     SBH also encouraged Affiliates to develop their own Sales Teams if, but only if they wanted to devote the time and resources to such an effort. **Ex. 3, 4, 5, 16.**

(10)    When affiliates did recruit someone, they did so to recruit additional sales team members who would sell products. Affiliates would often spend 30-45 minutes doing a presentation to each prospective affiliate.  **Testimony of Sherfield, Mehler, Baer, and Noland.**

(11)    While presentations to Affiliates included training on how to develop and operating Teams, the primary focus at SBH was sales of products, as evidenced by conducting daily Heat Calls and Zone 1 calls featuring Noland, Harris, Sacca and Curry providing primarily sales discussions, and most importantly, *how to sell* products by asking Affiliates participating in the calls to share a successful selling experience with everyone on the call that happened within the past 24 hours, and then providing feedback, support and support for their effort and continued success. Noland, Harris, Sacca, and Curry also consistently held or promoted regularly Facebook Live video training, posts, and support and oversaw other Affiliates who did the same.   **Ex. 663-779.**

(12)    Affiliates were instructed by their Up-Team and management (Jay Noland et al) to

strongly disclaim any income potential in any presentations to potential affiliates. **Ex. 594-662, 949 through 978-1.**

(13)   Each SBH Affiliate was an independent contractor and owned their own business as SBH Affiliates. **Testimony of Jay Noland.**

(14)   Each Affiliate agreed to the SBH Terms and Conditions which provided, in pertinent part, that each Affiliate was an independent contractor. **Ex. 2, 505, 522.**

(15)   SBH properly issued 1099 Income Tax Forms each year they were active SBH Affiliates. **Ex. 506, 516, 545.**

(16)   The Affiliate and guest reviewed the Terms and Conditions, at Paragraph 9, made it clear, in that:

> 9.   Truthful and Accurate: The AFFILIATE  certifies that neither the company nor his or her referrer has made any claims of guaranteed earnings or representations of anticipated earnings that might result from his or her efforts. The AFFILIATE understands that he or she <u>may not make any verbal or written statements regarding claims of income or potential earnings</u> that might result from his or her efforts or the efforts of others, unless specifically disclosed in a AFFILIATE Commission summary provided from time to time by the company. Affiliate also certifies that <u>neither the company nor his or her referrer has made any Medical Claims</u> regarding any cure, treatment, diagnosis, or prevention of any disease or illness in relation to any success by health products. AFFILIATE agrees that now, and in the future <u>not to make any income or medical claims whatsoever. AFFILIATE understands that commissions are solely earned on the sale of company products.</u> (emphasis supplied).

> **Ex. 522.**

(17)   Similarly, in Paragraph 11(a), that:

> AFFILIATES are compensated for the sale of Products sold to Customers and through their sales to customers through their affiliate organization. <u>No AFFILIATE will ever be compensated for referring other AFFILIATES.</u> <u>Without question, the sale of products to end consumers is the basis of the companies affiliate Commission program and must be emphasized while</u>

<u>referring other affiliates.</u>  (emphasis added)

**Ex. 522.**

**New Affiliates Introduction into SBH**

(18)  Most Affiliates first learned about SBH from their friends or family, by attending a public function (e.g. Farmers Market) or a private party sponsored by an SBH Affiliate. **Testimony of Sherfield, Mehler, Jo Dee Baer.**

(19)  If consumers wanted to hear more about SBH, they would sit down with an SBH Affiliate and review the SBH Business Overview in person, which was a power point which was discussed as presented.  At group presentations of 1 or more, J. Noland's video on Lets Talk Coffee or the Biz Builder Flash Drive was sometimes provided in group presentations. **Testimony of Jay Noland, Sherfield, Mehler, and Jo Dee Baer.**

(20)  After a presentation, the Affiliate explained the levels commitment and Affiliate could participate as. They could choose to be what was called , number 1's, 2's and 3's. Level 1's were people who basically wanted the coffee either for themselves or for the family friends with the benefit of earning a 10% commission back on order, and they also choose to possibly supplement their income. Level 2's were people who wanted to do more and replace part or even all of their income from their regular jobs. Level 3's were people who wanted financial freedom at whatever level that meant to them, and they were willing to make the time and commitment to that goal. **Testimony of Jay Noland, Sherfield, Mehler, and Jo Dee Baer.**

(21)  If the guest stated that they weren't interested in the business, the affiliate would generally ask the guest to purchase a few products.  **Testimony of Jay Noland, Sherfield, Mehler, and Jo Dee Baer.**

(22)  Potential Affiliates (or "guests") were asked what level they wanted to begin at.  Based on their answer provided by the guest, the affiliate would make a recommendation that

the guests of how they think the guests should get started. Most affiliates would likely recommend that the guest go ahead and order a few products or potentially a starter pack so that they can start using, sampling and selling the products on a light part time basis. **Testimony of Jay Noland, Sherfield, Mehler, and Jo Dee Baer.**

(23)   A Starter Pack was comprised of consisted of 1 black coffee, 1 latte, 1 hot cocoa, 1 chai tea, 1 bottle of essentials, and 1 bottle of g-drops for $125 and was offered with a discount. **Ex. 514.**

(24)   If a guest identified themselves as a Level 2, the affiliate likely recommended that they purchase an Accelerator Pack because that would get them about $600 worth of product for only $500.00 and would also provide them with a good amount of and variety of products to start using, sampling and selling on a moderate part-time basis.

(25)   The Accelerator Pack was 2 bags of chai tea, 1 bag hot cocoa, 2 bags latte, 3 black coffee, 2 bottle g-drops, 2 bottles of fruit+veggie, 1 bottle of life 120, 1 bottle of Essentials, 1 bottle of G-Burn, 1 bottle of Aller-G-Stop, and 1 bottle of G-Shield for $500 with $100 dollars of free Products. **Ex. 512.**

(26)    Level 3's were offered either an Accelerator Pack,  an **Accelerator Plus Pack** or Super Accelerator Pack comprised of a lot more Products.  **Ex. 512, 513, and 515.**

(27)   The Super Accelerator Pack had 6 bags chai tea, 6 bags hot cocoa, 16 bags black coffee, 15 bags latte, 6 bags of G-Drops, 4 bottles of Fruit+Veggie, 2 bottle of Life 120, 4 bottles of Essentials, 4 bottles of G-Burn, 2 bottles of Aller-G-Stop, 4 bottles of G-Shield, 2 bottles of G-Clear, and tickets to 3 training events for $1,995.  Excluding the training events (which averaged $295/event), the value of the SBH products were worth $2200, making the total value of $2,495 for a $1,995 purchase. **Ex. 515.**

(28)   None of the packs offered by SBH offered any incentives for recruiting new people.  The

price of the packs were cheaper than the wholesale price because they were bought in bulk. **Ex. 512, 513, and 515.**

(29)    An Affiliate was limited to purchasing one (1) of each pack for the lifetime of their membership. For example, once an Affiliate purchased a super accelerator pack, they could noy purchase another super accelerator pack ever. **Testimony of Jay Noland.**

(30)    The Affiliate usually fielded questions about SBH. **Testimony of Jay Noland, Sherfield, Mehler, and Jo Dee Baer.**

(31)    Guests were urged to make a list of people they knew, starting with their cell phone contacts, to help them identify potential customers and a potential customer base.  This helped a lot of guests determine how much they should buy individually. **Testimony of Jay Noland, Sherfield, and Mehler.**

(32)    If the guest decided to become an affiliate, they would complete an affiliate application on the computer, review and agree to the terms of use, and pay their $49 affiliate membership fee. **Testimony of Jay Noland, Sherfield, Mehler, and Jo Dee Baer.**

(33)    If the guest decided to purchase products, they would usually go ahead and choose the products they wanted, agreed to the terms of use, and purchased the products at the same time they became members. However, at times, some affiliates would wait before they ordered any product. **Testimony of Jay Noland, Sherfield, Mehler, and Jo Dee Baer.**

(34)    At this point, if a new affiliate wanted to start building their business, The Up Team Leader would begin directly training the new affiliates, direct the new affiliates to the training materials in their back office, or schedule a time to meet back together to begin training. . The core training for every Affiliate was the Fast Start Training System found in the Affiliate's back office. This training was created by Jay Noland. It included written

and audio training with the focus on selling products and recruiting others to sell products. **Testimony of Jay Noland, Sherfield, Mehler, and Jo Dee Baer.**

(35)   There was no set requirement that each Up-Team Leader follow this method, but it was recommended that they follow these steps. **Testimony of Jay Noland.**

(36)   For their $49 annual fee, SBH provided: (a) a license to promote and sell SBH Products; (b) a website for each SBH Affiliate that allowed consumers to order directly from SBH with each Affiliate receiving a 10% commission from the purchase; (c) manage the back office for order tracking; (d) ordering Products; (e) free training materials (e.g. Fast Start Training on issues such as sales, scripts, building a team and managing their business). (f) Merchant Processing Services (Affiliate did not have to set up a separate merchant account for their online customer orders); (g) Drop Shipping and Warehouse Services provided by SBH to ship orders directly to their online customers. **Testimony of Jay Noland.**

(37)   Affiliates were free to attend training sessions with their Up-Team focusing on product sales and were also free to attend training sessions offered in daily Heat/Zone1 calls.  In some cases, the Up-Team Leader gave one or more of his or her Down-Team Affiliates a free event ticket to incentivize them. **Testimony of Jay Noland.**

(38)   The Court has reviewed "Let's Talk Coffee" and  "SBH Business Overview" which were the a video and slideshow presentation that were used as part of the typical presentation to Potential Affiliates.  Neither of these videos makes specific guarantees of income if consumers decided to become SBH Affiliates.  As to the income discussions, there were written disclaimers that stated "Any earnings information, statements regarding income, or testimonials and examples are used in the SBH Commission Plan solely to explain how the Commission Plan works and are not

representative or guarantees of any earnings or income. Individual income results may vary significantly." **Exhibit 3.** These disclaimers were at the bottom of various slides on the SBH Business Overview.

(39)    Affiliates presenting the income potential also discussed the disclaimer with the attendees stating that the numbers were not guaranteed and talked about how each consumer might fit into SBH as Number 1's, 2's and 3's. **Testimony of Jay Noland, Sherfield, Mehler, and Jo Dee Baer.**

(40)    In light of the testimony about how the documents were presented, the Court finds that there were no false, deceptive or misleading acts that occurred in the typical presentation to consumers interested in becoming Affiliates.

(41)    Many Affiliates worked closely with their Up-Team leaders at public events to sell coffee (and other Products) and identify individuals interested in becoming SBH Affiliates. **Testimony of Sherfield, Mehler, and Jo Dee Baer.**

(42)    SBH generally recommended that Affiliates mark up the Products by 50% or more. This maximized each Affiliate's profits from direct selling to consumers, the ultimate customer. **Testimony of Jay Noland, Harris and Mehler.**

(43)    Affiliates worked with Team Leaders that helped them identify themselves as Level 1, Level 2 and Level 3 Affiliates.  **Testimony of Jay Noland, Sherfield, Mehler, and Jo Dee Baer.**

**SBH Trainings and Announcements**

(44)    At SBH training events, affiliates learned how to effectively sample and sell products at various events and trade shows, how to interact with prospective affiliates and customers, how to manage their own Team including how to manage their expectations, and the efficacy of all the SBH products. Mutiple doctors were at the paid training

events to provide additional product training and support. **Testimony of Jay Noland, Harris, Sherfield, Mehler, and Jo Dee Baer.**

(45) SBH and/or Noland would issue announcements indicating to Affiliates as to what level of training a new training was geared to help (i.e. a 1, 2 or 3). **Ex. 133, 510, 511, 521, 537, 538s, 547.**

(46) RED Trainings were not geared towards SBH affiliates and were open to the public. **Testimony of Jay Noland.**

(47) Trainings like RED, if they were advertised on the SBH Facebook page, came with disclosures on the type of training it was geared towards (i.e. whether it was for a 1, 2, or 3). **Similar to Exhibits 538 and 547.** RED Events were always for number 3's. **Testimony of Jay Noland.**

(48) Before confirming a purchase of a RED ticket, each person had to sign a RED Commitment and Agreement Form. **Ex. 579.**

(49) Eighty two (82%) of Affiliates' first purchase from SBH were for individual products. Only 18% of affiliates purchased a pack with their first purchase from SBH. **Exhibit 586.**

(50) This indicates that there was little, if any, pressure on new Affiliates to purchase "packs" of products to the benefit of their Up-Team Leader or SBH.

**Key SBH Statistics**

(51) Sixty percent (60%) of affiliates who bought packs with their first purchase made additional purchases.   19%  of affiliates who purchased packs with their first purchase bought SBH products on more than 5 different occasions. **Exhibit 586.**

(52) This shows that many new Affiliates confirmed and/or determined that they were able to sell the Products to their family and friends before ordering new Products.

(53)   Only three percent (3%) of unit sales were business packs. Packs made up 35% of the total $ revenue. **Exhibit 585.**

(54)   Seventy (70%)  of total orders were less than $1000/order- average spend per order was $255.88 in 2019. **Exhibit 817.**

(55)   SBH paid out 83% of its commissions to either an affiliates bank account, via check, or via Paypal.  18.9% of the commissions paid out were used by affiliates to purchase more product. **Exhibit 585.**

(56)   Eighty four percent (84%) of all product credits were used. The other 16% unused product credits were unable to be used due to the FTC Injunction and decision by the Receiver to refuse any refunds by Affiliates or allow product credit  to be used when the Receiver restarted sales operations (approximately four months after imposition of the TRO.). **Exhibit 585.**

(57)   At the time of imposition of the TRO, 17% of commissions belonging to Affiliates were unused in each affiliates' back office. **Exhibit 585.**

(58)   SBH had $2,224,612.75 in individual product sales in 2019. **Exhibit 817.**

(59)   SBH had only $757,500.45 in pack sales in 2019. **Exhibit 817.**

(60)   Only 12.4% of affiliates did not earn commissions (although they were able to purchase the Products and get a 10% commission). Of the 12.4% of affiliates that did not earn commissions, 59.6% of those were people who signed up with SBH through a special promotion where they were not required to pay the $49 annual fee. **Exhibit 585.**

(61)   From December 25, 2017 to April 25, 2018, SBH had a "5x5" Promotion. During the four month promotion, SBH sold 311 packs (about 62 packs a month) during the months of December 25, 2017 to April 25, 2018. This is 14% of all packs sold during the lifetime of the company. During the lifetime of SBH it sold about 78 packs per month.

(62)   In 2018, 276 affiliates ordered 12 or more times, averaging 20.3 invoices (meaning that that these affiliates were not just purchasing packs) accounted for 52.5% of total sales. **Exhibit 816.**

(63)   In 2018, there were 3563 of affiliates who spent less than $1,000 per year at SBH. On average those affiliates spent $203.64 per year. **Exhibit 585.**

(64)   Affiliates who qualified in terms of sales were invited to participate in contests that gave contest winners a trip to a conference and to meet with J. Noland over dinner about their sales performance.   The qualifications to participate in such competitions was based primarily on the participant's level of sales. **Exhibit _.**

(65)   The Founder's Pack Program was started on or about October 2017 and was a Program to incentivize motivated SBH to have a status that was different and unique from other Affiliates. **Exhibit 574.**   Affiliates were required to fill out an application with an Agreement to participate in the Founders' Program. The number of Founders was *limited* to 200 Founders, although new Founders could apply and replace Founders who wanted to withdraw from the Founders Program.  **Exhibit 876.**

(66)   In pertinent part, The Promotion was not a part of the SBH Commission Plan, but a limited time promotion as outlined and stated herein. "To be eligible, a Participant must first be an SBH Affiliate in good standing and then purchase an SBH Founders Pack, which entitles the Participant to qualify for SBH Founders Rewards."

(67)   The Founders Program provided for the following benefits and responsibilities: The SBH Founders Pack is priced at $2,495 (US) plus $150 Shipping/Handling and has 1,250 Volume points attached at time of purchase that flows through the 6 Tier Commission Plan.

- Over $2,700 of SBH wholesale product (equals over $200 in Free SBH Products).

- Receive a prestigious SBH Founders Lapel Pin.
- Eligible to be paid on all 6 Tiers of commissions immediately.
- 25% off all Success By Health Trainings for life
- Receive one share of the SBH Founders Pool. This pool consists of 2.5% of the total monthly REVENUE (in addition to the commission plan) in the country of purchase for 12 months after last SBH Founders Pack is sold.
- Receive 2 event tickets to the first 2018 Global SBH Summit. (Valued at $295 each)
- Receive 2 event tickets to the first USA SBH Wealth Warriors Boot Camp. (Valued at $295 each)
- Eligible to earn additional Founders Pool shares by developing team Auto-Orders and advancing to Super Affiliate levels.

The total value of the Founders Pack was $3,880 for a $2,495 purchase.

(68)  To assure each Founder was able to provide Products to his customers, the Program required each Founder to maintain a $100 (US) Auto-Order each calendar month during the commission period. **Exhibit 324.**

(69)  There was a No Refund-No Return provision in the Founders Pack Agreement. **Exhibit 324.**

(70)  However, in practice, all Founders were allowed either a refunds or a transfer of the products and Founders' status to another Affiliate. **Exhibit 520, 524, 525, 527, 530, 532, 535, 536, 539, 876.**

(71)  The Global Ambassador Program was started on or about October 18, 2018, which required applications by each Affiliate. In pertinent part, the Program was:

   For only for extremely serious SBH Affiliates committed to be Long

   Term Global Foundational Leaders for SBH. SBH Global Ambassador

   Founders understand that this is a significant responsibility and will make SBH

a priority. SBH Global Ambassador Founders will lead by the greatest example. The main purpose of this program is to seek out the leaders that will help SBH become the #1 Direct Sales Company in the world, and as such, members of this program will put forth every effort to ensure this goal becomes a reality.

SBH Global Ambassador Founders will:

- Support the Mission, Vision, Values and Long-Term Goals of SBH.
- Will offer my skills and talents to help ensure the health and success of SBH.
- Will contribute significant efforts to establish local, national and international group presentations to build SBH.
- Will work with my sales team to continually promote and communicate pertinent information that will expand SBH's business globally.
- Will attend all SBH Company Sponsored Events and encourage my team to do the same.
- Will actively participate in all requests for my assistance in developing SBH's business globally.
- Will be fully committed to learning how to build a strong and long-term business with SBH. **Ex. 324.**

(72)   The Global Ambassador Program limited the number of Global Ambassadors to 600. "There will only ever be a total of 600 BH Global Ambassador Founders Pack available that are distributed per different regions of the world. The available distribution of SBH Global Ambassador Founders Pack per region will be as such:

- Price of Pack: $4,995 + $225 Shipping and Handling (S/H could be more for Participants outside of the USA. Amount S/H will be emailed to participant upon acceptance of Application).

