**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Federal Trade Commission, | No. CV-20-00047-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| James D. Noland, Jr., et al., | |
| Defendants. | |

The bench trial in this matter took place over the course of 11 trial days in January and February 2023.  The Court's findings of fact and conclusions of law are set forth below.

## LEGAL STANDARD

Rule 52(a)(1) of the Federal Rules of Civil Procedure provides that "[i]n an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately.  The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court."

The Ninth Circuit has explained that a district court's findings under Rule 52(a) "should be explicit enough to give the appellate court a clear understanding of the basis of the trial court's decision, and to enable it to determine the ground on which the trial court reached its decision."  *Alpha Distrib. Co. of Cal., Inc. v. Jack Daniel Distillery*, 454 F.2d 442, 453 (9th Cir. 1972).  With that said, such findings must also "strike an appropriate balance between detail, simplicity, and efficiency. . . .  [E]xcessively long and detailed

findings are not necessary . . . and can even be unhelpful. . . .  Ultimately, the trial court's findings should be sufficient to reveal the court's concept of the facts and applicable legal standards without being needlessly elaborate or too wordy."  2 Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 52, at 46-47 (2021).  Put another way, "the judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts."  Fed. R. Civ. P. 52, advisory committee's note to 1946 amendment.[1]

## FINDINGS OF FACT

I.   Background

Before turning to the FTC's outstanding claims, it is helpful to provide an overview of the complicated factual and procedural history of this case and make some factual findings regarding witness credibility and other issues that are broadly relevant to the outstanding claims.

A.   **Overview Of The Two Actions**

Between 2017 and 2020, James "Jay" Noland ("Noland"), Lina Noland, Thomas Sacca ("Sacca"), and Scott Harris ("Harris") (together, "Defendants") operated a pair of multi-level marketing businesses ("MLMs").  The first, Success by Health ("SBH"), offered coffee products, other beverages, and nutraceuticals, while the second, VOZ Travel ("VOZ Travel"), promised to offer certain travel-related benefits.

In January 2020, the FTC filed a lawsuit against Defendants, which was assigned case number 20-cv-00047 and will be referred to as the "Lead Action."  In the operative complaint in the Lead Action, the FTC alleges that Defendants violated various provisions

---

[1]   As discussed throughout this order, the Court broadly found the FTC's witnesses to be credible, whereas many of the defense witnesses were not fully credible.  Thus, the Court largely agrees with the FTC's proposed findings of fact.  Nevertheless, given the directive to "make brief, definite, pertinent findings and conclusions upon the contested matters" and avoid "over-elaboration of detail or particularization of facts," this order does not address all 842 of the FTC's proposed findings of fact (Lead Action, Doc. 528) or all 271 of Defendants' proposed findings of fact (Lead Action, Doc. 529).  Instead, relevant findings have been included where appropriate.  This approach (which has still generated a 100+ page order) should not be viewed as an implicit rejection of any of the FTC's proposed findings.

of the Federal Trade Commission Act ("FTC Act") by operating SBH and VOZ Travel as unlawful pyramid schemes, by making false representations in the course of operating those ventures, and by engaging in certain product-shipping and refund practices that violated rules promulgated by the FTC. (Lead Action, Doc. 205.)[2]  During the early stages of the Lead Action, the FTC sought—and the Court granted—a temporary restraining order and a preliminary injunction. (Lead Action, Docs. 19, 38, 106, 109.)  These orders resulted in the appointment of a receiver to operate SBH and an asset freeze, among other things.

As the proceedings in the Lead Action were unfolding, the FTC identified another avenue for seeking relief, which stemmed from a different lawsuit the FTC had filed against Noland in the District of Arizona nearly two decades earlier.  In that lawsuit, which was assigned case number 00-cv-02260 and will be referred to as the "Contempt Action," the FTC accused Noland of engaging in various forms of misconduct related to an MLM called Bigsmart, which the FTC alleged to be a pyramid scheme.  (Contempt Action, Doc. 1.)  During the early stages of the Contempt Action, Noland filed bizarre pleadings filled with sovereign-citizen arguments.[3]   Later, in 2002, Noland agreed to settle the FTC's allegations.  The settlement agreement, which clarified that Noland was not admitting any wrongdoing, took the form of a stipulated permanent injunction that forbade Noland (and others "in active concert or participation" with Noland) from engaging in certain practices.  (Contempt Action, Doc. 66.)  As relevant here, the forbidden practices included (1) operating a "prohibited marketing scheme," including a pyramid scheme; (2) making

---

[2]     The abbreviation "Doc." refers to where the cited document was filed as part of the docket.  The abbreviation "Ex." refers to the exhibit number at trial.  The abbreviation "Tr." refers to the page number of the trial transcript.

[3]     *See, e.g.*, Contempt Action, Doc. 38 (Noland's "Request for Remedy," which threatened to place the assigned judge into "involuntary bankruptcy" and asserted that, by writing his name in the case caption in capital letters, the FTC had sued Noland's "VESSEL," a legal entity "registered with the Dept. of Transportation in Puerto Rico," rather than his person, which was the "secured/creditor/priority stockholder/holder-in-due-course" of his "VESSEL"); Contempt Action, Doc. 51 at 2-3 (order, explaining that "Noland claims that this Court lacks jurisdiction over him because he did not consent to the federal government's authority over him and because he claims that the FTC is acting under a 'secret jurisdiction'" and that "[n]othing in Noland's motions to dismiss disputes the factual or legal allegations presented by the FTC.  Instead Noland focuses on two theories from the 'Sovereign Citizens Movement' that have been consistently rejected by the courts as 'bizarre,' 'entirely frivolous,' 'meritless,' and 'unreasonable.'").

any "false or misleading statement . . . of material fact" in connection with an MLM; and (3) failing to take "reasonable steps" to monitor compliance with the permanent injunction. (*Id.* at 3-4, 6-7.)

In the FTC's view, Noland violated these provisions through his operation of SBH and VOZ Travel. Accordingly, in February 2020, the FTC filed a motion in the Contempt Action for an order to show cause why Noland should not be held in contempt for violating the permanent injunction. (Contempt Action, Doc. 78.) In response to the show-cause motion, Noland submitted declarations from Harris and Sacca in which they acknowledged that Noland had advised them of the permanent injunction and of the limitations imposed by it. (Contempt Action, Docs. 82-1, 82-2.) Based on that evidence, the FTC moved for an order to show cause why Harris and Sacca, too, should not be held in contempt. (Contempt Action, Doc. 91.)

In July 2022, the Court issued an order consolidating the Lead Action and the Contempt Action for all purposes. (Lead Action, Doc. 516.)

B.     **The Receivership**

As noted, the Court granted the FTC's request, made at the outset of the case, to appoint a receiver to assume control over SBH, VOZ Travel, and other related entities. Although this decision has been the subject of intense criticism by Defendants (and some SBH affiliates) over the past three years, the evidence presented during the bench trial leaves no doubt in the Court's mind that it was the correct decision.

The receivership also provides the backdrop for various developments that bear on the remaining disputed issues in this case. For example, as part of the preliminary injunction, the Court authorized the receiver to resume SBH product sales in the hope that such sales would "provide some relief to the Affiliates who feel harmed by the TRO." (Lead Action, Doc. 106 at 28.) The Court "allow[ed] the receiver to reactivate shipping and sell what SBH products she has in her possession." (*Id.*) The receiver reopened sales in mid-May 2020. (Tr. 368.) However, the receiver did not reactivate the SBH commission structure. (Tr. 366, 381, 397.)

SBH product sales plummeted after these changes were instituted.  In the years before entry of the TRO, affiliates bought an average of $6,694.23 in SBH products per day.  (Ex. 38 at 11-12.)  In contrast, during the 275-day period in which the receiver sold SBH products, SBH product sales averaged $413.56 per day (*id.* at 12)—a decrease of nearly 95% from pre-TRO sales.  The relevance of these developments is discussed in more detail in later portions of this order.

After assuming control over SBH, the receiver also identified various irregularities in how Defendants had been operating the business.  For example, the receiver discovered "that one of the products [G-Burn] contained an ingredient banned by the FDA" and thus discontinued selling that item.  (Tr. 370, 397.)  The receiver also became concerned that Defendants lacked "substantiation of the products' claims that they had been making on their website and in other promotional materials" and, after defense counsel was unable to provide any substantiation materials, arranged for "the website . . . to be changed and all of the product descriptions on the website . . . to be changed."  (*Id.* at 370.)  The receiver also discovered that SBH had been operating in Kentucky without registering with the state, lacked commercial liability insurance, and had not been collecting sales tax on product sales.  (*Id.* at 368-69.)

Separately, Defendants were required to "immediately" provide a copy of the TRO to each "affiliate, . . . employee, . . . and representative of any Defendant."  (Lead Action, Doc. 38 at 27.)  The TRO also barred Defendants from "[t]ransacting any of the business of the Receivership Entities."  (*Id.* at 23.)  Nevertheless, after being served with the TRO on January 13, 2020, Noland went to the beach and broadcasted a six-minute statement to SBH affiliates, never mentioning the TRO but instead mentioning some "legal matters that we're dealing with right now" and stressing how Defendants "do[] things the right way, bringing tons of integrity, transparency to the industry."  (Ex. 121 at 5:5-10.)  Defendants did not disclose the existence of the TRO to SBH affiliates until January 24, 2020.  (Lead Action, Doc. 351-2 at 7.)  The relevance of these developments is discussed in more detail *infra*, primarily in relation to the necessity and scope of injunctive relief.

Finally, the discussion of the receiver's role in this case would not be complete without noting that, in April 2021, the Supreme Court held in *AMG Capital Mgmt., LLC v. FTC*, 141 S.Ct. 1341 (2021), that the FTC may not obtain "equitable monetary relief such as restitution or disgorgement" pursuant to its authority under § 13(b) of the FTC Act.  *Id.* at 1344.  After *AMG Capital* was decided, Defendants argued that the receivership and asset freeze should be lifted.  (Lead Action, Doc. 383.)  In a September 2021 order, the Court disagreed, explaining in relevant part that "*AMG Capital* does not undermine the receivership component of the original order granting a preliminary injunction.  The purpose of the receivership was not merely to preserve assets in anticipation of a future award of monetary remedies pursuant to the FTC's § 13(b) claims—to the contrary, a key reason why the Court imposed the receivership was to prevent ongoing and future harm, by ousting the Individual Defendants from their management positions in entities that were likely functioning as pyramid schemes and making false income representations." (Lead Action, Doc. 412 at 6.)

C.   **Encrypted Communications**

Before trial, the Court granted the FTC's motion for spoliation sanctions.  (Lead Action, Doc. 401.)  The conduct underlying that motion, which related to Defendants' use of the encrypted communication services Signal and ProtonMail, was also the subject of extensive discussion during trial.[4]  Because these issues are relevant to all of the FTC's outstanding claims against Defendants—they have the potential to affect the Court's findings both as to liability and as to remedies—the Court addresses them here.  As summarized below, the Court finds that Defendants engaged in at least 10 discrete acts of dishonesty that relate, in one way or another, to Signal and ProtonMail.

---

[4]   The order granting the FTC's sanctions motion explained that there was no need for an evidentiary hearing because Defendants "ma[d]e no effort to identify the evidence they would attempt to submit during such a hearing or explain how it would differ from the voluminous evidence already submitted by the parties in relation to the FTC's motion." (Lead Action, Doc. 401 at 26.)  The Court continues to believe that approach was correct but notes that the bench trial functionally served as an evidentiary hearing, as Defendants presented an array of evidence during trial concerning why they deleted Signal and other related matters.  After hearing all of that evidence and evaluating Defendants' credibility, the Court reaches the same conclusions it reached in the sanctions order.

The first act of dishonesty is Defendants' initial decision to begin using Signal and ProtonMail. The relevant facts are as follows. On May 15, 2019, Wells Fargo inadvertently disclosed to Noland that the FTC had subpoenaed bank records related to him and his companies. (Lead Action, Doc. 401 at 3-4.) The very next day, Noland instructed the "SBH Leadership Council," which included Harris and Sacca, to install the Signal messaging application on their phones. (*Id.*) Signal emphasizes user privacy, highlighting its end-to-end encryption, and promises that messages cannot be seen by Signal or others. (*Id.*) Defendants installed and began using Signal that same day. (*Id.*) Around the same time, Defendants also switched to using ProtonMail, a Swiss encrypted email service that emphasizes user privacy. (*Id.*) On May 29, 2019, the FTC asked that Defendants "suspend any ordinary course destruction of documents, communications, and records." (*Id.*) Rather than suspend document destruction, Defendants instructed each other (as well as other SBH employees and affiliates) to use Signal or ProtonMail for "anything sensitive" or "important things." (*Id.*) The Court concludes, in its capacity as finder of fact, that Defendants' purpose in switching to Signal and ProtonMail was to conceal evidence from the FTC.

This finding dovetails with the second act of dishonesty. During their testimony at trial, Defendants sought to provide various innocent explanations for their decision to begin using Signal the day after learning about the FTC's investigation. Noland testified that the timing was a "coincidence." (Tr. 1560-61.) The Court found this testimony to be incredible and damaging to Defendants' credibility. In particular, the Court was unpersuaded by the explanation that Defendants chose to begin using Signal because a rival had just launched a competing travel business and they suspected the rival had learned about (and stolen) their idea for the travel business by hacking their phones. (*See, e.g.*, Tr. 757, 817-18, 1578.) Not only is there no evidence (apart from Defendants' testimony) that Defendants had begun developing their travel business idea before the rival's announcement, but Noland testified elsewhere that he orally told Luke Curry about the travel business idea and suspected that Curry was the source of the leak. (Tr. 1488-93.)

Assuming this is true, there would have been no reason to suspect the leak had actually been accomplished through phone hacking (and, thus, to switch to Signal to avoid future phone hacking).

In a related vein, the Court was unpersuaded by Defendants' testimony at trial that they only used Signal's messaging feature for non-substantive logistical texts (such as scheduling phone calls) and reserved their substantive discussions for phone calls conducted via Signal. (*See, e.g.*, Tr. 765, 821-22, 1501, 1566, 1869.) This explanation was not credible for at least two reasons. First, before switching to Signal, Defendants exchanged a large volume of substantive text messages via the "SBH Leadership Council" group chat on WhatsApp, but after switching to Signal, the volume of such messages dwindled. (Tr. 1568-70.) It is implausible that Defendants simply stopped engaging in substantive text message conversations after switching messaging platforms—the more logical inference is that Defendants began using Signal's messaging feature for these conversations. Second, the FTC presented evidence at trial of one instance in December 2019 where Harris sent the following text to Noland via the iOS app: "Please text me on signal." (Ex. 388.) This text undermines Defendants' testimony about how they used Signal's messaging function, which was only to make logistical arrangements for Signal phone calls. If that were true, Harris would have simply texted "Please *call* me on signal"—there would have been no need to switch over to Signal's messaging platform simply to then send *another* text message saying "Please call me on signal." The inference is that Defendants were using Signal's messaging function for substantive purposes but chose to testify untruthfully about that conduct at trial.

The third act of dishonesty occurred in the aftermath of the TRO. Among other things, the TRO required Defendants to "immediately transfer or deliver to the Temporary Receiver," *inter alia*, "[a]ll Documents of or pertaining to the Receivership Entities, including all communications occurring via electronic mail, electronic message service, or *encrypted messaging service*," "[a]ll computers, electronic devices, mobile devices, and machines used to conduct the business of the Receivership Entities," and relevant

passwords.  (Lead Action, Doc. 38 at 21-22, emphasis added).  As a result, the receiver asked Defendants to "turn over all of their electronic mail, electronic messages, or encrypted messages relating to the receivership entities."  (Tr. 343.)  In response, Defendants "[n]ever turn[ed] over any messages they sent using the Signal messaging app" and never disclosed "that they had used the Signal messaging app to communicate about company business."  (*Id.*)  Separately, the receiver asked Defendants to "turn over all of their electronic devices and mobile devices related to company business."  (Tr. 344.) However, after then-defense counsel advised the receiver—falsely, as it turns out—that "the mobile devices didn't contain anything that hadn't already been produced to [her]," she dropped the production request.  (Tr. 344-45.)  This conduct was deceptive and constituted a violation of a court order.

The fourth act of dishonesty occurred during Noland's first deposition on February 5, 2020.  During that deposition, the FTC asked Noland a series of questions about whether he used any encrypted messaging services or applications.  In response, Noland failed to disclose his use of Signal and ProtonMail:

> Q.    Have you ever used any type of encrypted communications to conduct Success By Media business?
>
> A.    I'm not sure what you mean, sir.
>
> Q.    Have you used any type of phone application or software system that encrypts the substance of the communication from point to point?
>
> A.    I mean, I think it's like standard practice now.  I don't know.  It's standard practice.
>
> Q.    Do you do that in your course of your work for Success By Media?
>
> A.    I don't know.  Whatever communication.  I mean, it's a phone call. The encrypted, what Verizon offers.
>
> Q.    Do you do anything separately to encrypt your communications apart from what a Verizon provider may do on their end?
>
> A.    Just have, you know, I think WhatsApp uses that now.

(Lead Action, Doc. 259-1 at 130.)  In its proposed findings of fact, the FTC urges the Court to find that Noland "feigned confusion and then lied" during this portion of the deposition.

1    (Lead Action, Doc. 528 at 156 ¶ 749.)  As harsh as these words may be, the Court agrees

2    in its capacity as factfinder that this is an accurate description of what transpired.

3          The fifth, related act of dishonesty arises from Noland's testimony during the bench

4    trial about his February 2020 deposition testimony.  In essence, Noland blamed the FTC's

5    attorney for cutting him off before he had a chance to complete his answer.  (Tr. 1570-71.)

6    Noland also seemed to blame his then-counsel for the omission.  (Tr. 1572-73.)  These are,

7    respectfully, not credible excuses for Noland's failure to disclose his use of Signal and

8    ProtonMail during the February 2020 deposition.

9          The sixth act of dishonesty occurred in mid-2020, when Noland used his ProtonMail

10   account to send an email to Robert Mehler.  (Ex. 355.)  In the Court's view as factfinder,

11   this email was not (as the defense sought to portray it at trial) some clumsily written but

12   well-intentioned attempt to gather evidence—instead, it was essentially a script that Noland

13   hoped SBH affiliates would follow when submitting declarations intended to bolster the

14   defense's position in this case.  The Court reaches this conclusion not only based on the

15   substance of the email but because of what followed.  After sending the email to Mehler,

16   Noland deleted it and failed to produce or disclose it to the FTC.  (Lead Action, Doc. 276

17   at 3 n.3.)  Separately, Mehler failed to disclose the email in response to a subpoena from

18   the FTC, a follow-up email from the FTC, and a subsequent letter from defense counsel.

19   (Tr. 1094-1104.)  Although Mehler attempted to explain at trial why his failure to produce

20   the email in response to these inquiries was a good-faith mistake, the Court did not find

21   this testimony credible.  Attempting to coach witnesses and then hide the evidence of the

22   witness-coaching is deeply troubling behavior.

23         The seventh act of dishonesty occurred on August 17, 2020, when Defendants

24   engaged in a coordinated effort to delete the Signal app from their phones, which were due

25   to be turned over for imaging the next day.  These deletion efforts prevented the forensic

26   recovery of any Signal-related information from the phones.  In the sanctions order, the

27   Court described Defendants' coordinated deletion of the Signal app as "an outrageous

28   maneuver that raises a strong inference of bad faith."  (Lead Action, Doc. 401 at 24.)  The

Court stands by that description now, after hearing the evidence during the bench trial.

The eighth, related act of dishonesty is Defendants' testimony during the bench trial about why they chose to delete Signal in this fashion. Essentially, Defendants testified that they only reason they did so was because they feared the FTC would otherwise be able to use the information in the Signal app to identify which individuals were making donations to their legal defense fund in this case and then harass those individuals with overbroad subpoena requests. (*See, e.g.*, Tr. 760-61 [Lina Noland]; Tr. 1260-61 [Sacca]; Tr. 1499-1501 [Noland].) This testimony is problematic for two reasons. First, even assuming that protecting donor identities was *one* reason why Defendants chose to delete the Signal app,[5] the Court does not accept that it was the *only* reason. Given the sheer scope of the dishonesty surrounding the use and concealment of Signal and ProtonMail, the Court infers that Defendants also deleted it with the intent of destroying evidence that could otherwise be used against them in this litigation. Their testimony to the contrary during trial undermined their credibility and serves as further evidence of dishonesty. Second, and more broadly, Defendants' trial testimony on this point seems to presuppose that there might be a good reason for intentionally violating a court order. There isn't. Even accepting their trial testimony, Defendants made a calculated, deliberate decision to violate the TRO because they concluded it would be in their tactical interest. This is troubling under any circumstance and is particularly troubling here, where the essential question posed by some of the FTC's requests for permanent injunctive relief is whether Defendants can be trusted to follow future court orders.

The ninth act of dishonesty, which came as something of a surprise during trial, concerns Noland's effort in August 2020 to create a new ProtonMail email account with the handle "breeze8." (Tr. 2059.) The fact that Noland created this email account is not,

---

[5]     The FTC questions the sincerity of Defendants' contention on this point, noting that Signal dialing records would not alone reveal which SBH affiliates were making donations (and that the FTC has, at any rate, learned the identity of the donors through other means). The Court finds it unnecessary to decide whether Defendants' professed desire to protect donor identities was one of their motivations for deleting Signal because, as discussed in the text, the decision was dishonest and indefensible even if this was part of the rationale.

1   alone, evidence of dishonesty—there is nothing inherently wrong with having multiple
2   email accounts.  Instead, the dishonesty stems from the testimony that Noland provided
3   during his December 14, 2020 deposition in this case.  During that deposition, Noland was
4   asked, point-blank, to identify "all email addresses you've used since January 1st, 2017"
5   and failed to identify the breeze8 account in his resulting answer.  (Tr. 2063-65.)  There is
6   no honest explanation for this omission.[6]

7   The tenth, related act of dishonesty is Noland's testimony during the FTC's rebuttal
8   case at trial, when he was finally confronted with his failure to disclose the breeze8 account
9   during his December 2020 deposition.  In response, Noland took zero accountability for
10  the omission, refused to even acknowledge that he had made a mistake (explaining that the
11  previous testimony related "specifically in regard to that spoliation at that time"), and
12  instead tried to blame his former counsel.  (Tr. 2068-71.)

13          D.      **Relevant Prior Rulings**

14          This case has involved an unusual degree of pretrial motions practice, as evidenced
15  by the more than 500 pretrial docket entries.  It is unnecessary here to provide a complete
16  summary of those pretrial rulings, which have been summarized in prior orders.  (*See, e.g.*,
17  Lead Action, Doc. 473 at 1-8.)  Instead, the Court will identify only the prior rulings that
18  help frame the issues being resolved in this order.

19          As noted, the FTC's claims in the Lead Action essentially fall into three categories:
20  (1)  Defendants violated the FTC Act by operating SBH and VOZ Travel as a pyramid
21  scheme; (2) Defendants violated the FTC Act by making false and misleading statements
22  in the course of operating SBH and VOZ Travel; and (3) Defendants violated the FTC's
23  Merchandise Rule, 16 C.F.R. § 435, and Cooling-Off Rule, 16 C.F.R. § 429, by not offering
24  and providing certain information and refunds.

25          In March 2021, the FTC moved for summary judgment as to liability on all of its

26  _____

27  [6]      During his direct testimony at trial, Noland also failed to disclose the breeze8
     ProtonMail account in response to questioning by his own counsel.  (Tr. 1494-95.)
28  Although this episode could potentially be characterized as another instance of dishonesty,
     the Court acknowledges that the questions posed by counsel were somewhat ambiguous
     (and certainly not as clear as the questions posed during the December 2020 deposition).

claims in the Lead Action.  (Lead Action, Doc. 285.)  In September 2021, the Court granted this motion in part.  (Lead Action, Doc. 406.)  On the one hand, the Court found there was no genuine dispute of material fact that (1) VOZ Travel was a pyramid scheme, (2) Defendants promoted VOZ Travel using false claims that consumers could reasonably expect to earn substantial income, and (3) Defendants provided the means and instrumentalities for others to violate the FTC Act by promoting VOZ Travel.  (*Id.* at 35-37, 43-44, 48.)[7]  The Court also found no genuine dispute of material fact that Defendants violated the Merchandise Rule and Cooling-Off Rule.  (*Id.* at 50-52.)[8]  On the other hand, the Court declined to grant summary judgment in the FTC's favor with respect to whether SBH was a pyramid scheme and whether Defendants made misrepresentations about SBH members' potential income.  (*Id.* at 40, 46.)[9]

In June 2021, the FTC moved for summary judgment with respect to monetary remedies in the Lead Action.  (Lead Action, Doc. 365.)  Although the FTC indicated at the outset of the case that it intended to seek damages of up to $8 million based on its claims in the Lead Action (Lead Action, Doc. 163 at 19), the FTC clarified in its remedies-related

---

[7]    These determinations stemmed, in part, from Defendants' failure to discuss (let alone defend) VOZ Travel in their motion papers.  (*See, e.g.*, *id.* at 35 ["The Individual Defendants largely ignore the FTC's evidence and arguments related to the VOZ Travel program.  Whatever the reason for this approach, it effectively dictates the outcome here—the FTC's initial evidentiary submissions are sufficient to meet its burden of production on the pyramid-scheme claim as applied to VOZ Travel and, because that evidence is essentially undisputed, it follows that the FTC is entitled to summary judgment [on Count One]."]; *id.* at 43 ["The FTC is entitled to summary judgment on Count Two for the simple reason that the Individual Defendants do not even attempt to defend some of the categories of misrepresentations identified in the FTC's motion.  As noted, the FTC specifically argues that Individual Defendants made false income claims regarding VOZ Travel."].)

[8]    These determinations stemmed, in part, from Defendants' concession that they had committed the alleged violations.  (*Id.* at 50 ["[T]he Individual Defendants' answer admits that Merchandise Rule violations occurred, objecting only to the assertion that such violations were 'numerous.'  This admission, standing alone, compels the entry of summary judgment in the FTC's favor on the issue of liability."]; *id.* at 51 ["There is no genuine dispute of material fact as to Count Six—the Individual Defendants admit they violated the Cooling-Off Rule."].)

[9]    Although the Court initially suggested there would be no need for a trial on whether SBH was a pyramid scheme because Count One of the operative complaint in the Lead Action only required a finding of pyramid-scheme liability as to SBH *or* VOZ Travel (Lead Action, Doc. 407 at 1), the Court later clarified that the SBH pyramid-scheme issue would be resolved at the bench trial because it is relevant to the scope of relief being sought by the FTC in both actions (Contempt Action, Doc. 134 at 3).

motion that, in light of *AMG Capital*, it was only seeking monetary remedies in the Lead Action pursuant to its Rules-based claims and was not seeking monetary remedies pursuant to its pyramid-scheme and false-statements claims.  (Lead Action, Docs. 351, 365.)  This reduced the damages sought in the Lead Action to approximately $1.1 million.  (Lead Action, Doc. 365 at 1.)  In November 2021, the Court denied the FTC's remedies-related motion, concluding that the FTC's methodology for calculating the damages associated with the Rules violations was overbroad.  (Lead Action, Doc. 438 at 7 ["Although the Court does not foreclose the possibility that consumers suffered some form of cognizable harm from the violations, the all-or-nothing methodology presented in the FTC's motion papers is flawed because it fails to account for the inherent value of the product that consumers ultimately received."].)

Separately, in the Contempt Action, the FTC's essential theory is as follows: (1) Noland, Harris, and Sacca violated the 2002 permanent injunction in various ways through their operation of SBH and VOZ Travel; (2) these violations qualify as "contumacious conduct"; (3) the Court may therefore impose compensatory sanctions against Noland, Harris, and Sacca pursuant to the law of civil contempt; (4) such monetary awards are not subject to the same limits that apply, post-*AMG Capital*, to the FTC's claims in the Lead Action; and (5) the Court should therefore award more than $7 million in sanctions in the Contempt Action.  (Lead Action, Doc. 532 at 64-66; Contempt Action, Doc. 106.)

In June 2021, the FTC filed a motion in which it asked the Court to enter the requested award in the Contempt Action without an evidentiary hearing.  (Contempt Action, Doc. 106.)  In March 2022, the Court issued an order denying this motion without prejudice.  (Contempt Action, Doc. 130.)  Although the Court recognized that "[t]he FTC has established that the Contempt Defendants violated some provisions of the permanent injunction," the Court noted that "the FTC has not established, at least at this stage of the proceedings, that the Contempt Defendants committed certain other alleged violations of the permanent injunction.  The FTC's contempt motion is based, in part, on the assertion

that SBH constituted a pyramid scheme and that the Contempt Defendants made false income-related statements in the course of operating SBH (conduct that would, in turn, violate Sections I, II, and III of the permanent injunction).  However, in the summary judgment order as to liability in the [Lead] Action, the Court concluded that the existence of triable issues of fact precluded the entry of summary judgment in the FTC's favor on those particular issues.  Because the FTC simply cross-references its summary judgment evidence for purposes of establishing contempt liability, the Court concludes that the FTC has not clearly and convincingly established, at this stage of the proceedings, that the Contempt Defendants violated Sections I, II, and III of the permanent injunction through their operation of SBH.  The FTC will need to seek to establish those violations at an evidentiary hearing." (*Id.* at 7-9.)  The Court further noted that "[b]ecause the FTC has not established all of the violations alleged in its motion, it follows that the FTC has not established an entitlement to the $7,012,913.25 compensatory contempt award sought in its motion.  To calculate that sum, the FTC added together the net revenues earned from both SBH and VOZ Travel.  But because the SBH-related violations have not been established, the FTC's requested sum is necessarily overstated." (*Id.* at 9.)[10]

Given this backdrop, the outstanding issues to be resolved during the bench trial are, broadly speaking: (1) whether SBH was a pyramid scheme; (2) whether Defendants made false and misleading statements with respect to SBH; (3) the extent to which Noland, Harris, and Sacca violated the 2002 permanent injunction (which depends, in part, on the resolution of the first two issues); (4) the monetary remedies that should be imposed based on the Rules violations in the Lead Action; (5) the monetary remedies that should be imposed in the Contempt Action; and (6) the scope of injunctive relief.

…

…

…

---

[10]     The Court also identified two potential problems with the FTC's methodology for calculating damages in the Contempt Action.  (Contempt Action, Doc. 130 at 9-11.)  Those issues are addressed in more detail in later portions of this order.

### E.   **The Bench Trial And Witness Credibility**

#### 1.   FTC Witnesses

During the bench trial, the FTC called five witnesses.  The first, Dr. Stacie Bosley, offered the opinions that "SBH was operating as a pyramid scheme" and that SBH "was misrepresenting the opportunity to consumers."  (Tr. 55.)[11]  On the whole, the Court found Dr. Bosley to be a credible and persuasive expert witness.  Although defense counsel attempted to poke holes in certain aspects of Dr. Bosley's analysis and methodology, these impeachment efforts did not undermine the overall persuasiveness of her opinions.

The FTC's second witness was Adam Rottner, an FTC investigator who "made undercover purchases [from SBH], joined the company as an affiliate and participated in calls and Facebook Live events."  (Tr. 219-20.)  The Court found Rottner to be a credible witness and assigned particular significance to his testimony concerning VOZ Travel.  More specifically, Rottner testified that although Defendants included several very specific product claims in presentations regarding VOZ Travel—*i.e.*, VOZ Travel could "literally" produce 70% savings on travel costs, VOZ Travel had a "complete gamification engine" that would provide rewards in exchange for feedback, VOZ Travel was "developing an exclusive travelers DNA tool," and VOZ Travel was "working on artificial intelligence named Dina that was comparable to Siri, Alexa, and Cortana"—there was no documentary evidence that any of these claims were true.  (Tr. 246-52.)

The FTC's third witness was Elizabeth Miles, an FTC data analyst.  The Court found Miles to be a credible witness.  Among other things, Miles calculated "that 94.7 percent of

---

[11]     *See also* Tr. 115 (Q: "You've testified that you found SBH met your economic definition of a pyramid scheme.  Putting everything together, the plan, the program, the training, instructions, practices, the approaches on safeguards, what is your conclusion on whether SBH operated as a pyramid scheme as defined by the *Koscot* test and *FTC v. BurnLounge*?"  A: "So I find, again, that affiliates did pay for the right to receive rewards where those rewards were for recruiting and unrelated to ultimate user sales.  And, again, the *BurnLounge* second principle says a system doesn't have to be wholly unrelated to user sales.  In practice as a whole, it's designed to operate to give you rewards that are unrelated.  And so I find that it satisfies the *Koscot* test."); Tr. 120 (Q: "Did you reach a conclusion on whether SBH's income representations are false?"  A: "I did, yes."  Q: "What was that conclusion?"  A: "That it does systematically misrepresent the earnings that would be achieved in this system.").

- 16 -

purchases from Success By Media were by affiliates" (Tr. 305); that only 420 affiliates (out of more than 6,000) were in a net position greater than zero vis-à-vis SBH (Tr. 307; Ex. 38 at 6-7);[12] that affiliate "purchases [from SBH] on the last day of the month [were] much, much higher than the rest of the month" (Tr. 311); and that affiliate purchases of SBH products fell by 94% after the TRO (Tr. 314).  As discussed in more detail *infra*, these calculations form part of the foundation for the Court's liability findings.  Although defense counsel attempted to identify methodological problems with several of Miles's calculations, these impeachment efforts did not undermine the overall persuasiveness of her calculations.