- Participants who purchase a SBH Ambassador Founders Pack are entitled to the following rewards:

  o  Over US$5,500 of SBH Wholesale Product (includes at least $500 in Free SBH Products)
  o  Receive a Prestigious SBH Global Ambassador Founders Pin.
  o  Two hundred and fifty (250) FREE distinctive professional SBH Global Ambassador Founders Business Cards.
  o  30% Discount off all company sponsored SBH Live Training Events for LIFE.
  o  2 Months Free "Gold Level" Social Selling System Platform ($158 Value for Free).

- 1 Year Free Access to Perpetual MLM Money Machine
- INTERACTIVE VIRTUAL Training Platform ($695 Value for Free).
- 1 Free Ticket to the SBH 2019 Millionaire Workshop
- Receive an equal portion of the SBH Global Ambassadors

- Founders Pool consisting of 3% of the Total Monthly Global CV for 12 months after last pack is sold!

  - Any SBH Global Ambassador Founder that achieves 4 Star Diamond Affiliate Status will also be vested in the future SBH Retirement pool plan.

- Once all of the available SBH Global Ambassador Founders Packs have been sold, three percent (3%) of the CV generated GLOBALLY will be put into the Pool each month for twelve consecutive months.

- Participants will be paid from the Pool every month starting the following month after the last available SBH Global Ambassador Founders Pack has been sold, for a period of 12 months thereafter.

- The SBH Ambassador Founders Pack is priced at $4,995 (US) plus $225* Shipping/ Handling and has 5,000QV/2,500 CV Volume attached at time of purchase that flows through the 6 Tier Commission Plan.

**Ex. 324.**

(73) Each applicant for the Global Ambassador Program signed an Agreement and had to go through a rigorous 3 phase vetting process in order to be accepted. **Exhibit-324.**

(74) There were no requests for refund of money on the Global Ambassador Program before the TRO.

(75) In 2018 there were 676 affiliates who spent more than $1,000 at SBH. Those people spent $4,417.13 per year. **Exhibit 816.**

(76) In 2019 there were 951 affiliates who spent more than $1,000 at SBH. Those people spent $4,452.44 per year. **Exhibit 817.**

(77) In 2019 305 affiliates ordered 12 or more times, averaging 21.2. invoices (meaning that that these affiliates were not just purchasing packs) accounted for 56.7% of total sales. **Ex. 811.**

(78) Prior to ordering from SBH, affiliates had to agree to the terms and conditions. These terms and condition explained that pre-orders had longer shipping times than items that were in stock. **Ex. 2, 505, 522.**

**SBH Shipping Practices and Data**

(79) Jay Noland would make Facebook posts updating people on shipping dates for pre orders. **Ex. 526, 908-915, 917-918.**

(80) SBH delivered 99.88% of the orders that it received. Out of 26796, only 21 were unshipped. Those 21 were due to the Injunction by the FTC. **Exhibit 585.**

(81) In the early stages of SBH, many orders that were placed through SBH were "pre orders" and thus had a wait time of about 60 days or longer in some cases before they were delivered, which was explained to consumers prior to purchasing in the terms and conditions. **Ex. 2, 505, 522, 918-919; Testimony of Jay Noland.**

(82) To the extent there were complaints for late shipment on preorders, none of these individuals sought refunds.  To the extent that there was a request for a different product to replace the preordered product that request was fulfilled by SBH. **Ex. 583, 583-1, 907-8 through 907-53.**

(83) SBH initially had a Refund policy that allowed for refunds within fourteen (14) days of the date of the request.  **Ex. 2, 505, 522.**

(84) In or about December, 2017, some affiliates started charging back on credit cards used to buy Products from SBH. These affiliates were effectively getting the product, selling it for a commission and then getting banks to refund their entire purchase of products.

(85) SBH had a ticketing system it used for refunds, both for product purchases as well as packs. **Ex. 583, 583-1, 907-8 through 907-53.** In practice, SBH had a refund policy

throughout its operational time. SBH initiated 172 refunds to affiliates, and there were 90 total chargebacks. **Exhibit 588**

(86)   SBH encouraged affiliates to buyout founders who did not want to be apart of the founders program. SBH would make a ticket system for each founder that requested a buyout and would coordinate these buyouts with others looking to become founders. **Ex. 520, 523-527, 530-542, 534-536, 539, 583, 583-1, 587-588, 876, 878, 907-8 through 907-53.**

(87)   Even though SBH moved to a no-refund policy on purchase of products in January 2018, it often honored refund requests. Even after SBH implemented its no refund policy, it did issue refunds after an internal review of the request. **Exhibit 588 and 907-7.** Even after the "no refund" policy was implemented in January 2018, 146 refunds were issued. *Id.* The no-refund policy was implemented as a deterrent to chargebacks as opposed to deterring legitimate complaints. **Testimony of Jay Noland.**

(88)   SBH implemented the no-refund policy after some affiliates began to abuse the chargeback system. There were some affiliates who ordered product, kept product, and initiated chargebacks from the company – functioning receiving the products for free. **Exhibit 588**. SBH had 134 *total* chargebacks, but challenged many of them. **Exhibit 588.** In total, SBH won 44 of the cases regarding the chargebacks and the credit card charges were allowed to go through. *Id.*

(89)   On May 20, 2019, an attorney for SBH learned of CID requests and sent a letter to the FTC offering to discuss any questions or concerns that it had. The FTC advised Eisenstein that it would get back to him. **Exhibit 549.**

(90)   The FTC then filed its Complaints on January 8, 2020. Doc. 3

(91)   The FTC secretly contacted various SBH Affiliates as part of its investigation. Doc. 8 at

26.

(92)   Virtually all of the SBH Affiliates that complained to the FTC were part of Luke Curry's group. **Ex. 798-812.**

(93)   Luke Curry was a Senior Field Advisor  and Affiliate for SBH, who participated in various training sessions and Heat/Zone 1 Calls.

(94)   On or about March 2018, Curry was suspended for violating SBH's  fraternization policy. Curry was suspended as Field Service  Advisor for six (6) months but carried on as an Affiliate.

(95)   Curry appeared to take responsibility for his policy violation, but eventually resigned from SBH. After Curry resigned, SBH Affiliate supporters, such as Sye Head, informed Executives that Curry had been recruiting them to other ventures during his suspension period. **Testimony of Jay Noland, Sye Head.**

(96)   Members of Curry's  Team also resigned from SBH either the month before his resignation or within a month after his resignation**.  Exhibit 798-812.**

(97)   Members of Curry's Team are the SBH Affiliates who made complaints and were deposed or identified for trial.

(98)   The FTC either contacted or were contacted by the following Complainants who were declarants and/or deponents in this case. **Ex. 930-1 through 930-5.**

(99)   Some communications were made using each Affiliates SBH email.  Other communications are believed to have been made through Affilates' personal email addresses. **Ex. 930-1 through 930-5.**

(100)   As to communications between the FTC and each Complainant-Witness, the FTC did not ask, or did not specifically ask for documents to support any damages documents from: Wood/Moncayo, Eva Myrher, Kathleen Van Liere,  Elaine McMillan, Luke

Curry, Ballard, Sarzynski. **Ex. 930-1 through 930-5.**

(101)   Kaci Woods sent over eighty documents to the FTC but did not send documents supporting her claim of losses caused by SBH. **Exhibit 930-4 (Kaci Wood/FTC Email Comms)**

(102)   The FTC did not document or ask for documents or the identity of documents from the Complainants to support the alleged misrepresentation claims made by Eva Myhrer, Kathleen Van Liere and Elaine McMillian regarding their allegations that they were misled to join SBH or somehow misled and/or when they were misled after joining SBH through either training, written or verbal representations. **Ex. 930-1 through 930-5.**

(103)   The FTC asked for, and received documents from Kaci Wood but did not make specific requests for documents relating to damages. **Exhibit 930-4 (Kaci Wood/FTC Email Comms).** The FTC accepted unsupported hearsay from Kaci Woods regarding damages in preparing declarations to be submitted by Complainants to the Court.

(104)   Because the FTC failed to ask about documents supporting the number and amount of profit for retail sales for its witnesses, the actual claims made by Kaci Wood/Moncayo, Eva Myhrer, the Underwoods, the Underhills, Craig Ballard, and Krystian Sarzynski are riddled with statements that falsely understate their retail sales and embellish their claims that they suffered losses or made no profits. **Ex. 930-1 through 930-5.**

(105)   A comparison of the Complainant-Witnesses' actual SBH record of purchases generally indicates that each witness grossly misstated their retail sales because they bought different levels of packs and <u>continued</u> purchasing packs while sharing their enthusiasm and excitement about their retail sales on Facebook. **Exhibit 798-812**.

(106)   Virtually all the Complaining Witnesses were part of Luke Curry's group at SBH and many worked for him prior to joining SBH with Mr. Curry. ***See generally* Exhibits 927-**

**1 through 927-9; Testimony of Jay Noland and Scott Harris.**  These Affiliates included: Luke Curry, , Krystian Sarznyski, Kaci Wood and Jason Johnson. *Id.*

(107)   The direct as well as circumstantial evidence establish that the Complaining Witnesses were part of Luke Curry's Down-Team at SBH and that a number of the Complaining Witnesses worked with Luke Curry at Zija, another MLM company.  Testimony shows that members of Curry's Group were tightly knit and loyal to Curry.  His suspension and resignation caused discontent between the SBH and the Complaining Witnesses The Complaining Witnesses either resigned or were terminated either shortly before or after Curry resigned on October 22, 2018.

(108)   The FTC failed to provide damages calculations for individual complainants in this case relating any of the allegations that it makes in this case. Instead, the FTC relies upon presumptions to assume all net revenues of all or various parts of SBH's business should be the damages in this case. **Exhibit 824.**

**Kaci Wood & Daniel Moncayo**

(109)   Kaci Wood (SBH affiliate) & Daniel Moncayo (co-applicant -husband) worked with Sye Head and Luke Curry at Zija, an MLM company. **Testimony of Robert Mehler, James Noland.**  Moncayo moved to SBH with Luke Curry on May 3, 2018. *Id.*  **Exhibit 805.** Sye Head was Wood's up team and Curry was Head's upteam. **Testimony of Sye Head.**

(110)   Wood started with $49 membership and then purchased a Super Accelerator Pack, followed by a Founders Pack II. **Exhibit 805.**   She had monthly subscriptions to Latte, G-Burn , Chai Tea, G-Clear, as well as purchased multiple training programs- Strong XP, Think & Grow Rich Mastery course, and attended all major trainings including MVP in October, 2018. *Id.* She made 52 different orders in less than 6 months, so she was obviously retailing a lot of product. *Id.*

(111) Wood purchased $10,0748 in SBH products over 52 orders, earned $6,490.78 in commissions (and with a chargeback on products which she had received for $33.95- was overpaid $6,576.99 in total commissions. **Exhibit 805.** Wood used $2,166.58 of her commissions to purchase more products rather than take cash payment. *Id.* She received $1,121.65 in product credits and used $1,114.70 of them. *Id.* Wood indicated that her family consumed $1,500 of the $10,048 she purchased from SBH. **Exhibit 927-9.** Assuming that Wood-Moncayo sold the Products at the recommended 50% markup, they would have received roughly $13,000 in revenue in addition to their commissions of $6,491 for a total of almost $19,500.

(112) Ms. Wood made 28 Facebook posts on the SBH Heat page between May 18, 2018 and September 13, 2018. **Exhibit 805.** All her posts were extremely positive- welcoming new team members, announcing events, and mostly, announcing that she was having incredible success retailing products.- spending whole days with her team retailing. *Id.* She even showed pictured of her hands full of cash of cash from selling product at retail in public, saying that the dollars she brought home she would be investing in more product. *Id.* She was also on almost all Heat Calls and gave Zone 1 stories. **Testimony of Robert Mehler, Scott Harris, Sye Head.**

(113)     However, in her deposition, Ms. Wood testified, under oath, that she spent $30,000 on product and that the products were very hard to retail, and she was never directed to retail product, only to recruit. **Kaci Wood Deposition at 26- 28**. Ms. Wood's Facebook posts refute this testimony. **Exhibit 805.** Ms. Wood also testified that she threw $18,000 of product in the trash when she left SBH, yet she only purchased approximately $10,748. *Id.* at 35, **Exhibit 805.**

(114)   Kaci Wood admitted in a Declaration filed in the state court action that she intentionally perjured herself in a declaration that she signed for the FTC ijn this case. . **Kaci Wood Deposition** at 96, **Exhibit 920.**

(115)      All of Kaci Wood's orders were delivered per Stamps.com and warehouse documentation. **Exhibit 805.**

(116)      Ms. Wood denied talking to other Affiliates about the case, but Defendants have presented Facebook pictures of Ms. Wood celebrating occasions with other members of Luke Curry's team after she was terminated by SBH. **Exhibits 945-948.**

(117)   Daniel Moncayo is Kaci Wood's husband. **Moncayo Depo at** . Moncayo and Wood shared an account at SBH. **Moncayo Depo. at 4.**

(118)   It appears Daniel Moncayo submitted two different complaints to the FTC under three different names. **Exhibit 800.** In one of the complaints, under the name Daniel Wood, he said that he lost $40,000, which is the same number that Kaci Wood gave the FTC **Exhibit 800, Exhibit 930-4.**  There there is another FTC complaint under the name Daniel Wood for $5,000. *Id.*   SBH records do not show the name "Daniel Wood" as an affiliate for SBH. *Id.* Lastly, There is also a complaint submitted by "Omar Moncayo" claiming that he lost $2,000. **Exhibit 800, Testimony of Lina Noland.** Omar Moncayo was an affiliate who purchased $33.95 in product. *Id.*

(119)   In his deposition, Moncayo admitted to submitted false chargebacks due to the Curry situation. **Moncayo Depo. at 21.**  Moncayo also testified that they "never sell products." *Id.* at 4.  The Facebook posts and order history of Wood and Moncayo rebut this testimony. **Exhibit 805.**

(120)   Lastly, Moncayo submitted an affidavit in the Nevada case indicating that he was never misled by Jay Noland and SBH. **Exhibit 922.**

**Jason Johnson**

(121)   Jason Johnson(SBH affiliate) & Mikayla (kayla) were referred to SBH by Ben Livermore who left SBH, and Jason was personally referred by Luke Curry.  He joined SBH on October 24, 2017.  **Exhibit 803.**

(122)   Johnson started with $49 membership and then purchased a Founders Pack I, followed by 29 more orders including Accelerator Pack, Super Accelerator Pack,  and multiple other products including monthly subscriptions to Black Coffee and G-Burn. *Id.*   In sum, Johnson purchased $17,061 in SBH products over 30 orders, earned $7,069.88 in commissions and used  $1,595.06 in commissions for more products instead of receiving cash. **Exhibit 803.** He received $349.65 in product credits and used $339.75 of them.  *Id.*      The Court finds it difficult to believe that Johnson was buying products wholesale through SBH and was unable to make a profit through retail sales.  Assuming that Johnson sold the Products at the recommended 50% markup, he would have received $8530 in profit in addition to his commissions of 7,069.88 for a total of $15,600.

(123)   The Johnsons made many posts on the SBH FB page about being excited to receive their product shipments, having success with retail sales at gym events, traveling to Las Vegas to build their business, taking pictures with Curry Lighting cigars with "fake" $100 bills, reporting they were selling 6 bags of coffee per week as is the "gameplan", happy to be at the MVP event and to become Global Ambassadors. **Exhibit 803.**

(124)   Johnson purchased  a Global Ambassador Pack on October 19, 2018, at MVP and before Luke Curry resigned three days later on October 22 2018. **Exhibit 803; Testimony of Lina Noland and Jay Noland.** After the check was deposited in SBH's bank account, he contacted his bank and lodged a chargeback on the payment, right. **Testimony of Jay Noland.** After this, SBH contacted the warehouse to stop shipment on the Global

Ambassador Pack. *Id.* Johnson contacted Scott Harris claiming he paid for his Pack and he wanted his product shipped.  At the time of the call, Mr. Johnson knew that he had received his money back from the chargeback. **Testimony of Scott Harris.** Mr. Harris checked the records and determined that Johnson had been paid.

(125)    In his deposition, Mr. Johnson admitted to understanding the SBH commission plan and how to make money on the plan, further stating that he worked the business according to the plan. **Deposition of Jason Johnson at p. 28-29.** Johnson also testified that he understood the training and the purpose of SBH. *Id.* Johnson admitted that the trainings were worthwhile and also admitted to making some personally bad business decisions based upon how his business was progressing (leaving his other job (Paluy Construction) too early, draining his wife's 401K, and selling their house in Florida- all to try and bolster up a shaky business. *Id* p. 158-160.

(126)    Johnson was close to Luke Curry and filed a complaint with the FTC and continued to socialize with Curry after Curry resigned from SBH.  **Exhibit 945, 948.**

### The Underhills

(127)    Jason and Stephanie Underhill purchased $13,872.00 in products from SBH   **Ex. 818**

(128)    Jason and Stephanie Underhill received $922.65 in product credit, as well as a $386.90 for chargebacks from SBH.  **Ex. 818**

(129)    Jason and Stephanie Underhill received $8,879.92 commissions from SBH. $8,291.73 were paid to them, $371.15 were used to purchase product, and $588.19 were in their wallet at the time of the Injunction by the FTC.   **Ex. 818** Assuming that the Underhills sold the Products at the recommended 50% markup, they would have received roughly $20,000 in revenue in addition to their commissions for a total of about $29,000.From

May 1, 2018 through November 2, 2018, Jason Underhill purchases were made up of 30 different invoices. **Ex. 818**

(130)   Jason Underhill purchased only 3 packs from SBH, the other 27 purchases were either individual products or presentations.     **Ex. 818**

(131)   19 of 30 purchases by the Underhills were $60 or less. **Ex. 818**

(132)   All of the orders purchased by the Underhills were delivered. **Ex. 818**

(133)   The Underhills had events for retail sales that had at least 21 participants.  **Ex. 818**

(134)   The Underhills were positive in their Facebook posts. **Ex. 818**

(135)   The Underhills "hit" "SBA1" multiple times which means they retailed a certain threshold of product. **Ex. 818**

(136)   The Underhills did not provide any evidence to support damages, that they did not receive certain products, or documents relating to their retail sales to the FTC. **See generally Jason and Stephanie Underhill deposition.**

**Krystian Sarzynski**

(137)   Krystian Sarzynski purchased $3,898 over five different orders. **Ex. 813**

(138)   Sarzynski earned $2,966.80 in commissions. $2,591.60 were paid, and $375.20 were in the wallet at the time of the Injunction. **Ex. 813** Assuming that he sold the Products at the recommended 50% markup, he would have received $5,800 in revenue in addition to his commissions for a total of nearly $9,000.