The FTC's fourth witness was Kimberly Friday, who served as the court-appointed receiver from January 2020 through August 2021.  The Court found Friday to be a credible witness.[13]  Although defense counsel attempted to suggest, via cross-examination, that Friday's flawed post-TRO marketing strategy and failure to obtain a merchant account were the real reasons for the post-TRO drop in SBH sales, the Court found this line of questioning only partly effective.  Friday was justified in taking the challenged steps she took to resume sales—it would have been reckless for the receiver to continue making the same income claims that had just been deemed problematic in the TRO and preliminary injunction rulings or to continue making the same product claims that Defendants had been unable to substantiate.  At any rate, although the Court does not discount the possibility that an array of factors may have contributed to the dramatic decrease in post-TRO sales, the Court was persuaded (in its capacity as factfinder) that the absence of true customer demand for SBH's products—which was revealed only after the promise of recruitment commissions was stripped away—was the primary reason for the decrease.

The FTC's final witness was Roshni Agarwal, a forensic account employed by the FTC.  (Tr. 792.)  The Court found Agarwal to be a credible witness.  Agarwal's limited

---

[12]     Miles acknowledged that her "loss position" calculations do not account for profits that affiliates may have earned from retail sales.  (Tr. 324-25.)

[13]     Although Friday initially seemed to misremember certain details concerning the purported offer by Dr. Maranakis to purchase all of SBH's coffee inventory (Tr. 404-07), the Court viewed this as an isolated instance of an honest mistake.

role was to calculate the amount of money that Success By Media transferred to Defendants (or accounts and entities associated with Defendants) between July 2017 and January 2020. (Tr. 798.)  Agarwal calculated the overall figure to be about $1.7 million, consisting of about $582,000 to Noland, about $404,000 to Lina Noland, about $450,000 to Harris, and about $251,000 to Sacca.  (Tr. 798-99.)

### 2. Defense Witnesses

During the bench trial, the defense called 14 witnesses.  It is helpful to group them into categories.

### a. **Affiliate Witnesses**

Nine of the defense witnesses (Tevis Sherfield, Melanie Summers, Sye Head, James McKee, Scott Cunningham, David Small, Clayton Miller, Francois Hewing, and Joe Farley) are former SBH affiliates.  From the Court's perspective, the main points the defense hoped to establish through these witnesses' testimony were that (1) affiliates genuinely enjoyed consuming SBH's products and attending SBH's (and Noland's) training seminars and believed they were deriving value from doing so; (2) affiliates did not feel misled by Defendants' income representations, in part because SBH made clear that an affiliate's income expectations should depend on whether the affiliate considered himself a #1, a #2, or a #3; (3) retail sales were a point of emphasis within SBH; and (4) affiliates were, in fact, able to earn meaningful profits through the retail sale of SBH products.

The testimony of the nine affiliate witnesses was only partially successful in establishing these points.  As an initial matter, the affiliate witnesses were a mixed bag in terms of credibility.  The Court viewed some of the affiliate witnesses as honest and credible, if at times exuberant.[14]  Nevertheless, even those witnesses' testimony regarding profits from retail sales must be discounted because, as discussed in more detail below, they did not carefully track (and, in some instances, did not even understand the difference

---

[14]     For example, the Court was not persuaded by one witness's contention that SBH's nutraceutical products literally caused his cranial plates to shift back into place 36 hours after he began taking those products.  (Tr. 1806-07.)

between) revenues and profits.

Other affiliate witnesses, in contrast, lacked credibility.  For example, one affiliate witness denied ever telling consumers that joining SBH would help them earn over $100,000, only to be confronted with a Facebook post where he made that representation. (Tr. 1919-20.)   This witness then denied ever offering cash bonuses to affiliates for recruiting someone into SBH to buy an accelerator pack, only to be confronted with a Facebook post where he made that representation.  (Tr. 1922-23.)  This witness then denied ever making the representation that "SBH is delivering people every day to financial freedom," only to be confronted with a Facebook post where he made that representation. (Tr. 1923-24.)

Similarly, another affiliate witness initially testified that retail sales were "kind of the backbone of everything [SBH] did" and "the backbone of the industry really, but especially the company" and denied that Noland had ever suggested that recruitment commissions (rather than retail sales) were the backbone of the company.  (Tr. 434, 447, 545.)  During cross-examination, however, the FTC played a video in which this witness was shown telling affiliates that, according to Noland, a particular recruitment commission *was* the heart and soul and backbone of the company.  (Tr. 545.)  This witness also testified, during his direct examination, that he never bought products just to achieve or maintain a certain rank within SBH.  (Tr. 483-85.)  However, during cross-examination, this witness was confronted with a depressing text-message exchange in which he reached out in a panic to Sacca on the last day of the month because "the bank declined [his] SBH auto-order for insufficient funds" and he was fearful he would lose his SBH rank if he did not place a qualifying order by the end of the month.  (Tr. 553, 556-58.)

It also came out during cross-examination that this witness, as well as other affiliate witnesses, donated large sums of money to Defendants' legal defense fund.  Although affiliates are, of course, free to use their money however they see fit, such donations undermine the donors' credibility as fact witnesses (because they suggest the witnesses are

not neutral and have an incentive to shape their testimony to assist the defense).[15]

With these thoughts in mind, the Court was generally persuaded by the affiliate witnesses' testimony that they enjoyed consuming SBH's products and attending SBH's (and Noland's) training seminars and believed they were deriving some value from doing so. The significance of this testimony is discussed in more detail in later parts of this order.

The Court was less persuaded by these witnesses' testimony concerning SBH's income representations and purported emphasis on retail sales. Although the Court accepts, particularly in light of the testimony concerning Zone 1 stories, that retail sales were *one* of the things that SBH and Defendants discussed during conversations with affiliates, the Court does not accept that retail sales were the main focus. Instead, after weighing all of the voluminous evidence in this case (including the video clips introduced by both sides, the written marketing materials, and the various witnesses' testimony), the Court concludes that SBH's main focus was on the lucrative commissions that affiliates could earn by recruiting others. It is telling that SBH's official "Retail Sales Script" instructed affiliates to only attempt to make one retail sale before showing how the product could be purchased at wholesale pricing. (Tr. 1916, citing Ex. 8.)

Finally, the affiliate witnesses' testimony concerning the profitability of retail sales is summarized as follows:

• Sherfield: Sherfield testified that he paid about $28,000 for SBH products. (Tr. 526.) Sherfield did not, in contrast, identify how much money he earned from selling those products. (*See, e.g.*, Tr. 470-71 [asserting that he "made money" (and rejecting any insinuation that he lost money) between December 2017 and November 2018 but not providing any explanation or quantification].) This, alone, undermines any suggestion that Sherfield's experience is proof of the profitability of retail sales within SBH.

At any rate, other aspects of Sherfield's testimony suggest that his profits from retail sales were small-to-nonexistent and paled in comparison to the profits he earned (and

---

[15]     In a related vein, one of the affiliate witnesses joined the defense team at counsel table after he was done testifying and spent the remainder of the trial helping the defense team operate its trial computer and display electronic exhibits.

hoped to earn) from commissions.  For example, Sherfield testified that he and his wife "personally" used the great majority of the products he purchased.  (Tr. 529 ["[M]y wife and I purchase around 350 to $500 worth of product per month and sometimes more for bulk discounts or to prepare for vendor events.  We used around $300 worth personally and retail or sample the rest."].)  Assuming, per this testimony, that Sherfield and his wife consumed about 75% of the $28,000 in products he purchased, this means that Sherfield had only about $7,000 worth of products left to sell.  And assuming, per some of the other testimony in the case, that SBH products could be sold at a 50% markup, this means that Sherfield could have earned, at most, $10,500 in revenue from retail sales, which would represent $3,500 in profit on the products he chose to use for retail sales rather than for consumption.[16]  This $3,500 figure pales in comparison to the near $20,000 in commissions that Sherfield earned from SBH.  (Tr. 527.)

Putting aside this comparison between the profits from retail sales and from commissions (which is relevant to the pyramid-scheme analysis *infra*), Sherfield's testimony painted a bleak overall picture of the viability of SBH as a business opportunity. Using the figures discussed in the preceding paragraph, Sherfield paid $28,000 to SBH for products but earned only $30,500 in overall revenue (commissions plus retail sales revenue) despite working "full-time on SBH" from December 2017 to January 2020, minus a few months where he focused on his work as a physical therapist.  (Tr. 524-25, 533, 552-53.)  Even accepting that this comparison does not tell the full story—because it does not capture the utility that Sherfield derived from his personal consumption of some of the products—it represents an abysmal return on time and capital that is difficult to reconcile with the rosy income representations that appeared in SBH's marketing materials and were made by Defendants.  (Tr. 546 [Sherfield, acknowledging that he would train other SBH affiliates that, consistent with SBH's marketing materials, they could earn $54,000 per year

---

[16]     This $3,500 estimate is consistent with (and, if anything, is generous in light of) Sherfield's testimony during direct examination that the most money he ever earned from retail sales after moving to Dallas was "probably 3[00] to $500 in a day or two of profits" (Tr. 474) and that he only attended, at most, five vendor events at which such sales were made (Tr. 521-22).

from retail sales and $1,173,500 per month from commissions].)   This comparison also does not account for the fact that Sherfield paid over $18,000—separate from the $28,000 or so he spent on SBH products—to attend various SBH-related training events.  (Tr. 536-37, 561-62, 569.)  Sherfield also acknowledged that, during his tenure as a full-time SBH affiliate, his bank declined one of his orders for SBH products due to insufficient funds, he had to take out a credit card intended "for individuals with no credit, limited [credit], or fair credit" in order to obtain a cash advance to buy SBH products, and he considered getting a title loan at one point in order to be able to afford more SBH products.  (Tr. 553-60.)  The fact that Defendants chose to call Sherfield as their first witness and held him up as an example of the legitimacy of SBH as a business opportunity speaks volumes—if this is the best example Defendants can proffer, it is a damning indictment of SBH.

• Summers: On direct, Summers testified that she became an SBH affiliate in late 2019, bought about $9,000 of SBH products, and earned a profit of between $3,200 and $3,300 from engaging in retail sales of those products, which was much more than the $1,100 or $1,200 she earned in commissions.  (Tr. 593, 599, 602.)  However, during cross-examination, Summers stated that she only earned $3,200 in revenue from retail sales.  (Tr. 614.)  Summers also acknowledged that, in her 2019 tax forms, she reported only $1,169 in revenue from SBH retail sales and claimed to have sustained a net loss of more than $13,000 from her SBH-related activities.  (Tr. 616-17.)  Finally, in response to follow-up questioning by the Court, Summers confirmed that the $3,200 figure she had mentioned during her direct testimony was "the total amount of revenue that [she] brought in from making retail sales to other people."  (Tr. 625.)[17]

As with Sherfield, it is difficult to see how Summers's testimony could serve as

---

[17]     Although Summers later made statements, in response to leading questions by defense counsel, that the $3,200 figure represented her net profit from retail sales (Tr. 625-26), Summers then confirmed in response to the FTC's follow-up questioning that she "received about 3200 in cash from retail sales" (Tr. 627).   Given these conflicts in Summers's testimony—not to mention the bias issues arising from the fact that Summers and her husband have donated $800,000 to the legal defense fund in this case (Tr. 618)—the Court concludes in its capacity as factfinder that the $3,200 figure represents Summers's gross revenues from retail sales, not her net profit from retail sales.

proof of the predominance of retail sales within SBH or proof that the income opportunity offered by SBH was, in practice, anywhere near as lucrative as it was described by Defendants and in SBH's marketing materials.  If Summers made only $3,200 in revenue from retail sales, the profit she could have earned from those sales was a fraction of that figure (because the revenues must be offset by the cost of the goods sold).  Also, Summers reported a large net loss on her SBH activities in 2019.  Once again, it is telling that Summers was, from the defense's perspective, one of best examples of financial success out of the thousands of SBH affiliates.

• Head: Head testified that he was an SBH affiliate between October 2017 and September 2019.  (Tr. 856, 902.)  Head also testified that he ultimately chose to leave SBH due to a lack of financial success: "[I]t was a mental struggle, it was a lot of mental struggle and emotional struggle.  And then it began to become a financial struggle.  So I decided to take time off.  And that's when I decided to pursue traditional business again, basically to make sure my mortgage was paid, essentially."  (Tr. 902.)  Although Head's testimony was not particularly detailed regarding the specifics of his financial performance,[18] Head did not deny telling the FTC that he had personally made only $1,100 or so in profits from retail sales over the course of his two-plus years at SBH.  (Tr. 873 [not denying that he made the statement: "I never had the greatest luck at retailing.  I maybe had about $4,000 in gross from retail sales selling about 2900 in wholesale product costs."].)  Head also testified that he stopped personally engaging in retail sales once he was able to recruit others and earn commissions based on their activity.  (Tr. 873 ["[A]fter my team knew how to retail, I myself did not retail any more, going door-to-door, because my team was doing so well . . . ."]; Tr. 858 [explaining that once he "finally comprehend[ed] and understood the commission plan, [he] immediately started recruiting my direct family and friends"].)

---

[18]      Before trial, Head was interviewed by an FTC representative and provided with a draft declaration to sign.  (Tr. 869-72.)  After reviewing the draft declaration, Head declined to sign it.  (*Id.*)  Much of Head's direct examination at trial concerned the accuracy of various statements in the draft declaration.  The defense's apparent purpose in eliciting this testimony was to show that the FTC is biased.  The Court did not find this line of questioning to be persuasive.

Additionally, Head testified that he had five tote bags' worth of unused SBH products at the time he quit. (Tr. 916.) Finally, Head testified that he suffered a net loss in 2019 on his SBH activities. (Tr. 893 ["I did report a loss for 2019 on my taxes from SBH."].)[19]

As with Sherfield and Summers, it is difficult to see how Head's testimony could be seen as helpful to the defense's case. Head barely made any money from engaging in retail sales, stopped even attempting to make retail sales once he realized he could earn more money from commissions, and sustained a net loss from his SBH experience in 2019 before ultimately quitting due to a lack of financial success (at which time he had a large stockpile of unused SBH products sitting in his house).

• <u>McKee</u>: McKee testified that he became an SBH affiliate in 2018 and regularly engaged in retail sales afterward, going door-to-door or selling at church or the mall. (Tr. 919, 925.) Although McKee did not purport to calculate the overall amount of profit he made from such retail sales, he testified that he sold, in the aggregate, between 210 and 320 bags of SBH coffee. (Tr. 929.) McKee also testified that, by January 2020, he was making about $300 to $500 per month from SBH, although he did not specify how much of that money came from retail sales and how much came from commissions. (Tr. 934.) During cross-examination, McKee did not dispute that he earned about $2,200 in commissions from SBH. (Tr. 938.) McKee also acknowledged that he spent about $7,500 on training sessions offered by SBH and Noland. (Tr. 937-38.)

Although the Court perceived McKee to be an honest and credible witness, the imprecision of his testimony regarding retail sales diluted that testimony's persuasive value. McKee did not appear to carefully track his retail sales and did not distinguish between the profits he earned from retail sales and the money he earned from commissions. Additionally, assuming that McKee made a profit of $20 for each bag of SBH coffee he sold—which is the estimated profit margin that other defense witnesses provided (Tr. 613, 1741, 1905)—McKee would have made, at most, $640 in profit from the 210-320 bags of

---

[19]   Head offered an elaborate explanation for this loss, which related to Luke Curry's departure from the company. Like much of the other testimony at trial related to Curry, the Court did not find this testimony particularly relevant.

coffee he sold, which is a small fraction of the $2,200 in profit he made from commissions and pales in comparison to SBH's income representations.

• Cunningham: During direct examination, Cunningham testified that he became an SBH affiliate after being introduced to SBH's coffee products and came to engage in retail sales by setting up an SBH coffee cart at his health club.  (Tr. 943-44, 950-52.) Cunningham estimated that he would make $60 to $200 in profit each time he operated the coffee cart (Tr. 952) and estimated that he did so about five times (Tr. 955).  However, during cross-examination, Cunningham acknowledged that he paid about $23,000 for SBH products, earned only about $7,100 in commissions, and believed (although he wasn't sure) that he had declared a net loss on his tax returns related to SBH.  (Tr. 957-59.)  Additionally, during redirect, Cunningham stated that he was not sure of the difference between revenue and profit.  (Tr. 960-61.)[20]

The Court views Cunningham's testimony as similar to McKee's testimony. Although Cunningham presented as an honest and sincere witness, it is difficult to view his testimony as helpful to the defense in light of its imprecision.  In any event, Cunningham's testimony at most shows that it was possible for an SBH affiliate to eke out a few hundred dollars in profits from retail sales.  This is not how the income opportunity was described by SBH or Defendants.  Additionally, even Cunningham, who seemed unusually focused on retail sales in comparison to other affiliates, appears to have earned more from commissions ($7,100) than he did from his own retail sales.

• Small: Small is a professional disc jockey who became an SBH affiliate after sampling and enjoying SBH's coffee products.  (Tr. 1722-25.)  Small testified that he "sold [a] lot of" SBH's coffee products, would typically make retail sales at "homecoming events" and "flea markets," and did "hundreds of events in multiple locations" over a three-year period.  (Tr. 1725-26.)  During his direct examination, Small declined to provide an

---

[20]    Although defense counsel asked a series of leading and hypothetical questions during redirect intended to show that Cunningham earned a profit from his SBH activities (Tr. 961-63), the Court did not find this portion of the testimony to be persuasive, particularly because Cunningham acknowledged that he did not understand some of the financial distinctions that counsel was attempting to draw (Tr. 963).

"exact figure" for the profit he derived from these sales activities but stated that "it was enough to pay a good portion of the rent and keep some food in the refrigerator for the family." (Tr. 1726-27.) During cross-examination, Small agreed with counsel that it was "possible" he had made a total of only $8,000 in profit from retail sales over at two-year period, which does not include his travel expenses. (Tr. 1742-43.) Small also agreed that he earned $2,400 in commissions during the same period. (Tr. 1742.) On redirect, Small testified that it was "very likely" that his retail-sales profits exceeded $8,000. (Tr. 1744.)

Small was perhaps the most helpful affiliate witness to the defense, in that he credibly testified (albeit without any corroborating documentation) that he earned a few thousand dollars each year from retail sales and that his retail-sale profits exceeded what he was earning from commissions. With that said, the Court does not view Small's testimony as particularly helpful to the defense in the overall scheme of things. Like Cunningham, Small focused his energy on retail sales in a manner that was not representative of the typical SBH affiliate, yet despite that focus, Small was only able to earn (at most) about $4,000 in annual profits from retail sales—a sum that pales in comparison to what SBH and Defendants claimed could be reasonably expected.

• Miller: Miller testified that he became an SBH affiliate in June 2019, made retail sales to approximately 25 friends and family members, and also recruited several acquaintances to become SBH affiliates. (Tr. 1809, 1812-15.) Notably, when asked to estimate how much money he was making from SBH, Miller testified: "I really couldn't tell you that. It would be really vague but I do know that it was—it was making a difference, yeah." (Tr. 1818.) And during cross-examination, Miller acknowledged that he purchased about $10,000 of SBH products, paid nearly $5,000 to attend SBH-related training events, and earned about $3,200 in commissions. (Tr. 1820-22.)

Miller's testimony regarding retail sales was unhelpful to the defense for the simple reason that he did not even purport to estimate how much profit he earned from those sales. Additionally, the few concrete figures that did emerge from Miller's testimony suggest that Miller's profits (if any) from retail sales were meager, that Miller earned more from

commissions than he did from retail sales, and that Miller's overall experience from the SBH business opportunity was not nearly as lucrative as SBH's marketing materials portrayed it to be (and may have resulted in a net loss).

• Hewing: Hewing testified that he regularly engaged in retail sales after becoming an SBH affiliate by selling coffee at trade shows and farmer's markets. (Tr. 1903.) During his direct examination, Hewing initially testified that he would usually sell coffee by the cup at a 300% markup over his cost and coffee by the bag at a 30% markup over his cost. (Tr. 1904.) However, Hewing later stated that he actually sold coffee by the bag at a 100% markup over his cost. (Tr. 1905.) Hewing also testified that he made an overall profit of $30,000 during his 20 months as an SBH affiliate, which included both commissions and profits from retail sales, and estimated spending about $3,000 or $4,000 on SBH products. (Tr. 1906.) However, during cross-examination, Hewing acknowledged that he actually spent about $8,300 on SBH products. (Tr. 1912.) Hewing also acknowledged that he incurred about $5,000 in expenses when traveling to the trade shows and other forums where he engaged in retail sales. (Tr. 1913.)

As an initial matter, the Court is hesitant to uncritically accept Hewing's testimony regarding retail sales in light of some of the credibility considerations identified earlier in this order—Hewing was repeatedly impeached by the FTC, has donated to the defense fund since this case began, and appears to be involved in Defendants' ongoing business ventures. Hewing was also imprecise and inconsistent when it came to recounting some of the basic details that would be necessary to calculate the profitability of retail sales, such as the cost of goods sold and the markup rate. Nevertheless, even accepting that Hewing bought $8,300 of SBH products (rather than the $3,000 or $4,000 he initially estimated), sold bags of coffee at a 100% markup (rather than the 30% figure he initially provided), and incurred $5,000 in travel and other expenses in the course of making retail sales, this would result in a net profit from retail sales of only about $3,500—a miniscule figure for 20 months of work that pales in comparison to the profits Hewing earned from commissions. Again, it is telling that this is the best the defense can muster when it comes to demonstrating the

supposed primacy and promise of retail sales.

• <u>Farley</u>:  Farley testified that he believed SBH's products were "life changing" because they helped him lose weight, alleviate his pain, and accelerate his recovery after he was involved in a serious accident that caused him to suffer broken bones and a head injury.  (Tr. 1947-48.)  As for his experience as an SBH affiliate, Farley testified that he "retailed some, but I didn't retail like a lot of people did."  (Tr. 1945-46.)  In contrast, Farley testified that he recruited between 50-100 other people to become SBH affiliates. (Tr. 1948.)  Farley also testified that, due to memory loss caused by the accident, he has no memory of how much money he made from SBH.  (Tr. 1950 ["I can't remember the money. A lot of things I can't remember, because it's been so long.  Between that and—a lot of things I lost memory on on the wreck that I've had."].)  During cross-examination, Farley estimated that he lost money on SBH at first but "probably" was making money toward the end.  (Tr. 1951.)[21]  Farley also acknowledged donating more than $10,000 to the legal defense fund in this case.  (Tr. 1961.)

Farley's testimony regarding retail sales was unhelpful to the defense because, due to his memory problems, he could not even estimate the profitability of those sales. Additionally, other portions of Farley's testimony suggested that he focused far more of his time and energy on recruiting efforts than on retail sales.

### b.   **Employee/Affiliate Witness**

Robert Mehler became one of the first SBH affiliates, then served as SBH's director of sales for a portion of 2019, and then resumed participating in SBH as an affiliate until the TRO was issued in January 2020.   Additionally, Mehler played a role in the dissemination of the witness-coaching email from Noland's ProtonMail account.

On direct examination, Mehler testified that he focused heavily on retail sales during his 25 months as an SBH affiliate and earned an overall profit of $38,667 during that period,

---

[21]      During redirect, defense counsel asked a series of leading questions to Farley that were intended to establish his profits from retail sales.  (Tr. 1964-66.)  The Court did not find this line of testimony persuasive.  Farley admitted on direct that he could not recall these details (due to his memory problems) and also admitted that he did not engage in much retail sales activity.

consisting of about $28,800 in profits from retail sales and another $15,835 in commissions (and offset by several thousand dollars in expenses).  (Tr. 1070-71.)

The Court does not assign much weight this testimony for several reasons.  First, Mehler was thoroughly impeached on an array of topics during cross-examination.  In particular, the Court was unpersuaded by Mehler's explanations for failing to disclose Noland's ProtonMail email in response to the FTC's subpoena, the FTC's follow-up email, or the letter from then-defense counsel.  (Tr. 1085-1105.)  Other credibility-impairing topics include Mehler's contention that it was permissible to pass off medical claims for SBH products under the guise of "coincidences" (Tr. 1106-07) and Mehler's involvement in promoting a spurious "clinical trial" involving an SBH weight loss product, which was actually conducted by a high-ranking SBH affiliate who was later convicted of federal fraud charges.  (Tr. 1140-43.)  Second, at any rate, Mehler offered little to corroborate his claimed profits from retail sales and made statements that were difficult to reconcile with his calculations.  For example, although Mehler testified on direct that his "purchases from the company were $27,000, and [his] retail profit, meaning cash to me over and beyond the cost of goods was $28,800 . . . [s]o I was working a slightly more than 100-percent margin" (Tr. 1071), the FTC introduced evidence during cross-examination that depicted Mehler selling SBH products at only a 50% markup over his cost (Tr. 1113-17).  The FTC also introduced evidence that Mehler previously claimed to have personally consumed between $250 and $400 of the products he purchased each month.  (Tr. 1120.)  There is no way Mehler could have earned anywhere near $28,000 in retail-sales profits if he was only selling at a 50% markup and consuming such a hefty portion of his inventory.  Third, putting aside all of these reasons to question the validity of Mehler's claim that he earned $28,000 or so in profits from retail sales during his 25 months as an affiliate, Mehler testified that these sales figures made him "one of the top retailers" in SBH.  (Tr. 1126, 1132.)  This hurts the defense more than it helps—Mehler's claimed profits from retail sales amounted to a little more than $1,000 per month, which is less than what an individual would earn from a full-time minimum wage job.  This sum pales in comparison to what

1    Defendants and SBH's marketing materials claimed could be reasonably expected.

2         Finally, putting aside Mehler's testimony about retail sales, other aspects of

3    Mehler's testimony were affirmatively harmful for the defense.  For example, Mehler

4    testified that he wasn't even aware of the 2002 permanent injunction during his tenure in

5    2019 as SBH's director of sales.  (Tr. 1108.)  This was a surprising revelation, given that

6    Noland was required under the 2002 permanent injunction to "take reasonable steps

7    sufficient to monitor and ensure that all of [Noland's] agents . . . comply with Paragraphs

8    I, II, and III of this Order" (Contempt Action, Doc. 66 at 6) and hopes to persuade the Court

9    in this case that he can be trusted to follow future court orders.

10                        c.    **Defendant Witnesses**

11        All four Defendants testified during the defense's case-in-chief.

12        • <u>Lina Noland</u>:  The first to testify was Lina Noland.  On direct, Ms. Noland testified

13   about various calculations and summaries she made using SBH's internal data and records,

14   including shipping records.  (Tr. 633-78, 731-43.)  Although some of this testimony was

15   persuasive and somewhat helpful to the defense (including some of the testimony

16   concerning shipping records), not all of it was.  In particular, the Court was unpersuaded

17   by the calculations that seemed intended to establish that non-affiliates were legitimately

18   interested in SBH's products and composed a significant segment of the purchasing

19   population.   (Tr. 638 [testifying that 31% of SBH's purchasers were "ultimate

20   customers"].)  During cross-examination, the FTC persuasively demonstrated that, when

21   the data in the spreadsheets is correctly tabulated, only 5.4% of the purchases in 2019 and

22   only 1.8% of the purchases in 2018 were by non-affiliate customers (and that even these

23   figures are potentially overstated because some of the purchases that were considered when

24   calculating these figures were made by affiliates who may have been misclassified as non-

25   affiliate customers in the spreadsheet).  (Tr. 841-46.)

26        During her direct examination, Ms. Noland also testified at length about the so-

27   called "complaining witnesses" and sought to impeach their credibility. (Tr. 703-31.)  This

28

was a recurrent point of emphasis in the defense case[22] and, from the Court's perspective as finder of fact, it largely fell flat. Even accepting that the complaining witnesses were biased against Defendants (and, thus, those individuals' claims and accusations should be viewed with skepticism), the FTC's case is not based on the claims of a handful of witnesses but rather on a veritable mountain of other evidence. Indeed, the FTC did not even call any of the complaining witnesses at trial. Additionally, to the extent the exhibits related to the complaining witnesses contained references to retail sales, those references were too fleeting and undeveloped to provide any meaningful support for Defendants' position in this case.

Ms. Noland also attempted to address the spoliation issue related to Signal. (Tr. 750-61.) Like Noland, she testified that it was a "coincidence" that and she "and the other defendants downloaded, installed and started using Signal with within about a day of learning of the FTC's investigation." (Tr. 763.) This testimony was not credible, for the reasons discussed elsewhere in this order, and the resulting lack of credibility tainted Ms. Noland's testimony on other topics.

Ms. Noland's credibility was also undermined by her testimony regarding the property in Panama. (Tr. 975.) As background, the Nolands appeared in a video shot in Panama, which was broadcast to SBH affiliates in 2019, in which Noland suggested that he owned a particular oceanfront property that could be seen in the background. (Ex. 350-48 at 1:28-1:51.)[23] Afterward, Ms. Noland gestured to the property and told SBH affiliates that they could "get all this" if they just followed the basics. (*Id.* at 5:10- 7:40.) In fact, the Nolands never owned the property—although both claimed (without corroboration) that Noland had made some preliminary steps to purchase the property in 2012, both acknowledged that Noland never actually purchased it. (Tr. 976-78, 998-99, 1643.) It

---

[22]    For example, a significant portion of Defendants' proposed findings of fact relate to the complaining witnesses, their purported lack of credibility, and FTC's purported failure to properly evaluate their allegations. (Lead Action, Doc. 529 at 16-38 ¶¶ 91-252.) Defendants also emphasized these topics in the Final Pretrial Order. (Lead Action, Doc. 532 at 46-48, 50-51.)

[23]    Noland also suggested to affiliates that he would be purchasing ("highly likely") adjacent lots "on a private beach." (Ex. 350-48 at 2:20-5:10.)

should go without saying that the Nolands' claims in the video were deceptive—they attempted to pass off a property they didn't own as proof of the luxurious lifestyle they had achieved (and affiliates could hope to achieve) through SBH.  Ms. Noland (and later Noland) then made things even worse by attempting, via their trial testimony, to defend the accuracy of those indefensible claims.

• <u>Sacca</u>:  Sacca explained that he has experienced significant health problems in recent years (including the onset of blindness, a heart attack, and the potential onset of multiple sclerosis) that have eroded his memory of many of the events at issue in this case. (Tr. 1183-84, 1202, 1270-71.)  Due to these limitations, defense counsel was allowed to use extensive leading questions during Sacca's direct examination.  (Tr. 1191.)

Although Sacca struck the Court as generally honest and credible, the Court did not credit his testimony regarding the adoption, use, and deletion of Signal and ProtonMail. (Tr. 1255-61.)  Additionally, Sacca's memory problems undermined the utility of much of his testimony.  Finally, Sacca made admissions on several topics that are harmful to the defense.  For example, Sacca admitted making impermissible income claims from time to time during his tenure at SBH.  Sacca's proffered justification for these claims—that his listeners knew he didn't really mean what he was saying—is speculative and unpersuasive. (Tr. 1210 [Q: "Now, do you have a habit of using the word 'guarantee' in some of your discussions with people?"  A: "Yeah, I do.  It's a word I use often, you know, right, wrong, or indifferent, I do use it.  So—but in every conversation I ever had, everybody knew we were not guaranteeing any income."].)  Sacca also testified that Noland never disclosed—and possibly mischaracterized the scope of—the 2002 permanent injunction, even though Sacca served as one of the individuals responsible for training and compliance within SBH. (*Compare* Tr. 1285-88 ["I was not aware of any permanent injunction.  I only knew that there was a record-keeping thing that had to happen like for—I think it was for six years, to 2008 maybe.  That was all I was aware of."], *with* Contempt Action, Doc. 82-2 ¶ 4 [Sacca declaration: "Prior to launching [SBH], Jay Noland advised me of the 2002 Permanent

Injunction entered against him and of the limitations imposed by that Injunction."].)[24]  As discussed in relation to Mehler, this approach undermines the notion that Noland can be trusted to ensure compliance with a future court order related to his operation of MLMs. Finally, and in a related vein, Sacca admitted that he and the other Defendants allowed two high-ranking SBH affiliates—including the one who operated the misleading "clinical trials" that Mehler touted—to continue serving as unsupervised "founders" even after they were indicted on federal fraud charges.  (Tr. 1297-1304.)  Again, this approach undermines any suggestion that Defendants prioritized compliance over profits.

• Noland:  Noland was not a credible witness.  Although the Court accepts a few isolated components of his testimony—among other things, the Court accepts that he trained several individuals at Organo Gold who went on to become big earners, that he subjectively (if incorrectly) believed at one time that his stake in Organo Gold was worth $44 million, and that Zone 1 stories were included during Heat Calls from the inception (and were not, as the FTC sometimes seemed to suggest, only a belated addition after learning about the FTC's investigation)—his testimony on many other issues was not worthy of credence.

As an initial matter, the voluminous examples of dishonesty related to Signal and ProtonMail, which are summarized earlier in this order, undermine the entirety of Noland's testimony.  Once a witness is shown to have repeatedly violated court orders and made false under-oath statements with respect to one topic, that witness's testimony on other topics must be viewed with skepticism.

There are also independent reasons for discounting Noland's testimony on other topics.  For example, Noland testified that SBH's use of senior field advisors resulted in "the most effective form of compliance I believe in the industry."  (Tr. 1421.)  Noland also cited the existence of senior field advisors as one of the reasons he didn't think it was necessary for SBH to track retail sales by affiliates (Tr. 1429) and identified the senior field

---

[24]    Sacca acknowledged that he had made statements to the contrary on this topic in a pretrial declaration.  (Tr. 1286-87.)

advisors as one way he attempted to "go[] above and beyond to [en]sure compliance with" the 2002 permanent injunction (Tr. 1440, 1603).  These assertions were not credible for an array of reasons.  As an initial matter, it is nonsensical that two or three senior field advisors would be better at tracking retail sales by SBH's thousands of affiliates than a formal tracking system.  Any such tracking by senior field advisors would necessarily be anecdotal and incomplete.  The Court recognizes that Noland has proposed adding a formal tracking system if allowed to resume control over SBH—a proposal discussed in more detail in later portions of this order—but his insistence that SBH's previous approach was some sort of best-in-the-industry solution is unpersuasive.  Separately, the evidence during the bench trial showed that Noland did not disclose the existence of (and may have mischaracterized the scope of) the 2002 permanent injunction to Sacca, who was one of SBH's senior field advisors (Tr. 1286-88); also did not disclose the 2002 permanent injunction to Mehler, who was SBH's one-time head of sales (Tr. 1108-09); and installed Harris as his other main senior field advisor after learning that Harris was subject to various cease-and-desist orders issued by state regulatory agencies regarding compliance failures in earlier businesses (Tr. 1874-79).[25]  This is hardly a serious approach toward compliance.