(139)   Sarzynski made purchases from January 2018 through September 2018**. Ex. 813**

(140)   Sarzynki did not purchase a pack from SBH until his last order in September 2018. Sarzynski only purchased less than $1,000 worth of product from SBH. **Ex. 813**

(141)   All of Sarzynski's purchases were shipped.  **Ex. 813**

(142)   Sarzynski was SBA1 rank. **Ex. 813**

(143)   Saryznski was a part of Curry's Down-team. Sarzynski Depo. at 13.

(144)   Sarzynski did not provide documents to the FTC to support his damages in his declaration. **See generally Deposition; Exhibit 807.**

(145)   The FTC did not request any documentation to support his claims and damages. **Exhibit 930-3.**

(146)   Sarzynski defaulted in the Nevada lawsuit filed by SBH against him. **Exhibit 925-1**.

   **Susan Michelle Wilder**

(147)   Susan Michelle Wilder was the mother of Jason Johnson.

(148)   Susan Michelle Wilder purchased $11,166.00 in products from SBH.  **Ex. 816**

(149)   Susan Michelle Wilder made 39 different purchases from SBH.  **Ex. 816**

(150)   Wilder received $1,570,17 in commissions. $1,570.17 were paid. **Ex. 816**

(151)   Wilder purchased two packs. The other 37 purchases were individual products. Wilder did not purchase a pack with her first purchase with the company. Wilder did not purchase her first pack until 2 months after she became an affiliate. It was her sixth purchase from SBH.  **Ex. 816**

(152)   26 of Wilder's 39 purchases were for $100 or less.   **Ex. 816**

(153)   Wilder received all of the items she purchased from SBH. **Ex. 816**

(154)   Wilders 39 purchases spanned from November 2017 through December 2019. **Ex. 816**

(155)   Wilder often made positive Facebook posts about SBH and its products. **Ex. 816**

(156)   Wilder had a booth at the Legacy Fest Senior Expo where she retailed her product. **Ex. 816**

(157)   Wilder posted on Facebook about her retailing SBH products. **Ex. 816**. Her posts were always positive. Id.

(158)   Wilder did not provide the FTC any evidence to support her claims of expenses and losses in her declaration. **Exhibit 927-6.**

(159)   Wilder estimated that she consumed about $1,692 of the $11,166.00 that she made**. Exhibit 927-6.** Based on the 50% markup recommended by SBH, Wilder should have made roughly $15,000 in retail revenue, even though she only reported in her Declaration that she made $6,500 from such sales. *Id.*; **Testimony of Jay Noland.**

**Stephanie Barnhouse**

(160)   Stephani Jeux DeVine Barnhouse purchased $5,292.00 in orders from SBH.  **Ex. 811**

(161)   Stephani Barnhouse made 24 total orders from SBH.        **Ex. 811**

(162)   Stephani Barnhouse made $536.90 in chargebacks from SBH.        **Ex. 811**

(163)   Barnhouse earned $2,2308.52 in commissions. $2,288.92 were paid directly to her. $19.60 remained in her wallet at the time of the Injunction.        **Ex. 811**

(164)   Barnhouse purchased 2 packs. She did not purchase a pack until her fourth purchase with the company.        **Ex. 811**

(165)   21 of Barnhouse 24 purchases were less than $60.   **Ex. 811**

(166)   Barnhouse received all orders that she purchased from SBH.        **Ex. 811**

(167)   Barnhouse did not pay for any training.        **Ex. 811**

(168)   Barnhouse made positive posts on Facebook regarding SBH.        **Ex. 811**

(169)   Barnhouse up team leader was Kaci Wood (Moncayo).        **Ex. 811**

(170)   Barnhouse retailed her products and was encouraged by her up team leader (Kaci Wood) to retail her products.        **Ex. 811**

(171)   Barnhouse posted the link to her website on various Facebook groups to retail her coffee.        **Ex. 811**

(172)   Barnhouse did not provide the FTC any evidence to support her claims of expenses and losses in her declaration. **Exhibit 927-2.**

(173)   Barnhouse estimated that she consumed about $1,450 of the $5,292.00 that she made**. Exhibit 927-6.** Based on the 50% markup recommended by SBH, Barnhouse should have made roughly $7,200 in retail revenue. *Id.*; **Testimony of Jay Noland.**

### Craig Ballard

(174)   Craig Ballard worked with Luke Curry at Zija. **Testimony of Jay Noland**.

(175)   Ballard moved with Luke Curry when he joined SBH and Luke Curry was his up-team leader. **Testimony of Jay Noland.**

(176)   In or about October 2017, during the MVP Event in San Diego, Ballard had an issue with fraternization and Luke Curry was assigned to work though the issue with Ballard. **Testimony of Jay Noland and Scott Harris.**

(177)   Ballard and Luke Curry were friends as well as business associates. **Testimony of Jay Noland and Scott Harris.**

(178)   Ballard purchased $6,417 between coffees and nutraceuticals **Ex. 798**

(179)   Ballard received $338 in product credit and used $254.90 to purchased product. **Ex. 798**

(180)   Ballard's total commissions therefore came to $7672.05. **Ex. 798**

(181)   Ballard started with a Founder Pack. **Ex. 798**

(182)   Even though Ballard purchased a Founder's Pack with a large amount of product, he subscribed to automatic orders of G-Burn, Black Coffee, Latte, Fruit & Veggies, Ganoderma Essential, Aller-G-Stop, Life 120 and G-Clear. This subscriptions are volunteer and people who had that activated was because they usually were selling or consuming a lot of that product **Ex. 798**

(183)   On various FaceBook Posts, Ballard received all his product, was retailing at events and using the products for himself. He was also doing selling products for his daughter Ex. 798

(184)   On 12/1/17 he states "Got my 10 boxes of Latte and already have several boxes pre-sold" **Ex. 798**

(185)   On a post dated 9/28/17, Ballard stated that Crystal Rhodes, a member of his team submitted an application for a Founder Pack and immediately retailed 35 boxes of coffee. In many cases, or at least in this case, the coffee products were being sold before the products were shipped. **Ex. 798**

(186)   On 8/4/18 Ballad posts a picture of himself retailing at a farmers event.  The prices of each coffee he was selling. Black $3 (A box/pouch of black has 30 sachets or servings, times $3 equals $90 per bag. Affiliates purchase a bag of black for $20. This is more than 100% margin) Latte $4 (A box/pouch of Latte have 20 sachets or servings, times $4 equals $80 per bag. Affiliates purchase a bag of black for $22. This is more than 100% margin). These were the prices Affiliates were selling individual servings of the products at vendor events like farmer market, Gym, School games, expo shows, etc.  **Ex. 798**

(187)   On 8/6/18, Ballard posts on Facbook  stating that one of his team members was able to pay her car payment with retailing profits, in her first month in the business" and "then some". **Ex. 798**

(188)   Ballard was very active posting on the FB Heat Page from the start and even during and after his challenge in Sept 2017. Ballard's last date of activity on the FB Group is Oct 6. In his deposition, Ballard testified  said he resigned and stopped pursuing the business on Apr 2019. This is the same month that Luke Curry resigned from SBH.  **Ex. 798**

(189)   On Sept 2017 at the MVP Event in San Diego, Craig Ballard was the first one to violate the non-fraternization policy with an affiliate. Jay gave Luke Curry guidance on how to handle this and to make sure Craig understand the policy Craig and Tiffany both were suspended and they both signed a notarized affidavit accepting they did violate the policy. Mr. Ballard continued building his business. **Testimony of Jay Noland.**

(190)   Craig Ballard did not provide the FTC with documents relating to his damages, his retail sales, or his expenses associated with SBH. *See generally* **Exhibit 927-4; Deposition of Craig Ballard.**

**Crystal Bose**

(191)   Crystal Bose ("Bose") purchased $81 between coffees and nutraceuticals. She placed 2 orders on May 16, 2018 and later on September 28, 2018. **Exhibit 799.**

(192)   Bose's first order was placed on May 16, 2018, was shipped out on the 17th of May and delivered on 19th of May. **Exhibit 799.**

(193)   Crystal Bose was assisted through the SBH customer service system. On May 20, 2018. Lorenzo sent an email to Andrea informing that Crystal submitted a ticket claiming an issue with her Ganoderma Essential, claiming that the capsules were broke. **Exhibit 799.** Andrea Selby, Service Manager, requested pictures of it and identify the batch. *Id.* On May 21, 2018 Crystal submitted pictures, Andrea Selby copied Lina Noland on the emails and asked for her approval to replace this bottle. *Id.* On May 22, 2018, Ms. Noland instructed Andrea Selby to send the invoice to warehouse and also requested the warehouse to send out a replacement bottle of Gandoderma Essential.

(194)    There is no evidentiary support for any claims, damages, retail or representations that purportedly occurred during Ms. Bose's time at SBH. **Exhibit 927-8.**

(195)  On November 22, 2018, Bose sent another ticket saying she could not log into her back office.  Bose requested that she be terminated on November 15, 2018. Once an affiliate is terminated, the Affiliate's account goes to an "arcade system" that only IT can recover. After several emails, Andrea let Lorenzo Valentini  know that Bose had $14 in commissions,  When she requested cancellation, Bose didn't did ask for her commissions or used it in product. Andrea told Bose that she could not pay the $14 in commissions. At that time, Bose told Andrea that she was going to report SBH.

(196)  Attached is the FB Post where Kaci Wood introduced Bose to the FB SBH Group. **Ex. 799**

(197)  Bose did not provide the FTC with documents relating to her damages, her expenses, or her retail sales associated with SBH. **Exhibit 927-8.**

**Kathleen Van Liere**

(198)  In or about November 2017, Kathleen ("Kat") Van Liere ("Van Liere") met and reconnected with Jo Dee Baer while Van Liere was serving as a flight attendant, her main occupation. **Testimony of Jo De Baer.**

(199)  Van Liere expressed an interest in Jo Dee Baer's involvement with SBH. **Testimony of Jo De Baer.**

(200)  Baer talked at length with Van Liere about the business, her ability to sell products, the different training and options to purchase SBH products for resale, and maintain her schedule as a flight attendant. **Testimony of Jo De Baer.**

(201)  Van Liere expressed an interest in coming into SBH with a Founders Pack and persuaded Baer that she had the contacts and time to devote to selling SBH products. **Testimony of Jo De Baer.**

(202)   Baer advised Van Liere about SBH's terms and conditions, the Starter's Pack, Super Accelerator Pack and the Founder's Pack. **Testimony of Jo De Baer.**  Baer also told Van Liere that there was no  guarantee that she would make any particular income and that her income would depend on her time, energy and sales skills. Id.

(203)   On or about November 28, 2017, Van Liere purchased a Founder's Pack and posted a "hello" type message on SBH's Facebook Live page. **Testimony of Jo De Baer.**

(204)   Based on her prior friendship with Van Liere and Van Liere's people skills and interest, Baer believed that Van Liere would do quite well with the SBH opportunity.  **Testimony of Jo De Baer.**

(205)   Baer  and Van Liere became were friendly enough were closed that Baer personally stayed overnight in Van Liere's Condo. Baer made two (2) trips to Denver to work with Van Liere, help her sell retail, and build her business. Baer also created a flight attendant marketing campaign for Frontier Airlines colleagues, drove down to the Orlando to meet Van Liere to set it all up.  **Testimony of Jo De Baer.**

(206)   Two months after purchasing her Founders Pack, Van Liere started ordering additional products with invoices being issued January 14, 2018, January 28, 2018, February 14, 2018, February 19, 2018, March 19, 2018, and April 29, 2018  Ex. 806.

(207)   During that time, Van Liere was working closely with Jo Dee Baer on retail sales and how to grow her business. **Testimony of Jo De Baer.**

(208)   On February 1, 2018, Baer and Van Liere exchanged emails about different people in the SBH organization.     **Ex. 806.**

(209)   On February 27, 2022, Baer sent Van Liere an email encouraging Van Liere and telling her:  I KNOW it gets overwhelming at times! I'm here to be your marietijg arm!!  You donh't need to got it alone…I just wanted o tell you this on an email: since this too long

for a textg---Give me the times off this weekand We'll figure out a time?... Looking

forward to it my dear!" **Ex. 806.**

(210)   On March 1, 2018 Van Liere sent an email apologizing for her actions relating to

SBH. **Ex. 881.**

(211)   At the end of April, 2018, Ms. Van Liere became ill. **Testimony of Jo De Baer.**

(212)   On May 20, 2018, Van Liere also wrote Baer stating:  "I'm flying in on the 28th of may-

-- what is your schedule that week? ALSO-- I have the beginning stages concept with

Dr. Jim that I would like you to be in on the inside? I'll explain in person. thanks for

letting me know your schedule and the blue-green algae should be here in two weeks do

you want me to bring some energy bites?... Hope we can have some quality time

together!" **Ex. 806.**

(213)    "I'm sending you this email first since you brought me into the program. I realize I'm

going to loose all the money I've put in so far, but I have to cut my losses and not get in

any deeper." *Id.*

(214)   On May 30, 2018, Van Liere advised Baer that she was not going to attend the "Boot

Camp" in June 2018 stating:  "I really need to keep my priorities straight and SBH is no

my highest priority.  I truly love the product. I should have never been a Founder,

especially after reading what you sent me.." **Ex. 806.**

(215)   In the same May 30, 2018 email, Van Liere states: "In SBH terms, I'm a Number 1. If

they'd let us sell retail from our websites, I think I could have stayed motivated, but that

wasn't the case. Even Steven, the flight attendant you met, is frustrated that he couldn't

sell retail from his website and it's strained our friendship. We both love the products,

but we can't carry bags of coffee to sell…  I will buy product for myself as I need it and

I may refer someone but that will not be my focus. I don't plan to grow an SBH

business.  If you can still help sell more of my tickets to the Bootcamp, I'd be truly grateful. As I told you before, I've only been paid for two of the 6 tickets." *Id.*

(216)  Following this email, Baer volunteered to help both her and her friend Steven build build a retail website for her business, but Van Liere declined.  Baer sold Van Liere's Boot Camp tickets. **Testimony of Jo De Baer.**

(217)  On July 3, 2018, Baer wrote Van Liere regarding "Founder Transfer"  **Ex. 806.**

(218)  Van Liere did not complain to Jo Dee Baer that Jo De Baer or SBH misled her. **Testimony of Jo De Baer.**

(219)  Baer concluded that Van Liere simply decided that even though she originally thought she could, through her airline connections and social skills that SBH was a good fit. However, the combination of her illness and the physical demands of her job as a flight attendant led her to discontinue working for SBH. **Testimony of Jo De Baer.**

(220)  Van Liere purchased $5,034.00 worth of product. She received $602.30 in commissions, of which $585.80 was paid. $16.50 remained in her wallet at the time of the injunction. Van Liere made 10 different purchases and all of them were delivered to her. She made all her purchases between November 28, 2017 and April 28, 2018. **Ex. 806.**

(221)  Van Liere did not supply the FTC with documents relating to her expenses, damages or retail sales in support of her statements in her declaration. **Ex. 927-7.**

(222)  Van Liere estimated she consumed $1,000 (or less) of the products she purchased. **Ex. 927-7.** Van Liere should have made $6,000 in revenue from her retail sales, despite the fact she claimed she made *no retail sales* of the product. *Id.*, **Testimony of Jay Noland.**

(223)   After Luke Curry's resignation however, each of these Complainant Witnesses resigned or were terminated.   In addition to them joining with Curry in filing complaints with the FTC, some of them engaged in a campaign of character assassination of J. Noland.

**Exhibit 314.**

(224)   On December 12, 2018 Noland and SBH filed a Complaint against the Witness Complainants in Clark County, Nevada alleging defamation, interference with contract seeking an injunctive relief against Curry. **Exhibit 321.**

(225)   On November 13, 2018 The Clark County Court granted a TRO against Curry, and Curry Enterprises, LLC. **Exhibit 928.**

(226)   Kaci Wood signed an Affidavit in the Clark County Action apologizing and retracting her defamatory statements about J. Noland.  **Exhibit 920.**

(227)   Daniel Montoyo signed an Affidavit in the Clark County Action retracting his defamatory statements about J. Noland.  **Exhibit 922.**

**FTC Failure to Investigate and Communications with Complainants**

(228)   The FTC apparently failed to analyze each Witness Complainants' actual purchasing history to determine whether they purchased SBH Products regularly, as that fact would have indicated that the Complainant sold their prior inventory and needed additional Products to make money.

(229)   The FTC also failed to ask any of the Complainant Witnesses to produce documents showing their retail sales and how much money they actually made per item, whether items were sold at trade shows or other events. **Ex. 930-1 through 930-5.**

(230)   The FTC had email communications with Luke Curry from December 18, 2018 through September 13, 2019. **Exhibit 930-2.**

(231)   Curry was a Senior Field Advisor in SBH and should have been a wealth of knowledge for the FTC to learn about how SBH functioned. **Exhibit 509.**

(232) On one of the last email communications with Mr. Curry, on July 22, 2019, 8 months after the original communication with Mr. Curry, the FTC asked Mr. Curry for "any documents you have." *Id.* at 2. The FTC did not specify what documents it requesting.

(233) The FTC did not ask Luke Curry about his experience or ask to put his experience in narrative form. *Id.* It is not clear whether Curry provided any documents to the FTC in response to any requests. *Id.*

(234) The FTC had four (4) email communications with Krystian Sarzynski from March 27, 2019 through June 27, 2019. It appears the FTC had two conversations with Sarzynski. There is no evidence in the email communications that Sarzynski provided the FTC with any documents. The FTC did not ask Sarzynski for documents or information regarding his retail sales, communications with other affiliates, representations made by SBH, or his experience in SBH. **Exhibit 930-3.**

(235) Out of all of the complainants, the FTC had the most communications with Kaci Wood. **Exhibit 930-4.**

(236) Kaci Wood complained to the FTC that she lost "40,000" even though in her own declaration she testified that she only lost $10,384. Ms. Wood reported only  $1,800 in retail sales. *Id.*, **Exhibit 927-9.**

(237) There are no emails from the FTC asking Ms. Wood for documents, although she did provide some to the FTC. **Exhibit 930-4.**

(238) The FTC did not ask Wood to provide documentation for the expenses that she claimed, how she kept track of her retail sales, or about what she reviewed when she became a member of SBH. *Id.*

(239) Mary Kay Kralapp has communications with the FTC between February 26, 2020 through May 4, 2020. **Exhibit 930-1.**

(240)   It appears that the FTC had one phone conversation with Ms. Kralapp. *Id.* at 16.