Noland also undermined his credibility through his many false statements regarding his personal wealth (and his defense of those false statements at trial).  The statements regarding the Panama property are already discussed above with respect to Lina Noland.  As noted, these were outrageous claims and Noland made things even worse by attempting to defend their accuracy.  (Tr. 1642-43.)

Another example of a false statement regarding Noland's wealth was his statement to an audience of SBH affiliates that "I've been financially free, completely time and money free since I was 36."  (Tr. 1636-37, citing Ex. 350-34 at 11:19.)  This statement was false and misleading—at the age of 36 (*i.e.*, in 2004 or 2005), Noland had not yet started

---

[25]     More specifically, Harris answered yes when asked whether he "told Mr. Noland about the California orders against you" and then answered yes when asked whether "after you told him that, he appointed you as a senior field advisor for Success By Health."  (Tr. 1879.)

Organo Gold, was working in the mortgage industry, and was living (or was about to start living) off credit cards.  (Tr. 1637, 1699.)  Nevertheless, during trial, Noland offered a variety of unpersuasive justifications and rationalizations for this statement and other similar statements.  For example, Noland repeatedly denied ever describing himself as a millionaire or even strongly implying that he was a millionaire.  (Tr. 1631-35.)[26]  Noland also flatly denied ever making any false or deceptive statement, on *any* topic, during his tenure at SBH and VOZ Travel.  (Tr. 1623 [Q: "Do you believe you ever made a statement while you were running SBH and VOZ Travel that was deceptive or misleading?" A: "No. I don't believe I ever did so."].)  These denials betray a lack of candor and accountability—it is obvious that statements about being financially free since the age of 36 (Tr. 1636-37), being financially free to the point of one's grandchildren never having to work again (Tr. 117, citing Ex. 25 at 57), owning luxury properties in Panama and around the world (Tr. 1643), and "I probably give away a couple million a year [but] [d]on't even feel it, though . . . [because] I got freedom" (Tr. 1639, citing Ex. 74 at 11) would imply millionaire status.

Another series of false statements, and credibility-impairing attempted justifications for those false statements, concerned VOZ Travel.  One of the VOZ Travel presentations included such statements as "We have a complete gamification engine that rewards you heavily for providing feedback and insights regarding our curated experiences," "Our Artificial Intelligence engine utilizes heuristics to determine your 'traveler DNA,'" and "Our A.I. is named 'Dina' and you can think of her as being like Siri, Alexa, Cortana, or Google Assistant."  (Ex. 299 at 28, 36.)  As noted above, the FTC established through Rottner's testimony (or, at least, established to the Court's satisfaction in its capacity as factfinder) that these statements were untrue—Defendants had not developed any such gamification engine or artificial intelligence engine, let alone an artificial intelligence engine named "Dina" that rivaled the competing engines created by Google, Amazon, and

---

[26]     The Court acknowledges that, in the course of making these denials, Noland agreed that he had made statements *intended* to convey that he was a millionaire.  (Tr. 1633, 1635.) This seems like an awfully fine semantic distinction, and the entire line of questioning at pages 1631-35 did not create a positive impression of Noland's truthfulness and candor.

1   other multi-billion dollar companies.  (Tr. 246-52.)  And if making such misrepresentations
2   weren't bad enough, Noland then attempted, in vain, to defend the accuracy of the
3   misrepresentations during his trial testimony.  (Tr. 1584-89.)

4          Finally, the Court was also unpersuaded by Noland's testimony regarding the ECF
5   royalty agreement.  The background details concerning the royalty agreement are set forth
6   in the Court's August 6, 2020 order.  (Lead Action, Doc. 177.)  In a nutshell, the royalty
7   agreement purports to require SBM to pay ECF (an entity also controlled by Noland) a
8   lump-sum payment of $500,000 and then 15% of its net profits over a 10-year period in
9   return for the right to use ECF's in "trademarks, service marks and secret ingredients." (*Id.*
10  at 2-3.)  Following the issuance of the TRO and preliminary injunction, the receiver took
11  control of both SBM and ECF.  (*Id.* at 13.)  In response, either ECF or Defendants filed a
12  motion for ECF to be released from the receiver's control.  (*Id.* at 5 n.4.)  The motion
13  intimated that, if ECF were freed from the receiver's control, ECF would then sue the
14  receiver and SBM to recoup the missing payments owed to ECF under the royalty
15  agreement.  (*Id.* at 13.)  In response to the motion, the FTC and the receiver "hotly
16  disputed" the "provenance and legitimacy" of the royalty agreement.  (*Id.* at 3, 13.)

17         At trial, the FTC presented evidence intended to establish that Noland had fabricated
18  a backdated version of the royalty agreement after the start of litigation in this case.  (Tr.
19  242-46 [Rottner].)  In an attempt to dispute these accusations, Noland testified that he
20  actually signed the royalty agreement in 2017 and then placed it in a file folder in his home
21  in Las Vegas.  (Tr. 1521-22, 1677-78.)  During cross-examination, the FTC pointed out
22  that, in certain pretrial filings, Noland's counsel had represented that Noland did not sign
23  the document until April 2018.  (Tr. 1678.)  Initially, Noland suggested that his counsel
24  had been wrong and that 2017 was the correct signing date.  (*Id.*)  The FTC then questioned
25  Noland about an email from his accountant in April 2018 expressing concern about the
26  lack of a signed agreement.  (Tr. 1679-80.)  At that point, Noland stated that the signing
27  date was actually April 2018.  (Tr. 1680-81.)  The FTC then offered Noland an opportunity
28  to address the evidence of fabrication it had presented earlier.  (Tr. 1681-83.)  Notably, this

1    evidence included an email from August 2019 in which Noland had been emailed a "draft"

2    version of the royalty agreement.  (Tr. 243-44, discussing Ex. 245.)  Noland's resulting

3    explanation was unsatisfactory, at least from the Court's perspective as the factfinder—at

4    no point did Noland explain why it would have been necessary to send him a draft version

5    of the agreement in August 2019 if he had already signed it in 2017 (as he initially testified)

6    or in April 2018 (as he testified after the 2017 date was shown to be wrong).  Nor did

7    Noland provide a satisfactory explanation during his testimony on redirect.  (Tr. 1712-

8    14.)[27]

9         Although this list of unpersuasive testimony is lengthy, it is not exhaustive—the

10   Court also found Noland's testimony on other topics to be unpersuasive and at times

11   incredible.  The Court has simply attempted to provide a representative, if lengthy, list

12   because its evaluation of Noland's credibility and truthfulness plays a key role in its

13   evaluation of the scope of injunctive relief that is necessary in this case.

14        • <u>Harris</u>:  Harris's testimony regarding the adoption, use, and deletion of Signal (Tr.

15   1858-69, 2023-26) was not persuasive.   The Court was also troubled by Harris's

16   representation to SBH affiliates that, since working for Equinox, he's "never had an issue

17   making six figures a year."  (Tr. 2015.)  In his sworn financial disclosures in this case,

18   Harris admitted making only a mid-five-figure income in 2015, 2016, and 2017. (Tr. 2015-

19   17, citing Ex. 311.)  Although Harris's six-figure income claim wasn't as much of a

20   whopper as some of Noland's income claims, it was still false.  Nor did Harris help his

21   credibility by attempting to defend the accuracy of that claim during his testimony on

22   redirect.  (Tr. 2049-50.)[28]

23        Finally, Harris acknowledged that he is the subject of several cease-and-desist and

24   _____

     [27]    Additionally, Noland's claim during redirect that he lacked any motive to fabricate

25   the ECF royalty agreement (Tr. 1714) is belied by the record—as noted, the motion to
     release ECF from the receiver's control intimated that Noland wished to rely on the royalty

26   agreement to sue the receiver and SBM for unpaid royalties.  (Lead Action, Doc. 157 at 12
     n.4.)

27   [28]    Some of the FTC's other attempts to impeach Harris's credibility concerned his
     application for a PPP loan and his omission (in securities filings) from the list of SBM's

28   officer and directors.  From the Court's perspective, these lines of inquiry were not wholly
     successful, as there may be honest explanations for the omissions at issue.

other orders pertaining to regulatory failures arising from his work at other companies before joining SBH.  (Tr. 1873-79.)  Harris also acknowledged that, after telling Noland about those orders, Noland installed him as a senior field advisor at SBH.  (Tr. 1879.)  Regardless of whether Harris was personally responsible for the issues the led to the issuance of the cease-and-desist orders—an issue that was disputed at trial—this was not a reassuring approach to regulatory compliance.

II.    <u>Outstanding Claims</u>

With this backdrop in mind, the Court now makes the following additional factual findings, which are grouped into categories that correspond with the outstanding claims to be resolved during the bench trial.[29]

A.    **SBH—Pyramid Scheme**

1.    <u>Overview Of Commission Plan</u>

SBH promoted a "six-phase" commissions plan (with six more phases added in August 2019) and other bonuses.  (Ex. 13; Ex. 14.)  Other than Phase 1 of the SBH commission plan (which did not involve any actual payments by SBH to affiliates), each form of compensation paid by SBH required recruiting, but not sales to ultimate users, to earn any meaningful amount of money.[30]

Phase 1 (Retail Sales) of the SBH commission plan did not involve any money paid by SBH to affiliates.  Rather, it simply referred to affiliates' (and non-affiliates') ability to buy products from SBH at a "wholesale price" and resell them at a mark-up.  (Ex. 13 at 2.)

Phases 2-6 of the SBH commission plan provided cash payments or product credits based solely on *purchases from* SBH by an affiliate and the affiliate's recruits (and those

---

[29]    Of course, some of the categories of factual findings correspond with more than one of the outstanding claims.  For example, the factual findings regarding the profitability of retail sales (or lack thereof) are relevant both to the pyramid-scheme claim and to the claim alleging false and misleading income misrepresentations.  Thus, the Court's placement of factual findings under a particular heading should not be viewed as an indication that the findings are irrelevant to other issues.

[30]    Also, for commissions to be paid out to an affiliate at all, SBH required affiliates to buy at least $200 in SBH products (or have others do the same through the affiliate's URL).  (Doc. 222 ¶ 1 [admitting Doc. 205 ¶ 27].)

recruits' recruits, and so on), rather than *sales to* ultimate users of the SBH products.  In each phase, Defendants paid rewards without regard to whether affiliates ever consumed the products or sold them to someone who did.

More specifically, Phase 2 (Auto Orders) of the SBH commission plan provided "product credit" to affiliates who made recurring purchases from SBH, and whose direct recruits did, too.[31]  (Ex. 13 at 3.)  Defendants described Phase 2 as "[l]oyalty rewards on yours and your referrals' recurring purchases."  (Ex. 16 at 44.)

Phase 3 (Accelerator Bonus) of the SBH commission plan paid a cash bonus to affiliates whose newly enrolled recruits purchased $500 "Accelerator Packs" or $1,995 "Super Accelerator Packs" from SBH.  (Ex. 13 at 3.)  Noland encouraged affiliates to take advantage of Phase 3 by "step[ping] up to the plate and . . . building a real home-based business [for] 500 bucks, and you go out there and personally refer three other people, and they're doing [$]500 each."  (Ex. 54 at 10:18-22.)

Phase 4 (6-Tier Commissions) of the SBH commission plan rewarded affiliates for purchases from SBH by themselves and their downline teams.  (Ex. 13 at 4.)  Defendants told affiliates to take advantage of the 6-Tier commissions through the "Power of Ten"— *i.e.*, by recruiting ten affiliates who bought hundreds of dollars of products per month and themselves recruited ten affiliates to do the same (with the chain continuing through six tiers).  The Power of Ten is discussed in additional detail below.  Defendants emphasized that the 6-tier commissions provided for "UNLIMITED Income," with "NO LIMIT" on the number of affiliates one could recruit into the program.  (Ex. 13 at 4.)

Phase 5 (Infinity Bonus) of the SBH commission plan paid SBH affiliates who achieved a rank of "SBA1" an additional commission on certain purchases by their recruits. (Ex. 13 at 4-5.)  Defendants explained that the purpose of Phase 5 was to "encourage[] you to develop a deep, strong Affiliate Team."  (Ex. 3 at 22.)

---

[31]     Product credits were only available to affiliates with a "$60 Monthly Auto-Order." (Ex. 13 at 3.)  Phase 2 "helps incentivize your affiliate team to place consistent orders, thus producing more income for you and for them."  (*Id.*)

Phase 6 (BAM Bonus) of the SBH commission plan paid "one-time 'hit' bonuses" to SBH affiliates who achieved the "Power of Ten" structure promoted by SBH.  (Ex. 13 at 5; Ex. 16 at 57.)  The smallest BAM bonus for completing a "10x10" structure (recruiting ten affiliates who each recruited ten affiliates, with each of those 100 affiliates ordering $100 per month), was $1,000, while the largest (for a completing a "10x10x10x10x10" with each affiliate ordering $500 per month) was $5 million.  (Ex. 16 at 57.)  Although Defendants promoted the BAM Bonus as providing "relatively fast lump sum bonuses" (Ex. 3 at 23), Defendants never paid a single BAM bonus, even at the $1,000 bonus level, because no affiliate ever completed a "10x10."  (Ex. 83 at 20:2-9 ["There's been nobody doing a ten-by-ten."]; Lead Action, Doc. 222 ¶ 1 [admitting Lead Action, Doc. 205 ¶ 73].)

Finally, affiliates' compensation within the SBH commission plan also varied, to some extent, based on their SBH "rank."  Affiliates' ranks, in turn, were based solely on purchases from SBH by the affiliate or the affiliate's downline team or customers.  (*See, e.g.*, Ex. 14 at 4 [defining "team volume"].)  SBH ranks ranged from "Business Affiliate," which required $5,000 in monthly purchases from the affiliate or the affiliate's downline team or customers, to "5 Star Diamond," which required $1.25 million in purchase volume. (Ex. 14 at 4.)  Affiliates' ranks reset every month.  (*See, e.g.*, Ex. 166 at 2 ["Where you finish the volume month his month will be the Rank that you are 'PAID AS' the entire following month."].)   Training materials instructed affiliates to "Focus on Rank Advancing."  (Ex. 5 at 22.)

### 2. Other Recruiting-Based Bonuses And Promotions

Defendants offered other rewards—outside of the six-phase commission plan—for recruiting new SBH affiliates.  For example, the "Power 500" and "Power 1000" bonuses— for affiliates "looking to jumpstart their business"—paid affiliates who bought a product pack (for at least $125) and, within 14 days, recruited new affiliates who also made purchases exceeding a certain price threshold.  (Ex. 16 at 48.)  The "5x5 bonus" paid up to $10,000 for recruiting five new affiliates, each of whom bought a $500 "Accelerator Pack"

and themselves recruited five new affiliates who also purchased Accelerator Packs.[32]  (Ex. 18; Doc. 222 ¶ 16 [admitting in part Doc. 205 ¶ 34].)  Defendants also paid a $200 SBH product credit bonus to each month's "Top Referrer"—*i.e.*, the top recruiter.  (Ex. 144; Ex. 142; Ex. 327.)

During one promotion, Defendants provided product credits as a reward for recruiting ten new affiliates.  (Ex. 210; Ex. 211.)  For another promotion, Defendants gave product credits to affiliates who enrolled at least 20 new affiliates, while recognizing anyone who enrolled at least 10 new affiliates as a "top performer."  (Ex. 169.)  Separately, an SBH "USA Tour Challenge" awarded $1,000 for the top recruiting affiliate.  (Ex. 240.)  To earn points, the challenge offered a breakdown system which awarded the highest number of points (10) to "[e]ach Global Ambassador Pack" purchased by a personally referred person, and the lowest number of points (1) to each "Affiliate personal referral."  (*Id.*)

Defendants did not, in contrast, pay any bonuses based on affiliates' retail sales—*i.e.*, sales from an affiliate's personal inventory to third-party ultimate users.  One affiliate testified that he managed to qualify for a reward trip to Aruba tethered only to achieving a certain "rank" in SBH (which is determined by qualifying volume purchased by the affiliate or their downline team from SBH).  (Tr. 1960-61.)

### 3.  Instructions To Focus On Recruiting

Defendants reinforced their recruitment-focused commission plan through their training documents and instructions to affiliates.

#### a.  **Four Steps To Success**

For example, Defendants promoted "Four Steps to Success" to "Hit the Ground Running as a new SBH Affiliate."  (Ex. 16 at 68.)  Notably, the "Four Steps to Success" omit retail sales to ultimate users.

---

[32]     These bonuses were not automatic.  To qualify, the affiliate needed to submit a form to an SBH email account.  (Ex. 18.)

More specifically, in Step 1 ("Get Started"), Defendants urged consumers to make large, up-front purchases of "business packs," which cost up to $1,995. (Ex. 16 at 64-66, 68; Ex. 5 at 17.) Defendants added that starting with a more expensive pack would create "more initial commission plan benefits." (Ex. 5 at 17.)

In Step 2 ("Be a Product of the Product"), Defendants told consumers to set up a monthly product "auto-order" to get products "to [u]se, [s]ample, and to [s]ell." (Ex. 5 at 18.) By "sample," Defendants instructed affiliates to "hand out [free] samples to at least 60 people within your first 30 days," and continue to give products away for free to induce consumers to join SBH. (*Id.* at 21.) Defendants told consumers to auto-order at least $60 per month (or $500 for an affiliate seeking "financial freedom"). (Ex. 16 at 44; Ex. 58 at 25:1-4 ["Do you have a 500 auto-order set up minimum . . . to prove that you're ready to go after these millions?"]; Ex. 17 ["Million Dollar Contract . . . . I will stay at least [an auto order minimum of $500] for a minimum of 18 months."]; Ex. 228 [reminding new "Global Ambassadors" to "set up at least a $250 (preferably $500) Auto-Order"].) Although Defendants sometimes equated *buying* $500 in products per month from SBH with *selling* six bags of coffee to consumers per week (Ex. 58 at 25:1-4; *id.* at 27:9-14), affiliates' compensation depended only on their purchases from SBH, not what they ultimately did with the products. As explained, SBH also did not track what affiliates did with the auto-ordered products. (Tr. 1886.)

In Step 3 ("Build A Team"), Defendants focused on recruiting. They instructed affiliates to "[b]e sure to Personally Refer at least 2 new SBH Affiliates within your first 48 Hours if you are aiming for Financial Freedom" or "within your first 7 Days if you are aiming to Replace Your Income (No More Job)." (Ex. 5 at 19, 21.) After the first seven days, affiliates were encouraged to "Keep Building Every Month," "Duplicate this System," and "Focus on Rank Advancing." (*Id.* at 22.)

In Step 4 ("Pay Attention to Training and Duplicate"), Defendants told SBH affiliates to use SBH-provided materials to "[t]each your team to do the same" steps

1  identified above.  (Ex. 16 at 68.)  Defendants described "DUPLICATION" as the "key to

2  long term success" as an SBH affiliate.  (Ex. 5 at 2.)

3        b.    **Power Of Ten**

4        Defendants' "Power of Ten" model also encouraged recruitment over profits from

5  retail sales.  Defendants highlighted their "Power of Ten" "success strategy," in which

6  affiliates "need to get 'my 10' Affiliate Team Members" and teach new recruits to "do the

7  same."  (Ex. 16 at 50.)  Defendants told affiliates they could achieve the full "Power of

8  Ten" by recruiting ten affiliates as their "Tier 1," each of whom would recruit ten as the

9  initial affiliate's "Tier 2," and so on through Tiers 3-5.  (Ex. 16 at 50-52.)  An SBH

10  presentation for recruits and new affiliates included the following visual directing Affiliates

11  to "get 'my 10' Affiliate Team Members" and to "teach[] each new Team Member to do

12  the same thing, get 'their 10'":

13

14

15

16  

17

18

19

20

21

22

23

24  (Ex. 16 at 50.)  Defendants also promoted an example of the "Power of 10" wherein each

25  of the top affiliate's 111,110 downline affiliates (through five tiers) generated purchases

26  from SBH of $500 per month, for a cumulative monthly purchase volume of over $55

27  million.  Defendants used visuals to highlight that the top affiliate in this example receives

28  a $1,173,500 monthly commission:



(Ex. 16 at 52.)  Additionally, upon completing the full Power of Ten, an affiliate became eligible to receive the full $5 million "BAM Bonus."  (Ex. 16 at 57.)

Defendants admit urging affiliates to achieve the Power of Ten.  (Doc. 222 ¶ 1 [admitting Doc. 205 ¶¶ 69-72].)  For example, Noland told affiliates: "You need to – out of the seven billion people in the world, you need to find 10. . . . You need 10."  (Ex. 84 at 44:23-25; *id.* at 45:7-10.)  In one video posted to Facebook, Harris told affiliates: "[Y]our ten-by-ten is the most important thing you can ever build in this company.  The most important thing you can do is think about it every day, I've got to get my ten . . . ."  (Ex. 86 at 26:16-19.)  In another video, Harris told affiliates: "You want that to be the most important thing in the world to everybody in your team, that you're trying to fill in your first ten as quickly as possible, that will either order a hundred or [$]500 in product . . . ."  (Ex. 86 at 27:10-18.)  In yet another Facebook video post, Noland told affiliates: "If you're not creating a ten-by-ten, you're not doing your job.  Until you get ten-by-tens, you got to be relentless, because that's the job we need done to become number one."  (Ex. 83 at 34:6-

12.)  A few minutes later, Noland emphasized the gravity of the situation: "[A]nybody that tells me that they want financial freedom and will not go . . . get these ten, they are an enemy.  They are an imposter.  They're a spy.  They come in to the camp to steal from you.  Steal what?  Your time.  They want to talk to you, though.  They want to—hey, they want to have meetings.  They want to have strategy sessions.  They want to do everything but get them ten."  (*Id.* at 44:8-15.)

During a Facebook video post, Sacca told affiliates that the SBH commission plan is "driven 100 percent, not—not 95, not 85, not 75—it's driven 100 percent by our [Power of Ten BAM] bonus. . . ."  (Ex. 82 at 11:6-16; Lead Action, Doc. 106 at 4 n.4.)  Sacca emphasized that he had come to this realization "last week, with Mr. Noland and Mr. Harris."  (Ex. 82 at 11:6-16.)  Three days after Sacca's statement, Noland emphasized that he fully agreed with Sacca: "Tommy Sacca did a phenomenal training the other night when he talked about the ten sheets.  He was with me.  I trained him on ten sheets . . . . As a matter of fact, it's the greatest training since I've met Tommy Sacca that he's ever done."  (Ex. 83 at 11:16-12:7.)

### c.  **Other Recruiting Instructions**

Defendants reinforced their recruiting-focused program through explicit recruiting instructions.  For example, Noland told affiliates that the goal of one cash promotion was to focus them on "what you should be focusing on right now, which is new people getting into the company."  (Ex. 117 at 24:18-21.)  At a live training event, Noland remarked, "[Y]ou know what to do.  You know you're supposed to recruit your ass off.  Freedom."  (Ex. 74 at 33:6-9.)  At the 2018 "RED" event, Harris told affiliates to "have a plan to recruit everybody you meet."  (Ex. 64 at 8:2-5.)  Just before that comment, Harris told affiliates that when people ask him, "[I]s this one of those pyramid things?," he says, "[H]ell, yeah it is.  If it wasn't, I wouldn't be doing it.  Do I look dumb enough to go get a job again?"  (Ex. 64 at 7:15-21.)

At the following year's RED event, Harris made a statement to the same effect:

"Some people are embarrassed or ashamed to say they're in direct sales because people ask stupid questions like, 'is this one of those pyramid things?'  I'm like, 'hell yeah.  If it wasn't, I wouldn't be doing it.' . . . And I explain residual income.  And I'm like, 'you damn right I'm doing this.' . . . Or I could be a wage slave."  (Ex. 91 at 7:7-18.)  At another event, Noland predicted dire consequences for any new affiliate who did not recruit someone within 48 hours: "[S]oon as I bring you in, you better put somebody in in 48 hours, or I am almost never going to talk to you again . . . .  Guess what will happen if you go slow.  More than likely you're going to die.  More than likely you're going to quit."  (Ex. 90 at 9:13-23.)  On a training call, Noland stated: "When a person joins [SBH], I'm like, 'great, way to go.'  But I'm not super fired up until that person recruits somebody else to join.  When they recruit somebody else to join, I go, 'All right, now okay, I got somebody now.  I've got me an inviter.'  See the most important thing in this industry if you want residual income, you have got to recruit inviters."  (Ex. 116 at 11:11-20.)

Defendants' slide deck from the June 2018 SBH "Bootcamp" event bluntly told affiliates: "You Have To Get Great At RECRUITING."  (Ex. 21 at 24.)  At the October 2018 "MVP" event, Noland went around the room asking affiliates, in front of the whole audience, how many new affiliates they had recruited recently and criticized them for not doing more.  (Ex. 74 at 14:13-24:3; *see id.* at 24:11-19 ["I love you and I want you to be extremely successful.  And the best way for me to get you to be successful is to go find new people that will outperform you."].)  On one conference call, SBH's then-director of sales, Mehler, explained that although retail sales could help affiliates "make some extra, part-time money," "recruiting is key" and affiliates should pursue getting a "10x by 10 by 10 by 10 by 10":

> I'll tell you something, folks.  I'm thinking about this.  We got a couple calls to close out with.  I'm thinking about most of these calls have been about retailing.  Okay?  And a little bit – Sonya had one about recruiting.  Folks, let me clue you into something.  *Retailing is a great way to make some extra part-time money*, to make some quick, quick money to be able to put in your pocket and to plant some seeds in the business.  You know, planting seeds

that can turn into more.

But remember I spoke earlier about multiplying . . . . You do something once and you make money over and over and over again.   But it's also multiplicative.   That's the key about this.   When you look at how we structured 10 by 10 by 10 by 10 by 10, all of a sudden 10 by 10, it's 100 people.  10 by 10 by 10, it's 1,000 people. . . . How many more lives can we change if we have 1,000 people doing it instead of just ourselves or instead of 10 or instead of 100?  So, you know *recruiting is key*.

(Ex. 94 at 20:8-23:25, emphases added.)

Defendants' internal discussions suggested that this recruiting focus was deliberate. In one series of text messages from Noland to Harris and Sacca, Noland made clear that "RECRUITING" is the "MAIN FOCUS."  (Ex. 288.)

### 4.   Retail Sales

The Court previously stated that "there is evidence that retail sales of coffee would not and could not provide a significant source of income for Affiliates."  (Doc. 406 at 39.) The evidence at trial powerfully confirmed this.  As noted in earlier portions of this order, the testimony from the affiliates who were called as defense witnesses at trial—which one might expect to showcase the very best examples of the profitability of retail sales— revealed that affiliates often lost money.  Additionally, even the affiliates who were able to eke out a small profit from retail sales generated miniscule net earnings that were often less than could be earned at a minimum-wage job and paled in comparison to the profits that could be earned from commissions.

The evidence presented by the FTC supports the same conclusions.  In particular, the Court credits the testimony of Dr. Bosley concerning the structural impediments to profitable retail sales that SBH created.  (Tr. 95-98 [noting that retail sales are "not fundamentally altering or playing into the way in which people are rewarded from the company"].)  Defendants also placed other restrictions on retail sales that limited their viability.  For example, Defendants barred affiliates from making retail sales on Amazon or eBay.  (Ex. 241 ["No one is allowed to sell SBH products on Amazon or eBay."]; Ex.

204 [Harris to Noland: "Amazon Sales against policies and procedures"].)  Defendants'
products also lacked UPC barcodes, which created another obstacle for affiliates looking
to resell products through local retail businesses, like grocery or convenience stores.  (Tr.
233.)  Defendants also barred affiliates from selling products below the suggested retail
price.  (*See, e.g.*, Ex. 254 at 1 [Sacca, pledging to "have compliance get involved" because
an affiliate was selling G-Burn for $79 instead of $89; affiliate writes:  "I was told in no
uncertain terms that if I didn't change my sale price to the retail of $89 immediately I could
be terminated so it was changed that very day I was notified!"].)  Such price floors not only
prohibited consumers from pricing products at a level that consumers wanted to pay, but
also prohibited them from competing with Defendants themselves, who offered products
direct to the public at "wholesale" rather than "retail" price.  (*Cf.* Ex. 380 ["I'm not sharing
my link on [Facebook]-want to keep the retail sales in the short term.  I'll post my link in
places to attract business.  But not to cannibalize what I have going . . . ."].)

### 5.   Limited Emphasis On Retail Sales

Above, the Court has summarized some of the evidence showing that Defendants
placed heavy emphasis on recruiting.  Defendants failed to place anywhere near a similar
level of emphasis on retail sales.[33]

For example, many of Defendants' training materials did not instruct affiliates that
retail sales were important to their financial success.  Defendants' "One Year Commitment
Form" for new affiliates (Ex. 6), which they asked all affiliates to sign (Ex. 5 at 18),
required affiliates to make ten commitments, none of which involve selling products to
non-Affiliate consumers.  Defendants' "Four Steps to Success" also do not mention sales

---

[33]     Thus, the Court specifically rejects some of Defendants' proposed findings of fact
on this issue, such as their suggestion that "[w]hile presentations to Affiliates included
training on how to develop and operat[e] Teams, the primary focus at SBH was sales of
products."  (Lead Action, Doc. 529 at 2 ¶ 11.)  Although some documents, such as SBH's
"Terms And Conditions," included statements such as "[w]ithout question, the sale of
products to end consumers is the basis of the companies [sic] affiliate Commission program
and must be emphasized while referring other affiliates" (Lead Action, Doc. 529 at 3-4
¶ 17, citing Ex. 522), the inclusion of these self-serving statements does not change the
reality of what was emphasized.

to actual users of the SBH products.  (Ex. 16 at 68.)

Defendants' primary recruiting pitch deck—the "Affiliate Business Tour" (Ex. 16)—told consumers (implausibly) that they could make an extra "$54,000 per year" from offline retail sales, but that doing so would require locating 100 retail customers who purchase products at "retail" prices monthly.  The same pitch deck, by contrast, showed how affiliates could earn over $1 million per month by recruiting just 10 affiliates to start their Power of Ten pyramid.  (Ex. 16 at 43, 49-52.)

Defendants also told affiliates that "Units" needed to be a "MAJOR focus."  (Ex. 147.)  They defined Units as "sale[s] in the SBH Online System," which they made clear were "Not Retail."  (*Id.*)  Thus, Defendants trained affiliates that their purchases from SBH—the "sales" that generated commissions—were "Not Retail."  (*Id.*)

To be clear, Defendants did not *ignore* retail sales.  Nevertheless, as discussed above, retail sales did not (and could not) provide a significant source of income to affiliates.  Indeed, Defendants sometimes told affiliates to give away products for free and/or treat retail sales as a one-off recruiting tool.  For example, SBH's "Fast Start System" training directed affiliates to first give away 60 product samples in their first 30 days for free (at a loss to affiliates) to induce recipients to become affiliates.  (Ex. 5 at 21.)  Defendants then told affiliates to tell recipients of the samples that they could get the products for "FREE" by enrolling as an affiliate—which Defendants claim "[m]ost people" will take.  (*Id.*)

Similarly, Defendants' "retail sales script" directed affiliates to ask their friends or family members to "help me out by buying at least *a bag or two of coffee from me one time at Retail Pricing*."  (Ex. 8, emphasis added.)  The affiliate was told to say, "If you like it, I will show you how to get it at Wholesale Pricing" directly from SBH.  (*Id.*)  Harris, similarly, directed affiliates to tell potential retail customers: "I just started a new coffee business; would you do me a favor *and just buy a few bags of coffee from me at retail*?  It would mean a lot to me.  And if you love this coffee as much as I do, and I believe you

will, *I can show you how to get it at wholesale or even for free*." (Ex. 113 at 23:21-24:4, emphasis added.)  Noland responded approvingly when an SBH affiliate posted to the SBH "Heat" Facebook group his strategy for approaching consumers: "Would you help me out and *buy a bag or two bags from me this one time TODAY at retail* and if you like it I'll show you how to get it at a discounted price." (Ex. 334, emphasis added.)

> 6.    Excessive Purchases And Lack Of Inventory-Loading Safeguards

Despite the many obstacles to earning profits through retail sales, Defendants urged consumers to join SBH and buy large product packs, telling them that the "more inventory you have to start your business, the faster your business typically will grow." (Ex. 5 at 17.) For example, and as noted above, Step 1 of the "Four Steps to Success" included directing affiliates to "[d]ecide on Accelerator Pack." (Ex. 4 at 12.)  Defendants also instructed affiliates to tell their new recruits that the "[t]he higher the Pack you initially start with, the more money you can make" and that, by buying a $2,000 product pack, they could "[m]ake 50% Profit on your money FAST!" (Ex. 10 at 7.)  As another example, Defendants' "Fast Start System" told affiliates that a "very simple way" to achieve a higher SBH "rank" after enrolling is "for you to start with a [$2,000] Super Accelerator Pack and then have the initial 2 people you [recruited] start with a Super Accelerator Pack. . . . This way you immediately [get] B.A. Qualified." (Ex. 5 at 3-4.)  Referencing the need to "get started" with a $2,000 product pack, Noland told recruits that they could just use "other people's money": "What I'm going to do is[,] I'm going to put it on a credit card.  I'm going to use other people's money." (Ex. 84 at 67:11-17.)