(241)   In the emails prior to this phone conversation, the FTC did not ask Ms. Kralapp for any documents or information regarding her time at SBH. The FTC did not ask for information relating to her expenses, retail sales, recruitment, or representations made to her by SBH. *Id.* The FTC had one phone conversation with Ms. Kralapp in April 2018 and wrote a declaration based solely on the phone conversation. *Id.* In the emails after the April phone conversation the FTC did not ask Ms. Kralapp for any documents verifying the information that was in her declaration. *Id.*

(242)   Similarly, the FTC spoke to Jessica Ibrahim in a very limited basis. **Exhibit 930-5.** Other than what Ms Ibrahim attached to her declaration, it is not clear that Ms. Ibrahim provided any other documents was asked or provided to the FTC. Similar to the FTC's other communications with other complaining affiliates, there is no critical look into what documents were provided, nor specific requests for communications, documents and other information that would shed light on how much Ms. Ibrahim retailed, who she communicated with, and what representations by SBH were made to her specifically. *Id.*

**Subpoenas to SBH Affiliates**

(243)   In contrast, the FTC subpoenaed various witnesses affiliated with SBH including Jo De Baer (Exhibit 979 at 21), and Robert Mehler, Exhibit 979 at 27) The subpoenas ask for:

1.All communications (on or after January 13, 2020) with James D. Noland, Jr., Lina Noland, Scott A. Harris, and Thomas G. Sacca that relate to Success By Media LLC, Success By Media Holdings Inc., Success By Travel, Voz Travel, or any other business venture.

2. All communications (on or after January 13, 2020) <u>with other Success By Health Affiliates that describe or relay the contents of any communications with James D. Noland, Jr., Lina Noland, Scott A. Harris, and Thomas G. Sacca</u> that relate to Success By Media LLC, Success By Media Holdings Inc. Success By Travel, Voz Travel, or any other business venture.

3. <u>Documents sufficient to show</u> your revenues from retail sales of Success By

<u>Health products.</u>

4. <u>Documents sufficient to show your costs (outside of the cost of products) of</u>
<u>making retail sales of Success By Health products, including the cost of office</u>
<u>space and product shipping.</u>

5. <u>Documents sufficient to determine how much money you have spent to</u>
<u>attend</u>
each Success By Media LLC (including Success By Networking, Success By
Health, and Success By Coaching) "<u>training" or other event</u>—including the cost
of event tickets, airfare, hotels, and other travel expenses.(emphasis supplied)

(244)   The subpoenas provide an instruction:

**Scope of Search**: This Subpoena covers documents and information in your
possession or under your actual or constructive custody or control, including
documents and information in the possession, custody, or control of your
attorneys, accountants, directors, officers, employees, service providers, and
other agents and consultants, whether or not such documents or information
were received from or disseminated to any person or entity.

(245)   Except for an email request to Kaci Woods generally asking for documents, the
FTC did not request the Complaining Witnesses to provide any documents,
including but not limited to documents relating to their Affiliate-to-Affiliate
emails, their retail sales or their costs of doing business.

(246)   The Court finds that the FTC had a duty to require Complaining Witnesses to
provide documentation of damages and provide emails regarding any bias or
motive they had to make complaint against SBH and its principals.

(247)   Dr. Bosley's report was provided to the Court on January 8. 2020.  Doc. 8-21. The
actual subpoenas to Mehler and Baer were dated June 11, 2020.  Dr. Bosley did
not have the documents and information provided by these two witnesses.  The
evidence shows that other witnesses were subpoenaed and produced responsive
documents regarding each Affiliate's communications with other Affiliates, their
retail sales and their costs of doing business.

(248)   The Complaining Witnesses did not provide documentary support for their retail sales and did not provide documentary support for their costs and expenses of doing business.

(249)   Dr. Bosley did not have actual data from which retail sales by Affiliates could have been calculated because all of the information obtained from Mehler, the Sherfields, and other affiliates who supported SBH were gathered after her January 2020 report. **Exhibit 25.** Dr. Bosley provided no supplemental report to account for such data.

(250)   The FTC could have, but failed to request the Complaining Witnesses provide emails and documentary proof of their damages.

(251)   The FTC could have, but failed to demand that the  Complaining Witnesses provide emails and documentary proof of their damages.

(252)   If necessary, the FTC could have, but failed to subpoena the  Complaining Witnesses for their emails and documentary proof of their damage

**Noland Has Coached and Trained Other Millionaires**

(253)   Jay Noland has helped train people who succeeded such as Holton Buggs, who then poached a bunch of distributors without my knowledge, yet continued to follow my foundational training methods and made them successful. **Jay Noland Testimony.**

(254)   Jay Noland has trained Edward Haynes, who was an Organo Gold distributor who made a reported $1,000,000 in six months in 2019.  Mr. Haynes was recruited by Mr. Buggs to go to Organo-Gold.  **Ex. 550, 551, 554.**

(255)   Business For Home is a recognized industry publication that reports commissions paid to affiliates and others in the MLM industry. Eight of Organo Gold's top

earners reported income exceeding $1,000,000 per year. **Jay Noland Testimony**; **Ex. 502.**

**Noland Believed His Wealth At The Time the Statements Were Made**

(256)   Jay Noland is still one of the owners of OrGano Gold to this day. Noland formed a partnership with Shane Morand and Bernardo Chua in 2008 to market and sell coffee and other products through multi-level marketing. In May 2008, the three incorporated as Organo Gold Enterprises, Inc.  A stock certificate of the shares Jay Noland has through a Canadian Corporation, Tsalach Investment Holdings, Inc**. Exhibit 500**.

(257)   Jay Noland personally recruited Holton Buggs into his company 3K Marketing.  By November 2009 global sales exceeded $2 million and in 2011, Organo Gold's global sales exceeded $200 million per annum.  **Exhibit 504**; **Jay Noland Testimony**.

(258)   Mr. Noland has filed a lawsuit to secure his shares of OrGano Gold. **Exhibit 501.** While this lawsuit is not active, At the time of the breach of our agreement by the other owners, Jay Noland was making about $60,000 per month, which put him on track to make millions with the company.  Attached is the expert witness report issued by Grant Thornton showing that, as of November 5, 2012 Noland's shares in OrGano Gold are worth $47,200,000.  **Exhibit 504.**

(259)   J. Noland believed that he was a millionaire despite the fact that he was in a lawsuit to prove his entitlement.

**VOZ**

(260)   Around April of 2019, Tony Potter and Jay Noland began to structure out how SBH would roll out our travel program. Noland pulled in Scott Harris and Matthew Guccione (our company COO) to also assist in the research. In or about

April-May, 2019, SBH started developing VOZ and created a PowerPoint that shows our business plan. **Exhibit _; Testimony of J. Noland and Tony Potter.**

(261) In early October 2019, SBH started talking to Advantage Services and building on the VOZ Travel concept that SBH had already started earlier in the year. SBH and Advantage Services began together to build out the travel booking technology behind VOZ. SBH began taking VOZ Travel Product Pack pre-orders from SBH affiliates around early October 2019 as well. In exchange for SBH Affiliates pre-ordering the VOZ Travel Product Pack, we offered substantial discounts (as much as a nearly $1,000 discount) and offered additional free services, benefits, and a free high-level special travel industry training. **Testimony of J. Noland**.

(262) In December 2019 SBH approached Advantage Services about a white label deal. This deal was going to push back the launch date of VOZ, which was an issue that Noland was not sure was worth it. **Testimony of J. Noland**. On December 20, 2019 SBH moved forward with the white labeling project. *Id.* The original beta testing for VOZ was slated for December 23, 2019, but this was also pushed back due to the white label project. *Id.* On January 3, 2020 an agreement was reached with Advantage Services regarding the white label project. **Exhibit 556.**

(263) However, there was issues with the owner of Advantage Services and SBH. **Exhibit 557.** Due to this SBH began talks with a new provider in case the deal with Advantage Services fell apart. **Exhibit 558.** At the time of the injunction Advantage Services was still in a contract with SBH to finish the white label job. **Exhibit 559.** However, by February 20, 2020 the deal was terminated and VOZ never got off the ground. **Exhibit 563.**

**Receiver Issues**

(264)   The Receiver did not operate SBH for about four months after her appointment.

(265)   In or about March 2020, Dr. James Maranakis made an offer to the receiver in March, 2020 to buy the remaining product for $1.8 million. **Testimony of Dr. Maranakis** (Doc. 430-1).

(266)   On May 11, 2020, the Receiver posted a message to every affiliates back office. **Ex. 564.** This letter had a chilling effect on purchasing and selling products because of the language by the receiver. **Testimony of Robert Mehler and Jo Dee Baer.**

(267)   After the Receivers letter on May 11, Dr. Maranakis made another offer of $1.5 million, in line with the 10% discount she had offered to SBH affiliates. **Testimony of Dr. Maranakis.** The receiver rejected both of these offers. *Id*

(268)   The receiver also had problems with shipping products. There were numerous complaints from SBH affiliates that they had not received the product for which they ordered and paid for via ACH. **Exhibits 565-568.** The product took weeks, and even months, to be received by SBH affiliates even though product was in the warehouse ready to be shipped. *Id.* In short the receiver's failures severely dampened any ability or drive for Affiliates to purchase product.

(269)   Prior to shipping of the products, Jay Noland and Scott Harris made the Receiver aware that she needed to purchase insurance at the warehouse to protect the product. **Exhibits 835 and 837.** The receiver did not renew the insurance because it was not necessary to operate SBH. **Ex. 837.** Ultimately, much of the product was damaged in a flood and because the receiver did not have insurance, this product was lost. **Testimony of Jay Noland**.

(270)   Additionally, the receiver allowed data and information to spoil. Defendants contend that the Warehouse computer definitively tracked the sale of all products shipped, to who as well as delivery dates on preorders and any other products but it was not preserved by the FTC or the Receiver in this case. The receiver never received this computer. **Exhibit 875.** If anyone complained about anything, such as a request for refund, a late or missing delivery, the ticket was processed and people were assigned to track the request from beginning to end. **Testimony of Lina and Jay Noland.** The Receiver discontinued the $45/month payment to supportsystem.com. On or about January 25, 2020, J. Noland tried to pay the monthly charge, but was locked out of the system (as an administrator) and was unable to pay the fees, resulting in loss of this critical data. **Testimony of Lina and Jay Noland.**

**FTC's Unwilling to Cooperate with Individual Defendants**

(271)   The FTC has shown no sign that it intends on effectively working with Jay Noland and other individual defendants in helping ensure future businesses are compliant with FTC law. For example, Defendants attorney has attempted to work with the FTC to launch a travel business that would have provided some money for any potential consumer redress. **Exhibit 877-1.** Defendants provided the FTC with many examples to substantiate its claim as well as offered a full access login so that the FTC could peruse the website and test any claims they believed was false. *Id.* The FTC did not take Defendants offer, instead stonewalled any efforts by continuing to ask for more information. **Exhibits 877-2 through 877-6.** Defendants continued to provide examples and information to the FTC, however it always claimed that the information was unsatisfactory, while failing

to provide any evidence for their point of view. *Id.* Moreover, the FTC is aware that the deals and packages that are generated through Defendants website are derived from a service provider, who has also indicate that it would assist the FTC with understanding the algorithms, insofar as it does not reveal key information its business practices. *Id.* This is additional evidence that the FTC is not working to protect consumers and foster an environment of fair trade practices.

## CONCLUSIONS OF LAW

As a threshold matter, the Court must address a jurisdictional issue raised by Defendants that affects the scope of this case.

Defendant Noland disputes the authority of the FTC to seek damages for violation of a twenty (20) year old injunction based on authority that it never had under Section 13(b). Authority to act pursuant to an act of Congress goes to the heart of subject matter jurisdiction.  Only Congress can confer subject matter jurisdiction for agencies, not the agencies themselves. *See Opera Plaza Residential Parcel Homeowners Ass'n v. Hoang*, 376 F.3d 831, 833 (9th Cir. 2004); *Axon Enter. v. FTC*, 986 F.3d 1173, 1178 (9th Cir. 2021); Doc. 3 (FTC Petition states that Congressional Statute provides Court with Subject Matter Jurisdiction).

The Supreme Court's decision *in AMG Capital Management v FTC*, 141 S.Ct. 1341 (2021) foreclosed the ability of the FTC to seek monetary remedies for violations of Section 5, such as the allegation that contemnors operated an illegal pyramid scheme. In deciding *AMG*, the Court rejected the Commission's interpretation of Section 13(b) on the basis that a provision allowing injunctive relief to restrain and enjoin unfair and deceptive practices was not authorized and circumvented authority granted by Congress to seek monetary relief in Court pursuant to Section 19. *See Id.* at 1349. This Court has already foreclosed any damages the FTC could attain damages stemming from Defendants alleged illegal pyramid scheme. Doc. 325 at 1.

Section 5 of the Act does not define the term "consumer." Based on the plain meaning of the "consumer" is is readily apparent that Section 5 of the Act that the term "consumes"  does not extend to "Affiliates" and independent contractors for SBH.  Defendants point out that: (1) the FTC alleged that consumers were induced to become Affiliates through misrepresentations regarding their income potential; and thus  (2)  any monetary or injunctive relief cannot be granted after the "consumers" became "Affiliates."

The Court concludes that Defendants have the better argument on this legal issue.  Neither Section 5 nor the enforcement rules, Section 13(b) and Section 19 provide definitions for who is, or who is not a "consumer" for purposes of enforcement. *Joffe v. Google*, 729 F.3d 1262, 1267 (9th Cir. 2013). "When terms used in a statute are undefined, we give them their ordinary meaning."); *Id.*; *United States v. Daas,* 198 F.3d 1167, 1174 (9th Cir. 1999) ("If the statute uses a term which it does not define, the court gives that term its ordinary meaning."). The ordinary meaning of "affiliate" in the legal context can refer to different types of affiliations through all sorts of industries. Affiliate: Definition in Corporate, Securities, and Markets (investopedia.com) A "Retail Affiliate" refers to one company that becomes affiliated with another to sell its products or services for a fee. Id.  A "consumer" is defined as "a person who purchase goods and services for personal use." consumer definition - Search (bing.com)

In addition to construing the plain meaning of terms used in the statute, the Court may also rely on other provisions of the statute that define who or what a consumer is or is not.  *AMG*, 141 S. Ct. at 1347-48; *See Wilson v. Bruks-Klockner Inc*. 602 F.3d 363 (2010) (analyzing statute by reference to other statutes). SBH sales to Affiliates were not "sales" to consumers, as defined in 15 U.S.C. § 2301(3). Congress defined "consumer", in pertinent part: "**(3)** The term "consumer" means a buyer (other than for purposes of resale) of any consumer product, any person to whom such product is transferred during the duration of an implied or written warranty (or service contract) applicable to the product,…." (emphasis supplied).  Section 13(b) broadly allows injunctive relief, but is limited by Section 45(n)'s plain language that an act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers

themselves and not outweighed by countervailing benefits to consumers.

SBH operations were focused on resale of products to Affiliates, as memorialized in its Terms and Conditions. **Exhibit 507 and 522.**  While the FTC points out that §2301(3) appears to be limited only to the warranty provisions of the Act, the plain language in Section 45(n) amplifies and supports the Congressional intent to assure that relief was provided only to "consumers" under Section 5 under the Act.  Section 45(n) provides:

> (n) The Commission shall have **no authority** *under this section* or section 57a of this title to declare unlawful an act or practice on the grounds that such act or practice is unfair unless the act or practice causes or is likely to cause <u>substantial injury</u> to <u>consumers</u> which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to <u>consumers</u> or to competition. In determining whether an act or practice is unfair, the Commission may consider established public policies as evidence to be considered with all other evidence. Such public policy considerations may not serve as a primary basis for such determination. (emphasis supplied)

The provision basically restates the principle that consumers must act reasonably under the circumstances to avoid injury and that they cannot get a windfall by purchasing and reselling products for a profit.

The FTC cites to legislative reports.  However, the FTC's reliance on legislative history is misplaced.   It is axiomatic that legislative history cannot defeat the ***plain meaning*** of a statute. *See Exxon Mobil Corp. v. Allapattah Servs., Inc.,* 545 U.S. 546, 568 (2005)  It is well axiomatic that: "[T]he authoritative statement is the statutory text, not the legislative history or any other extrinsic material. Extrinsic materials have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms.... [L]egislative history is itself often murky, ambiguous, and contradictory. Judicial investigation of legislative history has a tendency to become, to borrow Judge Leventhal's memorable phrase, an exercise in 'looking over a crowd and picking out your friends.'"

> As we have repeatedly held, <u>the authoritative statement is the statutory text</u>, **not the legislative history** or any other extrinsic material. Extrinsic materials have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms. Not all extrinsic materials are reliable sources of insight into legislative understandings, however,

and legislative history in particular is vulnerable to two serious criticisms. First, legislative history is itself often murky, ambiguous, and contradictory. Judicial investigation of legislative history has a tendency to become, to borrow. Second, judicial reliance on legislative materials like committee reports, which are not themselves subject to the requirements of Article I, may give *unrepresentative committee members—or, worse yet, unelected staffers and lobbyists*—both the power and the incentive to attempt strategic manipulations of legislative history to secure results they were unable to achieve through the statutory text. We need not comment here on whether these problems are sufficiently prevalent to render legislative history inherently unreliable *in* all circumstances, a point on which Members of this Court have disagreed. It is clear, however, that in this instance both criticisms are right on the mark.  Id. at 568-569.(emphasis supplied).

The FTC's attempt to avoid application of basic principles of statutory interpretations should be rejected.

Because Affiliates are not "consumers", Section 45(n) precludes the award of damages or injunctive relief based on SBH's activities with its Affiliate independent contractors.