SBH "Founders Packs" cost between $2,495 and $3,495 (plus $95-$150 shipping and handling), contained thousands of dollars in SBH products, and entitled the purchaser to "Founder" status, which included a share of the company's revenues over a limited period and membership in the purportedly forthcoming (but never-created) SBH "retirement pool." (Ex. 170 at 6; Ex. 130; Ex. 131; Ex. 53 at 9:23-11:7.)  SBH "Global Ambassador Packs" cost $4,995, plus $225 shipping and handling. (Ex. 324 at 4; Ex. 149.)

Like the Founders Packs, Global Ambassador Packs contained various products and other benefits, including, again, a share of the company's revenues over a limited period and membership in the purportedly forthcoming (but never-created) SBH "retirement pool." (Ex. 149.)  To remain a Global Ambassador, the affiliate was also required to maintain an additional $250 a month auto-order until "the last SBH Global Ambassador is sold" and then maintain a $500 a month auto-order.  (Ex. 324 at 3.)

Defendants told affiliates seeking financial freedom (#3's) that they needed to become Founders and Global Ambassadors.  On an early SBH "Heat" conference call, for example, Noland told affiliates that #3's should, "first and foremost," "step up and get a Founders Pack."  (Ex. 346 at 23:3-23.)  At the "ICON" training event, Noland demanded of attendees (who already had paid thousands of dollars to attend, Ex. 329 at 11): "If you want to be an ICON, are you at least a country founder? . . .  If you are not a country founder, stand up. . . .  So if you're going to be an ICON, do iconic stuff.  Don't leave no money on the table.  Don't let cost cost you everything . . . . You got to get to the point where you ain't standing up during those sessions because the only reason you stood up is because of what?  You're looking at the [cost.]  You ain't looking at the [value.]"  (Ex. 109 at 8:1-25.)  For those still worried about the cost of the Founders Pack, Noland reminded them: "Now, all you got to do is use OPM if you ain't got your own money.  Use other people's money [OPM].  Stick it on a credit card, or borrow somebody's credit card.  The only reason you won't do it is because you're too prideful. . . .  The problem is you're too prideful, and that'll keep you in the cellar.  Call some people, I need to borrow your credit card, I need some help.  If they're not going for financial freedom and you are, don't they need you?  They going to need you, so go on and help me out, let me use your credit, I'll get that paid back. . . .  It should take you 30 days, 60 days max, right?  Paying 18 percent interest . . . .  Let me use your credit card, and then I'll pay whatever interest charges you get."  (Ex. 109 at 11:20-12:25.)

Noland then touted the benefits of the more expensive Global Ambassador Pack:

"You're going to be an ICON, and you sitting in the room at the ICON training, and you ain't a global ambassador?"  (Ex. 109 at 13:23-14:1.)  He continued: "[I]f they say they want to be wealthy in SBH and you ain't global ambassador, you making an extremely— let me be raw—unwise decision that you are for sure—listen to me—going to regret.  Fact: if you're not a global ambassador and you want financial freedom, and it was sitting in front of your face, and all it took was for you to hustle to get the money that's not going to evaporate, it's going to come right back to you in product, that you can just turn right back into the money that you went and got, if you just hustle . . . ."  (Ex. 110 at 8:7-21.)

Separate from the emphasis on purchasing Founders Packs and Global Ambassador Packs, Defendants encouraged new affiliates to establish monthly "auto-orders" of SBH products, explaining that their success in the company depended on doing so.  (Ex. 7 at 2-3 ["If you don't sign up on our Auto-Order Program then you have approximately a 96% chance of quitting within 2 years and, therefore, not earning commissions."]; Ex. 5 at 18.)  After affiliates enrolled, Defendants continued to push them to make monthly product purchases untethered to retail demand.  At the end of each month, for example, Defendants sent emails telling affiliates to "qualif[y] to the Highest Affiliate Rank Possible!" and reminding them that "your Personal Orders count toward" rank advancement.  (Ex. 166 at 2-3, 7-9, 12-20, 23-25, 28-40, 43-49, 52-57.)  Defendants posted accompanying messages on their "SBH Heat" Facebook group.  (*Id.* at 1, 5-6, 10-11, 21-22, 26-27, 41-42, 50-51.)

In one end-of-month video message to affiliates, Harris boasted about the purported benefit of inventory loading: "If you've got $1,000 worth sitting in your house, congratulations.  If you've got four or $5,000 worth, congratulations.  If you've got more than that, congratulations.  Mr. Noland and I [in a prior MLM business] used to carry around 10, 15, 20, $25,000 or more in products."  (Ex. 95 at 30:11-17.)  In another end-of-month message, Harris encouraged affiliates who were $2,000-3,000 away from hitting a higher SBH "rank" to simply buy the products themselves, despite the fact that those "ranks" reset every single month and affiliates might find themselves in the exact same

situation the following month.  (Ex. 93 at 14:23-15:9 ["I'm two or [$]3,000 away from ranking up, I'm going to buy those products."]; Tr. 556.)  Affiliates heeded Defendants' warnings, with affiliates' purchase volume skyrocketing at the very end of each month.  (Tr. 310-11 [Miles, testifying that purchases on "[t]he last day of the month [were] 283 percent higher than the average of all of the other days of the month"].)

Defendants also encouraged excessive product purchases untethered to product demand by inventing "elite" (but sometimes non-existent) groups for affiliates in which they would receive purportedly exclusive benefits.  In November 2017, Defendants released a set of "base requirements" for the "CORE Team," which would have "exclusive advantages" within SBH and "help us build out the key leaders and trainers for the company's future."  (Ex. 133.)  The November 2017 CORE "base requirements" included recruiting three new affiliates within two weeks, each of whom placed a $100 product order.  (Ex. 133.)  There was no requirement to make any retail sales.  SBH affiliates reported to Defendants that they had completed the "CORE" base requirements, including by recruiting three new affiliates.  (Ex. 332.)  In 2018, Defendants declared it was now "time for us to build the SBH CORE Team!"  (Ex. 140.)  That team would include 20 affiliates and would be the "only way to be on the same page mentally with [Noland] on this Millionaire Making SBH Journey."  (Ex. 140.)  However, Defendants never actually selected a CORE team.

Separately, in early 2018, Noland hosted a series of "Millionaire Insider" conference calls.  (Ex. 167.)  Defendants wrote that "if you are truly focused on Financial Freedom, you can't miss these calls," adding that their mission was "to build and create 1,000 Millionaires.  It's going to fun [sic] watching it happen!"  (Ex. 167 at 1, 3, 4, 9.)  To join the Millionaire Insider calls, affiliates had to satisfy certain "criteria."  Those criteria included personally purchasing $500 or $1,000 in products from SBH within a four-day window or recruiting a new affiliate to do the same.  (Ex. 167 at 1, 3, 4, 9.)  There was no retail-sale requirement.

Separately, in mid-2018, Defendants began promoting an SBH "All Out, All In" Team.  (Ex. 168.)  Defendants explained: "These are the most committed people in SBH. These are the people who are ready to go for Financial Freedom with all they've got. . . . The elite of the elite from SBH will come out of this group."  (*Id*.)  Defendants sent an email to interested affiliates, laying out the qualifications for the All Out, All In team.  (Ex. 267 at 1.)  Among other things, Defendants required affiliates to buy $1,500 in SBH products (or recruit a new SBH affiliate to do the same) and buy two of Defendants' training programs at a cost of approximately $1,500.  (*Id.*; Ex. 309 [showing cost of Defendants' "Think & Grow Rich" and "Million Dollar Energy" courses].)  There was no retail-sale requirement.

Shortly after an event at which "All Out, All In" candidates obtained front-row seats, Defendants posted another "All Out/All In Challenge" to their Facebook group.  (Ex. 145.) Just like the last challenge, it required, *inter alia*, affiliates or their new recruits to purchase $1,500 in products from SBH.  (*Id.*)  Once again, there was no retail-sale requirement.

Despite encouraging affiliates to make large (and, in some cases, automatic and recurrent) product purchases, Defendants lacked policies and safeguards to ensure that affiliates' inventory ended up in the hands of ultimate users.  For example, Defendants' official policy prohibiting refunds "for any reason whatsoever" (Ex. 2 at 3) left consumers who were unable to sell their personal inventory with no realistic option but to take losses. The Court acknowledges that Defendants presented evidence of certain informal efforts to provide refunds even after the adoption of the official no-refunds policy (Lead Action, Doc. 532 at 49-50), but those efforts were insufficient to address the problems posed by the adoption of the official policy.

Defendants also failed to track retail sales and placed no restrictions on affiliates' ability to order more products while they still had excessive inventory on hand. Referencing what are sometimes known as *Amway* safeguards, Dr. Bosley explained that "SBH has no minimum retail sales requirement, no 70 percent rule (requiring Affiliates to

certify that 70% of their purchases were made to actual consumers of the products) or other specific inventory loading rule, and does not allow refunds."  (Ex. 25 at 98-99 ¶ 159.)  Dr. Bosley added that "MLM firms, even those that have been prosecuted for pyramid scheme activity, typically pay—at a minimum—lip service to safeguard policies including a minimum retail requirement, 70 percent rule, and refund policy." (*Id.  See also* Tr. 110-12 [Dr. Bosley's trial testimony on *Amway* safeguards].)  The Court found it significant that SBH lacked these safeguards.[34]

B.     **SBH—False And Misleading Statements**

Defendants promised financial success in three related ways:  (1) offering "financial freedom," or other lucrative rewards, to those who followed their instructions; (2) telling consumers they would achieve the same fictitious wealth as Noland if they followed his instructions; and (3) promising consumers that even if they did not want to push for "financial freedom," they could still earn hundreds or thousands of dollars per month.[35]

1.     "Financial Freedom"

a.     **The Representations**

Defendants told current and prospective SBH affiliates there were three types of affiliates—those looking to supplement their income (#1s); those looking to "[r]eplace [their] Income (No More Job)" (#2s); and those looking to obtain "Financial Freedom" (#3s).  (Ex. 3 at 33.)  Defendants stated that the choice of what type of affiliate to be is "yours" (Ex. 3 at 33), but that if an affiliate chose to seek financial freedom (*i.e.*, be a #3) and "pa[id] close attention," the affiliate would "be able to get out of that job in about six months" and attain financial freedom in 18 months.  (Ex. 54 at 9:5-9; Ex. 84 at 41:2-9.)

---

[34]     The Court was not persuaded that SBH's limitations on the number of "packs" an affiliate could purchase (*see, e.g.*, Tr. 458 [describing that SBH had a "policy against" buying more than one of any specific type of pack]) or SBH's application process to become a founder (*see, e.g.*, Tr. 477-78, 1219-21) came anywhere close to severing as adequate safeguards.

[35]     In its proposed findings of fact, the FTC identified a fourth category of false income representations ("touting the purported success of Noland's prior students").  The Court has not included this category because, as noted elsewhere in this order, the evidence regarding the falsity of this particular category of representations was not as strong as the FTC's evidence regarding other categories.

SBH did not keep track of how affiliates self-identified.  (Tr. 716, 1279.)

Noland also told affiliates they could have a "reasonable expectation" of replacing their job income in six months by being "result-oriented and focused" (Tr. 1624), adding if they "just applied [his system], without fail, you should be able to be finally free in 18 months" (Ex. 72 at 7:23-8:16).  On another occasion, Noland said: "Y'all got to just listen to me.  Because in this room tonight, it's going to be somebody that walks in for the first time, 18 months from now will never have to work again."  (Ex. 84 at 41:2-9.)  Similarly, on another occasion, Noland said: "[Y]ou listen to me and you listen to our top leadership council and our top leaders that are developing with SBH, you're going to be able to get out of that job in about six months if you pay close attention."  (Ex. 54 at 9:5-9.)

Although Defendants suggested during the bench trial that "financial freedom" was an amorphous term that could mean different things depending on the context (and might mean simply making enough money to pay a utility bill), this suggestion was not credible and was belied by the voluminous evidence establishing that Defendants characterized "financial freedom" as a level of income beyond merely being able to quit a job.  For example, on an early SBH "Heat" conference call, Noland explained: "I'm talking about financial freedom, where you just do not have to work again and money keeps coming in, over and over and over again."  (Ex. 346 at 13:9-16.  *See also* Ex. 84 at 13:1-3 ["Have financial freedom.  Do what you want, when you want, wherever you want."].)  Later, he explained that "financial freedom" meant, at a minimum, a perpetual stream of $20,000 monthly payments: "[W]hen we talk about financial freedom, independence, and wealth, . . . [w]e got to get to that [$]20,000-plus a month coming in consistently.  Whether you work or not, here comes [$]20,000 every month."  (*Id.* at 14:4-8.  *See also* Ex. 74 at 53:3-16 ["Some people in this room, 12 months.  That's the fastest I've had it done.  Complete time and money freedom. . . . Never have to work again.  Ever.  No less than [$]20,000 a month."].)  On another SBH Heat call, Noland defined "financial freedom" as "[n]ever, ever, ever having to work again, and having executive-style income, minimum six figures per year, whether you work or not, for the rest of your life. . . . [People seeking financial

freedom] want to spend the majority of their years doing what they want to do, living their dreams, exploring the world, having all the things that most people will never even touch. . . . I'm talking about six figures, maybe even seven figures, per year . . . . [A]nd it just keeps coming in, and you don't do any work that day." (Ex. 349 at 9:4-10:2.)

Defendants also used images of yachts and cars, piles of cash, and exotic vacations to promote consumers' potential financial earnings. (Ex. 350-84 at 0:41-0:51. *See also* Ex. 21 at 15.) At the SBH "Wealth Warriors Bootcamp" training event, Noland offered attendees the opportunity to "Get Paid Like A Professional Athlete" through "RESIDUAL INCOME" via SBH. (Ex. 21 at 9.) On another occasion, Noland called SBH a "literal golden goose" and "perpetual money and health machine" that would make affiliates millions of dollars. (Ex. 67 at 10:3-5.) Noland repeatedly vowed to create "1,000 millionaires" in SBH. (Ex. 60 at 18:16-22; Ex. 58 at 28:10-21; Ex. 136; Ex. 59 at 39:22-40:9 ["I want a thousand real millionaires. . . . I want 2,000 millionaires, when they reach retirement they've got a million dollars, a year, coming in, not from the stock market, but from coffee that people re-order . . . ."]; Ex. 59 at 44:6-11 ["I'm going to create a thousand millionaires that make a million dollars residual income a year."].)

Defendants stated that achieving this form of financial freedom was not simply theoretically possible, but reasonably likely—and, in some case, a virtual certainty—if affiliates followed Noland's training. In a 2018 video, "How to be a MILLIONAIRE in SBH," Noland stated, "You will be a millionaire if you apply this training, you're going to be a millionaire. You can go and look in the mirror and say I'm going to be a millionaire if I apply the training that J. Noland just gave me." (Ex. 71 at 42:13-21.) At another training, Noland told affiliates: "If I'm sitting down, working with you personally, . . . I know within three years, if you listen to me, I'm going to make you a millionaire." (Ex. 62 at 20:23-21:1.) Separately, during the October 2018 "MVP" event, Noland told the all-SBH affiliate audience (Ex. 148): "Y'all going to be rich. Don't worry about it. I'll make you a millionaire. Y'all got that? You three, I'm going to make you millionaires. Boom." (Ex. 74 at 28:19-24.) He added: "[Y]a'll going to see me go do billions and create multi-

multi-multi-millionaires.  So they're all going to make at least several million. . . . Some of y'all can be hanging around the fire and catch a little flame and make you a few million. That's cool." (*Id.* at 29:8-13.)  Meanwhile, Harris told one SBH affiliate by text message: "You'll make $100k+ in 2018." (Ex. 280.)  Mehler, SBH's then-director of sales, once told affiliates that a five-figure monthly income was *not* a "theoretical example" but instead a "fact" based on Noland's past results. (Ex. 337 at 6:23-7:5.)  And Duvon Botero, SBH's then-vice president of sales, quoted Noland to affiliates in October 2019, telling them: "[T]his is Mr. Noland, I'm quoting Mr. Noland, 'If you'll follow my system, I can guarantee you' . . . . This is a call for people who are looking for the business opportunity. 'But I can guarantee you, you will find success with our company because the system is a proven system.'" (Ex. 763 at 0:06-0:11, 15:55-16:35).[36]

### b.    **Proof Of Falsity**

Dr. Bosley modeled scenarios in which affiliates followed Defendants' instructions about how to maximize earnings under the SBH commission plan.  Based on that modeling, Dr. Bosley concluded "that this is a structure that's built on a pay-and-recruit model that will leave the vast majority in a loss position." (Tr. 98.  *See also id.* at 79-80 ["So what I find in SBH is that their ability to profit is dependent on their ability to recruit."].)  Thus, Dr. Bosley concluded that "SBH's income representations [were] false," because they "systematically misrepresent[ed] the earnings that would be achieved in this system." (Tr.

---

[36]    Defendants' occasional use of disclaimers did not alter the net impression created by these and other income representations.  As noted, some of the representations were not accompanied by any disclaimers, but instead phrased as guarantees.  And even when Defendants did provide disclaimers, they would often undo the "theoretical example" cautionary note by explaining the example was only theoretical "[b]ecause you just ain't done it yet" and adding, "But are there people that do it? . . . Yes.  I got people in my network globally, they make that look silly." (Ex. 84 at 53:20-54:5; *see also* Ex. 115 at 9:5-13 ["So if we talk about anything with theoretical examples, we say they're theoretical because you haven't done it yet.  If you do it, you get paid.  If you don't do anything, you don't get paid."].)  These disclaimers were also, in many instances, buried within training materials in small-print, faint text at the bottom of the page, whereas the income projections were highlighted in a contrasting color and much larger font. (Ex. 16 at 50.)  At any rate, clarifying that a particular income level is not "guaranteed" is different from clarifying that the income level should not be reasonably expected (which Defendants failed to do).  Indeed, at the same time Defendants claimed that ncome was not "guaranteed," they provide assurance that financial freedom was "achievable for the masses." (Ex. 10 at 6.)

120.)  The Court found this testimony credible.

Separately, Miles, the FTC's data analyst, created a "comprehensive spreadsheet that identifies each product and [event] ticket purchased from Success By Media, the date and amount of each purchase, and, for each affiliate, the total commissions (earned and disbursed)."  (Ex. 38 ¶¶ 4-5.)  Miles then prepared a "summary profile that for each affiliate and consumer shows the total value of purchases, the first and last invoice date for purchases, the total value of ticket sales, the total value of VOZ purchases, the total value of product credits, and total commissions (earned and disbursed)."  (Ex. 38 ¶ 5.)

Miles determined that SBH affiliates paid $6,205,551.29 (excluding purchases made with product credits) for SBH products.  (Ex. 38 ¶ 12.)[37]  Miles further determined that SBH affiliates earned $2,174,301.09 in commissions.  (*Id.*)[38]  Thus, in relation to SBH, affiliates suffered a net loss of more than $4 million (which does not include the additional cost of tickets for training events or certain other costs, such as travel and marketing expenses).

In addition to looking at the aggregate financial picture, Miles also identified the percentage of SBH affiliates who were in a net-loss position in relation to SBH.  Miles determined that less than 6% of affiliates (420 of the 6,957 total affiliates) received more money from SBH than they paid to SBH.  (Ex. 38 ¶ 17.)  Miles further found that only 110 affiliates (less than 2%) netted over $100 from SBH.  (Ex. 38 ¶ 18.)  Miles also testified that 65% of affiliates who attended trainings were in "a net loss position of greater than a thousand dollars" compared to 10% of affiliates who had not attended a training event.  (Tr. 309-10.)

Although these figures do not account for revenue from affiliates' offline retail sales (which Defendants did not track), the Court has no hesitation concluding, in its capacity as finder of fact after hearing all of the evidence at trial (including the testimony from the

---

[37]  This figure excludes shipping and taxes, which Defendants omitted in the spreadsheet Miles used.  Defendants calculated those costs at $437,072.96.  (Ex. 350-79, "Data Pie Charts" tab, Cell H24.)

[38]  Affiliates did not receive all of these funds because some left money in their SBH "e-Wallets."

defense's handpicked best examples of supposedly successful retail sales activity), that the revenue from retail sales was nowhere near enough to offset the losses calculated by Miles. Similarly, although Miles's figures omit the value of products personally consumed by SBH affiliates, consideration of that value would not change the overall conclusion that the great majority of SBH affiliates were net losers and the few who may have eked out a net positive outcome did not obtain anything close to the "financial freedom" that was being offered.

Finally, it is notable that Noland, Harris, and Sacca themselves did not earn, during their 29 months sitting atop the SBH pyramid, anything close to what Defendants claimed top affiliates could reasonably expect to achieve in just 18 months. Noland received $206,009.29 in commissions, or $7,103.77 per month over the relevant 29-month period. (Ex. 350-79, Tab 3a, "ID" number 400000, 90225.)[39] Noland also purchased only $300 in SBH products (Ex. 350-82, Row 275 - "Affiliate#" 400000) and admitted making "de minimis sales of his personal inventory." (Ex. 44 at 2 ¶ 12.) Thus, Noland averaged just over $7,000 per month over 29 months, not the $20,000 per month that Defendants told #3s they could reasonably expect, at a minimum, after 18 months.

Next, Harris received $120,812.22 in SBH commissions, or $4,165.94 per month, over the relevant 29-month period. (Ex. 350-79, Tab 3a, "ID" number 400003.) Harris admitted making "few if any" offline retail sales. (Ex. 44 at 2 ¶ 12.) Again, these earnings are far below what Defendants told #3s they could reasonably expect after 18 months.

Finally, Sacca received $108,712.67 in SBH commissions, or $3,748.71 per month, over the relevant 29-month period. (Ex. 350-79, Tab 3a, "ID" number 400005.) Sacca admitted "de minimis sales of personal product." (Ex. 44 at 2 ¶ 12.) As with Noland and Harris, Sacca's SBH earnings were thus far below what Defendants told #3s they could reasonably expect after 18 months.

…

---

[39] No non-Defendant SBH affiliate came close to that figure. Next in line was Jo Dee Baer, at $99,002.46 in commissions over roughly the same 29-month period. (Ex. 350-79, Tab 3a, "ID" number 400013.)

1

2.   Noland's Wealth

2

a.   **The Representations**

3

Defendants repeatedly used Noland's purported wealth to recruit new affiliates and

4

convince existing ones to spend more money.

5

At one event, for example, Noland rhetorically asked: "Jay, just please tell me how

6

you created a financial freedom life to where your son before he was born was already

7

retired?  And his kids are retired, and his kids' kids are retired?  I'm now working on my

8

fourth generation. . . . [I]t's going to be somebody that walks in here for the first time, 18

9

months from now will never have to work again."  (Ex. 84 at 40:15-41:5.)  At the same

10

event, Noland claimed he had been "financially free, completely time and money free since

11

I was 36" and had not "had to work a job . . . [s]ince I was 27," due to "this thing called

12

residual income."  (Ex. 84 at 14:19-15:1.)  Noland made effectively the same claim on an

13

early Heat call, claiming that as of 2004, he already "had reached complete time and money

14

freedom" and had been "generationally set-up for a long time."  (Ex. 350-93 at 24:20-

15

25:01.)  Noland told another audience he had "made more [money] than most people will

16

make in 10 lifetimes, or maybe even 20."  (Ex. 55 at 7:25-8:7.)  At another event, Noland

17

claimed to have given away "a couple million per year" to family, friends, and others,

18

adding that he did not "even feel it, though" because he had "freedom."  (Ex. 74 at 36:18-

19

37:6.)  Additionally, there are the misrepresentations discussed elsewhere in this order

20

related to the purported property in Panama on the private beach.

21

b.   **Proof Of Falsity**

22

As already discussed above, in relation to Noland's credibility, these representations

23

were false.[40]  In his January 2020 sworn financial statement, Noland reported he had a

24

negative net worth and owed over $210,000 in state and federal taxes.  (Ex. 310 at 8, 10.)

25

At his deposition, Noland was unable to identify a time he *ever* had a positive net worth.

26

(J. Noland Dep. Tr. (2/5/20) at 37:14-18 ["I would have to ask my accountant."].)  Noland

27

---

28

[40]     The cited representations would remain false even if Noland believed for a time that his claimed stake in Organo Gold (which he did not acquire until 2008) was worth millions of dollars.

- 61 -

admitted to the tax advocate assisting him in dealing with the IRS that he was "living on Credit Cards" in 2005 and 2006 and that, in 2007, the IRS ordered him to pay $187,000 in back taxes (which Noland admittedly "did not have the ability to pay").  (Ex. 201.)

            3.    Income Potential Short Of "Financial Freedom"

                  a.    **The Representations**

Defendants stated that even if an affiliate did not wish to become a #3 and obtain financial freedom, SBH could provide the steps needed to earn substantial income. Defendants told affiliates they were giving them "simple" steps to meet those goals, even if the steps would not be "easy."  (Ex. 346 at 21:5-6 ["And here's what so crazy.  Getting wealthy is simple.  I didn't say easy."].)

For #1s (those looking to "supplement" their income), Defendants explained that with minimal commitment, affiliates could expect to make "$300 to $500, maybe $1,000 extra a month."  (Ex. 347 at 13:13-15. ; *See also* Ex. 510 [#1s "want to Supplement Their Income (Make and [sic] extra $300 - $1,000/mo)"]; Ex. 346 at 30:6-8 ["I'm telling you, 80 percent need to just make an extra $2-, $300, maybe an extra $1,000 a month."]; Ex. 349 at 6:9-12 ["Number ones, these are people that are just looking to supplement their income. They're looking for maybe an extra $300, $500, maybe tops an extra $1,000 per month."]].)

Defendants were clear that the money #1s would earn, without much effort, would make a substantial difference in their lives: "[A]n extra $300 a month changes most people's lives and keeps them from ever filing for bankruptcy. . . We are impacting lives all over!"  (Ex. 529, ellipses in original.  *See also* Ex. 349 at 6:19-25 ["[M]ost people would be shocked to know if they just added an extra $100 to $300 per month to their mortgage [payment], they would . . . knock off years, some cases a decade [if] you had a 30-year mortgage."].)  To be a #1, affiliates needed to "ask two people per week for money to join [their SBH] business."  (Ex. 349 at 17:6-10.  *See also* Ex. 20 at 22; Ex. 21 at 34; Ex. 22 at 29; Ex. 23 at 64; Ex. 24 at 43.)

Defendants also estimated that #2s (those trying to replace their income) would make a minimum of about $2,500 to $3,000 per month.  (*See, e.g.*, Ex. 346 at 16:12-16 ["I

think that replacement income comes right around the $2,500 to $3,000 a month mark . . . ."].)  Defendants told affiliates they could get to the job-replacement level and quit their jobs in six months, if they spent just one or two hours per day, five days per week, asking two people per day to join their SBH business.  (Ex. 346 at 16:25-17:4 [referencing married couple:  "[B]oth of us gonna take at least an hour a day during the next six months, and we're getting out of this job."]; Ex. 347 at 26:4-13 ["If you're a number two, what you can get out of your job, you just simply ask two people a day for money to join the business; you do it five days a week . . . . You're going to do that for six months. . . . It usually takes an hour or two a day out of [your] life."]; Ex. 349 at 18:15-22 ["So over the course of six months, five days a week, you're going to ask people, what, two times per day for money to join the business.  That's what I've watched in 22 years of people who consistently break through and never have to work again . . . . They replace their income.  And it typically takes a person around six months."]; Ex. 20 at 22; Ex. 21 at 34; Ex. 22 at 29; Ex. 23 at 64; Ex. 24 at 43.)

Noland also told #2s that it did not matter what their current income was; as long as they spent one or two hours per day, five days per week, asking two people to join SBH, they could expect to replace their income in 6 months: "[E]verybody that I know that is a beast on that . . . [u]sually, they're out of their job within six months.  They don't ever have to work again.  They've replaced their income.  And it's funny, no matter what their income is, when they go ahead and ask at least two people a day . . . [they're] going to grow it to whatever their income is, it's just weird . . . ."  (Ex. 347 at 26:14-27:1.)

b.   **Proof Of Falsity**

The evidence discussed in Part II.B.1.b above, which bears on the falsity of the "financial freedom" income representations, also bears on the falsity of the representations concerning income potential short of "financial freedom."

…

…

…

C.    **SBH Rules Violations**

1.    Shipping Delays

Defendants consistently took orders for products that were out of stock and, in some cases, would not exist for 6-12 months.

a.    **Founders Packs**

For example, Defendants sold over 150 Founders Packs before November 10, 2017 (Ex. 131) and had sold 200 by January 23, 2018 (Ex. 137).   The purchasers spent approximately $570,000 on these Founder Packs.  (Ex. 170 at 6 [pre-November 10 price of $2,495 plus $95 shipping and handling]; Ex. 131 [150 packs sold at pre-November 10 price]; Ex. 130 [post-November 10 price of $3,495, plus $150 shipping and handling]; Ex. 137 [remaining 50 packs sold at post-November 10 price].)  Nevertheless, as of March 13, 2018—49 days after the final Founders Pack purchase and over four months after at least 150 Founders Pack purchases—Defendants still had not delivered approximately $370,000 in SBH products to these Founders Pack purchasers.  In particular, as of March 13, 2018, Defendants still owed Founders Pack purchasers 6,208 packages of Latte ($136,576, at $22 per package), 570 packages of Black Coffee ($11,400, at $20 per package), 1,322 bottles of "G-Drops" ($38,338, at $29 per bottle), 420 bottles of "Life 120" ($33,180, at $79 per bottle), 458 bottles of "Aller G Stop" ($17,862, at $39 per bottle), 704 bottles of "G-Burn" ($41,536, at $59 per bottle), 592 bottles of "G-Shield" ($23,088, at $39 per bottle), 564 bottles of "Fruit & Veggie" ($33,276, at $59 per bottle), 552 bottles of "Essential" ($21,528, at $39 per bottle), and 334 bottles of "G-Clear" ($13,026, at $39 per bottle).  (Ex. 180 [amount of each product owed to consumers]; Ex. 236 [cost of each product].)

b.    **Hot Cocoa**

Defendants also routinely exceeded their estimated shipment dates for "pre-orders." For example, on April 13, 2018, Defendants told SBH affiliates they had started "pre-production" of their Hot Cocoa product.  (Ex. 143 at 1.)  That same day, Defendants began accepting "pre-orders" for Hot Cocoa, with an estimated shipping date of June 20, 2018. (*Id.*)

Nevertheless, as of November 29, 2018, Defendants had not finalized the formulation of the Hot Cocoa product. (Ex. 225.) Defendants did not begin shipping Hot Cocoa until January 10, 2019 at the earliest—seven months after the estimated shipping date. (Ex. 151 ["SBH R&D Hot Cocoa just hit the warehouse and the Pre-Orders start shipping out today!"].) Between April 2018 and December 11, 2018 (30 days pre-shipment), Defendants accepted $51,337 in Hot Cocoa pre-orders. (Ex. 350-79 [Tab 6, filter Column L for "SBH Gourmet Hot Cocoa" and sum all orders between April 13, 2018 and December 11, 2018]; Ex. 143 [add $29 shipping and handling per order].)

### c.  **Rooibos Tea**

Similarly. on March 26, 2018, Defendants claimed to have started "pre-production" of their "Rooibos Tea" product. (Ex. 184 at 1.) That same day, Defendants opened pre-orders of Rooibos Tea with an estimated shipping date of May 20, 2018. (*Id.*)

Eleven months later, on February 24, 2019, Defendants ordered Rooibos Tea from their supplier. (Ex. 234.) At that time, Noland admitted that he was "really behind the 8-Ball on this," with "many Pre-Orders . . . outstanding for over 6 months." (*Id.*) Defendants did not start shipping Rooibos tea until March 8, 2019 at the earliest—almost a full year from the first pre-orders and over nine months after the estimated shipping date—and did not claim to have shipped all pre-orders until May 24, 2019. (Ex. 268 at 51-59 [first appearance of Rooibos on inventory report is March 8, 2019 and first non-zero entry for Rooibos is June 1, 2019]; Ex. 152 [Rooibos "about to hit the SBH Warehouse"]; Ex. 154 [May 24: "ALL Back Orders have been Shipped Out"].)

Between March 2018 and January 31, 2019 (at least 36 days pre-shipment), Defendants accepted over $25,000 in Rooibos Tea orders. (Ex. 350-79 [Tab 6, filter Column L for "R&D MycoCafe Gourmet Rooibos Tea (15 POUCHES) PRE-ORDER" and sum all orders between March 26, 2018 and December 11, 2018]; Ex. 184 at 1 [add $29 shipping and handling per order].)

### d.  **Chai Tea**

On March 5, 2018, Defendants announced that they had started "pre-production" of

a Chai Tea product.  (Ex. 139.)  That same day, Defendants began accepting "pre-orders" of Chai Tea, with an estimated shipping date of April 20, 2018.  (*Id.*)

Defendants did not start shipping Chai Tea until September 18, 2018, at the earliest. (Ex. 328.)  Noland admitted that "most" pre-orders did not ship until December 2018.  (Ex. 150.  *See also* Ex. 268 at 37-47 [no Chai Tea in stock from October 6, 2018 to January 11, 2019].)

Between March 5, 2018 and August 19, 2018 (30 days pre-shipment), Defendants accepted $60,230 in nonrefundable Chai Tea orders.  (Ex. 350-79 [Tab 6, filter Column L for "MycoCafe Chai Tea Pack (12 Pouches)" and "Chai Tea (12 Pouch Pack) [subscription]" and sum orders between March 26, 2018 and December 11, 2018]; Ex. 139 [add $29 shipping and handling per order].)