**Affiliates Were Independent Contractors**

The Court also concludes that the Affiliates were independent contractors.  Individual consumers have a right to enter into contracts to establish a business and affiliate with other companies to start their own business.     Many recognize that starting one's own business is an essential part of the "American Dream."  The FTC Act should not be applied to resellers because Congress intended a narrower application of the term "consumer;" The concept of independent contractor status is well developed and deeply rooted in Amer that is people who buy products and services for their persona use. It is also recognized that courts may not rewrite a contract for individuals/consumers unless there is a statutory basis for doing so.   Unlike most decisions about illegal pyramid schemes, SBH established a business that dealt only with Affiliates who signed contracts acknowledging that they were independent contractors owning and operating their own businesses and exercising their own business judgment.  The Up-Team and Down-Team structure was *advisory ----not supervisory*. Up-Team leaders provided guidance and training and did not instruct people to maintain a minimum level of sales or auto-order a minimum quantity of inventory. Indeed, everyone had freedom of choice---the choice to participate in SBH training or not, the choice to order inventory or not. For their annual fee, affiliates received a website, back office for managing

46

their business and tracking of orders, merchant processing services, drop ship services, and access to further skill development if they chose to pursue the SBH opportunity.

Affiliates agreed to resell the Products through direct consumer sales, handle shipment or other issues and, in exchange for their $49 annual fee, were provided with their "back office," which included an individual website for each Affiliate or their Company to sell Products to retail customers, order and track their orders from SBH, and correspondence as well as training sessions available to each Affiliate.  Before placing *any order* for Products, Affiliates were required to re-acknowledge that they understood and agreed to SBH's Terms and Conditions.  Affiliates were independent contractors that worked as hard as they wanted, whenever and wherever they wanted, used whatever sales tools or techniques they wanted and made as much money as they wanted and achieved financial results based on their individual personality, social skills and business skills. Affiliates had the option of working with their Up-Team, developing their own Team, both or *neither*.

Affiliates were *not* required to report their direct retail sales to SBH.  Affiliates were advised to charge a 50% markup on all products to maximize their profits.  A portion of retail sales (reported as 31% of SBH revenues) were made through some Affiliates' SBH-created website, which became part of SBH's data base. These sales, however, belonged to each Affiliate, who received a 10% wholesale discount.  However, the vast majority of retail sales were direct sales made by Affiliates because the Affiliates made substantially more profit than referring a customer to their SBH website, where their only profit was 10% off the wholesale price.

Affiliates were free to sell to whoever they wanted, whenever, wherever and set their own prices.  The Company generally recommended that Affiliates charge 50% of the wholesale price to retail consumers, but they were not bound to do so.  Many affiliates went to vendor events where they sold coffee to consumers for $3.00/coffee. Each bag of black coffee contained 30 individually wrapped sachets. A bag of coffee would cost $20. Selling $3.00 a up would gross an affiliate $90 on a $20 bag.  Regular customers ("consumers") became interested in SBH Products and made repetitive orders with Affiliates, who ordered and purchased the Products, shipped the Products, were paid directly by the consumers, and worked directly with the consumers.

Affiliates were expected to exercise reasonable judgment in determining how much product to purchase based on the number of retail customers they could sell Products.   If Affiliates needed assistance, they could consult their Up-Team or other Affiliates.

The determination of this issue affects the Court's consideration of damages alleged by the FTC because the ultimate "consumers" making retail purchases from Affiliates are the <u>real</u> "consumers" in this case.  The FTC's failure to calculate damages "necessary…to redress injury to consumers," if any, for the retail sales is fatal to its case in both the FTC's case based on Sections 5 and its contempt case.   F.R.Civ.P. 26.   Moreover, injunctive relief cannot be imposed where, as here, the injunctive relief does not protect "consumers" under the Act.

**The Inherent Power of the Courts to Impose Contempt**

The Commission urges the Court to adopt the position that the Court may impose any judgment it pleases without regard to actual damages awarded in the parallel action under the FTCA.  Specifically, the FTC asks the Court to award the $7,000,000+ remedy previously sought under Section 5 violation (which was barred by AMG), but do so through a contempt judgment.

As this Court notes in its opinion denying the Plaintiff's Motion for Sanctions, "in light of *AMG Capital*, there are unresolved questions about the FTC's authority to pursue a compensatory civil sanction based on new § 13(b) violations that also violate an injunction issued in a previous § 13(b) enforcement action." Doc. 130 at 10.

To illustrate the issue, if *Netforce Seminars* had been decided pursuant to *AMG*, the FTC would not be able to seek damages relating to an illegal pyramid scheme in that action. Thus, it would follow that any potential violation of this injunction could not produce damages.[1] If the FTC now lacks authority, it would be inequitable and against public policy to seek damages for any new violations over which the FTC lacks jurisdiction.

---

[1] In fact, as stated earlier, the Court has already made it clear that the FTC does not have jurisdiction to seek damages relating to the alleged illegal pyramid scheme.

Federal appeals courts around the country have found that the court's jurisdiction to impose civil contempt runs concurrent with the court's subject-matter jurisdiction over the main underlying action. *AngioDynamics, Inc. v. Biolitec AG*, 823 F.3d 1, 7 (1st Cir. 2016); c*f. Lewis v. S.S. Baune*, 534 F.2d 1115, 1121 (5th Cir. 1976). The Court's ability to pursue contempt damages is limited to an amount ***in equal measure*** awarded in the primary or main action. *See AngioDynamics*, 823 F.3d at 7(emphasis supplied); *Green Point Credit, LLC v. McLean (In re McLean)*, 794 F.3d 1313, 1319 n.2 (11th Cir. 2015) (the contempt power, we noted that such a power was "equal" to and reflective of a court's power to issue an underlying order in the first place.); *cf. FTC v. Trudeau*, 579 F.3d 754 (2009). In sum, a Court's contempt power cannot exceed the original jurisdiction in the underlying or "main" action. For this Court to award damages for a claim that did not or could not award in the main or primary action violates basic principles of fairness and equity enunciated in *AngioDynamics* and *Green Point*.

[ALTERNATE CONCLUSION]   The Court concludes that it has jurisdiction to issue damages precluded in the primary action.  However, any damages sought "must of course be based upon evidence of complainant's actual loss." *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303-04 (1947). The Supreme Court has also ruled that civil contempt awards must be remedial and cannot be punitive. *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 828(1994). As it stands, the FTC has not brought forth any measure of actual damages, but relies solely on the presumption that it is entitled to all revenues from contemnors. Doc. 74, 106 (Contempt Action). This Court has warned the FTC that this "all or nothing" calculation does not take into account the inherent value of the product received by consumers. Doc, 130 at 6 and 9.[2] Awarding damages that goes beyond the scope of actual damages proved by the FTC would be

_____

[2] There is ample evidence throughout the record, and the FTC's complaining witnesses admit that consumers liked the product and regularly bought the product to consume as well as to sell. ___.

49

punitive. The central problem with the FTC's damages case is that they have not come forward with individuals who can actually prove that they lost money or suffered injury.   The Court's review of the evidence reveals that none of the Complaining Witnesses actually lost money, that they understated their retail sales and failed to provide any documentary evidence that shows that they lost money on their SBH activities.  Defendants contend that the Court should be guided by the FTC's failure to provide proof of damages in support of its contempt claims.

On summary judgment, the court made it clear that the FTC's "all or nothing" methodology was flawed because it did not take into account the inherent value of the products or address whether the FTC had evidence to prove that a damages award was necessary to redress consumer injury.  Doc. 438 at 7.  In sum, the determination of necessity to redress consumers is an individualized inquiry, just as the necessity to prove "actual damages."   As previously noted,, the Court cannot award damages that provide a windfall for consumers. *Id.* This is true regardless of whether the damages are for Section 19 or for actual damages in contempt.

The Court previously noted that, as to the Merchandise Rule, there was no evidence that there were damages due to delay.   Doc 438 at  7-9.  Similarly, the Court expressed concern that thee were no damages from violations of the Cooling Off Rule.  The FTC failed to present evidence at trial on these very issues.   This Court rejects the FTC's "all-or-nothing" approach to damages for the Merchandise and Cooling Off Rules because this approach does not comport with Section 19's mandate that damages must be necessary to redress consumer injury.  Accordingly, the Court grants judgment in favor of Defendants and against the FTC on damages on the rules violations.[3]]

**Discovery Issues**

Defendants contend that the FTC violated the MIDP and Rule 26 automatic disclosure

---

[3] The 2002 Order did not address either the Merchandise or the Cooling Off rules.

requirements.  The FTC contends that the discovery rules do not apply in contempt proceedings.

Defendants argue that the rules should be applied where, as here, the cases were consolidated for

trial.   There is some force to Defendants' argument.    If the FTC fails to provide evidence to

support its claims in one case, the sanctions for discovery abuse must be applied to the other case.

The FTC created a substantial number of problems through its failure to comply with its

automatic disclosure requirements under the MIDP and Rule 26.   The discovery issues in this case

are *extraordinary*.  First, the FTC contends that the Complaining Witnesses are third parties to this

action and that the FTC has no obligation to seek information from the Complainants about their

case.  The FTC prepared the Complaining Witnesses' declarations and appeared at depositions on

their behalf.  ***See generally* depositions of FTC Complainants; Exhibits 927-1 through 927-9.**

The FTC also contend that Defendants had the burden to subpoena each potential witness to obtain

discovery.  The automatic disclosures do not require that a party conduct discovery if dissatisfied

with the FTC's disclosures.  . *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106

(9th Cir. 2001). The burden of automatic disclosure is non-delegable, and the burden cannot be

flipped onto Defendants. *Id.*

The MIDP and Rule 26 apply to cases where a lawyer or an agency appear on behalf of a

class whether the action is brought in an agency action or under Fed. R. Civ. P. 23.  Although the

Complaining Witnesses are not on the caption of this case, the FTC brought an action on their

behalf with their knowledge, their consent and in response to their complaints which seeks

damages for and on their behalf.  There is no question that the FTC represents these Complaining

Witnesses in this case.

### A. The MIDP Responses

Among other things, the MIDP requires each party to"[p]rovide a computation of damages

for each category of damages claimed by you… and a description of the documents or other

51

evidentiary material on which it is based, including materials bearing on the nature and extent of the injuries suffered." Id. ¶ B(5), District of Arizona's Mandatory Initial Discovery Pilot Project ("MIDP") See D. Ariz. G.O. 17-08.  Doc. 509 at 5.  The MIDP further provides that[t]he discovery obligations addressed in this general order supersede the disclosures required by Rule 26(a)(1) and are framed as court- ordered mandatory initial discovery pursuant to the courts inherent authority to manage cases."  Id. at 1.  See also id. ¶ A(2).  *SiteLock LLC v. GoDaddy.com LLC*, 2021 WL 2895503, *5-6 (D. Ariz. 2021).

If the FTC violated the MIDP are violations of a court order and sanctions are controlled by Rule 37(b)(2)(A), which authorizes the imposition of sanctions for failing to obey a court order to provide or permit discovery.  "The Defendants bear the initial burden of demonstrating that the FTC failed to comply with the applicable disclosure requirement."  *SiteLock LLC* at *5-6 (D. Ariz. 2021).

The MIDP responses provided by the FTC addressed, in part, the identities of all persons likely having discoverable information and a fair description of the nature of :

> a.  The defendants and each corporate defendants current and former employees, independent contractors, and agents, each of whom defendants can more readily identify than plaintiff can. This also includes the "Affiliates" Of success by health. The information available to these individuals includes information about defendants business practices, marketing strategies,(including training scripts), Statements made to affiliates and to consumers being recruited to be affiliates, revenues, shipping times, invoices, and the structure of defendants businesses and operations, the identity of victims; **affiliates earnings from retail sales and from commissions**; affiliates total spending on SH products and services; Affiliates total costs and pursuing the SBH business opportunity; **statements made by affiliates to other affiliates** and to consumers being recruited to be affiliates; Personal consumption by affiliates….(emphasis supplied).

The FTC identified the names and addresses of persons who gave written and recorded statements relevant to any party's claims or defenses.  This included Jaimie Marquez,[4] Jessica Ibrahim, Crystal Myhrer Stephan Jeaux Devine Barnhouse, Mary K. Robbins Kralapp, Kaci Wood, and C raig Ballard. Stephanie Underhill.  Depositions of the following were taken:  Jaime Marquez, Jessica Ibrahaim Crystal Bose, Eva Myhrer,_ Stepani Jeaux Devine-Barnhouse, Mary K. Robbins-Kralapp;

---

[44] Jaime Marquez is not an SBH affiliate.

Kaci Wood, Craig Ballard, Stephanie Underhill and consumers listed in the FTC's Consumer Sentinel Database.   Review of the FTC production revealed emails in the SBH production revealed that there were no Affiliate-Affiliate communications relating to the case, or affiliate communications with Luke Curry.   Considering that virtually all the Complainants were on Luke Curry's up-team, and that all these people resigned either before or after Curry resigned on October 22, 2018, it is highly probable that Curry talked to them about his suspension and his resignation. Each affiliate seeking a refund of some sort has failed to produce documents relating to the retail sales.   It is impossible to cross examine each Affiliate about any claims of retail sales or personal consumption without their emails or communications supporting their testimony. Moreover, when an individual has an "axe to grind" against a company and the individual defendants over money, there is a _likelihood_ that the Complainants are embellishing or, at best, simply forgot to provide support for their alleged losses, or produce documents that undercut or contradict their allegations. Regardless of reason, the disclosure rules apply.

Similarly, the FTC also provided a list of the documents, "electronically stored information ("ESI"), tangible things, land, or other property known by you to exist, *whether or not in your possession, custody or control*, that you believe may be relevant to any parties claims or defenses. **Exhibit 824**.   "Control" is defined as the [d]documents are deemed to be within the possession, custody or control under Rule 34 if the party has actual possession, custody or control or has the legal right to obtain the documents on demand."   294 FRD 610, 613 (D. Kan. 2013).   Indeed, this is the standard followed by the FTC when it subpoenaed documents from SBH witnesses.

## B. The Testimony of the Complaining Witnesses Was Not Credible

The FTC filed this case on behalf of thousands of affiliates but did so without filing a class action under Rule 23.   Throughout this litigation, the FTC has implicitly if not expressly represented to the Court that its Complaining Witnesses are representative and typical of all the Affiliates.   The question is regardless of whether the Affiliates are typical and represent the class, are they credible?   These were the only witnesses presented to this Court.

As set out in the Findings of Fact, this Court finds the deposition testimony of the Complaining Witnesses to be incredible.  On one hand, they claim that they were misled by and induced to join SBH by income representations.  However, the Affiliates simply point to representations that were purportedly made by J. Noland or others well after they were recruited, and after working with their Team Leaders in sales and sales training on Heat calls.  Thus, the Court concludes that the Complaining Witnesses were not induced by income representations.  Moreover, the number of Heat/Zone 1 calls persuades the Court that SBH was committed to training Affiliates how to make retail sales.  Many of the Complaining Witnesses previously worked for Zija and other MLM companies; e.g. Luke Curry, Kaci Wood, Daniel Moncayo.  The testimony shows that these witnesses knew about MLM sales, how to make them and the potential for making money under SBH's commission plan.

The Court notes that Kaci Wood and Daniel Montoyo filed declarations in the state court action effectively retracting their allegations against SBH.  Both subsequently stated that they lied to avoid the cost of a lawsuit.  Lying under oath is a crime in Texas.   The Court rejects their testimony on that and other grounds that reveal that they were not candid to the FTC or to this Court.

Virtually all the Complaining Witnesses understated their retail sales, failed to  provide documentation to support their expenses and costs of doing business.  The Court reviewed the following testimony:

**Kaci Wood & Daniel Moncayo**

 Kaci Wood (SBH affiliate) & Daniel Moncayo (co-applicant -husband) worked with Sye Head and Luke Curry at Zija, an MLM company. **Testimony of Robert Mehler, James Noland.**  Moncayo moved to SBH with Luke Curry on May 3, 2018, when he joined SBH. *Id.*  **Exhibit 805.**  Sye Head was Wood's up team and Curry was Head's upteam.  **Testimony**

54

**of Sye Head.**

Wood started with $49 membership and then purchased a Super Accelerator Pack, followed by a Founders Pack II. **Exhibit 805.**   She had monthly subscriptions to Latte, G-Burn , Chai Tea, G-Clear, as well as purchased multiple training programs- Strong XP, Think & Grow Rich Mastery course, and attended all major trainings including MVP in October, 2018. *Id.* She made 52 different orders in less than 6 months, so she was obviously retailing a lot of product. *Id.*

Wood purchased $16,087 in SBH products over 52 orders, earned $6,490.78 in commissions (and with a chargeback on products which she had received for $33.95- was overpaid $6,576.99 in total commissions. **Exhibit 805.**  Wood used $2,166.58 of her commissions to purchase more products rather than take cash payment. *Id.*  She received $1,121.65 in product credits and used $1,114.70 of them. *Id.*

Ms. Wood made 28 Facebook posts on the SBH Heat page between May 18, 2018 and September 13, 2018. **Exhibit 805.**  All her posts were extremely positive- welcoming new team members, announcing events, and mostly, announcing that she was having incredible success retailing products.- spending whole days with her team retailing. *Id.*  She even showed pictured of her hands full of cash of cash from selling product at retail in public, saying that the dollars she brought home she would be investing in more product. *Id.* She was also on almost all Heat Calls and gave Zone 1 stories. **Testimony of Robert Mehler, Scott Harris, Sye Head.**

However, in her deposition, Ms. Wood testified, under oath, that she spent $30,000 on product and that the products were very hard to retail, and she was never directed to retail product, only to recruit. **Kaci Wood Deposition at 26- 28**. Ms. Wood's Facebook posts refute this testimony. **Exhibit 805.** Ms. Wood also testified that she threw $18,000 of product in the trash when she left SBH, yet she only purchased approximately $16,000. *Id.* at 35, **Exhibit 805.**

Essentially, Kaci Wood admits that she intentionally perjured herself. **Kaci Wood Deposition** at 96 S, **Exhibit 920.**

Ms. Wood denied talking to other Affiliates about the case, but Defendants have presented Facebook pictures of Ms. Wood celebrating occasions with other members of Luke Curry's team after she left was terminated by SBH.

Daniel Moncayo was married to Kaci Wood. Mr. Moncayo testified that he

### Jason Johnson

Jason Johnson(SBH affiliate) & Mikayla (kayla) were referred to SBH by Ben Livermore who left SBH, and Jason was personally referred by Luke Curry.  He joined SBH on October 24, 2017.  **Exhibit 803.**

Johnson started with $49 membership and then purchased a Founders Pack I, followed by 29 more orders including Accelerator Pack, Super Accelerator Pack,  and multiple other products including monthly subscriptions to Black Coffee and G-Burn. *Id.*  In sum, Johnson purchased $17,061 in SBH products over 30 orders, earned $7,069.88 in commissions and used $$1,595.06 in commissions for more products instead of receiving cash.  **Exhibit 803.** He received $349.65 in product credits and used $339.75 of them.  *Id.*   The Court finds it difficult to believe that Johnson was buying products wholesale through SBH and was unable to make a profit through retail sales.