### e.  **Time Capsule**

On September 9, 2019, Defendants launched pre-orders of their "anti-aging" "Time Capsule" product, claiming it was "about to be here!"  (Ex. 157.)  However, as of September 14, 2019, Defendants had not chosen the vendor that would manufacture this product.  (Ex. 250.)  Defendants did not start shipping Time Capsule until November 17, 2019 at the earliest.  (Ex. 161.)

Between September 8, 2019 and October 10, 2019 (at least 38 days pre-shipment), Defendants accepted at least $47,955 in Time Capsule pre-orders (excluding shipping and handling).  (Ex. 350-79 [Tab 6, filter Column L for "Time Capsules (PRE-RELEASE 6 BOTTLES)" and "Time Capsules (PRE-RELEASE CASE – 12 BOTTLES)," and sum all orders between September 8, 2019 and October 10, 2019].)

### f.  **G-HCBD AM/PM**

On February 26, 2019, Defendants opened pre-orders of one of their CBD products: G-HCBD AM/PM ("AM/PM").  (Ex. 153.)  Defendants did not start shipping AM/PM until April 26, 2019 at the earliest.  (Ex. 268 at 56 [first appearance of "AM/PM" on inventory reports].)

Defendants  sold  over  $37,000  in  AM/PM  products  (excluding  shipping  and

1    handling) on or before March 26, 2019 (30 days pre-shipment).  (Ex. 350-79 [Tab 6, filter

2    Column L for "SBH R&D G-HCBD AM/PM (PRE-SALE 6 Pouches)" and "SBH R&D

3    G-HCBD AM/PM (Case – 12 Pouches)" and "SBH R&D G-HCBD AM/PM (1 Pouch –

4    30 day supply)," and sum all orders between February 26, 2019 and March 26, 2019].)

5         Additionally, Defendants made $24,796 in AM/PM sales (excluding shipping and

6    handling) between June 14 and October 10, 2019, notwithstanding that they had no

7    AM/PM in stock during that period.  (Ex. 268 at 60-78 [no AM/PM in stock between June

8    14, 2019-November 15, 2019]; Ex. 160 [Noland announcing AM/PM coming back in

9    stock]; Ex. 350-79 [Tab 6, filter Column L for "SBH R&D G-HCBD AM/PM (PRE-SALE

10   6 Pouches)" and "SBH R&D G-HCBD AM/PM (Case – 12 Pouches)" and "SBH R&D G-

11   HCBD AM/PM (1 Pouch – 30 day supply)," and sum all orders between June 14, 2019 and

12   October 10, 2019].)

13                    g.    **Other Shipping Delays**

14        The shipping delays identified above, which are the only delays for which the FTC

15   seeks monetary relief, are just a portion of Defendants' missing or late shipments.

16        One internal SBH document, for example, identifies "[h]ow much we owe on

17   backorders" as of March 13, 2018.  (Ex. 181.)  The document lists 403 pouches of Latte

18   (at $22 per pouch), 442 pouches of "Black Coffee" (at $20 per pouch), 39 bottles of "Life

19   120" (at $79 per bottle) and 97 bottles of Aller G Stop (at $39 per bottle).  (Ex. 181; Ex.

20   236 [for cost of products].)  The cumulative cost of these products is almost $25,000.

21        Separately, as of late April 2018, Noland admitted Defendants were "Back Ordered

22   like crazy" on "Aller-G-Stop" and had "been out for about a month."  (Ex. 189.)  A

23   February 2018 internal document listed over 100 "backorders" of a variety of products.

24   (Ex. 178.)  In October 2018, an SBH employee emailed Lina Noland: "Is there a chance to

25   know when G-Burn will become available again?  I have several affiliates inquiring for the

26   G-Burn orders."  (Ex. 219 at 5.)  Lina Noland responded: "people should not be contacting

27   us for that because [Jay Noland] said in a call about G-Burn being on backorder."  (*Id.*)[41]

28   ───────────────────
     [41]    The FTC provided extensive proposed findings of fact on other issues related to
     shipping, such as whether SBH's shipping records are sufficient to determine which orders

1              2.      Response To Refund Requests And Inquiries About Shipping Delays

2        When affiliates questioned the status of late shipments or asked for refunds,

3   Defendants would sometimes falsely respond that the orders had "shipped" or threaten the

4   questioning party with removal from the company or other discipline.

5        For example, one affiliate asked why her team member's three-month-old Chai Tea

6   order had not been sent even though the back office (*i.e.,* SBH's internal purchasing

7   system) said it was "shipped."  (Ex. 230.)  Defendants responded that the Chai Tea was

8   "still on backorder."  (Ex. 230.)  Another affiliate questioned the status of his one-month-

9   old Chai Tea order because the back office said it was "shipped."  (Ex. 218.)  In response,

10  an SBH staff member confirmed the product was "still on backorder."  (Ex. 218 at 2

11  [bottom of page].)

12       Even if consumers did figure out that an order labeled "shipped" had not actually

13  shipped, Defendants dissuaded them from seeking refunds (or even asking about the order

14  status).  SBH's official policy was that refunds were categorically prohibited.  (Lead

15  Action, Doc. 205 ¶¶ 98-99; Lead Action, Doc. 222 ¶¶ 55-56; Ex. 2 at 3 [official policy was

16  to allow no refunds "for any reason whatsoever"]; Lead Action, Doc. 529 at 16 ¶ 87

17  [Defendants' proposed findings of fact, acknowledging that "SBH moved to a no-refund

18  policy on purchase of products in January 2018" but claiming that refund requests were

19  occasionally honored despite this official policy].)  In one example, an affiliate asked

20  Defendants to "[p]lease refund me the chai tea order from 4 months ago and put the money

21  back in my wallet.  I [haven't] received it after being promised it months ago.  I could use

22  the money for the holidays."  (Ex. 223.)  Defendants responded by stating, "we do not do

23  refunds for orders already processed."  (Ex. 223.)  In another example, an affiliate wrote:

24  "It's been well over 4 months since I placed that order.  I'm going to need you to please

25  return my money because your customer service is not up to par so, I'm not interested in

26

27  _____

actually shipped.  Lina Noland also testified at length during the bench trial about shipping
issues.  The Court finds it unnecessary to address this topic in the same level of detail as it
28  has addressed other topics because the Court's ultimate rulings (both as to liability and
remedies) do not turn on the disputed shipping-related issues.

what your policy says."  (Ex. 227.)  An SBH employee responded: "Per our policies and procedures any order cannot be cancelled once processed.  Chai is on backorder right now." (Ex. 227.)

On some occasions, Defendants went further than barring refunds—they threatened customers seeking refunds or questioning their order status with termination from the company, not only for themselves, but also for the person who recruited them.  (*See, e.g.*, Ex. 114 at 5:23-12:3 ["I'm driving in the car right now, you ever get like a little gnat going around, that's what I feel like when people are complaining . . . You like swatting, like stop, get out of here.  So I've got some people I've got to prune."].)  In one case, Defendants "[s]uspended pending [t]ermination" an affiliate's membership because, in the Defendants' words, the affiliate "complained about not receiving [his pre-order] of Chai Tea among other things," which violated SBH's "very strict stance against negativity in any shape, form, or fashion."  (Ex. 196.)  Defendants also threatened to punish violations of their no-refund policy in other ways:  "Each time an AFFILIATE violates the No Refund Policy and files a chargeback or disputes a purchase they made from the Company, the liquidated damages will be three (3) times the amount of each of AFFILIATE's disputed payments(s) [sic] to the Company, but not less than $1,000 . . . ."  (Ex. 2 at 3.)  Consistent with Defendants' policy against "negativity," Noland once told affiliates, "if you complain, great chance you're going to be terminated, out, bam.  Isn't that amazing.  You can't complain.  People says, 'I can't complain?'  Nope, can't complain, you can't.  It's one of the rules."  (Ex. 59 at 20:4-15.)[42]

…

…

_____

[42]     During trial, the defense presented evidence that refund requests were occasionally granted, despite the official policy forbidding them, and that Defendants sometimes made efforts to find another affiliate who was willing to purchase a refund-seeking affiliate's unused product.  The defense also presented evidence that Defendants were particularly sensitive to chargebacks due to a coordinated spate of unfounded chargeback requests by the complaining witnesses.  Even if those contentions were accepted as true, the outcome here would not change.

D.      **VOZ Travel**[43]

In late August 2019, SBH's accountant, Crystal Roney, sent Noland "internal reporting" showing that SBM's net operating income for the year was negative, with SBH product sales plummeting nearly 33%.  (Ex. 246 at 1, 9.)  Roney warned Noland that he needed an "income run."  (*Id.* at 1.)  In October 2019, Defendants announced that they would start selling memberships in their "VOZ Travel" program.  (Ex. 115 at 36-69.)  The VOZ program required enrollees to buy $1,000-$2,795 "packs" to access a (never-completed) travel platform.

Defendants promoted VOZ Travel in much the same way as SBH—with promises of immense wealth potential.  In one VOZ Travel sales video, Sacca boasted: "Yes, there will be [VOZ] Travel ETAs making over [$]1.5 million per year.  We cannot guarantee you income . . . . We can guarantee you that, if you go to work, you're going to change your life."  (Ex. 118 at 17:14-18:8.)  Noland introduced VOZ Travel to SBH affiliates by telling them they could make a "six-figure income just saving people money on travel."  (Ex. 115 at 51:19-25.)  Defendants' VOZ Travel recruiting presentation touted consumers' ability to earn $230,000 per year with "casual effort" and $1.53 million per year by being "on the ball."  (Ex. 298 at 48-49.)  Defendants told VOZ Travel recruits: "You will MAKE significant earnings on sharing the [VOZ] platform with others."  (Ex. 298 at 35.)  Defendants elaborated: "Our lucrative compensation and rewards model presents a fun and profitable path towards financial independence."  (Ex. 298 at 42.)  As with SBH, Defendants claimed VOZ Travel would allow affiliates to "Literally replace your current income from Customer Savings alone."  (Ex. 297 at 4.)  VOZ Travel also utilized SBH's "Power of Ten" pitch, as affiliates were told they could earn $115,000 per month by completing the VOZ Power of Ten.  (Ex. 297 at 7.)

On October 7, 2019, when Noland announced VOZ Travel, Defendants had not yet

---

[43]      Although the Court already granted summary judgment in the FTC's favor with respect to liability on the VOZ Travel-related claims in the Lead Action, it is helpful to provide some additional findings here because the VOZ Travel bears on the scope of injunctive relief to be imposed in both actions and on the scope of monetary relief to be imposed in the Contempt Action.

retained a travel service provider to provide the service they were selling.  Despite this, Noland told listeners on the October 7, 2019 webinar that VOZ Travel members would save "up to 75 percent" on hotel and rental car prices available through Priceline, Orbitz, or similar "competitors."  (Ex. 115 at 39:5-16.)  Later, he reiterated that consumers could "literally save up to 70 to 75 percent on all your travel" and that VOZ Travel members' savings would be so impressive that "[t]ravel agencies are going to also become some of your customers."  (Ex. 115 at 48:2-17.)

On October 18, 2019, Defendants (still lacking a travel service provider) posted the VOZ PowerPoint presentation used by Noland on October 7 to the "SBH Heat" Facebook group.  (Ex. 158; promoting version of presentation that is Ex. 299.)  That presentation promised "discounts up to 75%+ from retail prices," adding users would "SAVE on all your travel, all the time."  (Ex. 299 at 32, 41.)  The presentation made elaborate promises about travel features beyond mere savings.  For example, it promised to determine members' "travel DNA" (or "tDNA") "by collecting a host of data points . . . from your online behavior" to create the "highest level of personalization for your travel."  (*Id.* at 28.)  It also promised VOZ Travel users access to an artificial intelligence assistant, "Dina," similar to "Siri, Alexa, Cortana, or Google Assistant."  (*Id.*)  And it promised VOZ Travel members a "unique rewards engine," or "complete gamification engine," that would reward VOZ Travel members for "providing feedback and insights regarding our curated experiences."  (*Id.* at 23, 36.)

On October 21, 2019—after making the promises described above—Defendants contracted with a vendor (Advantage Services) to provide the VOZ Travel service.  (Ex. 295.)  Shortly afterward, Advantage Services expressed concerns about the benefits Defendants had promised to consumers.  (Ex. 251 at 2-4.)  Advantage Services' Vice President of Business Development, Tanya Yeager, explained to Defendants that their claim that members "will save on all your travel all the time" was not true because "[n]ot all travel will have a savings, for example [a]irfare."  (*Id.* at 4.)  Yeager also wrote, in response to Defendants' promises to create "travel DNA":  "This is not a thing."  (*Id.* at 3-

4.)  Yeager added that Advantage Services had no "unique rewards engine" as Defendants had promised.  (*Id.* at 3.)  After flagging even more concerns with the presentation, Yeager asked Defendants to "please remove [the presentation] from use."  (*Id.* at 4.)

After receiving Yeager's email, Defendants asked affiliates to stop using the existing VOZ Travel presentation so that Defendants could "perform our final compliance verifications" and make "minor revisions."  (Ex. 159.)  Confusingly, Defendants added, in bold font: "To be clear, the nature of the VOZ program and future benefits as presented and sold remain unchanged."  (*Id.*)

Even after revising the VOZ Travel presentation in response to Yeager's email, Defendants continued to promise travel discounts "up to 75%+ from retail prices," without even mentioning any exclusion for airfare.  (Ex. 298 at 24.)  Additionally, rather than remove references to "tDNA," the virtual assistant named "Dina," the "complete gamification engine," and other services that did not exist, Defendants simply added a "VOZ Tomorrow" stamp to some, but not all, slides referencing these purported offerings.  (*Id.* at 28-31 ["VOZ Tomorrow" stamp], 32, 38-39 [no "VOZ Tomorrow" stamp].)

Defendants' claims regarding their VOZ offerings were false, unsubstantiated, or both.  At his deposition, Noland's only defense of the 75%-savings claims was to reference his own, undocumented, "market research."  (J. Noland Dep. Tr. (12/14/20) at 138:11-140:17.)  Noland also testified that Defendants themselves (and not Advantage Services) were developing, or maybe already developed—Noland, confusingly, was unsure—the "tDNA" system, the Siri-like virtual assistant Dina, and the "complete gamification engine" that they promised to consumers.  (J. Noland Dep. Tr. (12/14/20) at 151:17-152:9, 153:14-154:16, 169:5-170:13.)  But Defendants have neither identified nor produced any evidence of this.

By December 16, 2019, Noland knew VOZ Travel would not be ready to start that month.  (Ex. 252 [email to Noland discussing adding "3 weeks . . . to the timeline," resulting in a January 13, 2020 launch date].)  Nevertheless, on December 18, 2019, Noland reiterated that he would unveil VOZ "Beta Access" by year's end.  (Ex. 162.)  He used that

representation to convince consumers that December 18, 2019 was their final day to gain "some fantastic benefits." (*Id.* [including a graphic that says CUTOFF 12/18/2019 with a sunset image].)

During a December 20, 2019 SBH conference call, Noland disclosed the delay in releasing VOZ Travel but claimed it was because "two weeks ago something mega happened . . . the biggest travel deal ever." (Ex. 119 at 13:17-14:7.) He continued: "I want to scream, I want to run out of here, I want to shout, it just happened, a multi billion dollar inked deal, it's happened, and you're all a part of it." (Ex. 119 at 14:15-18.) Noland called the new contract the result of weeks of negotiations involving "all kind of attorneys" and involving "hotels, cruise lines, airlines, [and] rental cars." (Ex. 119 at 13:14-14:18.) This claim was untrue—Defendants have admitted that there was no new contract at all. (Lead Action, Doc. 222 at 7 ¶ 77.) Noland concluded the call announcing the VOZ Travel delay by promising, "Some of y'all this time next year, you're never going to have to work again, I'm telling you. Not everybody, not a ton of people, but there's going to be some people . . . ." (Ex. 119 at 35:4-9.)

The relationship between Defendants and Advantage Services deteriorated shortly after Noland announced the VOZ Travel delay. On January 6 and 8, 2020, both parties expressed their intent to terminate the agreement. (Ex. 255 at 6; Ex. 563 at 1-2.) In terminating the contract, Craig Morganson, Advantage Services' CEO, expressed concern about Defendants' "desire[] to engage in misrepresentations and other deceptive business practices." (Ex. 255 at 5.) Morganson added that Defendants had "embellish[ed] and misrepresent[ed]" the travel services offered by Advantage Services, which made it "impossible for [Advantage Services] to fulfill as you have promised." (*Id.* at 6.) Morganson concluded: "[W]e have witnessed an escalating unwillingness to operate within the confines of realistic expectations. In other words, you desire to market in ways that sell memberships, but are resistant to marketing in a manner that can be realistically serviced." (*Id.*)

Defendants' Chief Marketing Officer, Tony Potter, agreed that Defendants had

oversold VOZ Travel's purported benefits.  In an email predating the termination, Potter wrote that "in compiling comparatives" between Advantage Services and Travelocity, he had "not seen nearly the level of discounts/savings that will catapult [VOZ Travel] to the forefront of this race."  (Ex. 255 at 9.)  Potter added that Noland had "terrible experiences in trying to perform two real bookings."  (*Id.*)  Noland agreed.  (J. Noland Dep. Tr. (12/14/20) at 181:18-182:9.)

Despite the contract's termination (and the fact that Defendants would therefore be starting from scratch with finding an actual travel provider), Noland and SBM's then-Vice President of International Sales, Duvan Botero, held a call on January 8, 2020 encouraging affiliates to continue purchasing VOZ Travel "packs."  (Ex. 120.)  Noland, apparently recognizing his inability to actually provide a travel product, added that VOZ Travel is more than "a discount on your travel"—it is "freedom," "experiences," and "memories." (Ex. 120 at 13:5-24.)

Based on the evidence summarized above, the Court previously found that "even after the contract with Advantage Services fell through and no product was foreseeably available, the undisputed evidence shows that the Individual Defendants continued to push Affiliates to join VOZ Travel, purchase VOZ Travel packs, and recruit others to do so." (Lead Action, Doc. 406 at 36.)

Defendants' own reporting shows their VOZ Travel revenues total $1,210,830.  (Ex. 902.)  Defendants disbursed at least $15,932.99 in commissions attributable to VOZ p Travel urchases.  (Ex. 38 ¶ 22.)  Therefore, Defendants' net revenue from VOZ Travel sales is $1,194,897.01.

E. **Post-Lawsuit Developments**

Since entry of the TRO, Defendants have started, or attempted to start, various new business ventures.

For example, in June 2020, Noland disclosed that he was forming a new business entity called "MYB Publishing."  (Ex. 257.)  At the time, Noland claimed to be MYB's sole officer, director, principal, manager, and employee.  (*Id.*)  Defendants since identified

1   Lina Noland as MYB's "Marketing Director" (Ex. 264 at 2) and Harris testified that he is

2   also "involved with the management of MYB Publishing." (Tr. 2027.) Defendants initially

3   disclosed that MYB would engage in, among other things, "[p]roduction and dissemination

4   of information, literature, music, or media" and "[m]aking varied information available to

5   the general public." (Ex. 257.)

6        As of July 2020, the MYB Publishing website had testimonials from "Charity R."

7   and "Susan W." (Ex. 300 at 1-2.) When the FTC asked for information about them,

8   Defendants, without explanation, claimed the testimonials "cannot be located without

9   dozens of man hours involved" and subsequently removed them. (Ex. 264 at 1.)

10       Since December 2020, Defendants, through MYB Publishing, have promoted their

11   "Confidence Tones" product—literal audio "tones" and "sound frequencies" that,

12   Defendants claim, can "help relieve body aches and pains without dangerous medications,"

13   "help you lose weight without starving yourself or living at the gym," and "help you lower

14   blood pressure in a natural way." (Ex. 301 at 28.)

15       In June 2022, Defendants, through MYB Publishing, also began promoting their

16   "Special Universal Edition" of a book called "The Science of Getting Rich"—originally

17   published in 1910. (Ex. 163.) Defendants used the book release to promote a companion

18   "Science of Getting Rich Mastery Course," which sells for $795 (as a pre-order) and will

19   ultimately be sold for $1,497. (Ex. 305.) To promote the course, Defendants explain: "By

20   closely adhering to the principles outlined in this best-selling classic, we can finally ensure

21   our own success, wealth, and happiness without feeling the need to compete with anyone

22   or anything." (Ex. 305.)

23       Through MYB Publishing, the Nolands and Harris also launched their "XPMentor"

24   business. (Ex. 264.) It is a monthly subscription that, they claim, is "tailored specifically

25   for entrepreneurs and personal growth seekers" and will help "[m]aximize the lifespan of

26   your business by setting up the appropriate corporate structures, minimize tax liabilities,

27   and legally maintaining compliance" and "[d]evelop and maintain the appropriate

28   conscious and subconscious mindset necessary to grow a profitable business." (Ex. 306 at

1, emphasis omitted.)  In announcing the launch of XPMentor, Noland posted a Facebook video comparing himself to Martin Luther King, Jr. and Ghandi: "[A] lot of people come to me and say, how can you stay motivated with all the 'ish' you've been through the last couple of years.  I'm like, don't you understand what people like Martin Luther King went through, Mahatma Ghandi went through?  Don't you understand, even like people like Muhammad Ali . . . . So what I know how to do—I just know how to do it . . . ."  (Ex. 126 at 9:5-20.)

On November 10, 2020, Noland disclosed another new business, "Total Growth Technologies."  (Ex. 260.)  He described it as providing "[i]nformation technology services that include, but [are] not limited to, the production and delivery of data, training, knowledge, information, technology, and ongoing personal and professional development."  (Ex. 260.)  The Total Growth Technologies website identified a "team of experts individually specializing in everything from development to delivery."  (Ex. 302.)  When the FTC asked about the "team of experts," Noland, through counsel, explained that, actually, the experts "had not been activated to fulfill any roles as of yet" but "may include individuals within Mr. Noland's global network."  (Ex. 263.)

In April 2022, Total Growth Technologies disclosed that its "first venture" would actually be "[m]erchant processing . . . using the name Total Growth Payments."  (Ex. 262.)  Total Growth Payments markets itself to "high risk" businesses, among others.  (Ex. 307.)

On September 16, 2020, Defendants disclosed to the FTC a "new" business: "VOZ Travel."  (Ex. 273 at 1.)  The "new" VOZ Travel, they claimed, was essentially the same as the old VOZ Travel without the multilevel marketing component.  (Ex. 273 at 2-3.)  Noland, Sacca, and Harris were VOZ Travel officers.  (*Id.* at 1.)  After the FTC pointed out that the Receiver possessed the "VOZ" tradename, Defendants' counsel responded: "Okay.  My clients will not use the name VOZ Travel or anything similar to it (*TravelNU* is what they think will use)."  (Ex. 259.)

In May 2021, Noland submitted a sworn declaration stating: "We have obtained a new travel service provider."  (Lead Action, Doc. 335-6 at 3 ¶ 7.)  In September 2021, after

Defendants reiterated their plans for a new VOZ Travel, the FTC asked for details.  (Lead Action, Doc. 475-2 at 12.)  In December 2021, Defendants' counsel responded, providing a website for the new business:  www.TravelNU.net.  (Ex. 339.)  The TravelNU website offered "Luxury Travel For Less" "at exclusive pricing unavailable to the general public," including "2.8 Million Accommodations," "900+ Airlines," and "345,000 Activities," in addition to "hundreds of thousands of hotels around the world at up to 80%+ off the best rates you can find online" and "stunning hotels, condos, villas, and destination resorts all around the world for as low as $10/person per night."  (*Id.* at 1, 3-4.)  Defendants planned to charge TravelNU customers approximately $1,500-$5,000 up front, plus a $50-100 monthly fee.  (*Id.* at 4, 6, 7.)  The vendor they hired to provide the travel service, by contrast, offered to do so (in January 2020) for, at most, $12.27 per month per customer without any apparent up-front charge.  (Ex. 341 at 2.)  When asked by the FTC to explain the factual basis for certain TravelNU claims, Defendants moved the Court for an order sanctioning the FTC for acting in "bad faith."  (Lead Action, Doc. 506 at 11-14.)  The Court denied that motion.  (Lead Action, Doc. 518.)

Finally, in July 2021, Defendants disclosed their intent to start another not-quite-new business: "SBH Products, Inc."  (Ex. 274.)  The officers and directors would be Noland, Harris, and Sacca.  (*Id.*) Defendants explained: "The business will engage in the sale of products previously sold by Success By Health via marketing that does not involve multi-level marketing or commissions for sales.   The business will commence immediately."  (*Id.* at 2.)  The Receiver and FTC both objected to the plan to resume sales of SBH products because, *inter alia*, the right to sell SBH products belonged to the Receiver.  (*See, e.g.*, Lead Action, Doc. 394-1 at 10.)  Defendants then disclosed another new business: "Vibra365 International."  (Ex. 261.)  The officers were Noland, Harris, and Sacca.  (*Id.*.)  Vibra365 would offer "New Proprietary Nutraceutical Formulas, New Beverage Formulas, and New Health Product Formulas in various forms."  (*Id.*)  Currently, Vibra365 is selling "mushroom infused coffee," "mushroom infused latte," "VDetox," "VDetox Lifestyle Pack," "SuperImmune Complex," and "BalaFlex" under the

"Vibra360" tradename.  Also for purchase is a \$4,775.00 "VSuper Wholesaler Pack."

## F.  Adverse Inference

The Court has already made, in earlier portions of this order, extensive findings concerning Defendants' spoliation efforts concerning Signal and Protonmail and the associated acts of dishonesty surrounding those spoliation efforts.  Before trial, the FTC successfully moved, under Rule 37(e) of the Federal Rules of Civil Procedure, for an adverse-inference sanction based on Defendants' spoliation of electronically stored information.  (Lead Action, Doc. 401.)  Accordingly, in its proposed findings of fact, the FTC asks the Court to infer that, but for the spoliation, there would be various additional categories of liability-generating documents.  (Lead Action, Doc. 528 at 14 ¶ 74, 41 ¶ 210, 42 ¶ 213, 46 ¶ 232, 69-70 ¶ 346, 145 ¶ 779, 163 ¶ 31.)

In an abundance of caution, the Court declines to make such an inference.  As discussed below, there is already overwhelming evidence of liability, such that the inferred existence of some additional documents would have no bearing on the outcome here.  To be clear, the spoliation efforts (and associated acts of dishonesty) remain relevant—they bear on the scope of injunctive relief to be imposed.  The Court simply declines to rely on the adverse-inference sanction as the basis for inferring the existence of additional liability-generating documents.

Defendants also include, in the Final Pretrial Order, their own request for an adverse inference (or some other sanction) based on the destruction of "a warehouse computer and warehouse records."  (Lead Action, Doc. 532 at 114.)  The Court declines to impose any such sanction for the reasons identified by the FTC—not only is the request untimely without excuse, but "Defendants cite no legal authority for sanctioning a Court-appointed Receiver over evidence not requested during discovery and later damaged by an Act of God."  (*Id.* at 115.)

…

…

…

1

**CONCLUSIONS OF LAW**

2

I.    Lead Action, Count One—SBH Pyramid Scheme

3              In Count One of the Lead Action, the FTC alleges that SBH and VOZ Travel both

4    operated as pyramid schemes.  Although the Court previously granted summary judgment

5    in the FTC's favor with respect to VOZ Travel, it denied summary judgment with respect

6    to SBH due to the presence of material issues of disputed fact.  (Lead Action, Doc. 406 at

7    33-42.)  Having now considered the disputed evidence in its capacity as finder of fact, the

8    Court concludes that the FTC should also prevail on its pyramid scheme claim as to SBH.[44]

9              Section 5(a) of the FTC Act prohibits "unfair or deceptive acts or practices in or

10   affecting commerce."  15 U.S.C. § 45(a)(1).  "The operation of a pyramid scheme

11   constitutes an unfair or deceptive act or practice in or affecting commerce for the purposes

12   of § 5(a)."  *FTC v. BurnLounge, Inc.*, 753 F.3d 878, 880 (9th Cir. 2014) (citing *In re Koscot*

13   *Interplanetary, Inc.*, 86 F.T.C. 1106, 1178, 1181 (1975)).

14             "Not all MLM businesses are illegal pyramid schemes."  *Id.* at 883.  "To determine

15   whether a MLM business is a pyramid [scheme], a court must look at how the MLM

16   business operates in practice."  *Id.*  "[A] pyramid scheme is characterized by the payment

17   by participants of money to the company in return for which they receive (1) the right to

18   sell a product *and* (2) the right to receive in return for recruiting other participants into the

19   program rewards which are unrelated to sale of the product to ultimate users."  *Id.* (internal

20   quotation marks and citations omitted).

21   _____

22   [44]        Defendants have advanced the argument, in both the Final Pretrial Order (Lead
     Action, Doc. 532 at 3, 87, 90-92) and in their proposed findings (Lead Action, Doc. 529 at
23   43-46), that the Court lacks jurisdiction over the FTC's claims in the Lead Action because
     the relevant statutes only apply to "consumers" and SBH affiliates were not consumers but
24   independent contractors.  This argument lacks merit for the reasons stated by the FTC.
     (Lead Action, Doc. 532 at 87 [noting that "Section 5 of the FTC Act prohibits 'deceptive
25   acts or practices in or affecting commerce' without regard to the status of a victim" and
     "Section 19 of the FTC Act . . . empowers the Court to 'grant such relief as the court finds
26   necessary to redress injury to consumers or other persons, partnerships, and corporations
     resulting from the rule violation or the unfair or deceptive act or practice, as the case may
27   be'" and thus "relief is not limited to whether someone is a 'consumer' but broadly includes
     all 'other persons'"].)  Indeed, during closing argument, defense counsel conceded that "I
28   kind of missed this earlier, but the statute does say, you know, consumers and others."  (Tr.
     2148.)

- 79 -

The first prong of the pyramid-scheme test "can be satisfied by a required purchase to become [an affiliate]" or a "required purchase of non-returnable inventory to receive the full benefits of the program." *FTC v. Vemma Nutrition Co.*, 2015 WL 11118111, *3 (D. Ariz. 2015).   In the summary judgment order, the Court determined that "[t]here is no genuine dispute of material fact regarding the satisfaction of prong one of the *Koscot* test with respect to SBH." (Lead Action, Doc. 406 at 37.)   More specifically, there is no "dispute that consumers were required to pay an annual fee of $49 to be SBH Affiliates" and that, "by paying this fee, Affiliates gained the right to sell SBH products on their [replicated SBH] webpage." (*Id*.)   In the Final Pretrial Order, Defendants do not dispute that the first prong of the test is satisfied—all of Defendants' arguments pertain to the second prong. (Lead Action, Doc. 532 at 8-11, 54-56.)[45]

Satisfaction of the second prong is "the *sine qua non* of a pyramid scheme and is characterized by recruitment with rewards unrelated to product sales." *BurnLounge*, 753 F.3d at 883-84 (internal quotation marks omitted).   Put another way, the second prong is satisfied when "participants purchase the right to earn profits by recruiting other participants, who themselves are interested in recruitment fees rather than the sale of products." *Id.* (quoting *In re Amway Corp.*, 93 F.T.C. 618, 716 (1979)).   Notably, the second element "does not require that rewards be *completely* unrelated to product sales." *Id.* at 885.   If that were the rule, "any illegal MLM business could save itself from liability by engaging in *some* retail sales." *Id.* at 886.   Thus, in the Ninth Circuit, an MLM business may be considered an illegal pyramid scheme if "the rewards the participants received in return were largely for recruitment, not for product sales." *Id.*   Also, "simply because a MLM's product has value does not render an unlawful pyramid scheme lawful." *FTC v. Skybiz.com, Inc.*, 2001 WL 1673645, *10 (N.D. Okla. 2001), *aff'd*, 57 F. App'x 374 (10th Cir. 2003).   *See also BurnLounge*, 753 F.3d at 883, 885 (company was an illegal pyramid

---

[45]   Defendants also appear to concede, in their proposed findings of fact, that the first prong is satisfied. (Lead Action, Doc. 529 at 7 ¶ 36 ["For their $49 annual fee, SBH provided . . . a website for each SBH Affiliate that allowed consumers to order directly from SBH with each Affiliate receiving a 10% commission from the purchase . . . ."].)

scheme even though its "products had some value," because it "motivated [affiliates] through cash rewards earned by recruiting other participants").

Here, the evidence from the bench trial overwhelmingly establishes that the second prong of the pyramid-scheme test is satisfied. First, as a structural matter, SBH paid commissions based on purchases from SBH, rather than on the resale of those products to retail customers. Courts have repeatedly noted the potential problems posed by such a commission structure. *See, e.g.*, *Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776, 782 (9th Cir. 1996) ("In exchange for [the payment of money], the supervisor receives the right to sell the products and earn compensation based on product orders made by the supervisor's recruits. This compensation is facially unrelated to the sale of the product to ultimate users because it is paid based on the suggested retail price of the amount *ordered* from Omnitrition, rather than based on *actual sales* to consumers.") (citation and internal quotation marks omitted); *FTC v. Equinox Int'l Corp.*, 1999 WL 1425373, *6 (D. Nev. 1999) ("Rebates and bonuses, the primary compensation emphasized by Equinox, are facially unrelated to sales to the ultimate user but are based on purchases made from Equinox by the distributor and his downline."). Although Defendants argue that purchases from SBH are a proxy for retail sales—that is, one can assume that if a recruit is purchasing products from SBH, the recruit must be using those products to make retail sales or for personal consumption[46]—this assumption was not borne out by, and indeed contradicted by, the evidence presented at trial. *Cf. BurnLounge* 753 F.3d at 887-88 (rejecting the defendant's argument that internal sales to other members automatically constitute sales to ultimate users, while also rejecting the FTC's argument that such transactions can never constitute sales to ultimate users, and emphasizing that the ultimate characterization of such transactions "depends on how [the MLM's] bonus structure operated in practice").[47]

---

[46] *See, e.g.*, Lead Action, Doc. 532 at 55 ("At SBH, there was no question that Affiliates the resellers, were not the ultimate users of the Products or retail customers. . . . Thus, sales by SBH to Affiliates for resale negate the second prong of the *Koscot* test.").