The Johnsons made many posts on the SBH FB page about being excited to receive their product shipments, having success with retail sales at gym events, traveling to Las Vegas to build their business, taking pictures with Curry Lighting cigars with "fake" $100 bills, reporting they were selling 6 bags of coffee per week as is the "gameplan", happy to be at the MVP event and to become Global Ambassadors. **Exhibit 803.**

Johnson purchased  a Global Ambassador Pack on October 19, 2018, at MVP and before Luke Curry resigned three days later on October 22 2018. **Exhibit 803; Testimony of Lina**

**Noland and Jay Noland.** After the check was deposited in SBH's bank account, he contacted his bank and lodged a chargeback on the payment, right. **Testimony of Jay Noland**.  After this, SBH contacted the warehouse to stop shipment on the Global Ambassador Pack. *Id.* Johnson contacted Scott Harris claiming he paid for his Pack and he wanted his product shipped.  At the time of the call, Mr. Johnson knew that he had received his money back from the chargeback. **Testimony of Scott Harris.** Mr. Harris checked the records and determined that Johnson had been paid.

In his deposition, Mr Johnson admitted to understanding the SBH commission plan and the how to make money on the plan, further stating that he worked the business according to the plan. **Deposition of Jason Johnson at p. 28-29.** Johnson also testified that he understood the training and the purpose of SBH. *Id.*  Johnson admitted that the trainings were worthwhile and also admitted to making some personally bad business decisions based upon how his business was progressing (leaving his job too early, draining his wife's 401K, and selling their house in FL- all to try and bolster up a shaky business. *Id* p. 158-160.

Johnson was close to Luke Curry and filed a complaint with the FTC and continued to socialize with Curry after Curry resigned from SBH.  **Exhibit 945, 948.**

**The FTC Failed to  Show SBH Made Representations to Induce Consumers to Become SBH Affiliates and/or Created a Net Impression That Violates the Act and Continued to Violate the Act Thus Entitling the FTC To Damages.**

The FTC essentially argues that income claims were made in presentations to consumers that induced them to become SBH Affiliates, buy excessive amounts of SBH Products and then lose money because they could not sell the Products.   As framed by the FTC:  "The net impression from Defendants' advertisements was clear: join SBH, follow Defendants' instructions, and one can reasonably expect to make substantial, if not life-changing, amounts of money. "Financial freedom" was available, within 18 months, to consumers who chose to pursue it. Financial freedom meant, at a minimum, receiving monthly "residual income" of at least $20,000 per month without having to work." Citing the presumption of reliance and "widespread

1    misrepresentations, the FTC asserts that this Court must presume that consumers relied on these

2    misrepresentations before purchasing defendants' products or services.  Doc. ---at 67 citing *FTC v.*

3    *Figgie* at 606, *McGregor v Chierco, 206 F.3d 1378, 1388 (11th Cir. 2000) (contempt case)*.  At

4    that point, the Courts purportedly do not have to individualize damages, and the FTC can propose

5    a base line for damages. *Id.*  As set out above, the testimony of the Intervenors rebuts the

6    presumptions about misrepresentations regardless of whether the claim is for violating Section 5

7    or the 2002 Order.

8

9    The FTC's one-sided characterization of a "net impression" by SBH Affiliates requires the

10   Court to disregard the full context of messaging; that is, that sales of SBH Products could result in

11   achieving an individual Affiliates' goal of starting their own business, that their income from their

12   business was not guaranteed but they could achieve their goals whether the goal was developing

13   their own Team or simply selling enough Products to pay for their purchases.  The FTC's version

14   of net impression assumes that SBH's Affiliates were incapable of free choice, exercising their own

15   judgment based on their experience, education and prior training.  To the extent that the FTC wants

16   this court to make a determination of "net impression" based on some of their recorded calls but

17   there were underlined hundreds of daily calls communicating a "net impressions" almost every day through

18   underlined daily sales calls ("Heat Calls"):  (1) No guaranteed income; (2) the business is simple, make retail

19   sale and recruit others to make sales if you want to make more money; (3) "Retail sales is the

20   backbone of everything." ; (4) J. Noland did not want them to "spend your money" unless they

21   understood the business; (4) No pressure on Number 1's to sell more; (5) No pressure to attend

22   trainings.  **Exhibit 593** documented 122 Heat calls communicating this "net impression." **Exhibits**

23   594-662 are Heat/Zone 1 calls where Number 1's shared their sales experiences with J. Noland, the

24   Senior Field Advisors and other Affiliates who, in turn, provided input or support for the retail sales

25   efforts.  Transcripts of the Heat/Zone 1 calls will be made available to the Court prior to trial.

26   The FTC's version of net impression assumes that SBH's Affiliates were sheep incapable of

27   free choice, but each Affiliate exercised their own judgment based on their experience, education

28   and prior training.   Both the Team Leaders and the consumers discussed whether or how a Potential

Affiliate could determine if they would be able to sell and whether they were Number 1's, 2s and 3s. This *interactive* discussion about coffee and nutritional products was all geared to sales of the Products and kind of income each person wanted to achieve.

The net impression theory is not grounded in the statute, but is yet another judicial construct that goes far beyond Congressional intent.   As set out below, Congress made it clear that the Commission has no authority to declare unlawful an act or practice as unfair unless the act or practice is causes or likely to cause *substantial injury* to *consumers* (not resellers) which is not *reasonably avoidable by consumers themselves*, and *not outweighed by countervailing benefits to consumers* or to competition.   The FTC's "net impression" theory does not take into account the age, education, work experience and common wisdom of the individuals who heard SBH's message that it took hard work, tenacity, and skills in selling products to succeed.    A number of the Complaining Witnesses worked with Luke Curry at Zija and understood the basics of selling MLM before they joined SBH.

The FTC also *assumes* that even if someone made a decision to become an Affiliate, they were incapable of making a new decision after learning more about the day-to-day sales activities involved.    The FTC *assumes* that consumers were just "potted plants" during presentations when, in reality, consumers reacted and asked questions in addition to sharing information about their background, education and experience.

In the instant case, 910 SBH Affiliates who attempted to intervene in this case refute the claim that they were misled by SBH and they saw or that they heard the same material as the eighteen Complainant Witnesses.  The issue of a reasonable expectation of making "substantial income" rests primarily on representations that somehow induced and misled a consumer to become an Affiliate. *See* Doc. 205 ¶56, 116. Thus, the inquiry on net impression must be made as to the initial representations made by Team Leaders to potential Affiliates. The second level inquiry is whether subsequent statements somehow misled Affiliates to disregard their training, logic and *common sense* to buy more Products than they needed to meet consumer demand. The reasonable Affiliate would not spend more than necessary to sell to the retail customers they knew would be interested

1   in buying.

2       Teams became extremely close in working with their Team Leader, many of whom held

3   weekly training and sales meeting to help their Affiliates. *As with any business person, an Affiliate*

4   *has to be prepared to accept losses as well as profits when they invest time and money in a new*

5   *business.*

6       SBH primarily fostered a culture of retail sales and selling—not recruitment.  SBH trained

7   its Affiliates to show potential Affiliates encouraged Affiliates (not retail consumers) "Let's Talk

8   Coffee" or "SBH Business Overview" and laid out the *opportunity* to them, provided plentiful

9   material in each Affiliate's back office, encouraged them to attend training courses, attend Heat

10  Calls, Zone 1 calls, go on calls and work and train with up-team leaders, conduct coffee sales at

11  public functions and sell coffee and nutritional products.  The purpose was to support, foster and

12  train Affiliates to sell the Products so that they could achieve their personal goals which included:

13  (1) Getting a 10% commission on the Products if purchased for personal consumption to each

14  Affiliate and family members with the options developing sales skills and earning supplemental

15  funds for their families; (2) Selling Products to replace their income over time by developing the

16  appropriate sales skills in order to do so; and (3) Supporting and Selling Products to highly

17  motivated Affiliates who wanted to not only replace their income but become financially

18  independent over time. Jay Noland offered a sales and motivational approach to all Affiliates geared

19  to their personal goals as 1's, 2's and 3's. This included foundational training of selling at least 6

20  bags of coffee per week or $125 in commissionable sales volume and finding other people to sell at

21  least 6 bags of coffee per week or $125 in commissionable sales volume. It is not reasonable for any

22  Affiliate to expect to simply recruit people and earn money without those team of affiliates selling

23  product.

24      Jay Noland offered a sales and motivational approach to all Affiliates geared to their personal

25  goals as 1's, 2's and 3's.  If Affiliates wanted to become Number 3's, Noland advised that they must

26  sell 6 bags of coffee per week and encouraging Affiliates who want to develop a team to invest time

27  in helping each Affiliate obtain the training and sales skills to sell retail.   Teams became extremely

28  close in working with their Team Leader, many of whom held weekly training and sales meeting to

help their Affiliates.

It was not reasonable for any SBH Affiliate to expect to simply recruit other people without training them to sell to retail customers. SBH encouraged Affiliates to exercise reasonable business judgment in determining how much income they wanted to achieve through SBH. As a practical matter, most Affiliates with no prior sales background learned, within days, the reality of selling in an MLM business.

In that vein, the FTC has not come forward with representations that actually guarantee or promise someone that they will make millions if they join SBH. Even people such as Robert Mehler, SBH's then-Sales Director, were told by Jay Noland that Affiliates needed to sell directly and that being the Sales Director did not relieve him of his responsibility to sell directly to retail consumers. Mehler developed a substantial group of retail sales customers. There were hundreds of Heat/Zone 1 calls *devoid* of any promises of making substantial income, as well as dozens of training sessions where it was made clear that maximizing income at SBH required hard work, tenacity in developing sales and fostering sales through Affiliates who wanted to pursue #2 and #3 financial goals. **Exhibits** 664-779.  The vast majority of Affiliates were Number 1's which, in itself, shows that Affiliates understood that they were *not* required to recruit to stay with SBH. They set their own financial goals and SBH supported their choices. Above all, SBH respected free choice but offered options "to put their toe in the water" if or whenever an Affiliate wanted to experiment by trying to expand his or her sales by developing a Team.

The sheer volume of training opportunities, Heat/Zone 1 calls overwhelmingly negate any stray comments that could be construed as misrepresenting the basic culture at SBH-Retail Sales Come First, Retail Sales Come First, Retail Sales Come First. **Exhibits 593-779; 949 through 978-1.**

**SBH's Refund Policies**

This Court previously acknowledged that there were disputed facts as to how SBH operated in practice.  Although SBH started off with a Refund Policy (within 14 days of request), a large number of individuals started to charge back their purchases from SBH.  Jay Noland changed the Refund Policy to a No Refund policy but, in practice, SBH made refunds to pack purchasers and

other individuals who could not or did not want to sell or use the Products.  Thus, in practice, refunds were granted, but not to individuals who ordered products, received the Products, re-sold the Products, made chargebacks to credit card companies for the Products, essentially refusing to pay for the Products either having sold them or having every opportunity to sell the Products.  None of them tendered the Products and requested a refund.   J. Noland concedes, in hindsight, the Policy should have been more narrowly drawn to "No Refunds for Chargebacks."

### Contempt and the Presumption of Misrepresentation and Damages.

Before addressing any arguments regarding the presumption, it is important for the Court to understand that the alleged violations of Section V of the 2002 Order are not subject to the presumption. A presumption of actual reliance arises once the Commission has proved that the defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased the defendant's product. *FTC v. Figgie Int'l*, 994 F.2d 595, 605-06 (9th Cir. 1993). Similar to the rules violations of the main case, the failure to create written compliance programs, perform testing, and promptly investigate consumer complaints is not based on misrepresentations – these alleged violations are based on policies that the contemnors did not have. The FTC has not provided any data to support actual damages for violations of the injunction.  Thus, the FTC should not be awarded any "damages" for these alleged violations.

If the Court finds that the FTC is entitled to the presumption as it relates to any alleged violations of the injunction stemming from the alleged illegal pyramid scheme, the Court should also find that the Defendants have rebutted the presumption.  See Fed. R. Evid. 105. It does not appear that any Defendant has ever attempted to rebut the presumption of misrepresentation and damages in an FTC case.  However, Defendants have provided ample evidence to be the first to do so. As the Court is aware, over 200 individuals attempted to intervene in the main case in order to support the contemnors, and sue the FTC. Doc. 335-3, 358-2. About 1,000 people also indicated their support of contemnors in the underlying suit. Doc. 358-2. The numbers would indicate that

31% of the affiliates (about 40% of the actual money spent by affiliates) do not believe they were damaged by contemnors. Thus, the presumption is rebutted, and the burden shifts to the FTC to prove each Affiliate suffered damages as a result of misrepresentations by Defendants. **Exhibit 983.**

In effect, regardless of damages methodology, the FTC failed to disclose any calculations as to the inherent value of the various coffee or nutritional products. (the "Products") The Court made it clear that the FTC had to take into account the inherent value of the product received by consumers. Doc. 130 at 6 and 9.  Moreover, it would be inequitable to award revenue because the FTC fails chooses consumer loss as its baseline, contemnors should be allowed offsets by providing evidence that some customers were wholly satisfied with their purchase. *FTC v. Trudeau*, 579 F.3d 754, 773 (7th Cir. 2009).  There was no evidence submitted to the Court that consumers returned or tried to return the Products. These were consumable products that were in demand and which likely sold or consumed.  At worst, the inherent value of the products were the cost of the goods charged by the manufacturers.  The Court finds that the *inherent value* of the Products delivered to the Buyers is the agreed upon retail price.

The Court has broad authority to fashion an equitable remedy. *FTC v. EDebitPay, LLC*, 695 F.3d 938, 945 (9th Cir. 2012). Because of the number of individuals who claim to have not be harmed by Defendants, the inherent value of the product, and the unknown amount of money consumers received for selling the product, any award should focus on equity, proportionality and rather than consumer loss.

This Court acknowledged that there were disputed facts as to how SBH operated in practice. Although SBH started off with a Refund Policy (within 14 days of request), a large number of individuals started to charge back their purchases from SBH.  Jay Noland changed the Refund Policy to a No Refund policy but, in practice, SBH made refunds to pack purchasers and other individuals who could not or did not want to sell or use the Products.  Thus, in practice, refunds were granted,

but not to individuals who ordered products, received the Products, re-sold the Products, made chargebacks to credit card companies for the Products, essentially refusing to pay for the Products either having sold them or having every opportunity to sell the Products.  None of them tendered the Products and requested a refund.   In hindsight, the Policy should have been more narrowly drawn to "No Refunds for Chargebacks."

Although the FTC's Affiliate-Complainants generally alleged they suffered some sort of injury after they became Affiliates, *none of them produced documents that actually support their alleged losses*.   Nor did the FTC produce documents relating to communications by and between Luke Curry and his team during or after his suspension and resignation.  This failure deprives Defendants of any ability to cross examine witnesses at depositions (and now, at trial) or to provide contradictory impeachment information about what they actually thought of their claims and bias against SBH, Jay Noland and others.   The very first thing that a lawyer must obtain when investigating a claim by an individual plaintiff for contract-independent contractor disputes or claims is a copy of any document that relates to their contract or disputes, such as emails regarding complaints and their communications with other individuals or third parties that were not part of an affiliated email network.   General inquiries, or a failure to follow up and insist that the complainant-client provide documentation would ordinarily be grounds for malpractice in many grounds because it is a required disclosure under Rule 26 or under an MIDP Disclosure.  As a practical matter, the FTC or any other government agency should be insisting on full disclosure by Complainants-Witnesses before going to Court.   Otherwise, how could they determine who is being reasonable/credible and who is not?

Moreover, Fed. R. Civ. P. 11(b) requires that a (lawyer certifies to the best of their knowledge, information and belief, formed after reasonable inquiry under the circumstances.  The client is bound by the attorney's conduct in litigation and can also be found culpable.   In this case, the investigation appears to be comprised only of declarations suspension or resignation.  Thus, from an objective standpoint, a *reasonable investigator* empowered to bring a class action against small businesses should be held to a standard that includes obtaining all *personal* emails accounts for at least the time period of the relationship between the complainant and the or Agency, obtaining

damages documents, tax returns, W-2's 1099's etc that would either be discoverable or produced in redacted form.   As set out below, the Agency would have likely unearthed evidence that showed that the Complainants were telling less than the truth and likely embellished their "losses" understated their estimated and  unsupported claims of profits/losses, of inventory loading as well as any claims of misrepresentations.

Complainants (i.e. Plaintiffs) that fail to produce evidence that might allow opposing counsel to effectively represent them at trial of damages or injury during discovery cannot be allowed to testify at trial about documents or information that could have been, but were not produced in discovery.  The FTC purports to represent the Complainants, just as any lawyer represents a client.  This would include the duty to ensure that any deposition or other information relating to their Client's claims is produced either before a deposition or prior to trial.

The Court also heard testimony from SBH Affiliates about their experience during the process of becoming SBH Affiliates.   Their affirmative testimony rebuts the presumption on liability and contempt.  The Court also credits the Declarations of proposed Intervenors and that of individuals who signed to opt in as class members.

In *Figgie*, the Court allowed the residual hearsay rule to establish material facts in that case; i.e. pricing of products.  Defendants gave notice of its intent to use the Residual Hearsay Exception to the Hearsay Rule, Rule 801 to rebut the FTC's anticipated use of the presumptions of misrepresentation and damages.  Exhibits 813-1 through 813-200.  There were 200 declarants who filed declarations in this proceeding and almost 710 more Affiliates who sought to intervene in this case (the "Intervenors")  These individuals presumptively adopted the allegations of their class complaint.  This is precisely the kind of case where the Court should allow this type of evidence.  The declarations were not *perfect* but were submitted under oath stating that they were not missed by SBH and that the declarants were not damaged or suffer by SBH.   Notwithstanding this Court's reservations about the leading questions posed in the questionnaires, this goes only to the weight to be accorded the declarations and intervention complaint.  The FTC had ample time to conduct discovery prior to and after filing of the Complaint and conduct surveys or circulate its own questionnaires about liability or damages.

Because Defendants have rebutted the presumptions, the Court is left with the testimony of the Complaining Witnesses on both the Section 5 and Contempt cases.