[47] During closing argument, the FTC acknowledged that "[i]f, in a different set of facts, there was evidence that the downlines were turning around and really making robust retail sales from these products, . . . that might not qualify as a pyramid scheme because of those retail sales." (Tr. 2099.) Nevertheless, because such evidence was lacking here, the

The FTC argues that the Ninth Circuit's decision in *Omnitrition* supports a pyramid-scheme finding under these circumstances. The Court agrees. In *Omnitrition*, the Ninth Circuit noted that a company's "product sales" were "driven by enrolling people" who would then "buy exorbitant amounts of products that normally would not be sold in an average market by virtue of the fact that [members] enroll, get caught up in the process, in the enthusiasm. . . . It has nothing to do with the normal supply and demand in this world. It has to do with getting people enrolled, enrolling people, getting them on the bandwagon and getting them to sell product." 79 F.3d at 782 (quoting witness testimony). Here, too, Defendants drove SBH sales by pushing recruitment, taking advantage of the momentum from recruitment to sell large up-front product packs, urging large monthly purchases to stay on the path to financial freedom, and encouraging one's recruits to do the same (*i.e.*, to "duplicate"). In *Equinox*, similarly, the court found the second prong satisfied (at least at the preliminary injunction stage) where MLM participants were "given unrealistic hypothetical examples that their profits will increase geometrically if distributors focus on recruitment rather than retail sales." 1999 WL 1425373 at *6. That conduct resembles Defendants' use of the "Power of Ten" to focus affiliates on recruiting ("getting ten") rather than retail sales.

Second, putting aside the basic, structural disconnect between commission payments and retail sales in SBH, the evidence during the bench trial established that, in practice, Defendants placed heavy emphasis on recruiting and relatively little emphasis on retail sales. Defendants' arguments to the contrary[48] are simply belied by the record—although Defendants are able to identify some references to retail sales in various documents, training materials, and videos, those references were, from the Court's perspective as factfinder, not anything close to a primary point of emphasis. Tellingly, Defendants' "Four Steps To Success" did not even mention retail sales and Defendants'

---

FTC's concession on this point does not undermine its overall argument.

[48] *See, e.g.*, Lead Action, Doc. 532 at 9 ("Defendants focused their training, heat calls, Zone 1 Calls[,] Facebook posts, and livestream videos to emphasize product sales over recruitment."); *id.* at 43-44 ("SBH had a culture of *retail sales*."); *id.* at 54 ("The FTC's claims that SBH focused on recruitment and not retail sales is overstated.").

tier-based commissions, Generation Infinity Bonus, and BAM Bonus (which Sacca characterized as the 100% driver of the SBH commission plan) depended on recruiting massive downline teams.  Defendants were often explicit about this, explaining that the way to maximize tier-based commissions was to "get ten" recruits and that the Generation Infinity Bonus was to "encourage[] you to develop a deep, strong Affiliate Team."  (Ex. 3 at 22; Ex. 16 at 50.)  As noted, during one conference call, SBH's then-director of sales emphasized that "recruiting is key" and contrasted the massive rewards that affiliates could earn from recruiting with the limited rewards that affiliates could earn from retail sales, which were simply "a great way to make some extra part-time money."  (Ex. 94 at 20:8-23:25.)  The script that Defendants provided affiliates to assist them with retail sales directed the affiliate to only sell to the customer one time, before showing the customer how to obtain products directly from SBH instead.  (Ex. 8.)  These are just a few illustrative examples of the overall focus on recruiting over retail sales, which is explored in more detail in the findings of fact.

Third, it speaks volumes that SBH experienced a 95% decrease in sales volume after the receiver took control and eliminated the commission structure that was previously in place.  Even accepting that there may have been other reasons, in addition to the elimination of the commission structure, for the 95% decrease, the numbers are staggering.  Such a dramatic change suggests that the primary motivation for purchasing SBH products was not true consumer demand, such as a desire to resell the products in retail transactions or consume the products for personal satisfaction, but the hope that such purchases would lead to (or maximize or preserve the availability of) commissions.

Fourth, in a related vein, the Court was struck by the evidence showing that purchases of SBH products would spike on the last day of each month, that nearly 95% of the purchases from SBH were made by SBH affiliates (Tr. 99), and that SBH affiliates were economically incentivized (and aggressively encouraged) to use monthly purchases to maintain the "rank" necessary to qualify for increased commissions.  Taken together, these considerations bolster the conclusion that the allure of recruitment-based

commissions was the primary impetus for product purchases.  *Cf. Vemma*, 2015 WL 11118111 at *2 ("Vemma's own accounting records show that, in 2013, approximately 86% of its U.S. product sales were to participants classified as Affiliates . . . ; in 2014, approximately 71% of U.S. product sales were to Affiliates . . . .").

Fifth, as discussed at length in earlier portions of this order, Defendants failed in their attempt to show that retail sales provided a significant source of rewards.  The testimony from the affiliates who were called as defense witnesses at trial—which one might expect to showcase the very best examples of the profitability of retail sales— revealed that affiliates often lost money.  Even the affiliates who were able to eke out a small profit from retail sales generated miniscule earnings that were often less than could be earned at a minimum-wage job and paled in comparison to the profits that could be earned from commissions.  This testimony was not surprising, as Dr. Bosley credibly explained why the absence of meaningful retail sales activity was an inevitable consequence of the structure and incentives that Defendants created.

Sixth, other features of SBH provide additional support for the conclusion that it was operating, in practice, as a pyramid scheme.  Defendants failed to track retail sales by affiliates and made little effort to create the sort of safeguards against inventory-loading that other MLMs often utilize.  To the contrary, Defendants adopted an official no-refunds policy, often required (and otherwise strongly encouraged) automatic monthly orders, and threatened to bring civil and criminal charges against affiliates who requested refunds or made chargeback requests even when product orders went unfulfilled by the company for months on end.  Although Noland testified at trial that the presence of a few senior field advisors was sufficient to guard against excessive product purchases, this testimony was unpersuasive for the reasons stated elsewhere in this order.

Accordingly, the FTC met its burden of establishing that "the rewards [SBH] participants received in return were largely for recruitment, not for product sales." *BurnLounge*, 753 F.3d at 885.

…

II.    <u>Lead Action, Count Two—SBH False Statements</u>

In Count Two of the Lead Action, the FTC alleges that Defendants made misleading representations about the likelihood of earning substantial income in both SBH and VOZ Travel.  Although the Court previously granted summary judgment in the FTC's favor with respect to VOZ Travel, it denied summary judgment with respect to SBH due to the presence of material issues of disputed fact.  (Lead Action, Doc. 406 at 42-47.)  Having now considered the disputed evidence in its capacity as finder of fact, the Court concludes that the FTC should also prevail on its false-statements claim as to SBH.

A defendant may violate the FTC Act's prohibition against "unfair or deceptive acts" by making materially false misrepresentations.  *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009); *FTC v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001).  "An act or practice is deceptive if 'first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material.'"  *Gill*, 265 F.3d at 950.  "Deception may be found based on the 'net impression' created by a representation."  *Stefanchik*, 559 F.3d at 928.  "Advertising capable of being interpreted in a misleading way should be construed against the advertiser."  *Resort Car Rental Sys., Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975).

Here, the net impression created by Defendants' advertisements was that affiliates could reasonably expect to earn substantial, if not life-changing, amounts of money if they followed Defendants' instructions.  As noted, Defendants told consumers that by enrolling in SBH and following their instructions, they could expect to obtain financial freedom in 18 months.  That meant, at a minimum, receiving monthly "residual income" of at least $20,000 without ever having to work.  Affiliates not seeking financial freedom could still expect to supplement or replace their current job income, earning hundreds if not thousands of dollars per month by following Defendants' instructions.  Defendants bolstered their promises of substantial income by holding out Noland as proof that their plan worked.  Nevertheless, as noted, not even Defendants earned anywhere close to the income they

touted to affiliates.

As discussed in more detail in the findings of fact, these conclusions are unaffected by Defendants' use of purported "disclaimers," such as saying that income was not "guaranteed" or that the examples being presented were mere "theoretical examples." As an initial matter, saying that income is not "guaranteed" does not detract from the net impression that affiliates could "reasonably expect" financial freedom by following Defendants' instructions. Additionally, "[a] solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures." *FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006); *Donaldson v. Read Magazine, Inc.*, 333 U.S. 178, 188 (1948) ("Advertisements as a whole may be completely misleading although every sentence separately considered is literally true."). Similarly, companies may not "mak[e] deceptive use of unusual earnings realized only by a few." *Nat'l Dynamics Corp. v. FTC*, 492 F.2d 1333, 1335 (2d Cir. 1974). As in *Equinox*, the disclaimers here do "not accurately indicate the actual amount of earnings that can be expected and do not immunize [the company's] exaggerated claims of income." 1999 WL 1425373 at *6.

The net impression created by Defendants' statements was false and likely to mislead consumers acting reasonably under the circumstances. A representation is likely to mislead consumers if it is false. *See, e.g.*, *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1096 (9th Cir. 1994). The FTC is not required to show that consumers were *in fact* misled—only that the challenged representations were *likely* to mislead. *Cyberspace.com*, 453 F.3d at 1201 ("Although proof of actual deception is unnecessary to establish a violation of Section 5, such proof is highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstances.") (cleaned up); *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1203 (10th Cir. 2005) ("Neither proof of consumer reliance nor consumer injury is necessary to establish a § 5 violation."); *Goodman v. FTC*, 244 F.2d 584, 604 (9th Cir. 1957) ("[C]apacity to deceive and not actual deception is the criterion by which practices are tested under the Federal Trade Commission Act.").

Defendants' income claims—whether directed to affiliates considering themselves #1s, #2s, or #3s—were false in theory and in practice.  Dr. Bosley credibly opined that SBH's structure meant that the vast majority of SBH affiliates were destined to fail, and the real-world evidence bore this out, as discussed at length in early portions of this order.  And other examples of falsity abound.  For example, although Defendants claimed that a subset of SBH affiliates would be #3s, who could reasonably expect to attain financial freedom—a minimum of $20,000 monthly residual payments—by following their instructions, no one achieved or came close to that in practice.  Defendants also claimed that an additional subset of SBH affiliates would be #2s, who could reasonably expect to replace their job income in about six months, but almost no one achieved that.  Finally, Defendants also claimed that the remaining SBH affiliates would be #1s, "supplementing" their income by earning $300 to $1,000 per month, but only a fraction of SBH affiliates achieved that result.

Defendants' arguments to the contrary are unavailing.  For example, Defendants contend that "[t]he FTC's version of net impression assumes that SBH's affiliates were mere sheep incapable of free choice."  (Lead Action, Doc. 532 at 14-15.)  But concluding that false income misrepresentations—particularly the sort of blatant misrepresentations at issue here—are likely to mislead consumers acting reasonably under the circumstances does not treat such consumers as sheep.  Defendants also contend that the net impression created by their various representations was that retail sales were the key to success, which is never guaranteed.  (*Id.*)  But that premise is belied by the record and inconsistent with the determinations the Court has made in its capacity as factfinder.  For similar reasons, there is no merit to Defendants' contention that "[t]he reasonable Affiliate would not spend more than necessary to sell to the retail customers they knew would be interested in buying.  Simply put, the notion that the average Affiliate who has minimal sales experience would buy more than they needed is the sort of irrational thought process advanced only by the FTC lawyers and their expert witnesses."  (*Id.* at 16.  *See also id*. at 60 [same].)  Again, the evidence presented during the bench trial was to the contrary—evidence abounds of

affiliates placing orders, despite minimal-to-nonexistent success with retail sales, in order to maintain their rank or otherwise maximize their potential to earn commissions.

Defendants also argue that "[t]he net impression theory is not grounded in the statute, but is yet another judicial construct that goes far beyond Congressional intent." (*Id.* at 15.)  But whatever the merits of that argument, it is not properly directed to this Court. The Ninth Circuit has recognized and applied the net-impression theory, and this Court must follow Ninth Circuit law.  Defendants also seek to avoid liability on Count Two by denigrating Dr. Bosley's analysis as "Garbage in: Garbage Out" and touting the competing analysis of their expert witness, Michael Fahlman.  (*Id.* at 18-19, 62-63.)  But the Court has now determined, in its capacity as factfinder, that Dr. Bosley was a credible witness whose opinions are worthy of credence and Defendants ended up choosing not to call their expert at trial.  (Lead Action, Doc. 531 ["Defense counsel . . . advised the Court that Defense experts William Rayburn and Michael Fahlman will not be called to testify . . . ."].)

Defendants also dispute whether affiliates were, in fact, misled into making product purchases and argue that affiliates should be held to the higher standard of a "reasonable business owner" rather than the standard of a reasonable "consumer."  (Lead Action, Doc. 532 at 39-41.)  But the former is a red herring (as noted, the rule in the Ninth Circuit is that "capacity to deceive and not actual deception is the criterion by which practices are tested under the Federal Trade Commission Act," *Goodman*, 244 F.2d at 604) and the latter would not assist Defendants even if it were the correct standard (the sophisticated web of misrepresentations issue here would be likely to deceive both a reasonable consumer and a reasonable business owner).

In addition to all of the false representations that directly addressed the income SBH affiliates could reasonably expect to earn, there were also the misrepresentations concerning Noland's personal wealth.  These, too, functionally operated as income representations.[49]  Although Noland claimed to be fantastically wealthy by using the

---

[49]     The summary judgment order on liability includes the following passage: "Although the FTC has repeatedly invoked Noland's wealth-related misrepresentations over the

system he touted to SBH affiliates, the FTC demonstrated during the bench trial that his representations on this topic were false in many respects.

A misrepresentation is material "if it involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." *Cyberspace.com*, 453 F.3d at 1201 (internal quotation marks omitted). "Misrepresentations concerning anticipated income from a business opportunity generally are material and likely to mislead consumers because such misrepresentations strike at the heart of a consumer's purchasing decision." *Freecom Commc'ns*, 401 F.3d at 1203. *See also Vemma*, 2015 WL 11118111 at *5 ("Courts consistently conclude that misrepresentations regarding income potential are material."); *FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1267-68 (S.D. Fla. 2007) (misrepresentations as to income potential "were material and likely to mislead consumers acting reasonably under the circumstances"); *FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 529 (S.D.N.Y. 2000) ("The case law is clear that representations regarding the profit potential of a business opportunity are important to consumers, and therefore such are material misrepresentations in violation of Section 5."); *FTC v. Kitco of Nev., Inc.*, 612 F. Supp. 1282, 1291-92 (D. Minn. 1985) ("In particular, it is deceptive to misrepresent the benefits of a business opportunity. Misrepresentations concerning expected profits form a business or investment opportunity made to a prospective purchaser violate Section 5(a).").

course of this case, they are not mentioned in the complaint itself. Additionally, the specific allegation in Count Two is that the Individual Defendants violated § 5(a) of the FTC Act by making false representations concerning whether 'SBH Affiliates and VOZ Travel members are likely to earn substantial income,' and there is a colorable argument that Noland's misrepresentations about his own wealth fall outside the scope of that allegation. At any rate, it is unnecessary to decide whether Noland's false representations about his own wealth could trigger liability under Count Two because . . . the FTC has separately established that the Individual Defendants made materially false representations about the income potential associated with VOZ Travel (which is specifically identified as one of the potential bases for liability under Count Two)." (Lead Action, Doc. 406 at 45.) In its proposed findings, the FTC responds by arguing that "[t]he misrepresentations [concerning Noland's wealth] are within the FTC's allegation because they are one way Defendants made income misrepresentations—they used Noland as proof that the system creates financial freedom." (Lead Action, Doc. 528 at 89 n.10.) The Court finds this argument persuasive and also notes that Defendants offer no argument to the contrary. Thus, the FTC's arguments concerning Noland's wealth are properly part of both the Lead Action and the Contempt Action.

Here, Defendants made claims relating to a "central characteristic" of SBH—affiliates' projected incomes.  Therefore, the claims are presumed material.  Even without a presumption of materiality, Defendants' misrepresentations were material because their promises of substantial income were important to affiliates.  Although Defendants attempt to characterize the challenged misrepresentations as mere "puffery" (Lead Action, Doc. 532 at 34-38), this is not consistent with common sense or the evidence that was presented during the bench trial.

III.    Lead Action, Count Three—Means And Instrumentalities

In Count Three in the Lead Action, the FTC alleges that Defendants furnished SBH Affiliates and VOZ Travel participants with materials containing false or misleading representations, thereby providing the means and instrumentalities for the commission of deceptive acts or practices.  In the summary judgment order, the Court ruled in the FTC's favor as to this claim, at least in relation to the VOZ Travel representations.  (Lead Action, Doc. 406 at 47-48.)

In the Final Pretrial Order, Defendants' only argument as to Count Three is that they should not be held liable because there were no underlying misrepresentations—and, thus, they cannot be held liable for furnishing the means and instrumentalities.  (Lead Action, Doc. 532 at 20, 64.)  Because the Court has now ruled in the FTC's favor as to the SBH misrepresentations, it follows that complete liability as to Count Three is established.

Alternatively, even if Defendant hadn't forfeited the issue, the Court would rule in the FTC's favor.  Courts have "stressed the fact that one who 'places in the hands of another a means of consummating a fraud . . . in violation of the Federal Trade Commission Act is himself guilty of a violation of the Act.'"  *Goodman*, 244 F.2d at 591 (citation omitted). *See also Waltham Watch Co. v. FTC*, 318 F.2d 28, 32 (7th Cir. 1963) ("Those who put into the hands of others the means by which they may mislead the public, are themselves guilty of a violation of Section 5 of the [FTC] Act."); *Vemma*, 2015 WL 11118111 at *7 ("Vemma provides the 'means and instrumentalities' for Affiliates to deceive consumers by providing them with promotional, recruiting and training materials containing false or misleading

1    income representations, which is a further violation of the FTC Act."). Here, Defendants

2    gave affiliates the SBH marketing and training materials that were used to spread

3    Defendants' false income claims.

4    IV.    Lead Action, Remaining Counts And Scope Of Liability

5          In the March 2021 summary judgment order, the Court found no genuine dispute of

6    material fact that Defendants had violated the Merchandise Rule and the Cooling-Off Rule,

7    that the Corporate Defendants had operated as a common enterprise, and that Defendants

8    could be held individually liable for the Corporate Defendants' violations. (Lead Action,

9    Doc. 406 at 48-54.)

10         Although Defendants did not attempt, during the bench trial, to relitigate the issue

11   of liability for the Rules violations—all of their arguments concerning the Rules violations,

12   which are addressed *infra*, go to the scope of damages—Defendants did include, in the

13   Final Pretrial Order, a passage that seemingly attacks the earlier determination regarding

14   the scope of individual liability. Specifically, Defendants dispute "[w]hether Congress

15   authorized the district courts to create enterprise liability." (Lead Action, Doc. 532 at 113-

16   14.)

17         This argument is unavailing. First, it is untimely and forfeited. The time to raise

18   any such challenge was in response to the FTC's summary judgment motion on liability.

19   But as noted in the summary judgment order, Defendants did not respond to or dispute the

20   FTC's arguments and evidence as to common-enterprise liability or individual liability.

21   (Lead Action, Doc. 406 at 52-54.) Defendants cannot belatedly seek to relitigate those

22   long-settled issues by including new arguments in the Final Pretrial Order.

23         Second, and alternatively, Defendants' challenge fails on the merits for the reasons

24   stated in the summary judgment order and in FTC's responsive portion of the Final Pretrial

25   Order, which notes that "binding Ninth Circuit case law" supports the Court's earlier

26   determinations. (Lead Action, Doc. 532 at 113-14.) Indeed, just recently, the Ninth Circuit

27   affirmed similar determinations in an FTC enforcement action. *FTC v. Elegant Sols., Inc.*,

28   2022 WL 2072735, *1-2 (9th Cir. 2022) (noting that "[t]he district court properly

1    concluded that the five corporate defendants operated as a common enterprise" and that

2    "[t]he district court properly held the individual defendants liable for monetary and

3    injunctive relief" based on the corporate entities' violations).

4    V.    Contempt Action—Liability

5         "There can be no question that courts have inherent power to enforce compliance

6    with their lawful orders through civil contempt." *Shillitani v. United States*, 384 U.S. 364,

7    370 (1966). "The standard for finding a party in civil contempt is well settled: The moving

8    party has the burden of showing by clear and convincing evidence that the contemnors

9    violated a specific and definite order of the court. The burden then shifts to the contemnors

10   to demonstrate why they were unable to comply." *FTC v. Affordable Media, LLC*, 179

11   F.3d 1228, 1239 (9th Cir. 1999). "Willfulness is not an element of civil contempt." *United

12   *States v. Asay*, 614 F.2d 655, 661 (9th Cir. 1980).

13        As noted, the FTC's theory of liability in the Contempt Action is that Noland,

14   Harris, and Sacca (sometimes referred to collectively as "the Contempt Defendants")

15   violated the 2002 permanent injunction in various ways through their operation of SBH

16   and VOZ Travel and that these violations qualify as "contumacious conduct." (Lead

17   Action, Doc. 532 at 64-65; Contempt Action, Doc. 106.) In a March 2022 order, the Court

18   recognized that "[t]he FTC has established that the Contempt Defendants violated some

19   provisions of the permanent injunction" but held that "the FTC has not established, at least

20   at this stage of the proceedings, that the Contempt Defendants committed certain other

21   alleged violations of the permanent injunction. The FTC's contempt motion is based, in

22   part, on the assertion that SBH constituted a pyramid scheme and that the Contempt

23   Defendants made false income-related statements in the course of operating SBH (conduct

24   that would, in turn, violate Sections I, II, and III of the permanent injunction). However,

25   in the summary judgment order as to liability in the [Lead] Action, the Court concluded

26   that the existence of triable issues of fact precluded the entry of summary judgment in the

27   FTC's favor on those particular issues. Because the FTC simply cross-references its

28   summary judgment evidence for purposes of establishing contempt liability, the Court

concludes that the FTC has not clearly and convincingly established, at this stage of the proceedings, that the Contempt Defendants violated Sections I, II, and III of the permanent injunction through their operation of SBH.  The FTC will need to seek to establish those violations at an evidentiary hearing."  (Contempt Action, Doc. 130 at 7-9.)

The FTC has now made the showings it had not yet made at the time of the March 2022 order.  More specifically, as discussed in the earlier sections of this order, the FTC has now established that the Contempt Defendants operated SBH as a pyramid scheme and made false representations in the course of operating SBH.  Such conduct also violated the 2002 permanent injunction.  Although a higher standard of proof applies in the Contempt Action—the FTC must prove the underlying violations by clear and convincing evidence, whereas the burden of proof in the Lead Action is preponderance of the evidence—the FTC has satisfied that higher standard here with respect to all of the alleged violations of the 2002 permanent injunction.

It is also helpful to make a few housekeeping points.  Although contempt liability may only flow from the violation of a "specific and definite" court order, the Contempt Defendants do not dispute in the Final Pretrial Order that the relevant portions of the 2002 permanent injunction provided the necessary level of specificity and definitiveness.  (Lead Action, Doc. 532 at 60-63.)   At any rate, the relevant provisions are not vague and ambiguous—they impose clear compliance requirements, clearly prohibit the operation of a pyramid scheme or other prohibited marketing scheme, and clearly prohibit making false and misleading statements (including false and misleading income representations) in connection with an MLM.[50]  Additionally, although Sacca and Harris are not identified by

---

[50]     *Cf. FTC v. EDebitPay, LLC*, 695 F.3d 938, 944 (9th Cir. 2012) ("[B]ecause [defendants] themselves stipulated to the entry of the Final Order, they cannot collaterally attack the Final Order in contempt proceedings."); *Irwin v. Mascott*, 370 F.3d 924, 931-32 (9th Cir. 2004) ("[W]hen an injunction is addressed to a non-party and he is given notice of the injunction, Rule 71 permits a district court to use 'the same processes for enforcing obedience to the order as if[he were] a party,' such as holding him in contempt for violating it.  Here, the Injunction stated on its face that it applied to Commonwealth's 'principals, officers, agents,[and] employees,' which obviously includes Hyde, its vice president of operations.  Because Hyde received a copy of the Injunction, which states on its face that it applied to him, he was on notice of its terms.  He did not move to intervene or otherwise attack the Injunction when it issued, and he may not now challenge its legality in a

1  name in the 2002 permanent injunction, they do not dispute in the Final Pretrial Order that

2  they may be held liable for violations by virtue of having actual notice of the 2002

3  permanent injunction and working in active concert or participation with Noland.  (Lead

4  Action, Doc. 532 at 109-11.)

5          Finally, it is important to note the expansive manner in which the 2002 permanent

6  injunction defined the term "prohibited marking scheme."  As discussed in earlier portions

7  of this order, Ninth Circuit law calls for a fact-specific inquiry when determining, in a case

8  alleging that a business operated as a pyramid scheme in violation of § 5(a) of the FTC

9  Act, how to characterize commissions earned on internal sales to other members of an

10 MLM.  In *BurnLounge*, the FTC urged the Ninth Circuit to adopt the *per se* rule that

11 "internal sales to other [members] cannot be sales to ultimate users" while the defendant

12 urged the Ninth Circuit to adopt the competing *per se* rule that such internal sales always

13 qualify as sales to ultimate users.  753 F.3d at 887.  The Ninth Circuit declined both

14 invitations and instead held that the pyramid-scheme analysis turns on how the company's

15 "bonus structure operated in practice."  *Id.*  Thus, for purposes of evaluating the FTC's

16 pyramid-scheme claim in Count One of the Lead Action, the Court has performed the fact-

17 specific analysis required by *BurnLounge* concerning how SBH's bonus structure operated

18 in practice.

19         Because the FTC has now clearly and convincingly prevailed on that claim, it

20 follows that the Contempt Defendants' operation of SBH also violated the 2002 permanent

21 injunction, which specifically forbade the operation of a pyramid scheme.  (Contempt

22 Action, Doc. 66 at 3-4 [enjoining the operation of "any prohibited marking scheme" and

23 including, within the definition of "prohibited marketing scheme," "a pyramid sales

24 scheme"].)  But even if the FTC hadn't prevailed on that claim (or on its pyramid-scheme

25 claim as to VOZ Travel), the Contempt Defendants' operation of those businesses still

26 would have violated the 2002 permanent injunction.  This is because the 2002 permanent

27 injunction specified that "[r]ewards are 'unrelated' to the sale of products or services to

28

contempt proceeding arising out of its violation.") (internal citations omitted).

ultimate users if rewards are not based primarily on revenue from retail sales" and that "'[r]etail sales' does not include sales made by participants in a multi-level marketing program to other participants or recruits or to such a participant's own account." (*Id.* at 3.) Put another way, the 2002 permanent injunction adopted the principle that the FTC unsuccessfully urged the Ninth Circuit to adopt in *BurnLounge*—that is, that commissions paid on internal sales never qualify as rewards based on sales to ultimate users.  It follows that SBH qualifies as a "prohibited marking scheme" under this definition.

In the Final Pretrial Order, Defendants do not dispute that SBH's commission structure is, on its face, impermissible under the 2002 permanent injunction.  (Lead Action, Doc. 532 at 57 ["The FTC drafted the 2002 Order, which adopted a per se definition stating that internal sales do not count as ultimate-user sales and therefore cannot be the basis for Commission payments."].)  Instead, Defendants simply note that the test is different under *BurnLounge*.  (*Id.* at 57-58.)  But this is beside the point for purposes of liability in the Contempt Action.

VI.  Lead Action—Monetary Remedies

Although the FTC indicated at the outset of the case that it intended to seek damages of up to $8 million based on its claims in the Lead Action (Lead Action, Doc. 163 at 19), the FTC later clarified that, in light of *AMG Capital*, it is only seeking monetary remedies in the Lead Action pursuant to its Rules-based claims and is not seeking monetary remedies pursuant to its pyramid-scheme and false-statements claims.  (Lead Action, Docs. 351, 365.)  This greatly reduces the monetary remedies sought in the Lead Action.  Additionally, although the FTC acknowledges in its proposed findings that the monetary remedies sought in the Lead Action may be duplicative of the remedies sought in the Contempt Action, the FTC also clarifies that it "still seeks Section 19 monetary relief against Lina Noland, who is not a Contempt Defendant, for her rule violations.  Ms. Noland's liability would be joint and several with Contempt Defendants' contempt liability." (Lead Action, Doc. 528 at 193 ¶ 166.)  Thus, the Court begins by addressing the monetary remedies available in the Lead Action.

The FTC seeks monetary remedies based on violations of the Merchandise Rule and the Cooling-Off Rule.  In both instances, the FTC seeks relief under section 19 of the FTC Act, which authorizes courts "to grant such relief as the court finds necessary to redress injury to consumers . . . resulting from the rule violation[s, which] may include, but shall not be limited to, rescission or reformation of contracts [and] the refund of money or return of property."  15 U.S.C. § 57b(b).  The Ninth Circuit recently confirmed that such monetary relief remains available post-*AMG Capital*.  *Elegant Sols.*, 2022 WL 2072735 at *2 ("[A]lthough *AMG* held that monetary relief is not available under section 13(b) of the FTC Act, section 19 of the Act separately and specifically authorizes the FTC to seek monetary relief to address violations of certain rules . . . .").  The monetary relief available under section 19 is "relief based on a calculation of consumer loss, as opposed to a calculation of net unlawful profits."  *Id.* at *3.  *See also FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 605 (9th Cir. 1993) ("It follows [from the language of § 19 of the FTC Act] that there may be no redress without proof of injury caused by those practices.  And the relief must be necessary to redress the injury.").

## A.    **Merchandise Rule**

As discussed in earlier orders (Lead Action, Doc. 438 at 3-9), the Merchandise Rule is codified at 16 C.F.R. § 435.2.  As relevant here, it provides that it is a violation of the FTC Act:

> (b)(1) Where a seller is unable to ship merchandise within [the time clearly and conspicuously stated in the solicitation or within 30 days if no time is clearly and conspicuously stated], to fail to offer to the buyer, clearly and conspicuously and without prior demand, an option either to consent to a delay in shipping or to cancel the buyer's order and receive a prompt refund.  Said offer shall be made within a reasonable time after the seller first becomes aware of its inability to ship within the applicable time set forth in paragraph (a)(1) of this section, but in no event later than said applicable time.

> * * *

> (c)    To fail to deem an order cancelled and to make a prompt refund to the buyer whenever:

> (1)    The seller receives, prior to the time of shipment, notification

from the buyer cancelling the order pursuant to any option, renewed option or continuing option under this part;

(2)    The seller has, pursuant to paragraph (b)(1)(iii) of this section, provided the buyer with a definite revised shipping date which is more than thirty (30) days later than the applicable time set forth in paragraph (a)(1) of this section or has notified the buyer that it is unable to make any representation regarding the length of the delay and the seller:

    (i)    Has not shipped the merchandise within thirty (30) days of the applicable time set forth in paragraph (a)(1) of this section, and

    (ii)    Has not received the buyer's express consent to said shipping delay within said thirty (30) days;

(3)    The seller is unable to ship within the applicable time set forth in paragraph (b)(2) of this section, and has not received, within the said applicable time, the buyer's consent to any further delay;

(4)    The seller has notified the buyer of its inability to make shipment and has indicated its decision not to ship the merchandise;

(5)    The seller fails to offer the option prescribed in paragraph (b)(1) of this section and has not shipped the merchandise within the applicable time set forth in paragraph (a)(1) of this section.

(*Id.*)

### 1.    The Parties' Arguments

The FTC seeks $561,798.80 in monetary remedies based on Defendants' violations of the Merchandise Rule.  (Lead Action, Doc. 528 at 194-198; Lead Action, Doc. 532 at 28-29, 45, 74-75.)  Those damages stem from the shipping delays associated with the six categories of product orders (Founders Packs, Hot Cocoa, Rooibos Tea, Chai Tea, Time Capsule, and G-HCBD AM/PM) summarized in earlier portions of this order.  The FTC's theory is that because the products were not shipped within the 30-day window contemplated by the Merchandise Rule, and Defendants failed to provide the notices and refunds contemplated by the Merchandise Rule in the event of such a delay, a monetary

award is appropriate.  (*Id.*)  The FTC also disputes the necessity of any offset for the "value of products eventually received," arguing that Defendants bear the burden of proving an entitlement to such an offset and cannot meet their burden because (1) "they cannot prove that they eventually delivered the products at issue" and (2) "they cannot establish that the products had anything more than minimal value."  (*Id.*)  Alternatively, and at a minimum, the FTC seeks an award of $6,829, which represents the sum of the unsuccessful refund requests that five affiliates made as a result of shipping delays.  (*Id.*)

Defendants oppose any monetary award based on the Merchandise Rule violations. (Lead Action, Doc. 529 at 72-74; Lead Action, Doc. 532 at 29-30, 45, 75-77.)  As an initial matter, Defendants argue that "[p]re-offers are the issue.  As a relatively new company periodically rolling out new products or running short on established products, Affiliates understood and agreed that 'pre-offers' of new products or out of stock Products would not be delivered within 30 days but depended on production and delivery of the Products to SBH.  Such pre-offers or announcements about the backlogs were routinely made on SBH's Facebook page and on orders forms themselves. . . .  Moreover, associates knew from SBH's Terms and Conditions that orders might take up to 60 days or more for delivery of the Products."  (*Id.*, emphasis omitted.)  Alternatively, Defendants argue that the FTC's damages methodology is flawed because the FTC "fails to take into account the inherent value of the products.  There is no evidence any ultimate user or 'consumer' complained about SBH Products."  (*Id.*)  Defendants contend that damages cannot be presumed in this circumstance, because there were no misrepresentations, and that awarding full damages without any offset would result in a windfall to consumers.  (*Id.*)  Finally, Defendants argue that "[r]egardless of fault, the destruction of the warehouse laptop, or the failure to image or produce the laptop prevents Defendants from responding with greater detail as to what specific products were delivered and when.  Defendants contend that it would be inequitable to impose damages where, as here, they were unable to defend the details of this claim through no fault of their own."  (*Id.*)

…

2. <u>Analysis</u>

As an initial matter, the Court is unpersuaded by Defendants' seeming attempt to dispute liability—that is, their attempt to dispute whether the delayed shipments at issue here violated the Merchandise Rule.  That issue was already resolved in the FTC's favor at summary judgment and Defendants could not, at any rate, contract around the clear requirements of the Merchandise Rule by inserting longer shipping deadlines in the Terms and Conditions.