**Whether Defendants Operated an Illegal Pyramid Scheme.**

This Court previously considered whether SBH violated the two part *Koskot* test.   the Court already held, "There is no genuine dispute of material fact regarding the satisfaction of prong one of the *Koscot* test with respect to SBH." (Doc. 406 at 37.) Specifically, there is no "dispute that consumers were required to pay an annual fee of $49 to be SBH Affiliates" and that, "by paying this fee, Affiliates gained the right to sell SBH products on their [replicated SBH] webpage." (Doc. 406 at 37.)

The FTC alleges that the $49 annual fee gave the right to Affiliates to earn rewards not based on the sale of product to ultimate users, but based on purchases from SBH buy affiliates and people those affiliates recruited into SBH.   However, the court found that there were fact disputes as to whether SBH affiliate rewards were based on recruiting rather than retail sales. In pertinent part, the FTC alleged that defendants paid rewards based entirely on recruiting and purchases from SBH by affiliates and their recruits, rather than sales to ultimate users. the FTC claimed that 95% of all purchases from SBH were by affiliates and commissions were paid on those purchases. Secondly the FTC claimed that defendants, through their Commission plan, training materials and explicit instructions, encouraged affiliates to recruit to maximize their earnings. Thirdly, the FTC claims that defendants urged SBH affiliates to inventory load by buying products without regard for demand by the buyer or third parties. Finally, defendants allegedly employed no safeguards to connect affiliate purchasers to actual demand.

The FTC generated statistics that are simply erroneous. For example, the FTC's assertion that 95% of the sales by SBH was made to its Affiliates rather than to ultimate consumers.  That is because the FTC failed to investigate and determine how much Affiliates made from retail sales.

The FTC never even asked the Affiliates to provide them with documentary evidence of retail sales; instead, relying on hearsay from Complainants who ceased working for SBH and embarked on a vendetta against SBH and its principals after Luke Curry resigned.  While the FTC's expert, Dr. Bosley, prepared a *scientific-looking* analysis with data purportedly supporting the FTC's analysis, Dr. Bosley failed to actually review statistics that actually reflect the purchasing behavior at SBH, did not critically analyze retail sales by Affiliates and did not factor the inherent value of the Products.

Contrary to the FTC's claim that SBH focused on "recruitment" over retail sales, pressuring new "recruits" to buy packs of  Products they could not sell, the statistics show the following:

(1)  Eighty-two (82%) of Affiliates' first product purchase from SBH were for underline products. Only 18% of affiliates purchased a pack with their first purchase from SBH. **Exhibit 586.**

(2) Of these, sixty percent (60%) of these new Affiliates confirmed and/or determined that they could sell the Products by ordering additional Products. Of these, 19% of these Affiliates bought Products on more than five (5) occasions.  **Exhibit** 586.

(3) Seventy percent (70% of total orders were less than $1,000/order with average spend per order in 2019.  Exhibit 817.

(4) Less than 3% of unit sales were business packs.  Packs made up 35% of SBH total revenues.  **Exhibi**t 585.

(5) SBH paid out 83% of its commission  18.9% of the commissions paid out were used by Affiliates to purchase more Product. Eighty-four percent (84%) of all product credits were used by Affiliates to make more retail sales. The remaining 16% of unused product credits were seized by the Receiver after filing of the Complaint.  **Exhibit** 585.

Defendants focused their training, heat calls, Zone 1 Calls. Facebook posts, and livestream videos to emphasize sales over recruitment. Although the FTC cites to "mountains of evidence" in underline prior proceedings, there is a mountain of evidence that now shows that Affiliates were encouraged to make money by selling Products to retail consumers.  *Over one hundred Heat/Zone 1 sales calls*

show that Individual Defendants emphasized retail sales, training and supporting and supporting Affiliates to sell retail in a group setting (Facebook Live) showing their commitment to selling over recruitment. An emphasis on recruitment was imprudent if the "recruiters" did not train and promote retail sales by Affiliates.  Affiliates were afforded the 10% commission back and the opportunity to make retails sales at 50% markup, the recommended price on all Products. All product promotions were based on giving product credit and additional discounts on Product sales.  Many of the Complainant Witnesses identified in both the FTC's "Will Call" and "May Call" lists were experienced sales personnel in Zija or other MLM businesses before joining SBH.  They understood their business rose or fell with retail sales.

New Team members received training on how to make sales through videos, including "Lets Talk Coffee," and a Power Point, "SBH Business Overview." Once they became Affiliates, they had access to a back office and a website so that consumers ("ultimate users") could purchase directly from the website allowing Affiliates to earn a 10% commission. The back office provided sales tracking, product training, sales training, and important company communications.

Most importantly, new Affiliates had the opportunity to work with their Up-Team Leaders or other more experienced Affiliates to develop and/or hone their sale skills.  All Affiliates were asked to self-identify themselves as Number 1's, 2's or 3's.  Their Up-Team Leaders then made recommendations as to what, if any purchases, should be made to start their businesses. SBH Affiliates understood that retail selling was not second nature to many people and made recommendations to encourage success; that is, buying enough Product that could be sold if the new Affiliate showed a talent for selling retail.   SBH Affiliates seeking to help new Team Members asked each Affiliate to make a list of all their potential sales leads---family, friends, co-workers and draw from their mobile phone contacts.  This gave the new Affiliate a sense of who they should sell to first, and figure out if sales could be made to friends, family and co-workers.

If they did not realize it when they became new Affiliates, SBH Affiliates quickly came to understand the common-sense principle that you don't buy more Product than you can sell.  The ability to purchase Founder's Packs or similar programs depended on the Affiliate's sales, as determined by each Affiliate's product purchases for re-sale to consumers. Each Founder was vetted

by one or more of the Senior Field Advisors to assure that the Founders were qualified to take on a leadership role in the Company.  All packs were offered with free Product and training for them or their Team Members to attend sales or motivational training.  When Founders decided that they did not want to take their packs or wanted to refocus their career, SBH either refunded their Founders Pack or arranged a transfer of their Founder status to someone who desired to be a Founder. The replacement Founder paid the original purchaser for the products. This in turn refunded the original purchaser.  **Exhibit 876.**

The FTC relies heavily on *BurnLounge*, which emphasizes that the sale of products to end-users is critical.   In *BurnLounge*, the Court held that the key point in evaluating whether compensation to distributors (resellers) come primarily from recruiting, rather than the sale of the products to ultimate users, the courts look beyond the policies and procedures and examine how the company operates in practice.  *BurnLounge*, 753 F.3d at 883.  At SBH, there was no question that Affiliates were resellers, were not the ultimate users of the Products or retail customers. Any consumption of product was incidental to the right of the affiliate to participate in a money-making venture. Id. at 887.  Thus, sales by SBH to Affiliates for resale negate the second prong of the *Koskot* test. *Bostick v. Herbalife Int'l of Am. Inc*., 2013 U.S. Dist. LEXIS 205109, at *14 (C.D. Cal. 2013).  Unlike *In re Pfa Ins. Mktg. Litig*., 2021 U.S. Dist. LEXIS 244526, at 45-46 (ND. Cal.2021), SBH Affiliates were not rewarded if they recruited five new recruits within the first thirty (30) days.

On Founders Pack promotions, for example, Founders received $200 in free SBH Products (which they could sell for a 50% markup) and were vetted by the Senior Field Advisors, who reviewed each applicant's purchasing history and knew, from Facebook posts or Facebook Live sessions about the applicant's retail sales history.  All Founders were allowed either a refund or a transfer of the products and Founders' status to another Affiliate.  **Exhibit 520, 524, 525, 527, 530, 532, 535, 536, 539, 876.**  Similarly, applicants to the Global Ambassador Program were vetted and

were given $500 in free Products (which they could sell for a 50% markup). There were no refund requests in the Global Ambassador Program. Also, no one could purchase a Founders Pack or Global Ambassador Pack from the company's regular shopping cart to ensure that applicants were vetted. These purchases had to be manually entered by an SBH Staff member after vetting was done.

Thus, even *assuming* there were some written materials that suggested that recruitment was favored over retail sales, these materials were more than outweighed by Team Leaders training their Affiliates to sell, daily Heat/Zone 1 calls and the reality that reasonably prudent consumers or Affiliates understood their limitations, did not load up with inventory they could not sell, and gauged their level of commitment to SBH depending on their own individual experience and needs.   The complaints of a few do not overcome the testimony of Tevis Shurfield, Sye Head, Jo De Baer Robert Mehler, and other Team Leaders, nor do they overcome the declarations of 200 Affiliates and the 700+ class action plaintiffs in this case.

The FTC also contends that SBH offered product discounts and product credits and that these rewards were unrelated to sales to ultimate consumers.  SBH offered Product discounts and Product Credits. Even *assuming* that there were "rewards", the rewards were directly related to Product sales. There were one-off promotions which had requirements, such as requiring the Affiliate was part of a team that generated a minimum number of sales.  SBH knew that a high volume of purchases by Affiliate to resell products were possible only if retail purchasers bought the Products.

The FTC introduced exhibits about SBH's USA TOUR CHALLENGE, a sales contest held in 2019. Documents relating to the "Challenge" is marked as **Exhibit 929**. This was simply a "sales contest" in the basic sense of the word. Numerous companies hold such contests to generate excitement among its sales force and to stimulate sales. This particular contest was structured to ensure that newly referred affiliates got started in the proper way, i.e., getting, at minimum, a few products for their own use to have a positive experience and create belief in the product base, and

at a higher level, to get them started properly by having some product inventory to share with others and sell for a profit--- giving them belief in the business opportunity. It was imperative for success that a new affiliate got started on one of these tracks as soon as possible, so SBH incentivized the referring affiliate for helping their new referred start in the correct manner.

As with any sales contest, <u>the rewards were greater (more points awarded) for driving more sales</u>, so the larger the sales made- the more points rewarded. SBH also rewarded affiliates points for a personally referred attending the ICON training, which would "jumpstart" their knowledge, skills, and belief in SBH as a vehicle to help them achieve their personal goals. While all information necessary for success was available in the back office training sections, and through sales training center live trainings as well as online through FaceBook "live" events and ZOOM's, larger sales and personal development events were available, such as ICON in 2019, at a cost. This type of training was for someone willing to invest in themselves to learn at a higher level- no different than someone investing in a Tony Robbins or Zig Ziegler training- which has been quite common for *decades* and *decades*.

Lastly, the Court holds that SBH Affiliates were not "consumers" within the scope of the FTC Act. The only way a business (such as SBH) can structure a sales contest is by awarding points for activities that are totally trackable. SBH had no idea what an affiliate did, nor can it control the Product once received by the (independent contractor) Affiliate. An Affiliate might consume the Products, give it away (serve in a business setting or sample), or may sell it for a profit. They are independent contractors that can do as they wish within the scope of SBH's Rules & Regulations. The only thing SBH can track is products or event tickets being purchased by an affiliate directly from SBH. It is no different than a sales contest at Costco does with the products once they leave the store. Costco management has no idea what an independent business or individual who buys large volumes of goods purchased at Costco. An Affiliate (Independent

Contractor) has an absolute right to do as they please as they are not the end consumer if the products are used or resold in conducting their own independent business.

The Court therefore determines that judgment on this claim should be entered in favor of Defendants and against the FTC.  For the same reason, the Court also finds that Defendants are entitled to dismissal of the Contempt charge alleging violation of the 2002 Order.

**Whether SBH Affiliates suffered injury from violations of the Merchandise Rule and Cooling Off Rules?**

As to the Merchandise Rule, the FTC contends that SBH "who did not receive the refunds to which they were lawfully entitled suffered injury, as did affiliates who never received the merchandise they paid for. As to the Cooling Off Rule, the FTC contends that SBH affiliates suffered injury when defendants deprived them of the opportunity to identify the lies and misrepresentations they were told when defendants failed to inform them of their right to a refund. To make matters worse, defendants repeatedly emphasized that SH affiliates had to attend defendants trainings to obtain financial freedom and had to abide by defendants "no refund" policy

Defendants correctly note that there was no provision in the 2002 Order that referred to or enjoined violation of the Merchandise or Cooling Off Rules. Thus, the Court cannot award damages for rules violations as a contempt of the 2002 Order.

The computations provided by the FTC for the Rules violations were described by the Court in its Order on Motion to Exclude Damages:

> Specifically, as for the Merchandise Rule violations, the FTC again sought damages based on late-shipped orders for Founders Packs, rooibos tea, hot cocoa, chai tea, time capsules, and G-HCBD AM/PM. (Id. at 2-4.) Although the overall amount of Merchandise Rule damages sought in the summary judgment motion ($630,377) was slightly higher than the figure disclosed in December 2020 ($539,644.50), the increase did not arise from a change in the FTC's methodology but simply from the identification of more late-shipped orders for hot cocoa, rooibos tea, chai tea, and G-HCBD AM/PM than had previously been identified. (Id.) Similarly, as for the Cooling-Off Rule violations, although the amount of damages sought in the summary judgment motion ($526,488.50) was slightly higher than the figure disclosed in December 2020 ($506,338.50), the methodology was the same. (Id. at 7-10).

Doc. 509 at 3.  The Court also noted that the FTC consistently stated that it seeks to recover, as

1
2
damages, all revenues associated with certain transactions tainted by Rules violations and the anticipated consumer-harm evidence is consistent with that theory (and had no effect on the FTC's bottom-line damages computations).

3
4
Simply stated, the FTC has *not* modified its calculations to eliminate the issues raised by the Court.  Simply put, the FTC still fails to take into account the inherent value of the products There is no evidence any ultimate user or "consumer" complained about SBH Products.  As this Court previously held: "[T]he fundamental problem with the FTC's damages methodology is that it fails to account for the inherent value of the products and services received by consumers, thereby creating a windfall….[The FTC] seeks to secure a monetary award that would allow each consumer to recoup the full purchase price while retaining the underlying goods and services."  Doc. 509 at 7, 14. There is no evidence that any of the Section 19 complainants alleged misrepresentation as to the Cooling Off Rule or failure to deliver products on time.  As this Court noted, there is no evidence that any Affiliate or consumer suffered injury or damages from a late shipment, from a failure to advise the consumer of their right to a refund or that an Affiliate or consumer suffered injury that was "necessary …to redress injury to consumers."   Thus, the Court cannot award any damages for the FTC's main case alleging violations of the Merchandise and Cooling Off Rules.

In addition, because of the FTC's MIDC violations, there is no *competent* evidence that any Affiliate suffered a monetary loss from sale of the Products.

The FTC is not entitled to any damages presumption regarding the Merchandise Rule. The presumption of damages in FTC cases is reliant on misrepresentations being made.  *FTC v. Figgie Int'l, Inc*., 994 F.3d 595, 605-606 (9th Cir. 1993); Doc. 238 at 12-13. Here, the damages presented are based on the fact that the Defendants did not have a certain policy (i.e. there was, *in theory*, a No Refund Policy for shipments that were 60 days or more overdue). Doc. 406 at 50. There were no misrepresentations by Defendants to consumers regarding the Merchandise Rule. Indeed, Affiliate contracts provided for a 60 day delivery time. In addition to not having the presumption, consumers cannot receive a windfall pursuant to Section 19. Doc. 438 at 7; *Figgie*, 994 F.3d at 605-606; In *re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 143 (3d Cir. 2019) ("Equity abhors a windfall."). Thus, pursuant to Section 19 of the FTC Act, the FTC is limited to damages to make

consumers whole (i.e. actual damages).

Plaintiff is not entitled to any damages presumption regarding the Cooling-Off Rule. The presumption of damages in FTC cases is reliant on misrepresentations being made. *FTC v. Figgie Int'l, Inc.*, 994 F.3d 595, 605-606 (9th Cir. 1993); Doc. 238 at 12-13. Here, the damages presented were based on a policy that the Defendants did not have (i.e. the Defendants did not have a refund policy for tickets to training events up to 72 hours after the tickets were purchased at a live training event). Doc. 406 at 52. There is no evidence Defendants represented that they had a policy. Thus, pursuant to Section 19 of the FTC Act, the FTC is limited to damages to make consumers whole (i.e. actual damages). Consumers who attended the event for which they bought the ticket for would not be available for a refund because that would result in a windfall. *Figgie*, 994 F.3d at 605-606; In re *Millennium Lab Holdings II, LLC*, 945 F.3d 126, 143 (3d Cir. 2019) ("Equity abhors a windfall.")

For that matter, the FTC's claims under Section 5 are not entitled to a presumption of damages where, as here, over 1,000 Affiliates sought to intervene in this case. While proving each claim may be costly and/or time effective, that is not a consideration for the Court. *See Figgie,* 994 F.3d at 605-606. The major difference between this case and *Figgie* et. al. is that none of the Defendants tried to rebut the presumption in those cases.

Even if a presumption of damages existed under these two rules, the intervenors not only rebutted the presumption but also disclaimed any interest in damages whether under a rule or otherwise.  **Exhibit** 983 is a chart that calculates the amount of purchases made by Intervenors.

### Whether Congress authorized the district courts to create enterprise liability?

This legal issue has not been directly addressed by any circuit court (or district court). It appears that enterprise liability was created and never challenged, much like the failure by attorneys, for over three decades, to challenge the FTC to seek, and the district courts to impose monetary awards through Section 13(b).      Section 5 does not reveal any authority for the district courts to discard state law requiring that a plaintiff "pierce the corporate veil" before consolidating the assets

and revenues of different companies and individuals as part of an enterprise.

While the FTC greatly benefits from the court-created enterprise liability theory, that does not eliminate the duty of this Court to determine if there is any *statutory* authority to apply this concept in this case.  It is clear from the FTC's MIDP/Rule 26 Disclosures that it failed to calculate consumer injury without full reliance on individuating between SBH, SBM and each individual's participation in each company.  Thus, the FTC's damages claims should be excluded.

**The FTC's Alleged Damages**

The FTC contends that the Court should award contempt damages based on (1) the sale of SBH products and related materials (after netting out commissions paid to SBH affiliates and product credits used), (2)  live training events, and (3) VOZ "packs" (after netting out commissions attributable to VOZ).

The FTC assumes that consumer loss is the correct measure of damages.    Individual Defendants did not get compensated based on sales less commissions.  They were compensated as independent contractors.  Individual Defendants would therefore be compensated based on their income, as recorded for tax purposes  in W2s, 1099's or tax returns.  In *SEC v. Liu*, 140 S.Ct. 1936 (2020), the Court recognized that while a wrongdoer should not profit by his own wrong, the "wrongdoer" should not be punished by paying more than a fair compensation to the person wronged."  Id. at 1944.  The Court then held that: "Courts may not enter disgorgement awards that exceed the gains "made upon any business or investment, when both the receipts and payments are taken into the account." Id at 1949-1450.