Nevertheless, the FTC's request for $561,798.80 in monetary remedies based on the Merchandise Rule violations is flawed for the same reasons discussed in the November 2021 summary judgment order.  (Lead Action, Doc. 438 at 7-9.)  As noted there, the FTC's "all-or-nothing methodology . . . fails to account for the inherent value of the product that consumers ultimately received, even if the product was shipped late."  (*Id.*)  "Under the FTC's proposed approach, if a consumer ordered and paid for $5,000 of products from SBH, the shipping deadline expired without notification of the consumer's right to a refund, SBH shipped the products the very next day after the deadline expired, and the consumer was satisfied with the products upon receipt and immediately consumed them, the consumer would nevertheless be entitled to a $5,000 damage award . . . .  It is difficult to see how such an outcome could be viewed as 'necessary to redress injury' to the affected consumer."  (*Id.*)  "Although it is possible such a consumer might suffer other forms of harm from a late shipment—such as lost resale opportunities or a decrease in the market price of the product between the anticipated and actual shipping dates—the FTC has made no effort to prove the existence of such forms of harm."  (*Id.*)

In its trial filings, the FTC raises an array of arguments intended to address these concerns.  For example, the FTC argues that it merely bears the burden of providing a "reasonable estimate" of the appropriate monetary relief, at which point the burden shifts to Defendants to identify why the FTC's estimate is inaccurate.  (Lead Action, Doc. 528 at 193-96; Lead Action, Doc. 532 at 74.)  In a related vein, the FTC argues that because Defendants created the problem, "elementary conceptions of justice and public policy"

require Defendants to bear the consequences of any uncertainty their actions created, particularly where the alternative would be requiring the FTC to meet the "almost impossible" burden of proving a negative.  (*Id.*)  The FTC also contends that a refusal to shift the burden of proving delivery to Defendants would "incentivize sellers to destroy, or never create, shipping records because the absence of records would make it impossible for the FTC (or other law enforcement agencies) to prove non-shipment.  In fact, the Merchandise Rule itself includes a recordkeeping requirement . . . .  Allowing Defendants to benefit from their own poor records ignores this evidentiary presumption."  (*Id.*)

The FTC's arguments on these points are unavailing.  The FTC may only be required to provide a "reasonable estimate" of damages, but the FTC's methodology suffers from a fundamental flaw that renders it unreasonable on its face—it assumes that a late-shipped product automatically ceases to have any value, such that there is no need to provide an offset for the value of the product received.  For the reasons discussed in the November 2021 order, the Court respectfully cannot understand how such an approach can be reconciled with the text of section 19 of the FTC Act, which only authorizes monetary remedies based on Rules violations if "necessary to redress injury to consumers," or with *Figgie*, which emphasizes that "there may be no redress without proof of injury" and "the relief must be necessary to redress the injury."  994 F.2d at 605.  *See also CFPB v. Nationwide Biweekly Admin., Inc.*, 2017 WL 3948396, *12 (N.D. Cal. 2017) (rejecting regulatory agency's damages methodology, where agency sought a refund of all setup fees paid by consumers with no offset for the value of the service provided, and emphasizing "that even in *Figgie*, the restitutionary award was structured in a way that those customers who elected to retain the benefits of the products they had purchased (however minimal) would not receive the windfall of both a benefit and a refund").  This is not a situation, as in *FTC v. Direct Marketing Concepts, Inc.*, 624 F.3d 1 (1st Cir. 2010), where the only potential flaw in the FTC's methodology is its reliance on "fuzzy figures due to a defendant's uncertain bookkeeping."  *Id.* at 15.  The flaw here is more fundamental—it is a categorical refusal to account for the inherent value of the product received where the

underlying violation is a mere shipping delay and there is evidence that the product had at least some value to some purchasers.

The Court acknowledges that Defendants have also been shown to have engaged in other forms of misconduct with respect to their sale of SBH products, such as selling them as part of a pyramid scheme and making false income misrepresentations. But it would be analytically imprecise and improper to consider those violations when evaluating the injury arising from the Merchandise Rule violations. *Figgie*, 994 F.2d at 605 (under section 19, "there may be no redress without proof of injury *caused by those practices*") (emphasis added). Such an approach would create a backdoor to obtain the sort of monetary remedies under § 13(b) that Congress has declined to authorize. *AMG Capital*, 141 S.Ct. at 1349 ("[T]he Commission's broad reading would allow it to use § 13(b) as a substitute for § 5 and § 19. For the reasons we have just stated, that could not have been Congress' intent."); *Figgie*, 994 F.2d at 603 ("Section 19 liability must not be a rubber stamp of Section 5 liability.").

In a related vein, it bears emphasizing that the Merchandise Rule violations at issue here were not deceptive, pre-purchase misrepresentations. In *Figgie*, the Ninth Circuit discussed the hypothetical of a merchant who sells rhinestones while claiming they are diamonds. *Figgie*, 994 F.2d at 606. The Court explained: "Customers who purchased rhinestones sold as diamonds should have the opportunity to get all of their money back. We would not limit their recovery to the difference between what they paid and a fair price for rhinestones. The seller's misrepresentations tainted the customers' purchasing decisions. If they had been told the truth, perhaps they would not have bought rhinestones at all or only some. . . . The fraud in the selling, not the value of the thing sold, is what entitles consumers in this case to full refunds or to refunds for each detector that is not useful to them." *Id*. But the FTC's Merchandise Rule claim is not, in contrast to its pyramid scheme and false statement claims, a "fraud in the selling" claim.

For these reasons, this case is also distinguishable from *FTC v. QYK Brands LLC*, 2022 WL 3138761 (C.D. Cal. 2022). There, the violations of the Merchandise Rule were

not limited to shipping delays but also included pre-purchase misrepresentations about whether the products were in stock and would be shipped quickly.  *Id.* at *2 ("[B]etween March and August 2020, Defendants' hand sanitizer sales totaled over $3.3 million.  The FTC attributes this sales boom in part to Defendants' fast shipping promises.  For example, one Google advertisement . . . prominently stated, 'Hand Sanitizers in Stock' and 'Ships Today.'  And another Google advertisement . . . boasted that hand sanitizer 'Ships Fast from CA Today' . . . .  Defendants did not always follow through on their shipping promises.").  The court concluded that, "given Defendants' widely disseminated materially misleading claims that they had hand sanitizer in stock and ready to ship, . . . the FTC is entitled to a presumption of actual reliance in this case."  *Id.* at *8.  Put another way, "customers [were] owed a refund because Defendants' deception induced the sale in the first place."  *Id.* at *9.  But again, and as the *QYK Brands* court recognized, the FTC does not contend in *this* action that all of the Merchandise Rule violations involved affirmatively misleading promises about expected shipping times that helped induce the purchasing decisions.  *Id.* at *8 (concluding that "*Noland*'s concerns with consumer injury do not readily translate here" because "the FTC's theory of [Merchandise Rule] liability here turns on Defendants' pre-purchase, materially misleading shipping promises" whereas "the FTC's [Merchandise Rule] theory [in *Noland*] was based on violations that arose only *after* the contract was consummated").

The Court is also unpersuaded by the FTC's contention that Defendants should bear the burden of proving that they shipped all of the orders in question.  It is true, as discussed in more detail below in relation to the monetary remedies in the Contempt Action, that "courts apply a burden-shifting scheme" to "determine the appropriate amount of damages."  *Direct Marketing Concepts*, 624 F.3d at 15.  But the burden only shifts if the FTC first comes forward with a reasonable methodology.  *FTC v. Febre*, 128 F.3d 530, 535 (7th Cir. 1997) ("The Commission must show that its calculations reasonably approximated the amount of customers' net losses, and then the burden shifts to the defendants to show that those figures were inaccurate.").  The FTC never did so in relation

to the Merchandise Rule, so the burden never shifted as to that claim.

Nor is there any merit to the FTC's contention that, in light of the shoddiness of Defendants' shipping records, it would be impossible as a practical matter—and unfair when taking into account "elementary conceptions of justice and public policy"—to require the FTC to prove that the orders in question were never shipped. Of course, accurate and comprehensive shipping records would be one way of getting to the bottom of this issue, but the FTC also had other tools at its disposal to evaluate whether the delayed shipments were eventually made. The FTC could have, for example, used a consumer survey. *See, e.g.*, *Stefanchik*, 559 F.3d at 928-29 (discussing evidentiary value of "[t]he FTC's survey results"); *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1062 (C.D. Cal. 2012) ("Dr. Conrey is a Survey Methodologist . . . retained by the FTC to conduct the telephone survey at issue. The Conrey Survey 'measured the earnings and profit experienced by consumers who had purchased one of the three products. [It] also investigated whether investment in coaching services or investment of time was related to consumers' earnings or profit.'").

The FTC's position on this issue—that the Court should assume that none of the delayed shipments were ever made unless Defendants can prove otherwise—is particularly hard to fathom because the FTC acknowledges elsewhere that some (if not most) of the delayed shipments *were* made. For example, in relation to its fallback request for $6,829 in Merchandise Rule damages, the FTC acknowledges that three of the consumers who made unsuccessful cancellation requests for the delayed portions of their Founders Packs later received the products at issue. (Lead Action, Doc. 528 at 198 ¶ 190 ["[R]ather than refund the price of the undelivered products ($6,195 in sum), Defendants shipped them."].) Similarly, with respect to the delayed Hot Cocoa orders, the FTC admits in its proposed findings of fact that Defendants eventually began shipping Hot Cocoa, albeit not until "seven months after the estimated shipping date." (*Id.* at 115 ¶ 591.) And again, with respect to the delayed Rooibos Tea orders, the FTC acknowledges in its proposed findings that Defendants "start[ed] shipping Rooibos tea [on] March 8, 2019 at the earliest" and

further acknowledges that, according to Defendants' internal records, all of the shipments were eventually made: "[Defendants] did not claim to have shipped all pre-orders until May 24, 2019." (*Id.* at 116 ¶ 596.)   The FTC included similar acknowledgements of eventual shipping, albeit delayed, with respect to the other products at issue.  (*Id.* at 117 ¶ 601 ["Defendants did not start shipping Chai Tea until September 18, 2018, at the earliest."]; *id.* at 117 ¶ 605 ["Defendants did not start shipping Time Capsule until November 17, 2019 at the earliest."]; *id.* at 118 ¶ 608 ["Defendants did not start shipping AM/PM until April 26, 2019 at the earliest."].)  These acknowledgements are consistent with the Court's assessment, in its capacity as factfinder, of the status of the shipping problems at SBH.  Although affiliates consistently raised frustrations with the shipping *delays*, the Court was unconvinced that the problem went further and involved a consistent failure to make the shipments at all.

For these reasons, even if the burden did somehow shift to Defendants to show that the delayed shipments were eventually made, the Court would find that Defendants met that burden.  The issue here was delayed shipments, not missing shipments, and the FTC's invocation of burden-shifting frameworks cannot change that essential fact.

The FTC argues in the alternative that even if the products were eventually shipped, no offset is required because the products had no inherent value (or, at least, it was Defendants' burden to prove their inherent value, which Defendants failed to do).  These arguments fail for the same reasons as the FTC's arguments regarding missing shipments.  This is not a situation, as in *QYK Brands* or in the rhinestone/diamond analogy in *Figgie*, where the Rule violations involved deceptive, pre-purchase misrepresentation that tainted all of the purchasing decisions.  Thus, by failing to account for the value of the late-shipped products in its own methodology, the FTC failed to meet its initial burden of providing a "reasonable estimate" of damages (and no resulting burden ever shifted to Defendants).  Nor would it have been impossible for the FTC to come up with its own methodology for calculating the inherent value of the products.  The Court can imagine, for example, an expert describing how much satchels of coffee and tea usually cost on the open market

when not offered as part of a pyramid scheme and using that figure (rather than the higher price charged by SBH) as the inherent value. This methodology may have been subject to criticism, but at least it would have been something.[51]

This leaves the FTC's fallback claim for $6,829 in damages. To calculate that sum, the FTC identified five specific instances in which a consumer requested a refund after experiencing a shipping delay, only for SBH to reject the refund request. (Lead Action. Doc. 528 at 198 ¶¶ 189-93.)[52] In at least three of those instances, the product was eventually shipped to the consumer. (*Id.* ¶ 190.) Notably, Defendants make no effort to specifically address or dispute the FTC's claim for damages based on these five episodes.

The Court agrees with the FTC that an award of $6,829 in damages is appropriate based on these five transactions. The difference between these transactions and the other delayed-shipping episodes is that there is a specific reason—the refund request—to believe

---

[51] The Court notes that, in one of its trial filings, the FTC seems to have belatedly advanced a new theory for calculating the inherent value of the late-shipped products. Specifically, in its proposed conclusions of law, the FTC argues that because sales went down by 95% after the receiver was appointed and the commission structure was eliminated, the Court should conclude that the inherent value of the products was only 5% of what SBH was charging and should use that figure as an offset for purposes of calculating the Merchandise Rule damages. (Lead Action, Doc. 528 at 197 ¶ 188 ["[I]f the Court offsets for the 'value' of the SBH products, it should equal just 5% of product revenues, resulting in a redress amount for the Merchandise Rule violations of $533,708.96."].) This argument fails for two reasons. First, it is untimely and forfeited. Before trial, Defendants filed a motion to preclude the FTC from pursuing any damages methodology on its § 19 claims apart from the methodology (which did not account for the inherent value of the late-shipped products) that the Court had criticized in the November 2021 summary judgment order. (Lead Action, Doc. 482.) In response, the FTC avowed that it would not be advancing any new theories at trial. (Lead Action, Doc. 495.) As a result, the Court denied Defendants' motion, clarifying that "[h]ad the FTC attempted to formulate a new damages methodology in the wake of the November 2021 summary judgment ruling, Rule 37 might be implicated, but the FTC has not done so." (Lead Action, Doc. 509 at 7.) It is therefore surprising that the FTC would attempt to offer such a new theory for the first time in its proposed conclusions of law. The Court also notes that this new theory does not appear in the FTC's portion of the Final Pretrial Order, which provides an independent reason for concluding it is forfeited. *Hunt v. Cty. of Orange*, 672 F.3d 606, 617 (9th Cir. 2012) ("We have consistently held that issues not preserved in the pretrial order have been eliminated from the action.") (citation and internal quotation marks omitted). Second, even if the argument weren't forfeited, the Court would reject the FTC's new theory on the merits. As noted elsewhere in this order, there were an array of reasons for the 95% reduction in sales following the appointment of the receiver, so attributing the entire reduction to the elimination of the commission structure would go too far.

[52] The Court clarifies that it accepts, in its capacity as factfinder, the FTC's factual assertions regarding these five transactions.

that all five consumers stopped ascribing any value to the products once the shipment delays got too long. It would therefore not result in a windfall to conclude that, regardless of whether SBH eventually ended up shipping the now-unwanted products to these five consumers, they were harmed by the Merchandise Rule violation in the full amount of the price they paid. *Cf. QYK Brands*, 2022 WL 3138761 at *10 ("[G]iven that some customers may have been satisfied with their hand sanitizer orders even if delayed the Court prefers to implement a redress plan requiring customers to make refund requests rather than receiving the funds outright.").[53]

### B.   **Cooling-Off Rule**

As discussed in earlier orders (Lead Action, Doc. 438 at 9-15), the Cooling-Off Rule, which is codified at 16 C.F.R. § 429.1, gives consumers the right to cancel, within three business days, any purchase of at least $130 in goods or services that occurs at a location other than the merchant's place of business. *Id.* §§ 429.0(a), 429.1(g). The Rule also requires the seller to provide written or oral notice of this right and to provide a form "Notice of Cancellation" that the buyer can use to cancel the sale. *Id.* § 429.1(a)-(b), (e).

#### 1.   The Parties' Arguments

The FTC seeks $581,024.75 in monetary remedies based on Defendants' violations of the Cooling-Off Rule. (Lead Action, Doc. 528 at 198-202; Lead Action, Doc. 532 at 30-31, 45, 77-79.) Those damages stem from the sale of tickets to future training events during other live training events. (*Id.*) The FTC argues that Defendants were required, pursuant to the Cooling-Off Rule, to advise ticket purchasers of the right to rescind the purchase within three days but did the opposite by describing the tickets as non-refundable. (*Id.*) The FTC further contends that "[b]ecause Defendants coupled their Cooling-Off Rule

---

[53]     In the November 2021 summary judgment order, the Court noted the possibility that the FTC would, at trial, be able to recover damages under the Merchandise Rule by identifying customers who requested refunds. (Lead Action, Doc. 438 at 8-9 ["[E]ven assuming (without deciding) that the FTC might be able to secure a full-purchase-price damage award under § 57b(b) on behalf of a particular consumer who was so dismayed by a shipping delay that he would have opted for a full refund had he been given proper notice of his refund rights under the Merchandise Rule, the FTC has made no effort to identify any such consumers in its motion."].)

violations with misrepresentations about the wealth affiliates will achieve by attending, the only way to remedy the harm from the violations is to provide full refunds, unless Defendants can prove that fully-informed consumers (consumers who had not been lied to by Defendants) would not have exercised their cooling-off rights.  No offset for the 'value' of the tickets is required because the tickets had no value (when decoupled from the pyramid scheme) and because some events never occurred."  (*Id.*)  At a minimum, the FTC seeks $223,793.50 in damages based on the Cooling-Off Rule violations, which are Defendants' revenues from the ticket sales for three particular events (Kickoff 2020, RED 2020, and Millionaire Workshop) that never occurred.  (*Id.*)

Defendants oppose any monetary award based on the Cooling-Off Rule violations.  (Lead Action, Doc. 529 at 74; Lead Action, Doc. 532 at 31, 45-46, 79.)  As an initial matter, although Defendants do not dispute that they violated the Cooling-Off Rule when selling tickets to future training events at live events, they seem to dispute whether *all* of the ticket sales challenged by the FTC are implicated, because "the vast number of sales were made online, by mail or telephone."  (*Id.*)  More broadly, Defendants argue that the FTC has failed to show that purchasers suffered any harm from the violations because "[t]here were no requests for refunds or cancellations of courses or other materials within three days of any sale for training courses[,] conferences or other materials" and, in the few instances where ticket purchasers did request a refund, "other Affiliates and Up-Team Leaders bought tickets from an Affiliate that did not want to or could not attend a conference or other function for which tickets were sold."  (*Id.*)

### 2.   Discussion

The Court declines to award any damages based on the Cooling-Off Rule violations.  The analysis here mirrors, in many respects, the analysis concerning the Merchandise Rule.  Although the Court does not foreclose the possibility that the FTC could, in an appropriate case with sufficient evidence, obtain an award of monetary relief based on violations of the Cooling-Off Rule, the problem here is that the FTC's methodology goes beyond § 19's authorization to grant only "such relief as the court finds necessary to redress injury to

consumers" and violates *Figgie*'s corresponding mandate that "the relief must be necessary to redress the injury."

Identifying the revenues associated with transactions that violated the Cooling-Off Rule, as the FTC has attempted to do, is simply the first step in the analysis. This is because, as with the Merchandise Rule violation described above (and unlike in *QYK Brands* or in the rhinestone/diamond hypothetical in *Figgie*), the Cooling-Off Rule violation was simply a failure to provide certain information about refund rights.[54] Thus, determining whether consumers were injured by the violation requires a further evaluation of whether consumers would have requested a refund within three days if aware of their right to do so and whether the service that consumers ultimately received (here, attendance at a training session) had any inherent value that might require an offset. The FTC has done neither, which means that it failed to meet its initial burden of providing a "reasonable estimate" of damages (and, thus, no resulting burden ever shifted to Defendants). Nor would it have been impossible for the FTC to come up with a methodology for identifying whether consumers would have made cancellation requests if aware of the right to do so. Again, consumers surveys, although perhaps imperfect, could have been utilized.[55]

This is an unsatisfying outcome in some ways. Defendants committed blatant violations of the Cooling-Off Rule, and the resulting training events provided a vehicle for

---

[54]     The Court acknowledges that this violation falls closer to the line than the Merchandise Rule violation, given that Defendants affirmatively represented that the tickets were non-refundable.

[55]     The Court also concludes, as a factual matter, that few if any consumers would have actually exercised their refund rights under the Cooling-Off Rule if properly advised of those rights. The training events were portrayed as a necessary step in obtaining the financial freedom that affiliates hoped to achieve. Even though, as discussed elsewhere in this order, the dream that Defendants were selling was a false one, the evidence at trial showed that affiliates who were ensnared by Defendants' tactics spent significant time and money chasing the dream (and even kept believing in Defendants' promises, and supporting Defendants, after this lawsuit was filed and a receiver was appointed). The Court is therefore skeptical that ticket purchasers, if properly advised of their right to request a refund within 72 hours of purchase, would have exercised that right during the 72-hour window. These were not impulse purchases, despite the sometimes frenzied and emotional atmosphere at the events where the tickets were sold. For these reasons, the FTC's reliance (Tr. 2128) on *Int'l Society for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672 (1992), is misplaced. This case does not involve purchasers who were "on tight schedules" that interfered with their ability to raise complaints about unscrupulous sales tactics. *Id.* at 683-84.

Defendants to advance their pyramid scheme and repeat their false income representations. Nevertheless, and as *AMG Capital* recently emphasized, courts are not free to rewrite the language of statutes in an effort to achieve what they may view as optimal outcomes. Section 19 of the FTC Act only authorizes monetary remedies "as the court finds necessary to redress injury to consumers." 15 U.S.C. § 57b(b). "[T]here may be no redress [under section 19] without proof of injury *caused by those practices*." *Figgie*, 994 F.2d at 605 (emphasis added). A refined showing of injury and loss tied to the Cooling-Off Rule violations is what is missing here.[56]

Finally, the FTC's fallback request for $223,793.50 in Cooling-Off Rule damages is misplaced. All three events in question were scheduled (or, at least in the case of the Millionaire Workshop, somewhat tentatively scheduled) to take place in 2020, only to be cancelled after the TRO was granted and the receiver took control of SBH. There may be some theory as to why consumers should be entitled to a refund for the tickets to these cancelled events, but the Cooling-Off Rule is not that theory. The Rule violation was not the cause of these consumers' loss, as the 72-hour refund window had expired long before these events were cancelled.

## VI. Contempt Action—Monetary Remedies

### A. **Relevant Background**

In March 2022, the Court issued an order denying, without prejudice, the FTC's request for a monetary award of $7,012,913.25 in the Contempt Action. (Contempt Action, Doc. 130.) The requested figure "constitute[d] a full refund for all amounts that consumers paid to SBH and VOZ Travel (after an offset for commission payments to consumers)." (*Id.* at 6.) "The FTC acknowledge[d] this figure does not include any offset for the inherent value of the products that customers received and consumed." (*Id.*)

The Court's overarching reason for denying the request was that it was "based, in

---

[56] Also, as discussed in later portions of this order, Defendants are not getting a free pass for their Cooling-Off Rule and Merchandise Rule violations. The Court has taken Defendants' persistent disdain for regulatory compliance into consideration when deciding the appropriate scope of injunctive relief.

part, on the assertion that SBH constituted a pyramid scheme and that the Contempt Defendants made false income-related statements in the course of operating SBH (conduct that would, in turn, violate Sections I, II, and III of the permanent injunction)," but the FTC had not yet proved all of its SBH-related liability theories at that time.  (*Id.* at 9.)  Thus, "the FTC's requested sum is necessarily overstated."  (*Id.*)

The March 2022 order also identified two "potential problems" with the FTC's damages methodology, which the Court merely flagged for future consideration but did not decide.  (*Id.* at 9.)  The first potential problem was the FTC's failure to provide an offset "for the inherent value of the products that consumers actually received and consumed." (*Id*.)  The Court stated that "there is a colorable argument that any civil contempt award imposed in this case must include an offset for the value of products actually received." (*Id.* at 10.)  The second potential problem was that, "in light of *AMG Capital*, there are unresolved questions about the FTC's authority to pursue a compensatory civil sanction based on new § 13(b) violations that also violate an injunction issued in a previous § 13(b) enforcement action (such as the permanent injunction issued in the [Contempt] Action)." (*Id.*)  The Court "expresse[d] no prejudgment as to this issue and simply note[d] that it will benefit from further briefing."  (*Id.* at 10-11.)

### B.    **The Parties' Arguments**

The FTC now requests a monetary award of $7,306,873.14 in the Contempt Action. (Lead Action, Doc. 528 at 180-193; Lead Action, Doc. 532 at 21, 64-67.)  The requested figure consists of the $1,194,897.01 in net revenues arising from VOZ Travel sales and the $6,111,976.13 in net revenues arising from sales of SBH products and event tickets.  (*Id.*) The FTC also addresses the two concerns that were raised in the March 2022 order.  As for the first concern, the FTC contends that no offset is required with respect to VOZ Travel purchases for the simple reason that there was no product at all.  (*Id.*)  As for the SBH product and ticket purchases, the FTC argues that, under *FTC v. EDebitPay, LLC*, 695 F.3d 938 (9th Cir. 2012), the "baseline" civil contempt sanction for the violation of an FTC consent order is a "net-revenue sanction" and the burden of proving any entitlement to an

offset for the value of the products and services received falls to Defendants (which Defendants have failed to meet here).  (*Id.*)  The FTC also contends that "[e]very circuit to have addressed the issue in an FTC contempt action has . . . refus[ed] to give defendants the benefit of an offset for the 'value' of fraudulently sold goods."  (*Id.*)  As for the second concern, the FTC argues that *AMG Capital* does not affect the availability of broad compensatory remedies for violation of the 2002 permanent injunction, even if such remedies would have been unavailable in the underlying action that gave rise to the injunction, because "monetary relief may be available for order violations even where such relief is unavailable for violations of the statute underlying the order."  (*Id.*)  The FTC also contends that other courts have unanimously reached the same conclusion in post-*AMG Capital* decisions.  (*Id.*)

The Contempt Defendants oppose any monetary award in the Contempt Action. (Lead Action, Doc. 529 at 75-77; Lead Action, Doc. 532 at 67-73.)  In somewhat shotgun fashion, the Contempt Defendants first argue that any presumption of reliance and damages was rebutted by the hundreds of affiliate declarations and pleadings they sought to introduce into evidence at trial.  (*Id.*)  Second, the Contempt Defendants argue that the FTC's methodology is flawed because it fails to account for the inherent value of the products and services received.  (*Id.*)  Third, the Contempt Defendants argue that "no damages should be award[ed] in this case because the FTC's refusal to meet with Defendants and fully understand[] how this business worked . . . before filing [this] lawsuit . . . ruin[ed] SBH's business and that of thousands of Affiliates.  The business could have [operated] lawfully with some input from the FTC and overhauling some of its policies." (*Id.*)  Fourth, the Contempt Defendants argue that consumer loss is the incorrect standard for damages in a contempt action, as recognized in recent Supreme Court decisions.  (*Id.*) Fifth, the Contempt Defendants argue that "[e]ven assum[ing] that the Court adopted the [FTC's] position that its inherent authority allows it to impose a monetary remedy for Section 5 damages in the Underlying Case, the public policy enunciated by the Supreme Court in FTC cases should be heavily factored into what if any remedy was imposed."  (*Id.*)

Sixth, the Contempt Defendants argue that damages are unwarranted because none of the ultimate consumers—which, for purposes of this argument, the Contempt Defendants identify as retail consumers—complained about the challenged conduct in this case.  (*Id.*)  Seventh, the Contempt Defendants argue that the gross revenues from VOZ Travel were only $971,625 and that the FTC caused any resulting damage by preventing them from following through on providing travel services to the purchasers.  (*Id.*)  Eighth, and at a minimum, the Contempt Defendants argue that if Court chooses to make any monetary award in the Contempt Action, it should consider that SBH earned a net income of only $1,358,277.89, or $406,360.85 if basic overhead expenses are deducted; that some of the associated entities sustained a net loss; that Defendants earned relatively little in W-2 and 1099 wages from SBH; that there was $600,000 in SBH's bank account at the time of the TRO; that the receiver made several mistakes when operating SBH, including rejecting an offer from one affiliate to buy all of the existing inventory; and that the Court should assume that associates earned an aggregate profit of $3,103,250 from retail sales.  (*Id.*)  Finally, during closing argument, Defendants also urged the Court to deny any financial award due to the FTC's failure to comply with class action procedures.  (Tr. 2146-49.)

C.  **Analysis**

The FTC has successfully addressed the concerns that were raised in the March 2022 order.  As a result, and because the Contempt Defendants' various damages-related counterarguments are unavailing, the Court grants the FTC's request for the imposition of a $7,306,873.14 compensatory civil sanction in the Contempt Action, which is owed jointly and severally by the Contempt Defendants.[57]

The Court begins with the subset of the parties' arguments that do not present a

---

[57]    At the conclusion of his direct testimony at trial, Sacca asked the Court to "consider suspending" any monetary judgment against him in light of his limited financial resources. (Tr. 1273.)  Although the Court is sympathetic to Sacca's circumstances and notes that his conduct was not as egregious as that of others, this request is denied.  Joint and several liability is appropriate, factually and legally, under the circumstances of this case, where Sacca participated for several years in contumacious conduct that has caused widespread harm.  *Cf. FTC v. Leshin*, 618 F.3d 1221, 1236-37 (11th Cir. 2010) ("Where . . . parties join together to evade a judgment, they become jointly and severally liable for the amount of damages resulting from the contumacious conduct.") (citation omitted).

particularly close call.  There is no merit to the Contempt Defendants' suggestion that the absence of injury can be presumed from the affiliate declarations the Contempt Defendants sought to introduce during trial.  Those declarations were deemed unpersuasive and inadmissible for a host of reasons.  (Tr. 1978-84.)  Also meritless is the Contempt Defendants' suggestion that the FTC's conduct in bringing this action, and the FTC's and the receiver's conduct during the course of this action, should somehow serve to eliminate or reduce the available monetary remedies.  All of that conduct was in response to the illegal and contumacious conduct of the Contempt Defendants, which necessitated the FTC's intervention and the receiver's appointment.  The Court also rejects the Contempt Defendants' contention that monetary remedies are unavailable because the only "consumers" who might potentially be entitled to relief are the ultimate retail purchasers of SBH products, who were not harmed by the challenged practices.  This argument is inconsistent with the position that Defendants have taken as to other issues, such as how to characterize internal sales to SBH affiliates for purposes of the FTC's pyramid-scheme claim, and appears to be a variant of the failed jurisdictional argument that is addressed in earlier portions of this order.  At any rate, the Court's inherent authority to award compensatory contempt sanctions does not turn on whether the injured parties meet some technical definition of "consumers."  The Court also rejects, in its capacity as factfinder, the various alternative profit and revenue calculations offered by the Contempt Defendants and concludes that the competing figures offered by the FTC are accurate.  Finally, the Court disagrees with Defendants' contention that the FTC was required to comply with Rule 23 or some other formal class action procedure before seeking the type of relief being sought here.  As discussed below, the Ninth Circuit and other courts have upheld the exact sort of compensatory civil sanction award being sought here.

As for one of the potential problems with the FTC's methodology that the Court flagged in the March 2022 order—whether *AMG Capital* should be understood as curtailing the scope of compensatory relief that the FTC may obtain in a civil contempt action—the Court is persuaded by the FTC's arguments on this topic and unpersuaded by

1   the Contempt Defendants' arguments.  Put simply, *AMG Capital* does not affect the scope

2   of relief available in the Contempt Action.

3       The Supreme Court has recognized that "[j]udicial sanctions in civil contempt

4   proceedings may, in a proper case, be employed . . . to compensate the complainant for

5   losses sustained."  *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303-04

6   (1947).  This is an "ancient" rule that dates back to "the Founding."  *FTC v. Pukke*, 53

7   F.4th 80, 103 (4th Cir. 2022) ("Since the Founding, it has been understood that courts

8   possess contempt powers to guard against violations of their own orders. . . .  Without the

9   ability to enforce its own orders, the judicial system becomes all bark and no bite.  It is a

10  principle as ancient as the laws themselves that laws without a competent authority to

11  secure their administration from disobedience and contempt would be vain and nugatory.")

12  (citations and internal quotation marks omitted).  Equally well-settled is the principle that

13  courts should exercise this power expansively, to achieve "full remedial relief."  *McComb*

14  *v. Jacksonville Paper Co.*, 336 U.S. 187, 193 (1949) ("The measure of the court's power

15  in civil contempt proceedings is determined by the requirements of full remedial relief.").