The Court held that any presumption of damages was rebutted by the Intervenors.  In the instant case, the Complainant Affiliates each failed to present any individualized proof of damages. This is fatal to their damages claims for contempt as well as their rules violations. Even *assuming* that the Court adopted the position that its inherent authority allows it to impose a monetary remedy for Section 5 damages in the Underlying Case, the public policy enunciated by the Supreme Court in FTC cases must be heavily factored into what, if any, remedy is imposed.

Gross revenues from sale of VOZ packs came to $971,625.00.  This money was taken by the Receiver and no funds paid to the purchasers.  The FTC opposed any attempt to start TravelNU,

making it clear that it would sue Defendants if it started TravelNU operations.  Defendants offereed to provide TravelNU memberships in exchange for VOZ membership, but the FTC opposed that exchange, which would have benefitted virtually all VOZ members.  The TravelNU platform made hundreds, if not thousands of offers discounting luxury travel. The FTC insisted that Defendants had to be able to substantiate every offer.

Under its Agreement with the TravelNU's travel services vendor, Defendants did not prepare the offers, but simply provided a white label service to market the offers.  In other words, the data was out of Defendants' control.  The FTC's refusal to approve the TravelNU's activities deprived consumers of an opportunity to recoup a benefit that was denied as a result of the TRO and further proceedings.

Individual Defendants' net revenues are listed in the Individual Tax Returns, W-2's or 1099's which are in the FTC's possession.   That amount comes to the following for each Defendant:

**Harris**

| Taxable Year | W-2/1099 wages |
| --- | --- |
| 2017 | $38,062.12 |
| 2018 | $155,935.08 |
| 2019 | $111,535.39 |

**James Noland**

| Taxable Year | W-2/1099 wages |
| --- | --- |
| 2017 | $112,600 |
| 2018 | $88,000 |
| 2019 | $200,000 |

**Lina Noland**

| Taxable Year | W-2/1099 wages |
| --- | --- |
| 2017 | $83,550 |
| 2018 | $52,000 |
| 2019 | $60,000 |

| Taxable Year | W-2/1099 wages |
| --- | --- |

There was $600,000 in SBH's bank account at the time of seizure by the FTC.  However, the funds were committed to payment of Affiliates for commissions, e-wallets and vendors. Funds were not paid by the Receiver to SBH's vendors and Affiliates, instead almost all of the funds went to fees. **Exhibit  519**. This should not be treated as profit.

Finally, the Court will grant an offset of $1.8 million offered by Dr. Jim Marinakis in or about March 2020 for the purchase of the Receiver's inventory. Doc. 430-1. It appears that the Receiver did not disclose the offer to the Court, but rejected it because it was unfair to other Affiliates. These funds could have been used to benefit many Affiliates who were never paid commissions for sales because the Receiver ultimately ran out of money. The Receiver did not operate the Company for about four months after taking possession of SBH. Even then, its sales were quite limited, and refunds not paid.

As to the rules violations, the Court lacks authority to award damages unless "necessary" to "redress injury to consumers." Rules violations are brought under Section 19 of the Act. The statute does not define "necessary" but Microsoft Bing defines "necessary" as: "required to be done, achieved, or present; needed; essential…." The term "necessary" requires proof of damages. None of the Affiliates provided documentary proof of damages incurred as a result of the alleged delays. Allocation of damages *pro rata* from net revenues minus shipping and other expenses is nothing more than disgorgement, prohibited by AMG and constitutes a form of punishment, specifically prohibited by Congress in Section 19.

Section 435.2 provides that a company violates the Rule if, at the time of solicitation, the seller had a reasonable basis to expect to be able to ship any ordered merchandise to the buyer "[w]ithin that time clearly and conspicuously stated in any such solicitation." Otherwise, the seller has thirty days to deliver after receipt of a properly completed order from the buyer. In the instant case, the average delivery time was 3.8 days. In cases of preorders or backlogs, a longer time was disclosed on the preorder disclosure.

**Spoliation of Warehouse Records**

Defendants contend that the Receiver and the FTC failed to maintain warehouse records that would have negated or assist in defending the FTC's allegations on the Merchandise Rule. Defendants contend that the Warehouse computer *definitively* tracked the sale of all products shipped, to who as well as delivery dates on preorders and any other products but it was not preserved by the FTC or the Receiver in this case. The Court finds that there was a destruction of the evidence. Numerous devices were forensically imaged by the Receiver but not the warehouse

77

computer. Similarly, the Receiver failed to maintain the Customer Support program (supportsystem.com via sbmsupport.com), which documented all customer service requests and delivery problems. If anyone complained about anything, such as a request for refund, a late or missing delivery, the ticket was processed and people were assigned to track the request from beginning to end. The Receiver discontinued the $45/month payment to supportsystem.com. On or about January 25, 2020, J. Noland tried to pay the monthly charge, but was locked out of the system (as an administrator) and was unable to pay the fees, resulting in loss of this critical data.

**Defendants Substantially Complied with the Merchandise Rule.**

The FTC contends that Defendants failed to comply with the Merchandise Rule.  However, the FTC failed to come forward with evidence that identifies which Affiliate suffered losses as a result of the alleged violations.  Jay Noland issued Facebook posts updating people on shipping dates for pre orders. **Ex. 526, 908-915, 917-918.**

The evidence show that , if there was a back order or pre-order, the warehouse staff printed two copies of the invoice and physically maintained them in a folder until products arrived at warehouse. Then, those products were shipped out the following business day. With pre-orders and back-orders, affiliates were *given the option* to pre-order a new product with the express understanding that they might have to wait a time for the product. Noland routinely told affiliates <u>not</u> to preorder if they needed their money for other products or personal expenses. If any affiliate wanted to cancel the order, they were offered a credit to obtain *other* products. Such requests were made to Lina Noland.  To Lina Noland's recollection, very few people ever asked for a cash refund on back orders or pre-orders because they were happy with getting other products for their customers.

Thus, while there was no formal offer of a cancellation and refund after 30 days, there were always solutions provided to affiliates or customers.  Thus, there was substantial compliance with the Rule and no harm or de minimis harm to any affiliate.

**Dr. Bosley's Report**

The Court heard evidence from Dr Bosley. As set out above and below, however, Dr. Bosley (as well as the FTC) appeared to have made a fundamental legal assumption; that is, that resellers

of products are "consumers" under the Act when, in fact, the statute and federal public policy states the exact opposite.  Dr. Bosley opined on damages without addressing retail sales made by Affiliates but simply assumed that the total number of sales were made via individual Affiliates' SBH websites.  Thus, Bosley's report is irrelevant and unreliable under the Daubert test and F.R.Evid. 702.  In fact,  the evidence will show that many Affiliates had teams that generated substantial *retail sales* to each affiliate.  There was a substantial incentive for everyone to sell regardless of whether they were individuals versus selling with teams.  They got a 10% wholesale discount and, in most cases, a substantial markup for individual retails, and for vendor events, where they were able to sell cups of coffee at $3.00 per cup.

Similarly, the approximate 910  proposed intervenors were not factored into Dr. Bosley's report.  Clearly, these intervenors did not ask for refunds and should not be counted as part of an FTC calculation of damages through Dr. Bosley or others.  The evidence directly and indirectly demonstrates that the Complainant-Witnesses in this case understated their income and overstated their alleged "losses" or "injury."  Dr. Bosley did not conduct a critical analysis on retail sales.  This was a significant factor in addressing damages.  The Complainants did not disclose details of, and misrepresented their retail sales, but it could have been determined by how many Affiliates purchased products and packs.  For example, 85% of all Affiliates purchased less than $1,000 on products.  The Affiliates who purchased packs understood that they had to sell these packs, but the failure to obtain retail sales was the FTC's threshold burden..

The statistics show that Affiliates not only bought packs, but also purchased individual or other packs *after* they made their initial purchases.  This shows that each individual Affiliate sold their inventory before or by the time they made additional purchases.  Also, the reasonably prudent Affiliate knows when they need inventory for the retail customers or knows that they should not buy additional products *before* they have a reasonable expectation of making sales that cover their products.  Unlike the illegal pyramid cases where consumers have to buy a package of goods  before they even know if they can sell the product, SBH encouraged Affiliates to test the waters, and made sure they have contacts with family or friends to cover their purchases.

Either way, Dr. Bosley's report reveals a failure to analyze the actual conduct and

purchasing behavior of SBH's Affiliates. It does not appear that Dr. Bosley considered the possibility that retail sales were much higher than represented by the FTC. Thus, any statistical evaluation of compensation and illegal pyramid scheme by Dr. Bosley is unreliable under *Daubert*. There was plenty of time for the FTC to request a supplemental report from Dr. Bosley to cover some or all of the above issues, but the FTC apparently decided to proceed with her current, deficient report and testimony.

**Whether there is a cognizable danger of future violation by the Individual Defendants.**

Prognosticating future violations is not a science. It is difficult to understand the FTC's strategy in this case. On one hand, the FTC has a duty to prevent violations, On that point, the FTC could have, but did not accept Defendants Attorney David Eisenstein's offer to come in and inspect SBH's books and records. The Court recognizes that the FTC has broad discretion in making prosecution decisions. But as a result, the FTC limited its knowledge only to what they were told by Luke Curry and his team. Virtually all the Complaining witnesses left SBH as early as a month before or a month after Curry resigned from SBH or ceased making orders from SBH. Curry's purpose was to open up a competing business, as evidenced by a lawsuit against Curry and Company. The court in that case entered a Preliminary Injunction and ultimately dismissal. Curry did not appear to defend the charges.

Some of Curry's other team members were also sued, including Kaci Woods Moncayo, Daniel Moncayo, Casey Radermacher, Jason Johnson, McKayla Johnson, Jason Underhill, Stephanie Underhill and Richard Lowe. Al of these individuals either filed chargebacks against the company for products received, publicly disparaged the company and its executives or both. These were the only Affiliates that were ever seud by the company because of the egregious violations of the SBH terms and conditions.

Simply stated, Curry got disciplined for six months suspension from his position as Senior Field Advisor, got mad and then undermined the Company with his team, ultimately persuading his team members to leave SBH with him and open a new company. Kaci Woods, Daniel Moncayo and Richard Lowe filed declarations under the penalty of perjury that admitted that they were friends

1  of Luke Curry and apologized for defamatory comments about Jay Noland and SBH.   **Exhibits**

2  **920-922**.  Yet, the FTC is presenting Kaci Woods as one of their witnesses.  It does not appear that

3  Kaci Wood, Curry or any of the others disclosed SBH's lawsuit against them.

4             **What, if any, injunctive relief should be imposed against the Individual Defendants?**

5             The Court can impose injunctive relief to protect the public, but not by permanent bans on

6  activities that prevent parties from making a living for the Individual Defendants. 1st, 5th Amend.

7  U.S. Constitution. "Fencing In" is a judicially created concept, which does not supersede equitable

8  concerns of proportionality, equity and a recognition that people can change their business practices

9  through modern technology (e.g. Docu-Sign described below).  The Court must weigh a number of

10 factors in determining what, if any injunctive relief should be imposed against any of the Individual

11 Defendants.

12            As a threshold matter, the Court should weigh the fact that SBH was operated as an Affiliate

13 organization designed to maximize the ability of Affiliates to achieve their personal or financial

14 goals, whatever those goals were. Like any new, expanding organization, SBH made mistakes but

15 substantially complied with the spirit, if not the letter of various rules and regulations. J. Noland did

16 not generate a written compliance plan and was not required by the 2002 Order to do so, but he did

17 substantially comply with the 2002 Order by implementing three (3) Senior Field Advisory

18 Members and Online Support/Compliance ticketing system, and 800#, and daily training and

19 oversight calls for Affiliates. The change in policy from a Refund to a No-Refund policy was overly

20 broad and can be corrected to limit the abuse by some Affiliates who ordered products, received

21 them and then tried to get their money back---potentially a theft and certainly conversion. An official

22 policy of refunds would be instituted with refunds being granted if products are somehow defective

23 or are returned in good condition to SBH. The practice of refunding individuals who honestly

24 wanted a refund was never abandoned by SBH. Similarly, Defendants are well aware that their

25 procedures needed to be tightened up and prominently offered on shipments and/or sales of tickets,

26 such as the 3-day rule.  Issues such as disclaimers on possible compensation can be improved to be

27 more conspicuously displayed and in bold.

28            The Court can also order that SBH adopt a Docu-Sign type Application for SBH

Membership that unequivocally requires each Affiliate to scroll down a list of subjects that explain their rights and responsibilities under the Contract.  SBH can develop a software program that explains each duty and benefit they receive from affiliating with SBH. Each Affiliate must read and specifically acknowledged their understanding and Agreement on certain Terms and Conditions before becoming Affiliates including, *for example*:

1. I understand and agree that any claims by SBH or others that I can achieve a certain income by becoming an SBH Affiliate are simply speculation until I get experience selling the Products.

2. I understand and agree that just because someone else achieved a high income, that does NOT mean that I can achieve the same income by becoming an SBH Affiliate.

3. I understand and agree that any income that I achieve as an SBH Affiliate is dependent on my personal skills in selling, the number of contacts I can develop for selling coffee and/or nutritional products, my own personal commitment of time and resources to selling the Products, and devoting the time necessary to achieving my goals.

4. I understand and agree that I should not buy more Products than I feel confident that I can sell given my existing customer base.

5. I understand and agree that I will not lodge chargebacks with credit card companies if I have ordered Product and have sold or intend to sell the Products, as this potentially deprives SBH of revenues and my Up-Team of commissions.

6. I understand and agree that I can submit a "ticket" requesting a refund of products that are not charged back, and that the Company shall refund the price of these Products or offer the Products to other Affiliates at the same price.

7. I understand and agree that the Company may have backlogs in delivery of the Products ordered by me either because of unexpected demand or pre-order of Products. I agree to accept notice of such delays either directly, by daily HEAT calls announcing Product delays, or notices/posts to my back office.

8. If Products are not delivered within the expected time frame, I understand and agree that I can cancel the order and obtain delivery of other Products in stock or obtain a refund within 14 days of a request.

9. I understand that I am required, by federal law, to maintain records of retail sales to consumers that are my customer base. I also understand and agree that I will maintain these records if audited by the IRS and will voluntarily

1    produce my retail records upon request by the Federal Trade Commission.

2    10. I understand and agree any concerns or complaints can be resolved through
        my Up-Team Leader. I understand that SBH has an open door policy on all
3       sales, compensation or other issues, which can be raised by a "ticket", which
        will be forwarded through my UpTeam Leader, the Customer Service and
4       Senior Field Advisors.

5    Each statement would be _initialed_ by each Affiliate before becoming an SBH Affiliate. **Ex. 507 and**

6    **522.**

7        Each Affiliate would be required to initially a similar set of statements via DocuSign at least

8    every quarter or for any order exceeding $1000 or some other amount set by the Court.

9        Permanent bans on business activities likely violate the First and Fifth Amendments to the

10   United States Constitution by denying defendants in FTC their right to associate, enter into contracts

11   and engage in protected commercial speech. The First Amendment guarantees freedoms concerning

12   religion, expression, assembly and the right to petition. It guarantees freedom of expression by

13   prohibiting Congress from restricting the press or the rights of individuals to speak freely. In

14   _Bigelow v. Virginia_(1975), the Supreme Court ruled that an individual had the right to advertise in

15   Virginia about the availability of abortion services in New York. "The existence of commercial

16   activity, in itself is no justification for narrowing the protection of expression secured by the 1st

17   amendment." the court issued its opinion in _Virginia State Board of Pharmacy v. Virginia_ citizens

18   consumer council, Inc. (1976), In _Virginia State Board_, the Supreme Court extended First

19   Amendment free speech protection to commercial speech and striking down a state law making it

20   illegal for pharmacies to advertise the price of drugs. The court held that the First Amendment not

21   only includes the right of the speaker to speak but also the right of the listener to receive information.

22   In this case, consumers had a right to receive lawful information about drug prices." Stated

23   differently, the dispute in this case involves the communication of lawful or _accurate_ information.

24       While the communication of lawful information may warrant issuance of a permanent

25   injunction, the Court cannot completely ban a company or an individual from engaging in lawful

26   speech about a commercial business venture. Thus, any injunctive relief must be _narrowly tailored_

27   to address specific forms of speech that are inaccurate. In this case, it is entirely lawful for an

28   individual to describe a commission plan, but it is not lawful to guarantee that a consumer will make

a certain amount of money if they enter into a contract relationship. The Court must evaluate the overall context of the speech involved, determine if there was a guarantee under all the facts and circumstances. For example, if a consumer is told that he can make millions if he works hard, develops recommended sales skills and is tenacious in selling certain products, that is protected commercial speech.

The Fifth Amendment to the Constitution creates a number of rights applicable to civil legal proceedings.  In pertinent part, the Fifth Amendment requires that" due process of law" be part of any proceeding that denies a citizen "life, liberty or property."   A permanent ban may be possible under the Fifth Amendment, but not in this case.  Noland contends that he was misled into signing the 2002 Order. Regardless, the mere fact that a person reluctantly entered into a settlement agreement without any admission of wrong-doing made a mistake twenty (20) years ago does not warrant a *permanent ban* that deprives them of their right to commercial speech and make a living as a motivational speaker and sales coach.

Permanent injunctions should not be overly broad but should specify lawful activities and unlawful practices.  Indeed, in *FTC v. Cardiff,* CV 18-2104-DMG (PLAX) (C.D. CA, 2021). the district court, in a failure to test and substantiate nutritional products, refused to grant the FTC's request for a permanent ban/injunction on all activities relating to the manufacture of thin strip technology. Instead, the district court held that Redwood Scientific and the Cardiffs would be allowed to manufacture and sell the Products to distributors, and further ordered that Redwood Scientific would have to conduct appropriate testing prior to any distributor sales.

The Court finds that a permanent ban on Defendants' activities is overly broad and punitive. The Court also finds that SBH could be operated under stringent guidelines including, for example, the DocuSign procedures described by counsel.   SBH and the Individual Defendants may present an appropriate order on SBH operations within sixty (60) days of this Order.

Signed this ___ day of _____, 2023.

_____

Hon. Domenic Lanza
United States District Judge

84

\

Dated:  January 8, 2023

Very respectfully,

COCHELL LAW FIRM P.C.


By:   /s/ Stephen R. Cochell
      Stephen R. Cochell

Attorneys for DEFENDANTS
James D. Noland, et al.


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument, has been served on this 8th day of January, 2023 upon all counsel of record by email, facsimile, by regular mail or pursuant to the Court's ECF system.

                              /s/ Stephen R. Cochell
                              Stephen R. Cochell