16      In 2012, the Ninth Circuit confirmed that these principles are applicable when the

17  FTC seeks compensatory sanctions in a civil contempt proceeding.  *EDebitPay*, 695 F.3d

18  at 945 ("District courts have broad equitable power to order appropriate relief in civil

19  contempt proceedings. . . . [W]e have not had occasion to determine whether district courts

20  have comparable broad authority to calculate sanctions in contempt proceedings brought

21  by the FTC. . . .  We join our sister circuits today and hold that district courts have broad

22  discretion to use consumer loss to calculate sanctions for civil contempt of an FTC consent

23  order.") (citations and internal quotation marks omitted).  Thus, unless *AMG Capital*—or

24  some other Supreme Court or Ninth Circuit decision issued after *EDebitPay* was decided—

25  is "clearly irreconcilable" with the principles announced in *EDebitPay*, the Court must

26  follow those principles here.  *Miller v. Gammie*, 335 F.3d 889, 899-900 (9th Cir. 2003) (en

27  banc) (addressing "when, if ever, a district court or a three-judge panel is free to reexamine

28  the holding of a prior panel in light of an inconsistent decision by a court of last resort" and

concluding that such reexamination is permissible only when "the relevant court of last resort [has] undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable").

*AMG Capital* is not clearly irreconcilable with *EDebitPay*. *AMG Capital* was a case about statutory interpretation—whether a provision of the FTC Act authorizing the Commission to obtain a "permanent injunction" based on certain conduct should be understood as also authorizing the Commission to obtain equitable monetary relief pursuant to that provision. 141 S.Ct. at 1344. The Supreme Court made clear that its "task [was] not to decide" whether Congress's choice of remedies was "desirable. Rather, it [was] to answer a more purely legal question" about how to construe a statute. *Id.* at 1347. The Court's ultimate holding was "that § 13(b) as currently written does not grant the Commission authority to obtain equitable monetary relief." *Id.* at 1352. This narrow holding is not clearly irreconcilable with *EDebitPay* because the power to award compensatory sanctions in a civil contempt proceeding—and to do so in an expansive manner that achieves full remedial relief—is not a creature of statute. Rather, it is an inherent equitable power. *EDebitPay*, 695 F.3d at 945 ("District courts have broad equitable power to order appropriate relief in civil contempt proceedings."); *Pukke*, 53 F.4th at 103. Thus, even though the 2002 permanent injunction arose from a case in which the FTC was asserting § 13(b) claims (which, per *AMG Capital*, could not have given rise to an award of equitable monetary remedies), and even though much of the conduct giving rise to the FTC's request for civil compensatory sanctions in the Contempt Action also underlies the FTC's § 13(b) claims in the Lead Action (which, per *AMG Capital*, may not result in an award of equitable monetary remedies), the FTC remains free to seek monetary remedies in the Contempt Action based on that conduct. *Pukke*, 53 F.4th at 105-06 ("The Supreme Court's holding in *AMG* does indeed render invalid the $120.2 million equitable monetary judgment, at least to the extent that judgment rests on Section 13(b). Vacating that judgment does not help Pukke, however, because he already has a $120.2 million judgment against him for contempt of the telemarketing injunction . . . . [T]he $120.2

million order can be upheld under the contempt judgment, so *AMG* does not in fact change the bottom line."). *See generally McComb*, 336 U.S. at 193 ("We can lay to one side the question whether the Administrator, when suing to restrain violations of the Act, is entitled to a decree of restitution for unpaid wages. We are dealing here with the power of a court to grant the relief that is necessary to effect compliance with its decree. The measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief."); *FTC v. Hewitt*, 2023 WL 3364496, *2, *4, *6-7 (9th Cir. 2023) (characterizing *AMG Capital* as a case addressing "the statutory validity of . . . equitable monetary relief," noting that the scope of available "injunctive relief [is] unaffected by *AMG*," and acknowledging the FTC's argument that, even after *AMG Capital*, there remains "the potential for materially similar relief under alternative remedial pathways").[58]

This leaves the other potential problem with the FTC's methodology that the Court flagged in the March 2022 order—whether an offset is required for the value of the products and services that purchasers received. Having considered the parties' extensive briefing on this topic, the Court once again finds itself persuaded by the FTC's arguments and concludes that the concerns raised in the March 2022 order were unfounded. Unlike the conduct that violated the Merchandise Rule and the Cooling-Off Rule, the conduct that violated the 2002 permanent injunction (*i.e.*, operating a prohibited marking scheme/pyramid scheme and making false income representations) and now gives rise to the request for compensatory contempt sanctions was pervasive and went to the heart of consumers' purchasing decisions. This means that, for purposes of evaluating the resulting injury and harm, such consumers may be treated like the victims who bought the rhinestone in the *Figgie* hypothetical. That is, such consumers "should have the opportunity to get all of their money back. We would not limit their recovery to the difference between what they paid and a fair price for rhinestones." *Figgie*, 994 F.2d at 606.

---

[58]   Similarly, *Liu v. SEC*, 140 S. Ct. 1936 (2020), and *Kokesh v. SEC*, 581 U.S. 455 (2017), are not clearly irreconcilable with *EDebitPay* because they are statutory interpretation cases, not cases about the federal courts' inherent authority to impose compensatory sanctions in civil contempt proceedings.

Courts have repeatedly concluded that when the FTC makes the type of showing in a civil contempt action that it has made here—that is, a clear and convincing showing of a pattern or practice of contumacious conduct—the defendants' revenues should serve as the baseline for the resulting compensatory sanction. *See, e.g.*, *FTC v. BlueHippo Funding, LLC*, 762 F.3d 238, 245 (2nd Cir. 2014) ("[I]n the context of a contempt action arising out of violations of a promise to refrain from misrepresentations concerning material terms or omissions of material terms, we hold that the calculation of the appropriate measure of loss begins with the defendants' gross receipts derived from such contumacious conduct.") (citations and internal quotation marks omitted); *FTC v. Kuykendall*, 371 F.3d 745, 764-65 (10th Cir. 2004) ("When the FTC brings a civil contempt action to compensate injured consumers . . . [and] has shown through clear and convincing evidence that defendants were engaged in a pattern or practice of contemptuous conduct, the district court may use the defendants' gross receipts as a starting point for assessing sanctions. . . . To the extent the large number of consumers affected by the defendants' deceptive trade practices creates a risk of uncertainty, the defendants must bear that risk.") (citations omitted); *McGregor v. Chierico*, 206 F.3d 1378, 1388-89 (11th Cir. 2000) (same). *See also FTC v. Trudeau*, 579 F.3d 754, 771-72 (7th Cir. 2009) ("Consumer loss is a common measure for civil sanctions in contempt proceedings and direct FTC actions. Indeed, some courts, including ours, have held that in certain cases consumer loss is a more appropriate measure than ill-gotten gains. . . . [I]n the abstract, more than one measure could be reasonable; the circumstances of the case will dictate which is most appropriate.") (citations omitted).

The Ninth Circuit has cited these decisions with approval. *EDebitPay*, 695 F.3d at 945. The Court perceives no legal, factual, or equitable reason not to follow them here.[59]

---

[59] To the extent the Contempt Defendants' briefing can be understood as suggesting that the Contempt Defendants' compensation should be used as an alternative baseline for damages, the Court rejects that approach because it would fail to provide adequate compensation to those harmed by their conduct. As noted, Agarwal calculated Defendants' overall compensation to be about $1.7 million, consisting of about $582,000 to Noland, about $404,000 to Lina Noland, about $450,000 to Harris, and about $251,000 to Sacca. (Tr. 798-99.) A compensatory civil sanction of only $1.7 million would be insufficient to remedy the widespread harm here.

Thus, the starting point for the monetary award in the Contempt Action is $7,306,873.14, which represents the revenues from SBH, VOZ Travel, and ticket sales.  The Contempt Defendants, in turn, bear the burden of proving any offsets from that baseline.  *See, e.g.*, *BlueHippo*, 762 F.3d at 245 ("After the court uses the defendants' gross receipts as a baseline for calculating damages, the court must permit the defendants to put forth evidence showing that certain amounts should offset the sanctions assessed against them.") (cleaned up); *Kuykendall*, 371 F.3d at 766-67 ("[W]hen the FTC has proven a pattern or practice of contemptuous conduct at the liability stage by clear and convincing evidence, a presumption arises that allows the district court to use all revenue attributable to the contemptuous conduct—the gross receipts from consumers—as a baseline for assessing sanctions.  The defendants may then put forth evidence showing offset is required because certain consumers received refunds or were satisfied with their purchases.").[60]

The Contempt Defendants have not met that burden here.  The analysis as to VOZ Travel is simple.  No offset is required because VOZ Travel purchasers never received anything.  The Court acknowledges some VOZ Travel purchasers, who were obviously sympathetic to the defense, testified at trial they would rather receive a replacement product than a refund if given the option.  (*See, e.g.*, Tr. 1823, 1954.)  The Court found this testimony hard to believe and unpersuasive.

Although the analysis concerning SBH products is a bit closer, the Contempt Defendants still failed to meet their burden.  The analysis is closer because at least some individuals (like some of the affiliate witnesses at trial) genuinely enjoyed consuming SBH products and believed they were deriving value from doing so.  The Court has thus struggled to determine how, if at all, to account for that value in the offset analysis.

---

[60]    In *FTC v. Commerce Planet, Inc.*, 815 F.3d 593 (9th Cir. 2016), the Ninth Circuit endorsed the same approach for purposes of calculating an equitable monetary award based on a violation of section 13(b) of the FTC Act.  *Id.* at 604 ("If the FTC makes the required threshold showing, the burden then shifts to the defendant to show that the FTC's figures overstate the amount of the defendant's unjust gains.  Any risk of uncertainty at this second step 'fall[s] on the wrongdoer whose illegal conduct created the uncertainty.'") (citation omitted).  Although such awards are, of course, no longer available following *AMG Capital*, nothing in *AMG Capital* casts doubt on the viability of the burden-shifting methodology that the Ninth Circuit approved in *Commerce Planet*.

Ultimately, the outcome turns on the burden of proof—it was the Contempt Defendants' burden to develop some reasoned or quantifiable way to account for that value in the offset calculus and they failed to do so.  Just as the FTC took a risk, with respect to its § 19 claim for damages based on the Rules violations, by seeking to rely on an all-or-nothing methodology to meet its initial burden of proof, the Contempt Defendants took a risk by seeking to meet their burden of proof by advancing the all-or-nothing theory that because some purchasers derived some value from consumption, there can be no monetary award to anyone.  This theory is overbroad and unpersuasive for the reasons stated by the FTC: "In effect, when Defendants sold products or training, they actually sold (1) the product or service itself and (2) the promise that substantial income would follow.  But consumers received the product or service alone, without any realistic chance at financial success. . . . As in *Figgie*, consumers thought they were buying diamonds, but received rhinestones." (Lead Action, Doc. 528 at 186 ¶ 142.)  Courts have refused to provide an offset in analogous circumstances.  *See, e.g.*, *Kuykendall*, 371 F.3d at 766 (refusing to "offset gross receipts by the value of the magazines the consumers received"); *McGregor*, 206 F.3d at 1388-89 (refusing to offset revenues from fraudulent sale of printer toner by value of the printer toner); *Trudeau*, 579 F.3d at 773 n.16 ("[T]he award amount need not be reduced by the 'value' of the books.").

The offset analysis concerning training events is essentially the same.  The affiliates who were called as defense witnesses at trial testified that they enjoyed attending the training events and believed they were deriving some value from attending.  The Court also notes that a market existed for Noland's training and motivational services before he even started SBH.  (*See, e.g.*, Tr. 1503, 2119 [discussing Zija training].)  Thus, the Court accepts that the training events had *some* inherent value.[61]  However, the Contempt Defendants made no effort to disaggregate that value from the overall price that purchasers paid, which

---

[61]     There is no tension between this conclusion and Miles's testimony that affiliates who bought training lost more money in relation to SBH than those who didn't.  (Tr. 309-10.)  That calculation makes no effort to account for the value of the training being received.

was inflated due to their contumacious conduct.  Thus, they failed to meet their burden.

Finally, although the Contempt Defendants did not suggest that such a procedure should be utilized here, the Court notes that some courts have attempted to account for the windfall problem in FTC actions by requiring the FTC to administer a post-judgment process in which affected consumers who wish to obtain a full refund must physically return the offending product.  *Figgie*, 994 F.2d at 606 ("The district court's order creates no windfall for Figgie's customers.  Refunds are available to those buyers 'who can make a valid claim for such redress' . . . .  Those consumers who decide, after advertising which corrects the deceptions by which Figgie sold them the heat detectors, that nevertheless the heat detectors serve their needs, may then make the informed choice to keep their heat detectors instead of returning them for refunds."); *QYK Brands*, 2022 WL 3138761 at *10 ("[G]iven that some customers may have been satisfied with their hand sanitizer orders even if delayed the Court prefers to implement a redress plan requiring customers to make refund requests rather than receiving the funds outright.  The FTC is to hold this sum in an escrow account, and Defendants' customers may seek refunds directly from the FTC.  Funds must be returned to Defendants, less the FTC's costs to administer the refund process, if they remain unclaimed 120 days after consumers are notified.").  Although the Court alluded to the possibility of such a process in the November 2021 order (Lead Action, Doc. 438), the FTC has now persuasively explained why such a process is unnecessary here: "SBH products—perishable goods that are at least three years-old and live 'training' courses—are effectively unreturnable."  (Lead Action, Doc. 528 at 188 ¶ 147.)

VII.   Injunctive Relief

   A.   **Legal Standard**

Section 13(b) of the FTC Act authorizes federal courts to grant permanent injunctive relief in response to FTC Act violations.  *AMG Capital*, 141 S. Ct. at 1348-49.

"[I]njunctive relief is appropriate when there is a cognizable danger of recurrent violation, something more than the mere possibility."  *John Beck Amazing Profits LLC*, 888 F. Supp. 2d at 1012.  *See generally United States v. W.T. Grant Co.*, 345 U.S. 629, 633

(1953) ("[T]he moving party must satisfy the court that relief is needed.  The necessary determination is that there exists some cognizable danger of recurrent violation . . . .").  Relevant factors in evaluating the risk of recurrent violations include "the degree of scienter involved; the isolated or recurrent nature of the infraction; the defendants' recognition of the wrongful nature of his conduct; the extent to which the defendants' professional and personal characteristics might enable or tempt him to commit future violations; and the sincerity of any assurances against future violations."  *United States v. Laerdal Mfg. Corp.*, 73 F.3d 852, 854-55 (9th Cir. 1995) (citation omitted).

If injunctive relief is shown to be appropriate, the scope of the injunction should "be framed broadly enough to prevent respondents from engaging in similarly illegal practices in [the] future."  *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1105 (9th Cir. 2014) (cleaned up).  Courts are "not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past.  And those caught violating the FTC Act must expect some fencing in."  *Id.* (cleaned up).  The relevant factors bearing on the scope of the injunction include "(1) the seriousness and deliberateness of the violation; (2) the ease with which the violative claim may be transferred to other products; and (3) whether the respondent has a history of prior violations."  *Id.* (cleaned up).  "The weight given a particular factor or element will vary.  The more egregious the facts with respect to a particular element, the less important it is that another negative factor be present.  In the final analysis, we look to the circumstances as a whole and not to the presence or absence of any single factor."  *Sears, Roebuck and Co. v. FTC*, 676 F.2d 385, 392 (9th Cir. 1982).

### B.   **Cognizable Danger Of Future Violations**

#### 1.   The Parties' Arguments

The FTC argues that injunctive relief is necessary here because all of the relevant factors show that there is a cognizable danger of future violations.  (Lead Action, Doc. 528 at 202-05; Lead Action, Doc. 532 at 31-33.)  First, as for scienter, the FTC argues that Defendants "knowingly and intentionally lied about consumers' income potential in SBH" despite having "access to information showing affiliates' actual results," also "knowingly

and intentionally lied about their financial status," and then engaged in "particularly egregious" misconduct in relation to VOZ Travel by "promis[ing] travel benefits that they knew did not exist, and continu[ing] to do so even after they lost the ability to provide *any* travel service at all." (*Id.*)  Second, as for whether the violations were isolated or recurrent, the FTC argues they were recurrent because they "permeated" Defendants' operations over a multi-year period.  (*Id.*)  Third, as for the lack of recognition of wrongdoing, the FTC argues that Defendants "have denied doing anything wrong, instead casting blame at nearly anyone around them using conspiracy theories."  (*Id.*)  Fourth, as for Defendants' professional characteristics, the FTC argues that those characteristics favor injunctive relief because "since the TRO, [Defendants] have attempted to continue their SBH and VOZ schemes.  Noland and Harris both participated in Equinox in the 1990s, a company sued by the FTC and found likely to be a pyramid scheme at a preliminary injunction hearing.  Noland, of course, later settled the FTC's claims against him for participating in a second pyramid scheme, Bigsmart.  Sacca and Lina Noland also have lengthy histories in multilevel marketing, enabling them to return to the same misconduct at issue here.  In 2017, Harris was found to have violated a prior California cease and desist order not to make misleading claims or sell securities."  (*Id.*)  The FTC also points to the spoliation-related conduct as illustrative of the need for injunctive relief.

Defendants argue that injunctive relief is unnecessary because there is no cognizable danger of future violations.  (Lead Action, Doc. 529 at 80-81; Lead Action, Doc. 532 at 82-83.)  Defendants contend that the FTC could have avoided this entire controversy by accepting their attorney's offer, at the outset of the investigation, to inspect their books and records and that the FTC instead allowed itself to be manipulated by the complaining witnesses.  (*Id.*)

### 2.   Analysis

The Court has no doubt that injunctive relief is necessary and appropriate here.

Even if the analysis were confined to the four corners of SBH and VOZ Travel, all of the relevant factors would support a finding that Defendants pose a significant risk of

future violations.  The sheer volume of deceptive tactics and statements associated with those businesses provides unmistakable evidence of scienter and shows that the violations were not isolated, but recurrent.  Some of the details associated with VOZ Travel are particularly outrageous.  Also outrageous were some of the wealth-related representations, including the video about the house in Panama that is discussed in more detail elsewhere in this order.  Nor have Defendants displayed any meaningful recognition of wrongdoing. To the contrary, they have denied any fault—Noland flatly denied making any "statement while [he was] running SBH and VOZ Travel that was deceptive or misleading" (Tr. 1623)—while seeking to assign all of the blame for their current predicament to the FTC, or the Court, or the receiver, or the complaining witnesses.  For a time, Defendants even falsely sought to portray the FTC's expert as a Ku Klux Klan sympathizer in an effort to undermine her conclusions.  (Lead Action, Doc. 224 at 19.)

Even the little details of SBH and VOZ Travel suggest that Defendants pose a significant risk of future violations.  Although the Rules violations in this case may not provide an independent pathway to meaningful monetary awards, they are concerning. Defendants ignored—and in some cases, directly violated—important regulatory requirements meant to protect consumers.  Also concerning was the testimony that SBH's then-head of sales believed it was appropriate to make health claims about SBH's products so long as they were passed off as "coincidences."  Similarly concerning was the testimony that two top SBH affiliates used their own health clinic to run a self-interested study intended to establish the health benefits of SBH's products, were eventually indicted on federal fraud charges, and were allowed to remain in their positions post-indictment.  Then there was the testimony about SBH's lack of insurance and use of FDA-banned ingredients, which the receiver discovered after she was appointed.  It is difficult to hear all of those details and conclude that Defendants could be trusted to run a future MLM business in compliance with the law.

More important, the analysis here is not confined to the four corners of SBH and VOZ Travel.  The Contempt Defendants engaged in all of the misconduct described above

while laboring under the shadow of the 2002 permanent injunction.  One might have expected the looming threat of contempt sanctions to nudge the Contempt Defendants to err on the side of caution.  They did not.  Instead, they (among other things) adopted compensation structures for SBH and VOZ Travel that were facially illegal in light of how the 2002 permanent injunction defined the term "prohibited marketing scheme."  Given Defendants' utter disregard for the obligations created by the 2002 permanent injunction, it is difficult to assign any sincerity to their assurances that, if allowed to resume control over SBH and VOZ Travel (and/or operate another MLM in the future), they will implement new processes and oversight structures and rely on new technologies (such as DocuSign or retail tracking apps) to ensure compliance with the law.  Although the Court appreciates the time and effort that went into crafting the proposed new versions of the affiliate agreement and commission plan that Defendants presented at trial (Exs. 1006, 1007), those documents are just words on a page in the absence of any belief that Defendants can be trusted to faithfully abide by and implement them.

Noland's conduct in relation to the 2002 permanent injunction is particularly concerning.  He did not disclose the 2002 permanent injunction to Mehler (SBH's one-time head of sales), may have mischaracterized the scope of the 2002 permanent injunction to Sacca (one of SBH's senior field advisors), and installed Harris as his other main senior field advisor after learning that Harris was subject to various cease-and-desist orders issued by state regulatory agencies regarding compliance failures in earlier businesses.  This is hardly a serious approach toward compliance and amplifies the Court's doubts about whether Defendants could be trusted to follow the law in relation to a future MLM.

Defendants' post-TRO conduct also raises concerns about their willingness and capacity to comply with the law.  After being served with the TRO on January 13, 2020, Defendants did not comply with the requirement that they immediately provide a copy to each affiliate.  Instead, Noland broadcasted a six-minute statement to SBH affiliates that didn't mention the TRO but touted Defendants' honest and integrity.  There is also evidence that Noland fabricated the ECF royalty agreement.  Once again, such conduct

goes to the heart of whether Defendants pose a cognizable danger of future violations.

Finally, the analysis regarding the risk of future violations would not be complete without cross-referencing the acts of dishonesty related to spoliation that are summarized earlier in this order.  Those acts include destroying evidence, violating court orders, giving false under-oath testimony, and taking no accountability for the misconduct after being caught.

C.   **Scope Of Injunctive Relief**

1.   The Parties' Arguments

The scope of the injunctive relief sought by the FTC is expansive.  (Lead Action, Doc. 528 at 205-11; Lead Action, Doc. 532 at 79-82.)  "[T]he FTC seeks to enjoin the Defendants from: (1) participating in multi-level marketing programs, (2) participating in Ponzi or chain referral schemes, (3) making any material misrepresentations or unsubstantiated claims in connection with the sale of good or services, (4) failing to monitor compliance with the injunction and failing to investigate consumer complaints, (5) participating in the sale of 'business coaching' services, (6) violating terms based on the FTC's Merchandise Rule, and (7) violating terms based on the FTC's Cooling-Off Rule." (*Id.*)  The FTC also seeks "compliance reporting and monitoring provisions based on the FTC standard template that courts regularly issue." (*Id.*)

Defendants take issue with the scope of the injunctive relief sought by the FTC. (Lead Action, Doc. 529 at 81-84; Lead Action, Doc. 532 at 82-86.)  As an initial matter, Defendants argue that expansive injunctive relief is unwarranted because "[l]ike any new, expanding organization, SBH made mistakes but substantially complied with the spirit, if not the letter of various rules and regulations." (*Id.*)  Defendants also note that their proposed new versions of the affiliate agreement and commission plan address many of the practices that were challenged at trial, by (for example) allowing refunds, addressing shipping delays, bolstering income disclaimers, and requiring affiliates to DocuSign all of the terms and conditions. (*Id.*)  More broadly, Defendants argue that "[p]ermanent bans on business activities likely violate the First and Fifth Amendments to the United States

Constitution by denying defendants . . . their right to associate, enter into contracts and engage in protected commercial speech." (*Id.*) Defendants add: "Noland contends that he was misled into signing the 2002 Order. Regardless, the mere fact that a person reluctantly entered into a settlement agreement without any admission of wrong-doing made a mistake twenty (20) years ago does not warrant a *permanent ban* that deprives them of their right to commercial speech and make a living as a motivational speaker and sales coach." (*Id.*)

2.   Analysis

The Court agrees, in nearly all respects, with the FTC's arguments regarding the scope of injunctive relief.

As an initial matter, all of the relevant factors support the imposition of expansive relief. First, the violations at issue here were serious and deliberate. Second, it would be quite easy for Defendants to transfer the violative conduct to other products. Shortly before launching SBH, Noland claimed he could "plug any company or product into [his] process, and you can be free financially if you want to be." (Ex. 51 at 19:4-6.) When SBH began to falter, Defendants started another pyramid scheme, VOZ Travel, that featured the same deceptive income claims and commission structure. And since this case began, Defendants have attempted to launch what are in many respects new versions of SBH (Vibra360) and VOZ Travel (TravelNU).[62] Third, although no court has previously ruled that Defendants violated the FTC Act, Defendants have shown a propensity to violate court and administrative orders. Additionally, the Contempt Defendants violated multiple provisions of the 2002 permanent injunction, all Defendants violated certain provisions of the TRO, and the various forms of spoliation-related misconduct discussed in this order violated an array of court orders.

As for the seven specific categories of injunctive relief sought by the FTC, four

---

[62]   Defendants' post-lawsuit efforts to promote "Confidence Tones," which are auditory sounds that purport to relieve aches and pains, lower blood pressure, and induce weight loss, are also concerning. After being appointed to run SBH, the receiver expressed concern over Defendants' inability to substantiate some of the health claims associated with SBH's products. It is unclear whether Defendants are able to substantiate the health claims associated with "Confidence Tones."

seem uncontroversial and obvious.  Those are the requests to enjoin Defendants from "participating in Ponzi or chain referral schemes," "making any material misrepresentations or unsubstantiated claims in connection with the sale of good or services," "violating terms based on the FTC's Merchandise Rule," and "violating terms based on the FTC's Cooling-Off Rule."  These are simply requests to preclude Defendants from engaging in conduct that is already improper and Defendant did not specifically challenge these requests in their trial filings or during trial.

Also uncontroversial are the FTC's fifth requested category of injunctive relief, which is to enjoin Defendants from "failing to monitor compliance with the injunction and failing to investigate consumer complaints," and the FTC's request to impose "compliance reporting and monitoring provisions based on the FTC standard template that courts regularly issue."  These requests would not bar Defendants from engaging in any particular line of work and would simply create procedural tools for monitoring compliance (which are warranted here in light of Defendants' track record of non-compliance with the law). Defendants did not challenge these requests in their trial filings or during trial.[63]  *See generally FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1013, 1018 (N.D. Ind. 2000) ("Courts may order record-keeping and monitoring to ensure compliance with a permanent injunction.").

This leaves the FTC's two remaining categories of requested injunctive relief—to bar Defendants from "participating in multi-level marketing programs" and from "participating in the sale of 'business coaching' services."  The Court agrees with the FTC that the former is legally and factually warranted.  Although "[n]ot all MLM businesses are illegal pyramid schemes," *BurnLounge*, 753 F.3d at 883, Defendants have shown themselves to be utterly incapable of operating an MLM business in a lawful manner. "[C]ourts have routinely imposed some form of fencing in, barring violators from participating in certain lines of business or forms of marketing."  *John Beck Amazing*

---

[63] To the contrary, during closing argument, defense counsel stated that any "injunctive relief" should involve "liberal checkups by the FTC" to ensure compliance with the proposed new affiliate agreement and commission plan.  (Tr. 2192-93.)

*Profits*, 888 F. Supp. 2d at 1011.  In particular, courts have found it appropriate to bar defendants from engaging in the MLM industry based on conduct that is similar to the conduct at issue here.  *Five-Star Auto Club, Inc.*, 97 F. Supp. 2d at 536 ("[B]road injunctive relief against Michael Sullivan, including a prohibition on all multi-level marketing is appropriate.  After participating in numerous multi-level marketing schemes, Mr. Sullivan developed, owned and operated his own multi-level marketing scheme that was deceptive to its core. . . .  Moreover, throughout the pendency of this litigation, Mr. Sullivan has ignored this Court's orders.").  More broadly, courts have found industry-wide bans appropriate where defendants made "systematic . . . misrepresentations" and "continuously ignored and violated both [a statute] and the preliminary injunction," such that "giving Defendants another chance might prove to be unwise."  *Gill*, 265 F.3d at 957.  *See also FTC v. Shkreli*, 581 F. Supp. 3d 579, 639-49 (S.D.N.Y. 2022) (acknowledging that "[b]anning an individual from an entire industry and limiting his future capacity to make a living in that field is a serious remedy and must be done with care and only if equity demands" but concluding that such relief was warranted in light of the defendant's "egregious, deliberate, repetitive, long-running, and ultimately dangerous illegal conduct" and rhetorically asking "[i]f not now, when?").[64]

In contrast, the Court is unwilling to bar Defendants from participating in the sale of business coaching services.  Although the Court reaches this conclusion with some reluctance—the training events played an important role in the propagation of the illegal schemes in this case, and some of the details regarding Defendants' post-TRO businesses are concerning and unsavory—it is no small thing to impose a lifetime ban on an individual's ability to earn a livelihood in a particular industry.  The Court is hopeful that the prohibition against participating in the MLM industry—which, to be clear, extends to

---

[64]    In reaching this conclusion, the Court notes that it gave separate consideration to whether each individual Defendant should be enjoined from participating in an MLM business and concluded that each should be enjoined.  Although Sacca, Harris, and Lina Noland did not engage in the same volume of misconduct as Noland, the bottom line is that each Defendant proved himself or herself incapable of being trusted to operate an MLM business in a lawful manner.

providing business coaching services on behalf of MLMs, regardless of whether those MLMs are owned or operated by Defendants—strikes the correct balance between protecting consumers and allowing Defendants to earn a living.

Finally, there is no merit to Defendants' contention that the injunctive relief being imposed here would run afoul of the First and Fifth Amendments. To support their position that "the Court cannot completely ban a company or an individual from engaging in lawful speech about a commercial business venture" without violating the First Amendment (Doc. 532 at 85), Defendants cite *Bigelow v. Virginia*, 421 U.S. 809 (1975), and *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Counsel*, 425 U.S. 748 (1976). But those cases do not address the scope of prospective injunctive relief that may be imposed against a transgressor who has been shown to have engaged in illegal conduct. *Bigelow*, 421 U.S. at 829 (holding that the First Amendment precluded the imposition of criminal liability against a newspaper editor for publishing an advertisement for abortion, which was legal in Virginia at the time); *Virginia State Board of Pharmacy*, 425 U.S. at 762 (holding that the First Amendment protected a pharmacist's right to advertise prescription drugs). Numerous courts, including the Supreme Court, have recognized that it is permissible, in appropriate circumstances, to impose prospective injunctive relief that bars a party from engaging in conduct that would otherwise be protected by the First Amendment. *See, e.g., Nat. Soc. Of Pro. Eng'rs v. United States*, 435 U.S. 679, 697-98 (1978) ("Having found the Society guilty of a violation of the Sherman Act, the District Court was empowered to fashion appropriate restraints on the Society's future activities both to avoid a recurrence of the violation and to eliminate its consequences. . . . The First Amendment does not 'make it . . . impossible ever to enforce laws against agreements in restraint of trade . . . .' In fashioning a remedy, the District Court may, of course, consider the fact that its injunction may impinge upon rights that would otherwise be constitutionally protected, but those protections do not prevent it from remedying the antitrust violations.") (citations omitted); *FTC v. Shkreli*, 2022 WL 336973, *3 (S.D.N.Y. 2022) ("While First Amendment rights deserve of great protection, Shkreli's violations of the antitrust laws

1    have lost for him the right to speak publicly about the pharmaceutical industry when such

2    speech is uttered to influence the management or business of a Pharmaceutical

3    Company.").

4          As for the Fifth Amendment, Defendants concede that "[a] permanent ban may be

5    possible under the Fifth Amendment" but argue that such a ban would be impermissible

6    "in this case" because "the mere fact that a person reluctantly entered into a settlement

7    agreement without any admission of wrong-doing made a mistake twenty (20) years ago

8    does not warrant a permanent ban that deprives them of their right to commercial speech

9    and make a living as a motivational speaker and sales coach." (Doc. 532 at 85-86.)[65]  But

10   Noland's reluctance to enter into the 2002 permanent injunction is no defense to the

11   voluminous array of subsequent misconduct that now gives rise to the need for enhanced

12   injunctive relief.[66]

13         Accordingly,

14         **IT IS ORDERED** that within 14 days of the issuance of this order, the FTC shall

15   file an updated version of the proposed "Final Order of Permanent Injunction and Monetary

16   Judgment" (Lead Action, Doc. 530-1) that it filed before the bench trial.  The changes shall

17   be limited to conforming the proposed order to the rulings set forth in this order.  The FTC

18   shall also file a redlined version of the new document that reflects the changes from the

19   previous version.

20         …

21         …

22         …

23

---

24   [65]    Defendants also cite *FTC v. Cardiff*, 2021 WL 3616071 (C.D. Cal. 2021), to argue
     against a permanent ban.  But in *Cardiff*, although the Court held that "the Cardiffs'
25   participation in the manufacture and distribution of thinstrip products is not categorically
     banned," it did impose "a ban on the Cardiffs' participation in any direct-to-consumer sales
26   of thinstrip products."  *Id.* at *7.  The Court has followed a similar approach here, by
     barring MLM participation while allowing Defendants to participate in business coaching.

27   [66]    The Court wishes to emphasize that the conclusions reached in this order should not
     be viewed, in any way, as a criticism of defense counsel's performance during the bench
28   trial.  In the Court's estimation, defense counsel (who first appeared during the late stages
     of the case) did an admirable job in a difficult case.

1    **IT IS FURTHER ORDERED** that within 14 days of the issuance of this order, the

2    FTC shall file a notice concerning how it intends to proceed on its stayed claims in the

3    Lead Action against the Corporate Defendants.  (Lead Action, Doc. 473 at 13 ["The

4    Corporate Defendants will continue to be represented by the receiver's counsel of choice,

5    but the FTC's claims against the Corporate Defendants will be stayed (both in this action

6    and the contempt action, CV 00-2260) pending the resolution of the FTC's claims against

7    the Individual Defendants in both actions."].)

8    Dated this 11th day of May, 2023.

9

10

11    _____

12    Dominic W. Lanza
      United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28